ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ROYE ZUR, State Bar No. 273875
*rzur@elkinskalt.com*
LAUREN N. GANS State Bar No. 247542
*lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Reorganized Debtor
S&W Blue Jay Way, LLC

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**

| | |
|---|---|
| In re<br><br>S&W BLUE JAY WAY, LLC,<br><br>Reorganized Debtor. | Case No. 9:23-bk-10672-RC<br><br>Chapter 11<br><br>**DECLARATION OF ROYE ZUR IN SUPPORT OF DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON ITS OBJECTION TO CLAIM NO. 2-1 OF BLUE JAY 180, LLC**<br><br>**<u>Hearing Date and Time:</u>**<br>Date: May 8, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 5D<br>411 W. 4th St.<br>Santa Ana, CA 92701<br><br>Hon. Ronald A. Clifford III |

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

## DECLARATION OF ROYE ZUR

I, Roye Zur, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a partner with Elkins Kalt Weintraub Reuben Gartside LLP, attorneys of record for S&W Blue Jay Way, LLC (the "Debtor" or "Reorganized Debtor"), the reorganized debtor in the above-captioned bankruptcy case (the "Bankruptcy Case"). I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to the matters stated herein.

2. Attached hereto as **Exhibit 1** is a true and correct copy of *Blue Jay 180, LLC's Responses to Debtor's First Set of Interrogatories to Blue Jay 180, LLC*, served on my office on September 19, 2024.

3. Attached hereto as **Exhibit 2** is a true and correct copy of the transcript of the deposition of Ezra Cohen, which I conducted on September 30, 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 10, 2025, at Los Angeles, California.

Roye Zur

# EXHIBIT 1

Daniel A. Lev (CA Bar No. 129622)
daniel.lev@gmlaw.com
Greenspoon Marder LLP
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 954.771.9264

Ronald Richards (CA Bar No. 176246)
ron@ronaldrichards.com
Law Offices of Ronald Richards & Associates, APC
P.O. Box 11480
Beverly Hills, California 90213
Telephone: 310.556.1001
Facsimile: 310.277.3325

Geoffrey Long (CA Bar No. 187429)
glong0607@gmail.com
Law Offices of Geoffrey Long, A.P.C.
1601 N. Sepulveda Boulevard, No. 729
Manhattan Beach, California 90266
Telephone: 310.480.5946
Facsimile: 310.796.5663

Attorneys for Blue Jay 180, LLC

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**

| | |
|---|---|
| In re<br><br>S&W BLUE JAY WAY, LLC,<br><br>Debtor. | Case No. 9:23-bk-10672-RC<br><br>Chapter 11<br><br>**BLUE JAY 180, LLC'S RESPONSES TO DEBTOR'S FIRST SET OF INTERROGATORIES TO BLUE JAY 180, LLC**<br><br>DATE:<br>TIME: [No Hearing Required]<br>PLACE: |

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**PROPOUNDING PARTY:** **S&W Blue Jay Way, LLC, a California limited liability company**

**RESPONDING PARTY:** **Blue Jay 180, LLC, a California limited liability company**

**SET NO.:** **One**

Blue Jay 180, LLC, a California limited liability company ("Blue Jay") hereby submits the following responses to "Debtor's First Set of Interrogatories to Blue Jay 180, LLC" (the "Interrogatories") propounded by the reorganized debtor S&W Blue Jay Way, LLC, a California limited liability company (the "Debtor"), in writing, pursuant to Rule 33 of the Federal Rules of Civil Procedure, as made applicable by Rule 7033 of the Federal Rules of Bankruptcy Procedure.

**GENERAL OBJECTIONS**

Blue Jay generally objects to the Interrogatories on the following grounds, each of which is expressly incorporated by reference in the responses to the individual interrogatories below. All responses set forth herein are subject to and without waiver of any of these General Objections:

1. Blue Jay objects to the Interrogatories to the extent that they seek or require the disclosure of information or documents that are protected from discovery by the attorney-client privilege, the attorney work-product doctrine, the joint prosecution or common interest privilege, the right to privacy, or any other applicable privilege or immunity. Such responses as may hereafter be provided pursuant to the Interrogatories shall not include any information protected by such privileges or doctrines. Inadvertent disclosure of any such information is not intended to be and shall not operate as, a waiver of any applicable privilege, protection or immunity, in whole or in part.

2. By responding to the Interrogatories, Blue Jay does not concede the relevancy, materiality, or admissibility as evidence of any of the information sought.

3. The information provided herein is based on Blue Jay's present knowledge, information, and belief.

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

4. Blue Jay reserves the right to supplement, amend, or correct all or any parts of any response provided herein, which are subject to such additional or different information as discovery or further investigation may disclose. Blue Jay further reserves the right to object to the admissibility of all or any part of the Responses provided herein and any information contained therein.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

State all facts upon which YOU base YOUR statement at page 2 of the OPPOSITION that "Sohaili drafted the alleged usurious Note . . . ."

**RESPONSE TO INTERROGATORY NO. 1:**

The facts supporting Blue Jay's proof of claim were set forth in "Blue Jay 180 LLC's Opposition to Objection to Claim No. 2-1 of Blue Jay, LLC, a California limited liability company; Declaration of Ronald Richards in Support Thereof" (the "Opposition") [Docket No. 106], filed in response to the "Objection to Claim No. 2-1 of Blue Jay, LLC, a California limited liability company; Memorandum of Points and Authorities; Declarations of Kailey Wright and Roye Zur in Support Thereof" (the "Claim Objection"), filed by the Debtor on November 10, 2023 [Docket No. 90]. Specifically, in response to this Interrogatory, the Opposition stated as follows:

"In sum, the Debtor fails to inform the Court that the ultimate manager and principal of the Debtor, Hushmand Sohaili ("Sohaili"), who also is the manager of the managing member of the Debtor, was also legal counsel for Original Lender prior to and at the time of the loan transaction. Sohaili drafted the alleged usurious Note, and this entire transaction was only possible because Sohaili and his law firm - Akin Gump Strauss Hauer & Feld LLC ("Akin Gump") - prepared and had Original Lender sign a conflict waiver pursuant to California Rules of Professional Conduct, rule 1.8.1, which laid out this lending transaction in detail, including the 12% interest rate, but of course did not disclose that years later Sohaili and the Debtor would take the position that the loan was usurious.

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

But for the conflict waiver prepared by Sohaili as Original Lender's lawyer (as signed by Sohaili and Original Lender) the Debtor could not even have entered into this lending transaction with Original Lender as it would have been a violation of California Rules of Professional Conduct, rule 1.8.1. That conflict waiver, prepared by the Debtor's principal and Original Lender's lawyer (Sohaili), states the interest rate will be 12%. Original Lender obviously relied on the conflict waiver from his lawyer that what was stated was lawful. Incredibly, the Debtor and Sohaili now want to argue that the Cohen Loan and Note, as disclosed in the conflict waiver, is usurious.

Nowhere did the conflict waiver state that a 12% annual interest may be usurious under California law unless an exemption applies or what would happen if the loan was found to be usurious. It is galling that the Debtor and its principals are now taking this position. The Debtor and Sohaili's bad faith, along with possible other breaches and violations of duty and rules, is overwhelming.

In light of these facts, there is no evidence of willful intent to collect usurious interest, a necessary element of usury, because Original Lender clearly relied on his attorney/Debtor in putting together a deal and drafting a note that was lawful. As such, the Debtor is estopped from claiming usury under these indisputable facts.

In addition, the Debtor fails to disclose to this Court that, as part of the Cohen Loan and Note, Original Lender was issued a 10% profit participation membership interest in the Debtor. This additional consideration is included in both the conflict waiver and in the Debtor's operating agreement and amended operating agreement. The statutory definitions of "issuer" and "security" that the Debtor relies on to try to limit the scope of California Corporations Code § 25118 explicitly includes membership interests in a limited liability company. Therefore, even if the Debtor's limited interpretation of the usury exemption in Section 25118 was correct, which it is not, the exemption would apply even under that more limited application.

Finally, as explained below, the Debtor's restricted interpretation of the usury exemption in Section 25118 is not supported by the statute's plain language.

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

The Debtor inserts requirements into the exemption that are not contained in the statute, undermining its entire argument. The Debtor seeks to limit the exemption by arguing "loans must be part of a securities issuance." Such a limited application of the exemption is not at all supported by the plain language of the statute, and there clearly is no controlling authority supporting the Debtor's position. The cases the Debtor relies on deal with other corporate/securities laws (mostly securities fraud) and have no application to the usury exemption at issue.

The Debtor's reliance on other sections of the California Corporations Code to define terms in, or which the Debtor argues are somehow related to, Section 25118 equally is unavailing. Those definitions, in fact, include the note and limited liability membership interest involved here."

In addition, Sohaili violated Akin Gump's internal firm policies by not obtaining consent from his former partners to borrow money from a client. Sohaili further had an associate of Akin Gump. Daniel Shlomi, provide the documents directly to Robert Cohen via email and followed up to get the signed documents back. It is undisputed that Sohaili personally prepared, or had an attorney at his direction prepare, the operative loan documents.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 2:**

State all facts upon which YOU base YOUR statement at page 3 of the OPPOSITION that "Original Lender obviously relied on the conflict waiver from his lawyer that what was stated was lawful."

**Greenspoon Marder LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**RESPONSE TO INTERROGATORY NO. 2:**

See Response to Interrogatory No. 1.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 3:**

State all facts upon which YOU base YOUR statement at page 3 of the OPPOSITION that "Original Lender clearly relied on his attorney/Debtor in putting together a deal and drafting a note that was lawful."

**RESPONSE TO INTERROGATORY NO. 3:**

See Response to Interrogatory No. 1.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 4:**

State all facts upon which YOU base YOUR statement at page 6 of the OPPOSITION that "At the time of the Cohen Loan and prior thereto, Sohaili, along with Akin Gump, where Sohaili was a partner, were legal counsel for Robert Cohen the Trustee of Original Lender."

**RESPONSE TO INTERROGATORY NO. 4:**

The facts supporting Blue Jay's proof of claim were set forth in the Opposition filed in response to the Claim Objection. Specifically, in response to this Interrogatory, the Opposition stated as follows:

"In or about February 2013, Robert Cohen as Trustee of the Cohen Family Trust Dated March 13, 1986 as Restated December 31, 2005 (the "Original Lender") agreed to loan the Debtor the maximum principal amount of $2,500,000 (the "Cohen Loan") for purposes of the Debtor's acquisition of the property located at 1627-1633 Blue Jay Way, Los Angeles, California 90069 (the "Property"), together with all rights

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

appurtenant thereto. The Debtor intended to develop a multi-million dollar single family "spec" home at the Property.[1] The Cohen Loan from Original Lender to the Debtor is evidenced by a "Promissory Note Secured By Deed of Trust" (the "Note") dated February 26, 2013.

The Debtor's members and managers at the time of the Cohen Loan were RC/HS, LLC ("RC/HS"), a California limited liability company, and 1966 BJW, LLC, a Delaware limited liability company. See Note, a true and correct copy of which is attached as Exhibit 3 to the Objection, at p. 4 of 4; "Operating Agreement for S&W Blue Jay Way, LLC," at ¶ 2.7, signature page, and Exhibit "A", a true and correct copy of which is attached as Exhibit 1 to the attached Declaration of Ronald Richards (the "Richards Declaration"). RC/HS in turn is managed by Sohaili. See Exhibit 3 to the Objection, at p. 4 of 4; Exhibit 1 to Richards Declaration at signature page. The membership of RC/HS in the Debtor is defined in its Operating Agreement as the "Sohaili Member." See Exhibit 1 to Richards Declaration, at p. 1, introductory paragraph.

The terms of the Cohen Loan, except as amended by Original Lender and the Debtor, are set forth in the Note, but, as noted, Original Lender agreed to loan the Debtor the maximum principal sum of $2,500,000, with an initial advance in the amount of $1,750,000 at the time the Debtor closed on the purchase of the Property, with subsequent advances in the minimum amounts of $100,000. As explained in detail below, the Note was drafted by Sohaili, who, in addition to being one of the managing members of the Debtor, was also Mr. Cohen's lawyer at the time and prior thereto. The interest rate on the Cohen Loan under the Note is 12% per annum, with a contractual default rate of an additional 4% per annum. The original maturity date on the Note and Cohen Loan was the earlier of August 26, 2015, or upon the closing of the Debtor's sale of the Property.

---

[1] As noted, the Objection defines the Property as the real property located at 1627-1633 Blue Jay Way, Los Angeles, California 90069, together with all rights appurtenant thereto.

At the time of the Cohen Loan and prior thereto, Sohaili, along with Akin Gump, where Sohaili was a partner, were legal counsel for Robert Cohen the Trustee of Original Lender. See February 21, 2013, Conflict Waiver from Akin Gump and Sohaili to Robert Cohen, a true and correct copy of which is attached as Exhibit 2 to the Richards Declaration. In connection with the Cohen Loan, Sohaili drafted and had Mr. Cohen, on behalf of Original Lender, sign a conflict waiver which detailed the Cohen Loan lending transaction. See Exhibit 2 to Richards Declaration. That conflict waiver states, "Akin Gump Strauss Hauer and Feld LLP (the "Firm") and I have had a long standing relationship with you as your legal counsel. Since the California Rules of Professional Conduct requires full disclosure and informed written consent in cases of a potential or actual conflict of interest, I have prepared this letter to meet our professional obligations in that regard." Id.

Critically, as it relates to the Objection and the usury defense asserted therein, the conflict waiver states, "The Cohen Loan shall bear interest at the rate of 12%, and shall be paid as follows …." See Exhibit 2 to Richards Declaration, at ¶ 2. Sohaili, Original Lender's legal counsel and the manager of one of the managing members of the Debtor, *in his own conflict waiver* sets forth the 12% interest rate.

The Note, and all payments and obligations thereunder, was secured by a "Deed of Trust with Assignment of Rents (Long Form)" on the Property, dated March 5, 2013, and duly recorded in the Official Records, Recorder's Office, Los Angeles County, California, on March 19, 2013, as Document No. 20130411255 (the "Cohen Blue Jay DOT"). The Cohen Blue Jay DOT was to be junior to a deed of trust granted by the Debtor to East West Bank to secure additional funding in the amount not to exceed $3,000,000 for the Debtor's initial acquisition of the Property.

As additional consideration for the Cohen Loan, Debtor issued to Original Lender a 10% profit participation membership interest in the Debtor (the "Cohen Membership"). That Cohen Membership is discussed as an "anticipated" transaction and issuance in the Debtor's Operating Agreement. See Exhibit 1 to Richards Declaration, at

**Greenspoon Marder LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

¶ 3.2. After the Cohen Loan was consummated, the Debtor's Operating Agreement was amended to reflect the issuance of the Cohen Membership. See "First Amendment to Operating Agreement for S&W Blue Jay Way, LLC," at Exhibit C thereto (Percentage Interest of Members), a true and correct copy of which is attached as Exhibit 3 to the Richards Declaration. The Cohen Membership is also disclosed and acknowledged in the conflict waiver written and sent by Sohaili to Original Lender. See Exhibit 2 to Richards Declaration, at ¶ 6. Mr. Cohen never signed any operating agreement and was given his profit participation by his attorney Sohaili.

On May 1, 2017, Original Lender and the Debtor entered into an "Amendment to Promissory Note Secured by Deed of Trust" (the "Amendment to Note") which, among other things, extended the original majority date of the Cohen Loan and Note to the earlier of May 1, 2019, or the closing of the sale of the Property by the Debtor. However, the Debtor failed to pay all principal, interest, and other amounts due and owing on the Note by May 1, 2019, the extended maturity date set forth in the Amendment to Note."

In addition, the operative conflict waiver states that Robert Cohen was a client and Sohaili was his attorney. Further, Akin Gump has also confirmed that Robert Cohen was the firm's client and Sohaili was acting as his attorney of record.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 5:**

Describe in detail the "good and valuable consideration" referenced at page 7 of the OPPOSITION.

**RESPONSE TO INTERROGATORY NO. 5:**

Blue Jay incorporates by this reference its General Objections set forth above. Furthermore, Blue Jay objects to this Interrogatory on the following grounds:

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

The Interrogatory calls for information protected by the attorney-client privilege and the work product doctrine. The Interrogatory also seeks Blue Jay's protected information, including, without limitation, Blue Jay's proprietary information, and other confidential commercial information or sensitive information. The Interrogatory also seeks information not relevant to the subject matter of this proceeding, not admissible in evidence, and not reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory also is unduly overbroad and burdensome, and fails to identify the requested information with reasonable particularity. The Interrogatory also is vague and ambiguous.

**INTERROGATORY NO. 6:**

State all facts upon which YOU base YOUR statement at page 16 of the OPPOSITION that "Original Lender relied on . . . Sohaili – for the terms of the Note . . . ."

**RESPONSE TO INTERROGATORY NO. 6:**

See Responses to Interrogatories Nos. 1 and 4.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 7:**

State all facts upon which YOU base statement at page 16 of the OPPOSITION that "[t]he Debtor . . . drafted the Note . . . ."

**RESPONSE TO INTERROGATORY NO. 7:**

See Responses to Interrogatories Nos. 1 and 4.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 8:**

State all facts upon which YOU base YOUR statement at page 17 of the OPPOSITION that "Original Lender obviously wanted Sohaili and the Debtor to draft a

promissory note and structure a transaction that was lawful and did not violate California's usury laws."

**RESPONSE TO INTERROGATORY NO. 8:**

See Responses to Interrogatories Nos. 1 and 4.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 9:**

State all facts upon which YOU base YOUR statement at page 17 of the OPPOSITION that "Original Lender would not have waived the conflict had Sohaili disclosed that the 12% was potentially usurious or that the Debtor was preserving that argument and claim."

**RESPONSE TO INTERROGATORY NO. 9:**

See Responses to Interrogatories Nos. 1 and 4.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 10:**

State all facts upon which YOU base YOUR statement at page 19 of the OPPOSITION that "Sohaili clearly had a duty to advise and disclose to his client any such usury issue."

**RESPONSE TO INTERROGATORY NO. 10:**

See Responses to Interrogatories Nos. 1 and 4.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**Greenspoon Marder LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**INTERROGATORY NO. 11:**

If YOU contend that the DEBTOR defrauded the COHEN TRUST or Robert Cohen in connection with the LOAN, state all facts upon which YOU base YOUR contention.

**RESPONSE TO INTERROGATORY NO. 11:**

Blue Jay incorporates by this reference its General Objections set forth above. Furthermore, Blue Jay objects to this Interrogatory on the following grounds:

The Interrogatory calls for information protected by the attorney-client privilege and the work product doctrine. The Interrogatory also seeks information not relevant to the subject matter of this proceeding, not admissible in evidence, and not reasonably calculated to lead to the discovery of admissible evidence, as this is not a proceeding to adjudicated or determine whether the Cohen Trust was defrauded by the Debtor in connection with the Loan. The Interrogatory also is unduly overbroad and burdensome, and fails to identify the requested information with reasonable particularity. The Interrogatory also is vague and ambiguous.

Subject to and without waiving its objections, Blue Jay responds to this Interrogatory as follows:

See Responses to Interrogatories Nos. 1 and 4.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 12:**

State all facts upon which YOU base YOUR contention that the LOAN constitutes a "security" for purposes of California Corporations Code section 25118.

**RESPONSE TO INTERROGATORY NO. 12:**

The facts supporting Blue Jay's proof of claim were set forth in the Opposition filed in response to the Claim Objection. Specifically, in response to this Interrogatory, the Opposition stated as follows:

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

"In addition to the fact that the requisite element of intent is absent and the Debtor is estopped from claiming usury, the Cohen Loan and Note qualify for the usury exemption set forth in California Corporations Code § 25118. The plain language of that statute does not support the Debtor's ill-conceived argument that "[t]o qualify for the section 25118 exemption under the Corporate Securities Law, the loans must be part of a securities issuance." See Objection, at p. 10:8-9. The Debtor's suggested interpretation of Section 25118 simply is not supported by its plain language.

Section 25118 paragraphs (a) and (b) provide that "evidences of indebtedness" and persons and companies who purchase or hold them are exempt from the usury prohibition in two instances: (i) if the company issuing the debt (or a guarantor affiliated with the issuer) has at least $2,000,000 in total assets, according to its most recent financial statements; or (ii) if the debt is at least $300,000 at the time of issuance, or is issued pursuant to a written commitment or line of credit for at least $300,000. Cal. Corp. Code § 25118(a)-(b).

In addition, for either exemption to apply, one of the following must apply: (i) the lender and the issuer or guarantor of the indebtedness (or any of their officers, directors, or controlling persons) must have a preexisting personal or business relationship; or, (ii) the lender and the issuer, or the lender and the guarantor, by virtue of their own business and financial experience or that of their professional advisors, could reasonably be assumed to have the capacity to protect their own interests in connection with the transaction. Cal. Corp. Code § 25118(f).

Section 25118(f) further ensures that the loan is between sophisticated lenders and borrowers or between lenders and borrowers that have a prior personal or professional relationship. This, along with the dollar amount requirements in Section 25118 subsections (a) and (b), ensure that these exempt loans are for larger lending transactions between relatively sophisticated parties or known parties, and avoid use of the exemption by loan sharks and other unscrupulous lenders. See Heritage Networks, LLC v. Stone Canyon Entm't, LLC (In re Heritage Media Group), 2009 WL 1110653, 2009

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Bankr. LEXIS 1212 (Bankr. N.D. Tex. Apr. 21, 2009) (applying Section 25118 to lending transaction evidenced by promissory notes and meeting the dollar amount and preexisting relationship requirements).

Here, the Debtor does not even attempt to contend that Section 25118(f) is not satisfied. Clearly, there was a preexisting business, and a fiduciary relationship as evidenced by the conflict waiver which states, “Akin Gump Strauss Hauer and Feld LLP (the "Firm") and [Sohaili] have had a long standing relationship with you as your legal counsel.” See Exhibit 2 to Richards Declaration. The Debtor’s omission of this element likely is because it does not fit into its flawed interpretation of Section 25118.

Finally, Section 25118(c), a savings clause, provides, “[a]ny evidence of indebtedness described in subdivision (a) or (b), and the purchasers or holders thereof, shall be entitled to the benefits of the usury exemption contained in this section regardless of whether, at any time after the evidence of indebtedness or guaranty upon which the exemption is based is first issued or entered into, the evidence of indebtedness or guaranty is determined by a court of competent jurisdiction not to be a ‘security.’” Cal. Corp. Code § 25118(c). This subsection alone invalidates the Debtor’s argument that the Section 25118 exemption only applies when a loan is made in connection with the issuance of “securities,” as that term is defined in the California Corporate Securities Law of 1968 (Cal. Corp. Code §§ 2500, *et seq.)*.

As just noted, this likely is why the Debtor omitted this subsection when it quoted Section 25118 in the Objection and did not discuss this subsection in its Objection, which again exemplifies the Debtor’s violation of its duty of candor to this Court. Although, as discussed below, here the profit participation membership interest granted Original Lender by the Debtor also qualifies as a “security,” as defined in the Corporate Securities Law of 1968.

Applying the Debtor’s plain language analysis of Section 25118 to the facts here, it is clear that the Cohen Loan and Note are exempt. The Cohen Loan is evidenced by a Note which is at least $300,000 at the time of issuance. Cal. Corp. Code §

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

25118(b). Moreover, along with that evidence of indebtedness, and as additional consideration for the Cohen Loan, the Debtor issued to Original Lender a 10% membership profit participation in the Debtor that is reflected in the Debtor's Amended Operating Agreement and the conflict waiver. That membership interest is an additional "issued" evidence of indebtedness or "security," if one were to adopt the Debtor's narrow unsupported reading of Section 25118 and disregard Section 25118(c). Finally, to reiterate, Original Lender and the principal/managing member of the Debtor had a "long standing" preexisting professional relationship.

Not that the Debtor can deny the issuance of the profit participation membership issued to Original Lender, the Objection even admits it - "[t]he Cohen Trust is a 10% member in the Debtor …." See Objection, at p. 5:1. Maybe, giving the benefit of the doubt to Sohaili and the Debtor, perhaps the reason Original Lender was granted membership in connection with the Cohen Loan was so there would be no doubt whatsoever that this transaction would be exempt from usury. Either way, Original Lender clearly was relying on its lawyer (Sohaili), who is also the manager of the managing member of the Debtor, to structure a transaction that would be lawful and not usurious. Undoubtedly, the Debtor cannot agree to get its own financing from its member and managing member's client and then claim usury.

As demonstrated, the Debtor employs a strained reading of Section 25118 and applies case law dealing with other securities acts and regulations to arrive at its errant conclusion. The Objection, for instance, argues, "section 25118 only provides an exemption from usury protections for a very narrow and limited class of borrowers - i.e., non-natural borrowers who issue certain securities transactions (and not "whole" secured real estate loans in excess of $300,000 negotiated on a one-on- one basis between private entities) …." See Objection, at pp. 13:27-14:2. This strained interpretation of Section 25118 is not supported by the plain language of the statute nor by the other Corporations Code sections defining the terms that the Debtor focuses on.

In support of this flawed argument, the Objection argues, "[t]he usurious

real estate loan made by the Cohen Trust to the Debtor is not exempt under section 25118(b) because the Debtor is not and never has been an "issuer" and the Disputed Junior Loan is not a security." See Objection, at p. 17:13-15. The Objection is just plain wrong on this point, and there is no such requirement in the text of Section 25118. Moreover, even applying the Debtor's flawed reasoning, it is wrong on the facts.

Again, following the Debtor's flawed reasoning, the starting point is the definition of "issuer" as "any person who issues or proposes to issue any security…." Cal. Corp. Code § 25010. As discussed in detail below, "security" is defined broadly and specifically to include notes, evidence of indebtedness, and limited liability company membership. Corporations Code § 25010(d) limits the definition of "issuer" in connection with a limited liability company to not include individual liability for the trustees and members of the limited liability company. "In the case of an unincorporated association which provides by its articles for limited liability of any or all of its members, or in the case of a trust, committee, or other legal entity, *the trustees or members thereof shall not be individually liable as issuers of any security issued by the association, trust, committee, or other legal entity*." Cal. Corp. Code § 25010(d) (emphasis added).

This limitation shields limited liability company trustees and members from personal liability under the Corporate Securities Law of 1968. This narrow exclusion from personal liability for members and trustees of limited liability companies, however, shows that otherwise limited liability companies and their membership interests fall within the definition of "issuer" in Section 25010.

As such, limited liability companies fall within the definition of "issuer" and Section 25118 applies to limited liability companies and is not limited to registered or institutional issuers of securities, as argued by the Debtor. That is why the plain language of the Section 25118 exemption refers to "evidences of indebtedness" and "issuer." Cal. Corp. Code §§ 25118(a), (b). The plain language of the statute and of the definition of "issuer" in Section 25010(d), do not support the Debtor's argument that "section 25118 does not apply to simple privately negotiated one-on-one secured real

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

estate loans." See Objection, at p. 10:7-8.

The Objection then argues, "Section 25010 of the Corporations Code provides (with certain exceptions not relevant here) that "[i]ssuer means any person who *issues or proposes to issue any security* ...." See Objection, at p. 11:21-26 (emphasis in Objection) (quoting Cal. Corp. Code § 25010). As discussed below, the Debtor uses this language to then argue that a limited liability company membership interest is not a "security," but even that argument is not supported by the statutory language or case authority. Had the Objection continued with this analysis rather than drawn an unreasoned conclusion, it would have reached the conclusion that the Cohen Loan and Note here absolutely involved the issuance of a "security."

Contrary to the Debtor's argument, Corporations Code § 25019, defines "security" as, *inter alia,* "any note;… membership in an incorporated or unincorporated association; … evidence of indebtedness; … interest in a limited liability company and any class or series of those interests (including any fractional or other interest in that interest). Cal. Corp. Code § 25019). Therefore, the membership interest that Original Lender was issued in connection with the Cohen Loan is a "security," as is the Note.

Even if issuance of a security was a requirement for the Section 25118 usury exemption, none of the cases cited by the Debtor hold that the issuance of a membership interest in a limited liability company is not a "security" for purposes of Section 25118. Moreover, the Corporations Code sections defining both "issuer" and "security" include the issuance of a limited liability company membership within the plain language of their definitions.

To next try to take this transaction out of the Section 25118 usury exemption, the Debtor argues "'evidence of indebtedness' and 'issuer' are used in the companion statutes (exempting certain issuers from usury protections) to section 25118, namely - section 25116 (usury exemption for issuer securities where the issuers have obtained a permit) and section 25117 (usury exemption for listed or rated securities that are evidences of indebtedness) of the Corporate Securities Law." See Objection, at p.

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

12:12-16. Again, this argument actually supports the conclusion that Section 25118 is not limited to "issuers" that are permitted, listed or rated, which the plain language of Section 25118 does not require.

If Section 25118 was limited to institutional and permitted, listed, or rated issuers of "bonds, debentures, and other investment-type contracts" (Objection, at p. 10:11), it would be duplicative of these other usury exemptions which specifically apply to permitted issuers of securities and issuers of rated or listed securities. Certainly, the California Legislature did not enact Section 25118 to be duplicative of the usury exemptions in California Corporations Code §§ 25116 and 25117.

The Debtor also relies on two inapplicable cases in an attempt to support its argument that notwithstanding that the definition of "security" in California Corporations Code § 25019, is expansive and includes, *inter alia,* any note, interest in a limited liability company, membership in an incorporated or unincorporated association, or investment contract, that the statutory definition somehow does not mean what it says. See Objection, at p. 17:15-17.

The first case cited by the Debtor is People v. Black, 8 Cal. App. 5th 889 (2017). That case, however, has nothing to do with usury exemptions, and instead involved prosecution under California Corporations Code §§ 25401 and 25540(b), for false statements in the offer or sale of a security. The Black Court held, "[w]hether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.'" Id., at 899 (citing People v. Figueroa, 41 Cal. 3d 714, 736 (1986) (quoting People v. Syde, 37 Cal. 2d 765, 768 (1951)). Of course, the "statute[s]" the Black Court was referring to are Corporations Code §§ 25401 and 25540. Hence, the Court looked to the regulatory purpose of Sections 25401 and 25540, which is to criminalize the sale or purchase of securities which contain false or misleading

statements or omit material facts. Black, 8 Cal. App. 5th at 900-901.[2]

Likewise, Great Western Bank & Trust v. Kotz, 532 F.2d 1252 (9th Cir. 1976), also relied on by the Debtor, has no application to usury and does not even involve the California Corporations Code. That case involved an attempt by the lender on an unsecured note to recover against an officer of the borrower by arguing that he was a controlling person and liable for alleged material misrepresentations made in the course of the transaction. The bank argued that the note was a security within the meaning of the Securities Acts of 1933 and 1934 and sought relief under Section 17(a) of the Securities Act of 1933. Id., at 1253.

The Court held, "the promissory note given by Artko bears no economic resemblance to the 'securities' defined by the 1933 and 1934 acts. … [¶] A note given to a bank in the course of a commercial financing transaction is not generally a security within the meaning of the federal securities acts. To expand the reach of those acts to ordinary commercial loan transactions would distort congressional purpose as we interpret it." Id., at 1260. The Kotz Court's analysis and conclusion was based on the definitions of "security" in the Securities Acts of 1933 and 1934 and the Congressional purposes of those acts. Id., at 1255-56.

"The primary purpose of the Securities Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors." Id., at 1256 (quoting United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, 95 S. Ct. 2051, 44 L. Ed. 2d 621 (1975)). This has nothing to do with usury or the definition of "security"

---

[2] The cases and the risk capital test and federal Howey test discussed in the Debtor's footnote 1 on page 18 of the Objection also have nothing to do with usury exemptions. Those tests, as explained in Black, relate to whether a note is a security for purposes of securities fraud statutes. Those tests have no application to the usury issue and exemption. This is yet another misleading argument by the Debtor.

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**Greenspoon Marder LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

in the context of California's statutory usury exemptions, if that term is even relevant to Section 25118, which Blue Jay contends it is not.

In light of the foregoing discussion of the plain text of Section 25118 and the inapplicability of the Debtor's arguments, the Section 25118 usury exemption applies here. Section 25118 does not require that the loan be part of an institutional securities issuance in order to qualify for the exemption, as argued by the Debtor. Moreover, even if it did, here a "security," the limited liability profit participation membership, was issued in connection with the Cohen Loan.

Moreover, this transaction must also be viewed in light of the well-settled rule that, "if a contract is subject to two constructions, one of which will render it usurious and therefore unlawful and one which will render it lawful, the courts, in the absence of other evidence requiring the contract to be construed as usurious, will give it such construction as will render it lawful." Coley v. Wolcott, 103 Cal. App. 140, 146 (1930); see also, Bintliff, supra, 36 Cal. App. 3d at 423; Lindsey, supra, 132 Cal. App. 2d at 750-751.

As to the Debtor's legislative history discussion, it is not necessary in light of the plain text of the statutes and also is not persuasive. The legislative history cited by the Debtor in fact supports the argument that Section 25118 was intended to have broader application than the usury exemptions in California Corporations *Code §* 25116, which is limited to permitted issuers of securities.

The Debtor again employs its misleading tactics by arguing, "the Sponsor's Memo made clear that the new exemption would apply to loans *not* secured by real property." See Objection, at p. 15:8-9. The Objection then goes on to quote from that Sponsor's Memo as follows:

> Existing law limits [the application of usury exemptions] - *especially for loans not secured by real property* - primarily to lenders who are engaged in the business of lending and subject to government regulation, or who lend to borrowers

> that are publicly held, can issue rated debt, or have accumulated substantial shareholders' equity. Many start-up companies - for example, many of the high-tech and biotech companies located in Silicon Valley or Southern California - are unable to qualify for credit from such traditional lenders, and look to loans made by venture capital providers whose loans are not exempt from the usury law.

See Objection, at p. 15:10-14 (emphasis in Objection only) (quoting Aug. 21, 1998 Memorandum from Business Law Section, Legislative Chair, to Director of Research, State Bar of California (the "Sponsor's Memo").

The Sponsor's Memo does not indicate that Section 25118 only would apply to loans not secured by real property. Rather, the Sponsor's Memo simply explains and points to the fact that existing usury exemptions at the time, especially for loans not secured by real property, were limited to lenders who are in the lending business and subject to government regulation. Presumably, the Sponsor's Memo made the comment "especially for loans not secured by real property," because such real estate secured loans are often subject to the real estate broker usury exemption. This Sponsor's Memo quote supports the conclusion that Section 25118 was intended to have broad application since "[e]xisting law limit[ed] [the application of usury exemptions] … primarily to lenders who are engaged in the business of lending and subject to government regulation, or who lend to borrowers that are publicly held, can issue rated debt, or have accumulated substantial shareholders' equity." Section 25118 was proposed and passed so the usury exemption would have broader application.

The legislative history of Section 25118 certainly does not override the plain text of the statute and does not support the Debtor's self-serving restrictive interpretation of Section 25118 that it "applies solely to a narrow class of lenders and issuers participating in securities transactions." See Objection, at p. 16:13-15."

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 13:**

State all facts upon which YOU base YOUR contention in the STATE COURT COMPLAINT that the LOAN is exempt from California's usury laws.

**RESPONSE TO INTERROGATORY NO. 13:**

The facts supporting Blue Jay's proof of claim were set forth in the Opposition filed in response to the Claim Objection. Specifically, in response to this Interrogatory, the Opposition stated as follows:

"**A. There Was No Intent to Enter into a Usurious Loan**

As just mentioned, a transaction is rebuttably presumed not to be usurious. Garrick v. J. M. P., Inc., 150 Cal. App. 2d 232, 236 (1957); Janisse v. Winston Inv. Co., 154 Cal. App. 2d 580, 586 (1957). "The presumptions of law are in favor of legality; and therefore if the transaction in question is open to two constructions, one making for legality, the other for illegality, then in the absence of evidence pointing clearly to usury, it is the duty of the court to adopt the construction in favor of lawfulness." Lindsey v. Campbell, 132 Cal. App. 2d 746, 750 (1955).

The borrower bears the burden of proving the essential elements of a usurious transaction. Terry Trading Corp. v. Barsky, 210 Cal. 428, 433 (1930); Sandell, Inc. v. Bailey, 212 Cal. App. 2d 920, 931-932 (1963). As admitted in the Objection, willful intent is a necessary element of usury. "The essential elements of a claim of usury are: '(1) The transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction.'" WRI Opportunity Loans II, LLC v. Cooper, 154 Cal. App. 4th 525, 533 (2007) (quoting Ghirardo v. Antonioli, 8 Cal. 4th 791, 798 (1994) (citing 4 Miller & Starr, Cal. Real Estate Law (2d ed. 1989) § 10:2, p. 650).

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Here, Original Lender relied on the Debtor, the Debtor's principal, and Original Lender's legal counsel - Sohaili - for the terms of the Note and the legality thereof. The Debtor and Sohaili drafted the Note that provides for the 12% interest. The 12% interest was also disclosed by Sohaili and Akin Gump in obtaining Original Lender's "informed" waiver of the conflict of interest resulting from Sohaili entering into a business transaction with his client. It would shock the conscious to now find that the Note is usurious and all interest forfeited because the Debtor and Sohaili provided for a usurious interest rate for the Cohen Loan and Note and disclosed a usurious rate in their conflict waiver but did not explain the legal consequences of usury. Fortunately, not only does reason and equity preclude the Debtor's usury defense under these facts, there is a case on point in California.

In Lakeview Meadows Ranch v. Bintliff, 36 Cal. App. 3d 418 (1973), the principal of the borrower was an attorney who was selected to draft the operative document because of his knowledge of California law. Id., at 421. When the borrower defaulted, the lender commenced proceedings for a trustee foreclosure sale. The borrower filed suit requesting, among other things, a preliminary injunction against the sale. The Court held that the lender lacked an intent to charge an unlawful usurious amount and the borrower, who did not suggest the agreement was unlawful, believed that what he drafted conformed to the law and did not suggest to the lender that it did. "It seems reasonable to infer that [lender] wanted Zerner to draft an agreement which was entirely lawful and did not violate the usury laws in any way and that Zerner was well aware of this fact." Id., at 424.

Here, as in Bintliff, Original Lender obviously wanted Sohaili and the Debtor to draft a promissory note and structure a transaction that was lawful and did not violate California's usury laws. In obtaining Original Lender's "informed" consent to the transaction and waiver of an actual conflict of interest between a lawyer and his client, Sohaili even put the 12% interest in his conflict waiver which he had Original Lender sign. Clearly, there was no willful intent on the part of Original Lender to enter into a usurious

transaction under these facts. Original Lender would not have waived the conflict had Sohaili disclosed that the 12% was potentially usurious or that the Debtor was preserving that argument and claim.

