ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ROYE ZUR, State Bar No. 273875
*rzur@elkinskalt.com*
LAUREN N. GANS State Bar No. 247542
*lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for Reorganized Debtor
S&W Blue Jay Way, LLC

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**

In re

S&W BLUE JAY WAY, LLC,

Reorganized Debtor.

Case No. 9:23-bk-10672-RC

Chapter 11

**DECLARATION OF HUSHMAND SOHAILI IN SUPPORT OF DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON ITS OBJECTION TO CLAIM NO. 2-1 OF BLUE JAY 180, LLC**

**Hearing Date and Time:**
Date: May 8, 2025
Time: 9:00 a.m.
Place: Courtroom 5D
411 W. 4th St.
Santa Ana, CA 92701

Hon. Ronald A. Clifford III

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

# DECLARATION OF HUSHMAND SOHAILI

1. I am a managing member of HS Blue Jay Way, LLC, a managing member of S&W Blue Jay Way, LLC (the "Debtor" or "Reorganized Debtor"). Unless otherwise noted, I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to the matters stated herein.

2. I was a member of the California State Bar from 1979 until I retired at the end of 2022. I was one of founding partners of the Los Angeles office of Akin Gump Strauss Hauer & Feldt LLP ("Akin Gump") in August 1997. I retired from Akin Gump on December 31, 2021.

3. During my time at Akin Gump, I represented Burton Way Hotels, Ltd. ("BWH"), which is the owner of what is commonly known as the Four Seasons Hotel Los Angeles at Beverly Hills (the "Hotel"). BWH was a significant client of Akin Gump both before and after the loan to the Debtor (the "Loan") until the spring of 2019, when any client relationship of any sort, direct or indirect, with BWH terminated.

4. On information and belief, the Cohen Family Trust Dated March 13, 1986 as Restated December 31, 2005 (the "Cohen Trust") was the beneficial majority owner of BWH, and the trustee of the Cohen Trust was Robert Cohen. A.C.C., a California general partnership ("ACC"), owns the fee interest under a ground lease as ground lessor to BWH, which owns and operates the Hotel. On information and belief, the Cohen Trust also owns the majority of the interests in ACC.

5. Based on the results of a reasonable search by Akin Gump as part of discovery and my understanding of Akin Gump's policy, the Cohen Trust is not, and never has been, a client of Akin Gump.

6. This was confirmed by counsel for Akin Gump in connection with discovery conducted in this matter. Additionally, my recollection of Akin Gump's official policy on client/matter intake is that a person or entity may only become a client of Akin Gump if there is a signed engagement agreement and a specific matter and compliance with Akin Gump's intake procedures, which requires conflicts searches to be handled. Indeed, Akin Gump's policy explicitly requires the identification in each matter of clients and non-clients, specifically to avoid any confusion as to who is a client in a particular matter. I have reviewed Akin Gump's policy produced

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

to the Reorganized Debtor in this matter and have confirmed that my recollection is accurate. Finally, based on my review of documents produced by Akin Gump in this action, I am also able confidently to conclude that the Cohen Trust never made any payments to Akin Gump. Furthermore no partner in the firm can make a person or entity a client of the firm whether by loosely-worded email referencing mistakenly or not the Cohen Trust as a client. The power to confer the status of a client requires a signed retainer and acceptance of the form through the firm's intake system as a client. The power to accept the Cohen Trust as a client belonged solely with the firm. Robert Cohen was familiar with this system and the need for a signed retainer agreement to have one of his entities recognized as a client of Akin Gump and then subsequently clearance through the conflicts system.

7. Based on my review of documents produced by Akin Gump in this matter, I have confirmed that Akin Gump did no legal work for Robert Cohen personally from April 2009 and until multiple months <u>after</u> the Cohen Trust made the Loan to the Debtor. Other attorneys at Akin Gump billed a total of 2.3 hours unrelated to anything to do with the Loan from December 2013 until 2015, when the one open matter for Robert Cohen was closed and this time was written off. Additionally, there was no record of any payment from Robert Cohen as a client after 2009.