**B. The Debtor Is Estopped from Claiming Usury**

Estoppel is a defense to a usury claim. Bintliff*, supra,* 36 Cal. App. 3d at 424; Janisse, supra*,* 154 Cal. App. 2d at 587.

In Bintliff*,* in addition to finding that the lender lacked the intent to collect usurious interest, the Court also held that the plaintiff/borrower was estopped from claiming usury:

> The evidence and the allegations of the verified complaint show that plaintiff's agent, Mr. Zerner, agreed, in his capacity as a California lawyer, to draft the modification agreement to provide for 9 percent interest on the entire unpaid principal balance of $ 1,020,000. Zerner knew that defendant Bintliff wanted a legal and valid agreement, and *he certainly had a duty to advise Bintliff if he believed that such agreement was usurious under California law*. The record shows that *Zerner at no time suggested that the agreement was usurious. When he drafted the agreement, he presumably believed that it provided for a legal rate of interest, and he allowed Bintliff to rely upon his judgment in this regard*. It follows that the trial court properly found that Zerner's conduct created an estoppel against plaintiff to claim that the modification agreement was usurious.

Bintliff*,* 36 Cal. App. 3d at 424-425 (emphasis added).

In re Arce Riverside, LLC, 538 B.R. 563, 573 (Bankr. N.D. Cal. 2015) is also instructive. In Arce Riverside, a chapter 11 claimant, who was a licensed real estate broker, was estopped from using the real estate broker usury exemption codified at

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

California Civil Code § 1916.1, because it negotiated the terms of the loan for itself and not for a third party. In arriving at this conclusion and rejecting the claimant's estoppel arguments against the borrower/debtor, the court reviewed usury cases that applied estoppel to usury claims by borrowers. "But a common theme in those cases is the questionable conduct of the borrower in connection with the original transaction who later makes the usury claim." Id., at 573 (citing Buck v. Dahlgren, 23 Cal. App. 3d 779, 787 (1972); discussing Bintliff, supra, 36 Cal. App. 3d 418).

The facts here also are distinguishable from cases holding that a lender cannot argue estoppel against a borrower who knowingly enters into a usurious transaction. "In order to effectuate the statutory policy of protection, the courts have also regularly held a borrower and a lender are not *in pari delicto* in a usurious transaction and the lender may not assert an estoppel against the borrower simply because the borrower took the initiative in seeking the loan, knew of the usurious nature of the transaction, and paid usurious interest without protest." Buck v. Dahlgren, 23 Cal. App. 3d 779, 787 (1972) (citations omitted); Stock v. Meek, 35 Cal. 2d 809, 817 (1950). Here, however, the Debtor and its principal Sohaili did much, much more. The facts here clearly fall within the "common theme" of "questionable conduct," or worse blatant breaches of fiduciary duties, referred to by the Arce Riverside court.

In this case, Sohaili, a principal of the Debtor and counsel for Original Lender, drafted the Note. Sohaili disclosed his professional conflict of interest to Original Lender in the conflict waiver and obtained Original Lender's written waiver of the conflict pursuant to California Rules of Professional Conduct, Rule 1.8.1. Although the conflict waiver included the 12% interest rate, Sohaili never disclosed or advised Original Lender that the 12% interest rate is or could be usurious. Sohaili clearly had a duty to advise and disclose to his client any such usury issue. Clearly, Original Lender relied on his legal counsel's conflict waiver and that his legal counsel would not borrow money and later claim usury. Therefore, the Debtor is estopped from now claiming that the rate is usurious. The Debtor and managing member Sohaili's position in this regard truly shocks

the conscience and is likely to result in an amendment to the State Court Complaint or the filing of another state court complaint."

See Response to Interrogatory No. 12.

Blue Jay reserves the right to amend this Response to include information that may come to light during the course of discovery as discovery continues, particularly as it relates to procuring documents from Sohaili's former law firm, Akin Gump.

**INTERROGATORY NO. 14:**

For each of the facts set forth in YOUR responses to the above interrogatories, IDENTIFY each person who has knowledge of such facts.

**RESPONSE TO INTERROGATORY NO. 14:**

PMK of Akin Gump Strauss Hauer & Feld LLP

Hushmand Sohaili

Daniel Shlomi

Richard Weintraub

Ezra Cohen (listed precautionarily due to the "Subpoena To Testify At A Deposition In A Bankruptcy Case Or Adversary Proceeding" served by the Debtor)

Ernest Cohen (listed precautionarily due to the "Subpoena To Testify At A Deposition In A Bankruptcy Case Or Adversary Proceeding" served by the Debtor)

Beverly Cohen (listed precautionarily due to the "Subpoena To Testify At A Deposition In A Bankruptcy Case Or Adversary Proceeding" served by the Debtor)

Eleda Cohen (listed precautionarily due to the "Subpoena To Testify At A Deposition In A Bankruptcy Case Or Adversary Proceeding" served by the Debtor)

*[Remainder of page intentionally left blank]*

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Michelle Lerman (listed precautionarily due to the "Subpoena To Testify At A Deposition In A Bankruptcy Case Or Adversary Proceeding" served by the Debtor)

Andrew Kirsh (listed precautionarily due to the "Subpoena To Testify At A Deposition In A Bankruptcy Case Or Adversary Proceeding" served by the Debtor)

DATED: September 19, 2024 **GREENSPOON MARDER LLP**

By: /s/ *Daniel A. Lev*
Daniel A. Lev
Attorneys for Blue Jay 180, LLC

DATED: September 19, 2024 **LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, APC**

By: /s *Ronald Richards*
Ronald Richards
Attorneys for Blue Jay 180, LLC

DATED: September 19, 2024 **LAW OFFICES OF GEOFFREY LONG, A.P.C.**

By: /s/ *Geoffrey Long*
Geofrey Long
Attorneys for Blue Jay 180, LLC

**Greenspoon Marder LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**VERIFICATION**

I, Ronald Richards, Manager of Blue Jay 180, LLC, a California limited liability company, believe, based on reasonable inquiry, that the foregoing responses to "Debtor's First Set of Interrogatories to Blue Jay 180, LLC" propounded by the reorganized debtor S&W Blue Jay Way, LLC, a California limited liability company (the "Debtor"), are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of September, 2024.

Ronald Richards
Ronald Richards, Manager

# EXHIBIT 2

# Transcript of Ezra Cohen

**Date:** September 30, 2024
**Case:** S&W Blue Jay Way, LLC, In Re:

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

In re :

S&W BLUE JAY WAY, LLC, :

Reorganized Debtor. : Case No. 9:23-bk-10672-RC

x

DEPOSITION OF EZRA COHEN

Los Angeles, California

Monday, September 30, 2024

Stenographically Reported by:
JUSTYNE N. JOHNSON
RPR, CSR. No. 14301

Job No. 553676

Pages 1-141

The Deposition of EZRA COHEN, was taken on behalf of Reorganized Debtor, at 10345 West Olympic Boulevard, Los Angeles, California, beginning at 10:05 a.m., Pacific time on September 30, 2024, before JUSTYNE JOHNSON, RPR, Certified Shorthand Reporter No. 14301.

APPEARANCES:

FOR S&W BLUE JAY WAY, LLC
ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
BY: ROYE ZUR, ESQ.
Attorney at Law
10345 West Olympic Boulevard
Los Angeles, California 90064

FOR BLUE JAY 180, LLC
GREENSPOON MARDER LLP
BY: DANIEL A. LEV, ESQ.
Attorney at Law
333 South Grand Avenue
Suite 3400
Los Angeles, California 990071-1406

LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, APC
BY: RONALD RICHARDS, ESQ.
Attorney at Law
P.O Box 11480
Beverly Hills, California 90213

Also Present:
Hushnand Sohaili
Baron Cohen

INDEX

WITNESS EXAMINATION
EZRA COHEN
BY MR. ZUR............................8
BY MR. RICHARDS....................127
BY ZUR.............................139

EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Eddie Ezra Cohen's responses and objections to document requests in connection with subpoena to testify at a deposition in a bankruptcy case (7 pages) | 13 |
| EXHIBIT 2 | Declaration of Eddie Ezra Cohen in support of Plaintiffs' opposition to Defendant's motion for partial summary judgment" (4 pages) | 20 |
| EXHIBIT 3 | Document dated February 6, 2014, Bates-stamped SWBJ000369 through SWBJ000371 (3 pages) | 27 |
| EXHIBIT 4 | Document from Astro Escrow, Inc., dated December 29, 2015 (1 page) | 32 |
| EXHIBIT 5 | Email thread with subject "1633 Blue Jay Way, West Hollywood" (3 pages) | 46 |
| EXHIBIT 6 | Email with subject "Blue Jay Way Indemnity Agreement" (1 page) | 49 |
| EXHIBIT 7 | Email thread with subject "Blue Jay Way - Note, Indemnity and Conflict Waiver" (2 pages) | 57 |
| EXHIBIT 8 | Letter from Hushmand Sohaili to Robert Cohen, dated February 21, 2013 (5 pages) | 61 |
| EXHIBIT 9 | "Promissory Note Secured by Deed of Trust," dated February 26, 2013 (4 pages) | 61 |

EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| EXHIBIT 10 | Letter from Hushmand Sohaili to Ezra Cohen and Robert Cohen, dated April 17, 2018 (4 pages) | 67 |
| EXHIBIT 11 | Email from Hushmand Sohaili to Robert Cohen and Richard Weintraub, dated February 8, 2014 (1 page) | 87 |
| EXHIBIT 12 | Email from Daniel Shlomi with subject "Blue Jay Way Indemnity Agreement," dated February 22, 2013 (1 page) | 99 |
| EXHIBIT 13 | Email from Daniel Shlomi with subject "Blue Jay Way Conflict Waiver," dated February 22, 2013 (1 page) | 105 |
| EXHIBIT 14 | Email thread with subject "Blue Jay Way" (2 pages) | 108 |
| EXHIBIT 15 | Email from Daniel Shlomi with subject "Blue Jay Way," dated February 25, 2013 (1 page) | 109 |
| EXHIBIT 16 | Email thread with subject "Robert's Wire," dated February 25, 2013 (2 pages) | 114 |
| EXHIBIT 17 | Declaration of Hushmand Sohaili in support of Debtor's reply to Claim No. 2-1 of Blue Jay 190, LLC, a California limited liability company (7 pages) | 120 |

Los Angeles, California
September 30, 2024 | 10:05 a.m.

THE STENOGRAPHER: Good morning. We are going on the record at 10:05 a.m. on Monday, September 30, 2024, in the matter of re: S&W Blue Jay Way, LLC, Case Number 9:23-bk-10672-RC. Today's deposition is taking place at 10345 West Olympic Boulevard, Los Angeles, California.

My name is Justyne Johnson. I am a California certified shorthand reporter representing the firm Planet Depos, and my certification number is 14301. The deponent is Ezra Cohen.

Counsel, can you please introduce yourselves.

MR. ZUR: Good morning. This is Roye Zur of Elkins Kalt on behalf of S&W Blue Jay Way, LLC.

MR. JANNOL: Henry N. Jannol for the witness, Ezra Cohen.

MR. LEV: And Daniel Lev from Greenspoon Marder LLP on behalf of Blue Jay 180, LLC, and specially appearing for Ronald Richards, who's in trial today on behalf of the Cohen Trust.

THE STENOGRAPHER: Mr. Cohen, can you raise your right hand, please?

///

///

EZRA COHEN,

having first been sworn by the Certified Shorthand Reporter, was examined and testified as follows:

THE WITNESS: I do.

EXAMINATION

BY MR. ZUR:

Q Good morning, Mr. Cohen.

A Good morning.

Q As mentioned, my name is Roye Zur. I represent S&W Blue Jay Way.

A Can you speak up a bit, please?

Q Oh, I'm sorry.

A Thank you.

Q My name is Roye Zur. I represent S&W Blue Jay Way --

A Mm-hmm.

Q -- which is the debtor in the bankruptcy case pending in the Central District of California. Thank you for being here. We appreciate it.

Have you ever been deposed before?

A Yes.

Q And so you understand that since you're under oath, you're sworn to tell truth, and the effect of that oath is the same as if you were testifying in court?

A Yes.
Q Is there any reason you can't testify today?
A No.
Q You understand that we're going to need audible answers, no gestures, no shaking of the head or nodding; correct?
A Correct.
Q And if you need any clarification, if I'm not speaking loudly enough or speaking too quickly, just please interrupt me and let me know. Also, if you need a break, please let me know. Happy to do that.
Of course, your attorney may object on certain grounds. And he may instruct you not to answer. If he does, we can go off the record and discuss. But other than that, if he interposes any objections other than those in which he instructs you not to answer, you have to answer. You understand that?
A I do.
Q Thank you.
What's your current profession?
A I'm in the real estate business, mostly management.
Q And is that management of commercial properties, residential properties or both?
A One residential property that I own but mostly

commercial properties.
Q And the commercial properties are owned by?
A A series of different trusts set up by my parents for the benefit of the children and grandchildren.
Q And are you the only manager of those properties?
A Yes.
Q Are you a practicing attorney?
A I am licensed, but I haven't taken a client in 30 years. Maybe even longer.
Q When you say you haven't taken a client, do you mean you haven't taken on a new client in that long or you haven't practiced as an attorney?
A I haven't practiced as an attorney for -- I've only practiced as an attorney with relationship to family matters I've handled.
Q Okay. And when you say "family matters," is that in reference to the properties that you just mentioned or other things as well?
A I think ex- -- I can only think of, right now, exclusively the property matters -- properties that I manage.
Q Okay. Were you ever employed in the last 10 years by a law firm?
A No.
Q Okay. Did you sear- --

A And that might not be -- just going back to my earlier answer, I have represented A.C.C. Company and Burton Way Hotels in connection with matters related to the hotel and the fee but never as their sole lawyer. It's always been another lawyer.
Q Is it fair to say that you represented those entities as outside in-house counsel?
A I don't know what that term refers to. I think of it more as in-house counsel. What do you mean by "outside in-house counsel"?
Q We can move on. I --
A Okay.
Q When I said out- -- outside in-house counsel, I meant not formally employed by the entities such that you would be in-house counsel, but you would serve as an in-house counsel in the sense that you would provide general advice as an in-house counsel would before going to outside counsel.
A I don't know if I would say as in-house counsel would because I think of an in-house counsel working solely in connection with the entity. So I would render advice, provide input to both my father and my uncle with regards to the business of the partnerships.
Q And just to clarify, your father is Joseph Cohen?
A Yes.

Q And your uncle is Robert Cohen?
A Yes.
Q Okay.
MR. ZUR: I'm just going to mark --
MR. LEV: Can I just interject?
MR. ZUR: Yes.
MR. LEV: -- before you start going through documents?
Maybe you're going to ask the question, but I just want to get a foundational statement first. Because to the extent you're going to ask if he was counsel of record for the Cohen trust or Robert Cohen as part of this transaction, then we may have to interpose objections on behalf of the trust because that would be invasive of the attorney-client privilege. So maybe you can ask it --
MR. JANNOL: Guys --
MR. LEV: -- at the outset --
MR. JANNOL: Let's --
MR. LEV: -- that question --
MR. JANNOL: Sure.
MR. LEV: -- so we can clarify whether or not he was acting as counsel. Because if he's not -- wasn't acting as counsel, then let's go. That's what I'm saying.
MR. ZUR: Let's -- why don't we get to that?
MR. LEV: Okay.
MR. ZUR: I have other things that I need to get to.

MR. LEV: That's fine.
MR. ZUR: We'll get to that.
MR. LEV: At this point --
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. ZUR: We'll get to that.
MR. LEV: Okay. That's fine. I just want to let you know at the outset that that is going to be, obviously, an issue.
MR. ZUR: Well --
MR. LEV: And if he answers "No, I wasn't counsel," then --
MR. JANNOL: That's going to be the answer.
MR. LEV: Okay.
MR. ZUR: We -- we --
MR. LEV: We'll get there, is what you're saying.
MR. ZUR: We'll get there.
MR. LEV: Okay. Thank you, Counsel.
MR. ZUR: Okay. We're going to mark as Exhibit 1.
(Exhibit 1 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q So, Mr. Cohen, I've handed you a document entitled "Eddie Ezra Cohen's responses and objections to

document requests in connection with subpoena to testify at a deposition in a bankruptcy case." For the record, this was received by my office. It was sent over by Mr. Jannol's office.

Have you seen this document before?

A Yes.

Q And can you tell me briefly what your understanding of what this document is?

A My understanding is this is in response to a request for documents by you or your firm or somebody on behalf of Blue Jay Way, LLC. And this is the response.

Q Okay. Did you review these responses before counsel served them on my office?

A Yes.

Q And these responses are -- and I'm not asking about the legal objections. But the responses are correct, as far as you know?

A Yes. They're prepared by my attorney, and I think they're correct.

Q Did you work with your counsel to review and identify responsive documents in response to these requests?

A I was instructed by my attorney to produce all the documents that were related to the request. And that we did.

Q Okay. And so did you withhold any documents for --
A No.
Q -- any reason? Okay.
And other than your counsel, did you speak to anyone else about this deposition or the requests?
A No.
Q Come back to that later.
We spoke briefly about Burton Way Hotels and A.C.C. Company. What is the relationship exactly between the two entities?
A Burton Way Hotels is the tenant as a leasehold interest and a piece of property owned by A.C.C. Company.
Q And what is that property?
A It is currently known as the Four Seasons Hotel in Los Angeles. That is the property. 300 South Doheny.
(Stenographer clarification.)
BY MR. ZUR:
Q Is there any ownership interest between the two entities? Is there common ownership between the two of them?
A There was. Today I don't believe -- well, there -- the interest of A.C.C. Company are owned by two trusts. They're owned by two LLCs, and the ownership of the LLC that represented my father's interest is a series

of trusts created by my parents.
Q Okay.
A And I don't know exactly the ownership on the other side, which would be RC's side.
Q When you say "the other side," do you mean the other part of A.C.C. Company --
A Yes.
Q -- or of Burton Way Hotels?
A I would say both.
Q Okay. So is it fair to say -- do you know generally what the percentages are -- ownership between the two entities of what side is your family versus the RC side?
A Well, initially it was in the ratio 58/40 -- not initially, but for the long time, it was 58/42.
Q In which favor --
A And 58 percent being RC's side, 42 percent being my father's side.
Q And did that change at some point?
A It's changed a numbers of times. Yeah.
Q Okay. And as of today, do you have any idea what it might be?
A Which entity?
Q Well, let's start with A.C.C.
A I believe it's 58/40 -- I'm not positive. I

think it's 58/42 between an LLC created by RC for the benefit of his family and 42 percent is owned by an LLC my parents created. But I'm not exactly sure on RC's -- he did estate planning many years ago, and so there's some other -- I'm not exactly sure of the ownership interest. But in my mind, it's 58/42.

Q And that's as to A.C.C.; is --

A That's correct.

Q Is it also true as to Burton Way Hotels?

A Well, RC's divided his interest in a number of different ways amongst various family members of his. So I don't know -- and also, many years ago, his son had a 5 percent interest, which was then diluted to 3.5 interest. But there's a whole ownership structure on RC's side.

But in my mind, it remains 58/42. But that's not exactly the breakdown when you look at the percentages. You'd have to look at the K-1s and see which entity owns what percentage.

Q Understood. Thank you.

Who managed the entities for the period of time that you served as in-house counsel for them?

A Okay. So I'm not sure exactly what you mean by "manage." My father and my uncle both retained a voice -- you needed to act -- each of them needed to act in concert

with the other, but the more active role was definitely RC.

Q And when you say "active role," did that pertain to big-picture matters or did it pertain also to sort of day-to-day matters?

A I wouldn't say big-picture matters. I would say day-to-day matters. My father was essentially deaf. RC had a different personality. So he engaged with a number of people related to the hotel much more than my father did.

Q Would you consider Burton Way Hotels and the trust -- let me back up for a second. Let's -- strike that, please.

When you refer to the RC side of the family owning either a part of A.C.C. Company or Burton Way Hotels, was that ownership through the family trust that Robert Cohen was the trustee of?

A If you'd repeat it, because you lost me.

Q Apologies.

A Why don't you get to what you're trying to find out and that would be easier than a lot of words.

Q Did Robert Cohen's family trust own on behalf of the RC side of the family the parts of A.C.C. and Burton Way Hotels that you discussed earlier?

MR. JANNOL: If you know.

BY MR. ZUR:
Q If you know.
A My recollection is that the interest was held by RC and his wife as to most of their interest with -- early on, I think he set up an irrevocable trust for a piece of it, only 'cause I remember seeing that on documents. But there was a point in time where he did additional estate planning where he transferred his interest, I believe, into the -- a trust that he had created. But it wasn't for the piece that he had originally transferred many years ago into an irrevocable trust.
Q And when you say "many years ago," could that have been done in the '80s?
A Yes.
Q Okay. So is it fair to say that the Cohen trust that Robert Cohen had set up was a distinct entity from Burton Way Hotels?
A I don't know that. I don't know the trust you're talking about. This would be total speculation. I know that there is an entity Burton Way Hotels. There's an LLC. There's a limited partnership. And I -- there're a variety of different entities which make up ownership of that.
Q I'll sort of get to my question. Given that Burton Way Hotels and A.C.C. Company were owned by two

parts of the families -- one being your side, your father's side, and the other being RC's side -- you wouldn't consider Burton Way Hotels or A.C.C. to be the same as Robert Cohen's; correct? Distinct; right?

A There are --

(Mr. Sohaili entered the conference room.)

THE WITNESS: So should we go on [sic] the record?

MR. ZUR: Let's go off the record a moment.

THE WITNESS: Okay.

THE STENOGRAPHER: One -- off the record at 10:22 a.m.

(Off the record.)

THE STENOGRAPHER: Back on the record at 10:24 a.m.

MR. ZUR: Thank you. I'm going to mark as Exhibit 2.

(Exhibit 2 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

MR. JANNOL: Thank you.

MR. LEV: Thanks.

BY MR. ZUR:

Q Take a moment please just to familiarize yourself with the document. I'm not going to ask you specifics about it, so... and let me know when you're ready.

For the record, this is an excerpt of the document, so you'll notice that it is not the complete document, and that was done intentionally.

A Oh.

Q I wanted to save paper.
A I didn't notice that. Thank you.
I haven't seen this document in a long time.
Q Okay. So are you generally familiar with what the document is? And for the record, it's Exhibit 2. It is the -- it's a document entitled "Declaration of Eddie Ezra Cohen in support of Plaintiffs' opposition to Defendant's motion for partial summary judgment." It appears to have been filed in a case entitled "Burton Way Hotels Limited, et al., v. Four Seasons Hotel Limited, et al., in the U.S. District Court, Central District of California, and Case Number 2:11-CV-00303-PSG.
Are you generally familiar with this document, Mr. Cohen?
A I recognize the document.
Q Okay. And as mentioned earlier, this is an excerpt of the full document. And the final page of this document, which is marked page 11, that's your signature?
A Yes.
Q And so fair to say that if you take my representation as true that I left out the pages that were in this document originally, this was a declaration that you signed and that was filed in this case?
A Yes.
Q Okay. If you look at paragraphs 1 and 2 where

you stated in this declaration that you have "served as counsel to Plaintiffs Burton Way Hotels, LLC; Burton Way Hotels, Limited; and A.C.C. Company since 1985," this is the representation that you referred to earlier when you answered my questions about your work as an attorney?

A Question's not exactly clear. But this -- I represented them. I don't believe Burton Way Hotels, LLC, existed in 1985. But when it came into existence, I think Burton Way Hotels, LTD, and A.C.C. Company were in existence then. So -- but I represent -- I worked on behalf of both of those and represented them.

Q Okay. And what general subject matters did you advise those entities about?

A Well, I was involved with certain capital events. This one has to do with a negotiation with Four Seasons regarding an amendment to the management contract.

Q And when you say capital events, are you referring to loan transactions, equity infusions?

A Dealing with lenders. I was involved working with Hush and his firms. They changed over years. And I was involved with working alongside my uncle and my father and working with them.

Q In providing the legal services to those entities, who did you communicate with on the --

A Mostly --

Q -- A.C.C. --
A Hush.
Q Okay.
A And also other members of his firm, Tony Salandra. I mean, there's a whole list of folks.
Q And on the A.C.C. Burton Way Hotel side, other than your father and RC, who else did you communicate with?
A From time to time, different members, but mostly my father and RC. Nobody else had as active as [sic] role as they did.
Q And so when you needed direction, you communicated with one or both of them; correct?
A Yes.
Q When you needed legal direction. Apologies.
A Well, yes. I communicated with both of them freely.
Q Understood. Did you have any formal retainer agreements with A.C.C. or Burton Way Hotels?
A I don't believe so.
Q Did you have any retainer agreements with any other entities that either of them owned?
A No.
Q Did you send them periodic billing?
A Not on a regular basis. I mean, not on a monthly

basis.
Q So how did you get paid?
A Usually at the conclusion of a capital event, I would send them a bill.
Q And it was hourly work?
A No. It was scope of work. It was -- depended -- the -- it depend on the -- how long I'd been working on something, depended on, you know, that kind of an effort.
Q And did you keep track of the time you spent on any particular matters for them?
A No.
Q Okay. At this time, did you have any other clients other than --
A No.
Q Okay. What kinds of legal documents did you review in providing the legal service to Burton Way Hotels and A.C.C. Company generally?
A The review of documents I mostly left to Hush. The comments to Hush's review was mostly where I was involved. I wasn't the person primarily reviewing documents. Maybe if there were term sheets, I would read them also. But principally relying on Hush's review and then discussing particulars as they came up from there.
Q Did you ever have conversations either with your father or RC about matters that didn't necessarily have to

do with Burton Way Hotels or A.C.C. Company specifically over legal matters?

A Well, my father for sure. Because I -- all the things that I could do in my mind, like a number of leases, I handled for my father. Purchased the house, I handled that. I don't think we used outside counsel. But I did a number of things for my father. But I wa- -- RC would not -- I did not do that for RC.

I mean, I was intimately involved with the day-to-day management or running and development of my father's business. And I also worked on behalf of the hotel.

Q So if you had conversations with RC and RC had some kind of legal question, was it always pertaining to Burton Way Hotels and A.C.C. or did it sometimes pertain to other things not specifically related to those entities?

A I think it related to Burton Way Hotels and A.C.C.

Q Did they consider you a reliable attorney in the family with whom they could consult?

A Who's "they"?

Q Your father and RC.

A I think they both trusted me. My father relied on me more than RC did. My father relied on me quite a

bit.
Q Okay. Did RC rely on others in addition to you?
A I believe so. Yeah. He had a...
Q Anybody else that you can think of that he relied on for legal advice that were members of the family?
A I know he relied on Hush. I don't know what other lawyers -- he would get input from a variety of different lawyers. There was a firm in Washington that gave him tax input at one point. There was -- I don't know. I would be speculating.
Q Any other members of the family that he might have relied on in addition to you?
A I don't know. I mean, I don't know to what extent he used his son-in-law or his daughter. I have no idea.
Q And his daughter is Michelle Lerman?
A One of his daughters is Michelle Lerman. Yeah. She's an attorney.
Q And the son --
A She did estate work, so I don't know if he would really rely on her. And, you know, Jeff was, I think, a litigator. I never worked with Jeff. I don't know if he'd rely on him or used him.
Q And when you say "Jeff," you're referring to Jeff Lerman?

A Yes. Michelle's husband.
Q Okay. This document's going to be Exhibit 3.
(Exhibit 3 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment to familiarize yourself with the document and let me know when you're ready.
You ready?
A Yes.
Q So for the record, this is a document with a Bates number at the bottom-right corner bearing Bates number SWBJ000369 through 371. This is a document that was produced to my office by Mr. Cohen in response to the subpoena.
Mr. Cohen, can you tell me generally what this document is?
A Looks like an escrow instruction.
Q From whom to whom?
A Well, to, I believe there's a person named Mary Brown, who's an escrow agent, and it's from all the parties who signed it.
Q If you look at the third page -- that's 371, the bottom-right corner -- is that your signature at the top?
A Yes. Where it says Ezra Cohen, yes, that's me.
Q Okay. And this was an instruction given by

A.C.C. Company to this escrow agent that you identified earlier; is that correct?
A That's the way it reads to me.
Q And you --
A I don't know if it's only by A.C.C. Company because it's signed by the borr- -- I'm not -- yeah. It's an escrow instruction. I think it's from everybody but...
Q And it's signed by you on behalf of JC/SC Family LLC and it's signed by Eleda Cohen on behalf of RC/BC Family LLC?
A That is correct.
Q And are those the two entities that you were thinking of when you said that A.C.C. was owned by -- in part by your father's side of the family and another part by the RC side of the family?
A Yes. But I believe there's also a piece owned by another entity originally relating from RC's interest. I don't know if that's the exclusive ownership of the partnership.
Q Can you recall where you got this document from?
A Came off my computer.
Q Just for the record, this is a document that was produced by my office to Mr. Lev in response to document requests that were served on the debtor by Mr. Lev's client. Did you receive --

A So you said I produced this document. I had my nephew go through my computer and take everything off the computer that was related to the request for production of documents. And I believe that where's this came from. I don't know if I produced one that doesn't have the number on the bottom -- the Bates stamp. 'Cause I'm not sure how one with the Bates stamp would have it.

MR. JANNOL: Let's make it quick. I think we produced a Mary Brown document. And now you're providing us with Mary Brown document ten years ago so...

MR. ZUR: Let's go off the record for a minute.

THE STENOGRAPHER: Off the record at 10:40 a.m.

(Off the record.)

THE STENOGRAPHER: Back on the record at 10:42 a.m.

BY MR. ZUR:

Q Mr. Cohen, can you tell me generally what these escrow instructions related to?

A Very vaguely. I don't recall seeing it. When I first -- when I saw it more recently and scratched -- you know, thinking back, there was -- okay. I was surprised that the loan came from A.C.C. I thought my dad had made a loan to Ar- -- to Hush. And now I'm thinking, like, okay, maybe A.C.C. made the loan.

I thought my dad and my uncle made independent loans to Hush at some point, and they got paid back. Now

I'm seeing oh, no, the loan was made by A.C.C. to Hush, and that loan was paid back.

I wasn't involved with the making of the loan. I think I was helping to facilitate the repayment of the loan.

Q Okay. And when you say loan to Hush, the borrower on this -- reflected on this document is 180 PCH, LLC, and it looks like there are two members who have signature pages. One of them is HS 270, LLC, with Mr. Sohaili as its sole member, and then there's another one called PCH 10,000 LLC with an individual named Richard Weintraub as a member. Does that sort of refresh your recollection as to who the borrower was?

A No. I mean, in my mind, my father's mind, it was a loan to Hush.

Q Okay.

A So, you know, you could do -- I wouldn't know the entities. We don't underwrite -- we're not in the business of making loans. So we don't underwrite things, all that, but my dad fully trusted Hush and...

Q Okay. Did you have anything to do with this loan in February of 2014 when this document was signed or did you just get this document and sign it?

A I think I was more involved with facilitating the payback of the loan. I don't even fully understand how

the loan gets paid back, to be honest with you, whether it's going to be an instruction from Eleda, Hush, or myself. I mean, I'm not even sure the whole gyration. I get intimately involved with the things I handle for my dad principally, and I couldn't tell you the exact gymnastics of who -- I don't know who Mary Brown is. Haven't used First American Title. I didn't prepare the document, this escrow instruction.

Q Do you know who negotiated this loan on behalf of A.C.C.?

A It would be speculation. But I would think it was my uncle and Hush.

Q Okay.

A But that would be speculation. I don't know that for certain. Like I said, I thought my dad had made a loan to Hush that got paid back -- an initial loan to Hush that got paid back. And so I look at this, I see A.C.C. made the loan.

Q Okay. Do you know if your father or RC asked for a guarantee of this loan by either Mr. Sohaili or Mr. Weintraub, the two members of 180 PCH?

A Well, I don't know Richard Weintraub. I know Hush. And we would typically want to -- I just -- we would want -- like I said, we would make a loan to Hush, not to an entity. I don't want to get involved with the

gymnastics of an entity.

Q Okay.

MR. ZUR: This next document is a single page. It's Exhibit 4.

(Exhibit 4 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZUR:

Q Let me know when you've had a chance to --

A Just one page; right?

Q Yes.

A Yeah.

Q This is a document -- for the record, it appears to be dated December 29, 2015. Can you tell me what this document is, Mr. Cohen?

Well, first, let me back up for a second. Is -- at the bottom, in blue ink next to the word "signature," it has a signature, and then it says "authorized officer." Is that your signature?

A Yes.

Q Okay. Can you tell me what this document is?

A I believe it indicates the amount to get a loan paid off as of a certain date.

Q And is it --

A Known as a demand.

Q And is it the same loan that we had just

discussed in Exhibit 4?
A I think so.
Q I'm sorry. Exhibit 3.
A I think so.
Q Okay. And does this refresh your recollection as to what the timing was as between the making of the loan and the repayment of the loan?
A No.
Q Okay. This document is dated December 29, 2015. The other document was dated sometime in February 2014. Do you remember generally now what the timing of the making of the loan was and the repayment of the loan?
A No.
Q Okay. Do you recall receiving -- you mentioned that this loan was made, in your mind, to Hush. It wasn't, but in your mind. Do you recall receiving any conflict waiver letters from Hush or his law firm?
MR. JANNOL: For this loan?
MR. ZUR: For this loan.
THE WITNESS: I don't recall. Not saying that there wasn't, but I don't recall.
MR. JANNOL: You've answered.
BY MR. ZUR:
Q If a conflict waiver letter had been provided to A.C.C., would you have reviewed it? In other words, would

you have been the person to review it?
A I would have trusted Hush. So...
Q But would you have been the person to review?
A I would have done probably a cursory review of it. But it was -- I had full trust in Hush. So if he put something and asked me to sign it, I would sign it.
Q Okay. But it wouldn't have been your father reviewing it carefully or --
A No.
Q -- RC?
A I don't know about RC.
Q Okay. But your father would have trusted you to be the one to look at it and tell him if anything was amiss; right?
A I don't think my -- my father would have relied on either Hush or myself before he signed the document.
Q Okay.
MR. ZUR: Can we take a five-minute break?
MR. JANNOL: Sure.
MR. ZUR: Off the record.
THE STENOGRAPHER: Off the record at 10:50 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 11:01 a.m.
BY MR. ZUR:
Q Mr. Cohen, when you provided legal advice to your

father or RC in connection with Burton Way Hotels and A.C.C. matters, did you do so in emails, texts, phone calls, all of the above?

A My -- I don't believe we dealt much in texts. Maybe a little bit. Mostly maybe with RC and my dad. Well, mostly with my dad would probably be email, and RC mostly in phone -- by phone.

Q So if you sent RC a document to look at, is it fair to say that he would call you and you guys would chat about it on the phone?

A I don't recall sending RC documents. I wasn't -- I didn't operate in a formal capacity. I participated in conversations. Like, RC probably had more conversations with Hush than he did with me directly. And I know when RC would communicate with my dad, he would make a point to sit with him in person 'cause my dad couldn't hear on the phone.

So I didn't report to RC that way. It was more facilitating and working in connection with various conversations that were happening. So I don't know if that -- I mean, I think you're trying to describe something that was kind of, like, more formal, but it wasn't.

Q I think I asked you earlier about --

A Sorry.

Q I'll ask it again. Do you recall receiving a conflict waiver letter from Hush or Hush's firm in connection with the A.C.C. loan back in 2014?
A I don't recall.
Q Okay. What would have been the purpose of such a conflict had it been sent, in your mind?
A Hush needing something with respect to his firm saying that he could borrow money from a client.
Q And why would it have been important for a conflict waiver letter to be sent at all given his role as a lawyer?
A Well, we worked with Hush for years. So he was our lawyer. And then there was -- Hush was also a businessman doing deals -- or trying to do deals. So he wanted to borrow money from my dad and my uncle.
Q And would it have been appropriate for him to -- to serve as a lawyer in a transaction that he was involved in personally or through an entity that he owned?
A There's a relationship of trust there. So we trusted him.
Q Right. But my question is different. Would it have been appropriate for him to act as a lawyer?
A I can't comment on that. I mean, he did what he did. What can I tell you?
Q And if he sent a conflict waiver letter, what

would the purpose of that letter be?
A I suspect to have cover with his firm, to make sure that his firm knew, look, we have a conflict waiver.
Q And would it make sense for him to tell your father or RC, who are the decision-makers, that his clients -- that they should not rely on him as counsel and they should speak to somebody else about that matter given that he has a personal stake in it?
MR. JANNOL: Do you want his state of mind today or at the time?
MR. ZUR: At any time.
MR. JANNOL: If it ever occurred to you.
BY MR. ZUR:
Q I ask you as a lawyer.
A I'm going to answer based on my relationship with Hush and my father. And as I saw it, it was a relationship based on trust. And so my dad would -- my dad had a very good sense of when to do business with somebody. And he did it basically -- 'cause he couldn't hear very well. So he had to be able to trust somebody. So that was the most important, I think, that my dad went on. And it was innate, and he just had it. Took me a long time to realize that he had that skill. So he fully trusted Hush.
Q And the documents I've shown you, which we've

marked as Exhibits 3 and 4, having to do with that loan back in 2014 from A.C.C. to 180 PCH, did you have anything to do with the documentation of that loan? Did you review any documents? Did you comment on them?
A Not that I recall. I thought the loan was from my father to Hush. And now I see that it was from A.C.C. to an entity. So my recollection is -- I don't have a recollection of that.
Q And you were counsel to A.C.C. at the time; right?
A I did not -- well, Hush was counsel to A.C.C. at the time too, so was his entire firm. So everything I did for A.C.C. was through Hush. Like, I would rely on Hush in -- on legal matters related to A.C.C. And he knew that. We were very close.
Q And this matter, the loan that we're referring to, was not a matter that related solely to A.C.C. -- right? -- because it was a loan to an entity that Hush had an interest in; right?
A Well, you say --
Q That's what the document reflects.
A It was a loan from A.C.C. to another entity. But I can tell you, from my dad's point of view, from my point of view, it would have been a loan to Hush. Would haven't been made without that.