8. For smaller matters like the Loan, Robert Cohen (whether on behalf of the Cohen Trust or entities in which he owned a beneficial interest) utilized smaller boutique firms or his immediate family members, such as Michelle Lerman (his daughter), Jeffrey Lerman (his son-in-law), or Ezra Cohen (his nephew). (Ezra Cohen also was in-house counsel for BWH and ACC and had held that position for over 30 years.) For example, in October 2019, when a subcontractor working on the Blue Jay Property (defined below) asserted a relatively small approximate $50,000 mechanics' lien on that property, Robert Cohen engaged Mr. Lerman to sign off on a lender's consent on behalf of the Cohen Trust.

9. My contact with Robert Cohen during the period in question from the beginning of 2013 until 2019 in my capacity as an attorney, related largely, if not exclusively, to BWH (and, to a much smaller extent, ACC) and the Hotel.

10. During the latter part of 2012 and the early part of 2013, Richard Weintraub (who is another beneficial owner of the Debtor) and I identified a residential development opportunity at the

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

real property located at 1633 Blue Jay Way, Los Angeles, CA 90069 (the "Blue Jay Property"). To finance the purchase of the Blue Jay Property, we were in the process of arranging a loan from East West Bank. Just before or while the purchase of the Blue Jay Property was in escrow, I spoke to Robert Cohen about becoming a partner in our investment. (Indeed, the entity that I initially formed to become the member of the Debtor was named RC/HS, LLC.) I had heard that Robert Cohen had invested with his grandson in a smaller property close to the Blue Jay Property, and had expressed an interest in investing in the Blue Jay Property.

11. At some point during my discussions with Robert Cohen, which, to the best of my recollection, occurred during the time that Mr. Weintraub and I were committed to the purchase of the Blue Jay Property, Robert Cohen told me and Mr. Weintraub that he was not comfortable being an equity investor, but that he would be willing to lend the funds necessary for the purchase. He told me that he had done similar loans with others, and suggested that he make a loan to help fund the purchase that would be junior to the loan the Debtor would obtain from East West Bank and would substitute for the necessary equity funds he was going to supply. I inquired regarding the interest rate, and Robert Cohen said that he would not charge any points, but that he normally gets 12% interest. Robert Cohen also said that he would require personal guaranties by Mr. Weintraub and me. When I questioned giving a personal guaranty and paying 12% interest (when banks were charging only 4%!), Robert Cohen agreed after some back and forth not to require personal guaranties. But he wanted the 12%. We did not negotiate the interest rate. I did not think about the issue of usury. Because we were committed to the purchase of the Blue Jay Property, I was focused on obtaining the necessary funding. Robert Cohen told me that this was the price of the financing and that is what he has gotten in the past. Our choices were limited - abandon the purchase or accept his terms.

12. At or about the same time, in early February 2013, I asked my assistant (or another staff member) at Akin Gump to run a conflicts check for the Cohen Trust. The Cohen Trust was not a client of Akin (the client was BWH), but given that the Cohen Trust was the majority general partner of BWH, BWH was a significant client of Akin Gump, and given the pendency of a major litigation in which Akin Gump had been representing BWH, in an abundance of caution I decided

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

to obtain a conflict waiver for the Loan from the Cohen Trust to the Debtor. I had no power to make a non-client a client of Akin Gump, nor did I intend to change the status of the Cohen Trust's non-client relationship with Akin Gump by obtaining a conflict waiver. The client status of any person or entity is determined and acknowledged by Akin Gump strictly and solely in accordance with its intake policies and procedures.

13. I informed Robert Cohen in writing in or around February 8, 2013, that he would have to sign a conflict waiver as trustee of the Cohen Trust. I assigned Daniel Shlomi, an attorney at Akin Gump, to help me prepare the conflict waiver, promissory note, and indemnification agreement for the Loan, with Akin Gump representing only me and my entity, HS Blue Jay, LLC (formerly Rc/Hs, LLC). In my extensive experience at Akin, it was common in the Los Angeles office (and consistent with firm guidelines at the time) to have firm attorneys assist partners (and other attorneys) on personal investments, and to have Akin Gump represent the partner. Mr. Shlomi also worked on the Debtor's operating agreement, representing my interests and finalizing the agreement with attorney Rahsaana Allen, who represented Mr. Weintraub and his entity. Neither Akin Gump nor I represented the Cohen Trust in any manner, and that was made clear in both the conflict waiver and the operating agreement. The Cohen Trust did sign the operating agreement but was an express third-party beneficiary of a 10% profits interest that had been part of the economics that Robert Cohen had negotiated for the Cohen Trust. As a result, the Cohen Trust became a member of the Debtor at closing.