Q I understand. And you, as a lawyer --
A Mm-hmm.
Q -- a very experienced one, would not --
A Why do you say I'm so experienced?
Q Well, you've practiced since I was a child.
A You're doing something with these comments, and I don't appreciate it.
Q I --
A I didn't take any outside clients. I only worked for a family partnership. And I had the tutelage -- I learned everything I learned from Hush. I knew him from right out of law school. Worked for him in a law firm. I could go on, but I relied on him. So don't -- let's keep things straight with what they are.
Q I'm only trying to keep things straight. My --
A Okay.
Q -- question was, I thought, straightforward.
If Hush's personally involved in a loan transaction --
A Mm-hmm.
Q -- from an entity that you represent, would you have the same type of blind trust in Hush or would you, as counsel for that entity, give independent advice?
A Sir, we weren't in the business of making loans to people. We made a loan to Hush. So it's basic, it

wasn't underwritten. There wasn't -- look at financials. None of that stuff. You make a loan to Hush 'cause you trust him.

He's acted as family counsel for so many years. Everybody in the family trusted him with everything.

Q What was the interest rate on that loan? Do you recall?

A I don't recall.

Q Okay. Let's take a take a look at Exhibit 4.

A Yeah, I see that.

Q Middle of the page in blue ink.

A Mm-hmm.

Q Does that refresh your recollection as to what the interest rate was?

A No.

Q Okay. Under the word "demand" --

A Mm-hmm.

Q -- could you read that paragraph to me?

A "You are handed herewith a Note in the amount of $2,000,000 dated February 7, 2014, secured by a Deed of Trust recorded in the County of Los Angeles, executed by: 180 PCH, LLC, in favor of: A.C.C. Company, together with Deed of Trust and Request For Full" convey -- "Reconveyance thereof, which you are authorized to deliver to the parties in interest or their representative

provided on or before close of escrow you hold for our account the sum of $2,021,232.88 calculated as follows: $2,000,000 plus interest at the rate of 12.5 percent per annum from December 1, 2015, to December 31, 2015, to and including the close of escrow.

"Additional fees, if any, none.

"Disbursement to be made by check of your company or by title company designated by you. In the event that the conditions of your escrow have not been complied with, you are instructed to return" the enclosed -- "all enclosed documents upon our written demand to you. Mail check to the undersigned beneficiary at the address given."

MR. JANNOL: Do you want him to read more?

MR. ZUR: No. Thank you.

MR. JANNOL: Okay.

BY MR. ZUR:

Q Do you have any reason to believe that the 12.5 percent reflected in this document is incorrect?

A I don't remember the document, and so I'm not going to -- it looks corre- -- it looks like it's in my handwriting.

Q Okay. And if it was wrong, would you have signed it, or would you have made sure that what's in here is correct before signing it?

A I was getting the numbers from somewhere and the names of the entities from somewhere, and I wrote them in.
Q Okay.
A So I believe they were correct.
Q Okay. Do you remember anything about who chose the 12.5 percent --
A No.
Q -- interest rate for that loan?
A No.
Q Do you recall speaking to anybody about the interest rate on that loan?
A No.
Q Did you raise any issues with respect to the interest rate on the loan?
A No.
Q Did you consider that maybe the interest rate was illegal under California law?
A I wouldn't assume it to be illegal.
Q Okay. And you didn't speak to anybody involved in the transaction about the interest rate, any issues with it?
A There's something in my mind that says 1 percent a month, and that's 12 percent. So I don't know the 12.5 percent, and I didn't negotiate the interest rate. So I don't recall.

Q Did you recall if your father or RC ever consulted with you about the interest rate, whether you provided advice or not on it?
A No.
Q Okay. Did Hush say anything to you about the interest rate?
A Not that I recall. I -- the -- what I remember from Hush is 1 percent per month or -- and I think that's kind of -- as I remember, there was a business term that it was going to be 1 percent a month. But that came in initially after the fact.
Then there was a subsequent loan, and we weren't part of that subsequent loan. And I think that's where I remember that discussion. I didn't even realize this was a year. I didn't think it was even that long. I thought it was a shorter-term loan.
Q Would your father or your uncle have consulted with anybody other than you on this loan, as far as -- as far as lawyers?
A I don't know.
Q Okay.
A My father wouldn't have.
Q You mentioned earlier that your family was not in the business of making loans. Are you --
A I was speaking of my father's family. I don't

know what RC has done and his family's done.
Q Are you aware of any loan transactions to third parties or family members that --
A Well, to family members is a different matter. To third parties, I remember maybe two loans my dad made. One to a really long-time friend. She had a birthday with him. Known him for 60, 70 years, for $25,000 and probably his best friend's wife, who -- my dad's best friend passed away. Loans her $10,000.
Q And --
A But we weren't -- may dad didn't make loans.
Q And did your father ever consult with you about anything having to do with those two loans that you mentioned?
A I helped facilitate them. I don't think there was a promissory note for Jackie Hassen. I think there was a very rudimentary promissory note for Rose Benon. She was the one that had a $10,000 loan.
Q And when you say you facilitated, does that mean that you --
A I made sure the check got written, and we got it delivered and got them paid, you know.
Q Would you have drafted the promissory note?
A The -- I don't believe there was a promissory note for Jackie Hassen. I do believe there was a

promissory note for Rose Benon. And I took something off the computer. It was maybe one paragraph. Maybe it was two paragraphs, but it just memorialized that there was a $10,000 loan.

Q Are you aware of any loan transactions to family members or otherwise by the RC side of the family?

A No.

And on our family side, there's a lot of loans between -- my sisters had borrowed money from my parents and it goes on and on. So there's -- that is extensive. And there are some transactions we try and keep up with the -- the federal interest rate to make sure, you know, all that stuff. But that's on an immediate-family basis. I can't speak for RC's family in that regard.

Q Would RC have made loans to anybody through an entity?

A I don't know.

Q Okay. You mentioned that the family -- both the RC side of the family and your father's -- consulted various lawyers over the years in addition to --

A I did not say that, sir.

Q -- Hush's firm --

A I said RC's family and RC consulted a lot of lawyers. My dad didn't. My dad had very few -- he used Henry. There was a fellow named Al Howard he used before

Hush came in the picture, who died. And then there was Hush. I don't -- that was it.

Q And when would RC have opted to consult with you as opposed to Hush on a particular matter involving Burton Way Hotels or any other entity?

A I think RC would discuss things that he wanted me to communicate to my father. So that's really how he used me. He didn't use me as the entity lawyer so much. He used me more as a go-between between -- to facilitate a communication between my father and him.

Q Okay.

MR. ZUR: I'm going to mark as Exhibit 5.

(Exhibit 5 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

MR. JANNOL: Thank you.

MR. LEV: Thanks.

BY MR. ZUR:

Q Take moment to generally familiarize yourself this document and let me know when you're ready.

MR. JANNOL: You've read it?

THE WITNESS: I'm ready. Sorry.

BY MR. ZUR:

Q So just for the record, this is a -- appears to be an email chain with the latest email being Friday, February 1, 2013, at 3:53 p.m. Pacific time. That's an

email from Hush to -- I think that's RC with a CC to you; is that correct, Mr. Cohen?
A Yes.
Q Can you tell me what this email chain is?
A I think it speaks for itself. I don't really remember it. Oh, I don't remember it. I don't know if -- I remember meeting with East West Bank in Pasadena on occasion probably around 2013 about generally engaging or using East West Bank to be our bankers or to take a position as our bankers because we'd been using City National Bank.
So if that's the meeting -- 'cause I do remember driving to Pasadena one time and meeting people at East West Bank maybe some time around -- a long time ago. I don't remember it as a meeting regarding a property.
Q When you say -- you said our bank, is that a specific entity or the family generally?
A Well, I think -- whether the hotel would do banking there, whether Burton Way Hotels would do banking there, whether A.C.C. Company would do banking from there, whether my father and his various entities and trusts would do banking there, and the same thing on RC's side on -- for RC. That's what I meant by "our."
Q So this email chain, as you remember it, related to a meeting with East West Bank in connection --

A Well, let me go back and say it again. 'Cause that's not -- I don't remember this email chain. I see that I'm copied on it. With respect to East West Bank, I remember one meeting that I attended that had to do with the subject matter that I described, not the subject matter of Hush's 1633 Blue Jay Way property.

So I don't recall ever going to East West Bank in regards to Hush's development. And I think Hush was with us when we went to East West Bank to talk about a general banking relationship. And I'm not sure how that introduction came. I don't know if it was through Hush or through somebody else. But that's, as I recall, what that meeting was about.

Q Do you remember Hush having any sort of connection to East West Bank?

A Not that I recall.

Q Is it possible that somebody else would have connected you to East West Bank other than Hush?

A Well, somebody did. I don't know who did. Somebody made an introduction for us.

Q Is it possible that it was Mr. Weintraub?

A I don't know that. I've never met Richard. I've met Richard one time at my uncle's house but I wouldn't recognize him if I saw him.

Q And what was the meeting at which you might have

met him?
A It was a holiday party in December at my uncle's house. I believe there was an introduction amongst a large group of people.
Q Do you remember approximately what year that might have been?
A No. It would have been a long time ago. I don't know. Ten years ago. Maybe longer. I only went to one or two of my uncle's holiday parties. Maybe three. I mean, not many.
Q Okay. Do you know anything generally about Mr. Weintraub? I understand you don't know him personally. You might have met him once or twice, but...
A Generally, I know --
MR. JANNOL: What's the relevance, guys?
MR. ZUR: I'm just asking.
THE WITNESS: He does real estate development. He's been attached to some interesting projects.
MR. ZUR: Okay. This next document is going to Exhibit 6.
(Exhibit 6 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. JANNOL: Thank you.
BY MR. ZUR:
Q Take a moment to familiarize yourself with this

document and let me know when you're ready, Mr. Cohen.
A I'm ready.
Q So for the record, this is an email -- well, the underlying email, which was forwarded from you to jwoods@jcre-la.com on May 2, 2024. The original email was from Joseph Cohen to you on February 23, 2013, at 10:10 a.m. with the subject re: Blue Jay Way Indemnity Agreement."
Can you tell me what this email is?
A It's a communication by my father to me regarding a loan to Hush and Weintraub in connection with Blue Jay Way.
Q And what's -- and what's your father telling you in this email as you understood--
A He's not interested in going forward.
(Stenographer clarification.)
THE WITNESS: I think there -- you know, when the first loan was paid off, there was a request for another loan. I remember receiving from Hush a rendering, and then that was the first time we went to look at the property. We didn't like the property. We go on reasons about that.
And it was a complicated structure because Hush wanted the ability to get a construction loan. If I recall, there was something about a subordination. That's

all I recall.
BY MR. ZUR:
Q You mentioned a loan before this one --
A Yeah.
Q -- you said, was paid off. Which loan is that you're referring to?
A I think that was the $2 million loan that got paid off.
Hush is shaking his head, so I'm not sure what I'm saying wrong.
Q So let's -- just for the record, the email here is dated February 2013. And I believe the loan that you're referring to is the one that's referenced in Exhibit 3.
A Mm-hmm.
Q And that loan -- at least in Exhibit 3 and then in Exhibit 4, that postdates this email that's 2014 and 2015.
A I'm going to tell you my recollection that there was one loan. That loan got paid off. I thought it was a loan from my father to Hush. And it turns out maybe it's a loan from A.C.C. to Hush. And it's not even to Hush. It's to an entity.
And then there's a subsequent -- I remember there was a subsequent loan. Because Hush was telling me, you

know, about the project, and they wanted to get their invested rights. And I'm not sure. A lot of stuff like that. But most importantly we went to the site and -- so as a real estate matter, it didn't seem to make sense to us. And everything was complicated.

Q Who went to the site?

A My father and I.

Q Just the two of you?

A Yes.

Q And did you discuss the -- other than the site itself, did you discuss the terms of the potential loan with your father?

A My dad would have looked at it and asked himself or -- whether he thought that was a viable development -- viable deal, if it made sense. Didn't make sense to my dad, so he wasn't interested.

Q Would you have discussed the -- other than as a general real estate development, would you have discussed the terms of the loan with your dad specifically in helping him decide whether to invest?

A Well, yeah. You would discuss it. I mean, I remember it being complicated.

Q What part of it was complicated, in your mind?

A Entities, subordination, things like that. So, you know.

Q Did you have a full understanding of the terms other than the subordination and the entities involved?
A Not that I can recount. I mean, I didn't -- we didn't pursue it. So...
Q Would you have, in a conversation with your father, said this is -- these are the entities. This is the subordination. These are the terms of the repayment, the interest rate, et cetera. Would you have had that conversation with him?
A No. That was probably more detailed than my father would want to hear. He would -- if it wasn't so straightforward that he could follow, that spoke for itself.
Q At the time, did you know what the terms of the proposed loan transaction were?
A I don't recall.
Q In setting yourself up for a conversation with your father about it, would you have reviewed those documents to familiarize yourself with the terms so that you could?
A I don't recall seeing documents. I do recall -- I don't even -- I just know that there was some -- I don't even recall the particular conversation. I know that there was some -- yeah. I'm -- Hush was excited about a project he was going to do with Richard and why it was so

great. And you can make a lot of money.
But we went and saw the ren- -- we saw the rendering that he had sent us, and we saw the site. I think there was already concrete in the ground. And so they had done some work. That's my recollection of what we saw. Saw very steep site, very high up Blue Jay Way. Wasn't interesting to my father.
Q In the email from your father to you, it looks like there was an attachment called "Blue Jay Way Indemnity Agreement."
A Mm-hmm.
Q Do you recall that document at all?
A No.
Q Did you send it to your father?
A I don't know.
Q It looks like there's a part of the email that you had sent to him that might be cut off here. I can't see the content of the email. Is it possible that your email to him had that document attached to it?
A I don't know.
Q Could your father have gotten it from any other person?
A Yes.
Q Who?
A Hush. Hush emailed my father.

Q Would Hush have communicated with your father directly on this?
A Quite possibly.
Q Okay.
A Could have been somebody from his firm.
Q Did you ever speak to Hush about this loan?
A I know we spoke about that -- how it was complicated. It wasn't clean.
I don't know if it got reduced down to my father would make a loan to you but wouldn't make a loan to your entity. I don't recall specifically.
But I know that there was a general -- there were two problems with it. One was that it was complicated, and the other my dad didn't believe in the project.
Q And when your father -- it looks like he decided to pass on this --
A Mm-hmm.
Q -- opportunity, did he communicate that directly to Hush or did you?
A I don't know. I know he did to me, but he may have very well communicated to Hush too. My dad had dialogue or communications with Hush. It wasn't all through me.
Q And you mentioned a conversation or a series or -- I didn't really catch how many times, but at least

one time that you relayed to Hush your father's concerns with the project. Do you recall when that was?

A I don't recall.

Q Would it have been before this email or after this email from your father to you?

A I don't recall. I suspect it would have been after. I don't know when this email was sent in context of our communication about it.

Q Okay.

A I don't have a timeline on all this.

Q And when you spoke to Hush, was it in person or was it on the phone?

A Probably on the phone. I don't -- you know, Hush and I generally didn't meet in person. I mean, I would come to his office, but mostly we would speak on the phone. So I suspect it was on the phone.

Q And is it possible that upon receiving this email, you might have picked up the phone and called Hush and said, "My dad decided to pass on this"?

A I don't know. I really don't know. I probably wouldn't have -- I didn't -- probably wouldn't have done it immediately. Maybe I did. I don't remember.

MR. ZUR: This next document is going to be marked Exhibit 7.

///

(Exhibit 7 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZUR:

Q Take a moment to read this, familiarize yourself and then let me know when you're ready.

A I'm ready.

Q Okay. For the record, this is an email chain that was forwarded to -- from you to yourself and jwoods@jcre-la.com on May 2, 2024. And --

A So, like I said, my nephew went through my computer and pulled everything he could. And then he sent it to himself so he could sent it over to Henry's office.

Q Understood. Thank you.

Are you familiar with this email chain?

A I don't remember.

Q Looks like the initial email -- at least the first one in the chain is an email from Daniel Shlomi, who has an Akin Gump email address, on February 21, 2013, at 8:33 p.m. to Hush. And it says, "Hush, please find clean and redlined versions of the following document. Note to Cohen trust, indemnity agreement, conflict waiver."

Then there's another email forwarding it from Hush to Shingly Lee with a CC to Robert Cohen. Can you tell me who Shingly Lee is?

A She worked for RC, his family, various entities,

and she worked for A.C.C. Company and Burton hotels.

Q And what was -- does she still work for those entities?

A Yes.

Q What's her position today?

A I think the same as it's always been, kind of a go-to person. She's -- I mean, she probably best -- facilitates the paperwork, keep track of paperwork. I don't -- she doesn't have any -- of entities we're involved in, she doesn't have any power or authority to do things, but she would make sure things are set up, things like that.

Q Is she sort of like an office manager?

A I think so.

Q Okay.

A We don't have formal structure in how people -- you know, so I think she's kind of like the go-to person.

Q Would RC perhaps use her as an assistant of sorts?

A Yeah.

Q Okay.

A I think everybody in their family used her as an assistant.

Q Okay.

A Continues to.

Q The next email looks like a forward of the first forward from Hush to Shingly Lee and RC, and it says, "Hi Ezra, RC wanted to ask if you could review these documents and call him to discuss. Hush needs the docs to be signed this morning. So if you could do this right away, we'd appreciate it. Thanks, Shingly."

And this was sent from Shingly to you on February 22nd at 9:28 a.m., and the subject is a forward "Blue Jay Way - Note, Indemnity, and Conflict Waiver." And it appears that there are a bunch of documents that are attached as well.

Do you recall receiving this email?

A No.

Q Well, did you receive this email?

A Well, I believe so. It was on my computer.

Q Okay.

A I don't know if I opened it, but I believe I did.

Q Okay.

A I -- it didn't -- you know, you can see -- if it's highlighted or not. I have a bunch of emails I haven't opened. I don't know if this one -- I don't remember this document. But it came from my computer.

Q If Shingly had sent you an email, is there any reason why you might ignore it?

A Yeah.

Q What reason would that be?
A Busy doing other things. I'm kind of a one-man show. So...
Q Well, would you eventually get to it or would you just --
A Not necessarily.
Q Okay.
A Like I say, I still have unopened emails on my computer.
Q From Shingly?
A I bet you I -- soup to nuts I do.
Q Okay. And if Shingly asked you -- well, let me take a step back. Strike that.
Did you speak to RC about these documents?
A I don't recall.
Q If you had opened that email, would you have done what RC asked and reviewed the documents and called him to discuss?
A Not in great detail. I would have done a cursory review. You know, I don't do secured transactions on my own. So I don't -- I'm really not an expert in it, but I can give a cursory review. I mean, most of what I do is go through leases. And then after that, oftentimes I use outside attorneys to help me with leases, if they get more complicated or something like that.

Q Well --
A So I might have done a cursory review.
Q Well, what would a cursory review include?
A Not much. Looking at the document. I mean, the documents would have been prepared by Hush, and I would have trusted those documents.
Q All right. Let's come back to this one.
A Okay.
MR. ZUR: We're going to go to Exhibits 8 and 9. The first one is Exhibit 8. And then the next one I'll just hand out now -- may as well -- is going to be Exhibit 9.
(Exhibits 8 and 9 were marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment just to familiarize yourself with the documents and let me know when you're ready.
A I'm ready.
Q Okay. So in Exhibit 7, at the second page there were various attachments to the email that Ms. Lee had sent you.
A Mm-hmm.
Q And one of them is promissory note secured by deed of trust -- well, excuse me. Sorry. The second document is redlined, and it has a document number "V1

Promissory Note Secured By Deed of Trust," et cetera, et cetera. And then at the bottom, there's a redline, again, with numbers "v1-RC Consent and Waiver," et cetera, et cetera.

Are these the documents that were attached to that email?

A I don't know.

Q Are the numbers at the -- that are reflected in the second page of Exhibit 7 the same as the numbers at the bottom-left corners of the two documents that we've marked as Exhibits 8 and 9?

A Let's see here.

So I think one of the documents is listed here. And that's this 203390061-v2. This one says "-RC." On the -- number on the bottom doesn't say "-RC." So that one -- let's see if we can find this one. Is this it?

So then there's -- this one looks like it's the 1203383924-v2. It's a redline, looks like. So that one I think is listed.

Q Okay. So when you do a cursory review of these two documents, what would you have looked for?

A I don't remember looking at them.

Q Okay. If you do a cursory review of a promissory note, what would you be looking for?

A I don't remember doing cursory reviews of

promissory note [sic]. If I looked at it, it would -- but I don't remember, so I don't -- what I would look for, probably the names, maybe the dates, the amounts, the interest rate. I mean, I don't remember making a cursory review of these documents.

Q And do you remember speaking with RC about this at all?

A No.

Q Did you relay to anybody other than --

A I believe --

Q -- Hush --

A -- I told RC my dad wasn't interested in going forward with this. That, I think, would have been -- and I think RC said he wanted to do it. I'm just trying to kind of put this in my mind how this came about. There was a time they were both going to do it. Then we were -- my dad wasn't interested. And RC, I think -- I mean, I just left it to RC and Hush to work it out.

Q And do you remember when you spoke to RC about your dad not wanting to be involved?

A No.

Q Would it have been immediately after getting that email from your dad or later on?

A Would have been after.

Q Immediately after or a week after?

A I don't know.
Q Okay.
A But it might have been before too. I mean, the email seems like as of right now, but I think that there were misgivings before that. So I don't know.
Q So is it possible that you might have communicated to RC that your dad wasn't interested in participating in this transaction before receiving that email?
A Probably not. But my -- you know, my father would, you know, talk in terms "I got cold feet." He would say something like that. So I would know that there's some, you know -- but I don't know exactly when -- whether my father communicated to RC or whether I did. I can't recall. Very well could have been my father talking to RC.
Q And did -- do you know why Shingly sent you this email?
A No.
Q Do you know why RC would have wanted you to look at the documents?
A Probably 'cause Hush told him somebody's got to look at it for him.
Q And why would Hush tell him that?
A Because Hush is his lawyer and wants to borrow

money from him.
Q Okay. So Hush couldn't give him advice on that?
A I think so. I think that where's we're going with this.
Q Okay. And so is this why Hush gave that conflict waiver letter that is attached as Exhibit 8?
A I don't know. I would assume so, but I don't know. I think so.
Q Would it have been important to you to speak to your uncle and talk to him about this given that he couldn't do it with Hush?
A I think we all trusted her, and I think my uncle trusted Hush. So --
Q Okay. But if RC wanted to talk to you about something --
A He wouldn't have talked to me in confidentiali- -- should I do this? Should I not do this? Should I do it with Hush? That was completely between him and Hush.
Q That's in terms of doing the transaction --
A The whole negotiation --
Q -- in general?
A -- of it. RC would have negotiated this with Hush. He wouldn't have had me negotiate it with Hush. It would be something RC would do.
Q Okay. And are there any parts of the transaction

that RC would not negotiate directly with Hush?
A Not that I know of.
Q Would RC, for example, know what interest rate to charge?
A RC would, again, trust Hush in terms of what they were negotiating. I think RC would talk to him about the interest rate, talk to him about the amount of the loan. I think they would have done all of that. It was certainly not done through me.
Q Okay. And would RC be sophisticated enough to dictate the terms of the loan?
A I don't know what you mean by --
MR. JANNOL: I'm sorry I'm laughing.
THE WITNESS: I mean, I don't know what you mean by "sophisticated." He did not have a lot of school education, but he was a very smart man. And he too trusted people. He once gave me a long story how he -- when -- the core to his success was his ability to trust people.
MR. JANNOL: Let's take a minute since you are new to the game.
MR. ZUR: Which game?
MR. JANNOL: Let's go off the record for a second.
THE STENOGRAPHER: Off the record at 11:50 a.m.
(Off the record.)

THE STENOGRAPHER: Back on the record at 1:09 p.m.
MR. ZUR: Good afternoon again, Mr. Cohen. We're going to mark this next document as Exhibit 10.
(Exhibit 10 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment and familiarize yourself with it and then let me know when you're ready.
A I'm ready.
Q Could you tell me what this document is?
A I believe it's a document to some kind of a work out with past fees between Burton Way Hotels and Akin Gump with respect to the Four Seasons litigation.
Q Okay. And if you look at the third -- the third of the four pages of this document where it says, "Agreed: Burton Way Hotels, LLC, By: Ezra Cohen," is that your signature?
A Yes, it is.
Q And it's dated April 20, 2018?
A Yes, it is.
Q Did you review this document before you signed it?
A I believe so. I don't remember, but I believe so.
Q Okay. And what does this agreement accomplish in

your mind?
A Just looking at the face of it right now, I think it was a way to deal with past due fees and an arrangement regarding payment of past due fees and maybe an arrangement with respect to potentially future fees.
Q And was there some sort of dispute that had arisen before this agreement was signed?
A I don't recall it being a dispute. I do know that there was concern about the amount of fees and the high fees and high fees of going forward. So I don't -- that's -- and I think this is an attempt to solve that.
Q Okay. And did you act as counsel for Burton Way Hotels in connection with this agreement?
A I think I was more in a capacity of negotiating it with RC and Hush, not so much as the lawyer on it.
Q So did you negotiate this directly with Hush?
A I can't remember. I think maybe my uncle did. I see that there was a part here about a deferral of fees that had to do with an outcome, and I don't know if it was me that was driving that. I think it was -- I'm not sure.
Q If there was a dispute between Burton Way Hotels and its own counsel, in this case being Akin Gump --
A Mm-hmm.
Q -- would Burton Way Hotels need another lawyer to advise it in connection with that dispute, given that

Akin Gump clearly can't be counsel in connection with that dispute?

A Well, you're calling it a dispute. I'm thinking that we're negotiating past fees. And, to me, it was a negotiation of monies. So --

Q When --

A -- I don't know if there was -- I don't belie- -- we didn't have another lawyer. I mean, we brought in another lawyer to represent us on an appeal that was outside of the Akin Gump firm. But I don't think that he helped us with respect to this.

Q And why -- and -- do you know who -- on the last page, it's got some individuals CC'd. One of them is Mr. Jannol. In what capacity did Mr. Jannol serve in connection with this agreement?

A I'm not sure.

Q Do you know why he was cc'd on this?

A I do not.

Q Okay. The last name here looks likes Douglas Maynard?

A Mm-hmm.

Q Do you know who that is?

A I do not.

Q And do you know why this person might have been CC'd?

A I do not.
Q Okay. And then the middle name, looks like, is Michelle Lerman, Esquire?
A Yeah. That would be my cousin.
Q Any idea why Michelle Lerman was copied on this?
A I do not.
Q She's a lawyer; right?
A Yes, she is.
Q Is it possible that she had advised somebody in connection with in agreement?
A I suppose it's possible. I think her expertise -- or her field was in estates and trusts. But, you know, I think she was probably concerned about her father, father's health. So maybe she took a more active role in something.
Q Okay. So if she was involved --
A I don't know that she was.
Q If --
A Yeah.
Q -- if she was involved, she would have been involved on behalf of her father?
A I don't know.
Q RC --
A I mean, I --
Q She wouldn't -- let me just finish.

A I'm sorry.
Q She would not have been involved on behalf of Burton Way Hotels; right?
A I don't know if that would be the case. You'd -- I don't know. I don't -- I don't know that.
Q If she had been involved on behalf of Burton Way Hotels --
A Mm-hmm.
Q -- since you're the person signing on behalf of Burton Way Hotels --
A Mm-hmm.
Q -- this agreement -- if she had been involved on behalf of Burton Way Hotels, she would've communicated with you; right?
A I don't know that. I mean, this is a family relationship, so I don't know. I can't remember the circumstances, to be honest with you.
Q Okay. Would she have spoken, for example, with your father about this agreement?
A It's hard to speak to my father. Like I said, he couldn't hear. So that wouldn't have been -- RC would have spoken to Father. I doubt she would have spoken to Hush. They had a more acrimonious relationship. Probably -- I'm just guessing -- it was me talking to Hush or RC talking to Hush.

Q Okay. And --
A But it could have been Michelle too. She would have very well called Hush and -- I don't know. I don't pretend to control people and know what everybody says, so I don't know.
Q And she likely would have spoken to her father about this?
A I would imagine that for sure.
Q Okay. Did your father and RC ever have disputes between the two of them?
A Yes.
Q And were you involved ever in resolving those disputes?
A Yes.
Q Was Hush ever involved in resolving those disputes?
A Absolutely.
Q Okay. And who else might have advised them in connection with those disputes?
A Well, I think they looked at Hush as being somebody that would be impartial to both. So he had a lot of voice in the relationship. I'm sure R- -- if there was a dispute between my dad and RC, I had a lot of voice with my dad, maybe a lot less with RC, and RC would probably use me to communicate his point to my dad to try and

convince my dad.
Q And you would meet in person with your dad to --
A Yeah. We --
Q -- have those conversations?
A I would see him quite bit.
Q Okay. You wouldn't speak to him on the phone; right?
A Very rarely.
Q Okay.
A That was difficult.
Q Would Hush ever speak to him on the phone?
A Maybe. But difficult. Usually when you talk to my dad on the phone, it's a one-way conversation. He could speak, but he couldn't hear. So him speaking on the phone was very difficult.
Q Okay. Going back to this document, which we marked as Exhibit 10, if you look at paragraph 7, which is on the second page --
A Mm-hmm.
Q -- can you tell me what paragraph 7 is, just generally?
A Well, I'm not fully reading it but just looks like a release.
Q Now, why would there -- is this a release both ways on -- one on behalf of Akin Gump and the other one on

behalf of Burton Way Hotels?
A It looks like it's both ways.
Q Okay. And why would there be a release in this document?
A I would imagine that the parties are trying to start at ground zero moving forward.
Q Okay. Well, if there's no dispute, why is there a need for a release?
A I think that fees were very high and trying to set some -- I think just what I said, just trying to set some groundwork to go forward.
Q And did Burton Way Hotels contend that the fees were too high and shouldn't be paid?
A Frequently. I don't know about -- yeah. I would say we complained quite a bit about fees.
Q Okay. And was the complaint relayed by you to Hush or by your uncle or your father to Hush?
A I would guess it was mostly RC to Hush. RC was probably more heavy with Hush than I was. I had close personal relationship with Hush. I don't remember having those conversations with him, but I might have.
Q Okay. And you mentioned earlier that another counsel was brought in at some point in connection with an appeal. Was there -- which counsel was that? Do you remember?

A His name's Richard Schirtzer. Quinn Emanuel was the firm.
Q Okay. And Quinn Emanuel represented Burton Way Hotels only in an appeal or was it in this underlying litigation as well?
A Well, I think that's where we were in this litigation. So they took the appeal from this litigation.
Q Okay. And what was Akin Gump's role once Quinn Emanuel came?
A I think to cooperate and assist them in -- give you a chance to read that.
Q Go ahead.
A You sure?
Q Yeah. Go ahead.
A Okay.
Q Finish your answer.
A They were -- took on the appeal. Akin's role, I think, was to assist with the -- prosecuting the litigation.
Q But Akin was no longer lead counsel once --
A That's correct.
Q -- once -- okay.
A I don't think they even sat at the table when the appeal was brought. I remember Martyr (phonetic), I forget his first name, was there. But I think he sat

behind the attorneys. So -- but I think Richard Schirtzer, my recollection, took the lead on it.
Q And when was this? What time?
A I'm going to guess it's probably right around this time. I mean, I'm not exactly sure the years.
Q Okay. So is it fair to say, just to sort of sum it up, that in or about April of 2018, there was -- there had been some dispute between Burton Way Hotels and Akin Gump about past fees and future fees and that the result of it was this agreement (indicating) and Quinn Emanuel eventually replacing Akin Gump as counsel?
A That's going to be my speculation of what this is. That's my best guess right now sitting here.
Q Okay. And this individual at Quinn Emanuel, Mr. Schirtzer --
A Mm-hmm.
Q -- did he handle the trial after the appeal?
A Yes.
Q Okay. Going back to the loan from A.C.C. to 180 PCH or -- yeah. I think it's 180 PCH. Do you recall raising the -- raising usury in connection with that loan back in 2014?
A No. What I recall was a drive out to the property and look at the property and told Hush how much I liked the property. And he had plans. He was going to do

three houses and all that. I said, "Well, okay. I'll take one." That just never came to pass.

So -- so I was trying to get myself in there. That was something I thought looked good, trying to find a way to -- find a piece for myself in that. That looked like an interesting deal. And there was some issues about access and the driveway and doing a split and all this stuff. But, to me, that seemed like an amazing piece of property.

Q When you were looking at this loan back in 2014, this opportunity in -- I guess, it was in Malibu -- did you understand that the property was owned by an entity and not by Hush personally?

A I assumed -- I didn't even know if they had title to it. I don't really know the ownership structure. I would imagine it was going to be a partnership. I don't know if they owned it at the time.

Q When you say "they," who are you referring to?

A I know he was working with Richard on it.

Q Richard who?

A Richard Weintraub.

Q Okay.

A Could have been something they just hadn't tied up. I mean, my recollection was an embryonic stage and -- but I don't really know. I never got very far with it.

Q And would you expect that if they're buying a piece of property together as a partnership that they would form some sort of entity for that purpose?
A I would.
Q And that the entity would essentially just own that piece of property?
A No. I think they had a -- they were going to develop it. They were going to do whatever they were going to do with it.
Q Correct.
A You know, it was the plan.
Q Okay. And did you discuss the terms of that loan and that investment potential with your father?
A I don't recall.
Q When you say your father decided to make the loan, did he just speak directly to Hush and decide to make the loan?
A I don't recall saying that my dad chose -- I think Hush worked it out with RC. Like, I thought my dad was -- when I looked at those documents for this, I was surprised to see that the loan was not to my dad -- from my dad to Hush. I thought my dad made a loan to Hush.
So -- but now I see it was, oh, A.C.C. made the loan to the entity that was buying the property or bought the property. So I'm not sure -- and I think that was

probably a discussion that Hush had with RC. And then I was involved on the -- when it was being repaid.
Q Would your --
A As --
Q -- would your dad make a loan personally on behalf of himself and RC?
A No. Not on behalf of RC. But he -- I -- in my mind, I thought that this was a loan between my dad to Hush that got repaid. So -- then realized, no, it wasn't. It was from the partnership to Hush. Okay. So then I think RC probably told my dad about -- you know, that we made that loan and it's getting repaid.
Q Okay. Would your dad make a loan to Hush or Hush's entity based on conversations that Hush had with RC?
A Yeah. They were both loaning the money separately to Hush, so Hush -- RC would go to my dad and say, "Okay. This is what" -- you know, they would do things together. So that's how I -- in my mind, that's how it was set up. So, like I said, I was surprised it was A.C.C. that got paid back. But I see that. That makes sense.
Q But if the two of them are making a loan --
A Mm-hmm.
Q -- then Hush has to have spoken to one or both of

them to get that loan going; right?
A Yeah. I think he would have spoken to RC, not so much with my dad. Hush didn't speak to my dad that much.
Q Got it.
A And then the entity that would have the money would be A.C.C. So that's where the money would be. So makes sense that the loan came from A.C.C.
(Side discussion between Mr. Zur and Mr. Sohaili.)
BY MR. ZUR:
Q Okay. And your dad wouldn't make a loan personally anyway because he only made those two loans that you referenced earlier to friends?
A Yeah. He was not in the lending business. I mean, you could think of it more like -- and he didn't invest in other people's deals so much, so I know that he has a history of, like -- he's borrowed money just on the basis of a relationship and a handshake with banks. So that kind of dealing wasn't foreign to him, so...
Q Okay. This was -- this was in 2014.
A Mm-hmm.
Q Going back to the 2013 loan in connection with that Blue Jay property, when your father sent you that --
A Just so you know, I'm not real clear on the difference. I know that there's one that got paid back.

And then I think the second one my father did not participate in, is my recollection going forward.

Q So the record is clear, the loan we had just talked about where your father participated through A.C.C., that occurred after the other loan. The other loan --

A I don't remember.

Q -- that we refer to as the Blue Jay loan, that took place in 2013. This one re- -- involving A.C.C. occurred in 2014.

A So which one got paid back?

Q The one in 2014.

A Okay.

Q Going back to Exhibit 6, which is the email from your father, February 23rd, at 10:10 a.m., where he tells you that he's inclined to pass.

A Why don't I see it?

Q Your counsel just gave it to you, but...

A I got it.

Q So in the email, he says, "As I understand the Hush Weintraub loan, the lender will be guaranteeing the construction loan, the land loan, and one other loan?"

It seems that he had some understanding of the terms. Do you know how he got an understanding of the terms of the transaction?

A Through discussions --
Q With?
A -- with RC and myself.
Q Okay.
A I don't think he pro -- I doubt he would have talked to Hush about it.
Q Okay. And so let's dissect that. If he had spoken to you --
A Mm-hmm.
Q -- what terms would he get from you? What information would you relay to him about the transaction?
A Whatever I knew. And I don't remember these pieces to it. I knew there was a construction loan that Hush had to get, and there was a subordination issue. I don't know what the land loan is, and I don't know what the one other loan is. Maybe the land loan was the loan that they were going to make. I'm not sure. It would be speculation.
Q And how would you know the terms of the loan -- or the transaction rather?
A Mostly probably conversations with Hush. Maybe a little bit with RC, but probably more directly with Hush.
Q Okay. And do you remember speaking to Hush about this loan?
A Not specifically. I can't recall a conversation,

but I would have talked to Hush about this --
Q Okay.
A -- if this was something my dad was going to participate in.
Q Okay. Let's go back to Exhibit 8, which was -- it looks like a redline of the conflict waiver letter.
A I'm going the wrong way.
(Stenographer clarification.)
THE WITNESS: I'm going wrong way. So let me just -- is it the letter dated February 21, 2013?
MR. ZUR: Yes. It's a redline.
THE WITNESS: Okay.
MR. ZUR: Yeah. It's a draft.
BY MR. ZUR:
Q Generally looking at this document, does it contain the terms of the transaction?
A I don't know. Contains the terms of a transaction. I'm just looking at it, says "land loan for $3 million." It mentions East West Bank so maybe that's the lender. I'm not sure.
Q In the email from your father where he says, "The lender will be guaranteeing the construction loan," who -- which lender is he talking about?
A I'm not sure.
Q Is it reasonable for him to think that

East West Bank would be the lender here?
A Well, from the document, I'm going to guess it was East West Bank. But I don't know that from that, and I don't even know -- I can't remember.
Q Would East West --
A I mean, it's not based on my recollection of this.
Q East West Bank wouldn't guarantee anything -- right? -- in a transaction like this. Is it possible that he's --
A I don't know.
Q -- is it possible that when he says "the lender," he's talking about the Cohen trust because the Cohen trust is lending money pursuant to this transaction that's described in this letter?
A I don't know that. I don't know that.
Q Okay. So if your father has some sort of understanding of the terms --
A Mm-hmm.
Q -- and he likely didn't get it from Hush, but he might have gotten it either from you or from his brother --
A Mm-hmm.
Q -- from RC, then if he got it from you, then you would know the terms pursuant to this letter; right?