14. When the conflict waiver, promissory note, and indemnification agreement were ready, they were sent to Robert Cohen, as trustee of the Cohen Trust, in around February 21, 2013. Around that time, when I asked who would be representing the Cohen Trust in the loan transaction, Robert Cohen told me that it would be his nephew, Ezra Cohen. I knew Ezra Cohen well, having worked with him as in-house counsel for BWH and ACC for many years during which the Cohen Trust had been the majority beneficial owner of both of those entities, and I knew that Robert Cohen relied on his legal expertise as an experienced and highly competent real estate attorney for legal advice on the Cohen Trust's most valuable assets. I also worked with Ezra Cohen in his first year or two out of law school and had great respect for his legal abilities, having described him to others

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

many times before such transaction as one of the smartest first-year associates I had ever worked with. I knew the Cohen Trust was in good hands for what was a small transaction for the Cohen Trust and Robert Cohen. Shortly after I was informed by Robert Cohen that he would be using Ezra Cohen to represent the Cohen Trust, I informed Mr. Shlomi of the same. Robert Cohen independently made the decision of who to use as attorney for the Cohen Trust and did not consult with me other than to advise me of who he was using.

15. I first sent the promissory note, conflict waiver, and indemnification agreement to Robert Cohen as soon as Mr. Shlomi provided the same to me. My best recollection is that Robert Cohen promptly told me to send the loan documents to Ezra Cohen because I wanted to get the documents signed the next day to meet the closing timing for the purchase of the Blue Jay Property. I instructed Mr. Shlomi immediately to send the loan documents to Ezra Cohen because we needed to have the documents reviewed for signing. Mr. Shlomi did so. He followed up with revisions and signature pages for the various documents and copied Ezra Cohen on the emails and documents. I did not receive any emails from Ezra Cohen asking me (or Mr. Shlomi) to stop including him on communications concerning the Loan or the Blue Jay Property.

16. Given that Robert Cohen had told me that Ezra Cohen would be reviewing the various documents for him, and given that I knew Ezra Cohen was a highly competent and experienced real estate attorney (and Robert Cohen's nephew), I understood that Ezra Cohen reviewed the loan documents for the Cohen Trust. Thus, when the documents were returned signed by Robert Cohen, I understood that they had been approved and signed off on by Ezra Cohen. I was never informed until many years after the transaction, sometime in or around the fall of 2022 (from a conversation with Eleda Cohen),[1] that Ezra Cohen allegedly had not reviewed or approved the

---

[1] In the Fall of 2022, Mr. Weintraub and I met with then-counsel for the Cohen Trust, Andrew Kirsh, and Robert Cohen's daughter, Eleda Cohen, concerning the Loan. At that meeting, I informed Eleda Cohen (who was representing her father, Robert Cohen, at the meeting) that her father had informed me to send the loan documents to Ezra Cohen as the attorney representing him. Both Mr. Kirsh and Eleda Cohen said that Robert Cohen denied this, and that Ezra Cohen did not recall receiving the loan documents. I responded that I would ask Mr. Shlomi (who had been the junior associate at Akin Gump during the making of the Loan) to provide a declaration that he sent the loan documents to Ezra Cohen. At a subsequent meeting, Eleda Cohen acknowledged that she had checked with Ezra Cohen and that he had confirmed that he received the promissory note and other loan documents but that he understood it was for purposes of reviewing it to determine if Ezra Cohen's father, Joseph Cohen, would participate in the loan. I responded that I did not know what Robert Cohen told Ezra Cohen, and that I only knew what he told me

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

transaction. I first heard directly from Ezra Cohen during his recent deposition in this action that he does not recall having received the documents because he may not have opened his emails (which I was surprised by since this would be totally out of character. I made it clear to Robert Cohen that he was not to rely on me and he knew that because he had with Akin Gump and with other firms signed conflict waivers in the past. Because we were adverse, I had suggested to Robert Cohen (verbally and in writing) that he consult his own counsel, which based on his statements to me and correspondence from his assistant, Shingly Lee, to attorney Ezra Cohen, he seems to have done so. Robert Cohen was a very experienced businessman (with a net worth, based on information and belief, of hundreds of millions of dollars) and given our negotiation of the terms such as the interest rate he was an accomplished negotiator who had done many such transactions involving much larger sums. He knew that he needed independent legal advice and, based on my past experience with him in such situations, I believe he sought and received such advice before he signed the conflict waiver and indemnification agreement and approved the note for closing.