A If I remember. I don't remember. I don't really remember seeing this.

Q Okay. But you did receive a copy of it; right?

A It -- I believe we sent you this from my computer.

Q Okay. So you would know the terms either from talking to Hush, talking to your uncle, or reading this document or another document like it. Is that fair to say? Those are the possibilities?

A That would be the possibilities. I don't recall reading it. I don't recall engaging with it. There was -- if it was something my dad wasn't going to do, I was going to be less involved. Things that my dad was involved with, I became very involved with. So that's what I can tell you.

And I don't remember going through the nitty-gritty with this. I do remember that there was -- one of the reasons my dad passed was that the deal was complicated. And I can't remember exactly what all those complications were, but there was a lot.

Q Okay. And if it -- if the deal was complicated, how would your dad know all of the ins and outs? It'd have to be relayed to him by you?

A Yeah. It can't be communicated very directly. It's complicated.

Q And you would have been knowledgeable enough about the terms of the deal to educate him about it; right?
A I don't have a recollection of the deal at this point. But it probably would have been communicated through my dad -- through RC or myself. My dad and RC would have breakfast together frequently. They had conversations. That wasn't with me. So my dad got stuff. But...
Q And RC knew enough about the real estate and the lending businesses to communicate these things effectively to your up -- to your father?
A RC could make a deal. I think he was very -- he'd been involved in a number of deals. I don't see RC as a lender, more -- as much as I do as a deal person.
Q Okay. So getting into details of who's going to guaranteeing what and things of that nature, that would have to be you communicating that to your father; right?
A Possibly. I don't recall doing that here.
THE WITNESS: You keep shaking your head, and I don't know why. You just, like, doing this (indicating), and it's bugging me.
MR. SOHAILI: Well, well --
THE WITNESS: It's bugging me.
MR. SOHAILI: Okay. Well, then I won't do it.

THE WITNESS: Thank you. I'm trying to be with him, and you're sitting here going like this (indicating). It's a little strange.

So he would get the details from me or maybe even RC. So -- my dad was a smart man too. So he could figure things out.

MR. ZUR: Okay.

THE WITNESS: But he wasn't as involved with the details, but he was a smart man.

MR. ZUR: Okay. We're going to mark this next exhibit as Exhibit 11.

THE STENOGRAPHER: Mm-hmm.

MR. JANNOL: 11.

MR. ZUR: 11. Yep.

(Exhibit 11 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZUR:

Q Take a minute or two to familiarize yourself with this and just let me know when you're ready.

A I'm ready.

Q Okay. So for the record, this is a document -- this is an email dated February 8, 2013, at 2:14 p.m., and it's from Hush to Robert Cohen and Richard Weintraub. And it starts, "I just want to" summarize -- it's a typo -- "summarize [sic] bullet points since we are getting ready

to waive contingencies Monday and get a land loan from East West." And then it has a list of items. And the last item says "will also have to get a conflict waiver from RC due to the client relationship. Let me know if either of you have any issue with this or I have left something out. Thanks."

Have you ever seen this email before today?

A No.

Q Okay. In the last paragraph when Hush says he will also have to "get a conflict waiver from RC due to the client relationship," do you know why?

A Well, I know RC was one of his clients, the partnership, Burton Way Hotels, A.C.C. RC might have also been a client of Hush.

Q Okay.

A I'm not sure.

Q And what would the purpose of the conflict waiver be in this scenario?

A Well, to clear RC to be able to do a deal and clear Akin Gump from any deal that Hush was doing with RC.

Q And would Hush, as part of that conflict waiver, need to tell RC, "Hey, we're doing a deal together. I can't be your counsel on this"?

A Well, I think -- I would suppose so. Yeah.

Q Have you ever sent a conflict waiver letter to a

client?
A No.
Q Okay. So going back to Exhibit 8, which was the draft of the conflict waiver that was dated February 21st, in the final paragraph, at the bottom of page 2, where it says "The firm and I advise you that you may want to seek the advice of independent counsel of your choice in connection with the transaction and this consent and waiver."
Is that where Hush would tell somebody who he's got a client relationship with that he can't represent him on that deal and he should speak to other counsel?
A I would think that's part of papering it for -- to make the -- ability to make the loan to Hush.
Q I understand that. But Hush can't represent the client he's doing a deal with; right?
A I believe that's true.
Q Okay. And so he would have to tell the client, "I can't do it. You should speak to somebody else." And that's what that draft says; right?
A Hush is -- I don't think he probably -- I think that says we need a conflict letter in order for this thing to go forward.
Q Well, that's his email --
A Mm-hmm.

Q -- on February 8th.
A And so conflict letter is going to say, in this case, "We've advised you to seek independent counsel." I see that in the words.
Q Is that what the letter says? It says "We have advised you" or "I do advise you"?
A Well, I think he's advising them to seek -- or advising RC to seek advice from independent counsel and/or saying that he may -- I think that's what it says.
Q Okay. So on February 8th, Hush told RC, "Hey, we're going to have to get a conflict waiver due to the client relationship." And then sometime around February 21st, there's a draft of this conflict waiver letter where he says, "I advise you to seek independent counsel."
That's consistent with the email; right?
A I believe so.
Q Okay. And do you know if RC followed up --
A I don't know --
Q -- on that recommendation?
A -- I don't know that.
Q When Shingly Lee sent you that email saying RC wants you to look at these documents and discuss with him because these documents need to be signed, do you think that that's why she asked you to do that?

A That would be consistent with this. I don't have any recollection of having a discussion with RC about this. I never went through the terms with RC about this.
Q Okay.
A I can see how -- I recall -- we were out -- my dad was out, so I wasn't that involved. And it was complicated. Now, Hush is trying to do what he needed to do to allow this to go forward, and I think RC wanted to go forward with it. So that's where it's at.
Q The family trusted Hush at this time; right?
A Definitely.
Q Okay. And so if Hush sent a letter --
A Mm-hmm.
Q -- to RC telling him that he should speak to other counsel because he can't advise him on it, RC would have taken that advice seriously -- right? -- and sought other counsel?
A No. I don't think that's the way I read the letter, to be honest with you. I read it as saying, hey, we got to get this done to make the deal happen. And when I say the family trusted Hush, trusted Hush with the advice he gave us in terms of our outside matters, trusted Hush to invest with him -- or to do something with him maybe. Maybe not. I don't know.
My dad always thought Hush was an honorable

person, would loan to him or whatever. I mean, he trusted him. I know that Hush helped my father quite a bit with respect to me, in terms of providing -- getting a sounding board to work through issues that I had with my father. And he just trusted Hush, had -- you know, was able to hear both side of things and play that role. So that's trust.

Q As a lawyer --

A Mm-hmm.

Q -- you're generally familiar with lawyers' duties in entering into business deals with their clients; right?

A I don't know "generally" means in this case. I mean, I think there are lawyers that invest with clients many times. So I don't know exactly the fine -- the slicing it thin.

(Mr. Richards joined the videoconference.)

BY MR. ZUR:

Q Would a lawyer have a duty under the rules -- I'm not asking which rule specifically, obviously. But would a lawyer have a duty to advise a client that they are doing a deal with, "Hey, I cannot represent you in this matter. You should get your own counsel"?

A Yeah. I think there's a conflict of interest, but a lawyer does business directly with a client. But I can think -- I got to believe there are situations where

lawyers invest with clients. It just doesn't -- I don't have an exact example of it, but it doesn't seem foreign to me, so...
Q And in a situation like that, that communication would be made by way of a conflict waiver perhaps?
A I would imagine that's the case.
Q Okay. And in this particular transaction, do you think that that's the way it was communicated here with that conflict waiver letter that Hush sent?
A I think the words say that. But I think that there was still a trust that went beyond what the words were, so...
Q So when Shingly emails you --
A Mm-hmm.
Q -- and says, "RC wants" to -- wants "you to look at this and discuss with him," does RC want to discuss the terms of the business deal?
A I have no idea. I wasn't part of it. And I have no idea -- I get -- I'm kind of a one-man show. So I get busy on a lot of things. And if my involvement isn't on that, I'm doing other things. So I don't recall.
Q Would RC want to have consulted with you about whether he should do the deal at all?
A No. He wouldn't have asked me that.
Q Okay.

A If anything, he would have asked me, "Would you come in and sign something for me" or "I just need you." But he never discu- -- I don't remember him discussing the merits of either of these transactions with me.
Q And these transactions -- this particular one on Blue Jay had nothing to do with Burton Way Hotels; right?
A I don't -- I think it had to do with A.C.C. Because that's where -- I'm just guessing that's where A.C.C.'s money -- the money was with A.C.C. So -- and I thought -- I mean, before I thought my dad had made part of the loan on one of the properties. But it's not clear to me.
But go ahead.
Q Okay. So if RC wants to talk to you about this loan, it's likely not about the economic -- the economics of the deal and whether he should do it; right?
A I don't have any recollection of RC talking to me about any deal that didn't deal with the hotel.
Q Right. So if he wants you to look at the documents, it's in your role as a licensed member of the Bar. Is that fair?
A I did not act like RC's lawyer in this transaction.
Q I wasn't asking that. I understand --
A Well, you're asking me if I did it as a licensed

member of the Bar, so.

Q I'm not talking about what you did. I'm asking about what his expectation was. And my question is very specific. When he is asking you to look at the documents, which is what Shingly said to you in that email, is he asking you to look at the documents and tell him whether he should even do this deal economically business-wise or --

A I have no idea, sir.

Q Well, let me finish the question.

A Okay.

Q -- or is it more likely that he views you as a lawyer and simply wants you to look at it and make sure everything is --

MR. RICHARDS: I'm going to object as speculation.

By the way, this is Ronald Richards. I'm here as well appearing now.

THE WITNESS: I have no idea.

BY MR. ZUR:

Q Okay. But he -- did he ever seek your advice on whether to do an economic deal? Not the legalities. Not legal issues surrounding the deal, but whether --

A I'm thinking --

THE STENOGRAPHER: One at a time, please. I did not hear the full question.

MR. ZUR: I said not -- not the legalities or legal issues, but whether he should do the deal.

THE WITNESS: That didn't concern my father?

BY MR. ZUR:

Q Yes.

A Not that I can think of.

Q Can you recall multiple instances where RC, either directly or through Shingly, asked you to look at documents -- legal documents?

A RC would send through Shingly, even probably himself too, a lot of emails. A lot of traffic. I didn't respond to all of them. So there was stuff about Martin Deet (phonetic). There's all kinds of stuff that I just -- I wouldn't be able to keep up with all that. So that was beyond what I could do.

Q Would you eventually, next time you saw him or next time you were on the phone with him, go through these things?

A No. Not necessarily.

Q So there might have been scenarios where he asked you questions about particular documents and you just never told him?

A Absolutely. Yes.

Q And if you -- would this be true as well as to matters that he communicated to you were time sensitive?

A I don't know.
Q Did he ever differentiate between matters that were time sensitive and matters that were not?
A I don't recall. I see in Shingly's letter, she's saying something needs to happen by today or tomorrow. So that would be an example. But I don't know.
Oftentimes Hush, like -- or RC would try and, you know, "This is a rush." But I didn't always respond to that.
Q When did you find out from your father that he was not interested in participating in that loan?
A I can't remember exactly when. I remember when we drove up there -- and I don't know exactly when that was. But I just know from that time on, he wasn't interested.
Q If you look at Exhibit 6 again, which is the email from your father --
A Mm-hmm.
Q -- where he says to you -- it's the last sentence. He says --
A I'm inclined to pass.
Q That's the -- that's the penultimate sentence.
A Oh.
Q The one right after that says, "Let's take another ride out there and let's talk about the negatives

versus the positives."
A Mm-hmm.
Q Is it fair to say that you went there again after Saturday, February 23rd?
A I don't know exactly when we went up there. But I do remember going up there with him and looking at the site and him not being interested in...
Q Did you go just once to the site?
A I only went there once with him. I believe I went there once on my own.
Q Okay. So when he says, "Let's take another ride up there" --
A Mm-hmm.
Q -- that references the only time that you guys went together?
A I only have one memory of being up there with my dad. And I'm pretty sure I went up there once just to go check it out for myself. I wanted to see what it was about.
Q Okay. And sometime after you guys went there together, he confirmed it to you that he was officially out?
A Yeah. He confirmed that he was not interested in that.
Q Okay.

MR. ZUR: Are we up to 12?
THE STENOGRAPHER: Yes.
(Exhibit 12 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. ZUR: Let's go off the record for a moment.
THE STENOGRAPHER: Off the record at 1:56 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 1:58 p.m.
MR. ZUR: Thank you.
BY MR. ZUR:
Q So, Mr. Cohen, if your father passed on the deal sometime after sending this email to you on February 23rd, when -- at some point after you guys went to the site together, the email that you received from Shingly saying RC wants you to look this over, at that time your dad hadn't yet communicated to you that he is not interested in doing the deal; is that right?
A I don't remember the dates.
Q Okay.
A So...
Q Well, let's look at them. The email from your father was Saturday, February 23rd, at 10:10 a.m.
A Mm-hmm.
Q You guys went to the site a few days later?
A I don't know.

Q Would it have been --
A I don't know.
Q Okay. If you look at Exhibit 7, which is the email from Shingly to you, that email is dated February 22nd at 9:28 a.m. So about 24 hours earlier.
A Mm-hmm. What is it? This is -- okay.
Q So at that time when you received this email from Shingly --
A Mm-hmm.
Q -- you hadn't yet heard from your father that he's no longer interested in pursuing the deal; right?
A I hadn't received this email, but I'm not sure my dad was interested prior to him even sending this email. 'Cause I remember there was some -- it's complicated. And I don't remember exactly when that happened. And then my suspicion is RC's talking to my dad, and then my dad's just reaching out to me.
Q If you had gotten an email from RC on Burton Way Hotels or A.C.C. saying, "Hey, I need you to look at this document. It's getting signed today or tomorrow," would you ignore that email?
A My --
MR. RICHARDS: Objection. Calls for speculation. Improper hypothetical.
///

BY MR. ZUR:
Q Have you ever received emails from RC that said, "I need you to look that the document. It's going to be signed today or tomorrow," and ignored it?
A Well, I don't remember seeing this one. So this would be one. And if you said "before" in your hypothetical about the hotel, if I did receive it, I probably would have sent it to Hush. But that's why I think it would have gone to Hush.
I relied on Hush. I can't think of anything I did for Burton Way Hotels without it being also through Hush.
Q Okay. And if RC had told you that something was time sensitive, would you address it?
MR. RICHARDS: Objection. Calls for speculation. Improper hypothetical. Asked and answered.
THE WITNESS: I can't read that.
MR. ZUR: You're not supposed to read it.
THE WITNESS: Well, he's putting in front of me. I can't read backwards.
BY MR. ZUR:
Q You can -- you can answer the question.
A Say it again, please.
MR. ZUR: Could you read back the question, please?
THE STENOGRAPHER: Question, "Okay. And if RC had

told you that something was time sensitive, would you address it?"

THE WITNESS: Not --

MR. RICHARDS: Same objections. Speculation. Improper hypothetical. Asked and answered.

BY MR. ZUR:

Q You can answer.

A I don't know. It was also a family relationship with RC and I. We got into our share of squabbles. And he was my uncle, so it wasn't purely attorney-client privilege that we -- you seem to be describing. So he was also my dad's partner. So I carried -- so there's a whole different type of relationship.

Q Was Hush eventually fired as counsel for the family business?

A I don't recall. I remember after we lost the case, I had a conversation with Hush where I -- we went to dinner. He took me to dinner at Avra, and I expressed how disappointed I was in the outcome and disappointed in him that we got there.

(Stenographer clarification.)

THE WITNESS: So I don't -- that was the last time I remember speaking with Hush.

BY MR. ZUR:

Q And the firing, if it occurred, was in connection

with Quinn Emanuel replacing Akin Gump in that litigation?
A No. I think after the outcome of the litigation, as far as I know, we just stopped using Hush. It's not like we replaced him with anybody. We just flapped around without counsel. We still really don't have counsel.
Q But as far as your litigation is concerned, in 2017, Akin Gump was replaced by Quinn Emanuel?
A I believe so. But I'm not pos- -- I don't know the -- that chain -- because I think they were still on the pleadings or something. And then when there was an appeal -- so I remember the appeal, Hush had an appellate lawyer, and his firm -- I forget his name, but he was there. I'm not exactly sure of the time. But I never saw a letter that says "You're fired."
Q Okay.
A My understanding we just stopped using him. The last exhibit that we marked --
MR. ZUR: Was that 12?
THE STENOGRAPHER: Yes.
BY MR. ZUR:
Q -- that was a February 22, 2013, email from Daniel Shlomi to Robert Cohen with copies to Shingly, you, Hush, Richard Weintraub, and Rahsanna Allen. Do you have that in front of you?
A I do.

Q Have you ever seen this document?
A I don't recall ever seeing it.
Q But it was sent to you; right?
A It's got the correct email address.
Q Okay. You see it has attachments?
A No.
Q Just below the subject.
A Okay.
Q Do you recall opening up any of those attachments?
A I do not.
Q Okay. This email was sent on Friday, February 22nd, at 10:17 p.m. Had your father communicated to you by that time whether he was interested in continuing?
A I don't recall.
Q Okay. And if he had not yet communicated it to you, would you read this email?
A I don't know. I don't -- on a Friday night, you're not likely to get me reading emails, I guess, unless there's something that's directly going on. I don't remember seeing this. And I -- you know, clearly people are up late at night working on things. I wasn't part of that.
Q Was there a time sensitivity communicated by this

email?
A I don't know. I don't see that.
Q Could you read the final sentence?
A "Hopefully this document is acceptable to all parties as we need to get Robert's signature tomorrow morning."
Q Does that communicate a time sensitivity?
A It suggests one, but it's not always the case. I mean, I don't know why you'd get a signature on Saturday morning. People frequently write things and time goes on.
MR. ZUR: Okay. Let's go to the next one. It's going to be Exhibit 13.
(Exhibit 13 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Let me know when you're ready.
A I'm ready.
Q Okay. So this is an email from Daniel Shlomi to Robert Cohen with copies to Shingly, you, and Hush. And the subject is -- and the -- it was sent February 22nd at 10:18 p.m.
A Mm-hmm.
Q Subject "Blue Jay Way Conflict Waiver." And it says, "Robert, attached please find a revised draft of the conflict waiver and a redline against the draft, I

believe, Hush previously sent you. This revised draft mentions the deed of trust as security for your note, discusses the completion guarantee for your loan, and substitutes a new entity for Richard as discussed in my email regarding the indemnity agreement."

Did you read this email?

A I don't believe so.

Q Did you read any of the attachments?

A No. I don't belie- -- I don't recall receiving this, and it is my email address.

Q Do you know what he's referring to when he says "completion guarantee for your loan"?

A I don't. I was confused earlier when I was trying to explain it. I think -- oh, I think that they -- he needed a completion guarantee from RC is what I recall.

Q Okay. So if we go back to Exhibit 6, which is the email from your father to you, the following morning, when he says "As I understand the Hush Weintraub loan, the lender will be guaranteeing the construction loan."

Is that the completion guarantee referenced in Mr. Shlomi's email to you?

A I don't know. It might be, but I don't know that.

Q So when your father is mentioning the lender will be guaranteeing the construction loan, how would he know

that?
MR. RICHARDS: Objection. Calls for speculation. Lack of foundation. Lack of personal knowledge.
BY MR. ZUR:
Q You can answer.
A I don't know. Either through me or RC. I'm not sure.
Q Do you recall speaking to your father about a completion guarantee?
A No. I recall that the deal was complicated. I don't remember the ins and outs exactly of it. I recall one of the hang-ups being subordination and not having a clear guarantee from Hush saying he's going to pay back this loan. That, to me, was easil- -- more easily defined. And we didn't believe in the project.
Q The loan wasn't to Hush personally; right?
A Hush's entity. So Hush could have signed a personal guarantee.
Q Right. If the loan had been to Hush personally, there would be no need for a guarantee; right?
A No. There probably wouldn't be because the guarantee wouldn't have been enforceable. If we made the loan to Hush, Hush's guarantee wouldn't have been effectively a guarantee, from what I've learned.
Q Right. You only need a guarantee from an

individual if you make a loan to an entity; right?
A That's my understanding. Correct.
Q Okay.
MR. ZUR: This is going to be 14.
(Exhibit 14 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Let me know when you're ready.
A I'm ready.
Q Okay. So this is an email from Mr. Shlomi to Shingly and RC, and copies to you and Hush, and it's dated February 25, 2013, at 10:07 a.m. And it says, "Robert, as discussed, attached are the final Word versions of the indemnity agreement and conflict waiver. I only need PDFs of your signature on the two signature pages I sent in my previous email. I will then circulate final executed copies."
Do you recall receiving this email?
A No.
Q Did this -- did you receive this email before you went and visited the site with your father?
A I don't recall receiving this email.
Q Well, you know -- we know that you did receive the email. It was sent to you. So my question is a little bit different. Did this email come to you before

you went with your father to visit the site?
A I don't know.
Q Would you have gone to the site first thing in the morning on Monday?
MR. RICHARDS: Objection. Calls for speculation. Improper hypothetical.
BY MR. ZUR:
Q You can answer.
A I don't know. I don't recall.
MR. ZUR: It's 15?
THE STENOGRAPHER: (Nods head in the affirmative.)
(Exhibit 15 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Did you know who Daniel Shlomi was at the time?
A Yeah.
Q So you knew he was an associate at Akin Gump working for Hush?
A You know, I was just thinking, I don't know if he was an associate or partner. But he worked at Akin Gump underneath Hush.
Q Okay. And when you got emails from Akin Gump on Burton Way hotel matters, you would address them; right?
A Sometimes. Not always.
Q If they contained legal documents?

A Not always.
Q Did you wonder, at or about February 25, 2013, why you were getting all these emails from Daniel Shlomi that had nothing to do with Burton Way Hotels?
A I don't know that I opened them. I see it had something to do with Burton Blue Jay Way. I don't remember receiving them. And if my dad -- if -- knew enough about Blue Jay Way for us to go up to the property or talked about going up to the property, doesn't surprise me that emails came my way. But I can't tell you I remember them.
Q But at this time, you hadn't yet found out finally that your dad wasn't interested; right?
A I can't tell you that.
MR. RICHARDS: Objection. Asked and answered.
THE WITNESS: I don't have --
MR. RICHARDS: Speculation.
Are you getting my objections, Madam Court Reporter?
THE STENOGRAPHER: I am.
MR. RICHARDS: Okay. Mister -- Ezra, can you give me half a second for me to impose an objection?
And also, Roye, can we take a break in about five minutes so I can walk up there?
MR. ZUR: Sure.

MR. RICHARDS: Thanks.

MR. LEV: I told him not to come up.

THE WITNESS: Do we want to do a break now for him or what?

MR. LEV: I don't care.

(Simultaneous cross talk interrupted by the stenographer.)

THE STENOGRAPHER: I'm sorry. One at a time, please.

MR. ZUR: Let's go off the record briefly.

THE STENOGRAPHER: Off the record at 2:17 p.m.

(Mr. Richards entered the conference room.)

(Off the record.)

THE STENOGRAPHER: Back on record at 2:33 p.m.

BY MR. ZUR:

Q Okay. So I've passed out Exhibit 15. It's an email from Daniel Shlomi to Shingly, copying Robert Cohen, you, and Hush, subject "Blue Jay Way." I don't know if I stated the date already, but it's February 25th at 9:33 a.m.

The second paragraph -- so it's addressed to Shingly. And it says, "We should be receiving the East West loan documents this morning, and Robert will be cosigning the guarantee. Once you receive this document, please arrange for it to be signed as soon as possible since the bank will need everything signed quickly."

Have you ever seen this document before?
A I've never seen it.
Q But this was sent to you?
A It has my name in the CC line. Doesn't have my email address. But it has my name.
Q Okay. Is the guarantee that's referenced in the second paragraph, is that the guarantee that your father referred to in the email to you?
MR. RICHARDS: Objection. Speculation. Lack of personal knowledge. Foundation.
BY MR. ZUR:
Q You can answer.
A I don't know.
Q And if Shingly had communicated to you, as she did three days earlier, that RC wants you to look at documents, and then you receive documents for several days thereafter, you wouldn't bother opening this email or reading it?
MR. RICHARDS: Objection. Speculation. Improper hypothetical. Conjecture.
BY MR. ZUR:
Q You can answer.
A It's very possible.
Q That in spite of her telling you that --
A Yes.

Q -- he wants you to look at it?
THE WITNESS: Can I have a minute with my attorney?
MR. ZUR: Of course.
THE WITNESS: Just want to say one thing.
MR. JANNOL: Sure.
THE STENOGRAPHER: Off the record at 2:35 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 2:37 p.m.
THE WITNESS: Okay.
So I keep looking at the date, February 25th. I don't recall seeing these documents. But I could tell you for the last 33 years, I've had a spiritual teacher. And his birthday is February 26th. And it's always something we celebrate in a big way.
This is three years after he died. But we still continued to celebrate. So there could have been emails and all this stuff. I've got a lot of emails I don't open. I'm not directly involved with something, I don't necessarily open it. I don't believe -- I could very well have not seen this and not even been in the office while this was going down. I'm not telling you for sure.
But I'm just looking at that date, and if that's one day before we're going to commemorate his birth, I'm guessing that's even more reason why. But I don't -- this wasn't my thing. This wasn't my deal. So there's a lot

of chatter going back and forth. I can see, personality-wise, Hush likes to communicate a lot. RC likes to communicate a lot. I think they're doing the whole thing. It wasn't going through me.

MR. JANNOL: Got it. Okay.

Next question.

MR. ZUR: Okay. This next one is going to 16.

(Exhibit 16 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZUR:

Q Take a minute to look, and let me know when you're ready.

You ready?

A Yeah.

Q Okay. Have you ever seen these emails?

A I don't recall. No.

Q Okay. So for the record, there's an email dated February 25th at 11:37 from Daniel Shlomi to Hush and copying Shingly. Then there's a response from Shingly to Daniel Shlomi this time with copies to Hush. The second email address is, I believe, RC's. And then it says -- and then you. And the subject is "Re: Robert's Wire," and it's dated February 25, 2013, at 1:42 p.m.

Do you see that email?

A The 1:40- -- yeah.

Q Okay. Were you and RC copied on the initial email from Daniel Shlomi to Hush copying Shingly?
A I bel- --
MR. RICHARDS: Objection. Lack of personal knowledge. Speculation.
MR. ZUR: He's looking at the document.
THE WITNESS: Well, from the document, I don't believe I've ever seen this.
BY MR. ZUR:
Q Okay. So is it fair to say that Shingly added you to the email?
MR. RICHARDS: Objection. Speculation.
THE WITNESS: I don't know.
BY MR. ZUR:
Q Well, Shingly is the one who responded; correct?
A Could have been somebody on Shingly's account. I don't really fully know.
Q Somebody using Shingly's email?
A Yeah. I don't know.
Q Either Shingly or somebody else?
A Somebody. And I got -- I assume that's me. I mean, it's got my name on it, but it doesn't have my email address.
Q Okay.
A So...

Q Did anybody else have access to Shingly's email?
A I don't know. Never been to her office.
Q Okay. So somebody -- either Shingly or somebody posing as Shingly -- responded to the emails from Daniel Shlomi and added RC. That is RC's email; correct?
A I -- well, I assume so.
Q Added RC and you. Any idea why she might have done that?
MR. RICHARDS: Objection. Calls for speculation. Assumes the fact not in evidence. Lack of personal knowledge. Lack of authentication that there's no other emails in between these emails.
BY MR. ZUR:
Q You can answer.
A I don't know.
Q Okay. Given that she sent you an email three days earlier saying RC wanted you to discuss these documents --
A Mm-hmm.
Q -- wanted you to review these documents and discuss with him, is it fair to say that she thought you were looking at these documents?
MR. RICHARDS: Objection.
THE WITNESS: I don't --
MR. RICHARDS: Speculation. Hold on. Let me just get

my objection. Speculation. No foundation. Improper hypothetical. Badgering.

THE WITNESS: You're not badgering me, but I don't know. But maybe you are.

He's really badgering me?

I don't know.

BY MR. ZUR:

Q She communicated to you three days earlier that she wanted you to look at documents; right? We've looked at that --

MR. RICHARDS: Objection.

MR. ZUR: You've got to let me finish.

MR. RICHARDS: I will.

MR. ZUR: Thank you.

BY MR. ZUR:

Q She communicated to you three days earlier that she wanted you to review the documents -- or that RC wanted you to review the documents; right?

MR. RICHARDS: Objection. Asked and answered.

MR. JANNOL: Would you --

THE WITNESS: So --

MR. JANNOL: Let him finish, please. Are you done with your question?

MR. ZUR: I'm done with my question.

MR. JANNOL: Objection. Asked and answered.

Argumentative. Ask him a question. Don't make accusations, please.

MR. ZUR: They're not accusations.

MR. JANNOL: They are.

MR. ZUR: They're not. They're really not.

MR. JANNOL: Okay.

MR. ZUR: They're really not.

MR. JANNOL: You can answer the question.

THE WITNESS: Can you repeat the question, please?

MR. JANNOL: Sure.

MR. RICHARDS: Are you going to read the objections too? 'Cause I just don't know if I want to keep objecting. Can you read my objection?

THE STENOGRAPHER: If you want me to, I will.

MR. RICHARDS: I do.

THE STENOGRAPHER: One moment.

Question, "She communicated to you three days earlier that she wanted you to review the documents -- or that RC wanted you to review the documents; right?"

Mr. Richards, "Objection. Asked and answered."

Mr. Jannol, "Would you" --

The witness, "So" --

Mr. Jannol, "Let him finish, please.

Are you done with your question?"

Mr. Zur, "I'm done with my question."

Mr. Jannol, "Objection. Asked and answered. Argumentative. Ask him a question. Don't make accusations, please."

Mr. Zur, "They're not accusations."

Mr. Jannol, "They are."

THE WITNESS: I didn't ask you to repeat the -- hear that. But you said the word "communicated." I don't remember Shingly communicating this to me verbally. I see that there's some emails back and forth. I don't remember receiving them. I don't remember engaging Shingly with this. I don't even remember engaging RC with this.

So I'm not saying -- I don't have a recollection of exactly how my involvement -- I was not in on all these back and forths while they're doing this and they're, like, minutes apart with these emails. That's not happening at all in real time with me.

BY MR. ZUR:

Q Is there a reason that you can think of that Akin Gump would be sending you these emails and Shingly would add you to emails if -- if neither RC nor Akin Gump wanted you to read them?

MR. LEV: Objection. Calls for speculation. Improper hypothetical. Lack of personal knowledge. Vague as to who Akin Gump is.

THE WITNESS: So I think it goes back to what we

discussed earlier. I think they wanted me involved for appearance. But I wasn't involved with this thing.
BY MR. ZUR:
Q Who's "they"?
A I was --
Q I'm sorry.
A Hush and RC. I mean, to make this deal happen, this was between them and what they were doing.
Q Understood.
A Did not get negotiated with me.
Q Okay. Did you ever communicate to Hush or to Mr. Shlomi or anybody that you're not reading these emails, that you're not involved in this, that you have...
A Not that I recall.
Q Okay. You never sent any emails in response to Mr. Shlomi or to Shingly?
A Not that I recall.
Q Okay.
A I have produced everything I found.
MR. ZUR: Okay. This is the last exhibit.
THE STENOGRAPHER: So Exhibit 17?
MR. ZUR: Yeah.
(Exhibit 17 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. JANNOL: Thank you.

MR. ZUR: You're welcome.
Oh, did I give you two?
BY MR. ZUR:
Q You don't have to read this whole document but just familiarize yourself generally, and then we're going to focus on paragraph 9.
A Well, there's a lot here. I'm not a quick reader.
Q I understand.
A So I'll just go to 9. Is that okay? I can see that it has to do with litigation, Hush's declaration. It's in this Blue Jay Way matter. Is that enough familiarity?
Q Sure.
A Okay.
Q So for the record, this is a document filed in the Blue Jay Way bankruptcy case. It was filed as docket number 109. It's entitled "Declaration of Hushmand Sohaili in support of Debtor's reply to Claim No. 2-1 of Blue Jay 180, LLC, [sic] a California limited liability company."
And wow. I'm now noticing a massive typo.
MR. JANNOL: Happens.
MR. ZUR: It happens. Yes.
///

BY MR. ZUR:
Q So for the record, this is a declaration that Mr. Sohaili submitted in the bankruptcy case. Could you read paragraph number 9, Mr. Cohen, please?
A "I asked RC which attorney was reviewing it for him and to whom the promissory note should be sent. RC told me to send the documents to his nephew, Ezra Cohen, Esquire" -- never called me that -- "whom I knew well because he had worked on BWH and A.C.C. matters. As RC instructed, Mr. Sohaili sent the loan documents to Ezra Cohen."
Q Is it true that Mr. Shlomi sent the loan documents to you as reflected in the emails that we've seen?
A I only know what those documents -- what they present. So I don't remember ever seeing them.
Q Okay. Is it true that you knew Hush well because you had worked on BWH and A.C.C. matters?
A I would go further. I knew Hush before that. I mean, when I came out of law school, the first job I took, Hush was there. And I mildly worked underneath him, but we had a fast friendship, and he had represented other members of my family. So I felt close to him from the very beginning when I met him.
Q Is it reasonable, given the existence of the

conflict waiver where Hush told RC to got his own counsel because he couldn't advise him on it and given that Shingly asked you to look at the documents on behalf of RC -- is it reasonable for Hush to have thought that RC had his own counsel?

MR. LEV: Objection. Speculation. Conjecture. Lack of personal knowledge.

THE WITNESS: I don't think so.

BY MR. ZUR:

Q Why?

A Hush knew my capacity as a lawyer. He knew I didn't do secured transactions. I didn't -- wouldn't have been a -- I wouldn't have -- there, once or twice, I signed an opinion letter for A.C.C. Company in connection with financing for Burton Way Hotels. He prepared the whole thing. I just signed it 'cause he put it in front of me and said, "We need to have separate counsel do this."

So for him to think that RC was getting, you know, independent counsel to review all this stuff, it was -- he would have only gone to me because, "Hey, he's a lawyer. He's going to be friendly. He's going to help us get this thing done." So that would be my speculation.

Q I see.

A I don't know that. Nobody's ever said that to

me, but that would be my guess. So I don't think it's reasonable for -- I don't reasonably think he thought he was going to a third-party lawyer to go deal with this thing. He figured he was coming to me because he's going to help make this thing happen. I think that's why I was included in these emails. I was the easiest workplace to go.

Q You thought that's why Shingly sent you that email?

A I think --

MR. LEV: Speculation.

THE WITNESS: -- Shingly -- you want to read that to me?

MR. JANNOL: You have a question pending.

MR. ZUR: Yeah.

THE WITNESS: I'm not sure. He asked if I thought it was reasonable, and I don't think it was reasonable.

BY MR. ZUR:

Q For Shingly to send you that email?

A Oh. I think Shingly was doing just as directed.

Q By?

A RC.

Q Okay.

A That's what I think.

Q And did you represent A.C.C. the following year

on a similar loan to another one of Hush's entities?
A Not that I know of.
Q The exhibits that we looked at before with the payoff requests and the letter to escrow --
A Oh, getting paid back? I thought -- my recollection was that was a loan that was coming back to my dad. I don't remember it being a loan from A.C.C. So he went through the whole thing, and I helped -- facilitated the payoff of that loan. So...
But if you'd ask me before all this, I thought my dad had made the loan. I didn't realize the loan came from A.C.C. Company. And I looked at all the documents, okay, I can see it.
Q But your dad had never made any loans personally in that amount?
A To family members. I mean, I don't know. Not -- yeah. So...
Q Okay.
MR. ZUR: Let's go off the record for a minute.
THE STENOGRAPHER: Off the record at 2:53 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 2:56 p.m.
MR. ZUR: So we're actually, we're ready to conclude.
MR. RICHARDS: I got a couple questions.
MR. ZUR: We'll conclude our part.

THE WITNESS: You're concluded?
MR. ZUR: We're concluding our part. Yeah.
THE WITNESS: Okay. Good. He's coming around so I can see him.
MR. RICHARDS: Are the exhibits in front of him?
MR. JANNOL: Scanned it --
THE WITNESS: Yes, they are, and they're in order.
THE STENOGRAPHER: One -- I'm sorry. One at a time, please.
MR. RICHARDS: We're not on the record. Oh yeah.
THE STENOGRAPHER: Yes, we are.
MR. RICHARDS: Where are the official exhibits? Are they over there (indicating)?
MR. LEV: She's got them.
MR. RICHARDS: Okay.
THE WITNESS: I have copies that they gave me, and they're still in order, I think.
MR. RICHARDS: All right.
MR. JANNOL: Take these. These are numbered.
THE WITNESS: Oh.
MR. JANNOL: Okay?
THE WITNESS: Easier.

EXAMINATION

BY MR. RICHARDS:

Q Okay. If you could just look at Exhibit 7, please. When you received the email on February 22, 2013, that's before the email that your dad sent that indicated he didn't want to do the project; isn't that correct?

A I don't remember receiving this email dated February 22nd. The date of the February 22nd email to me is before the date of my father's email to me.

Q That's correct. I just want to establish that you -- when Shingly sent you the documents to look at, it was the day before your father sent you the email; correct. It's dated before?

A It's dated before. I don't remember seeing this.

Q That's right. Sitting here today, can you rule out that she wasn't sending you the documents to look at them for your father's benefit?

A I don't know. That would be speculation.

Q Right. So you couldn't say, yes, she was sending them to look for the benefit of my father or, no, she wasn't. You have no opinion; correct?

A I have no idea.

Q Okay.

A Well, it would be -- she probably would have said my dad's name in there, but I don't know. I don't know.