17. I did not consider the legality of the interest rate in the Loan. I did not research it or instruct anyone else to research it. I never thought of usury or talk to Mr. Weintraub or Mr. Shlomi about it. Indeed, throughout my legal career, the issue of usury as a defense rarely – if ever – came up, because the much larger transactions to which I was accustomed almost always were subject to an exemption from usury (either because the lender itself was exempt or because the involvement of a real estate broker rendered the transaction exempt).

18. A year after the Cohen Trust made the Loan to the Debtor, ACC made a $2 million loan to 180 PCH, LLC (“180 PCH”), another entity in which Mr. Weintraub and I are beneficial 50/50 owners. I was involved in negotiating this loan with Robert Cohen as the beneficial majority owner of ACC (while keeping Mr. Weintraub advised of the negotiations and terms and seeking his consent). In connection with that loan, Robert Cohen demanded an interest rate of 12.5%. Attorney Ezra Cohen represented ACC (which was beneficially owned by the family trust of his father, Joseph Cohen, and the Cohen Trust) , in connection with the ACC loan. The parties used a promissory note

---

to do and what I understood. Mr. Weintraub sat next to me during these conversations with Eleda Cohen.

similar to the note given in connection with the Loan.

19. During his review of the loan documents in connection with the ACC/180 PCH loan, Ezra Cohen raised through Robert Cohen an issue with respect to the 12.5% interest rate in the note and its likely violation of the usury laws. My reaction was “good catch – I hadn’t thought about that at all.” I then proceeded to make sure the exemption normally applicable to such real estate loans as being made and arranged by a real estate broker was put into place so that it was exempt from usury. Ezra Cohen also sought from the title insurer a usury endorsement as belt and suspenders So Ezra Cohen was perfectly capable of spotting the usury issue and seems to have to missed it in connection with the Loan to the Debtor. I proceeded to address the usury issue raised by Ezra Cohen by inserting a real estate broker into the transaction, such that the loan would be “arranged by a real estate broker“ and exempt from usury. The loan by ACC to 180 PCH was paid in full approximately one year later (in early 2015).

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 10, 2025, at Santa Monica, California.

Hushmand Sohaili

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10345 W. Olympic Blvd., Los Angeles, CA 90064.

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF HUSHMAND SOHAILI IN SUPPORT OF DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON ITS OBJECTION TO CLAIM NO. 2-1 OF BLUE JAY 180, LLC** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) January 10, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) January 10, 2025 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) January 10, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**VIA OVERNIGHT MAIL**

Honorable Ronald A. Clifford III
United States Bankruptcy Court
Central District of California
1415 State Street, Suite 233 / Courtroom 201
Santa Barbara, California 93101-2511

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 10, 2025 | Lauren B. Wageman | */s/ Lauren B. Wageman* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**ADDITIONAL SERVICE INFORMATION (if needed):**

1. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- **Anthony Bisconti** tbisconti@bklwlaw.com, 7657482420@filings.docketbird.com;docket@bklwlaw.com
- **Brian David Fittipaldi** brian.fittipaldi@usdoj.gov
- **Chris L Frost** chris@frostllp.com, nicole@frostllp.com;allison@frostllp.com;xiomara@frostllp.com;josh@frostllp.com;zach@frostllp.com
- **Daniel A Lev** daniel.lev@gmlaw.com, cheryl.caldwell@gmlaw.com;dlev@ecf.courtdrive.com
- **Lee S Raphael** ecfcca@ecf.courtdrive.com, cmartin@pralc.com
- **Ronald N Richards** ron@ronaldrichards.com, 7206828420@filings.docketbird.com
- **United States Trustee (ND)** ustpregion16.nd.ecf@usdoj.gov
- **Matthew Cave** mcave@kfc.law, mschneider@kfc.law