Q 'Cause when you look at the emails in date order, it looks like your father's interested in the deal until we see the February 23rd email where he says he's not interested. Is that fair to say, just looking at the emails only?
A Going by the dates.
Q Right.
A But I don't remember seeing this.
Q I'm not saying you need to remember seeing this.
A Okay.
Q I'm saying, did you ever look at documents for your father ever with respect to deals?
A Yes.
Q Okay. And at any time, did you ever tell Hush in this transaction that's at issue in this case that you were representing RC?
A No.
Q Okay. And did --
A I don't recall. I don't think I would have said that.
Q Right. Well, you testified that you didn't represent him -- correct? -- in this transaction?
A As far as I know, I did not.
Q So I'm just -- for the record, I'm establishing you don't have any recollection of telling Hush that you

were representing him; correct?
MR. ZUR: Vague.
THE WITNESS: I don't have recollection of having that discussion with Hush.
BY MR. RICHARDS:
Q Well, if you're typically not representing someone in a transaction, would it be fair to say you wouldn't then tell people you were; right?
A I don't typically represent people in a transaction.
Q Right. And you --
A That's not what I do.
Q Right. And you testified earlier that you don't do secured debt -- you don't represent clients in secured debt transactions; is that fair to say?
A That's definitely fair to say.
Q Okay. And do you remember Hush ever having a conversation with you that --
A I would say I've never represented something. In fact, I would use somebody to do it for me.
Q Okay. So you don't feel you have the skill set to do -- represent paying clients in a secured debt transaction?
A That's correct.
Q All right. And you don't have any recollection

of Hush telling you with spoken words, "Hey, you're representing RC in this transaction"; correct?
A I don't have a recollection of that.
Q Okay. And do you have a recollection of Daniel Shlomi telling you, "Hey, I understand you're acting as an attorney for RC"? Do you have a recollection of that?
A I don't have a recollection of that.
Q Okay. And in other emails, you see people sending RC documents without you on the email. Did you see that in the exhibits?
A I did not see that.
Q You did not?
A No.
Q Okay. All right. Let's take a look at Exhibit 16. Just at the bottom of the first page, you'll see an email from Daniel Shlomi to Shingly, and he's writing Hush.
A So it's Daniel Shlomi to Hush, and it's copied to Shingly. And that's it.
Q Right. I'll represent I'm not going to keep you here to show you a bunch of other emails where you're not on the email. But, typically, when you're -- are you familiar with the anti-contact rule?
A No.

Q Okay. Are you aware, just generally, that if you actually were the lawyer in a transaction, people wouldn't be emailing your client or their assistant without you on the email, if you were the lawyer, or do you not know what the anti-contact rule is?
A I don't know the anti-contact rule, but you usually go through somebody's attorney.
Q Okay. And let's take a look at Exhibit 8, please, the conflict waiver -- or the draft of a conflict waiver, Exhibit 8 and 10. Mr. Zur, my colleague, showed you these documents.
A So 8 or 10? Which one do you want me to look at?
Q I'd like for you to just have 8 and 10 in front of you. (Indiscernible) copy.
(Stenographer clarification.)
MR. RICHARDS: These are really dark.
BY MR. RICHARDS:
Q Okay. Let's look at Exhibit 8 first. Did you have any participation in the preparation of this conflict waiver in Exhibit 8?
A No.
Q Okay. And as a lawyer, have you ever assist -- have you ever been paid to draft conflict waivers for clients?
A No.

Q Do you have any clients tip -- are you, like, a practicing attorney?
A I have no clients, and I'm not a practicing -- well, I am a lawyer. I'm a licensed lawyer, but I don't hang a shingle. I don't take clients.
Q And so when Mr. Zur was asking you about certain, what I would call, statutory language in a conflict waiver about you have the right to seek independent counsel, have you ever taken any courses to what that language means?
A No.
Q Okay. And have you ever given advice to any third party as a lawyer on what they should do if they get a conflict before they sign a conflict waiver?
A No.
Q Did you, in any way, advise RC on the ramifications of the conflict waiver that his trusted lawyer, Hush, had sent him?
A No.
Q At any time during the -- this -- during the time that you knew Hush, did he ever tell you that he put his clients in usurious loans?
A No.
Q At any time did Hush ever indicate to you that he would put your brother in a loan that was illegal?
A My father's brother.

Q Your father's brother. Sorry. I apologize.
A Yeah. No.
Q At any time during your review -- or at any time this matter was being considered by Joe Cohen, did Hush ever tell you, hey -- something to the effect of, "Hey, secretly, this is a usurious loan, but I'm not going to tell anybody"?
A No.
Q Would it have surprised you to find out if Hush played a trick on either Joe or Robert Cohen that he drafted -- his office drafted a usurious loan?
A Yes.
Q And why is that?
A Because there was a relationship of trust there. And I think both speaking for my dad and RC, they would have loaned money to Hush based on their relationship with Hush, not based on even his financial statement, anything like that. It would have been -- and so even if it's going to an entity, the person -- you wouldn't have just done it with an entity without knowing who's involved with the entity and you trust the person.
I mean, I --
Q You --
A -- never drafted a loan like that (indicating). I mean...

Q I think you're pointing to Exhibit 9; right?
A That's correct.
Q Okay. And if you look at the first paragraph of Exhibit 9, you see that the interest rate is 12 percent.
A Yes.
Q Are you aware that, in this case, over a decade later, Hush is now contending that the loan that his office drafted for your uncle is usurious? Are you aware of that?
A Not directly. I've been -- I don't have much knowledge of the case. I've stayed away from it. But I've heard -- I -- I've heard --
Q Okay.
A -- that there's a usurious claim.
Q In the course of you dealing with Hush, did he ever trick your father, to the best of your knowledge, with any documents he prepared?
A Not that I know of. I --
Q What about your uncle?
THE STENOGRAPHER: I'm sorry.
BY MR. RICHARDS:
Q I'm sorry. I cut you off. Go ahead. Finish the sentence.
A Not that I know of. Trust him.
And you were asking about my uncle. Do I know of

him ever tricking my uncle? Not that I know of.
Q And your uncle's Robert Cohen?
A That's correct.
Q Okay. Would it surprise you to learn that Hush drafted a promissory note for his company to lend money to your uncle Robert, and then 11 years later he contended that the interest rate he put on the loan was usurious?
A Yes.
MR. ZUR: Objection. Compound. Impossible to understand. Assumes facts not in evidence. Calls for speculation.
MR. JANNOL: You can answer.
MR. ZUR: Mischaracterizes.
THE WITNESS: It would surprise me because I believe Hush -- if it was usurious and improper, he knew it at -- when the loan was signed. I mean, he wrote it, and he would have known it. I mean, he's done so many secured transactions. I mean, that was such a big part of his business. So he -- and opinion letters. Every time we did a loan, he had to -- you know, had the firm, that was multiple days to opine on a loan and to say it was correct.
And, I mean, I don't know all the things that go into an opinion letter, but all the stuff that a lender would traditionally want. So that would surprise me.

BY MR. RICHARDS:
Q As a brother lawyer of Hush, did you consider Hush to be an expert in secured transactions?
A I don't know. Did you say "brother"?
Q Brother, lawyer, fellow attorney, member of the Bar?
A Yeah. I considered Hush to be an expert in secured transactions.
Q And I've read this conflict waiver a couple times. Does it say anywhere that Hush was advising Robert Cohen that the loan that he -- the loan documents he drafted were usurious?
MR. ZUR: Objection.
THE WITNESS: I don't know. I'm sorry.
THE STENOGRAPHER: What was the objection?
MR. ZUR: Assumes facts not in evidence. Mischaracterizes prior testimony.
THE WITNESS: I don't know. I didn't read the conflict letter.
BY MR. RICHARDS:
Q You didn't read the conflict -- would you want to -- I can represent to you the word "usury" or "usurious" is not in the letter. Will you take my word for it?
A Yeah.

Q Okay. Would -- did -- at any -- do you know of any reason why -- knowing Hush so well as a trusted confidant of the family, why he wouldn't have disclosed in 2013 that the loan that his law firm -- or the loan documents that his law firm created was he -- was usurious, according to Hush?
MR. ZUR: Calls for speculation.
THE WITNESS: I can answer?
BY MR. RICHARDS:
Q Yeah.
A I don't know of any reason why.
Q Okay. In 2013, would it be fair --
A And did you ask if it would surprise me?
Q Yeah. You said --
A Yeah, it would surprise me.
Q -- that he wouldn't disclose that?
A Yeah.
Q Okay.
A Or that he would create it.
Q And back in 2013, would it be fair to say that you had -- your family had a close relationship with Hush?
A Yes.
Q And did you -- and you've testified that you trusted him implicitly; correct?
A Yes.

Q Did you consider -- did your family consider him a fiduciary?
A Yes.
Q And can you think of any reason why, as a fiduciary, that Hush would direct his law firm to draft a loan document that 11 years later he would contend was usurious?
MR. ZUR: Objection. Calls for speculation.
THE WITNESS: I don't know of any reason why.
BY MR. RICHARDS:
Q Did Hush -- did you ever get to observe Hush's relationship with RC?
A Yes.
Q And did RC trust Hush, to the best of your knowledge?
A Yes. I think -- I'm just going to speculate, but I think Hush was -- had a fondness for my father, maybe more than RC, but absolutely he really liked RC and respected him. And yeah.
Q And I'm assuming you never -- Counsel never showed you the operating agreement for S&W Blue Jay, but I'm assuming you never read that either; correct?
A I never saw it.
Q Okay.
MR. RICHARDS: All right. I don't have any further

questions.

THE STENOGRAPHER: Mr. Jannol, and Mr. Richards, are you ordering a copy?

MR. JANNOL: No.

MR. LEV: Yes. I did order one through the email.

MR. ZUR: I have just one --

MR. RICHARDS: Oh, we're going to go for round three.

(Simultaneous cross talk interrupted by the stenographer.)

THE STENOGRAPHER: One at a time, please.

MR. ZUR: I just have one question.

THE WITNESS: I can't read it when it's upside down.

MR. ZUR: Eyes on me, please.

EXAMINATION

BY MR. ZUR:

Q Would it surprise you to hear that in 2014, in connection with the loan made by A.C.C. to 180 PCH, you raised an issue as to usury in connection with that loan?

MR. RICHARDS: Objection as to form.

THE WITNESS: I don't --

MR. JANNOL: Would it surprise you, yes or no?

MR. RICHARDS: Assumes the fact not in evidence.

THE WITNESS: It would surprise me.

MR. ZUR: Okay.

THE STENOGRAPHER: Off the record at 3:12 p.m.

(Off the record.)

THE STENOGRAPHER: Back on the record at 3:13 p.m.

MR. RICHARDS: He's finishing -- Mr. Zur's finishing and I have no re-redirect.

THE STENOGRAPHER: Off the record at 3:13 p.m.

(Time noted 3:13 p.m.)

---o0o---

STATE OF CALIFORNIA )
)
)

CERTIFICATE OF REPORTER

I, JUSTYNE N. JOHNSON, do hereby certify that the witness in the foregoing deposition was by me duly affirmed to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed under my direction and supervision; that the foregoing is a full, complete and true record of said testimony; that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of September, 2024.

Justyne Johnson

JUSTYNE N. JOHNSON, CSR NO. 14301

**A**
**ability**
50:24, 66:18, 89:14
**able**
37:20, 88:19, 92:5, 96:14
**about**
14:16, 15:6, 15:9, 19:19, 20:21, 22:5, 22:13, 24:25, 34:11, 35:10, 35:24, 37:7, 42:5, 42:10, 42:20, 43:2, 43:5, 44:12, 47:8, 48:9, 48:13, 49:11, 50:22, 50:25, 52:1, 53:18, 53:24, 55:6, 55:7, 56:8, 60:14, 63:6, 63:15, 63:19, 65:10, 65:14, 66:6, 66:7, 68:9, 68:18, 70:13, 71:19, 72:7, 74:14, 74:15, 76:7, 76:9, 77:6, 79:11, 81:4, 82:6, 82:11, 82:23, 83:1, 83:23, 84:13, 86:2, 86:10, 91:2, 91:3, 93:22, 94:14, 94:15, 94:18, 95:2, 95:3, 96:12, 96:21, 97:25, 98:19, 100:5, 101:7, 107:8, 110:2, 110:8, 110:9, 110:23, 132:6, 132:8, 134:19, 134:25
**above**
35:3
**absolutely**
72:17, 96:23, 138:18
**acceptable**
105:4
**access**
77:7, 116:1
**accomplish**
67:25
**according**
137:6
**account**
41:2, 115:16
**accusations**
118:2, 118:3, 119:3, 119:4
**acrimonious**
71:23
**act**
17:25, 36:22, 68:12, 94:22
**acted**
40:4
**acting**
12:21, 130:6
**active**
18:1, 18:3, 23:10, 70:14
**actually**
125:23, 131:2
**add**
119:20
**added**
115:10, 116:5, 116:7
**addition**
26:2, 26:12, 45:20
**additional**
19:7, 41:6
**address**
41:12, 57:18, 101:14, 102:2, 104:4, 106:10, 109:23, 112:5, 114:21, 115:23
**addressed**
111:20
**advice**
11:17, 11:22, 26:5, 34:25, 39:23, 43:3, 65:2, 89:7, 90:8, 91:16, 91:22, 95:20, 132:11
**advise**
22:13, 68:25, 89:6, 90:6, 90:14, 91:15, 92:20, 123:2, 132:15
**advised**
70:9, 72:18, 90:3, 90:6
**advising**
90:7, 90:8, 136:10
**affirmative**
109:11
**affirmed**
141:9
**after**
43:11, 56:4, 56:7, 60:23, 63:22, 63:24, 63:25, 76:17, 81:5, 97:24, 98:3, 98:20, 99:12, 99:13, 102:16, 103:2, 113:15
**afternoon**
67:2
**again**
36:1, 48:1, 62:2, 66:5, 67:2, 97:16, 98:3, 101:23
**against**
105:25
**agent**
27:20, 28:1
**ago**
17:4, 17:12, 19:11, 19:12, 29:10, 47:14, 49:7, 49:8
**agreed**
67:15
**agreement**
5:26, 6:16, 50:8, 54:10, 57:21, 67:25, 68:7, 68:13, 69:15, 70:10, 71:12, 71:19, 76:10, 106:5, 108:14, 138:21
**agreements**
23:19, 23:21
**ahead**
75:12, 75:14, 94:13, 134:22
**akin**
57:18, 67:12, 68:22, 69:1, 69:10, 73:25, 75:8, 75:20, 76:8, 76:11, 88:20, 103:1, 103:7, 109:17, 109:20, 109:22, 119:18, 119:20, 119:24
**akin's**
75:17
**al**
21:10, 21:11, 45:25
**all**
14:23, 25:3, 27:20, 30:20, 35:3, 36:10, 41:10, 45:13, 51:1, 54:12, 55:22, 56:10, 61:7, 63:7, 65:12, 66:8, 77:1, 77:7, 85:19, 85:22,

93:23, 96:12, 96:13, 96:14, 105:4, 110:3, 113:17, 119:13, 119:16, 123:20, 125:10, 125:12, 126:18, 129:25, 130:15, 135:23, 135:24, 138:25
**allen**
103:23
**allow**
91:8
**alongside**
22:21
**already**
54:4, 111:18
**also**
3:23, 9:10, 17:9, 17:12, 18:4, 23:4, 24:22, 25:11, 28:16, 36:13, 88:3, 88:10, 88:13, 101:11, 102:8, 102:12, 110:23
**always**
11:5, 25:14, 58:6, 91:25, 97:8, 105:8, 109:24, 110:1, 113:13
**amazing**
77:8
**amendment**
22:16
**american**
31:7
**amiss**
34:14
**amongst**
17:11, 49:3
**amount**
32:21, 40:19, 66:7, 68:9, 125:15
**amounts**
63:3
**angeles**
1:22, 2:3, 3:8, 3:16, 7:1, 7:8, 15:16, 40:21
**annum**
41:4
**another**
11:5, 28:14, 28:17, 30:10, 38:22, 50:18, 57:22, 68:24, 69:8, 69:9, 74:22, 85:8, 97:25, 98:11, 125:1
**answer**
9:13, 9:16, 9:17, 11:2, 13:14, 37:15, 75:16, 101:22, 102:7, 107:5, 109:8, 112:12, 112:22, 116:14, 118:8, 135:12, 137:8
**answered**
22:5, 33:22, 101:16, 102:5, 110:15, 117:19, 117:25, 118:20, 119:1
**answers**
9:5, 13:12
**anti-contact**
130:24, 131:5, 131:6
**any**
9:2, 9:8, 9:15, 15:1, 15:4, 15:19, 16:21, 23:18, 23:21, 24:10, 24:12, 26:11, 33:16, 37:11, 38:4, 39:9, 41:6, 41:18, 42:13, 42:20, 44:2, 45:5, 46:5, 48:14, 54:21, 58:9, 58:10, 59:23, 65:25, 70:5, 88:5, 88:20, 91:2, 94:17, 94:18, 104:9, 106:8, 116:7, 120:15, 125:14, 128:14, 128:25, 129:25, 131:19, 132:1, 132:9, 132:11, 132:15, 132:19, 132:23, 133:3, 134:17, 137:1, 137:2, 137:11, 138:4, 138:9, 138:25, 141:19, 141:20
**anybody**
26:4, 42:10, 42:19, 43:18, 45:15, 63:9, 103:4, 116:1, 120:12, 133:7
**anyone**
15:6
**anything**
30:21, 34:13, 38:2, 42:5, 43:5, 44:13, 49:11, 84:8, 94:1, 101:10, 133:17
**anyway**
80:12
**anywhere**
136:10
**apart**
119:15
**apc**
3:18
**apologies**
18:19, 23:15
**apologize**
133:1
**appeal**
69:9, 74:24, 75:4, 75:7, 75:17, 75:24, 76:17, 103:11
**appearance**
120:2
**appearances**
3:1
**appearing**
7:19, 95:17
**appears**
21:9, 32:12, 46:23, 59:10
**appellate**
103:11
**appreciate**
8:20, 39:7, 59:6
**appropriate**
36:16, 36:22
**approximately**
49:5
**april**
6:7, 67:19, 76:7
**ar**
29:22
**argumentative**
118:1, 119:2
**arisen**
68:7
**around**
47:8, 47:14, 76:4, 90:12, 103:4, 126:3
**arrange**
111:24
**arrangement**
68:3, 68:5
**asked**
31:19, 34:6, 35:24, 52:13, 60:12, 60:17, 90:25, 93:24, 94:1, 96:8, 96:20, 101:16, 102:5, 110:15, 117:19, 117:25, 118:20, 119:1,

122:5, 123:3, 124:16
**asking**
14:15, 49:16, 92:19, 94:24, 94:25, 95:2, 95:4, 95:6, 132:6, 134:25
**assist**
75:10, 75:18, 131:22
**assistant**
58:18, 58:23, 131:3
**associate**
109:17, 109:20
**associates**
3:18
**assume**
42:18, 65:7, 115:21, 116:6
**assumed**
77:14
**assumes**
116:10, 135:10, 136:16, 139:23
**assuming**
138:20, 138:22
**astro**
5:19
**attached**
13:22, 20:15, 27:4, 32:6, 46:14, 49:18, 49:22, 54:19, 57:2, 59:11, 61:13, 62:5, 65:6, 67:5, 87:16, 99:4, 105:14, 105:24, 108:6, 108:13, 109:13, 114:9, 120:24
**attachment**
54:9
**attachments**
61:20, 104:5, 104:10, 106:8
**attempt**
68:11
**attended**
48:4
**attorney**
3:6, 3:13, 3:20, 9:12, 10:7, 10:12, 10:13, 10:14, 14:18, 14:23, 22:5, 25:20, 26:18, 113:2, 122:5, 130:6, 131:7, 132:2, 136:5, 141:19
**attorney-client**
12:14, 102:10
**attorneys**
60:24, 76:1
**audible**
9:4
**authentication**
116:11
**authority**
58:10
**authorized**
32:17, 40:24
**avenue**
3:14
**avra**
102:18
**aware**
44:2, 45:5, 131:1, 134:6, 134:8
**away**
44:9, 59:5, 134:11

B

**back**
11:1, 15:8, 18:12, 20:12, 29:14, 29:20, 29:25, 30:2, 31:1, 31:16, 31:17, 32:15, 34:23, 36:3, 38:2, 48:1, 60:13, 61:7, 67:1, 73:16, 76:19, 76:22, 77:10, 79:21, 80:22, 80:25, 81:11, 81:14, 83:5, 89:3, 99:8, 101:24, 106:16, 107:13, 111:13, 113:8, 114:1, 119:9, 119:14, 119:25, 125:5, 125:6, 125:22, 137:20, 140:3
**backwards**
101:20
**badgering**
117:2, 117:3, 117:5
**bank**
47:7, 47:9, 47:11, 47:14, 47:16, 47:25, 48:3, 48:7, 48:9, 48:15, 48:18, 83:19, 84:1, 84:3, 84:8, 111:25
**bankers**
47:9, 47:10
**banking**
47:19, 47:20, 47:22, 48:10
**bankruptcy**
1:1, 5:9, 8:18, 14:2, 121:17, 122:3
**banks**
80:18
**bar**
94:21, 95:1, 136:6
**baron**
3:25
**based**
37:15, 37:17, 79:14, 84:6, 133:16, 133:17
**basic**
39:25
**basically**
37:19
**basis**
23:25, 24:1, 45:13, 80:18
**bates**
27:11, 29:6, 29:7
**bates-stamped**
5:17
**bc**
28:9
**bearing**
27:11
**became**
85:14
**because**
11:20, 12:9, 12:13, 12:21, 18:18, 25:3, 28:6, 38:18, 47:10, 50:23, 51:25, 64:25, 80:12, 84:13, 90:24, 91:15, 94:8, 103:9, 107:21, 122:9, 122:17, 123:2, 123:21, 124:4, 133:14, 135:14
**been**
8:2, 8:21, 11:5, 19:13, 21:9, 24:7, 33:24, 34:1, 34:3, 34:7, 36:5, 36:6, 36:9, 36:16, 36:22, 38:24, 38:25, 41:9, 47:10, 49:6, 49:7, 49:18, 55:5, 56:4, 56:6, 58:6,

61:5, 63:13, 63:22, 63:24, 64:3, 64:15, 65:9, 69:24, 70:20, 71:2, 71:6, 71:12, 71:21, 72:2, 76:8, 77:23, 86:1, 86:5, 86:14, 88:14, 96:20, 100:1, 107:19, 107:22, 107:23, 113:16, 113:20, 115:16, 116:2, 123:13, 131:23, 133:18, 134:10
**before**
2:4, 8:21, 11:17, 12:7, 14:5, 14:12, 34:16, 41:1, 41:25, 45:25, 51:3, 56:4, 64:3, 64:5, 64:8, 67:21, 68:7, 88:7, 94:10, 101:6, 108:20, 108:25, 112:1, 113:23, 122:19, 125:3, 125:10, 127:5, 127:9, 127:12, 127:13, 127:14, 132:13
**beginning**
2:3, 122:24
**behalf**
2:1, 7:15, 7:19, 7:20, 12:13, 14:11, 18:22, 22:11, 25:11, 28:8, 28:9, 31:9, 70:21, 71:2, 71:6, 71:9, 71:13, 73:25, 74:1, 79:6, 79:7, 123:3
**behind**
76:1
**being**
8:20, 16:17, 20:1, 20:2, 46:24, 52:22, 68:8, 68:22, 72:20, 79:2, 98:7, 98:16, 101:11, 107:12, 125:7, 133:4
**bel**
115:3
**belie**
69:7, 106:9
**believe**
15:22, 16:25, 19:8, 22:7, 23:20, 26:3, 27:19, 28:16, 29:4, 32:21, 35:4, 41:18, 42:4, 44:24, 44:25, 49:3, 51:12, 55:14, 59:15, 59:17, 63:10, 67:11, 67:23, 85:4, 89:17, 90:17, 92:25, 98:9, 103:8, 106:1, 106:7, 107:15, 113:19, 114:21, 115:7, 135:14
**below**
104:7
**beneficiary**
41:12
**benefit**
10:4, 17:2, 127:17, 127:20
**benon**
44:17, 45:1
**best**
44:8, 58:7, 76:13, 134:16, 138:14
**bet**
60:11
**between**
15:10, 15:19, 15:20, 16:11, 17:1, 33:6, 45:9, 46:9, 46:10, 65:18, 67:12, 68:21, 72:10, 72:23, 76:8, 79:8, 80:8, 97:2, 116:12, 120:8
**beverly**
3:22
**beyond**
93:11, 96:15
**big**
113:14, 135:18
**big-picture**
18:4, 18:6
**bill**
24:4
**billing**
23:24
**birth**
113:23
**birthday**
44:6, 113:13
**bit**
8:12, 26:1, 35:5, 73:5, 74:15, 82:22, 92:2, 108:25
**blind**
39:22
**blue**
1:7, 3:3, 3:10, 5:23, 5:25, 5:29, 6:15, 6:19, 6:24, 6:26, 6:33, 7:6, 7:15, 7:19, 8:11, 8:15, 14:11, 32:16, 40:11, 48:6, 50:7, 50:11, 54:6, 54:9, 59:9, 80:23, 81:8, 94:6, 105:23, 110:6, 110:8, 111:17, 121:12, 121:17, 121:20, 138:21
**board**
92:4
**borr**
28:6
**borrow**
36:8, 36:15, 64:25
**borrowed**
45:9, 80:17
**borrower**
30:7, 30:13
**both**
9:24, 11:22, 16:9, 17:24, 22:11, 23:13, 23:16, 25:24, 45:18, 63:16, 72:21, 73:24, 74:2, 79:16, 79:25, 92:6, 133:15
**bother**
112:17
**bottom**
29:6, 32:16, 62:2, 62:15, 89:5, 130:16
**bottom-left**
62:10
**bottom-right**
27:11, 27:23
**bought**
78:24
**boulevard**
2:2, 3:7, 7:8
**box**
3:21
**break**
9:11, 34:18, 110:23, 111:3
**breakdown**
17:17

**breakfast**
86:7
**briefly**
14:7, 15:9, 111:9
**brother**
84:22, 132:24, 132:25, 133:1, 136:2, 136:4, 136:5
**brought**
69:8, 74:23, 75:24
**brown**
27:20, 29:9, 29:10, 31:6
**bugging**
86:22, 86:24
**bullet**
87:25
**bunch**
59:10, 59:20, 130:22
**burton**
11:3, 15:9, 15:12, 16:8, 17:9, 18:11, 18:15, 18:23, 19:17, 19:20, 19:25, 20:3, 21:9, 22:2, 22:7, 22:9, 23:6, 23:19, 24:16, 25:1, 25:15, 25:18, 35:1, 46:4, 47:19, 58:1, 67:12, 67:16, 68:12, 68:21, 68:24, 71:3, 71:6, 71:10, 71:13, 74:1, 74:12, 75:3, 76:8, 88:13, 94:6, 100:18, 101:11, 109:23, 110:4, 110:6, 123:15
**business**
9:21, 11:23, 25:11, 30:19, 37:18, 39:24, 43:9, 43:24, 80:14, 92:11, 92:24, 93:17, 102:15, 135:19
**business-wise**
95:7
**businesses**
86:11
**businessman**
36:14
**busy**
60:2, 93:20
**buying**
78:1, 78:24
**bwh**
122:9, 122:18

**C**

**calculated**
41:2
**california**
1:2, 1:22, 2:3, 3:8, 3:16, 3:22, 6:34, 7:1, 7:8, 7:9, 8:19, 21:12, 42:17, 121:20, 141:2
**call**
35:9, 59:4, 132:7
**called**
30:11, 54:9, 56:18, 60:17, 72:3, 122:8
**calling**
69:3
**calls**
35:3, 100:23, 101:15, 107:2, 109:5, 116:9, 119:22, 135:10, 137:7, 138:8
**came**
22:8, 24:23, 28:21, 29:4, 29:21, 43:10, 46:1, 48:11, 59:22, 63:15, 75:9, 77:2, 80:7, 110:10, 122:20, 125:11
**can't**
9:2, 36:23, 45:14, 54:17, 64:15, 68:17, 69:1, 71:16, 82:25, 84:4, 85:19, 85:24, 88:23, 89:11, 89:15, 89:19, 91:15, 97:12, 101:10, 101:17, 101:20, 110:10, 110:14, 139:12
**cannot**
92:21
**capacity**
35:12, 68:14, 69:14, 123:11
**capital**
22:14, 22:17, 24:3
**caption**
141:20, 141:21
**care**
111:5
**carefully**
34:8
**carried**
102:12
**case**
1:9, 5:10, 7:6, 8:18, 14:2, 21:9, 21:12, 21:23, 68:22, 71:4, 90:3, 92:12, 93:6, 102:17, 105:8, 121:17, 122:3, 128:15, 134:6, 134:11
**catch**
55:25
**cause**
19:6, 29:6, 35:16, 37:19, 40:2, 47:12, 48:1, 64:22, 100:14, 118:12, 123:16, 128:1, 141:10, 141:21
**cc**
47:1, 57:23, 112:4
**cc'd**
69:13, 69:17, 69:25
**celebrate**
113:14, 113:16
**central**
1:2, 8:19, 21:11
**certain**
9:12, 22:14, 31:15, 32:22, 132:6
**certainly**
66:9
**certificate**
141:5
**certification**
7:11
**certified**
2:5, 7:10, 8:2, 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:13, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 114:9, 120:24
**certify**
141:7, 141:18
**cetera**
53:8, 62:1, 62:2, 62:3, 62:4
**chain**
46:24, 47:4, 47:24, 48:2, 57:7, 57:14,

57:17, 103:9
**chance**
32:8, 75:11
**change**
16:19
**changed**
16:20, 22:20
**charge**
66:4
**chat**
35:9
**chatter**
114:1
**check**
41:7, 41:12, 44:21, 98:18
**child**
39:5
**children**
10:4
**choice**
89:7
**chose**
42:5, 78:18
**circulate**
108:16
**circumstances**
71:17
**city**
47:10
**claim**
6:33, 121:19, 134:14
**clarification**
9:8, 15:17, 50:16, 83:8, 102:21, 131:15
**clarify**
11:24, 12:20
**clean**
55:8, 57:19
**clear**
22:6, 80:24, 81:3, 88:19, 88:20, 94:11, 107:13
**clearly**
69:1, 104:22
**client**
10:8, 10:10, 10:11, 28:25, 36:8, 88:4, 88:11, 88:14, 89:1, 89:11, 89:16, 89:18, 90:12, 92:20, 92:24, 131:3
**clients**
24:13, 37:6, 39:9, 88:12, 92:11, 92:13, 93:1, 129:14, 129:22, 131:24, 132:1, 132:3, 132:5, 132:21
**close**
38:15, 41:1, 41:5, 74:19, 122:23, 137:21
**cohen**
1:20, 2:1, 3:25, 4:3, 5:12, 5:34, 6:6, 6:7, 6:10, 7:12, 7:17, 7:21, 7:22, 8:1, 8:8, 11:24, 12:1, 12:11, 13:24, 18:17, 19:15, 19:16, 21:7, 21:14, 27:13, 27:15, 27:24, 28:9, 29:16, 32:14, 34:25, 47:2, 50:1, 50:6, 57:21, 57:23, 67:2, 67:16, 84:13, 87:23, 99:11, 103:22, 105:19, 111:16, 122:4, 122:7, 122:11, 133:4, 133:10, 135:2, 136:11
**cohen's**
5:5, 13:25, 18:22, 20:4
**cold**
64:11
**colleague**
131:10
**com**
50:5, 57:9
**come**
15:8, 56:15, 61:7, 94:2, 108:25, 111:2
**coming**
124:4, 125:6, 126:3
**commemorate**
113:23
**comment**
36:23, 38:4
**comments**
24:19, 39:6
**commercial**
9:23, 10:1, 10:2
**common**
15:20
**communicate**
22:24, 23:7, 35:15, 46:7, 55:18, 72:25, 86:11, 105:7, 114:2, 114:3, 120:11
**communicated**
23:13, 23:16, 55:1, 55:21, 64:7, 64:14, 71:13, 85:24, 86:5, 93:8, 96:25, 99:16, 104:13, 104:17, 104:25, 112:14, 117:8, 117:16, 118:17, 119:7
**communicating**
86:18, 119:8
**communication**
46:10, 50:10, 56:8, 93:4
**communications**
55:22
**company**
6:35, 11:2, 15:10, 15:13, 15:23, 16:6, 18:15, 19:25, 22:3, 22:9, 24:17, 25:1, 28:1, 28:5, 40:22, 41:7, 41:8, 47:20, 58:1, 121:21, 123:14, 125:12, 135:5
**complained**
74:15
**complaint**
74:16
**complete**
20:23, 141:14
**completely**
65:18
**completion**
106:3, 106:12, 106:15, 106:20, 107:9
**complicated**
50:23, 52:5, 52:22, 52:23, 55:8, 55:13, 60:25, 85:19, 85:21, 85:25, 91:7, 100:14, 107:10
**complications**
85:20
**complied**
41:9
**compound**
135:9
**computer**
28:21, 29:2, 29:3, 45:2, 57:11, 59:15, 59:22, 60:9, 85:5
**concern**
68:9, 96:3

**concerned**
70:13, 103:6
**concerns**
56:1
**concert**
17:25
**conclude**
125:23, 125:25
**concluded**
126:1
**concluding**
126:2
**conclusion**
24:3
**concrete**
54:4
**conditions**
41:9
**conference**
20:6, 111:11
**confidant**
137:3
**confidentiali**
65:16
**confirmed**
98:21, 98:23
**conflict**
5:30, 6:19, 33:17, 33:24, 36:2, 36:6, 36:10, 36:25, 37:3, 57:21, 59:9, 65:5, 83:6, 88:3, 88:10, 88:17, 88:21, 88:25, 89:4, 89:22, 90:2, 90:11, 90:13, 92:23, 93:5, 93:9, 105:23, 105:25, 108:14, 123:1, 131:9, 131:19, 131:23, 132:7, 132:13, 132:16, 136:9, 136:19, 136:21
**confused**
106:13
**conjecture**
112:20, 123:6
**connected**
48:18
**connection**
5:7, 11:3, 11:21, 14:1, 35:1, 35:19, 36:3, 47:25, 48:15, 50:11, 68:13, 68:25, 69:1, 69:15, 70:10, 72:19, 74:23, 76:21, 80:22, 89:8, 102:25, 123:14, 139:18, 139:19
**consent**
62:3, 89:8
**consider**
18:11, 20:3, 25:20, 42:16, 136:2, 138:1
**considered**
133:4, 136:7
**consistent**
90:16, 91:1
**construction**
50:24, 81:22, 82:13, 83:22, 106:19, 106:25
**consult**
25:21, 44:12, 46:3
**consulted**
43:2, 43:17, 45:19, 45:23, 93:22
**contain**
83:16
**contained**
109:25
**contains**
83:17
**contend**
74:12, 138:6
**contended**
135:6
**contending**
134:7
**content**
54:18
**context**
56:7
**contingencies**
88:1
**continued**
6:1, 113:16
**continues**
58:25
**continuing**
104:15
**contract**
22:16
**control**
72:4
**conversation**
53:5, 53:9, 53:17, 53:23, 55:24, 73:13, 82:25, 102:17, 129:18
**conversations**
24:24, 25:13, 35:13, 35:20, 73:4, 74:21, 79:14, 82:21, 86:8
**convey**
40:23
**convince**
73:1
**cooperate**
75:10
**copied**
48:3, 70:5, 115:1, 130:19
**copies**
103:22, 105:19, 108:11, 108:17, 114:20, 126:16
**copy**
85:3, 131:14, 139:3
**copying**
111:16, 114:19, 115:2
**core**
66:18
**corner**
27:11, 27:23
**corners**
62:10
**corre**
41:21
**correct**
9:6, 9:7, 14:17, 14:19, 17:8, 20:4, 23:13, 28:2, 28:11, 41:25, 42:4, 47:2, 75:21, 78:10, 104:4, 108:2, 115:15, 116:5, 127:6, 127:10, 127:13, 127:21, 128:22, 129:1, 129:24, 130:2, 134:2, 135:3, 135:22, 137:24, 138:22, 141:16
**cosigning**
111:23
**could**
19:12, 25:4, 25:21, 30:17, 36:8, 39:13, 40:18, 53:12, 53:20, 54:21, 55:5, 57:11, 57:12, 59:3, 59:5, 64:15, 67:10, 72:2, 73:14, 77:23, 80:15, 86:13, 87:5, 96:15, 101:24, 105:3, 107:17, 113:11, 113:16, 113:19, 115:16, 122:3, 127:3
**couldn't**
31:5, 35:16,

37:19, 65:2, 65:11, 71:21, 73:14, 123:2, 127:19
**counsel**
7:13, 11:7, 11:9, 11:10, 11:13, 11:15, 11:16, 11:17, 11:18, 11:19, 11:20, 12:10, 12:21, 12:22, 13:12, 13:19, 14:13, 14:20, 15:5, 17:22, 22:2, 25:6, 37:6, 38:9, 38:11, 39:23, 40:4, 68:12, 68:22, 69:1, 74:23, 74:24, 75:20, 76:11, 81:18, 88:23, 89:7, 89:12, 90:3, 90:8, 90:15, 91:15, 91:17, 92:22, 102:14, 103:5, 123:1, 123:5, 123:17, 123:20, 132:8, 138:20, 141:18
**county**
40:21
**couple**
125:24, 136:9
**course**
9:12, 113:3, 134:15
**courses**
132:9
**court**
1:1, 8:25, 21:11, 110:18
**cousin**
70:4
**cover**
37:2
**create**
137:19
**created**
16:1, 17:1, 17:3, 19:9, 137:5
**cross**
13:4, 111:6, 139:8
**csr**
1:33, 141:26
**current**
9:20
**currently**
15:15
**cursory**
34:4, 60:19, 60:22, 61:2, 61:3, 62:20, 62:23, 62:25, 63:4
**cut**
54:17, 134:22

D

**dad**
29:21, 29:24, 30:20, 31:5, 31:15, 35:5, 35:6, 35:15, 35:16, 36:15, 37:17, 37:18, 37:21, 44:5, 44:11, 45:24, 52:13, 52:16, 52:19, 55:14, 55:21, 56:19, 63:12, 63:17, 63:20, 63:23, 64:7, 72:23, 72:24, 72:25, 73:1, 73:2, 73:13, 78:18, 78:19, 78:21, 78:22, 79:5, 79:8, 79:11, 79:13, 79:17, 80:3, 80:11, 83:3, 85:12, 85:13, 85:18, 85:22, 86:6, 86:8, 87:5, 91:6, 91:25, 94:10, 98:17, 99:15, 100:13, 100:16, 110:7, 110:13, 125:7, 125:11, 125:14, 127:5, 133:15
**dad's**
38:23, 44:8, 100:16, 102:12, 127:25
**daniel**
3:12, 6:14, 6:18, 6:25, 7:18, 57:17, 103:22, 105:18, 109:15, 110:3, 111:16, 114:18, 114:20, 115:2, 116:4, 130:5, 130:17, 130:19
**dark**
131:16
**date**
32:22, 111:18, 113:10, 113:22, 127:8, 127:9, 128:1
**dated**
5:16, 5:20, 5:34, 5:38, 6:7, 6:11, 6:16, 6:20, 6:26, 6:29, 32:13, 33:9, 33:10, 40:20, 51:12, 67:19, 83:10, 87:22, 89:4, 100:4, 108:11, 114:17, 114:23, 127:7, 127:13, 127:14
**dates**
63:3, 99:18, 128:6
**daughter**
26:14, 26:16
**daughters**
26:17
**day**
113:23, 127:12, 141:23
**day-to-day**
18:5, 18:7, 25:10
**days**
99:24, 112:15, 112:16, 116:17, 117:8, 117:16, 118:17, 135:21
**deaf**
18:7
**deal**
52:15, 68:3, 77:6, 85:18, 85:21, 86:2, 86:4, 86:13, 86:15, 88:19, 88:20, 88:22, 89:12, 89:16, 91:20, 92:21, 93:17, 93:23, 94:16, 94:18, 95:7, 95:21, 95:22, 96:2, 99:11, 99:17, 100:11, 107:10, 113:25, 120:7, 124:3, 128:2
**dealing**
22:19, 80:19, 134:15
**deals**
36:14, 80:16, 86:14, 92:11, 128:12
**dealt**
35:4
**debt**
129:14, 129:15, 129:22
**debtor**
1:9, 2:2, 8:18,

28:24
**debtor's**
6:32, 121:19
**decade**
134:6
**december**
5:20, 32:13, 33:9, 41:4, 49:2
**decide**
52:20, 78:16
**decided**
55:15, 56:19, 78:15
**decision-makers**
37:5
**declaration**
5:11, 6:31, 21:6, 21:22, 22:1, 121:11, 121:18, 122:2
**deed**
5:38, 40:20, 40:23, 61:24, 62:1, 106:2
**deet**
96:13
**defendant's**
5:14, 21:8
**deferral**
68:18
**defined**
107:15
**definitely**
18:1, 91:11, 129:16
**deliver**
40:24
**delivered**
44:22
**demand**
32:24, 40:16, 41:11
**depend**
24:7
**depended**
24:6, 24:8
**deponent**
7:11
**depos**
7:11
**deposed**
8:21
**deposition**
1:20, 2:1, 5:9, 7:7, 14:2, 15:6, 141:8, 141:11, 141:17, 141:20
**describe**
35:21
**described**
48:5, 84:15
**describing**
102:11
**description**
5:3, 6:3
**designated**
41:8
**detail**
60:19
**detailed**
53:10
**details**
86:16, 87:4, 87:9
**develop**
78:8
**development**
25:10, 48:8, 49:17, 52:14, 52:18
**dialogue**
55:22
**dictate**
66:11
**died**
46:1, 113:15
**difference**
80:25
**different**
10:3, 17:11, 18:8, 19:22, 23:9, 26:8, 36:21, 44:4, 102:13, 108:25
**differentiate**
97:2
**difficult**
73:10, 73:12, 73:15
**diluted**
17:13
**dinner**
102:18
**direct**
138:5
**directed**
124:20
**direction**
23:12, 23:15, 141:13
**directly**
35:14, 55:2, 55:18, 66:1, 68:16, 78:16, 82:22, 85:24, 92:24, 96:8, 104:21, 113:18, 134:10
**disappointed**
102:19
**disbursement**
41:7
**disclose**
137:16
**disclosed**
137:3
**discu**
94:3
**discuss**
9:14, 46:6, 52:10, 52:11, 52:21, 59:4, 60:18, 78:12, 90:23, 93:16, 116:17, 116:21
**discussed**
18:24, 33:1, 52:17, 52:18, 106:4, 108:13, 120:1
**discusses**
106:3
**discussing**
24:23, 94:3
**discussion**
43:14, 79:1, 80:8, 91:2, 129:4
**discussions**
82:1
**dispute**
68:6, 68:8, 68:21, 68:25, 69:2, 69:3, 72:23, 74:7, 76:8
**disputes**
72:9, 72:13, 72:16, 72:19
**dissect**
82:7
**distinct**
19:16, 20:4
**district**
1:2, 8:19, 21:11
**divided**
17:10
**division**
1:2
**docket**
121:17
**docs**
59:4
**document**
5:6, 5:16, 5:19, 13:24, 14:1, 14:5, 14:8, 20:20, 20:23, 20:24, 21:3, 21:5, 21:6, 21:13, 21:15, 21:17, 21:18, 21:22, 27:7, 27:10, 27:12, 27:16, 28:20, 28:22, 28:23, 29:1, 29:9, 29:10, 30:7, 30:22, 30:23, 31:8, 32:3, 32:12,

32:14, 32:20, 33:9, 33:10, 34:16, 35:8, 38:21, 41:19, 41:20, 46:19, 49:19, 50:1, 54:12, 54:19, 56:23, 57:20, 59:22, 61:4, 61:25, 67:3, 67:10, 67:11, 67:15, 67:21, 73:16, 74:4, 83:15, 84:2, 85:8, 87:21, 100:20, 101:3, 104:1, 105:4, 111:23, 112:1, 115:6, 115:7, 121:4, 121:16, 138:6
**document's**
27:2
**documentation**
38:3
**documents**
12:7, 14:10, 14:21, 14:24, 15:1, 19:6, 24:15, 24:18, 24:21, 29:4, 35:11, 37:25, 38:4, 41:11, 53:19, 53:21, 59:3, 59:10, 60:14, 60:17, 61:5, 61:6, 61:17, 62:5, 62:10, 62:13, 62:21, 63:5, 64:21, 78:20, 90:23, 90:24, 94:20, 95:4, 95:6, 96:9, 96:21, 109:25, 111:22, 112:16, 113:11, 116:18, 116:20, 116:22, 117:9, 117:17, 117:18, 118:18, 118:19, 122:7, 122:10, 122:13, 122:15, 123:3, 125:12, 127:11, 127:16, 128:11, 130:10, 131:11, 134:17, 136:11, 137:5
**doheny**
15:16
**doing**
36:14, 39:6, 60:2, 62:25, 65:19, 77:7, 86:19, 86:21, 88:20, 88:22, 89:16, 92:21, 93:21, 99:17, 114:3, 119:14, 120:8, 124:20
**done**
19:13, 20:24, 34:4, 44:1, 54:5, 56:21, 60:16, 60:19, 61:2, 66:8, 66:9, 91:20, 116:8, 117:22, 117:24, 118:24, 118:25, 123:23, 133:20, 135:17
**doubt**
71:22, 82:5
**douglas**
69:19
**down**
55:9, 113:21, 139:12
**draft**
83:13, 89:4, 89:20, 90:13, 105:24, 105:25, 106:1, 131:9, 131:23, 138:5
**drafted**
44:23, 133:11, 133:24, 134:8, 135:5, 136:12
**drive**
76:23
**driveway**
77:7
**driving**
47:13, 68:20
**drove**
97:13
**due**
68:3, 68:4, 88:4, 88:10, 90:11
**duly**
141:8
**during**
132:19, 133:3
**duties**
92:10
**duty**
92:18, 92:20

**E**

**each**
17:25
**earlier**
11:2, 18:24, 21:16, 22:4, 28:2, 35:24, 43:23, 74:22, 80:13, 100:5, 106:13, 112:15, 116:17, 117:8, 117:16, 118:18, 120:1, 129:13
**early**
19:4
**easier**
18:21, 126:22
**easiest**
124:6
**easil**
107:14
**easily**
107:14
**east**
47:7, 47:9, 47:13, 47:25, 48:3, 48:7, 48:9, 48:15, 48:18, 83:19, 84:1, 84:3, 84:5, 84:8, 88:2, 111:21
**economic**
94:15, 95:21
**economically**
95:7
**economics**
94:15
**eddie**
5:5, 5:11, 13:25, 21:6
**educate**
86:2
**education**
66:16
**effect**
8:24, 133:5
**effectively**
86:11, 107:24
**effort**
24:8
**either**
18:15, 23:22, 24:24, 31:20, 34:16, 84:21, 85:6, 88:5, 94:4, 96:8, 107:6, 115:20, 116:3, 133:10, 138:22
**eleda**
28:9, 31:2
**elkins**
3:4, 7:14
**else**
15:6, 23:7, 23:10, 26:4, 37:7, 48:12, 48:17, 72:18, 89:19, 115:20, 116:1
**emailed**
54:25

**emailing**
131:3
**emails**
35:2, 59:20, 60:8, 93:13, 96:11, 101:2, 104:20, 109:22, 110:3, 110:10, 113:16, 113:17, 114:15, 116:4, 116:12, 119:9, 119:15, 119:19, 119:20, 120:13, 120:15, 122:13, 124:6, 128:1, 128:5, 130:9, 130:22
**emanuel**
75:1, 75:3, 75:9, 76:10, 76:14, 103:1, 103:7
**embryonic**
77:24
**employed**
10:22, 11:14
**enclosed**
41:10, 41:11
**enforceable**
107:22
**engaged**
18:8
**engaging**
47:8, 85:11, 119:10, 119:11
**enough**
9:9, 66:10, 86:1, 86:10, 110:8, 121:12
**entered**
20:6, 111:11
**entering**
92:11
**entire**
38:12
**entities**
11:7, 11:14, 15:11, 15:20, 16:12, 17:21, 19:22, 22:13, 22:24, 23:22, 25:17, 28:12, 30:18, 42:2, 47:21, 52:24, 53:2, 53:6, 57:25, 58:3, 58:9, 125:1
**entitled**
13:25, 21:6, 21:9, 121:18
**entity**
11:21, 16:23, 17:18, 19:16, 19:20, 28:17, 31:25, 32:1, 36:18, 38:7, 38:18, 38:22, 39:21, 39:23, 45:16, 46:5, 46:8, 47:17, 51:23, 55:11, 77:12, 78:3, 78:5, 78:24, 79:14, 80:5, 106:4, 107:17, 108:1, 133:19, 133:20, 133:21
**equity**
22:18
**escrow**
5:19, 27:17, 27:20, 28:1, 28:7, 29:17, 31:8, 41:1, 41:5, 41:9, 125:4
**esq**
3:5, 3:12, 3:19
**esquire**
70:3, 122:8
**essentially**
18:7, 78:5
**establish**
127:10
**establishing**
128:24
**estate**
9:21, 17:4, 19:7, 26:20, 49:17, 52:4, 52:18, 86:10
**estates**
70:12
**et**
21:10, 53:8, 62:1, 62:3
**even**
10:9, 30:25, 31:3, 43:14, 43:15, 51:22, 53:22, 53:23, 75:23, 77:14, 84:4, 87:4, 95:7, 96:10, 100:13, 113:20, 113:24, 119:11, 133:17, 133:18
**event**
24:3, 41:8
**events**
22:14, 22:17
**eventually**
60:4, 76:11, 96:16, 102:14
**ever**
8:21, 10:22, 24:24, 37:12, 43:1, 44:12, 48:7, 55:6, 72:9, 72:12, 72:15, 73:11, 88:7, 88:25, 95:20, 97:2, 101:2, 104:1, 104:2, 112:1, 114:15, 115:8, 120:11, 122:16, 123:25, 128:11, 128:12, 128:14, 129:17, 131:22, 131:23, 132:9, 132:11, 132:20, 132:23, 133:5, 134:16, 135:1, 138:11
**every**
135:19
**everybody**
28:7, 40:5, 58:22, 72:4
**everything**
29:2, 38:12, 39:11, 40:5, 52:5, 57:11, 95:14, 111:25, 120:19
**evidence**
116:10, 135:10, 136:16, 139:23
**ex**
10:19
**exact**
31:5, 93:2
**exactly**
15:10, 16:3, 17:3, 17:5, 17:17, 17:23, 22:6, 64:13, 76:5, 85:19, 92:14, 97:12, 97:13, 98:5, 100:15, 103:13, 107:11, 119:13
**examination**
4:2, 8:6, 127:1, 139:15
**examined**
8:3
**example**
66:3, 71:18, 93:2, 97:6
**excerpt**
20:22, 21:17
**excited**
53:24
**exclusive**
28:18
**exclusively**
10:20
**excuse**
61:24
**executed**
40:21, 108:16

**exhibit**
5:3, 5:5, 5:11, 5:16, 5:19, 5:22, 5:25, 5:28, 5:33, 5:37, 6:3, 6:5, 6:9, 6:14, 6:18, 6:23, 6:25, 6:28, 6:31, 13:20, 13:21, 20:13, 20:14, 21:5, 27:2, 27:3, 32:4, 32:5, 33:1, 33:3, 40:9, 46:12, 46:13, 49:20, 49:21, 51:14, 51:16, 51:17, 56:24, 57:1, 61:10, 61:11, 61:19, 62:9, 65:6, 67:3, 67:4, 73:17, 81:14, 83:5, 87:10, 87:11, 87:15, 89:3, 97:16, 99:3, 100:3, 103:17, 105:12, 105:13, 106:16, 108:5, 109:12, 111:15, 114:8, 120:20, 120:21, 120:23, 127:3, 130:16, 131:8, 131:10, 131:18, 131:20, 134:1, 134:4
**exhibits**
5:1, 6:1, 38:1, 61:9, 61:12, 62:11, 125:3, 126:5, 126:12, 130:11
**existed**
22:8
**existence**
22:8, 22:10, 122:25
**expect**
78:1
**expectation**
95:3
**experienced**
39:3, 39:4
**expert**
60:21, 136:3, 136:7
**expertise**
70:12
**explain**
106:14
**expressed**
102:18
**extensive**
45:10
**extent**
12:10, 26:14
**eyes**
139:13
**ezra**
1:20, 2:1, 4:3, 5:5, 5:11, 6:6, 7:12, 7:16, 8:1, 13:25, 21:7, 27:24, 59:3, 67:16, 110:21, 122:7, 122:10

**F**

**face**
68:2
**facilitate**
30:4, 44:15, 46:9
**facilitated**
44:19, 125:9
**facilitates**
58:8
**facilitating**
30:24, 35:19
**fact**
43:11, 116:10, 129:20, 139:23
**facts**
135:10, 136:16
**fair**
11:6, 16:10, 19:15, 21:20, 35:9, 76:6, 85:8, 94:21, 98:3, 115:10, 116:21, 128:4, 129:7, 129:15, 129:16, 137:12, 137:20
**familiar**
21:4, 21:13, 57:14, 92:10, 130:24
**familiarity**
121:13
**familiarize**
20:19, 27:6, 46:18, 49:25, 53:19, 57:4, 61:16, 67:7, 87:18, 121:5
**families**
20:1
**family**
10:14, 10:16, 16:12, 17:2, 17:11, 18:14, 18:16, 18:22, 18:23, 25:21, 26:5, 26:11, 28:8, 28:10, 28:14, 28:15, 39:10, 40:4, 40:5, 43:23, 43:25, 44:3, 44:4, 45:5, 45:6, 45:8, 45:14, 45:18, 45:19, 45:23, 47:17, 57:25, 58:22, 71:15, 91:10, 91:21, 102:8, 102:15, 122:23, 125:16, 137:3, 137:21, 138:1
**family's**
44:1
**far**
14:17, 43:18, 43:19, 77:25, 103:3, 103:6, 128:23
**fast**
122:22
**father**
11:22, 11:24, 17:24, 18:7, 18:9, 22:21, 23:7, 23:10, 24:25, 25:3, 25:5, 25:7, 25:23, 25:24, 25:25, 31:19, 34:7, 34:12, 34:15, 35:1, 37:5, 37:16, 38:6, 43:1, 43:17, 43:22, 44:12, 46:7, 46:10, 47:21, 50:10, 50:13, 51:21, 52:7, 52:12, 53:6, 53:11, 53:18, 54:7, 54:8, 54:14, 54:21, 54:25, 55:1, 55:9, 55:15, 56:5, 64:10, 64:14, 64:15, 70:14, 70:21, 71:19, 71:20, 71:22, 72:6, 72:9, 74:17, 78:13, 78:15, 80:23, 81:1, 81:4, 81:15, 83:21, 84:17, 86:12, 86:18, 92:2, 92:4, 96:3, 97:10, 97:17, 99:11, 99:22, 100:10, 104:13, 106:17, 106:24, 107:8,

108:21, 109:1, 112:7, 127:12, 127:20, 128:12, 134:16, 138:17
**father's**
15:25, 16:18, 20:2, 25:11, 28:14, 30:14, 43:25, 45:19, 56:1, 70:14, 127:9, 127:17, 128:2, 132:25, 133:1
**favor**
16:16, 40:22
**february**
5:16, 5:35, 5:39, 6:12, 6:17, 6:21, 6:27, 6:30, 30:22, 33:10, 40:20, 46:25, 50:6, 51:12, 57:18, 59:8, 81:15, 83:10, 87:22, 89:4, 90:1, 90:10, 90:13, 98:4, 99:12, 99:22, 100:5, 103:21, 104:13, 105:20, 108:12, 110:2, 111:18, 113:10, 113:13, 114:18, 114:23, 127:4, 127:8, 128:3
**federal**
45:12
**fee**
11:4
**feel**
129:21
**fees**
41:6, 67:12, 68:3, 68:4, 68:5, 68:9, 68:10, 68:18, 69:4, 74:9, 74:12, 74:15, 76:9
**feet**
64:11
**fellow**
45:25, 136:5
**felt**
122:23
**few**
45:24, 99:24
**fiduciary**
138:2, 138:5
**field**
70:12
**figure**
87:5
**figured**
124:4
**filed**
21:9, 21:23, 121:16, 121:17
**final**
21:17, 89:5, 105:3, 108:13, 108:16
**finally**
110:13
**financial**
133:17
**financials**
40:1
**financing**
123:15
**find**
18:20, 57:19, 62:16, 77:4, 77:5, 97:10, 105:24, 133:9
**fine**
13:1, 13:8, 92:14
**finish**
70:25, 75:16, 95:10, 117:12, 117:22, 118:23, 134:22
**finishing**
140:4
**fired**
102:14, 103:14
**firing**
102:25
**firm**
7:10, 10:23, 14:10, 23:4, 26:8, 33:17, 36:2, 36:7, 37:2, 37:3, 38:12, 39:12, 45:22, 55:5, 69:10, 75:2, 89:6, 103:12, 135:20, 137:4, 137:5, 138:5
**firms**
22:20
**first**
8:2, 12:9, 29:19, 31:7, 32:15, 50:18, 50:20, 57:17, 59:1, 61:10, 75:25, 109:3, 122:20, 130:16, 131:18, 134:3
**five**
110:23
**five-minute**
34:18
**flapped**
103:4
**focus**
121:6
**folks**
23:5
**follow**
53:12
**followed**
90:18
**following**
57:20, 106:17, 124:25
**follows**
8:3, 41:2
**fondness**
138:17
**foregoing**
141:8, 141:14, 141:19
**foreign**
80:19, 93:2
**forget**
75:25, 103:12
**form**
78:3, 139:20
**formal**
23:18, 35:12, 35:22, 58:16
**formally**
11:14
**forth**
114:1, 119:9
**forths**
119:14
**forward**
50:15, 59:1, 59:2, 59:8, 63:13, 68:10, 74:6, 74:11, 81:2, 89:23, 91:8, 91:9
**forwarded**
50:4, 57:8
**forwarding**
57:22
**found**
110:12, 120:19
**foundation**
107:3, 112:10, 117:1
**foundational**
12:9
**four**
15:15, 21:10, 22:15, 67:13, 67:15
**freely**
23:17
**frequently**
74:14, 86:7, 105:10
**friday**
46:24, 104:12, 104:19

**friend**
44:6, 44:8
**friend's**
44:8
**friendly**
123:22
**friends**
80:13
**friendship**
122:22
**front**
101:19, 103:24, 123:16, 126:5, 131:13
**full**
21:17, 34:5, 40:23, 53:1, 95:25, 141:14
**fully**
30:20, 30:25, 37:23, 73:22, 115:17
**further**
122:19, 138:25, 141:18
**future**
68:5, 76:9

G

**game**
66:21, 66:22
**gartside**
3:4
**gave**
26:9, 65:5, 66:17, 81:18, 91:22, 126:16
**general**
11:17, 22:12, 48:9, 52:18, 55:12, 65:21
**generally**
16:11, 21:4, 21:13, 24:17, 27:15, 29:16, 33:11, 46:18, 47:8, 47:17, 49:11, 49:14, 56:14, 73:21, 83:15, 92:10, 92:12, 121:5, 131:1
**gestures**
9:5
**getting**
42:1, 63:22, 79:12, 86:16, 87:25, 92:3, 100:20, 110:3, 110:18, 123:19, 125:5
**give**
39:23, 60:22, 65:2, 75:10, 110:21, 121:2
**given**
19:24, 27:25, 36:10, 37:7, 41:13, 65:10, 68:25, 116:16, 122:25, 123:2, 132:11, 141:15
**go**
9:14, 12:22, 20:7, 20:8, 29:2, 29:11, 39:13, 48:1, 50:21, 60:23, 61:9, 66:23, 74:11, 75:12, 75:14, 79:17, 83:5, 89:23, 91:8, 91:9, 94:13, 96:17, 98:8, 98:17, 99:5, 105:11, 106:16, 110:8, 111:9, 121:10, 122:19, 124:3, 124:7, 125:19, 131:7, 134:22, 135:23, 139:7
**go-between**
46:9
**go-to**
58:7, 58:17
**goes**
45:10, 105:10, 119:25
**going**
7:4, 9:4, 11:1, 11:17, 12:4, 12:7, 12:8, 12:10, 13:9, 13:14, 13:20, 20:13, 20:20, 27:2, 31:2, 37:15, 41:21, 43:10, 46:12, 48:7, 49:19, 50:15, 51:19, 53:25, 56:23, 61:9, 61:11, 63:12, 63:16, 65:3, 67:3, 68:10, 73:16, 76:4, 76:12, 76:19, 76:25, 77:16, 78:7, 78:8, 78:9, 80:1, 80:22, 81:2, 81:14, 82:17, 83:3, 83:7, 83:9, 84:2, 85:12, 85:13, 85:16, 86:16, 87:2, 87:10, 89:3, 90:2, 90:11, 95:15, 98:6, 101:3, 104:21, 105:11, 107:13, 108:4, 110:9, 113:21, 113:23, 114:1, 114:4, 114:7, 118:11, 121:5, 123:22, 124:3, 124:4, 128:6, 130:21, 133:6, 133:19, 138:16, 139:7
**gone**
101:9, 109:3, 123:21
**good**
7:4, 7:14, 8:8, 8:9, 37:18, 67:2, 77:4, 126:3
**gotten**
54:21, 84:21, 100:18
**grand**
3:14
**grandchildren**
10:4
**great**
54:1, 60:19
**greenspoon**
3:11, 7:18
**ground**
54:4, 74:6
**grounds**
9:13
**groundwork**
74:11
**group**
49:4
**guarantee**
31:20, 84:8, 106:3, 106:12, 106:15, 106:20, 107:9, 107:13, 107:18, 107:20, 107:22, 107:23, 107:24, 107:25, 111:23, 112:6, 112:7
**guaranteeing**
81:21, 83:22, 86:17, 106:19, 106:25
**guess**
74:18, 76:4, 76:13, 77:11, 84:2, 104:20, 124:1
**guessing**
71:24, 94:8, 113:24
**gump**
57:18, 67:12,

68:22, 69:1, 69:10, 73:25, 76:9, 76:11, 88:20, 103:1, 103:7, 109:17, 109:20, 109:22, 119:19, 119:20, 119:24
**gump's**
75:8
**guys**
12:15, 35:9, 49:15, 98:14, 98:20, 99:13, 99:24
**gymnastics**
31:6, 32:1
**gyration**
31:3

**H**

**half**
110:22
**hand**
7:23, 61:11, 141:22
**handed**
13:24, 40:19
**handle**
31:4, 76:17
**handled**
10:15, 25:5, 25:6
**handshake**
80:18
**handwriting**
41:22
**hang**
132:5
**hang-ups**
107:12
**happen**
91:20, 97:5, 120:7, 124:5
**happened**
100:15
**happening**
35:20, 119:16
**happens**
121:23, 121:24
**happy**
9:11
**hard**
71:20
**hassen**
44:16, 44:25
**head**
9:5, 51:9, 86:20, 109:11
**health**
70:14
**hear**
35:16, 37:20, 53:11, 71:21, 73:14, 92:6, 95:25, 119:6, 139:17
**heard**
100:10, 134:12
**heavy**
74:19
**held**
19:3
**help**
60:24, 123:22, 124:5
**helped**
44:15, 69:11, 92:2, 125:8
**helping**
30:4, 52:20
**henry**
7:16, 45:25
**henry's**
57:12
**here**
8:20, 41:24, 51:11, 54:17, 62:12, 62:13, 68:18, 69:19, 76:13, 84:1, 86:19, 87:2, 93:8, 95:16, 121:7, 127:15, 130:22
**hereby**
141:7
**hereto**
13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:14, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 114:9, 120:24
**hereunto**
141:22
**herewith**
40:19
**hey**
88:22, 90:10, 91:19, 92:21, 100:19, 123:21, 130:1, 130:5, 133:5
**hi**
59:2
**high**
54:6, 68:10, 74:9, 74:13
**highlighted**
59:20
**hills**
3:22
**himself**
52:13, 57:12, 79:6, 96:11
**history**
80:17
**hold**
41:1, 116:25
**holiday**
49:2, 49:9
**hollywood**
5:24
**honest**
31:1, 71:17, 91:19
**honorable**
91:25
**hopefully**
105:4
**hotel**
11:4, 15:15, 18:9, 21:10, 23:6, 25:12, 47:18, 94:18, 101:7, 109:23
**hotels**
11:3, 15:9, 15:12, 16:8, 17:9, 18:11, 18:16, 18:24, 19:17, 19:20, 19:25, 20:3, 21:10, 22:2, 22:3, 22:7, 22:9, 23:19, 24:16, 25:1, 25:15, 25:18, 35:1, 46:5, 47:19, 58:1, 67:12, 67:16, 68:13, 68:21, 68:24, 71:3, 71:7, 71:10, 71:13, 74:1, 74:12, 75:4, 76:8, 88:13, 94:6, 100:19, 101:11, 110:4, 123:15
**hourly**
24:5
**hours**
100:5
**house**
25:5, 48:23, 49:3
**houses**
77:1
**howard**
45:25
**hs**
30:9
**husband**
27:1
**hush's**
24:19, 24:22, 36:2, 39:18, 45:22, 48:6, 48:8, 79:14,

107:17, 107:23, 121:11, 125:1, 138:11
**hushmand**
5:33, 6:5, 6:9, 6:31, 121:18
**hushnand**
3:24
**hypothetical**
100:24, 101:7, 101:16, 102:5, 109:6, 112:20, 117:2, 119:23

**I**

**idea**
16:21, 26:15, 70:5, 93:18, 93:19, 95:9, 95:18, 116:7, 127:22
**identification**
13:21, 20:14, 27:3, 32:5, 46:13, 49:21, 57:1, 61:12, 67:4, 87:15, 99:3, 105:13, 108:5, 109:12, 114:8, 120:23
**identified**
28:1
**identify**
14:21
**ignore**
59:24, 100:21
**ignored**
101:4
**illegal**
42:17, 42:18, 132:24
**imagine**
72:8, 74:5, 77:16, 93:6
**immediate-family**
45:13
**immediately**
56:22, 63:22, 63:25
**impartial**
72:21
**implicitly**
137:24
**important**
36:9, 37:21, 65:9
**importantly**
52:3
**impose**
110:22
**impossible**
135:9
**improper**
100:24, 101:16, 102:5, 109:6, 112:19, 117:1, 119:22, 135:15
**in-house**
11:7, 11:9, 11:10, 11:13, 11:15, 11:16, 11:17, 11:19, 11:20, 17:22
**inc**
5:20
**inclined**
81:16, 97:21
**include**
61:3
**included**
124:6
**including**
41:5
**incorrect**
41:19
**indemnity**
5:26, 5:30, 6:16, 50:7, 54:10, 57:21, 59:9, 106:5, 108:14
**independent**
29:24, 39:23, 89:7, 90:3, 90:8, 90:14, 123:20, 132:8
**index**
4:1
**indicate**
132:23
**indicated**
127:5
**indicates**
32:21
**indicating**
76:10, 86:21, 87:2, 126:13, 133:24
**individual**
30:11, 76:14, 108:1
**individuals**
69:13
**information**
82:11
**infusions**
22:18
**initial**
31:16, 57:16, 115:1
**initially**
16:14, 16:15, 43:11
**ink**
32:16, 40:11
**innate**
37:22
**input**
11:22, 26:7, 26:9
**ins**
85:22, 107:11
**instances**
96:7
**instruct**
9:13
**instructed**
14:23, 41:10, 122:10
**instruction**
27:17, 27:25, 28:7, 31:2, 31:8
**instructions**
29:17
**instructs**
9:16
**intentionally**
20:24
**interest**
15:13, 15:19, 15:23, 15:25, 17:5, 17:10, 17:13, 17:14, 19:3, 19:4, 19:8, 28:17, 38:19, 40:6, 40:14, 40:25, 41:3, 42:8, 42:11, 42:14, 42:16, 42:20, 42:24, 43:2, 43:6, 45:12, 53:8, 63:4, 66:3, 66:7, 92:23, 134:4, 135:7
**interested**
50:15, 52:16, 63:12, 63:17, 64:7, 97:11, 97:15, 98:7, 98:23, 99:16, 100:11, 100:13, 104:14, 110:13, 128:2, 128:4, 141:20
**interesting**
49:18, 54:7, 77:6
**interject**
12:5
**interpose**
12:12
**interposes**
9:15
**interrupt**
9:10
**interrupted**
13:4, 111:6, 139:8
**intimately**
25:9, 31:4

**introduce**
7:13
**introduction**
48:11, 48:20, 49:3
**invasive**
12:13
**invest**
52:20, 80:16, 91:23, 92:13, 93:1
**invested**
52:2
**investment**
78:13
**involved**
22:14, 22:19, 22:21, 24:20, 25:9, 30:3, 30:24, 31:4, 31:25, 36:17, 39:18, 42:19, 53:2, 58:10, 63:20, 70:16, 70:20, 70:21, 71:2, 71:6, 71:12, 72:12, 72:15, 79:2, 85:13, 85:14, 86:14, 87:8, 91:6, 113:18, 120:1, 120:2, 120:13, 133:20
**involvement**
93:20, 119:13
**involving**
46:4, 81:9
**irrevocable**
19:5, 19:11
**issue**
13:10, 82:14, 88:5, 128:15, 139:19
**issues**
42:13, 42:20, 77:6, 92:4, 95:22, 96:2
**it'd**
85:22
**item**
88:3
**items**
88:2
**itself**
47:5, 52:11, 53:13

J

**jackie**
44:16, 44:25
**jannol**
7:16, 12:15, 12:17, 12:19, 13:14, 18:25, 20:16, 29:8, 33:18, 33:22, 34:19, 37:9, 37:12, 41:14, 41:16, 46:15, 46:20, 49:15, 49:23, 66:13, 66:20, 66:23, 69:14, 87:13, 113:5, 114:5, 117:20, 117:22, 117:25, 118:4, 118:6, 118:8, 118:10, 118:21, 118:23, 119:1, 119:5, 120:25, 121:23, 124:14, 126:6, 126:19, 126:21, 135:12, 139:2, 139:4, 139:22
**jannol's**
14:4
**jay**
1:7, 3:3, 3:10, 5:23, 5:25, 5:29, 6:15, 6:19, 6:24, 6:26, 6:34, 7:6, 7:15, 7:19, 8:11, 8:15, 14:11, 48:6, 50:7, 50:11, 54:6, 54:9, 59:9, 80:23, 81:8, 94:6, 105:23, 110:6, 110:8, 111:17, 121:12, 121:17, 121:20, 138:21
**jc**
28:8
**jeff**
26:21, 26:22, 26:24
**job**
1:35, 122:20
**joe**
133:4, 133:10
**johnson**
1:32, 2:4, 7:9, 141:7, 141:26
**joined**
92:16
**joseph**
11:24, 50:6
**judgment**
5:15, 21:8
**justyne**
1:32, 2:4, 7:9, 141:7, 141:26
**jwoods@jcre-la**
50:5, 57:9

K

**k-1s**
17:18
**kalt**
3:4, 7:15
**keep**
24:9, 39:13, 39:15, 45:11, 58:8, 86:20, 96:14, 113:10, 118:12, 130:21
**kind**
24:8, 25:14, 35:22, 43:9, 58:6, 58:17, 60:2, 63:15, 67:11, 80:19, 93:19
**kinds**
24:15, 96:13
**knew**
37:3, 38:14, 39:11, 82:12, 82:13, 86:10, 109:17, 110:7, 122:8, 122:17, 122:19, 123:11, 132:20, 135:15
**knowing**
133:20, 137:2
**knowledge**
107:3, 112:10, 115:4, 116:11, 119:23, 123:7, 134:11, 134:16, 138:15
**knowledgeable**
86:1
**known**
15:15, 32:24, 44:7, 135:17

L

**lack**
107:3, 112:9, 115:4, 116:10, 116:11, 119:23, 123:6
**land**
81:22, 82:15, 82:16, 83:18, 88:1
**language**
132:7, 132:9
**large**
49:4
**last**
10:22, 69:12, 69:19, 88:3, 88:9, 97:19, 102:22, 103:17, 113:12, 120:20
**late**
104:23
**later**
15:8, 63:23,

99:24, 134:7, 135:6, 138:6
**latest**
46:24
**laughing**
66:13
**law**
3:6, 3:13, 3:18, 3:20, 10:23, 33:17, 39:12, 42:17, 122:20, 137:4, 137:5, 138:5
**lawyer**
11:4, 11:5, 36:11, 36:13, 36:17, 36:22, 37:14, 39:1, 46:8, 64:25, 68:15, 68:24, 69:8, 69:9, 70:7, 92:8, 92:18, 92:20, 92:24, 94:22, 95:13, 103:12, 123:11, 123:22, 124:3, 131:2, 131:4, 131:22, 132:4, 132:12, 132:17, 136:2, 136:5
**lawyers**
26:7, 26:8, 43:19, 45:20, 45:24, 92:10, 92:13, 93:1
**lead**
75:20, 76:2
**learn**
135:4
**learned**
39:11, 107:24
**leasehold**
15:12
**leases**
25:5, 60:23, 60:24
**least**
51:16, 55:25, 57:16
**lee**
57:23, 57:24, 59:2, 61:20, 90:22
**left**
21:21, 24:18, 63:18, 88:5
**legal**
14:16, 22:23, 23:15, 24:15, 24:16, 25:2, 25:14, 26:5, 34:25, 38:14, 95:22, 96:1, 96:9, 109:25
**legalities**
95:21, 96:1
**lend**
135:5
**lender**
81:21, 83:20, 83:22, 83:23, 84:1, 84:12, 86:15, 106:19, 106:24, 135:24
**lenders**
22:19
**lending**
80:14, 84:14, 86:11
**lerman**
26:16, 26:17, 26:25, 70:3, 70:5
**less**
72:24, 85:13
**let's**
12:17, 12:22, 12:23, 16:24, 18:12, 20:8, 29:8, 29:11, 39:13, 40:9, 51:11, 61:7, 62:12, 62:16, 66:20, 66:23, 82:7, 83:5, 97:24, 97:25, 98:11, 99:5, 99:21, 105:11, 111:9, 125:19, 130:15, 131:8, 131:18
**letter**
5:33, 6:5, 33:24, 36:2, 36:10, 36:25, 37:1, 65:6, 83:6, 83:10, 84:15, 84:25, 88:25, 89:22, 90:2, 90:5, 90:14, 91:12, 91:19, 93:9, 97:4, 103:14, 123:14, 125:4, 135:24, 136:19, 136:23
**letters**
33:17, 135:19
**lev**
3:12, 7:18, 12:5, 12:7, 12:16, 12:18, 12:20, 12:24, 13:1, 13:3, 13:8, 13:12, 13:15, 13:17, 13:19, 20:17, 28:23, 46:16, 111:2, 111:5, 119:22, 123:6, 124:11, 126:14, 139:5
**lev's**
28:24
**liability**
6:35, 121:20
**licensed**
10:8, 94:20, 94:25, 132:4
**liked**
76:25, 138:18
**likely**
72:6, 84:20, 94:15, 95:12, 104:20
**likes**
69:19, 114:2, 114:3
**limited**
6:35, 19:21, 21:10, 22:3, 121:20
**line**
112:4
**list**
23:5, 88:2
**listed**
62:13, 62:19
**litigation**
67:13, 75:5, 75:7, 75:19, 103:1, 103:2, 103:6, 121:11
**litigator**
26:22
**little**
35:5, 82:22, 87:3, 108:25
**llc**
1:7, 3:3, 3:10, 6:34, 7:6, 7:15, 7:19, 14:11, 15:25, 17:1, 17:2, 19:21, 22:2, 22:7, 28:9, 28:10, 30:8, 30:9, 30:11, 40:22, 67:16, 121:20
**llcs**
15:24
**llp**
3:4, 3:11, 7:18
**loaned**
133:16
**loaning**
79:16
**loans**
29:25, 30:19, 39:24, 43:24, 44:5, 44:9, 44:11, 44:13,

45:8, 45:15, 80:12, 125:14, 132:21
**long**
10:11, 16:15, 21:3, 24:7, 37:23, 43:15, 47:14, 49:7, 66:17
**long-time**
44:6
**longer**
10:9, 49:8, 75:20, 100:11
**look**
17:17, 17:18, 21:25, 27:22, 31:17, 34:13, 35:8, 37:3, 40:1, 40:9, 50:20, 63:2, 64:20, 64:23, 67:14, 73:17, 76:24, 90:23, 93:15, 94:19, 95:4, 95:6, 95:13, 96:8, 97:16, 99:15, 99:21, 100:3, 100:19, 101:3, 112:15, 113:1, 114:11, 117:9, 123:3, 127:3, 127:11, 127:16, 127:20, 128:1, 128:11, 130:15, 131:8, 131:12, 131:18, 134:3
**looked**
52:13, 62:21, 63:1, 72:20, 77:4, 77:5, 78:20, 117:9, 125:3, 125:12
**looking**
61:4, 62:22, 62:24, 68:2, 77:10, 83:15, 83:18, 98:6, 113:10, 113:22, 115:6, 116:22, 128:4
**looks**
27:17, 30:8, 41:21, 54:8, 54:16, 55:15, 57:16, 59:1, 62:17, 62:18, 69:19, 70:2, 73:22, 74:2, 83:6, 128:2
**los**
1:22, 2:2, 3:8, 3:16, 7:1, 7:8, 15:16, 40:21
**lost**
18:18, 102:16
**lot**
18:21, 45:8, 45:23, 52:2, 54:1, 66:15, 72:21, 72:23, 72:24, 85:20, 93:20, 96:11, 113:17, 113:25, 114:2, 114:3, 121:7
**loudly**
9:9

**M**

**madam**
110:18
**made**
29:21, 29:23, 29:24, 30:1, 31:15, 31:18, 33:15, 38:25, 39:25, 41:7, 41:24, 44:5, 44:21, 45:15, 48:20, 52:15, 78:22, 78:23, 79:12, 80:12, 93:5, 94:10, 107:22, 125:11, 125:14, 139:18
**mail**
41:11
**make**
19:22, 29:8, 31:24, 35:15, 37:2, 37:4, 40:2, 44:11, 45:12, 52:4, 52:15, 54:1, 55:10, 58:11, 78:15, 78:17, 79:5, 79:13, 80:11, 82:17, 86:13, 89:14, 91:20, 95:13, 108:1, 118:1, 119:2, 120:7, 124:5
**makes**
79:22, 80:7
**making**
30:3, 30:19, 33:6, 33:12, 39:24, 43:24, 63:4, 79:23
**malibu**
77:11
**man**
66:16, 87:5, 87:9
**manage**
10:21, 17:24
**managed**
17:21
**management**
9:22, 9:23, 22:16, 25:10
**manager**
10:5, 58:13
**many**
17:4, 17:12, 19:10, 19:12, 40:4, 49:10, 55:25, 92:14, 135:17
**marder**
3:11, 7:18
**mark**
12:4, 13:20, 20:13, 46:12, 67:3, 87:10
**marked**
13:21, 20:14, 21:18, 27:3, 32:5, 38:1, 46:13, 49:21, 56:23, 57:1, 61:12, 62:11, 67:4, 73:17, 87:15, 99:3, 103:17, 105:13, 108:5, 109:12, 114:8, 120:23
**martin**
96:12
**martyr**
75:24
**mary**
27:19, 29:9, 29:10, 31:6
**massive**
121:22
**matter**
7:6, 37:7, 38:16, 38:17, 44:4, 46:4, 48:5, 48:6, 52:4, 92:22, 121:12, 133:4
**matters**
10:15, 10:16, 10:20, 11:3, 18:4, 18:5, 18:6, 18:7, 22:12, 24:10, 24:25, 25:2, 35:2, 38:14, 91:22, 96:25, 97:2, 97:3, 109:23, 122:9, 122:18
**maybe**
10:9, 12:8, 12:14, 24:21, 29:23, 35:5,

42:16, 44:5, 45:2, 47:14, 49:8, 49:9, 51:21, 56:22, 63:3, 68:4, 68:17, 70:14, 72:24, 73:12, 82:16, 82:21, 83:19, 87:4, 91:24, 117:4, 138:17
**maynard**
69:20
**mean**
10:11, 11:9, 16:5, 17:23, 23:5, 23:25, 25:9, 26:13, 30:14, 31:3, 35:21, 36:23, 44:19, 49:10, 52:21, 53:3, 56:14, 58:7, 60:22, 61:4, 63:4, 63:17, 64:3, 66:12, 66:14, 69:8, 70:24, 71:15, 76:5, 77:24, 80:15, 84:6, 92:1, 92:13, 94:10, 105:9, 115:22, 120:7, 122:20, 125:16, 133:22, 133:25, 135:16, 135:17, 135:18, 135:23
**means**
92:12, 132:9
**meant**
11:14, 47:23
**meet**
56:14, 73:2
**meeting**
47:7, 47:12, 47:13, 47:15, 47:25, 48:4, 48:13, 48:25
**member**
30:10, 30:12, 94:20, 95:1, 136:5
**members**
17:11, 23:4, 23:9, 26:5, 26:11, 30:8, 31:21, 44:3, 44:4, 45:6, 122:23, 125:16
**memorialized**
45:3
**memory**
98:16
**mentioned**
8:10, 10:17, 21:16, 33:14, 43:23, 44:14, 45:18, 51:3, 55:24, 74:22
**mentioning**
106:24
**mentions**
83:19, 106:2
**merits**
94:4
**met**
48:22, 48:23, 49:1, 49:13, 122:24
**michelle**
26:16, 26:17, 70:3, 70:5, 72:2
**michelle's**
27:1
**middle**
40:11, 70:2
**might**
11:1, 16:22, 26:11, 48:25, 49:6, 49:13, 54:17, 56:18, 59:24, 61:2, 64:3, 64:6, 69:24, 72:18, 74:21, 84:21, 88:13, 96:20, 106:22, 116:7
**mildly**
122:21
**million**
51:7, 83:19
**mind**
17:6, 17:16, 25:4, 30:14, 33:15, 33:16, 36:6, 37:9, 42:22, 52:23, 63:15, 68:1, 79:8, 79:19
**minute**
29:11, 66:20, 87:18, 113:2, 114:11, 125:19
**minutes**
110:24, 119:15
**mischaracterizes**
135:13, 136:17
**misgivings**
64:5
**mister**
110:21
**mm-hmm**
8:17, 39:2, 39:20, 40:12, 40:17, 51:15, 54:11, 55:17, 61:22, 68:23, 69:21, 71:8, 71:11, 73:19, 76:16, 79:24, 80:21, 82:9, 84:19, 84:23, 87:12, 89:25, 91:13, 92:9, 93:14, 97:18, 98:2, 98:13, 99:23, 100:6, 100:9, 105:22, 116:19
**moment**
20:8, 20:19, 27:6, 46:18, 49:25, 57:4, 61:16, 67:7, 99:5, 118:16
**monday**
1:24, 7:5, 88:1, 109:4
**money**
36:8, 36:15, 45:9, 54:1, 65:1, 79:16, 80:5, 80:6, 80:17, 84:14, 94:9, 133:16, 135:5
**monies**
69:5
**month**
42:23, 43:8, 43:10
**monthly**
23:25
**more**
11:9, 18:1, 18:9, 25:25, 29:19, 30:24, 35:13, 35:18, 35:22, 41:14, 46:9, 53:10, 60:24, 68:14, 70:14, 71:23, 74:19, 80:15, 82:22, 86:15, 95:12, 107:14, 113:24, 138:18
**morning**
7:4, 7:14, 8:8, 8:9, 59:5, 105:6, 105:10, 106:17, 109:4, 111:22
**most**
19:4, 37:21, 52:3, 60:22
**mostly**
9:21, 9:25, 22:25, 23:9, 24:18, 24:19, 35:5, 35:6, 35:7, 56:15, 74:18, 82:21

**motion**
5:14, 21:8
**move**
11:11
**moving**
74:6
**much**
18:9, 35:4, 46:8, 61:4, 68:15, 76:24, 80:3, 80:16, 86:15, 134:10
**multiple**
96:7, 135:21
**myself**
31:3, 34:16, 77:3, 77:5, 82:3, 86:6, 98:18

**N**

**name**
7:9, 8:10, 8:15, 69:19, 70:2, 75:25, 103:12, 112:4, 112:5, 115:22, 127:25
**name's**
75:1
**named**
27:19, 30:11, 45:25, 141:20, 141:21
**names**
42:2, 63:3
**national**
47:11
**nature**
86:17
**nd**
59:8, 100:5, 104:13, 105:20, 127:8
**necessarily**
24:25, 60:6, 96:19, 113:19
**necessary**
141:16
**need**
9:4, 9:8, 9:10, 12:25, 68:24, 74:8, 88:22, 89:22, 90:24, 94:2, 100:19, 101:3, 105:5, 107:20, 107:25, 108:14, 111:25, 123:17, 128:9
**needed**
17:25, 23:12, 23:15, 91:7, 106:15
**needing**
36:7
**needs**
59:4, 97:5
**negatives**
97:25
**negotiate**
42:24, 65:23, 66:1, 68:16
**negotiated**
31:9, 65:22, 120:10
**negotiating**
66:6, 68:14, 69:4
**negotiation**
22:15, 65:20, 69:5
**neither**
119:20
**nephew**
29:2, 57:10, 122:7
**never**
11:4, 26:22, 48:22, 77:2, 77:25, 91:3, 94:3, 96:22, 103:13, 112:2, 116:2, 120:15, 122:8, 125:14, 129:19, 133:24, 138:20, 138:22, 138:23
**new**
10:11, 66:20, 106:4
**next**
32:3, 32:16, 49:19, 56:23, 59:1, 61:10, 67:3, 87:10, 96:16, 96:17, 105:11, 114:6, 114:7
**night**
104:19, 104:23
**nitty-gritty**
85:17
**nobody**
23:10
**nobody's**
123:25
**nodding**
9:5
**nods**
109:11
**none**
40:2, 41:6
**northern**
1:2
**note**
5:29, 5:37, 40:19, 44:16, 44:17, 44:23, 44:25, 45:1, 57:20, 59:9, 61:23, 62:1, 62:24, 63:1, 106:2, 122:6, 135:5
**noted**
140:7
**nothing**
94:6, 110:4, 141:9
**notice**
20:23, 21:2
**noticing**
121:22
**number**
7:6, 7:11, 17:10, 18:8, 21:12, 25:4, 25:7, 27:11, 27:12, 29:5, 61:25, 62:15, 86:14, 121:18, 122:4
**numbered**
126:19
**numbers**
16:20, 42:1, 62:3, 62:8, 62:9
**nuts**
60:11

**O**

**oath**
8:24, 8:25
**object**
9:12, 95:15
**objecting**
118:13
**objection**
100:23, 101:15, 107:2, 109:5, 110:15, 110:22, 112:9, 112:19, 115:4, 115:12, 116:9, 116:23, 117:1, 117:11, 117:19, 117:25, 118:13, 118:20, 119:1, 119:22, 123:6, 135:9, 136:13, 136:15, 138:8, 139:20
**objections**
5:6, 9:15, 12:12, 13:25, 14:16, 102:4, 110:18, 118:11
**observe**
138:11
**obviously**
13:9, 92:19
**occasion**
47:8
**occurred**
37:12, 81:5,

81:10, 102:25
**office**
14:3, 14:4, 14:13, 27:13, 28:23, 56:15, 57:12, 58:13, 113:20, 116:2, 133:11, 134:8
**officer**
32:17
**offices**
3:18
**official**
126:12
**officially**
98:21
**oftentimes**
60:23, 97:7
**oh**
8:13, 20:25, 30:1, 47:6, 78:23, 97:23, 106:14, 121:2, 124:20, 125:5, 126:10, 126:20, 139:7
**olympic**
2:2, 3:7, 7:8
**once**
49:13, 66:17, 75:8, 75:20, 75:22, 98:8, 98:9, 98:10, 98:17, 111:23, 123:13
**one**
9:25, 13:6, 20:1, 20:10, 22:15, 23:13, 26:9, 26:17, 29:5, 29:7, 30:9, 30:11, 32:9, 34:13, 39:3, 44:6, 44:18, 45:2, 47:13, 48:4, 48:23, 49:8, 51:3, 51:13, 51:20, 55:13, 56:1, 57:17, 59:21, 61:7, 61:10, 61:23, 62:13, 62:14, 62:16, 62:17, 62:18, 69:13, 73:25, 77:2, 79:25, 80:25, 81:1, 81:9, 81:11, 81:12, 81:22, 82:16, 85:18, 88:12, 94:5, 94:11, 95:24, 97:24, 98:16, 101:5, 101:6, 105:8, 105:11, 107:12, 111:8, 113:4, 113:23, 114:7, 115:15, 118:16, 125:1, 126:8, 131:12, 139:5, 139:6, 139:10, 139:11
**one-man**
60:2, 93:19
**one-way**
73:13
**only**
10:5, 10:14, 10:19, 19:6, 28:5, 39:9, 39:15, 49:8, 75:4, 80:12, 98:9, 98:14, 98:16, 107:25, 108:14, 122:15, 123:21, 128:5
**open**
113:18, 113:19
**opened**
59:17, 59:21, 60:16, 110:5
**opening**
104:9, 112:17
**operate**
35:12
**operating**
138:21
**opine**
135:21
**opinion**
123:14, 127:21, 135:19, 135:24
**opportunity**
55:18, 77:11, 141:16
**opposed**
46:4
**opposition**
5:13, 21:7
**opted**
46:3
**order**
89:22, 126:7, 126:17, 128:1, 139:5
**ordering**
139:3
**original**
50:5
**originally**
19:10, 21:22, 28:17
**other**
9:14, 9:15, 10:18, 12:25, 15:5, 16:4, 16:5, 16:6, 17:5, 18:1, 20:2, 23:4, 23:6, 23:22, 24:12, 24:13, 25:16, 26:7, 26:11, 33:10, 33:25, 43:18, 46:5, 48:18, 52:10, 52:17, 53:2, 54:21, 55:14, 60:2, 63:9, 73:25, 80:16, 81:5, 81:22, 82:16, 89:12, 91:15, 91:17, 93:21, 116:11, 122:22, 130:9, 130:22
**others**
26:2
**otherwise**
45:6
**out**
11:13, 18:21, 21:21, 39:12, 51:21, 61:11, 63:18, 67:12, 76:23, 78:19, 87:6, 88:6, 91:5, 91:6, 97:10, 97:25, 98:18, 98:22, 100:17, 110:12, 111:15, 122:20, 127:16, 133:9
**outcome**
68:19, 102:19, 103:2, 141:21
**outs**
85:22, 107:11
**outset**
12:16, 13:9
**outside**
11:7, 11:10, 11:13, 11:18, 25:6, 39:9, 60:24, 69:10, 91:22
**over**
14:3, 22:20, 25:2, 45:20, 57:12, 99:15, 126:13, 134:6
**own**
9:25, 18:22, 60:21, 68:22, 78:5, 92:22, 98:10, 123:1, 123:5
**owned**
10:2, 15:13, 15:23, 15:24, 17:2, 19:25, 23:22, 28:13,

28:16, 36:18, 77:12, 77:17
**ownership** 15:19, 15:20, 15:24, 16:3, 16:11, 17:5, 17:14, 18:16, 19:22, 28:18, 77:15
**owning** 18:15
**owns** 17:18

**P**

**pacific** 2:3, 46:25
**page** 5:3, 5:21, 5:27, 6:3, 6:12, 6:17, 6:21, 6:27, 21:17, 21:18, 27:22, 32:3, 32:9, 40:11, 61:19, 62:9, 69:13, 73:18, 89:5, 130:16
**pages** 1:37, 5:10, 5:15, 5:18, 5:24, 5:31, 5:35, 5:39, 6:8, 6:24, 6:30, 6:36, 21:21, 30:9, 67:15, 108:15
**paid** 24:2, 29:25, 30:2, 31:1, 31:16, 31:17, 32:22, 44:22, 50:18, 51:5, 51:8, 51:20, 74:13, 79:21, 80:25, 81:11, 125:5, 131:23
**paper** 21:1
**papering** 89:13
**paperwork** 58:8
**paragraph** 40:18, 45:2, 73:17, 73:20, 88:9, 89:5, 111:20, 112:7, 121:6, 122:4, 134:3
**paragraphs** 21:25, 45:3
**parents** 10:3, 16:1, 17:3, 45:9
**part** 12:11, 16:6, 18:15, 28:14, 43:13, 52:23, 54:16, 68:18, 88:21, 89:13, 93:18, 94:10, 104:24, 125:25, 126:2, 135:18
**partial** 5:14, 21:8
**participate** 81:2, 83:4
**participated** 35:12, 81:4
**participating** 64:8, 97:11
**participation** 131:19
**particular** 24:10, 46:4, 53:23, 93:7, 94:5, 96:21
**particulars** 24:23
**parties** 27:21, 40:25, 44:3, 44:5, 49:9, 74:5, 105:5, 141:19
**partner** 102:12, 109:20
**partnership** 19:21, 28:19, 39:10, 77:16, 78:2, 79:10, 88:13
**partnerships** 11:23
**parts** 18:23, 20:1, 65:25
**party** 49:2, 132:12
**pasadena** 47:7, 47:13
**pass** 55:16, 56:19, 77:2, 81:16, 97:21
**passed** 44:8, 85:18, 99:11, 111:15
**past** 67:12, 68:3, 68:4, 69:4, 76:9
**pay** 107:13
**payback** 30:25
**paying** 129:22
**payment** 68:4
**payoff** 125:4, 125:9
**pch** 30:7, 30:11, 31:21, 38:2, 40:22, 76:20, 139:18
**pdfs** 108:14
**pending** 8:19, 124:14
**penultimate** 97:22
**people** 18:9, 39:25, 47:13, 49:4, 58:16, 66:17, 66:19, 72:4, 104:23, 105:10, 129:8, 129:9, 130:9, 131:2
**people's** 80:16
**percent** 16:17, 17:2, 17:13, 41:3, 41:19, 42:6, 42:22, 42:23, 42:24, 43:8, 43:10, 134:4
**percentage** 17:19
**percentages** 16:11, 17:17
**perhaps** 58:18, 93:5
**period** 17:21
**periodic** 23:24
**person** 24:20, 27:19, 34:1, 34:3, 35:16, 54:22, 56:11, 56:14, 58:7, 58:17, 69:24, 71:9, 73:2, 86:15, 92:1, 133:19, 133:21
**personal** 37:8, 74:20, 107:3, 107:18, 112:10, 115:4, 116:10, 119:23, 123:7
**personality** 18:8
**personality-wise** 114:2
**personally** 36:18, 39:18, 49:13, 77:13, 79:5, 80:12,

107:16, 107:19, 125:14
**pertain**
18:3, 18:4, 25:15
**pertaining**
25:14
**phone**
35:2, 35:7, 35:10, 35:17, 56:12, 56:13, 56:16, 56:18, 73:6, 73:11, 73:13, 73:15, 96:17
**phonetic**
75:24, 96:13
**picked**
56:18
**picture**
46:1
**piece**
15:13, 19:5, 19:10, 28:16, 77:5, 77:8, 78:2, 78:6
**pieces**
82:13
**place**
7:7, 81:9, 141:11
**plaintiffs**
5:13, 21:7, 22:2
**plan**
78:11
**planet**
7:10
**planning**
17:4, 19:8
**plans**
76:25
**play**
92:6
**played**
133:10
**pleadings**
103:10
**please**
7:13, 7:23, 8:12, 9:10, 9:11, 13:6, 18:13, 20:19, 57:19, 95:24, 101:23, 101:24, 105:24, 111:8, 111:24, 117:22, 118:2, 118:9, 118:23, 119:3, 122:4, 126:9, 127:4, 131:9, 139:10, 139:13
**plus**
41:3
**point**
13:3, 16:19, 19:7, 26:9, 29:25, 35:15, 38:23, 72:25, 74:23, 86:5, 99:13
**pointing**
134:1
**points**
87:25
**pos**
103:8
**posing**
116:4
**position**
47:10, 58:5
**positive**
16:25
**positives**
98:1
**possibilities**
85:9, 85:10
**possible**
48:17, 48:21, 54:18, 56:17, 64:6, 70:9, 70:11, 84:9, 84:12, 111:24, 112:23
**possibly**
55:3, 86:19
**postdates**
51:17
**potential**
52:11, 78:13
**potentially**
68:5
**power**
58:10
**practiced**
10:12, 10:13, 10:14, 39:5
**practicing**
10:7, 132:2, 132:3
**preparation**
131:19
**prepare**
31:7
**prepared**
14:18, 61:5, 123:15, 134:17
**present**
3:23, 122:16
**pretend**
72:4
**pretty**
98:17
**previous**
108:16
**previously**
106:1
**primarily**
24:20
**principally**
24:22, 31:5
**prior**
100:13, 136:17
**privilege**
12:14, 102:11
**pro**
82:5
**probably**
34:4, 35:6, 35:13, 44:7, 47:8, 53:10, 56:13, 56:20, 56:21, 58:7, 63:3, 64:10, 64:22, 70:13, 71:24, 72:24, 74:19, 76:4, 79:1, 79:11, 82:21, 82:22, 86:5, 89:21, 96:10, 101:8, 107:21, 127:24
**problems**
55:13
**produce**
14:23
**produced**
27:13, 28:23, 29:1, 29:5, 29:8, 120:19
**production**
29:3
**profession**
9:20
**project**
52:1, 53:25, 55:14, 56:2, 107:15, 127:6
**projects**
49:18
**promissory**
5:37, 44:16, 44:17, 44:23, 44:24, 45:1, 61:23, 62:1, 62:23, 63:1, 122:6, 135:5
**properties**
9:23, 9:24, 10:1, 10:2, 10:5, 10:17, 10:20, 94:11
**property**
9:25, 10:20, 15:13, 15:14, 15:16, 47:15, 48:6, 50:21, 76:24, 76:25, 77:9, 77:12, 78:2, 78:6, 78:24, 78:25, 80:23, 110:8,

110:9
**proposed**
53:15
**prosecuting**
75:18
**provide**
11:16, 11:22
**provided**
33:24, 34:25, 41:1, 43:3
**providing**
22:23, 24:16, 29:9, 92:3
**pulled**
57:11
**purchased**
25:5
**purely**
102:10
**purpose**
36:5, 37:1, 78:3, 88:17
**pursuant**
84:14, 84:25
**pursue**
53:4
**pursuing**
100:11
**put**
34:5, 63:15, 123:16, 132:20, 132:24, 135:7
**putting**
101:19

**Q**

**question**
12:8, 12:18, 19:24, 25:14, 36:21, 39:17, 95:3, 95:10, 95:25, 101:22, 101:24, 101:25, 108:24, 114:6, 117:23, 117:24, 118:1, 118:8, 118:9, 118:17, 118:24, 118:25, 119:2, 124:14, 139:11
**question's**
22:6
**questions**
22:5, 96:21, 125:24, 139:1
**quick**
29:8, 121:7
**quickly**
9:9, 111:25
**quinn**
75:1, 75:3, 75:8, 76:10, 76:14, 103:1, 103:7
**quite**
25:25, 55:3, 73:5, 74:15, 92:2

**R**

**r**
72:22
**rahsanna**
103:23
**raise**
7:22, 42:13
**raised**
139:19
**raising**
76:21
**ramifications**
132:16
**rarely**
73:8
**rate**
40:6, 40:14, 41:3, 42:8, 42:11, 42:14, 42:16, 42:20, 42:24, 43:2, 43:6, 45:12, 53:8, 63:4, 66:3, 66:7, 134:4, 135:7
**rather**
82:20
**ratio**
16:14
**rc's**
16:4, 16:17, 17:3, 17:10, 17:15, 20:2, 28:17, 45:14, 45:23, 47:22, 94:22, 100:16, 114:21, 116:5
**rd**
81:15, 98:4, 99:12, 99:22, 128:3
**re-redirect**
140:5
**reaching**
100:17
**read**
24:21, 40:18, 41:14, 46:20, 57:4, 75:11, 91:18, 91:19, 101:17, 101:18, 101:20, 101:24, 104:18, 105:3, 106:6, 106:8, 118:11, 118:13, 119:21, 121:4, 122:4, 124:12, 136:9, 136:18, 136:21, 138:22, 139:12, 141:16
**reader**
121:8
**reading**
73:22, 85:7, 85:11, 104:20, 112:18, 120:12
**reads**
28:3
**ready**
20:21, 27:7, 27:8, 46:19, 46:21, 50:1, 50:2, 57:5, 57:6, 61:17, 61:18, 67:8, 67:9, 87:19, 87:20, 87:25, 105:16, 105:17, 108:8, 108:9, 114:12, 114:13, 125:23
**real**
9:21, 49:17, 52:4, 52:18, 80:24, 86:10, 119:16
**realize**
37:23, 43:14, 125:11
**realized**
79:9
**really**
26:21, 44:6, 46:7, 47:5, 55:25, 56:20, 60:21, 77:15, 77:25, 85:1, 103:5, 115:17, 117:5, 118:5, 118:7, 131:16, 138:18
**reason**
9:2, 15:4, 41:18, 59:24, 60:1, 113:24, 119:18, 137:2, 137:11, 138:4, 138:9
**reasonable**
83:25, 122:25, 123:4, 124:2, 124:17
**reasonably**
124:2
**reasons**
50:21, 85:18
**recall**
28:20, 29:18, 33:14, 33:16, 33:20, 33:21, 35:11, 36:1, 36:4, 38:5, 40:7, 40:8,

42:10, 42:25, 43:1, 43:7, 48:7, 48:12, 48:16, 50:25, 51:1, 53:16, 53:21, 53:23, 54:12, 55:11, 56:2, 56:3, 56:6, 59:12, 60:15, 64:15, 68:8, 76:20, 76:23, 78:14, 78:18, 82:25, 85:10, 85:11, 86:19, 91:5, 93:21, 96:7, 97:4, 102:16, 104:2, 104:9, 104:16, 106:9, 106:15, 107:8, 107:10, 107:11, 108:18, 108:22, 109:9, 113:11, 114:16, 120:14, 120:17, 128:19
**receive**
28:25, 59:14, 85:3, 101:7, 108:20, 108:23, 111:23, 112:16
**received**
14:3, 99:14, 100:7, 100:12, 101:2, 127:4
**receiving**
33:14, 33:16, 36:1, 50:19, 56:17, 59:12, 64:8, 106:9, 108:18, 108:22, 110:7, 111:21, 119:10, 127:7
**recently**
29:19
**recognize**
21:15, 48:24
**recollection**
19:3, 30:13, 33:5, 38:7, 38:8, 40:13, 51:19, 54:5, 76:2, 77:24, 81:2, 84:6, 86:4, 91:2, 94:17, 119:12, 125:6, 128:25, 129:3, 129:25, 130:3, 130:4, 130:6, 130:8
**recommendation**
90:20
**reconveyance**
40:24
**record**
7:5, 9:14, 12:11, 14:2, 20:7, 20:8, 20:10, 20:11, 20:12, 20:22, 21:5, 27:10, 28:22, 29:11, 29:12, 29:13, 29:14, 32:12, 34:20, 34:21, 34:22, 34:23, 46:23, 50:3, 51:11, 57:7, 66:23, 66:24, 66:25, 67:1, 81:3, 87:21, 99:5, 99:6, 99:7, 99:8, 111:9, 111:10, 111:12, 111:13, 113:6, 113:7, 113:8, 114:17, 121:16, 122:2, 125:19, 125:20, 125:21, 125:22, 126:10, 128:24, 140:1, 140:2, 140:3, 140:6, 141:15
**recorded**
40:21
**recount**
53:3
**redline**
62:2, 62:18, 83:6, 83:11, 105:25
**redlined**
57:20, 61:25
**reduced**
55:9
**refer**
18:14, 81:8
**reference**
10:17
**referenced**
51:13, 80:13, 106:20, 112:6
**references**
98:14
**referred**
22:4, 112:8
**referring**
22:18, 26:24, 38:16, 51:6, 51:13, 77:18, 106:11
**refers**
11:8
**reflected**
30:7, 41:19, 62:8, 122:13
**reflects**
38:21
**refresh**
30:12, 33:5, 40:13
**regard**
45:14
**regarding**
22:16, 47:15, 50:10, 68:4, 106:5
**regards**
11:23, 48:8
**regular**
23:25
**related**
11:3, 14:24, 18:9, 25:16, 25:18, 29:3, 29:17, 38:14, 38:17, 47:24
**relating**
28:17
**relationship**
10:14, 15:10, 36:19, 37:15, 37:17, 48:10, 71:16, 71:23, 72:22, 74:20, 80:18, 88:4, 88:11, 89:11, 90:12, 102:8, 102:13, 133:14, 133:16, 137:21, 138:12
**relay**
63:9, 82:11
**relayed**
56:1, 74:16, 85:23
**release**
73:23, 73:24, 74:3, 74:8
**relevance**
49:15
**reliable**
25:20
**relied**
25:24, 25:25, 26:4, 26:6, 26:12, 34:15, 39:13, 101:10
**rely**
26:2, 26:21, 26:23, 37:6, 38:13
**relying**
24:22
**remains**
17:16
**remember**
19:6, 33:11, 41:20, 42:5, 43:7, 43:9, 43:14, 44:5, 47:6, 47:7, 47:12, 47:15,

47:24, 48:2, 48:4, 48:14, 49:5, 50:19, 51:24, 52:22, 56:22, 57:15, 59:22, 62:22, 62:25, 63:2, 63:4, 63:6, 63:19, 67:23, 68:17, 71:16, 74:20, 74:25, 75:24, 81:7, 82:12, 82:23, 84:4, 85:1, 85:2, 85:16, 85:17, 85:19, 94:3, 97:12, 98:6, 99:18, 100:14, 100:15, 101:5, 102:16, 102:23, 103:11, 104:22, 107:11, 110:7, 110:11, 119:8, 119:9, 119:10, 119:11, 122:16, 125:7, 127:7, 127:14, 128:8, 128:9, 129:17
**ren**
54:2
**render**
11:21
**rendering**
50:19, 54:3
**reorganized**
1:9, 2:2
**repaid**
79:2, 79:9, 79:12
**repayment**
30:4, 33:7, 33:12, 53:8
**repeat**
18:18, 118:9, 119:6
**replaced**
103:4, 103:7
**replacing**
76:11, 103:1
**reply**
6:33, 121:19
**report**
35:18
**reported**
1:31, 141:12
**reporter**
2:5, 7:10, 8:3, 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:13, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 110:19, 114:9, 120:24, 141:5
**represent**
8:10, 8:15, 22:10, 39:21, 69:9, 89:11, 89:15, 92:21, 124:25, 128:22, 129:9, 129:14, 129:22, 130:21, 136:22
**representation**
21:21, 22:4
**representative**
40:25
**represented**
11:2, 11:6, 15:25, 22:7, 22:11, 75:3, 122:22, 129:19
**representing**
7:10, 128:16, 129:1, 129:6, 130:2
**request**
14:10, 14:24, 29:3, 40:23, 50:18
**requests**
5:7, 14:1, 14:22, 15:6, 28:24, 125:4
**residential**
9:24, 9:25
**resolving**
72:12, 72:15
**respect**
36:7, 42:13, 48:3, 67:13, 68:5, 69:11, 92:3, 128:12
**respected**
138:19
**respond**
96:12, 97:8
**responded**
115:15, 116:4
**response**
14:9, 14:11, 14:21, 27:13, 28:23, 114:19, 120:15
**responses**
5:5, 13:25, 14:12, 14:15, 14:16
**responsive**
14:21
**result**
76:9
**retained**
17:24
**retainer**
23:18, 23:21
**return**
41:10
**reuben**
3:4
**review**
14:12, 14:20, 24:16, 24:18, 24:19, 24:22, 34:1, 34:3, 34:4, 38:3, 59:3, 60:20, 60:22, 61:2, 61:3, 62:20, 62:23, 63:5, 67:21, 116:20, 117:17, 117:18, 118:18, 118:19, 123:20, 133:3
**reviewed**
33:25, 53:18, 60:17
**reviewing**
24:20, 34:8, 122:5
**reviews**
62:25
**revised**
105:24, 106:1
**richard**
6:10, 30:11, 31:22, 48:22, 48:23, 53:25, 75:1, 76:1, 77:19, 77:20, 77:21, 87:23, 103:23, 106:4
**richards**
3:18, 3:19, 4:5, 7:20, 92:16, 95:15, 95:16, 100:23, 101:15, 102:4, 107:2, 109:5, 110:15, 110:17, 110:21, 111:1, 111:11, 112:9, 112:19, 115:4, 115:12, 116:9, 116:23, 116:25, 117:11, 117:13, 117:19, 118:11, 118:15, 118:20, 125:24, 126:5, 126:10, 126:12, 126:15, 126:18, 127:2, 129:5, 131:16, 131:17, 134:21, 136:1, 136:20, 137:9, 138:10, 138:25, 139:2, 139:7, 139:20, 139:23, 140:4

**ride**
97:25, 98:11
**right**
7:22, 10:19, 20:4, 32:9, 34:14, 36:21, 38:10, 38:18, 38:19, 39:12, 59:5, 61:7, 64:4, 68:2, 70:7, 71:3, 71:14, 73:7, 76:4, 76:13, 80:1, 84:9, 84:25, 85:3, 86:3, 86:18, 89:16, 89:20, 90:16, 91:10, 91:16, 92:11, 94:6, 94:16, 94:19, 97:24, 99:17, 100:11, 104:3, 107:16, 107:19, 107:20, 107:25, 108:1, 109:23, 110:13, 117:9, 117:18, 118:19, 126:18, 127:15, 127:19, 128:7, 128:21, 129:8, 129:11, 129:13, 129:25, 130:15, 130:21, 132:8, 134:1, 138:25
**rights**
52:2
**robert**
5:34, 6:6, 6:10, 12:1, 12:11, 18:17, 18:22, 19:16, 20:4, 57:23, 87:23, 103:22, 105:19, 105:24, 108:12, 111:16, 111:22, 133:10, 135:2, 135:6, 136:10
**robert's**
6:29, 105:5, 114:22
**role**
18:1, 18:3, 23:10, 36:10, 70:15, 75:8, 75:17, 92:6, 94:20
**ronald**
3:18, 3:19, 7:20, 95:16
**room**
20:6, 111:11
**rose**
44:17, 45:1
**round**
139:7
**roye**
3:5, 7:14, 8:10, 8:15, 110:23
**rpr**
1:33, 2:4
**rudimentary**
44:17
**rule**
92:19, 127:15, 130:24, 131:5, 131:6
**rules**
92:18
**running**
25:10
**rush**
97:8

S

**s**
19:13, 94:9
**s&w**
1:7, 3:3, 7:6, 7:15, 8:11, 8:15, 138:21
**said**
11:13, 28:13, 29:1, 31:15, 31:24, 45:23, 47:16, 51:5, 53:6, 56:19, 57:10, 63:14, 71:20, 74:10, 77:1, 79:20, 95:5, 96:1, 101:2, 101:6, 119:7, 123:17, 123:25, 127:24, 128:19, 137:14, 141:10, 141:12, 141:15, 141:16, 141:21
**salandra**
23:5
**same**
8:25, 20:4, 32:25, 39:22, 47:22, 58:6, 62:9, 102:4, 141:17
**sat**
75:23, 75:25
**saturday**
98:4, 99:22, 105:9
**save**
21:1
**saw**
29:19, 37:16, 48:24, 54:2, 54:3, 54:6, 96:16, 103:13, 138:23
**say**
10:10, 10:16, 11:6, 11:19, 16:5, 16:9, 16:10, 18:3, 18:6, 19:12, 19:15, 21:20, 22:17, 26:24, 30:6, 35:9, 38:20, 39:4, 43:5, 44:19, 45:21, 47:16, 48:1, 60:8, 62:15, 64:12, 74:15, 76:6, 77:18, 78:15, 79:18, 85:9, 90:2, 91:21, 93:10, 98:3, 101:23, 113:4, 115:10, 116:21, 127:19, 128:4, 129:7, 129:15, 129:16, 129:19, 135:21, 136:4, 136:10, 137:20
**saying**
12:22, 13:17, 33:20, 36:8, 51:10, 78:18, 90:9, 90:22, 91:19, 97:5, 99:14, 100:19, 107:13, 116:17, 119:12, 128:9, 128:11
**says**
27:24, 32:17, 42:22, 57:19, 59:2, 62:14, 67:15, 72:4, 81:20, 83:18, 83:21, 84:12, 88:3, 88:9, 89:6, 89:20, 89:22, 90:5, 90:9, 90:14, 93:15, 97:19, 97:20, 97:24, 98:11, 103:14, 105:24, 106:11, 106:18, 108:12, 111:21, 114:21, 128:3
**sc**
28:8
**scanned**
126:6
**scenario**
88:18
**scenarios**
96:20

**schirtzer**
75:1, 76:2, 76:15
**school**
39:12, 66:15, 122:20
**scope**
24:6
**scratched**
29:19
**sear**
10:25
**seasons**
15:15, 21:10, 22:15, 67:13
**second**
18:12, 32:15, 61:19, 61:24, 62:9, 66:23, 73:18, 81:1, 110:22, 111:20, 112:7, 114:20
**secretly**
133:6
**secured**
5:37, 40:20, 60:20, 61:23, 62:1, 123:12, 129:14, 129:22, 135:17, 136:3, 136:8
**security**
106:2
**see**
17:18, 31:17, 38:6, 40:10, 48:2, 54:18, 59:19, 62:12, 62:16, 68:18, 73:5, 78:21, 78:23, 79:21, 81:17, 86:14, 90:4, 91:5, 97:4, 98:18, 104:5, 105:2, 110:5, 114:1, 114:24, 119:8, 121:10, 123:24, 125:13, 126:4, 128:3, 130:9, 130:11, 130:12, 130:17, 134:4
**seeing**
19:6, 29:18, 30:1, 53:21, 85:2, 101:5, 104:2, 104:22, 113:11, 122:16, 127:14, 128:8, 128:9
**seek**
89:6, 90:3, 90:7, 90:8, 90:14, 95:20, 132:8
**seem**
52:4, 93:2, 102:11
**seemed**
77:8
**seems**
64:4, 81:23
**seen**
14:5, 21:3, 88:7, 104:1, 112:1, 112:2, 113:20, 114:15, 115:8, 122:14
**send**
23:24, 24:4, 54:14, 96:10, 122:7, 124:19
**sending**
35:11, 99:12, 100:13, 119:19, 127:16, 127:19, 130:10
**sense**
11:16, 37:4, 37:18, 52:4, 52:15, 79:22, 80:7
**sensitive**
96:25, 97:3, 101:14, 102:1
**sensitivity**
104:25, 105:7
**sent**
14:3, 35:8, 36:6, 36:10, 36:25, 54:3, 54:17, 56:7, 57:11, 57:12, 59:7, 59:23, 61:21, 64:17, 80:23, 85:4, 88:25, 90:22, 91:12, 93:9, 101:8, 104:3, 104:12, 105:20, 106:1, 108:15, 108:24, 112:3, 116:16, 120:15, 122:6, 122:10, 122:12, 124:8, 127:5, 127:11, 127:12, 132:17
**sentence**
97:20, 97:22, 105:3, 134:23
**separate**
123:17
**separately**
79:17
**september**
1:24, 2:4, 7:2, 7:5, 141:23
**series**
10:3, 15:25, 55:24
**seriously**
91:16
**serve**
11:15, 36:17, 69:14
**served**
14:13, 17:22, 22:1, 28:24
**service**
24:16
**services**
22:23
**set**
10:3, 19:5, 19:16, 58:11, 74:10, 79:20, 129:21, 141:22
**setting**
53:17
**several**
112:16
**shaking**
9:5, 51:9, 86:20
**share**
102:9
**sheets**
24:21
**shingle**
132:5
**shingly**
57:23, 57:24, 59:2, 59:6, 59:7, 59:23, 60:10, 60:12, 64:17, 90:22, 93:13, 95:5, 96:8, 96:10, 99:14, 100:4, 100:8, 103:22, 105:19, 108:11, 111:16, 111:21, 112:14, 114:19, 115:2, 115:10, 115:15, 115:20, 116:3, 116:4, 119:8, 119:10, 119:19, 120:16, 123:3, 124:8, 124:12, 124:19, 124:20, 127:11, 130:17, 130:20
**shingly's**
97:4, 115:16, 115:18, 116:1
**shlomi**
6:14, 6:18, 6:25, 57:17, 103:22, 105:18, 108:10, 109:15, 110:3, 111:16, 114:18, 114:20, 115:2, 116:5,

120:12, 120:16, 122:12, 130:5, 130:17, 130:19
**shlomi's**
106:21
**shorter-term**
43:16
**shorthand**
2:5, 7:10, 8:2, 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:13, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 114:9, 120:24
**should**
20:7, 37:6, 37:7, 65:17, 89:12, 89:19, 91:14, 92:22, 93:23, 94:16, 95:7, 96:2, 111:21, 122:6, 132:12
**shouldn't**
74:13
**show**
60:3, 93:19, 130:22
**showed**
131:10, 138:21
**shown**
37:25
**sic**
20:7, 23:10, 63:1, 87:25, 121:20
**side**
16:4, 16:5, 16:12, 16:13, 16:17, 16:18, 17:15, 18:14, 18:23, 20:1, 20:2, 23:6, 28:14, 28:15, 45:6, 45:8, 45:19, 47:22, 80:8, 92:6
**sign**
30:23, 34:6, 94:2, 132:13
**signature**
21:18, 27:23, 30:9, 32:16, 32:17, 32:18, 67:17, 105:5, 105:9, 108:15
**signature-7dmpd**
141:24
**signed**
21:23, 27:21, 28:6, 28:8, 28:9, 30:22, 34:16, 41:23, 59:4, 67:21, 68:7, 90:24, 100:20, 101:4, 107:17, 111:24, 111:25, 123:14, 123:16, 135:16
**signing**
41:25, 71:9
**similar**
125:1
**simply**
95:13
**simultaneous**
13:4, 111:6, 139:8
**since**
8:23, 22:3, 39:5, 66:20, 71:9, 87:25, 111:25
**single**
32:3
**sir**
39:24, 45:21, 95:9
**sisters**
45:9
**sit**
35:16
**site**
52:3, 52:6, 52:10, 54:3, 54:6, 98:7, 98:8, 99:13, 99:24, 108:21, 109:1, 109:3
**sitting**
76:13, 87:2, 127:15
**situation**
93:4
**situations**
92:25
**skill**
37:23, 129:21
**slicing**
92:15
**smart**
66:16, 87:5, 87:9
**sohaili**
3:24, 5:33, 6:5, 6:9, 6:32, 20:6, 30:10, 31:20, 80:9, 86:23, 86:25, 121:19, 122:3, 122:10
**sole**
11:4, 30:10
**solely**
11:21, 38:17
**solve**
68:11
**some**
16:19, 17:4, 25:14, 29:25, 45:11, 47:14, 49:18, 53:22, 53:24, 54:5, 64:13, 67:11, 68:6, 69:13, 74:10, 74:11, 74:23, 76:8, 77:6, 78:3, 81:23, 84:17, 99:13, 100:14, 119:9
**somebody**
14:10, 37:7, 37:19, 37:20, 48:12, 48:17, 48:19, 48:20, 55:5, 70:9, 72:21, 89:10, 89:19, 115:16, 115:18, 115:20, 115:21, 116:3, 129:20
**somebody's**
64:22, 131:7
**someone**
129:7
**something**
24:8, 34:6, 35:22, 36:7, 39:6, 42:22, 45:1, 50:25, 60:25, 64:12, 65:15, 65:24, 70:15, 77:4, 77:23, 83:3, 85:12, 88:6, 91:23, 94:2, 97:5, 101:13, 102:1, 103:10, 104:21, 110:6, 113:13, 113:18, 129:19, 133:5
**sometime**
33:10, 90:12, 98:20, 99:12
**sometimes**
25:15, 109:24
**somewhere**
42:1, 42:2
**son**
17:12, 26:19
**son-in-law**
26:14
**soon**
111:24
**sophisticated**
66:10, 66:15
**sorry**
8:13, 33:3, 35:25, 46:21, 61:24, 66:13,

71:1, 111:8, 120:6, 126:8, 133:1, 134:20, 134:22, 136:14
**sort**
18:4, 19:24, 30:12, 48:14, 58:13, 68:6, 76:6, 78:3, 84:17
**sorts**
58:19
**sought**
91:16
**sounding**
92:3
**soup**
60:11
**south**
3:14, 15:16
**speak**
8:12, 15:5, 37:7, 42:19, 45:14, 55:6, 56:15, 60:14, 65:9, 71:20, 73:6, 73:11, 73:14, 78:16, 80:3, 89:12, 89:19, 91:14
**speaking**
9:9, 42:10, 43:25, 63:6, 73:14, 82:23, 102:23, 107:8, 133:15
**speaks**
47:5
**specially**
7:19
**specific**
47:17, 95:4
**specifically**
25:1, 25:16, 52:19, 55:11, 82:25, 92:19
**specifics**
20:20
**speculate**
138:16
**speculating**
26:10
**speculation**
19:19, 31:11, 31:14, 76:12, 82:18, 95:15, 100:23, 101:15, 102:4, 107:2, 109:5, 110:17, 112:9, 112:19, 115:5, 115:12, 116:9, 116:25, 117:1, 119:22, 123:6, 123:23, 124:11, 127:18, 135:11, 137:7, 138:8
**spent**
24:9
**spiritual**
113:12
**spite**
112:24
**split**
77:7
**spoke**
15:9, 53:12, 55:7, 56:11, 63:19
**spoken**
71:18, 71:22, 72:6, 79:25, 80:2, 82:8, 130:1
**squabbles**
102:9
**st**
89:4, 90:13
**stage**
77:24
**stake**
37:8
**stamp**
29:6, 29:7
**start**
12:7, 16:24, 74:6
**starts**
87:24
**state**
37:9, 141:2
**stated**
22:1, 111:18, 141:11
**statement**
12:9, 133:17
**states**
1:1
**statutory**
132:7
**stayed**
134:11
**steep**
54:6
**stenographer**
7:4, 7:22, 13:5, 13:6, 15:17, 20:10, 20:12, 29:12, 29:14, 34:21, 34:23, 50:16, 66:24, 67:1, 83:8, 87:12, 95:24, 99:2, 99:6, 99:8, 101:25, 102:21, 103:19, 109:11, 110:20, 111:7, 111:8, 111:10, 111:13, 113:6, 113:8, 118:14, 118:16, 120:21, 125:20, 125:22, 126:8, 126:11, 131:15, 134:20, 136:15, 139:2, 139:9, 139:10, 140:1, 140:3, 140:6
**stenographically**
1:31
**step**
60:13
**still**
58:2, 60:8, 93:11, 103:5, 103:9, 113:15, 126:17
**stopped**
103:3, 103:16
**story**
66:17
**straight**
39:14, 39:15
**straightforward**
39:17, 53:12
**strange**
87:3
**strike**
18:12, 60:13
**structure**
17:14, 50:23, 58:16, 77:15
**stuff**
40:2, 45:13, 52:2, 77:8, 86:8, 96:12, 96:13, 113:17, 123:20, 135:24
**subject**
5:22, 5:25, 5:28, 6:15, 6:19, 6:23, 6:26, 6:28, 22:12, 48:5, 50:7, 59:8, 104:7, 105:20, 105:23, 111:17, 114:22
**submitted**
122:3
**subordination**
50:25, 52:24, 53:2, 53:7, 82:14, 107:12
**subpoena**
5:8, 14:1, 27:14
**subscribe**
141:17
**subsequent**
43:12, 43:13, 51:24, 51:25

**substitutes**
106:4
**success**
66:18
**suggests**
105:8
**suite**
3:15
**sum**
41:2, 76:6
**summarize**
87:24, 87:25
**summary**
5:15, 21:8
**supervision**
141:14
**support**
5:12, 6:32, 21:7, 121:19
**suppose**
70:11, 88:24
**supposed**
101:18
**sure**
12:19, 17:3, 17:5, 17:23, 25:3, 29:6, 31:3, 34:19, 37:3, 41:24, 44:21, 45:12, 48:10, 51:9, 52:2, 58:11, 68:20, 69:16, 72:8, 72:22, 75:13, 76:5, 78:25, 82:17, 83:20, 83:24, 88:16, 95:13, 98:17, 100:12, 103:13, 107:7, 110:25, 113:5, 113:21, 118:10, 121:14, 124:16
**surprise**
110:9, 135:4, 135:14, 135:25, 137:13, 137:15, 139:17, 139:22, 139:24
**surprised**
29:20, 78:21, 79:20, 133:9
**surrounding**
95:22
**suspect**
37:2, 56:6, 56:16
**suspicion**
100:16
**swbj**
5:17, 5:18, 27:12
**sworn**
8:2, 8:24

**T**

**table**
75:23
**take**
20:19, 21:20, 27:6, 29:2, 34:18, 39:9, 40:9, 46:18, 47:9, 49:25, 57:4, 60:13, 61:16, 66:20, 67:7, 77:2, 87:18, 97:24, 98:11, 110:23, 114:11, 126:19, 130:15, 131:8, 132:5, 136:23
**taken**
2:1, 10:8, 10:10, 10:11, 91:16, 132:9, 141:11
**taking**
7:7
**talk**
13:4, 48:9, 64:11, 65:10, 65:14, 66:6, 66:7, 73:12, 94:14, 97:25, 111:6, 139:8
**talked**
65:16, 81:4, 82:6, 83:1, 110:9
**talking**
19:19, 64:15, 71:24, 71:25, 83:23, 84:13, 85:7, 94:17, 95:2, 100:16
**tax**
26:9
**teacher**
113:12
**tell**
8:24, 14:7, 27:15, 29:16, 31:5, 32:13, 32:20, 34:13, 36:24, 37:4, 38:23, 47:4, 50:9, 51:19, 57:24, 64:24, 67:10, 73:20, 85:15, 88:22, 89:10, 89:18, 95:6, 110:10, 110:14, 113:11, 128:14, 129:8, 132:20, 133:5, 133:7, 141:9
**telling**
50:13, 51:25, 91:14, 112:24, 113:21, 128:25, 130:1, 130:5
**tells**
81:15
**ten**
29:10, 49:8
**tenant**
15:12
**term**
11:8, 24:21, 43:9
**terms**
52:11, 52:19, 53:1, 53:7, 53:14, 53:19, 64:11, 65:19, 66:5, 66:11, 78:12, 81:24, 81:25, 82:10, 82:19, 83:16, 83:17, 84:18, 84:25, 85:6, 86:2, 91:3, 91:22, 92:3, 93:17
**testified**
8:3, 128:21, 129:13, 137:23
**testify**
5:8, 9:2, 14:1
**testifying**
8:25
**testimony**
136:17, 141:12, 141:15
**texts**
35:2, 35:4
**th**
111:18, 113:10, 113:13, 114:18, 141:23
**thank**
8:14, 8:19, 9:19, 13:19, 17:20, 20:13, 20:16, 21:2, 41:15, 46:15, 49:23, 57:13, 87:1, 99:9, 117:14, 120:25
**thanks**
20:17, 46:16, 59:6, 88:6, 111:1
**thereafter**
112:17, 141:13
**therein**
141:11
**thereof**
40:24
**thin**
92:15

**thing**
47:22, 89:23, 109:3, 113:4, 113:25, 114:4, 120:2, 123:16, 123:23, 124:4, 124:5, 125:8
**things**
10:18, 12:25, 25:4, 25:7, 25:16, 30:19, 31:4, 39:14, 39:15, 46:6, 52:24, 58:11, 60:2, 79:19, 85:13, 86:11, 86:17, 87:6, 92:6, 93:20, 93:21, 96:18, 104:23, 105:10, 135:23
**thinking**
28:13, 29:20, 29:22, 69:3, 95:23, 109:19
**third**
27:22, 44:2, 44:5, 67:14, 132:12
**third-party**
124:3
**thought**
29:21, 29:24, 31:15, 38:5, 39:17, 43:15, 51:20, 52:14, 77:4, 78:19, 78:22, 79:8, 91:25, 94:10, 116:21, 123:4, 124:2, 124:8, 124:16, 125:5, 125:10
**thread**
5:22, 5:28, 6:23, 6:28
**three**
49:9, 77:1, 112:15, 113:15, 116:16, 117:8, 117:16, 118:17, 139:7
**through**
5:18, 12:7, 18:16, 27:12, 29:2, 36:18, 38:13, 45:15, 48:11, 48:12, 55:23, 57:10, 60:23, 66:9, 81:4, 82:1, 85:16, 86:6, 91:3, 92:4, 96:8, 96:10, 96:17, 101:11, 107:6, 114:4, 125:8, 131:7, 139:5
**tied**
77:23
**time**
2:3, 13:6, 16:15, 17:21, 19:7, 21:3, 23:9, 24:9, 24:12, 37:10, 37:11, 37:23, 38:9, 38:12, 46:25, 47:13, 47:14, 48:23, 49:7, 50:20, 53:14, 56:1, 63:16, 76:3, 76:5, 77:17, 91:10, 95:24, 96:16, 96:17, 96:25, 97:3, 97:14, 98:14, 99:15, 100:7, 101:14, 102:1, 102:22, 103:13, 104:14, 104:25, 105:7, 105:10, 109:15, 110:12, 111:8, 114:20, 119:16, 126:8, 128:14, 132:19, 132:23, 133:3, 135:19, 139:10, 140:7, 141:11
**timeline**
56:10
**times**
16:20, 55:25, 92:14, 136:10
**timing**
33:6, 33:11
**tip**
132:1
**title**
31:7, 41:8, 77:14
**today**
7:20, 9:2, 15:22, 16:21, 37:9, 58:5, 88:7, 97:5, 100:20, 101:4, 127:15
**today's**
7:7
**together**
40:22, 78:2, 79:19, 86:7, 88:22, 98:15, 98:21, 99:14
**told**
63:12, 64:22, 76:24, 79:11, 90:10, 96:22, 101:13, 102:1, 111:2, 122:7, 123:1
**tomorrow**
97:5, 100:20, 101:4, 105:5
**tony**
23:4
**took**
37:22, 45:1, 70:14, 75:7, 75:17, 76:2, 81:9, 102:18, 122:20
**top**
27:23
**total**
19:19
**track**
24:9, 58:8
**traditionally**
135:25
**traffic**
96:11
**transaction**
12:12, 36:17, 39:19, 42:20, 53:15, 64:8, 65:19, 65:25, 81:25, 82:11, 82:20, 83:16, 83:18, 84:9, 84:14, 89:8, 93:7, 94:23, 128:15, 128:22, 129:7, 129:10, 129:23, 131:2
**transaction"**
130:2
**transactions**
22:18, 44:2, 45:5, 45:11, 60:20, 94:4, 94:5, 123:12, 129:15, 135:18, 136:3, 136:8
**transcribed**
141:13
**transferred**
19:8, 19:10
**trial**
7:20, 76:17
**trick**
133:10, 134:16
**tricking**
135:1
**true**
17:9, 21:21, 89:17, 96:24, 122:12, 122:17, 141:15
**trust**
5:38, 7:21,

12:11, 12:13, 18:12, 18:16, 18:22, 19:5, 19:9, 19:11, 19:15, 19:18, 34:5, 36:19, 37:17, 37:20, 39:22, 40:3, 40:21, 40:23, 57:21, 61:24, 62:1, 66:5, 66:18, 84:13, 92:7, 93:11, 106:2, 133:14, 133:21, 134:24, 138:14
**trusted**
25:24, 30:20, 34:2, 34:12, 36:20, 37:24, 40:5, 61:6, 65:12, 65:13, 66:17, 91:10, 91:21, 91:22, 92:1, 92:5, 132:16, 137:2, 137:24
**trustee**
18:17
**trusts**
10:3, 15:24, 16:1, 47:21, 70:12
**truth**
8:24, 141:9, 141:10
**try**
45:11, 72:25, 97:7
**trying**
18:20, 35:21, 36:14, 39:15, 63:14, 74:5, 74:9, 74:10, 77:3, 77:4, 87:1, 91:7, 106:14
**turns**
51:21
**tutelage**
39:10
**twice**
49:13, 123:13
**two**
15:11, 15:19, 15:20, 15:23, 15:24, 16:12, 19:25, 28:12, 30:8, 31:21, 44:5, 44:13, 45:3, 49:9, 52:8, 55:13, 62:10, 62:21, 72:10, 79:23, 80:12, 87:18, 108:15, 121:2
**type**
39:22, 102:13
**typically**
31:23, 129:6, 129:9, 130:23
**typo**
87:24, 121:22

U

**uncle**
11:22, 12:1, 17:24, 22:21, 29:24, 31:12, 36:15, 43:17, 65:10, 65:12, 68:17, 74:17, 85:7, 102:10, 134:8, 134:19, 134:25, 135:1, 135:6
**uncle's**
48:23, 49:2, 49:9, 135:2
**under**
8:23, 40:16, 42:17, 92:18, 141:13
**underlying**
50:4, 75:4
**underneath**
109:21, 122:21
**undersigned**
41:12
**understand**
8:23, 9:4, 9:17, 30:25, 39:1, 49:12, 77:12, 81:20, 89:15, 94:24, 106:18, 121:9, 130:5, 135:10
**understanding**
14:8, 14:9, 53:1, 81:23, 81:24, 84:18, 103:16, 108:2
**understood**
17:20, 23:18, 57:13, 120:9
**understood-**
50:14
**underwrite**
30:18, 30:19
**underwritten**
40:1
**united**
1:1
**unless**
104:21
**unopened**
60:8
**until**
128:2
**upside**
139:12
**use**
46:8, 58:18, 60:23, 72:25, 129:20
**using**
47:9, 47:10, 103:3, 103:16, 115:18
**usually**
24:3, 73:12, 131:7
**usurious**
132:21, 133:6, 133:11, 134:8, 134:14, 135:7, 135:15, 136:12, 136:23, 137:6, 138:7
**usury**
76:21, 136:22, 139:19

V

**v1**
61:25
**v1-rc**
62:3
**v2**
62:14, 62:18
**vague**
119:23, 129:2
**vaguely**
29:18
**variety**
19:22, 26:7
**various**
17:11, 35:19, 45:20, 47:21, 57:25, 61:20
**verbally**
119:8
**versions**
57:20, 108:13
**versus**
16:12, 98:1
**viable**
52:14, 52:15
**videoconference**
92:16
**view**
38:23, 38:24
**views**
95:12
**visit**
109:1
**visited**
108:21
**voice**
17:24, 72:22, 72:23

W

**wa**
25:7

**waive**
88:1
**waiver**
5:30, 6:20, 33:17, 33:24, 36:2, 36:10, 36:25, 37:3, 57:21, 59:9, 62:3, 65:6, 83:6, 88:3, 88:10, 88:17, 88:21, 88:25, 89:4, 89:9, 90:11, 90:13, 93:5, 93:9, 105:23, 105:25, 108:14, 123:1, 131:9, 131:10, 131:20, 132:7, 132:13, 132:16, 136:9
**waivers**
131:23
**walk**
110:24
**want**
12:9, 13:8, 31:23, 31:24, 31:25, 37:9, 41:14, 53:11, 87:24, 89:6, 93:16, 93:22, 111:3, 113:4, 118:12, 118:14, 124:12, 127:6, 127:10, 131:12, 135:25, 136:22
**wanted**
21:1, 36:15, 46:6, 50:24, 52:1, 59:3, 63:14, 64:20, 65:14, 91:8, 98:18, 116:17, 116:20, 117:9, 117:17, 117:18, 118:18, 118:19, 119:20, 120:1
**wanting**
63:20
**wants**
64:25, 90:23, 93:15, 94:14, 94:19, 95:13, 99:15, 112:15, 113:1
**washington**
26:8
**way**
1:7, 3:3, 5:23, 5:26, 5:29, 6:15, 6:19, 6:24, 6:26, 7:6, 7:15, 8:11, 8:16, 11:3, 14:11, 15:9, 15:12, 16:8, 17:9, 18:11, 18:15, 18:24, 19:17, 19:20, 19:25, 20:3, 21:9, 22:2, 22:7, 22:9, 23:6, 23:19, 24:16, 25:1, 25:15, 25:18, 28:3, 35:1, 35:18, 46:5, 47:19, 48:6, 50:7, 50:12, 54:6, 54:9, 59:9, 67:12, 67:16, 68:3, 68:12, 68:21, 68:24, 71:3, 71:6, 71:10, 71:13, 74:1, 74:12, 75:3, 76:8, 77:5, 83:7, 83:9, 88:13, 91:18, 93:5, 93:8, 94:6, 95:16, 100:18, 101:11, 105:23, 109:23, 110:4, 110:6, 110:8, 110:10, 111:17, 113:14, 121:12, 121:17, 123:15, 132:15, 141:20
**ways**
17:11, 73:25, 74:2
**we'll**
13:2, 13:7, 13:17, 13:18, 125:25
**we're**
9:4, 13:20, 30:18, 38:16, 58:9, 61:9, 65:3, 67:2, 69:4, 87:10, 88:22, 90:11, 113:23, 121:5, 125:23, 126:2, 126:10, 139:7
**we've**
37:25, 62:10, 90:3, 117:9, 122:13
**week**
63:25
**weintraub**
3:4, 6:11, 30:12, 31:21, 31:22, 48:21, 49:12, 50:11, 77:21, 81:21, 87:23, 103:23, 106:18
**welcome**
121:1
**went**
37:21, 48:9, 49:8, 50:20, 52:3, 52:6, 54:2, 57:10, 91:3, 93:11, 98:3, 98:5, 98:9, 98:10, 98:15, 98:17, 98:20, 99:13, 99:24, 102:17, 108:21, 109:1, 125:8
**weren't**
39:24, 43:12, 44:11
**west**
2:2, 3:7, 5:24, 7:8, 47:7, 47:9, 47:14, 47:25, 48:3, 48:7, 48:9, 48:15, 48:18, 83:19, 84:1, 84:3, 84:5, 84:8, 88:2, 111:22
**whatever**
78:8, 82:12, 92:1
**whereof**
141:22
**whether**
12:20, 31:1, 43:2, 47:18, 47:19, 47:20, 47:21, 52:14, 52:20, 64:14, 93:23, 94:16, 95:6, 95:21, 95:22, 96:2, 104:14
**whole**
17:14, 23:5, 31:3, 65:20, 102:12, 114:4, 121:4, 123:16, 125:8, 141:9
**wife**
19:4, 44:8
**wire**
6:29, 114:22
**withhold**
15:1
**within-entitled**
141:10
**without**
38:25, 101:11, 103:5, 130:10,

131:3, 133:20
**witness**
4:2, 7:16, 8:4, 20:7, 20:9, 33:20, 46:21, 49:17, 50:17, 66:14, 83:9, 83:12, 86:20, 86:24, 87:1, 87:8, 95:18, 96:3, 101:17, 101:19, 102:3, 102:22, 110:16, 111:3, 113:2, 113:4, 113:9, 115:7, 115:13, 116:24, 117:3, 117:21, 118:9, 118:22, 119:6, 119:25, 123:8, 124:12, 124:16, 126:1, 126:3, 126:7, 126:16, 126:20, 126:22, 129:3, 135:14, 136:14, 136:18, 137:8, 138:9, 139:12, 139:21, 139:24, 141:8, 141:12, 141:15, 141:22
**wonder**
110:2
**word**
32:16, 40:16, 108:13, 119:7, 136:22, 136:23
**words**
18:21, 33:25, 90:4, 93:10, 93:11, 130:1
**work**
14:20, 22:5, 24:5, 24:6, 26:20, 54:5, 58:2, 63:18, 67:11, 92:4
**worked**
22:10, 25:11, 26:22, 36:12, 39:9, 39:12, 57:25, 58:1, 78:19, 109:20, 122:9, 122:18, 122:21
**working**
11:20, 22:19, 22:21, 22:22, 24:7, 35:19, 77:19, 104:23, 109:18
**workplace**
124:6
**would've**
71:13
**wouldn't**
18:6, 20:3, 30:17, 34:7, 42:18, 43:22, 48:23, 55:10, 56:21, 65:16, 65:23, 70:25, 71:21, 73:6, 80:11, 84:8, 93:24, 96:14, 107:21, 107:22, 107:23, 112:17, 123:12, 123:13, 129:8, 131:2, 133:19, 137:3, 137:16
**wow**
121:22
**write**
105:10
**writing**
130:18
**written**
41:11, 44:21
**wrong**
41:23, 51:10, 83:7, 83:9
**wrote**
42:2, 135:16

**Y**

**yeah**
16:20, 26:3, 26:17, 28:6, 32:11, 40:10, 51:4, 52:21, 53:24, 58:20, 59:25, 70:4, 70:19, 73:3, 74:14, 75:14, 76:20, 79:16, 80:2, 80:14, 83:13, 85:24, 88:24, 92:23, 98:23, 109:16, 114:14, 114:25, 115:19, 120:22, 124:15, 125:17, 126:2, 126:10, 133:2, 136:7, 136:25, 137:10, 137:14, 137:15, 137:17, 138:19
**year**
43:15, 49:5, 124:25
**years**
10:9, 10:23, 17:4, 17:12, 19:11, 19:12, 22:20, 29:10, 36:12, 40:4, 44:7, 45:20, 49:8, 76:5, 113:12, 113:15, 135:6, 138:6
**yep**
87:14
**yourself**
20:19, 27:6, 46:18, 49:25, 53:17, 53:19, 57:4, 57:8, 61:16, 67:7, 87:18, 121:5
**yourselves**
7:13

**Z**

**zero**
74:6
**zur's**
140:4

**$**

**$10,000**
44:9, 44:18, 45:4
**$2**
51:7
**$2,000,000**
40:20, 41:3
**$2,021,232.88**
41:2
**$25,000**
44:7
**$3**
83:19

**.**

**.127**
4:5
**.139**
4:6
**.8**
4:4

**0**

**000369**
5:17, 27:12
**000371**
5:18
**00303**
21:12
**01**
34:23
**05**
2:3, 7:2, 7:5
**07**
108:12
**09**
67:1

**1**

**1**
1:37, 5:21, 5:27, 6:12, 6:17, 6:21, 6:27, 67:1,

99:6, 99:8, 114:23
**10**
2:3, 6:5, 7:2, 7:5, 10:22, 20:10, 20:12, 29:12, 29:14, 34:21, 50:7, 67:3, 67:4, 73:17, 81:15, 99:22, 104:13, 105:21, 108:12, 131:10, 131:12, 131:13
**10,000**
30:11
**10345**
2:2, 3:7, 7:8
**105**
6:18
**10672**
1:10, 7:7
**108**
6:23
**109**
6:25, 121:18
**11**
6:9, 21:12, 21:18, 34:23, 66:24, 87:11, 87:13, 87:14, 87:15, 114:18, 135:6, 138:6
**114**
6:28
**11480**
3:21
**12**
6:14, 42:23, 99:1, 99:3, 103:18, 134:4, 140:1
**12.5**
41:3, 41:19, 42:6, 42:23
**120**
6:31
**1203383924**
62:18
**13**
5:5, 6:18, 105:12, 105:13, 140:3, 140:6, 140:7
**14**
6:23, 87:22, 108:4, 108:5
**1406**
3:16
**141**
1:37
**14301**
1:33, 2:5, 7:11, 141:26
**15**
6:25, 109:10, 109:12, 111:15
**16**
6:28, 114:7, 114:8, 130:16
**1633**
5:23, 48:6
**17**
6:7, 6:31, 104:13, 111:10, 120:21, 120:23
**18**
67:19, 105:21
**180**
3:10, 7:19, 30:7, 31:21, 38:2, 40:22, 76:20, 121:20, 139:18
**190**
6:34
**1985**
22:3, 22:8
**1:**
114:25

**2**

**2**
5:31, 6:24, 6:30, 87:22, 111:10, 111:13, 113:6, 113:8, 125:20, 125:22
**2-1**
6:33, 121:19
**20**
5:11, 67:19
**2013**
5:35, 5:39, 6:17, 6:21, 6:27, 6:30, 46:25, 47:8, 50:6, 51:12, 57:18, 80:22, 81:9, 83:10, 87:22, 103:21, 108:12, 110:2, 114:23, 127:4, 137:4, 137:12, 137:20
**2014**
5:17, 6:12, 30:22, 33:10, 36:3, 38:2, 40:20, 51:17, 76:22, 77:10, 80:20, 81:10, 81:12, 139:17
**2015**
5:20, 32:13, 33:9, 41:4, 51:18
**2017**
103:7
**2018**
6:7, 67:19, 76:7
**2024**
1:24, 2:4, 7:2, 7:5, 50:5, 57:9, 141:23
**203390061**
62:14
**21**
5:35, 57:18, 83:10, 89:4, 90:13
**22**
6:17, 6:21, 20:10, 59:8, 100:5, 103:21, 104:13, 105:20, 127:4, 127:8
**23**
1:10, 7:7, 50:6, 81:15, 98:4, 99:12, 99:22, 128:3
**24**
20:12, 100:5
**25**
6:27, 6:30, 108:12, 110:2, 111:18, 113:10, 114:18, 114:23
**26**
5:39, 113:13
**27**
5:16
**270**
30:9
**28**
59:8, 100:5
**29**
5:20, 32:13, 33:9
**2:-cv--psg**
21:12

**3**

**3**
5:18, 5:24, 46:25, 140:1, 140:3, 140:6, 140:7
**3.5**
17:14
**30**
1:24, 2:4, 7:2, 7:5, 10:9, 141:23
**300**
15:16
**31**
41:4
**32**
5:19
**33**
57:19, 111:13,

111:19, 113:12
**333**
3:14
**3400**
3:15
**35**
113:6
**37**
113:8, 114:18
**371**
27:12, 27:22

**4**

**4**
5:15, 5:39, 6:8
**40**
16:14, 16:25, 29:12, 114:25
**42**
16:15, 16:17, 17:1, 17:2, 17:6, 17:16, 29:14, 114:23
**46**
5:22
**49**
5:25

**5**

**5**
5:35
**50**
34:21, 66:24
**53**
46:25, 125:20
**553676**
1:35
**56**
99:6, 125:22
**57**
5:28
**58**
16:14, 16:15, 16:17, 16:25, 17:1, 17:6, 17:16, 99:8

**6**

**60**
44:7
**61**
5:33, 5:37
**67**
6:5

**7**

**7**
5:10, 6:36
**70**
44:7

**8**

**8**
57:19
**80**
19:13
**87**
6:9
**8th**
90:1, 90:10

**9**

**9**
59:8, 100:5, 111:19, 134:1
**90064**
3:8
**90213**
3:22
**99**
6:14
**990071**
3:16
**9:-bk--rc**
1:10, 7:7

## Fw: Blue Jay Way - Note, Indemnity and Conflict Waiver

**From:** Ezra Cohen (ecohen8640@aol.com)

**To:** ecohen8640@aol.com; jwoods@jcre-la.com

**Date:** Wednesday, May 22, 2024 at 01:20 PM PDT

----- Forwarded Message -----
From: shingly@sbcglobal.net <shingly@sbcglobal.net>
To: Ezra Cohen <ecohen8640@aol.com>
Sent: Friday, February 22, 2013 at 09:28:11 AM PST
Subject: Fwd: Blue Jay Way - Note, Indemnity and Conflict Waiver

Hi, Ezra.

RC wanted to ask if you could review these documents and call him to discuss? Hush needs the docs to be signed this morning so if you could do this right away we'd appreciate it.

Thanks,

Shingly
*Sent from my Verizon Wireless 4G LTE DROID*

-------- Original Message --------
Subject: Fwd: Blue Jay Way - Note, Indemnity and Conflict Waiver
From: "Sohaili, Hushmand" <hsohaili@akingump.com>
To: Shingly Lee <shingly@sbcglobal.net>
CC: Robert Cohen <rcdukespoint@gmail.com>

EXHIBIT
CSR NO. 14301
7
9/30/2024 Job No. 553676
depobook.com

Did this come through.

Sent from my iPad

Begin forwarded message:

From: "Shlomi, Daniel" <dshlomi@akingump.com<mailto:dshlomi@akingump.com>>
Date: February 21, 2013 8:33:35 PM PST
To: "Sohaili, Hushmand" <hsohaili@akingump.com<mailto:hsohaili@akingump.com>>
Subject: Blue Jay Way - Note, Indemnity and Conflict Waiver

Hush,

Attached please find clean and redlined versions of the following document:

- Note to Cohen Trust
- Indemnity Agreement
- Conflict Waiver

Best,

Daniel

Daniel Shlomi
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East | Suite 2400 | Los Angeles, CA 90067-3010 | USA | Direct: +1 310.728.3326 |

**Internal: 43326**
**Fax: +1 310.229.1001 | dshlomi@akingump.com<mailto:dshlomi@akingump.com> | akingump.com<http://www.akingump.com> | Bio<http://www.akingump.com/dshlomi>**

---

**IRS Circular 230 Notice Requirement: This communication is not given in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon any tax advice contained in this communication for the purpose of avoiding United States federal tax penalties. In addition, any tax advice contained in this communication may not be used to promote, market or recommend a transaction to another party.**

**The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.**

**Promissory Note Secured by Deed of Trust_S&W Blue Jay Way LLC_203383924(2).DOCX**
**55.4kB**

**ATT00001.htm**
**140B**

**Redline - 203383924-v1-Promissory Note Secured by Deed of TrustS&W Blue Jay Way LLC and 203383924-v2-Promissory Note Secured by Deed of TrustS&W Blue.docx**
**50kB**

**ATT00002.htm**
**140B**

**Blue Jay Way - Indemnity Agreement_203390063(2).DOC**
**45.5kB**

**ATT00003.htm**
**140B**

**Redline - 203390063-v1-Blue Jay Way - Indemnity Agreement and 203390063-v2-Blue Jay Way - Indemnity Agreement.doc**
**49kB**

**ATT00004.htm**
**140B**

**RC Consent and Waiver_203390061(2).DOCX**
**84.4kB**

**ATT00005.htm**
**140B**

**Redline - 203390061-v1-RC Consent and Waiver and 203390061-v2-RC Consent and Waiver.docx**
**73.5kB**

**ATT00006.htm**
**92B**

## Roye Zur

**From:** Shlomi, Daniel
**Sent:** Friday, February 22, 2013 10:17 PM
**To:** 'Robert Cohen (rcdukespoint@gmail.com)'
**Cc:** shingly@sbcglobal.net; 'Ezra Cohen (ecohen8640@aol.com)'; Sohaili, Hushmand; 'Richard Weintraub'; 'Rahsaana Allen'
**Subject:** Blue Jay Way Indemnity Agreement
**Attachments:** Blue Jay Way - Indemnity Agreement_203390063(6)-c.DOC; Redline - 203390063-v2-Blue Jay Way - Indemnity Agreement and 203390063-v6-Blue Jay Way - Indemnity Agreement-c.doc

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Robert,

I am assisting Hush with the Blue Jay Way Transaction. Attached please find a clean draft of the Indemnity Agreement and a redline against the version I believe Hush previously sent you.

As Hush discussed with you, Richard's entity has changed from his Trust to LVC One Thousand, LLC, which is an entity one level below his Trust. Richard is in the process of giving us comfort on the net worth of this entity and its ability to meet its obligations. Also, the revised draft now provides for a deed of trust and completion guaranty with respect to your loan.

Hopefully this document is acceptable to all parties, as we need to get Robert's signature tomorrow morning.

Best,

Daniel

**Daniel Shlomi**
**AKIN GUMP STRAUSS HAUER & FELD LLP**
2029 Century Park East | Suite 2400 | Los Angeles, CA 90067-3010 | USA | Direct: +1 310.728.3326 | Internal: 43326
Fax: +1 310.229.1001 | dshlomi@akingump.com | akingump.com | Bio

EXHIBIT
CSR No. 14301
depobook.com
12
9/30/2024 Job No. 533676

**Roye Zur**

---

**From:** Shlomi, Daniel
**Sent:** Friday, February 22, 2013 10:18 PM
**To:** 'Robert Cohen (rcdukespoint@gmail.com)'
**Cc:** shingly@sbcglobal.net; 'Ezra Cohen (ecohen8640@aol.com)'; Sohaili, Hushmand
**Subject:** Blue Jay Way Conflict Waiver
**Attachments:** Redline - 203390061-v2-RC Consent and Waiver and 203390061-v4-RC Consent and Waiver-c.docx; RC Consent and Waiver_203390061(4)-c.DOCX

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Robert,

Attached please find a revised draft of the conflict waiver and a redline against the draft I believe Hush previously sent you. This revised draft mentions the Deed of Trust as security for your note, discusses the completion guaranty for your loan, and substitutes a new entity for Richard as discussed in my email regarding the Indemnity Agreement.

Best,

Daniel

**Daniel Shlomi**
AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East | Suite 2400 | Los Angeles, CA 90067-3010 | USA | Direct: +1 310.728.3326 | Internal: 43326
Fax: +1 310.229.1001 | dshlomi@akingump.com | akingump.com | Bio

EXHIBIT
CSR No. 14301
depobook.com
13
9/30/2024 Job No. 533676

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10345 W. Olympic Blvd., Los Angeles, CA 90064.

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF ROYE ZUR IN SUPPORT OF DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON ITS OBJECTION TO CLAIM NO. 2-1 OF BLUE JAY 180, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) January 10, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) January 10, 2025 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) January 10, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**

Honorable Ronald A. Clifford III
United States Bankruptcy Court
Central District of California
1415 State Street, Suite 233 / Courtroom 201
Santa Barbara, California 93101-2511

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 10, 2025 | Lauren B. Wageman | */s/ Lauren B. Wageman* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**ADDITIONAL SERVICE INFORMATION (if needed):**

1. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- **Anthony Bisconti** tbisconti@bklwlaw.com, 7657482420@filings.docketbird.com;docket@bklwlaw.com
- **Brian David Fittipaldi** brian.fittipaldi@usdoj.gov
- **Chris L Frost** chris@frostllp.com, nicole@frostllp.com;allison@frostllp.com;xiomara@frostllp.com;josh@frostllp.com;zach@frostllp.com
- **Daniel A Lev** daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Lee S Raphael** ecfcca@ecf.courtdrive.com, cmartin@pralc.com
- **Ronald N Richards** ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **United States Trustee (ND)** ustpregion16.nd.ecf@usdoj.gov
- **Matthew Cave** mcave@kfc.law, mschneider@kfc.law