Daniel A. Lev (CA Bar No. 129622)
daniel.lev@gmlaw.com
Greenspoon Marder LLP
333 South Grand Avenue, Suite 3400
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 954.771.9264

Ronald Richards (CA Bar No. 176246)
ron@ronaldrichards.com
Law Offices of Ronald Richards & Associates, APC
P.O. Box 11480
Beverly Hills, California 90213
Telephone: 310.556.1001
Facsimile: 310.277.3325

Geoffrey Long (CA Bar No. 187429)
glong0607@gmail.com
Law Offices of Geoffrey Long, A.P.C.
1601 N. Sepulveda Boulevard, No. 729
Manhattan Beach, California 90266
Telephone: 310.480.5946
Facsimile: 310.796.5663

Attorneys for Blue Jay 180, LLC

**Greenspoon Marder LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**

In re

S&W BLUE JAY WAY, LLC,

Debtor.

Case No. 9:23-bk-10672-RC

Chapter 11

**BLUE JAY 180, LLC'S APPENDIX OF EVIDENCE IN SUPPORT OF OPPOSITION TO REORGANIZED DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON OBJECTION TO CLAIM NO. 2-1**

[Filed concurrently with: (i) Memorandum of Points and Authorities in Support of Opposition; (ii) Opposition to Statement of Uncontroverted Facts; and (iii) Objections to Debtor's Evidence]

DATE: May 8, 2025
TIME: 9:00 a.m.
PLACE: Courtroom "5D"

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

Pursuant to Rule 7056-1(c)(3) of the United States Bankruptcy Court, Central District of California, Local Rules, Blue Jay 180, LLC ("Blue Jay") hereby submits "Blue Jay 180, LLC's Appendix of Evidence in Support of Opposition to Reorganized Debtor's Motion for Summary Judgment On Objection to Claim No. 2-1" (the "Opposition Appendix of Evidence") in support of "Blue Jay's Opposition to Reorganized Debtor's Motion for Summary Judgment On Objection to Claim No. 2-1" (the "MSJ Opposition"), filed in response to the "Reorganized Debtor's Notice of Motion and Motion for Summary Judgment On Its Objection to Claim No. 2-1 of Blue Jay 180, LLC" (the "Motion") [Docket No. 236], filed by the reorganized debtor S&W Blue Jay Way, LLC (the "Debtor" or "S&W").

**APPENDIX OF EVIDENCE**

- Declaration of Ronald Richards
- Exhibit "A"— February 8, 2013 email from Hushmand Sohaili to Robert Cohen and Richard Weintraub summarizing deal points and stating need for client conflict waiver
- Exhibit "B"— February 21, 2013 conflict waiver letter from Hushmand Sohaili and Akin Gump Strauss Hauer & Feld LLC to Robert Cohen
- Exhibit "C"— February 25, 2013 email from Daniel Shlomi of Akin Gump Strauss Hauer & Feld LLC to Shingly Lee, assistant for Robert Cohen, re conflict waiver letter
- Exhibit "D"— Operating Agreement for S&W Blue Jay Way, LLC dated February 25, 2013
- Exhibit "E"— First Amendment to Operating Agreement for S&W Blue Jay Way, LLC dated April 18, 2013
- Exhibit "F"— April 28, 2017 conflict waiver letter from Hushmand Sohaili and Akin Gump Strauss Hauer & Feld LLC to Robert Cohen
- Exhibit "G"— April 28, 2017 email from Hushmand Sohaili to Robert Cohen transmitting April 28, 2017 conflict waiver

Greenspoon Marder LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 954.771.9264

- Exhibit "H"— Schedule K-1 to Robert & Beverly Cohen for Cohen Trust's 10% profit interest in S&W Blue Jay Way, LLC for the years 2019-2021
- Exhibit "I"— Akin Gump Strauss Hauer & Feld LLC spreadsheet of billing entries to client Robert Cohen
- Exhibit "J"— condensed deposition transcript of Ezra Cohen taken on September 30, 2024
- Exhibit "K"— condensed deposition transcript of Michelle Lerman taken on February 28, 2025
- Exhibit "L"— Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding) served on third-party Akin Gump Strauss Hauer & Feld LLP in the action entitled In re S&W Blue Jay Way, LLC, United States Bankruptcy Court, Central District of California, Case No. 9:23-bk-10672-RC
- Exhibit "M"— Amendment to Promissory Note Secured by Deed of Trust dated May 1, 2017
- Exhibit "N"—February 5, 2014 conflict waiver letter from Hushmand Sohaili and Akin Gump Strauss Hauer & Feld LLC to A.C.C. Company

DATED: April 17, 2025

**GREENSPOON MARDER LLP**

By: */s/ Daniel A. Lev*
Daniel A. Lev
Attorneys for Blue Jay 180, LLC

DATED: April 17, 2025

**LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, APC**

By: Ronald Richards
Ronald Richards
Attorneys for Blue Jay 180, LLC

# EXHIBIT "A"

Message

**From:** Sohaili, Hushmand [/O=AKINGUMP/OU=LA/CN=RECIPIENTS/CN=HUSHMANDS]
**Sent:** 2/8/2013 10:13:56 PM
**To:** Robert Cohen (rcdukespoint@gmail.com) [rcdukespoint@gmail.com]; 'rweintraub@weintraubfs.com' [rweintraub@weintraubfs.com]
**Subject:** re S and W Blue jay Way,LLC ("Developer"

I just want to summaries bullet points since we are getting ready to waive contingencies Monday and get a land loan from East West:

1.RC will lend Developer up to $2.5 million as a loan junior to the first secured loan to the land loan lender and/or the construction lender and will be evidenced from a note from Developer .

The loan will bear interest rate of 12% per annum and be paid on a monthly basis. It is anticipated that about $1.5 mill will be needed at closing around February 18th and then the rest will be needed as funds are needed for the project..The term is anticipated to be 2.5 years and loan is prepay able .

2 Rc will co sign, with me and Richard ,jointly and severally for the land loan (including interest reserve and money for plans ) anticipated to be between $2.5 and potentially $3.0 mill. Richard and I will separately indemnify him on his co signing .Rc will not have to co sign the construction loan .

C.N addition for Co signing the land loan Rc will get 10% of the net profits, after all interest costs , as a participation less the amount of interest he received in para #1 above.

4.If Rc decides, in his sole discretion, he is will to co sign the construction loan as well as the land loan with the same indemnity from Richard and I as in #2 above ,then instead of the 10% participation being reduced by the interest he has received as provided in para #3 ,the participation in para #3 will be modified so that it will not be reduced by the interest he receives.

5. will also have to get a conflict waiver from RC due to the client relationship.

Let me know if either of you have any issue with this or I have left something out .Thx.

# EXHIBIT “B”

**Akin Gump**
**STRAUSS HAUER & FELD LLP**

**HUSHMAND SOHAILI**
+1 310.229.1060/fax: +1 310.229.1001
hsohaili@akingump.com

February 21, 2013

Robert Cohen
Burton Way Hotels, LLC
2029 Century Park East
Suite 2300
Los Angeles, CA 90067-3010

Re: 1633 Blue Jay Way - Conflict Waiver

Dear RC:

As you know, Akin Gump Strauss Hauer and Feld LLP (the "Firm") and I have had a long standing relationship with you as your legal counsel. Since the California Rules of Professional Conduct requires full disclosure and informed written consent in cases of a potential or actual conflict of interest, I have prepared this letter to meet our professional obligations in that regard.

By signing this conflict waiver, you hereby consent as trustee of the Cohen Family Trust dated March 13, 1986, as restated December 31, 2005, as amended (the "Cohen Trust") to the following (the "Transaction"):

1. S&W Blue Jay Way, LLC ("Borrower") shall acquire certain real property located at 1633 Blue Jay Way, Los Angeles, California (the "Property").

2. The Cohen Trust shall lend to Borrower the principal sum of $2,500,000 (the "Cohen Loan"), which shall be a loan junior to initially the Land Loan (as defined below) and upon repayment of the Land Loan will be junior to the Construction Loan (as defined below) and will be evidenced by a unsecured note (the "Note") from Borrower to the order of the Cohen Trust. There shall be an initial advance of $1,750,000 at the closing of the acquisition of the Property with subsequent advances to be made in minimum amounts of $100,000. The Cohen Loan shall bear interest at the rate of 12%, and shall be paid as follows: (i) interest only on a monthly basis and (ii) all principal and unpaid interest will be due on the earlier of August 26, 2015 or upon the closing of the sale of the Property. The Note shall provide that Borrower will keep the Property free of any other liens. The Cohen Loan shall be prepayable at any time but even if repaid the Cohen Trust will still be entitled to its 10% Profit Participation. The Note shall be secured by a Second Deed of Trust, which shall subsequently be subordinated to the deed of trust securing the Construction Loan. At the time of the Construction Loan, the Weintraub Guarantors and I shall provide the Cohen Trust with a completion guaranty on the same terms and conditions as the completion guaranty to be provided to the Construction Loan Lender.

3. Borrower shall obtain a land loan from East West Bank ("Land Loan Lender") in an amount not to exceed $3,000,000 (the "Land Loan") in order to acquire the Property and for interest for money reserves, and plans and specifications with respect to the House (as defined below). In order to facilitate the Land Loan, Richard Weintraub ("RW"), the Cohen Trust and I, shall each co-sign and

Akin Gump
STRAUSS HAUER & FELD LLP



provide a guaranty in favor of Land Loan Lender (the "Land Loan Guaranty"). As provided in the Indemnity Agreement, you will be indemnified by RW and La Villa Contenta, LLC ("LVC", together with RW, collectively, the "Weintraub Guarantors") and me for any losses pursuant to the Land Loan.

4. At the time final permits are obtained and plans and specifications are completed for construction of a single family home (the "House") on the Property, Borrower shall obtain a construction loan (the "Construction Loan") from a bank or financial institution regularly engaged in the business of making such construction loans ("Construction Loan Lender"). In order to facilitate the Construction Loan, (i) the Weintraub Guarantors and I shall each co-sign and provide a completion guaranty, in favor of Construction Loan Lender, subject to approval of financing terms and guarantee agreements (each such guaranty, a "Construction Loan Guaranty") and (ii) the Cohen Trust shall either (x) co-sign with the Weintraub Guarantors and I, and will provide a Construction Loan Guaranty, which shall be limited to guaranteeing the payment of up to $2,000,000 of the Construction Loan or (y) shall pledge cash or marketable securities in the amount of $2,000,000 in favor of the Construction Loan Lender as collateral for the Construction Loan (the "Construction Loan Pledge").

5. As provided in the Indemnity Agreement, the Weintraub Guarantors and I shall each jointly and severally indemnify the Cohen Trust with respect to any losses, claims and costs related to the Land Loan Guaranty, Construction Loan Guaranty, or Construction Loan Pledge.

6. Through subsidiary entities, RW and I shall each at closing have a 45% membership interest in Borrower. The Cohen Trust shall have a 10% profit participation in Borrower ("Profit Participation") and will be entitled to receive 10% of Borrower's net profits after deducting all costs and expenses and after all capital and outstanding loans are repaid.

7. RW and I anticipate diluting our interest in Borrower further in order to bring in other investors if necessary after the closing of the Property. In such event, your 10% Participation Interest will not be diluted.

8. This is not a full recitation of all the aspects of the Transaction but is rather a summary of the key terms. The Transaction will be documented in the Note and Indemnity Agreement. The Indemnity Agreement shall provide for the subsequent amendment of Borrower's Operating Agreement in order to provide for the Cohen Trust's Profit Participation.

The Firm and I advise you that you may want to seek the advice of independent counsel of your choice in connection with the Transaction and this consent and waiver. Please execute the enclosed copy of this letter in the space provided for your respective signature indicating your acknowledgement of, consent to, and waiver of any potential or actual conflicts created by my involvement in the Transaction.

[Signatures on Following Page]

Akin Gump
STRAUSS HAUER & FELD LLP



Sincerely,

Hushmand Sohaili of
Akin Gump Strauss Hauer & Feld LLP

Cohen Family Trust dated March 13, 1986, as
restated December 31, 2005, as amended

____________________________________

Robert Cohen, Trustee

Akin Gump
STRAUSS HAUER & FELD LLP



Sincerely,

Hushmand Sohaili of
Akin Gump Strauss Hauer & Feld LLP

Cohen Family Trust dated March 13, 1986, as restated December 31, 2005, as amended

Robert Cohen, Trustee

# EXHIBIT "C"

[redacted] [redacted]
**Attachments:** Sig Page to Indmenity Agreement-c.pdf
Sig Page to Conflict Waiver-c.pdf

---

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

---

**From:** Shlomi, Daniel
**Sent:** Monday, February 25, 2013 9:33 AM
**To:** 'shingly@sbcglobal.net' <shingly@sbcglobal.net>
**Cc:** 'Robert Cohen' <rcdukespoint@gmail.com>; 'Ezra Cohen' <ecohen8640@aol.com>; Sohaili, Hushmand <hsohaili@akingump.com>
**Subject:** Blue Jay Way

Hi Shingly,

This morning can you please send me Robert's signature pages to the final drafts of the Indemnity Agreement and Conflict Waiver that I sent on Saturday. Attached please find signature pages to each of these two documents.

We should be receiving the East West Loan Documents this morning and Robert will be co-signing the Guaranty. Once you receive this document please arrange for it to be signed as soon as possible since the bank will need everything signed quickly.

Please let me know if you have any questions.

Best,

Daniel

**Daniel Shlomi**

LLP

**AKIN GUMP STRAUSS HAUER & FELD**
2029 Century Park East | Suite 2400 | Los Angeles, CA 90067-3010 | USA | Direct: +1 310.728.3326 | Internal: 43326
Fax: +1 310.229.1001 | dshlomi@akingump.com | akingump.com | Bio

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT "D"

# OPERATING AGREEMENT

# FOR

# S&W BLUE JAY WAY, LLC

This Operating Agreement is entered into as of February 25, 2013, by and between 1966 BJW, LLC, a Delaware limited liability company (the "Weintraub Member") and Rc/Hs, LLC, a California limited liability company ("Rc/Hs" or the "Sohaili Member") (referred to individually as a Member and collectively as the Members).

## RECITALS

The Members have formed a limited liability company under the Act (as defined below). The Articles of Organization of the Company (as defined herein) filed with the California Secretary of State on January 29, 2013, are hereby adopted and approved by the Members.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I: DEFINITIONS

The following capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined will have the meanings set forth in California Corporations Code §17001.

1.1. "Act" means the Beverly-Killea Limited Liability Company Act (California Corporations Code §§17000-17656), including amendments from time to time.

1.2. "Agreement" means this operating agreement, as originally executed and as amended from time to time.

1.3. "Articles of Organization" is defined in California Corporations Code §17001(b) as applied to this Company.

1.4. "Assignee" means a Person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.5. "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.6. "Book Adjustments" means, for any item of Company property for a given fiscal year, adjustments with respect to Book Value for depreciation, cost recovery, or other amortization deduction or gain or loss computed in accordance with Treasury Reg §1.704-1(b)(2)(iv)(g), including Book Depreciation.

1.7. "Book Depreciation" means, for any item of Company property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for that item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the Gross Asset value of that item at the beginning of the fiscal year (or the acquisition date during the fiscal year) by (2) the federal adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Company may determine Book Depreciation, provided that it is done in a reasonable and consistent manner.

1.8. "Capital Account" means, for any Member, a separate account maintained and adjusted in accordance with Article III, Section 3.3.

1.9. "Capital Contribution" means, with respect to any Member, the amount of money, or services rendered or to be rendered, and the fair market value of any property contributed to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take "subject to" under IRC §752) in consideration of a Percentage Interest held by that Member. A Capital Contribution will not be deemed a loan.

1.10. "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds on account of an involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.11. "Company" means the company named in Article II, Section 2.2.

1.12. "Corporations Code" ("Corp C") means the California Corporations Code.

1.13. "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit, or similar items of the Company, and to receive distributions from the Company under this Agreement or under the Act, but does not include any other rights of a Member, including the right to vote, the right to participate in the management of the Company, or, except as provided in Corp C §17106, any right to information concerning the business and affairs of the Company.

1.14. "Electronic transmission by the Company" and "electronic transmission to the Company" have the meanings set out in California Corporations Code §17001(o)(1)-(2).

1.15. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.16. "Encumbrance" means, with respect to any Membership Interest, or any part of it, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.17. "Gross Asset Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(a) The Gross Asset Value of any item of property contributed by a Member to the Company will be the fair market value of that property, as mutually agreed by the contributing Member and the Company;

(b) The Gross Asset Value of any item of Company property will be adjusted as of the following times: (1) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (2) the distribution of money or other property (other than a de minimis amount) by the Company to a Member as consideration for an Economic Interest in the Company; and (3) the liquidation of the Company within the meaning of Treasury Reg §1.704-1(b)(2)(ii)(g), provided, however, that adjustments under clauses (1) and (2) above will be made only if the Members have determined that the Company must revalue its assets in accordance with Treasury Reg §1.704-1(b)(2)(iv)(f);

(c) The Gross Asset Value of any Company asset distributed to any Member will be the fair market value of the asset on the date of distribution;

(d) The Gross Asset Value of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted tax basis of the assets under Internal Revenue Code §734(b) or 743(b), subject to the limitations imposed by IRC §755 and only to the extent that the adjustments are taken into account in determining Capital Accounts under Treasury Reg §1.704-1(b)(2)(iv)(m), and if the Gross Asset Value of an asset has been determined or adjusted under paragraph (a), (b), or (d) of this Section 1.17, the Gross Asset Value will thereafter be adjusted by the Book Adjustments, if any, taken into account with respect to the asset for purposes of computing Profits and Losses.

1.18. "Initial Member" or "Initial Members" means those Persons whose names are set forth in the first sentence of this Agreement. A reference to an "Initial Member" means any of the Initial Members.

1.19. "Involuntary Transfer" means, with respect to any Membership Interest, or any part of it, any Transfer or Encumbrance, whether by operation of law, under court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.20. "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.21. "Losses." See "Profits and Losses."

1.22. "Majority of Members" means the Weintraub Member and Sohaili Member in their respective sole discretion acting jointly and unanimously; provided however if they are deadlocked and if and only if a lender with respect to the Cohen Loan, the East West Loan, or a replacement construction loan has sent a notice of default or there has been a failure to make a payment within the applicable grace period for such loan, then the Cohen Trust may make the final decision and break the deadlock. Notwithstanding anything to the contrary in this Agreement if either the Weintraub Member or Sohaili Member has its Percentage Interest reduced to less than 30% (after accounting for the Cohen Participation and the New Investor Percentage Interest) (i.e. from an effective 42.5% to 30%), as a result of dilution for failure to contribute additional Capital Contributions pursuant to Section 3.4, then Initial Member whose Percentage Interest is not so reduced shall have sole decision making authority.

1.23. "Meeting" is defined in Article V, Section 5.2.

1.24. "Member" means an Initial Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.25 Members Initial Capital shall be each Initial Members initial capital contribution as set forth on Exhibit A.

1.26. "Notice" means a written notice required or permitted under this Agreement. A notice will be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL WorldWide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic transmission by or to the Company (see §1.14); or when delivered to the home or office of a recipient in the care of a person whom the deliverer has reason to believe will promptly communicate the notice to the recipient.

1.27. "Percentage Interest" means a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

1.28. "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.29. "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for the year or period, determined in accordance with IRC §703(a).

1.30. "Proxy" has the meaning set forth in the first paragraph of California Corporations Code §17001(ai). A Proxy may not be transmitted orally.

1.31."Property" that certain real property commonly known as 1633 Blue Jay Way, Los Angeles.

1.32. "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Internal Revenue Code, as those Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.33. "Substituted Member" is defined in Article VIII, Section 8.8.

1.34. "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.35. "Transfer" means any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of a Membership Interest or any part of a Membership Interest, directly or indirectly (including by or through transfers of holders of the beneficial interest in such Membership Interest), other than an Encumbrance that is expressly permitted under this Agreement.

1.36. "Triggering Event" is defined in Article VIII, Section 8.3.

1.37. "Vote" means a written consent (or email confirmation) or approval, a ballot cast at a Meeting, or a voice vote at a Meeting.

1.38. "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. Except as otherwise expressly provided herein all Voting shall be in accordance with Majority of Members as defined herein.

1.39 "Writing" includes any form of recorded message capable of comprehension by ordinary visual means, and when used to describe communications between the Company and its Members, "writing" will include electronic transmissions by and to the Company as defined in California Corporations Code §17001(o)(1)-(2).

1.40. "Written" or "in writing" includes facsimile and other electronic communication authorized by the California Corporations Code.

## ARTICLE II: ARTICLES OF ORGANIZATION

2.1. The Company is a limited liability company organized pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement. Except as expressly

provided herein to the contrary, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act. The Membership Interest of each Member shall be personal property for all purposes.

2.2. The name of the Company shall be "**S&W Blue Jay Way, LLC.**" The Company's business may be conducted under any other name or names deemed advisable by the Members. The words "Limited Liability Company," the abbreviation "L.L.C.," or the designation "LLC," or similar words or letters shall be included in the Company's name where necessary for the purpose of complying with the laws of any jurisdiction that so requires.

2.3. The principal office of the Company shall be at any location as designated by the Members.

2.4. The initial agent for service of process on the Company will be Paracorp Incorporated. A Majority of Members may from time to time change the Company's agent for service of process.

2.5. The purpose of the Company shall be to acquire the Real Property and to develop a residential, single-family house upon such real property to be held for investment and rental subject to sale at such times as the Majority of Members determine.

2.6. The term of existence of the Company will commence on the effective date of filing of Articles of Organization with the California Secretary of State, and will continue until terminated by the provisions of this Agreement or as provided by law.

2.7. The Members will be the managers of the Company.

## ARTICLE III: CAPITALIZATION AND LOANS

3.1. Each Initial Member will contribute to the capital of the Company as the Member's Initial Capital Contribution the money or property specified in Exhibit A to this Agreement. The Fair Market Value of each item of contributed property as agreed between the Company and the Member contributing the property is set forth in Exhibit A. The Initial Members anticipate the initial amounts of capital required to develop the real property to be acquired by the Company shall approximate the amounts set forth in the proposed budget attached hereto as Exhibit B.

3.2. With the prior written consent of the Weintraub Member and the Sohaili Member, the Company may obtain such further funds (in addition to amounts provided in Section 3.2 and the amount the Initial Members are obligated to contribute as it requires for its operations from sources and on terms which are acceptable to the Weintraub Member and the Sohaili Member. As of the effective date of this Agreement, the Company anticipates entering into a loan with the

Cohen Family Trust dated March 13, 1986 as restated December 31, 2005, as amended ("Cohen Trust") in the principal amount of two million five hundred thousand ($2,500,000.00), with a interest rate of twelve percent (12%) and a net profits participation of ten percent (10%) ("Cohen Participation") per the attached. The Cohen Loan shall be secured by a Second Deed of Trust to be provided by the Company shortly hereafter. The Cohen Participation shall be reflected by a 10% of Percentage Interests as a Member. It is intended that the Cohen Trust be a third party beneficiary under this Agreement. In addition, as of the effective date of this Agreement, the Company has secured a loan by East West Bank in the principal amount of $2,125,000 with an interest rate of prime plus 1%, the payment of which loan is personally and jointly and severally guaranteed by Hushmand Sohaili ("Mr. Sohaili"), Richard Weintraub ("Mr. Weintraub"), and the Cohen Trust in accordance with the terms set forth in the loan documents pertaining to such loan.

3.3. In the event that the Company shall require funds in order to carry out the purposes of the Company and such funds shall not be available from either prior capital contributions of the Members or the proceeds of a third-party loan to the Company, then upon agreement of the Weintraub Member and the Sohaili Member, any Member may, but shall not be required to, loan to the Company such required funds. In the event such a loan is made, the same shall not be considered an increase in the Member's Capital Account nor an increase in its share of Company profits. Each such loan shall be without recourse except as to the assets of the Company and shall be upon such terms as shall be agreed to by the lending Member. The Company anticipates shortly after the closing of the purchase of the Property to take an equity investment from a Greg Feinberg ("New Investor") in the amount of Five Hundred Thousand Dollars ($500,000.00) of Capital Contributions allowing New Investor Five (5%) as his Percentage Interest and a credit for its Capital Contributions equal to Five Hundred Thousand Dollars. This Five (5%) Percentage will be reduced equally from the Percentage Interests of the Sohaili Member (i.e. 45% will be reduced to 42 ½) and the Weintraub Member (i.e. 45% will be reduced to 42 ½%).

3.4. (a) The Members shall not be required to contribute additional capital to the Company except as specified in this Section 3.4. If, however, the Weintraub Member or the Sohaili Member determines, in its sole discretion, that additional capital is reasonably necessary within the next thirty (30) days to carry out the purposes of the Company, such Initial Member may, from time to time, by written notice, call for additional Capital Contributions to be made by 50% each by the two Initial Members . Each Initial Member shall contribute its 50% share of the additional Capital Contributions called for 50% in cash on or before the due date specified in the written notice, which due date shall be no less than ten (10) days from the date of such written notice; provided, however, that, except as otherwise provided herein, no Initial Member shall be required to contribute more than an aggregate of six hundred thousand dollars ($600,000) in Capital Contributions taking into account any of the Initial Members Initial Capital Contributions (the "Cap"). Notwithstanding the foregoing, the cap of six hundred thousand dollars ($600,000) provided for in the immediately preceding sentence shall not apply to the extent any additional Capital Contributions in excess of the Cap are called to enable the Company to make any mortgage or loan payment including without limitation any payment on the Cohen Loan and the East West Loan. If a Member (a "Non-Contributing Member") fails to make its share of the additional Capital Contributions called for on or before the due date specified in the written notice, the non-defaulting Initial Member may, on five (5) days' prior written notice to the Non-Contributing Member, accept and agree to fund all, or a portion of the Non-Contributing

Member's unpaid share of the additional Capital Contributions ("Contributing Member") in which case the Percentage Interests of the Non-Contributing Member and the Contributing Member shall be adjusted accordingly so there is a 2:1 dilution for the failure by the Non-contributing Member to fund the required additional capital contributions relating to the capital call for the additional Capital Contributions up to the Cap. There will be a 3:1 dilution for failure to fund any mortgage or loan payments by the Non-Contributing Member if provided by the Contributing Member. For example in 2:1 dilution scenario, if the Sohaili Member is the Non-contributing Member and has funded its Initial Capital Contribution of Three Hundred Thousand ($300,000.00) but failed to fund its remaining additional Capital Contribution of Three Hundred Thousand ($300,000.00) and if the Weintraub Member has funded its full Six Hundred Thousand ($600,000.00) and in addition funds Three Hundred Thousand ($300,000.00) that the Sohaili Member failed to fund the Percentage Interests shall be adjusted as follows:

Assuming that each Initial Member starts with 42.5% of a Percentage Interest (after the 10% to Cohen Participation and 5% to the New Investor that will be brought in subsequent to the closing of the purchase of Property). So out of the total funded by the Initial Members of $1,200,000, representing a total of 85% of Percentage Interests, each Three Hundred Thousand ($300,000) would represent 21-25% Percentage Interests. So as a result of the failure by the Sohaili Member to fund its additional contribution of Three Hundred Thousand ($300,000.00) it will lose 2 x 21.25% or all of its 42.5% of Percentage Interest but the Sohaili Member will still have a right as a priority per Section 4.5 hereof to along with the Weintraub Member (and the New Investor) to pro rata receive a return of its Three Hundred Thousand of Capital Contributions that it previously made. A default on a Capital Contribution used to fund payment on a loan to East West or the Cohen Trust apply the exact same principles in the foregoing example except the dilution shall be applied on a 3:1 basis.

(b) Notwithstanding whether the Contributing Member does or does not fund the Non-contributing Member's unpaid share of a Capital Contribution, the Non-Contributing Member shall indemnify defend and hold harmless the Contributing Member or the other Member (even if not a Contributing Member but as long as it is not a Non-Contributing Member) and/or its beneficial owners from any loss, costs, liabilities or expenses of any kind as a result of either the Contributing Member (i) making its own share of a Capital Contribution or (ii) the Contributing Member making the Non-Contributing Member's Capital Contribution as a result of such default by the Non-Contributing Member.

3.5. Except as expressly provided in this Agreement or with the prior written consent of the Weintraub Member and the Sohaili Member, no Member shall be required or entitled to contribute any other or further capital to the Company, nor shall any Member be required or entitled to loan any funds to the Company.

3.6. If a Initial Member fails to make a required Initial Capital Contribution, as set forth in Exhibit A, the day before the closing date of the purchase of the Property that Member's entire Membership Interest will terminate and that Member will indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees, caused by the failure to make that Capital Contribution.

3.7. An individual Capital Account will be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of Profits, (2) decreased by that Member's share of Losses, and (3) adjusted as required in accordance with applicable provisions of the Code and Regulations.

3.8. A Member will not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property from the Company, except as provided in this Agreement.

3.9. No interest will be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

3.10. A Member will not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

3.11. Except as otherwise provided herein, the Initial Members shall be indemnified and held harmless by the Company from and against any and all claims, demands, liabilities, costs, damages, expenses and causes of action of any nature whatsoever arising out of or incidental to any act performed or omitted to be performed by such Initial Members, except for their obligation to fund Capital Contributions as provided herein in connection with the business of the Company; provided, however, that, such act or omission was taken in good faith, was reasonably believed by the applicable Member to be in the best interests of the Company and the scope of authority granted to such Member under this Agreement, and did not constitute fraud, bad faith, willful misconduct or gross negligence on behalf of such Member and provided, further, however, that no indemnification may be made to or on behalf of any Member or other person if a judgment or other final adjudication adverse to such person establishes that his or her or its acts were committed in bad faith or were the result of active and deliberate dishonesty and were related to the cause of action so adjudicated and, provided, further, however, that an indemnity under this Section shall be paid solely out of and to the extent of Company assets and shall not be a personal obligation of any Member.

3.12. The Company and the other Initial Members shall be indemnified and held harmless by each Member from and against any and all claims, demands, liabilities, costs, damages, expenses and causes of action of any nature whatsoever arising out of or incidental to any act performed by a Initial Member which is not performed in good faith or is not reasonably believed by such Member to be in the best interests of the Company and within the scope of authority conferred upon such Member under this Agreement, or which arises out of the fraud, bad faith, willful misconduct or gross negligence of such Member.

3.13. No Member will have priority over any other Member with respect to the return of a Capital Contribution or distributions of cash or non-cash property except as set forth in Section 4.5.

3.14. Mr. Weintraub individually and La Villa Contenta, LLC (collectively, the "Weintraub Guarantors"), and the individual owner of the Sohaili Member, Mr. Sohaili (Mr. Sohaili and the Weintraub Guarantors collectively referred to herein as "Guarantors") are executing various indemnities and guaranties. Mr. Weintraub and Mr. Sohaili are each executing a guaranty to East West Bank ("East West Bank Guaranty"), the Guarantors are executing the Indemnity Agreement for the benefit of the Cohen Trust, and the Guarantors may bear and execute other indemnities and liabilities ("Additional Guaranties"; together with the East West Bank Guaranty and the Indemnity Agreement, collectively, the "Personal Guaranties"). Notwithstanding the limitation on additional capital contribution in Section 3.4 or any other provision of this Agreement, Mr. Sohaili and the Weintraub Guarantors agree that Mr. Sohaili will bear 50% and the Weintraub Guarantors will collectively bear 50% of any loss, liability, cost or expense ("Losses") under such Personal Guaranties and that Mr. Sohaili will indemnify, defend and hold harmless the Weintraub Guarantors and the Weintraub Guarantors will indemnify, defend and hold harmless Mr. Sohaili from any Losses in excess of 50% of the total Losses paid by such Guarantor so that Mr. Sohaili ends up paying 50% and the Weintraub Guarantors collectively end up paying 50% of the Losses from such Personal Guaranties.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. The Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit will be allocated, for Company book purposes and for tax purposes, to each Member in accordance with that Member's Percentage Interest.

4.2. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Reg §1.704-1(b)(2)(ii)(d)(4)-(6), items of Company gross income and gain will be specially allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in the Member's Capital Account created by the adjustment, allocation, or distribution as quickly as possible. Any special allocation under this Section 4.2 will be taken into account in computing subsequent allocations of Profits and Losses, so that the net amount of allocations of income and loss and all other items will, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred. The provisions of this Section 4.2 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Reg §§1.704-1(b) and 1.704-2 and will be interpreted and applied in a manner consistent with those Regulations.

4.3. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members will be treated in accordance with applicable law.

4.4. In the case of a Transfer of an Economic Interest during any fiscal year, the Assigning Member and Assignee will each be allocated the Economic Interest's share of Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.

4.5. Notwithstanding anything to the contrary in this Agreement all cash resulting from the normal business operations of the Company and from a Capital Event will be distributed first to repay the Cohen Loan and the East West Loan, next among the Members pro rata in accordance with their relative Capital Contributions until they have all received a return of all of their Capital Contributions and then in proportion to their Percentage Interests at such times as the Majority of the Members may agree; provided however that, all cash resulting from a Capital Event after paying all costs, expenses due and reasonably anticipated to be due, and any debt shall be distributed in accordance with the foregoing immediately following the consummation of the Capital Event.

4.6. If the proceeds from a sale or other disposition of a Company asset consist of property other than cash, the value of the property will be as determined by the Members. Noncash proceeds will then be allocated among all the Members in accordance with Section 4.5 . If noncash proceeds are subsequently reduced to cash, the cash will be distributed to each Member in accordance with Section 4.5.

4.7. Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's Interest is liquidated, all items of income and loss first will be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions to the Members' Capital Accounts will be made before the final distribution is made. The final distribution to the Members will be made to the Members in accordance with Section 4.5.

## ARTICLE V: MANAGEMENT

5.1. The business of the Company will be managed by Majority of the Members, provided that, notwithstanding anything to the contrary herein contained, the Vote of a Majority of the Members is required with respect to every decision concerning the Company. A Member will be a manager only during the time the Member is a Member of the Company. Unless otherwise provided in this Agreement, all decisions concerning the management of the Company's business will be made by the Vote of a Majority of Members, provided that, notwithstanding anything to the contrary herein contained, no such decision will be effective without the Vote of the Majority of Members. Any such action submitted to the Members in writing for a Vote, shall be responded to within five (5) business days in writing. In the event any Member fails to respond in writing, such action shall be deemed to be disapproved.

5.2. Once any decision is made by the Vote of a Majority of Members, each of the Weintraub Member and the Sohaili Member shall have the power and authority to bind or act on behalf of the Company, to pledge its credit, to execute any instrument on its behalf, and to render it liable for any purpose.

5.3. The Members are not required to hold meetings, and decisions may be reached through one or more informal consultations followed by agreement among a Majority of Members, if all Members are consulted (although all Members need not be present during a particular consultation), or by a written consent signed by a Majority of Members, or by an email exchange evidencing agreement among a Majority of Members. In the event that the Majority of Members wish to hold a formal meeting (a "Meeting") for any reason, the following procedures will apply:

(1) A Majority of the Members may call a Meeting of the Members by giving Notice of the time and place of the Meeting at least 72 hours beforehand. The Notice needs to specify the purpose of the Meeting, and the location of the Meeting which should be in West Los Angeles or Malibu.

(2) The two Initial Members will constitute a quorum for the transaction of business at any Meeting of the Members.

(3) The transactions of the Members at any Meeting, however called or Noticed, or wherever held, will be as valid as though transacted at a Meeting duly held after call and Notice if a quorum is present and if, either before or after the Meeting, each Member not present signs a written waiver of Notice, a written consent to the holding of the Meeting, or an approval of the minutes of the Meeting.

(4) Any action required or permitted to be taken by the Members under this Agreement may be taken without a Meeting pursuant to the terms of Section 5.3 hereof.

(5) A meeting of the Members may be conducted, in whole or in part, by electronic transmission by and to the Company or by electronic video screen communication if (1) the Company implements reasonable measures to provide Members (in person or by Proxy) a reasonable opportunity to participate in the meeting and to vote on matters submitted to the Members, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with those proceedings, and if (2) any Member Votes or takes other action at the meeting by means of electronic transmission to the Company or electronic video screen communication, a record of that vote or action is maintained by the Company.

(6) The Members will keep or cause to be kept with the books and records of the Company full and accurate minutes of all Meetings, Notices, and waivers of Notices of Meetings, and all written consents and email exchanges in lieu of Meetings.

5.4. The Initial Members, the Weintraub Guarantors and Hushmand Sohaili will not be entitled to compensation for their services.

5.5. The Company may have a President, who may be, but need not be, a Member. A Majority of the Members may provide for additional officers of the Company and for their election, and

may alter the powers, duties, and compensation of the President and of all other officers. The President, if there is one, will attend any Meetings of Members called under Section 5.3(1)-(6).

5.6. All assets of the Company, whether real or personal, will be held in the name of the Company.

5.7. All funds of the Company will be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at locations determined by a Majority of Members. Withdrawal from those accounts will require the signature of the person or persons designated by a Majority of Members.

5.8. Richard Weintraub shall act as the day to day manager and coordinate subject to the Vote of the Majority of Members all aspects of the development of the Property for which he shall receive no separate or additional compensation other than distributions provided herein to the Weintraub Member under Section 4.5.

## ARTICLE VI: ACCOUNTS AND RECORDS

6.1. Complete books of account of the Company's business, in which each Company transaction will be fully and accurately entered, will be kept at the Company's principal executive office and will be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours. The costs of inspection and copying will be borne by the Member.

6.2. Financial books and records of the Company will be kept on the accrual method of accounting, which will be the method of accounting followed by the Company for federal income tax purposes. A balance sheet and income statement of the Company will be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company will be January 1 through December 31.

6.3. At all times during the term of existence of the Company, and beyond that term if a Majority of the Members deem it necessary, the Members will keep or cause to be kept the books of account referred to in Section 6.2, and the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(b) A copy of the Articles of Organization, as amended;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(d) Executed counterparts of this Agreement, as amended;

(e) Any powers of attorney under which the Articles of Organization or any amendments were executed;

(f) Financial statements of the Company for the six most recent fiscal years; and

(g) The books and records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If a Majority of Members deems that any of the foregoing items will be kept beyond the term of existence of the Company, the repository of those items will be as designated by a Majority of Members.

6.4. Within 90 days after the end of each taxable year of the Company, the Company will send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's federal, state, and local income tax or information returns for that year.

## ARTICLE VII: MEMBERS AND VOTING

7.1. There will be only one class of membership and no Member will have any rights or preferences in addition to or different from those possessed by any other Member, provided that the vote of a Majority of Members shall be required for all decisions. Any action that may or that must be taken by the Members will be by a Majority of Members, except that the following actions will require the unanimous Vote of the Members:

(a) Any amendment of the Articles of Organization or this Agreement; or

(b) Compromise of the obligation of a Initial Member to make a Capital Contribution.

7.2. The record date for determining the Members entitled to Notice of any Meeting, to Vote, to receive any distribution, or to exercise any right in connection with any other lawful action, will be the date set by a Majority of Members, provided that the record date may not be more than 60, nor less than 10 days before the date of the Meeting, nor more than 60 days before any other action.

In the absence of any action setting a record date, the record date will be determined in accordance with California Corporations Code §17104(k).

7.3. At all Meetings of Members, a Member may Vote in person or by Proxy. The Proxy will be filed with any Member before or at the time of the Meeting, and may be filed by facsimile

transmission to a Member at the principal executive office of the Company or any other address given by a Majority of Members to the Members for that purpose.

## ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS

8.1. A Member may withdraw from the Company at any time by giving Notice of Withdrawal to all other Members at least 180 calendar days before the effective date of withdrawal. Withdrawal will not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member will divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with the transfer restrictions and option rights set forth below.

8.2. Except as expressly provided in this Agreement, a Member will not Transfer any part of the Member's Membership Interest in the Company, (including any beneficial Economic Interest) whether now owned or later acquired, unless (1) the Weintraub Member and the Sohaili Member unanimously approve in writing the transferee's admission to the Company as a Member and (2) the Membership Interest to be Transferred, when added to the total of all other Membership Interests Transferred in the preceding 12 months, will not cause the termination of the Company under IRC §708(b)(1)(B). No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless the Encumbrance has been approved in writing by the Majority of Members. Any Transfer or Encumbrance of a Membership Interest without that approval will be void. Notwithstanding the foregoing, a Member or a beneficial owner in Member may Transfer any part of the Member's Membership Interest to (i) trusts established for the benefit of Mr. Weintraub, Mr. Sohaili or their immediate family members or (ii) Mr. Weintraub, Mr. Sohaili or their immediate family members individually (collectively, "Permitted Transferee") so long as such Permitted Transferee also becomes liable for the Personal Guaranties.

8.3. Except as expressly permitted under Section 8.2, a prospective Transferee of a Membership Interest may be admitted as a Member with respect to the Membership Interest ("Substituted Member") only (1) on the unanimous Vote of the Weintraub Member and the Sohaili Memberin favor of the prospective Transferee's admission as a Member, (2) on the prospective Transferee's executing a counterpart of this Agreement as a party to it. Any prospective Transferee of a Membership Interest will be deemed an Assignee, and, therefore, the owner of only an Economic Interest until the prospective Transferee has been admitted as a Substituted Member and (3) the beneficial individual owners directly or indirectly in such entity or trust or individual beneficial owner agreeing to sign any guarantees, indemnities or any personal liability that has been signed or undertaken (collectively "Guarantees and Indemnities") by Hushmand Sohaili or the Weintraub Guarantors to the other Initial Member (and their beneficial Owners), as well as to the Cohen Trust, East West and other third parties.

8.4. Any person admitted to the Company as a Substituted Member will be subject to all provisions of this Agreement.

8.5. The initial sale of Membership Interests in the Company to the initial Members has not been qualified or registered under the securities laws of any state, or registered under the Securities Act of 1933, as amended, in reliance on exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of Membership Interests to Members under the California Corporate Securities Law of 1968, as amended, also in reliance on an exemption from the requirement that a permit for issuance of securities be procured. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred or Encumbered unless registered or qualified under applicable state and federal securities laws or unless, in the opinion of legal counsel satisfactory to the Company, qualification or registration is not required. A Member who desires to transfer a Membership Interest will be responsible for all legal fees incurred in connection with that opinion.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1. The Company will be dissolved on the first to occur of the following events:

(a) The written agreement of a Majority of Members to dissolve the Company.

(b) The sale or other disposition of substantially all of the Company assets.

(c) Entry of a decree of judicial dissolution under California Corp C §17351.

9.2. On the dissolution of the Company, it will engage in no further business other than that necessary to wind up its business and affairs. The Members winding up the Company's affairs will give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the Company's records. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company will be distributed or applied in the following order of priority:

(a) To pay the expenses of liquidation.

(b) To repay outstanding loans to Members. If there are insufficient funds to pay those loans in full, each Member will be repaid in the ratio that the Member's respective loan, together with accrued and unpaid interest, bears to the total of all those loans from Members, including all interest accrued and unpaid on those loans. Repayment will first be credited to unpaid principal and the remainder will be credited to accrued and unpaid interest.

(c) Among the Members in accordance with the provisions of Article IV, Section 4.7.

9.3. Except as expressly provided herein, each Member will look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return

the investment of any Member, the Member will have no recourse against any other Members for indemnification, contribution, or reimbursement. Notwithstanding the foregoing, the indemnities and guarantees (i) by Mr. Sohaili and the Weintraub Guarantors of the obligations of the Sohaili Member and the Weintraub Member to each other respectively, (ii) by Mr. Sohaili and Mr. Weintraub to East West and (iii) by Mr. Sohaili and the Weintraub Guarantors to the Cohen Trust shall continue in full force and effect unmodified by the prior sentence.

## ARTICLE X: ARBITRATION

10.1. Any action to enforce or interpret this Agreement, or to resolve disputes over this Agreement between the Company and a Member, or between or among the Members, will be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration will be the exclusive dispute resolution process in the state of California, but arbitration will be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. The demand will set forth the nature of the matter to be resolved by arbitration. The Members will select the place of arbitration. The substantive law of the state of California will be applied by the arbitrator to the resolution of the dispute. The parties will share equally all initial costs of arbitration. The prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator will be final, binding, and conclusive on all parties. Judgment may be entered on any such decision in accordance with applicable law in any court having jurisdiction of it. The arbitrator (if permitted under applicable law) or the court may issue a writ of execution to enforce the arbitrator's decision.

## ARTICLE XI: GENERAL PROVISIONS

11.1. This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it will not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

11.2. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

11.3. This Agreement will be construed and enforced in accordance with the laws of the state of California. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision will, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid that invalidity, illegality, or unenforceability or, if that is not possible, the provision will, to the extent of that invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement will remain in effect.

11.4. This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

11.5. Whenever used in this Agreement, the singular will include the plural, the plural will include the singular, and the neuter gender will include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require.

11.6. The parties to this Agreement will promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and will do any and all other acts and things reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

11.7. Except as provided in this Agreement, no provision of this Agreement will be construed to limit in any manner the Members in the carrying on of their own respective businesses or activities.

11.8. Except as provided in this Agreement, no provision of this Agreement will be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

11.9. Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

11.10. Each Member represents and warrants that such Member has substantial experience in evaluating companies similar to the Company such that it is capable of evaluating the merits and risks of its investment in the Company. Each Member further represents that it has had the opportunity to consult with its own independent legal and financial advisors and that by reason of its business or financial experience, such Member has the capacity to protect its own interests. Each Member must bear the economic risk of its investment in the Company indefinitely.

11.11. The article, section, and subsection titles and headings contained in this Agreement are inserted as a matter of convenience and for ease of reference only and will be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

11.12. This Agreement may be altered, amended, or repealed only by a writing signed by all of the Members.

11.13. Time is of the essence of every provision of this Agreement that specifies a time for performance.

11.14. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity will have or acquire any right by virtue of this Agreement.

11.15. The Members intend the Company to be a limited liability company under the Act. No member will take any action inconsistent with the express intent of the parties to this agreement.

11.16. This Agreement will not be construed against one of the Members as the "drafter" whether or not this Agreement was drafted in whole or part by that Member's counsel. Akin Gump Strauss Hauer & Feld LLP ("Akin") has represented solely Mr. Sohaili and the Sohaili Member with respect to this Agreement and Rahsaana Allen has represented the Weintraub Member and the Weintraub Guarantors with respect to this Agreement. Further, all parties acknowledge that neither Akin nor Mr. Sohaili will now or ever in the future be providing legal services or legal advice to the Company or any Member relating to this Agreement or the Company's business, other than the Sohaili Member. Notwithstanding anything to the contrary herein or elsewhere, whether express or implied to the extent that Mr. Sohaili and Akin has provided or will in the future provide legal services with respect to any documentation that the Company, the Weintraub Member, the Weintraub Guarantors, New Investor or the Cohen Trust executes with respect to the Company, such services have been strictly provided solely on behalf of Mr. Sohaili or the Sohaili Member, with respect to his or its direct or indirect interest in the matter and not with respect to the Company, the Weintraub Member, the Weintraub Guarantors, the Cohen Trust, New Investor or any other Member. To the extent that Rahsaana Allen and Nella Law Group, APC has provided or will in the future provide legal services with respect to any documentation that the Company, the Sohaili Member, the Sohaili Guarantors, New Investor or the Cohen Trust executes with respect to the Company, such services have been strictly provided solely on behalf of Mr. Weintraub or the Weintraub Member, with respect to his or its direct or indirect interest in the matter and not with respect to the Company, the Sohaili Member, the Sohaili Guarantors, the Cohen Trust, New Investor or any other Member. Akin will continue to represent the Cohen Trust on separate unrelated matters.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**Members**

**1966 BJW, LLC,**
a Delaware limited liability company

By: ERW One Thousand, LLC, its managing member

By: LVC One Thousand, LLC, its managing member

By: ______________________________
Name: Richard Weintraub
Title: Manager

**Rc/Hs, LLC,**
a California limited liability company

By: ______________________________
Name: Hushmand Sohaili
Title: Manager

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**Members**

**1966 BJW, LLC,**
a Delaware limited liability company

By: ERW One Thousand, LLC, its managing member

By: LVC One Thousand, LLC, its managing member

By: ______________________________
Name: Richard Weintraub
Title: Manager

**Rc/Hs, LLC,**
a California limited liability company

By: ______________________________
Name: Hushmand Sohaili
Title: Manager

# EXHIBIT A

## NAMES, ADDRESSES AND PERCENTAGE INTERESTS OF MEMBERS

## S&W BLUE JAY WAY, LLC

| NAME | PERCENTAGE INTEREST | INITIAL CAPITAL CONTRIBUTION |
|---|---|---|
| 1966 BJW, LLC<br>26880 Pacific Coast Highway<br>Malibu, CA 90265 | 50% * | $300,000.00 |
| Rc/Hs, LLC<br>721 18th Street<br>Santa Monica, California 90402 | 50%* | $300,000.00 |

* Subject to the total profit participation of 10% to the Cohen Trust.

**EXHIBIT B**

**PROPOSED BUDGET**

**S&W BLUE JAY WAY, LLC**

| | |
|---|---|
| Land | $4,400,000 |
| 10,000 square feet at $700 per foot all in cost | $7,000,000 |
| Interest on Cohen Trust Loan, East West Loan and Construction Loan | $900,000 |
| **Total** | **12,300,000** |

# EXHIBIT "E"

**FIRST AMENDMENT TO**

**OPERATING AGREEMENT**

**FOR**

**S&W BLUE JAY WAY, LLC**

**A CALIFORNIA LIMITED LIABILITY COMPANY**

This First Amendment ("First Amendment") to the Operating Agreement for S&W Blue Jay Way, LLC (the "Company") is made as of the 18th day of April, 2013 by and among, Rc/Hs, LLC, a California limited liability company (the "Sohaili Member"), 1966 BJW, LLC, a Delaware limited liability company (the "Weintraub Member"), and 66 Degrees North Post, LLC, a California limited liability company ("Fienberg Member"). All capitalized terms set forth herein shall have the meanings ascribed to such terms in the Operating Agreement for the Company, dated as of February 25, 2013 (the "Operating Agreement") unless otherwise defined herein.

WHEREAS, on February 25, 2013, the Company purchased that certain real property located at 1633 Blue Jay Way, Los Angeles, California (the "Property") for the purpose of constructing a single family home on the Property;

WHEREAS, pursuant to Section 3.3 of the Operating Agreement, the Company anticipated shortly after the purchase of the Property to take an equity investment from Fienberg Member in the amount of Five Hundred Thousand Dollars ($500,000) of Capital Contributions allowing Fienberg Member five percent (5%) as its Percentage Interest and a credit for its Capital Contributions equal to $500,000;

WHEREAS, concurrently herewith Fienberg Member is making a Capital Contribution of Five Hundred Thousand Dollars ($500,000) to the Company; and

WHEREAS, the parties hereto wish to amend the Operating Agreement to provide for (i) the admission of Fienberg Member, (ii) the continuation of the Company as reconstituted and (iii) certain other changes as more particularly set forth below.

NOW, THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged and intending to be legally bound the parties agree as follows:

1. Admission. Fienberg Member shall become the owner of a five percent (5%) Membership Interest of the Company, hereby becomes a party to, and is bound by, all terms and conditions of the Operating Agreement, as amended by this First Amendment and from time to time, and shall be deemed a "Member." The parties hereby admit Fienberg Member as a Member holding a Membership Interest in the Company in exchange for its $500,000 Capital Contribution.

2. Definitions. Article I of the Operating Agreement is hereby amended to add or amend and restate the following definitions in the appropriate alphabetical order:

a. "Fienberg Member" means 66 Degrees North Post, LLC , a California limited liability company; Manager: The Gregg Fienberg Trust, Gregg Fienberg Trustee

b. "Percentage Interest" means the percentage interest of a Member set forth opposite the name of such Member under the heading "Percentage Interest" on Exhibit C.

c. "Membership Interest" means the entire interest of a Member in the Company, including the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and conditions of this Agreement.

3. Cohen Loan and East West Loan. Section 3.2 of the Operating Agreement is hereby amended by adding the phrase "Exhibit C (the "Cohen Loan")" at the end of the second sentence thereof and by adding the phrase "(the "East West Loan")" at the end of the sixth sentence thereof.

4. Capital Contribution. Section 3.4(a) of the Operating Agreement is hereby amended by adding the following parenthetical at the end of the second sentence thereof:

"(it being acknowledged that under no circumstance shall Fienberg Member be required to make any additional Capital Contributions or be subjected to the dilution mechanism described in this Section 3.4(a))".

5. Management. Notwithstanding anything to the contrary in the Operating Agreement, Fienberg Member shall be a passive Member of the Company and shall have no voting, approval or decision rights with respect to the Company.

6. Distributions. Section 4.5 of the Operating Agreement is hereby amended and restated in its entirety to read as follows:

"Notwithstanding anything to the contrary in this Agreement, at such times as the Majority of the Members may agree, all cash resulting from the normal business operations of the Company and from a Capital Event will be distributed as follows:

(i) first, to repay the Company's expenses, the Cohen Loan, the East West Loan, any construction loan and any debts due or reasonably anticipated to be due (including any reserves);

(ii) second, to each Member that has made a Capital Contribution to the Company, such Member to receive a preferred return to be distributed in proportion with such member's Capital Contribution to the Company, which shall be computed based on a rate of return equal to ten percent (10%) compounded annually ("Preferred Return"). For example, if the property is sold after one year and Fienberg Member's Capital Contribution is $500,000, the Sohaili Member's Capital Contribution at that time is $1,000,000 and the Weintraub Member's Capital Contribution at that time is $1,000,000 (total of $2,500,000 in Capital Contributions), then, (a) Fienberg Member's Preferred Return would be $50,000 (20% of $250,000), (b) the Sohaili Member's Preferred Return would be $100,000 (40% of $250,000), and (c) the Weintraub Member's Preferred Return would be $100,000 (40% of $250,000);

(iii) third, to Fienberg Member until it has received a return of all of its Capital Contribution;

(iv) fourth, among the Members (other than Fienberg Member) pro rata in accordance with their relative Capital Contributions until they have all received a return of all of their Capital Contributions; and

(v) fifth, among the Members in proportion to their Percentage Interests."

7. Transfers of Membership Interests. Section 8.2 of the Operating Agreement is hereby amended by adding the following sentence after the last sentence thereof:

"Notwithstanding the foregoing, Fienberg Member may Transfer any part of its Membership Interest to (i) trusts established for the benefit of Fienberg Member or Gregg Fienberg or his immediate family members or (ii) to Gregg Fienberg's immediate family members individually, and in each instance of such Transfer Fienberg Member shall be personally liable and continue to remain personally liable for such assignee's obligations under this Agreement."

8. Exhibit C. A new Exhibit C attached hereto as Exhibit C is added to the Operating Agreement.

9. Disclosure. Fienberg Member hereby acknowledges that (i) it has not relied on any verbal and/or written statements, conversations, representations and information, if any, made or given by the Company, the Weintraub Member, the Sohaili Member or any of their agents, employees, attorneys, or representatives with respect to any aspect or feature of the Property, (ii) it has received access to all diligence material with respect to the Property, and (iii) it is relying exclusively upon his own independent investigation and evaluation of the Property and this investment.

10. Counterparts. This First Amendment may be executed in any number of counterparts, each of which together shall constitute one instrument, binding upon all parties, notwithstanding that all of such parties may not have executed the same counterpart.

11. Ratification of Operating Agreement. Except as expressly modified and amended herein, all of the terms and conditions of the Operating Agreement shall remain in full force and effect.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the day and year first above written.

**WEINTRAUB MEMBER:**

**1966 BJW, LLC,**
a Delaware limited liability company

By: ERW One Thousand, LLC, its managing member

By: LVC One Thousand, LLC, its managing member

By: ______________________________
Name: Richard Weintraub
Title: Manager

**SOHAILI MEMBER:**

**Rc/Hs, LLC,**
a California limited liability company

By: ______________________________
Name: Hushmand Sohaili
Title: Manager

**FIENBERG MEMBER:**

**66 Degrees North Post, LLC,**
a California limited liability company

By: The Gregg Fienberg Trust, its manager

By: ______________________________
Name: Gregg Fienberg
Title: Trustee

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the day and year first above written.

**WEINTRAUB MEMBER:**

**1966 BJW, LLC,**
a Delaware limited liability company

By: ERW One Thousand, LLC, its managing member

By: LVC One Thousand, LLC, its managing member

By: ______________________
Name: Richard Weintraub
Title: Manager

**SOHAILI MEMBER:**

**Rc/Hs, LLC,**
a California limited liability company

By: ______________________
Name: Hushmand Sohaili
Title: Manager

**FIENBERG MEMBER:**

**66 Degrees North Post, LLC,**
a California limited liability company

By: The Gregg Fienberg Trust, its manager

By: ______________________
Name: Gregg Fienberg
Title: Trustee

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment on the day and year first above written.

**WEINTRAUB MEMBER:**

**1966 BJW, LLC,**
a Delaware limited liability company

By: ERW One Thousand, LLC, its managing member

By: LVC One Thousand, LLC, its managing member

By: ______________________________
Name: Richard Weintraub
Title: Manager

**SOHAILI MEMBER:**

**Rc/Hs, LLC,**
a California limited liability company

By: ______________________
Name: Hushmand Sohaili
Title: Manager

**FIENBERG MEMBER:**

**66 Degrees North Post, LLC,**
a California limited liability company

By: The Gregg Fienberg Trust, its manager

By: ______________________
Name: Gregg Fienberg
Title: Trustee

**EXHIBIT C**

**PERCENTAGE INTERESTS OF MEMBERS**

**S&W BLUE JAY WAY, LLC**

| NAME | PERCENTAGE INTEREST |
|---|---|
| 1966 BJW, LLC<br>26880 Pacific Coast Highway<br>Malibu, CA 90265 | 42.5% |
| Rc/Hs, LLC<br>721 18th Street<br>Santa Monica, California<br>90402 | 42.5% |
| Cohen Family Trust<br>c/o Burton Way Hotels, LLC<br>2029 Century Park East<br>Suite 2200<br>Los Angeles, CA 90067-3010 | 10% |
| 66 Degrees North Post, LLC<br>4817 Carpenter Ave,<br>Valley Village, CA 91607 | 5% |

# EXHIBIT "F"

**Akin Gump**
**STRAUSS HAUER & FELD LLP**

**HUSHMAND SOHAILI**
+1 310.229.1060/fax: +1 310.229.1001
hsohaili@akingump.com

April 28, 2017

VIA EM-AIL

Robert Cohen
rcdukespoint@gmail.com

Re: 1633 Blue Jay Way - Conflict Waiver

Dear RC:

As you know, Akin Gump Strauss Hauer and Feld LLP (the "Firm") and I have had a long standing relationship with you as your legal counsel. Since the California Rules of Professional Conduct requires full disclosure and informed written consent in cases of a potential or actual conflict of interest, I have prepared this letter to meet our professional obligations in that regard.

The Cohen Family Trust dated March 13, 1986, as restated December 31, 2005, as amended (the "Cohen Trust") previously made a loan in the amount of $2,500,000 (the "Cohen Loan") to S&W Blue Jay Way, LLC ("Borrower") in connection with Borrower's acquisition of certain real property located at 1633 Blue Jay Way, Los Angeles, California (the "Property"), which Cohen Loan is evidenced by that certain Promissory Note Secured By Deed of Trust dated February 26, 2013, in the original principal amount of $2,500,000, executed by Borrower (the "Note"), and which Note is secured by that certain Deed of Trust with Assignment of Rents (Long Form) (the "Cohen Deed of Trust") dated as of March 5, 2013, recorded on March 19, 2013, as Instrument No. 20130411255 in the official records of the Los Angeles County, California.

By signing this conflict waiver, you hereby consent as trustee of the Cohen Family Trust to the following in connection with the Cohen Loan (the "Transaction"):

1. The Cohen Trust will subordinate the lien of the Cohen Deed of Trust to a new senior loan (the "New Senior Loan") in the amount of $3,725,000 (i.e. a $1,500,000.00 increase over the current balance of the existing first lien encumbering the Property) to be obtained from the same lender that provided the previous senior loan by Borrower, which New Senior Loan shall be secured by a deed of trust on the Property (the "Senior Deed of Trust") and shall bear interest at a rate of 9%. The Cohen Trust will execute, and permit Borrower to record, a Subordination Agreement pursuant to which the Cohen Deed of Trust shall be subordinated to the Senior Deed of Trust. As of the date hereof, the outstanding principal balance of the Cohen Loan is $2,150,000 which reflects the pay down of the original principal balance of the Cohen Loan.

2. The Note shall be amended to extend the term of the Cohen Loan so that it is co-terminus with the New Senior Loan. The entire increase in proceeds of the New Senior Loan (after deducting closing costs and expenses (including any origination fee)) will be used to fund development of the Property.

Akin Gump
STRAUSS HAUER & FELD LLP



3. In consideration of the extension of the Cohen Loan's maturity date and the Cohen Trust's agreement to subordinate the Cohen Loan as provided above, Borrower's affiliate, 180 PCH, LLC, shall execute and cause to be recorded a second lien deed of trust (the "Malibu Deed of Trust") in favor of the Cohen Trust on certain real property commonly known as 33386 and 33398 Pacific Coast Highway, Malibu, California to secure the remaining balance of the Cohen Loan. The Malibu Deed of Trust shall be subordinated to that certain Long Form Deed of Trust and Assignment of Rents dated as of December 15, 2015, recorded on January 6, 2016 as Instrument No. 20160011910 in the Official Records securing a loan in the amount of $2,700,000.00.

4. Upon closing of the New Senior Loan, Richard Weintraub and I, who are each indirect owners of Borrower, shall collectively prepay a portion of the Cohen Loan in the amount of $200,000 ($100,000 shall come from me and $100,000 shall come from Richard).

5. This is not a full recitation of all the aspects of the Transaction but is rather a summary of the key terms. The Transaction will be documented in (i) an amendment to the Note, (ii) the Subordination Agreement and (iii) the Malibu Deed of Trust.

The Firm and I advise you that you may want to seek the advice of independent counsel of your choice in connection with the Transaction and this consent and waiver. Please execute the enclosed copy of this letter in the space provided for your respective signature indicating your acknowledgement of, consent to, and waiver of any potential or actual conflicts created by my involvement in the Transaction.

[Signatures on Following Page]

Akin Gump
STRAUSS HAUER & FELD LLP



Sincerely,

Hushmand Sohaili of
Akin Gump Strauss Hauer & Feld LLP

Cohen Family Trust dated March 13, 1986, as
restated December 31, 2005, as amended

________________________________________
Robert Cohen, Trustee

# EXHIBIT "G"

**Subject:** FW: Conflict Waiver
**Attachments:** RC Consent and Waiver 208597158-v2.docx

**From:** Hush Sohaili <hushsohaili@gmail.com>
**Sent:** Friday, April 28, 2017 10:56 AM
**To:** Richard Weintraub <rweintraub@weintraubre.com>
**Subject:** Fwd: Conflict Waiver

FYI.

Sent from my iPhone

Begin forwarded message:

**From:** "Sohaili, Hushmand" <hsohaili@akingump.com>
**Date:** April 28, 2017 at 1:47:03 PM EDT
**To:** Robert Cohen <rcdukespoint@gmail.com>
**Subject: Fwd: Conflict Waiver**

RC this is the conflict waiver and has a short summary of our transaction as required by ethics rules. Please sign and send back with the other documents. Thx

# EXHIBIT “H”

4

651119

**Schedule K-1 (Form 1065)** 2019
Department of the Treasury
Internal Revenue Service
For calendar year 2019, or tax year
beginning ____ ending ____

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

## Partner's Share of Income, Deductions, Credits, etc.

▶ See separate instructions.

### Part I Information About the Partnership

**A** Partnership's employer identification number
46-2018755

**B** Partnership's name, address, city, state, and ZIP code
S & W BLUE JAY WAY, LLC
22837 PACIFIC COAST HIGHWAY #775
MALIBU, CA 90265

**C** IRS Center where partnership filed return ▶
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
56-2320389

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
COHEN FAMILY TRUST
C/O BURTON WAYS HOTEL, LLC
2029 CENTURY PARK EAST, SUITE 2200
LOS ANGELES, CA 90067-3010

**G** ☐ General partner or LLC member-manager ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN ____ Name ____

**I1** What type of entity is this partner? TRUST

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 10.0000000 % | 10.0000000 % |
| Loss | 0.0000000 % | 0.0000000 % |
| Capital | 10.0000000 % | 10.0000000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ 195,000. | $ 195,000. |
| Recourse | $ 0. | $ 0. |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L** Partner's Capital Account Analysis
SEE STATEMENT

| | |
|---|---|
| Beginning capital account | $ |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ |
| Other increase (decrease) (attach explanation) | $ |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 0. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes ☒ No If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning $
Ending $

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | |
|---|---|
| 1 Ordinary business income (loss) | 0. |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4a Guaranteed payments for services | |
| 4b Guaranteed payments for capital | |
| 4c Total guaranteed payments | |
| 5 Interest income | |
| 6a Ordinary dividends | |
| 6b Qualified dividends | |
| 6c Dividend equivalents | |
| 7 Royalties | |
| 8 Net short-term capital gain (loss) | |
| 9a Net long-term capital gain (loss) | |
| 9b Collectibles (28%) gain (loss) | |
| 9c Unrecaptured section 1250 gain | |
| 10 Net section 1231 gain (loss) | |
| 11 Other income (loss) | |
| 12 Section 179 deduction | |
| 13 Other deductions | |
| 14 Self-employment earnings (loss) | |
| 15 Credits | |
| 16 Foreign transactions | |
| 17 Alternative min tax (AMT) items | |
| 18 Tax-exempt income and nondeductible expenses | |
| 19 Distributions | |
| 20 Other information | |

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

DRAFT

S & W BLUE JAY WAY, LLC 46-2018755

SCHEDULE K-1 ITEM L. PARTNER'S CAPITAL ACCOUNT ANALYSIS

TAX BASIS

DRAFT

4

651119

**Schedule K-1 (Form 1065)** **2020**
Department of the Treasury
Internal Revenue Service
For calendar year 2020, or tax year
beginning ______ ending ______

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See separate instructions.

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

## Part I Information About the Partnership

A Partnership's employer identification number
46-2018755

B Partnership's name, address, city, state, and ZIP code
S & W BLUE JAY WAY, LLC
22837 PACIFIC COAST HIGHWAY #775
MALIBU, CA 90265

C IRS Center where partnership filed return ▶
E-FILE

D ☐ Check if this is a publicly traded partnership (PTP)

## Part II Information About the Partner

E Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
***-**-0389

F Name, address, city, state, and ZIP code for partner entered in E. See instructions.
ROBERT & BEVERLY COHEN
2029 CENTURY PARK EAST, SUITE 2200
LOS ANGELES, CA 90067-3010

G ☐ General partner or LLC member-manager [X] Limited partner or other LLC member

H1 [X] Domestic partner ☐ Foreign partner

H2 [X] If the partner is a disregarded entity (DE), enter the partner's:
TIN 56-2320389 Name COHEN FAMILY TRUST C/O

I1 What type of entity is this partner? INDIVIDUAL

I2 If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

J Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 10.0000000 % | 10.0000000 % |
| Loss | 0.0000000 % | 0.0000000 % |
| Capital | 10.0000000 % | 10.0000000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

K Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ 195,000. | $ 195,000. |
| Recourse | $ 0. | $ 0. |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

L **Partner's Capital Account Analysis**
SEE STATEMENT

| | |
|---|---|
| Beginning capital account | $ |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ |
| Other increase (decrease) (attach explanation) | $ |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 0. |

M Did the partner contribute property with a built-in gain or loss?
☐ Yes [X] No If "Yes," attach statement. See instructions.

N **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning $
Ending $

## Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Item | Amount |
|---|---|
| 1 Ordinary business income (loss) | 0. |
| 2 Net rental real estate income (loss) | |
| 3 Other net rental income (loss) | |
| 4a Guaranteed payments for services | |
| 4b Guaranteed payments for capital | |
| 4c Total guaranteed payments | |
| 5 Interest income | |
| 6a Ordinary dividends | |
| 6b Qualified dividends | |
| 6c Dividend equivalents | |
| 7 Royalties | |
| 8 Net short-term capital gain (loss) | |
| 9a Net long-term capital gain (loss) | |
| 9b Collectibles (28%) gain (loss) | |
| 9c Unrecaptured section 1250 gain | |
| 10 Net section 1231 gain (loss) | |
| 11 Other income (loss) | |
| 12 Section 179 deduction | |
| 13 Other deductions | |
| 14 Self-employment earnings (loss) | A 0. |
| 15 Credits | |
| 16 Foreign transactions | |
| 17 Alternative min tax (AMT) items | |
| 18 Tax-exempt income and nondeductible expenses | |
| 19 Distributions | |
| 20 Other information | |

21 ☐ More than one activity for at-risk purposes*
22 ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

SCHEDULE K-1 ITEM L. PARTNER'S CAPITAL ACCOUNT ANALYSIS

BEGINNING CAPITAL ACCOUNT METHOD USED - TAX BASIS

## List of Codes Used in Schedule K-1 (Form 1065)

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to this instruction. |
|---|---|---|
| 1. Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | | |
| | Passive loss | See page 8 |
| | Passive income | Schedule E (Form 1040), line 28, column (h) |
| | Nonpassive loss | See page 8 |
| | Nonpassive income | Schedule E (Form 1040), line 28, column (k) |
| 2. Net rental real estate income (loss) | | See page 8 |
| 3. Other net rental income (loss) | | |
| | Net income | Schedule E (Form 1040), line 28, column (h) |
| | Net loss | See Instructions for Form 8582 |
| 4a. Guaranteed payment Services | | See instructions for Schedule E (Form 1040) |
| 4b. Guaranteed payment Capital | | See instructions for Schedule E (Form 1040) |
| 4c. Guaranteed payment Total | | See page 8 |
| 5. Interest income | | Form 1040 or 1040-SR, line 2b |
| 6a. Ordinary dividends | | Form 1040 or 1040-SR, line 3b |
| 6b. Qualified dividends | | Form 1040 or 1040-SR, line 3a |
| 6c. Dividend equivalents | | See page 9 |
| 7. Royalties | | Schedule E (Form 1040), line 4 |
| 8. Net short-term capital gain (loss) | | Schedule D (Form 1040), line 5 |
| 9a. Net long-term capital gain (loss) | | Schedule D (Form 1040), line 12 |
| 9b. Collectibles (28%) gain (loss) | | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| 9c. Unrecaptured section 1250 gain | | See page 9 |
| 10. Net section 1231 gain (loss) | | See page 9 |
| 11. Other income (loss) | | |
| | Code A. Other portfolio income (loss) | See page 9 |
| | Code B. Involuntary conversions | See page 9 |
| | Code C. Section 1256 contracts & straddles | Form 6781, line 1 |
| | Code D. Mining exploration costs recapture | See Pub. 535 |
| | Code E. Cancellation of debt | See page 9 |
| | Code F. Section 743(b) positive adjustments | See page 10 |
| | Code G. Section 965 inclusion | See page 10 |
| | Code H. Income under subpart F (other than inclusions under section 951A) | See page 10 |
| | Code I. Other income (loss) | See page 10 |
| 12. Section 179 deduction | | See page 11 |
| 13. Other deductions | | |
| | Code A. Cash contributions (60%) | See page 11 |
| | Code B. Cash contributions (30%) | See page 11 |
| | Code C. Noncash contributions (50%) | See page 11 |
| | Code D. Noncash contributions (30%) | See page 11 |
| | Code E. Capital gain property to a 50% organization (30%) | See page 11 |
| | Code F. Capital gain property (20%) | See page 11 |
| | Code G. Contributions (100%) | See page 11 |
| | Code H. Investment interest expense | Form 4952, line 1 |
| | Code I. Deductions - royalty income | Schedule E (Form 1040), line 19 |
| | Code J. Section 59(e)(2) expenditures | See page 12 |
| | Code K. Excess business interest expense | See page 12 |
| | Code L. Deductions - portfolio (other) | Schedule A, line 16 |
| | Code M. Amounts paid for medical insurance | Schedule A, line 1, or Schedule 1 (Form 1040), line 16 |
| | Code N. Educational assistance benefits | See page 12 |
| | Code O. Dependent care benefits | Form 2441, line 12 |
| | Code P. Preproductive period expenses See the Partner's Instructions | See page 12 |
| | Code Q. Commercial revitalization deduction from rental real estate activities | See Form 8582 instructions |
| | Code R. Pensions and IRAs | See page 12 |
| | Code S. Reforestation expense deduction | See page 12 |
| | Codes T through U. Reserved for future use | |
| | Code V. Section 743(b) negative adjustments | See page 12 |
| | Code W. Other deductions | See page 12 |
| | Code X. Section 965(c) deduction | See page 13 |
| Code 14. Self-employment earnings (loss) | | |
| | Note. If you have a section 179 deduction or any partner-level deductions, see page 13 before completing Schedule SE (Form 1040). | |
| | Code A. Net earnings (loss) from self-employment | Schedule SE (Form 1040) |
| | Code B. Gross farming or fishing income | See page 13 |
| | Code C. Gross non-farm income | See page 13 |

## List of Codes Used In Schedule K-1 (Form 1065) (continued)

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to this instruction. |
|---|---|---|
| 15. Credits | | |
| | Code A. Low-income housing credit (section 42(j)(5)) from pre-2008 buildings | See page 13 |
| | Code B. Low-income housing credit (other) from pre-2008 buildings | See page 13 |
| | Code C. Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See page 13 |
| | Code D. Low-income housing credit (other) from post-2007 buildings | See page 13 |
| | Code E. Qualified rehabilitation expenditures (rental real estate) | See page 13 |
| | Code F. Other rental real estate credits | See page 14 |
| | Code G. Other rental credits }See the Partner's Instructions | See page 14 |
| | Code H. Undistributed capital gains credit | Schedule 3 (Form 1040), line 12, box a |
| | Code I. Biofuel producer credit | See page 14 |
| | Code J. Work opportunity credit | See page 14 |
| | Code K. Disabled access credit | See page 14 |
| | Code L. Empowerment zone employment credit | See page 14 |
| | Code M. Credit for increasing research activities | See page 14 |
| | Code N. Credit for employer social security and Medicare taxes | See page 14 |
| | Code O Backup withholding | See page 14 |
| | Code P Other credits | See page 14 |
| 16. Foreign transactions | | |
| | Code A. Name of country or U.S. possession | Form 1116, Part I |
| | Code B. Gross income from all sources | Form 1116, Part I |
| | Code C. Gross income sourced at partner level | Form 1116, Part I |
| | Foreign gross income sourced at partnership level | |
| | Code D. Reserved for future use | |
| | Code E. Foreign branch category | Form 1116, Part I |
| | Code F. Passive category | Form 1116, Part I |
| | Code G. General category | Form 1116, Part I |
| | Code H. Other | Form 1116, Part I |
| | Deductions allocated and apportioned at partner level | |
| | Code I. Interest expense | Form 1116, Part I |
| | Code J. Other | Form 1116, Part I |
| | Deductions allocated and apportioned at partnership level to foreign source income | |
| | Code K. Reserved for future use | |
| | Code L. Foreign branch category | Form 1116, Part I |
| | Code M. Passive category | Form 1116, Part I |
| | Code N. General category | Form 1116, Part I |
| | Code O. Other | Form 1116, Part I |
| | Other information | |
| | Code P. Total foreign taxes paid | Form 1116, Part II |
| | Code Q. Total foreign taxes accrued | Form 1116, Part II |
| | Code R. Reduction in taxes available for credit | Form 1116, line 12 |
| | Code S. Foreign trading gross receipts | Form 8873 |
| | Code T. Extraterritorial income exclusion | Form 8873 |
| | Codes U and V. Reserved for future use | |
| | Code W. Section 965 information | See page 15 |
| | Code X. Other foreign transactions | See page 15 |
| | Codes Y and Z. Reserved for future use | |
| | Code AA. Gross receipts per Regulations 1.59A-7(e)(2)-current year | |
| | Code AB. Gross receipts per Regulations 1.59A-7(e)(2)-first preceding year | |
| | Code AC. Gross receipts per Regulations 1.59A-7(e)(2)-second preceding year | |

## List of Codes Used in Schedule K-1 (Form 1065) (continued)

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to this instruction. |
|---|---|---|
| 16. Foreign transactions (continued) | | |
| | Code AD. Gross receipts per Regulations 1.59A-7(e )(2)-third preceding year | |
| | Code AE. Base erosion tax benefits from base erosion tax payments per Regulations 1.59A-7(d). | |
| | Code AF. Amounts included in the denominator of the base erosion percentage per Regulations 1.59A-2(e)(3)(i) | |
| | Code AG. Section 951A (GILTI) information | |
| | Code AH. Foreign-derived intangible income (FDII) information | |
| | Code AI. Section 864(c)(8) foreign partner's distributive share of the deemed sale items on transfer of partnership interest | |
| 17. Alternative minimum tax (AMT) items | | |
| | Code A. Post-1986 depreciation adjustment | See Instructions for Form 6251 |
| | Code B. Adjusted gain or loss | See Instructions for Form 6251 |
| | Code C. Depletion (other than oil & gas) | See Instructions for Form 6251 |
| | Code D. Oil, gas, and geothermal - gross income | See Instructions for Form 6251 |
| | Code E. Oil, gas, and geothermal - deductions | See Instructions for Form 6251 |
| | Code F. Other AMT items | See Instructions for Form 6251 |
| 18. Tax-exempt income and nondeductible expenses | | |
| | Code A. Tax-exempt interest income | Form 1040 or 1040-SR, line 2a |
| | Code B. Other tax-exempt income | See page 15 |
| | Code C. Nondeductible expenses | See page 15 |
| 19. Distributions | | |
| | Code A. Cash and marketable securities | See page 15 |
| | Code B. Distribution subject to section 737 | See page 16 |
| | Code C. Other property | See page 16 |
| 20. Other information | | |
| | Code A. Investment income | Form 4952, line 4a |
| | Code B. Investment expenses | Form 4952, line 5 |
| | Code C. Fuel tax credit information | Form 4136 |
| | Code D. Qualified rehabilitation expenditures (other than rental real estate) | See page 16 |
| | Code E. Basis of energy property | See page 16 |
| | Code F. Recapture of low-income housing credit for section 42(j)(5) partnerships | See page 16 |
| | Code G. Recapture of low-income housing credit for other partnerships | See page 16 |
| | Code H. Recapture of investment credit | See Form 4255 |
| | Code I. Recapture of other credits | See page 16 |
| | Code J. Look-back interest-completed long-term contracts | See Form 8697 |
| | Code K. Look-back interest-income forecast method | See Form 8866 |
| | Code L. Dispositions of property with section 179 deductions | See page 17 |
| | Code M. Recapture of section 179 deduction | See page 17 |
| | Code N. Business interest expense (information item) | See page 17 |
| | Code O. Section 453(l)(3) information | Sch. 2 (Form 1040), line 8 |
| | Code P. Section 453A(c) information | Sch. 2 (Form 1040), line 8 |
| | Code Q. Section 1260(b) information | Sch. 2 (Form 1040), line 8 |
| | Code R. Interest allocable to production expenditures | See Regulations sections 1.263A-8 through -15 |
| | Code S. Capital construction fund (CCF) nonqualified withdrawals | Sch. 2 (Form 1040), line 10 |
| | Code T. Depletion deduction | See Pub. 535 |
| | Code U. Reserved for future use | |
| | Code V. Unrelated business taxable income | See page 18 |

## List of Codes Used in Schedule K-1 (Form 1065) (continued)

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to this instruction. |
|---|---|---|
| 20. Other information (continued) | | |
| | Code W. Precontribution gain (loss) | Form 8949 and/or Schedule D (Form 1040); or Form 4797 |
| | Code Y. Net investment income | See Instructions for Form 8960 |
| | Code Z. Section 199A information | Form 8995 or Form 8995-A |
| | Code AA. Section 704(c) information | See page 18 |
| | Code AB. Section 751 gain (loss) | See page 18 |
| | Code AC. Section 1(h)(5) gain (loss) | See page 19 |
| | Code AD. Deemed section 1250 unrecaptured gain | See page 19 |
| | Code AE. Excess taxable income | See Instructions for Form 8990 |
| | Code AF. Excess business interest income | See page 19 |
| | Code AG. Gross receipts for section 448(c) | See page 19 |
| | Code AH. Other information | See page 19 |

TAXABLE YEAR 2020

# Member's Share of Income, Deductions, Credits, etc.

029421 12-15-20
CALIFORNIA SCHEDULE
**K-1 (568)**

TYB 01-01-2020 TYE 12-31-2020
***-**-0389
ROBERTBEVER COHEN

2029 CENTURY PARK EAST SUITE 2
LOS ANGELES CA 90067-3010

46-2018755 201302910285
S & W BLUE JAY WAY LLC

22837 PACIFIC COAST HIGHWAY 77
MALIBU CA 90265

**A** What type of entity is this member? • See instructions.

(1) [X] Individual (4) [ ] C Corporation (7) [ ] LLP (10) [ ] Exempt Organization
(2) [ ] S Corporation (5) [ ] General Partnership (8) [ ] LLC (11) [ ] Disregarded Entity
(3) [ ] Estate/Trust (6) [ ] Limited Partnership (9) [ ] IRA/Keogh/SEP

**B** Is this member a foreign member? • [ ] Yes [X] No

**C** Enter member's percentage (without regard to special allocations) of:

| | (i) Beginning | (ii) Ending |
|---|---|---|
| Profit | 10.0000 % | • 10.0000 % |
| Loss | 0.0000 % | • 0.0000 % |
| Capital | 10.0000 % | • 10.0000 % |

**D** Member's share of liabilities:

| | (i) Beginning | (ii) Ending |
|---|---|---|
| Nonrecourse | $ .00 | • $ .00 |
| Qualified nonrecourse financing | $ 195,000 .00 | • $ 195,000 .00 |
| Recourse | $ 0 .00 | • $ 0 .00 |

**E** Reportable transaction or tax shelter registration number(s)

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) • [ ]

(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) • [ ]

**G** Check here if this is: • (1) [ ] A final Schedule K-1 (568) (2) [ ] An amended Schedule K-1 (568)

**H** Is this member a resident of California? • [X] Yes ▶ [ ] No

4

029422 12-15-20

Member's name: ROBERT & BEVERLY COHEN

Member's identifying number: ***-**-0389

I Analysis of member's capital account: Check the box • (1) [X] Tax Basis (2) [ ] GAAP (3) [ ] IRC Section 704(b) Book (4) [ ] Other (explain)

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Member's share of line 3, line 4, and line 7 Form 568, Schedule M-2 | (d) Withdrawals and distributions | (e) Capital account at end of year, combine column (a) through column (d) |
|---|---|---|---|---|
| • | • | • | • ( ) | • 0 |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | | | • | ▶ |
| | 2 Net income (loss) from rental real estate activities | | | • | ▶ |
| | 3 Net income (loss) from other rental activities | | | • | • |
| | 4 Guaranteed payments to members | | | • | ▶ |
| | 5 Interest income | | | • | ▶ |
| | 6 Dividends | | | • | ▶ |
| | 7 Royalties | | | • | ▶ |
| | 8 Net short-term capital gain (loss) | | | • | ▶ |
| | 9 Net long-term capital gain (loss) | | | • | ▶ |
| | 10 a Total gain under IRC Section 1231 (other than due to casualty or theft) | | | • | ▶ |
| | b Total loss under IRC Section 1231 (other than due to casualty or theft) | | | • | ▶ |
| | 11 a Other portfolio income (loss). Attach schedule | | | • | ▶ |
| | b Total other income | | | • | ▶ |
| | c Total other loss | | | • | ▶ |
| Deductions | 12 Expense deduction for recovery prop. (IRC Section 179) | | | | |
| | 13 a Charitable contributions | | | | |
| | b Investment interest expense | | | | |
| | c 1 Total expenditures to which an IRC Section 59(e) election may apply | | | | |
| | 2 Type of expenditures | | | | |
| | d Deductions related to portfolio income | | | | |
| | e Other deductions | | | | |

4

029423 12-15-20

Member's name: ROBERT & BEVERLY COHEN

Member's identifying number: ***-**-0389

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Credits | 15 a Total withholding (equals amount on Form 592-B if calendar year LLC) | | | • | ▶ |
| | b Low-income housing credit | | | | |
| | c Credits other than line 15b related to rental real estate activities | | | | |
| | d Credits related to other rental activities | | | | |
| | e Nonconsenting nonresident member's tax paid by LLC | | | | |
| | f Other credits - Attach required schedules or statements | | | | |
| Alternative Minimum Tax (AMT) Items | 17 a Depreciation adjustment on property placed in service after 1986 | | | | |
| | b Adjusted gain or loss | | | | |
| | c Depletion (other than oil & gas) | | | | |
| | d Gross income from oil, gas, and geothermal properties | | | | |
| | e Deductions allocable to oil, gas, and geothermal properties | | | | |
| | f Other alternative minimum tax items | | | | |
| Tax-exempt Income and Nondeductible Expenses | 18 a Tax-exempt interest income | | | | |
| | b Other tax-exempt income | | | | |
| | c Nondeductible expenses | | | | |
| Distributions | 19 a Distributions of money (cash and marketable securities) | | | | |
| | b Distributions of property other than money | | | | |
| Other Information | 20 a Investment income | | | | |
| | b Investment expenses | | | | |
| | c Other information. See instructions | STMT | | | |

029424 12-15-20

| Member's name | Member's identifying number |
|---|---|
| ROBERT & BEVERLY COHEN | ***-**-0389 |

**Other Member Information**

**Table 1** - Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest | $ | Sec. 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
| Dividends | $ | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY - See instructions.

**Table 2** - Member's share of distributive items.

A. Member's share of the LLC's business income. See instructions. $

B. Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ | Rents/Royalties | $ |
| Sec. 1231 Gains/Losses | $ | Other | $ |

C. Member's distributive share of the LLC's property, payroll, and sales:

| **Factors** | **Total within and outside California** | **Total within California** |
|---|---|---|
| Property: Beginning | $ | $ |
| Property: Ending | $ | $ |
| Property: Annual rent expense | $ | $ |
| Payroll | $ | $ |
| Sales | $ | $ |

S & W BLUE JAY WAY, LLC 46-2018755

CA SCHEDULE K-1 OTHER INFORMATION

| DESCRIPTION | AMOUNT |
| --- | --- |
| PRIOR 3 YEARS' AVERAGE GROSS RECEIPTS UNDER SECTION 448(C) | |
| ADJUSTED TAXABLE INCOME (LOSS) | |

4

651121

**Schedule K-1 (Form 1065)** **2021**
Department of the Treasury
Internal Revenue Service

For calendar year 2021, or tax year beginning ____ ending ____

☐ Final K-1 ☐ Amended K-1 OMB No. 1545-0123

## Partner's Share of Income, Deductions, Credits, etc.

▶ See separate instructions.

### Part I Information About the Partnership

**A** Partnership's employer identification number
46-2018755

**B** Partnership's name, address, city, state, and ZIP code
S & W BLUE JAY WAY, LLC
22837 PACIFIC COAST HIGHWAY #775
MALIBU, CA 90265

**C** IRS center where partnership filed return ▶
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
***-**-0389

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.
ROBERT & BEVERLY COHEN
2029 CENTURY PARK EAST, SUITE 2200
LOS ANGELES, CA 90067-3010

**G** ☐ General partner or LLC member-manager ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner ☐ Foreign partner

**H2** ☒ If the partner is a disregarded entity (DE), enter the partner's:
TIN 56-2320389 Name COHEN FAMILY TRUST C/O

**I1** What type of entity is this partner? INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ▶ ☐

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 10.0000000 % | 10.0000000 % |
| Loss | 0.0000000 % | 0.0000000 % |
| Capital | 10.0000000 % | 10.0000000 % |

Check if decrease is due to sale or exchange of partnership interest ▶ ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ | $ |
| Qualified nonrecourse financing | $ 195,000. | $ 195,000. |
| Recourse | $ 0. | $ 0. |

Check this box if Item K includes liability amounts from lower tier partnerships ▶ ☐

**L** **Partner's Capital Account Analysis**

| | |
|---|---|
| Beginning capital account | $ |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ |
| Other increase (decrease) (attach explanation) | $ |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 0. |

**M** Did the partner contribute property with a built-in gain (loss)?
☐ Yes ☒ No If "Yes," attach statement. See instructions.

**N** **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning $
Ending $

### Part III Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| Line | Item | Amount |
|---|---|---|
| 1 | Ordinary business income (loss) | 0. |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | |
| 4c | Total guaranteed payments | |
| 5 | Interest income | |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | |
| 6c | Dividend equivalents | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| 14 | Self-employment earnings (loss) | A 0. |
| 15 | Credits | |
| 16 | Schedule K-3 is attached if checked ▶ ☐ | |
| 17 | Alternative min tax (AMT) items | |
| 18 | Tax-exempt income and nondeductible expenses | |
| 19 | Distributions | |
| 20 | Other information | |
| 21 | Foreign taxes paid or accrued | |

**22** ☐ More than one activity for at-risk purposes*
**23** ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

## List of Codes and References Used in Schedule K-1 (Form 1065)

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to these instructions. |
|---|---|---|
| 1. Ordinary business income (loss). Determine whether the income (loss) is passive or nonpassive and enter on your return as follows. | | |
| | Passive loss | See page 8 |
| | Passive income | Schedule E (Form 1040), line 28, column (h) |
| | Nonpassive loss | See page 8 |
| | Nonpassive income | Schedule E (Form 1040), line 28, column (k) |
| 2. Net rental real estate income (loss) | | See page 8 |
| 3. Other net rental income (loss) | | |
| | Net income | Schedule E (Form 1040), line 28, column (h) |
| | Net loss | See Instructions for Form 8582 |
| 4a. Guaranteed payment services | | See Instructions for Schedule E (Form 1040) |
| 4b. Guaranteed payment capital | | See Instructions for Schedule E (Form 1040) |
| 4c. Guaranteed payment total | | See page 8 |
| 5. Interest income | | Form 1040 or 1040-SR, line 2b |
| 6a. Ordinary dividends | | Form 1040 or 1040-SR, line 3b |
| 6b. Qualified dividends | | Form 1040 or 1040-SR, line 3a |
| 6c. Dividend equivalents | | See page 9 |
| 7. Royalties | | Schedule E (Form 1040), line 4 |
| 8. Net short-term capital gain (loss) | | Schedule D (Form 1040), line 5 |
| 9a. Net long-term capital gain (loss) | | Schedule D (Form 1040), line 12 |
| 9b. Collectibles (28%) gain (loss) | | 28% Rate Gain Worksheet, line 4 (Schedule D instructions) |
| 9c. Unrecaptured section 1250 gain | | See page 9 |
| 10. Net section 1231 gain (loss) | | See page 9 |
| 11. Other income (loss) | | |
| | Code A. Other portfolio income (loss) | See page 9 |
| | Code B. Involuntary conversions | See page 9 |
| | Code C. Section 1256 contracts & straddles | Form 6781, line 1 |
| | Code D. Mining exploration costs recapture | See Pub. 535 |
| | Code E. Cancellation of debt | See page 10 |
| | Code F. Section 743(b) positive adjustments | See page 10 |
| | Code G. Reserved for future use | |
| | Code H. Section 951(a) income inclusions | See page 10 |
| | Code I. Other income (loss) | See page 10 |
| 12. Section 179 deduction | | See page 11 |
| 13. Other deductions | | |
| | Code A. Cash contributions (60%) | See page 11 |
| | Code B. Cash contributions (30%) | See page 11 |
| | Code C. Noncash contributions (50%) | See page 11 |
| | Code D. Noncash contributions (30%) | See page 12 |
| | Code E. Capital gain property to a 50% organization (30%) | See page 12 |
| | Code F. Capital gain property (20%) | See page 12 |
| | Code G. Contributions (100%) | See page 12 |
| | Code H. Investment interest expense | Form 4952, line 1 |
| | Code I. Deductions - royalty income | Schedule E (Form 1040), line 19 |
| | Code J. Section 59(e)(2) expenditures | See page 12 |
| | Code K. Excess business interest expense | See page 12 |
| | Code L. Deductions - portfolio income (other) | Schedule A (Form 1040), line 16 |
| | Code M. Amounts paid for medical insurance | Schedule A (Form 1040), line 1; or Schedule 1 (Form 1040), line 17 |
| | Code N. Educational assistance benefits | See page 12 |
| | Code O. Dependent care benefits | Form 2441, line 12 |
| | Code P. Preproductive period expenses | See page 12 |
| | Code Q. Reserved for future use | |
| | Code R. Pensions and IRAs | See page 12 |
| | Code S. Reforestation expense deduction | See page 13 |
| | Codes T through U. Reserved for future use | |
| | Code V. Section 743(b) negative adjustments | See page 13 |
| | Code W. Other deductions | See page 13 |
| 14. Self-employment earnings (loss) | | |
| | **Note.** If you have a section 179 deduction or any partner-level deductions, see page 13 before completing Schedule SE (Form 1040). | |
| | Code A. Net earnings (loss) from self-employment | Schedule SE (Form 1040) |
| | Code B. Gross farming or fishing income | See page 13 |

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to these instructions. |
|---|---|---|
| 15. Credits | | |
| | Code A. Reserved for future use | |
| | Code B. Reserved for future use | |
| | Code C. Low-income housing credit (section 42(j)(5)) from post-2007 buildings | See page 13 |
| | Code D. Low-income housing credit (other) from post-2007 buildings | See page 13 |
| | Code E. Qualified rehabilitation expenditures (rental real estate) | See page 14 |
| | Code F. Other rental real estate credits | See page 14 |
| | Code G. Other rental credits | See page 14 |
| | Code H. Undistributed capital gains credit | Schedule 3 (Form 1040), line 13a |
| | Code I. Biofuel producer credit | See page 14 |
| | Code J. Work opportunity credit | See page 14 |
| | Code K. Disabled access credit | See page 14 |
| | Code L. Empowerment zone employment credit | See page 14 |
| | Code M. Credit for increasing research activities | See page 14 |
| | Code N. Credit for employer social security and Medicare taxes | See page 14 |
| | Code O. Backup withholding | See page 14 |
| | Code P. Other credits | See page 14 |
| 17. Alternative minimum tax (AMT) items | | |
| | Code A. Post-1986 depreciation adjustment | See Instructions for Form 6251 |
| | Code B. Adjusted gain or loss | See Instructions for Form 6251 |
| | Code C. Depletion (other than oil & gas) | See Instructions for Form 6251 |
| | Code D. Oil, gas, and geothermal - gross income | See Instructions for Form 6251 |
| | Code E. Oil, gas, and geothermal - deductions | See Instructions for Form 6251 |
| | Code F. Other AMT items | See Instructions for Form 6251 |
| 18. Tax-exempt income and nondeductible expenses | | |
| | Code A. Tax-exempt interest income | Form 1040 or 1040-SR, line 2a |
| | Code B. Other tax-exempt income | See page 15 |
| | Code C. Nondeductible expenses | See page 15 |
| 19. Distributions | | |
| | Code A. Cash and marketable securities | See page 15 |
| | Code B. Distribution subject to section 737 | See page 15 |
| | Code C. Other property | See page 15 |
| 20. Other information | | |
| | Code A. Investment income | Form 4952, line 4a |
| | Code B. Investment expenses | Form 4952, line 5 |
| | Code C. Fuel tax credit information | Form 4136 |
| | Code D. Qualified rehabilitation expenditures (other than rental real estate) | See page 16 |
| | Code E. Basis of energy property | See page 16 |
| | Code F. Recapture of low-income housing credit for section 42(j)(5) partnerships | See page 16 |
| | Code G. Recapture of low-income housing credit for other partnerships | See page 16 |
| | Code H. Recapture of investment credit | See Form 4255 |
| | Code I. Recapture of other credits | See page 16 |
| | Code J. Look-back interest-completed long-term contracts | See Form 8697 |
| | Code K. Look-back interest-income forecast method | See Form 8866 |
| | Code L. Dispositions of property with section 179 deductions | See page 16 |
| | Code M. Recapture of section 179 deduction | See page 16 |
| | Code N. Business interest expense (information item) | See page 16 |
| | Code O. Section 453(l)(3) information | Schedule 2 (Form 1040), line 14 |
| | Code P. Section 453A(c) information | Schedule 2 (Form 1040), line 15 |
| | Code Q. Section 1260(b) information | Schedule 2 (Form 1040), line 17z |
| | Code R. Interest allocable to production expenditures | See Regulations sections 1.263A-8 through -15 |
| | Code S. Capital construction fund (CCF) nonqualified withdrawals | Schedule 2 (Form 1040), line 17z |
| | Code T. Depletion deduction | See Pub. 535 |
| | Code U. Section 743(b) basis adjustment | See page 17 |
| | Code V. Unrelated business taxable income | See page 17 |
| | Code W. Precontribution gain (loss) | Form 8949 and/or Schedule D (Form 1040); or Form 4797 |
| | Code X. Reserved for future use | |
| | Code Y. Net investment income | See Instructions for Form 8960 |

| Box Number / Item | | Where to report or where to find further reporting information. Page numbers refer to these instructions. |
|---|---|---|
| | Code Z. Section 199A information | Form 8995 or Form 8995-A |
| | Code AA. Section 704(c) information | See page 18 |
| | Code AB. Section 751 gain (loss) | See page 18 |
| | Code AC. Section 1(h)(5) gain (loss) | See page 18 |
| | Code AD. Deemed section 1250 unrecaptured gain | See page 18 |
| | Code AE. Excess taxable income | See Instructions for Form 8990 |
| | Code AF. Excess business interest income | See page 18 |
| | Code AG. Gross receipts for section 448(c) | See page 18 |
| | Code AH. Other information | See page 18 |
| 21. Foreign taxes paid or accrued | | See page 19 |

4

TAXABLE YEAR 2021

# Member's Share of Income, Deductions, Credits, etc.

129421 12-27-21
CALIFORNIA SCHEDULE
**K-1 (568)**

TYB 01-01-2021 TYE 12-31-2021
***-**-0389
ROBERTBEVER COHEN

2029 CENTURY PARK EAST SUITE 2
LOS ANGELES CA 90067-3010

46-2018755 201302910285
S & W BLUE JAY WAY LLC

22837 PACIFIC COAST HIGHWAY 77
MALIBU CA 90265

**A** What type of entity is this member? • See instructions.

(1) [X] Individual (4) [ ] C Corporation (7) [ ] LLP (10) [ ] Exempt Organization
(2) [ ] S Corporation (5) [ ] General Partnership (8) [ ] LLC (11a) [ ] Disregarded Entity (DE)
(11b) DE owner's name
(3) [ ] Estate/Trust (6) [ ] Limited Partnership (9) [ ] IRA/Keogh/SEP (11c) DE owner's TIN

**B** Is this member a foreign member? • [ ] Yes [X] No

**C** Enter member's percentage (without regard to special allocations) of:

| | (i) Beginning | (ii) Ending |
|---|---|---|
| Profit | 10.0000 % | • 10.0000 % |
| Loss | 0.0000 % | • 0.0000 % |
| Capital | 10.0000 % | • 10.0000 % |

Check the box if decrease is due to sale or exchange of LLC interest [ ]

**D** Member's share of liabilities:

| | (i) Beginning | (ii) Ending |
|---|---|---|
| Nonrecourse | $ .00 | • $ .00 |
| Qualified nonrecourse financing | $ 195,000.00 | • $ 195,000.00 |
| Recourse | $ 0.00 | • $ 0.00 |

Check the box if Item D includes liability amounts from lower tier LLCs [ ]

**E** Reportable transaction or tax shelter registration number(s)

**F** (1) Check here if this is a publicly traded partnership as defined in IRC Section 469(k)(2) • [ ]

(2) Check here if this is an investment partnership (R&TC Sections 17955 and 23040.1) • [ ]

4

129422 01-26-22

| Member's name | Member's identifying number |
|---|---|
| ROBERT & BEVERLY COHEN | ***-**-0389 |

G Check here if this is: • (1) ☐ A final Schedule K-1 (568) (2) ☐ An amended Schedule K-1 (568)

H Is this member a resident of California? • ☒ Yes ▶ ☐ No

I Did this member contribute property with a built-in gain or loss? If "Yes" attach statement. See instructions ☐ Yes ☒ No

J Member's share of net unrecognized IRC Section 704(c) gain or (loss) (i) Beginning ______ (ii) Ending ______

K Analysis of member's **tax basis** capital account.

| (a) Capital account at beginning of year | (b) Capital contributed during year | (c) Current year net income (loss) | (d) Other increase (decrease) (attach explanation) | (e) Withdrawals and distributions | (f) Capital account at end of year, combine column (a) through column (e) |
|---|---|---|---|---|---|
| • | • | • | | • ( ) | • 0 |

**Caution:** Refer to Member's Instructions for Schedule K-1 (568) before entering information from this schedule on your California return.

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (Form 1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities | | | • | ▶ |
| | 2 Net income (loss) from rental real estate activities | | | • | ▶ |
| | 3 Net income (loss) from other rental activities | | | • | • |
| | 4 a Guaranteed payments for services | | | | |
| | 4 b Guaranteed payments for capital | | | | |
| | 4 c Total guaranteed payments | | | • | ▶ |
| | 5 Interest income | | | • | ▶ |
| | 6 Dividends | | | • | ▶ |
| | 7 Royalties | | | • | ▶ |
| | 8 Net short-term capital gain (loss) | | | • | ▶ |
| | 9 Net long-term capital gain (loss) | | | • | ▶ |
| | 10 a Total gain under IRC Section 1231 (other than due to casualty or theft) | | | • | ▶ |
| | b Total loss under IRC Section 1231 (other than due to casualty or theft) | | | • | ▶ |
| | 11 a Other portfolio income (loss). Attach schedule | | | • | ▶ |
| | b Total other income | | | • | ▶ |
| | c Total other loss | | | • | ▶ |

129423 01-25-22

Member's name: ROBERT & BEVERLY COHEN

Member's identifying number: ***-**-0389

| | (a) Distributive share items | (b) Amounts from federal Schedule K-1 (Form 1065) | (c) California adjustments | (d) Total amounts using California law. Combine col. (b) and col. (c) | (e) California source amounts and credits |
|---|---|---|---|---|---|
| Deductions | 12 Expense deduction for recovery prop. (IRC Section 179) | | | | |
| | 13 a Charitable contributions | | | | |
| | b Investment interest expense | | | | |
| | c 1 Total expenditures to which an IRC Section 59(e) election may apply | | | | |
| | 2 Type of expenditures | | | | |
| | d Deductions related to portfolio income | | | | |
| | e Other deductions | | | | |
| Credits | 15 a Total withholding (equals amount on Form 592-B if calendar year LLC) | | | • | ▶ |
| | b Low-income housing credit | | | | |
| | c Credits other than line 15b related to rental real estate activities | | | | |
| | d Credits related to other rental activities | | | | |
| | e Nonconsenting nonresident members' tax paid by LLC | | | | |
| | f Other credits - Attach required schedules or statements | | | | |
| Alternative Minimum Tax (AMT) Items | 17 a Depreciation adjustment on property placed in service after 1986 | | | ◉ | ◉ |
| | b Adjusted gain or loss | | | | |
| | c Depletion (other than oil & gas) | | | | |
| | d Gross income from oil, gas, and geothermal properties | | | | |
| | e Deductions allocable to oil, gas, and geothermal properties | | | | |
| | f Other alternative minimum tax items | | | | |
| Tax-exempt Income and Nondeductible Expenses | 18 a Tax-exempt interest income | | | | |
| | b Other tax-exempt income | | | | |
| | c Nondeductible expenses | | | | |
| Distributions | 19 a Distributions of money (cash and marketable securities) | | | ◉ | |
| | b Distributions of property other than money | | | ◉ | |
| Other Information | 20 a Investment income | | | | |
| | b Investment expenses | | | | |
| | c Other information. See instructions | | | | |

21 ☐ More than one activity for at-risk purposes. See instructions.

22 ☐ More than one activity for passive activity purposes. See instructions.

4

129424 12-27-21

| Member's name | Member's identifying number |
|---|---|
| ROBERT & BEVERLY COHEN | ***-**-0389 |

**Other Member Information**

**Table 1** - Member's share of nonbusiness income from intangibles (source of income is dependent on residence or commercial domicile of the member):

| | | | | | |
|---|---|---|---|---|---|
| Interest ... | $ | Sec. 1231 Gains/Losses | $ | Capital Gains/Losses | $ |
| Dividends | $ | Royalties | $ | Other | $ |

FOR USE BY MEMBERS ONLY - See instructions.

**Table 2** - Member's share of distributive items.

A. Member's share of the LLC's business income. See instructions. $

B. Member's share of nonbusiness income from real and tangible personal property sourced or allocable to California.

| | | | |
|---|---|---|---|
| Capital Gains/Losses | $ | Rents/Royalties | $ |
| Sec. 1231 Gains/Losses | $ | Other | $ |

C. Member's distributive share of the LLC's property, payroll, and sales:

| **Factors** | **Total within and outside California** | **Total within California** |
|---|---|---|
| Property: Beginning | $ | $ |
| Property: Ending | $ | $ |
| Property: Annual rent expense | $ | $ |
| Payroll | $ | $ |
| Sales | $ | $ |

# EXHIBIT "I"

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ID | Date | Tkpr | TKPR Name | Client | Matter | Bs Hrs | Bl Hrs | Std Amt |
| 2 | 2440941 | 7/1/1998 | 7114 | KOEN, ROBERT G | 120105 | 1 | 0.3 | 0.3 | $127.50 |
| 3 | 2440943 | 7/1/1998 | 7114 | KOEN, ROBERT G | 120105 | 1 | -0.3 | -0.3 | ($127.50) |
| 4 | 2440942 | 7/6/1998 | 7114 | KOEN, ROBERT G | 120105 | 1 | 0.3 | 0.3 | $127.50 |
| 5 | 2440944 | 7/6/1998 | 7114 | KOEN, ROBERT G | 120105 | 1 | -0.3 | -0.3 | ($127.50) |
| 6 | 2440946 | 11/8/1999 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $375.00 |
| 7 | 2440945 | 11/9/1999 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $375.00 |
| 8 | 2440947 | 11/10/1999 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $187.50 |
| 9 | 2440948 | 11/10/1999 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 2.25 | 2.25 | $843.75 |
| 10 | 2572809 | 12/15/1999 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $375.00 |
| 11 | 2645297 | 2/7/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $395.00 |
| 12 | 2645298 | 2/16/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $395.00 |
| 13 | 2869428 | 3/9/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $197.50 |
| 14 | 2869429 | 3/9/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | -0.5 | -0.5 | ($197.50) |
| 15 | 2869430 | 3/9/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $197.50 |
| 16 | 2784675 | 3/10/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $197.50 |
| 17 | 2784676 | 3/13/2000 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $296.25 |
| 18 | 4068340 | 4/12/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $341.25 |
| 19 | 4569245 | 9/18/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1 | 1 | $400.00 |
| 20 | 4569246 | 9/19/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $227.50 |
| 21 | 4569247 | 9/19/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.2 | 1.2 | $480.00 |
| 22 | 4569248 | 9/28/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.25 | 1.25 | $500.00 |
| 23 | 4770842 | 11/6/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 2 | 2 | $800.00 |
| 24 | 4770845 | 11/6/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 2.25 | 2.25 | $1,023.75 |
| 25 | 4770846 | 11/6/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $227.50 |
| 26 | 4770843 | 11/7/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 2 | 2 | $800.00 |
| 27 | 4770847 | 11/7/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 2 | 2 | $910.00 |
| 28 | 4770840 | 11/8/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.5 | 1.5 | $682.50 |
| 29 | 4770841 | 11/15/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $341.25 |
| 30 | 4770844 | 11/16/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $341.25 |
| 31 | 4891753 | 11/27/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.25 | 1.25 | $568.75 |
| 32 | 4891758 | 11/27/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | -1.25 | -1.25 | ($568.75) |
| 33 | 4891764 | 11/27/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.25 | 1.25 | $568.75 |

| | J | K | L |
|---|---|---|---|
| 1 | Base Amt | Billed Amt | Wip Wo |
| 2 | $127.50 | $127.50 | $0.00 |
| 3 | ($127.50) | ($127.50) | $0.00 |
| 4 | $127.50 | $127.50 | $0.00 |
| 5 | ($127.50) | ($127.50) | $0.00 |
| 6 | $405.00 | $405.00 | $0.00 |
| 7 | $405.00 | $405.00 | $0.00 |
| 8 | $202.50 | $202.50 | $0.00 |
| 9 | $911.25 | $911.25 | $0.00 |
| 10 | $405.00 | $405.00 | $0.00 |
| 11 | $405.00 | $405.00 | $0.00 |
| 12 | $405.00 | $405.00 | $0.00 |
| 13 | $202.50 | $202.50 | $0.00 |
| 14 | ($202.50) | ($202.50) | $0.00 |
| 15 | $212.50 | $212.50 | $0.00 |
| 16 | $202.50 | $202.50 | $0.00 |
| 17 | $303.75 | $303.75 | $0.00 |
| 18 | $318.75 | $318.75 | $0.00 |
| 19 | $400.00 | $400.00 | $0.00 |
| 20 | $212.50 | $212.50 | $0.00 |
| 21 | $480.00 | $480.00 | $0.00 |
| 22 | $500.00 | $500.00 | $0.00 |
| 23 | $800.00 | $800.00 | $0.00 |
| 24 | $956.25 | $1,023.75 | $67.50 |
| 25 | $212.50 | $227.50 | $15.00 |
| 26 | $800.00 | $800.00 | $0.00 |
| 27 | $850.00 | $910.00 | $60.00 |
| 28 | $637.50 | $682.50 | $45.00 |
| 29 | $318.75 | $341.25 | $22.50 |
| 30 | $318.75 | $341.25 | $22.50 |
| 31 | $531.25 | $531.25 | $0.00 |
| 32 | ($531.25) | ($531.25) | $0.00 |
| 33 | $531.25 | $593.75 | $62.50 |

| | M |
|---|---|
| 1 | Narrative |
| 2 | Telephone conferences regarding debt. |
| 3 | BACK OUT |
| 4 | Discussion. |
| 5 | BACK OUT |
| 6 | Review and follow up with respect to various aspects of proposed investment; review offering materials; telephone conference with Robert Cohen. |
| 7 | Review and follow up re investigation of potential investment for Robert Cohen. |
| 8 | Finalize letter response. |
| 9 | Work on Xyleco project; review and follow up ; various telephone conferences with Robert Cohen; draft letter response. |
| 10 | Deal with setting up partnership entity; review and follow up. |
| 11 | Review and analysis corporate securities issues on transfer of stock for boat. |
| 12 | Work on miscellaneous items re sale of Piazz; review and follow up. |
| 13 | Check with Xyleco lawyer; telephone conference with Robert Cohen. |
| 14 | BACK OUT |
| 15 | Check with Xyleco lawyer; telephone conference with Robert Cohen. |
| 16 | Respond to do current request for Xelyco lawyer; telephone conference with Robert Cohen. |
| 17 | Respond to e-mail re additional documents; telephone conference with Robert Cohen. |
| 18 | Telephone conference with Bob Schenkman re property tax triggered by Kelvin transfer to American Real Property; follow up with tax lawyer; review |
| 19 | Conference with Hush Sohaili; telephone call and review of agreements regarding property tax savings, guaranteed payment in LLC regarding exchan |
| 20 | Telephone conference with Ernie; follow up with issues raised on OP units; conference with Tony. |
| 21 | Correspondence and conference with Hush Sohaili regarding contract clauses in LLC regarding mechanics of distribution allocations. |
| 22 | Review documents; telephone call with Ed Israel regarding LLC tax issues. |
| 23 | Review files and telephone calls regarding analysis of documents and issues. |
| 24 | Review and analysis re property tax issues on Costa Mesa; follow up with R.C. and Ernie; conference with Tony; review and analysis. |
| 25 | Telephone conference with R.C. re what needs to be done. follow up re Partnership Agreement provisions; analysis. |
| 26 | Review files and telephone calls regarding analysis of documents and issues. |
| 27 | Various follow up with Ernie and R.C. re how the ISCO/Costa Mesa transaction; review the Second Amendment to Isco; telephone conference with T |
| 28 | Deal with costa Mesa issues; review and follow up; analysis other terms of structure and deal; deal with how Zand buy-out worked; follow up with E |
| 29 | Telephone conference with Ernie re letter; follow up with RC; review letter proposed to Ed. |
| 30 | Review and follow up with RC re issues on Costa Mesa split up. |
| 31 | Meet with Eddie and RC re Costa Mesa - issues and potential solutions; review and analysis. |
| 32 | BACK OUT |
| 33 | Meet with Eddie and RC re Costa Mesa - issues and potential solutions; review and analysis. |

| | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Client Name | Matter Name | Parent | Parent Name | Period | Post Date | Offc | Dept | Rank Code |
| 2 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199807 | 7/6/1998 | NY | RE | 100 |
| 3 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199808 | 8/31/1998 | NY | RE | 100 |
| 4 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199807 | 7/17/1998 | NY | RE | 100 |
| 5 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199808 | 8/31/1998 | NY | RE | 100 |
| 6 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199911 | 11/16/1999 | LA | RE | 100 |
| 7 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199911 | 11/16/1999 | LA | RE | 100 |
| 8 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199911 | 11/16/1999 | LA | RE | 100 |
| 9 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199911 | 11/16/1999 | LA | RE | 100 |
| 10 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 199912 | 12/17/1999 | LA | RE | 100 |
| 11 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200002 | 2/15/2000 | LA | RE | 100 |
| 12 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200002 | 2/25/2000 | LA | RE | 100 |
| 13 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200004 | 5/1/2000 | LA | RE | 100 |
| 14 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200005 | 5/25/2000 | LA | RE | 100 |
| 15 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200005 | 5/25/2000 | LA | RE | 100 |
| 16 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200003 | 3/13/2000 | LA | RE | 100 |
| 17 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200003 | 3/14/2000 | LA | RE | 100 |
| 18 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200104 | 4/17/2001 | LA | RE | 100 |
| 19 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200109 | 9/19/2001 | LA | RE | 110 |
| 20 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200109 | 9/21/2001 | LA | RE | 100 |
| 21 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200109 | 10/2/2001 | LA | RE | 110 |
| 22 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200109 | 10/2/2001 | LA | RE | 110 |
| 23 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200111 | 11/19/2001 | LA | RE | 110 |
| 24 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/6/2001 | LA | RE | 100 |
| 25 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/6/2001 | LA | RE | 100 |
| 26 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200111 | 11/19/2001 | LA | RE | 110 |
| 27 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/6/2001 | LA | RE | 100 |
| 28 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200111 | 11/13/2001 | LA | RE | 100 |
| 29 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200111 | 11/16/2001 | LA | RE | 100 |
| 30 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200111 | 11/27/2001 | LA | RE | 100 |
| 31 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/26/2001 | LA | RE | 100 |
| 32 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200201 | 1/22/2002 | LA | RE | 100 |
| 33 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |

| | W | X | Y | Z |
|---|---|---|---|---|
| 1 | Location Code | Baty | Raty | ROffc |
| 2 | NYC | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 3 | NYC | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 4 | NYC | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 5 | NYC | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 6 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 7 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 8 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 9 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 10 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 11 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 12 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 13 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 14 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 15 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 16 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 17 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 18 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 19 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 20 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 21 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 22 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 23 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 24 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 25 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 26 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 27 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 28 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 29 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 30 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 31 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 32 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 33 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |

CONFIDENTIAL

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 34 | 4891754 | 11/29/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $341.25 |
| 35 | 4891759 | 11/29/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | -0.75 | -0.75 | ($341.25) |
| 36 | 4891765 | 11/29/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $341.25 |
| 37 | 4891755 | 11/30/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $113.75 |
| 38 | 4891760 | 11/30/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | -0.25 | -0.25 | ($113.75) |
| 39 | 4891766 | 11/30/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $113.75 |
| 40 | 4891767 | 12/6/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $227.50 |
| 41 | 4891768 | 12/7/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $113.75 |
| 42 | 4891756 | 12/13/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.5 | 1.5 | $682.50 |
| 43 | 4891761 | 12/13/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | -1.5 | -1.5 | ($682.50) |
| 44 | 4891769 | 12/13/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.5 | 1.5 | $682.50 |
| 45 | 4891770 | 12/17/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $227.50 |
| 46 | 4891757 | 12/18/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 3.75 | 3.75 | $1,500.00 |
| 47 | 4891762 | 12/18/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | -3.75 | -3.75 | ($1,500.00) |
| 48 | 4891763 | 12/18/2001 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 3.75 | 3.75 | $1,500.00 |
| 49 | 4891771 | 12/18/2001 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.25 | 1.25 | $568.75 |
| 50 | 4891772 | 1/14/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $237.50 |
| 51 | 242622 | 3/7/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $356.25 |
| 52 | 42198549 | 4/23/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0 | 0 | $0.00 |
| 53 | 42198550 | 4/23/2002 | FIRM | FIRM, DEFAULT | 120105 | 1 | 0 | 0 | $0.00 |
| 54 | 7354443 | 5/6/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $237.50 |
| 55 | 7357378 | 5/8/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $475.00 |
| 56 | 42192295 | 5/21/2002 | FIRM | FIRM, DEFAULT | 120105 | 1 | 0 | 0 | $0.00 |
| 57 | 42192296 | 5/21/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0 | 0 | $0.00 |
| 58 | 42200620 | 7/15/2002 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0 | 0 | $0.00 |
| 59 | 42200621 | 7/15/2002 | FIRM | FIRM, DEFAULT | 120105 | 1 | 0 | 0 | $0.00 |
| 60 | 10218872 | 2/12/2004 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.9 | 1.9 | $836.00 |
| 61 | 11517667 | 8/18/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 1 | 1 | $235.00 |
| 62 | 11536262 | 8/18/2004 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.1 | 1.1 | $484.00 |
| 63 | 11513804 | 8/19/2004 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 3.3 | 3.3 | $1,683.00 |
| 64 | 11517689 | 8/19/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 3.5 | 3.5 | $822.50 |
| 65 | 11536272 | 8/19/2004 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.5 | 0.5 | $220.00 |
| 66 | 11516929 | 8/20/2004 | 12330 | GALER, SCOTT D. | 120105 | 1 | 1.3 | 1.3 | $552.50 |

| | J | K | L |
|---|---|---|---|
| 34 | $318.75 | $318.75 | $0.00 |
| 35 | ($318.75) | ($318.75) | $0.00 |
| 36 | $318.75 | $356.25 | $37.50 |
| 37 | $106.25 | $106.25 | $0.00 |
| 38 | ($106.25) | ($106.25) | $0.00 |
| 39 | $106.25 | $118.75 | $12.50 |
| 40 | $212.50 | $237.50 | $25.00 |
| 41 | $106.25 | $118.75 | $12.50 |
| 42 | $637.50 | $637.50 | $0.00 |
| 43 | ($637.50) | ($637.50) | $0.00 |
| 44 | $637.50 | $712.50 | $75.00 |
| 45 | $212.50 | $237.50 | $25.00 |
| 46 | $1,500.00 | $1,500.00 | $0.00 |
| 47 | ($1,500.00) | ($1,500.00) | $0.00 |
| 48 | $1,500.00 | $1,500.00 | $0.00 |
| 49 | $531.25 | $593.75 | $62.50 |
| 50 | $237.50 | $237.50 | $0.00 |
| 51 | $356.25 | $896.25 | $540.00 |
| 52 | $0.00 | $0.00 | $0.00 |
| 53 | $0.00 | $0.00 | $0.00 |
| 54 | $237.50 | $237.50 | $0.00 |
| 55 | $475.00 | $475.00 | $0.00 |
| 56 | $0.00 | $0.00 | $0.00 |
| 57 | $0.00 | $0.00 | $0.00 |
| 58 | $0.00 | $0.00 | $0.00 |
| 59 | $0.00 | $0.00 | $0.00 |
| 60 | $836.00 | $0.00 | ($836.00) |
| 61 | $235.00 | $235.00 | $0.00 |
| 62 | $484.00 | $0.00 | ($484.00) |
| 63 | $1,683.00 | $1,815.00 | $132.00 |
| 64 | $822.50 | $822.50 | $0.00 |
| 65 | $220.00 | $0.00 | ($220.00) |
| 66 | $552.50 | $0.00 | ($552.50) |

| | M |
|---|---|
| 34 | Review and analysis re settlement of RC/Ed issues; review and follow up. |
| 35 | BACK OUT |
| 36 | Review and analysis re settlement of RC/Ed issues; review and follow up. |
| 37 | Review and follow up. |
| 38 | BACK OUT |
| 39 | Review and follow up. |
| 40 | Review and analysis re issues raised by Ed re Costa Mesa Agreement. |
| 41 | (Costa Mesa) Telephone conference with Ed re property tax trigger. |
| 42 | Review and follow up re analysis on Costa Mesa; follow up with Ed's request. |
| 43 | BACK OUT |
| 44 | Review and follow up re analysis on Costa Mesa; follow up with Ed's request. |
| 45 | Follow up with Ed re resolution of RC/Ed claim. |
| 46 | Review and analysis of LLC agreement; telephone calls; prepare memo; review files regarding memos and correspondence. [NEED TO TRANSFER TO 1 |
| 47 | BACK OUT |
| 48 | Review and analysis of LLC agreement; telephone calls; prepare memo; review files regarding memos and correspondence. |
| 49 | Follow up re memo on issue of how excess cash flow with sale proceeds are divided between holders if some holders withdraw ; telephone conferen |
| 50 | Telephone conference with RC re issues; telephone conference with Ed; review and follow up. |
| 51 | ( use to intake money) Review and follow-up with Vitalli; follow-up with Rich; deal with how we want to handle purchase Agreement and loan inter-r |
| 52 | |
| 53 | |
| 54 | Follow up with Ed Israel re settlement. |
| 55 | Meet with Ed to discuss Costa Mesa settlement; review and analysis; follow up with R. Cohen. |
| 56 | |
| 57 | |
| 58 | |
| 59 | |
| 60 | Analysis re Willow Tree purchase letter; conference; revise documents. |
| 61 | form; e-mail. |
| 62 | Telephone calls and analysis re trust authorization issues and precedents; conferences regarding files and prior opinion for loan conditions. |
| 63 | (Willow Tree) Review and follow up with various calls with R.C.'s office; v arious calls with R.C.; telephone confeerence with lender; telephone confer |
| 64 | Review and analysis of Cohen Family Trust; review and analysis of opinion issues; attorney conference with H. Sohaili; research re Certificate of Trust |
| 65 | Follow-up discussions on trust issues. |
| 66 | Reviewed legal opinion and back-up and office conferences with J. Friedman re same. |

| | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|
| 34 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/26/2001 | LA | RE | 100 |
| 35 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200201 | 1/22/2002 | LA | RE | 100 |
| 36 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 37 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/26/2001 | LA | RE | 100 |
| 38 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200201 | 1/22/2002 | LA | RE | 100 |
| 39 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 40 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 41 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 42 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 12/26/2001 | LA | RE | 100 |
| 43 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200201 | 1/22/2002 | LA | RE | 100 |
| 44 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 45 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 46 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200112 | 1/4/2002 | LA | RE | 110 |
| 47 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200201 | 1/22/2002 | LA | RE | 110 |
| 48 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 110 |
| 49 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 50 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200202 | 2/11/2002 | LA | RE | 100 |
| 51 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200203 | 3/8/2002 | LA | RE | 100 |
| 52 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200204 | 4/23/2002 | LA | RE | 100 |
| 53 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200204 | 4/23/2002 | DC | GEN | 999 |
| 54 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200205 | 5/7/2002 | LA | RE | 100 |
| 55 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200205 | 5/10/2002 | LA | RE | 100 |
| 56 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200205 | 5/21/2002 | DC | GEN | 999 |
| 57 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200205 | 5/21/2002 | LA | RE | 100 |
| 58 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200207 | 7/15/2002 | LA | RE | 100 |
| 59 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200207 | 7/15/2002 | DC | GEN | 999 |
| 60 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200402 | 2/17/2004 | LA | RE | 110 |
| 61 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/23/2004 | LA | RE | 300 |
| 62 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 9/1/2004 | LA | RE | 110 |
| 63 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/20/2004 | LA | RE | 100 |
| 64 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/23/2004 | LA | RE | 300 |
| 65 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 9/1/2004 | LA | RE | 110 |
| 66 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/23/2004 | LA | COR | 110 |



CONFIDENTIAL

| | W | X | Y | Z |
|---|---|---|---|---|
| 34 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 35 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 36 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 37 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 38 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 39 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 40 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 41 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 42 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 43 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 44 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 45 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 46 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 47 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 48 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 49 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 50 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 51 | CA | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 52 | | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 53 | | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 54 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 55 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 56 | | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 57 | | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 58 | | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 59 | | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 60 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 61 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 62 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 63 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 64 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 65 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 66 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 67 | 11517711 | 8/20/2004 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 2.8 | 2.8 | $1,428.00 |
| 68 | 11517801 | 8/20/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 4.8 | 4.8 | $1,128.00 |
| 69 | 11528453 | 8/24/2004 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.8 | 0.8 | $408.00 |
| 70 | 11535102 | 8/24/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 2 | 2 | $470.00 |
| 71 | 11535105 | 8/25/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.3 | 0.3 | $70.50 |
| 72 | 11527659 | 8/26/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.6 | 0.6 | $141.00 |
| 73 | 11531402 | 8/30/2004 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.8 | 0.8 | $408.00 |
| 74 | 11535576 | 8/30/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.2 | 0.2 | $47.00 |
| 75 | 11602480 | 9/2/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 1.5 | 1.5 | $352.50 |
| 76 | 11816181 | 9/3/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.2 | 0.2 | $47.00 |
| 77 | 11587511 | 9/8/2004 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.2 | 0.2 | $47.00 |
| 78 | 12011628 | 3/3/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.8 | 0.8 | $228.00 |
| 79 | 12420862 | 3/8/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 5 | 5 | $1,425.00 |
| 80 | 12416239 | 3/9/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $267.50 |
| 81 | 12420909 | 3/9/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 1.5 | 1.5 | $427.50 |
| 82 | 12419800 | 3/10/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.8 | 0.8 | $428.00 |
| 83 | 12420959 | 3/10/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 1 | 1 | $285.00 |
| 84 | 12435524 | 3/23/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.8 | 0.8 | $428.00 |
| 85 | 12505316 | 4/21/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.4 | 0.4 | $114.00 |
| 86 | 12486346 | 4/26/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 1 | 1 | $285.00 |
| 87 | 12504368 | 4/27/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.5 | 0.5 | $142.50 |
| 88 | 12504019 | 4/28/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.5 | 0.5 | $142.50 |
| 89 | 12629683 | 7/26/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $401.25 |
| 90 | 12714011 | 9/22/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 1.5 | 1.5 | $427.50 |
| 91 | 12714249 | 9/22/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $133.75 |
| 92 | 12715084 | 9/23/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.5 | 0.5 | $142.50 |
| 93 | 12719639 | 9/26/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.2 | 0.2 | $57.00 |
| 94 | 12758382 | 10/17/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.3 | 0.3 | $85.50 |
| 95 | 12758853 | 10/19/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.8 | 0.8 | $228.00 |
| 96 | 12787275 | 11/1/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.3 | 0.3 | $85.50 |
| 97 | 12787284 | 11/2/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.4 | 0.4 | $114.00 |
| 98 | 12787403 | 11/3/2005 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.5 | 0.5 | $142.50 |
| 99 | 12793360 | 11/10/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $267.50 |

| | J | K | L |
|---|---|---|---|
| 67 | $1,428.00 | $1,540.00 | $112.00 |
| 68 | $1,128.00 | $1,128.00 | $0.00 |
| 69 | $408.00 | $440.00 | $32.00 |
| 70 | $470.00 | $470.00 | $0.00 |
| 71 | $70.50 | $70.50 | $0.00 |
| 72 | $141.00 | $141.00 | $0.00 |
| 73 | $408.00 | $440.00 | $32.00 |
| 74 | $47.00 | $47.00 | $0.00 |
| 75 | $382.50 | $382.50 | $0.00 |
| 76 | $51.00 | $0.00 | ($51.00) |
| 77 | $51.00 | $51.00 | $0.00 |
| 78 | $252.00 | $252.00 | $0.00 |
| 79 | $1,575.00 | $1,575.00 | $0.00 |
| 80 | $287.50 | $287.50 | $0.00 |
| 81 | $472.50 | $472.50 | $0.00 |
| 82 | $460.00 | $460.00 | $0.00 |
| 83 | $315.00 | $315.00 | $0.00 |
| 84 | $460.00 | $460.00 | $0.00 |
| 85 | $126.00 | $126.00 | $0.00 |
| 86 | $315.00 | $315.00 | $0.00 |
| 87 | $157.50 | $157.50 | $0.00 |
| 88 | $157.50 | $157.50 | $0.00 |
| 89 | $431.25 | $431.25 | $0.00 |
| 90 | $472.50 | $472.50 | $0.00 |
| 91 | $143.75 | $143.75 | $0.00 |
| 92 | $157.50 | $157.50 | $0.00 |
| 93 | $63.00 | $63.00 | $0.00 |
| 94 | $94.50 | $94.50 | $0.00 |
| 95 | $252.00 | $252.00 | $0.00 |
| 96 | $94.50 | $94.50 | $0.00 |
| 97 | $126.00 | $126.00 | $0.00 |
| 98 | $157.50 | $157.50 | $0.00 |
| 99 | $287.50 | $287.50 | $0.00 |

| | M |
|---|---|
| 67 | (Willow Tree) Work on opinion letter with Joe Friedman; review and follow up; analysis re revisions and finalize; telephone conference with Tony Be |
| 68 | Draft opinion and draft form of Certificate of Trust; conference with S. Galer re form of opinion; edit and revise; numerous telephone calls with C. Go |
| 69 | Review and follow up with respect to WillowTree. |
| 70 | E-mails with T. Beall re form of opinion and form of certificate of trust; telephone calls re same with T. Beall; review cited portion of 7th Amendment |
| 71 | E-mail and telephone call with T. Beall; edit certificate of trust. |
| 72 | Numerous e-mails re form of opinion and answer questions from C. Goodstein. |
| 73 | Follow up and get final opinion out and done; telephone conference with Joe. |
| 74 | Telephone call with H. Sohaili re certificate of trust and opinion; telephone call with M. Fernandez re same. |
| 75 | Willow Tree: E-mail with M. Gibson re form of opinion; edit opinion; telephone call with T. Beall re same. |
| 76 | Telephone call with T. Beall re opinion (Willow Tree). |
| 77 | File maintenance re Willow Tree opinion. |
| 78 | [Robert Cohen Trust Opinion] Telephone call with M. Gibson; emails; file review; telephone call with C. Goodstein. |
| 79 | Work on Copa Ladeene and Camino de Oro opinions and forms of Trust Certifications; review file; numerous telephone calls and e-mails with C. Good |
| 80 | Review and analysis re opinion; follow up with Joe re trust and other amendments. |
| 81 | Edit Copa and Camino opinions; e-mails and telephone calls. |
| 82 | Review and analysis re two separate opinions for refinancing by general partner of loans. |
| 83 | Review of fax from C. Goodstein; telephone calls; conference with H. Sohaili; e-mail re trust opinions and closing procedure. |
| 84 | Review and follow up with RC re life insurance. Call with Silverman re financing insurance. |
| 85 | E-mails re new closing date and opinions. |
| 86 | E-mails and telephone call with C. Goodstein and D. Best; edit trust opinions and trust certificates; draft and send letter to D. Best. |
| 87 | E-mails re opinion with D. Best; check on delivery status. |
| 88 | E-mails are loan amount; edit opinion. |
| 89 | Review and advise re refinancing of project with other GP's and follow up on tax issue with GP's trust if loan is increased. |
| 90 | Telephone calls and e-mails with C. Goodstein, M. Gibson and D. Best regarding updated Copa Ladeene opinion; review file; revise forms of opinion a |
| 91 | Follow up re Copa Ladeene refinance. |
| 92 | E-mails with D. Best; edit form of opinion; distribute. |
| 93 | Telephone calls with C. Goodstein re closing date. |
| 94 | Emails re: Copa Ladeene trust opinion. |
| 95 | Emails re: certification of trust, phone call with C. Goodstein, revise form and forward to C. Goodstein. |
| 96 | E-mails and telephone calls re Copa Ladeene opinion; arrangement for execution and delivery. |
| 97 | E-mails and telephone call re Copa Ladeene opinion including call to M. Fernandez to re-execute opinion with new date per D. Best's request. |
| 98 | E-mails with D. Best and C. Goodstein to confirm loan amount after new information received from D. Best; revise opinion; distribute. |
| 99 | General advice re Studio City; telephone conference with RC and Bob Schenkman. |

| | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|
| 67 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/23/2004 | LA | RE | 100 |
| 68 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/23/2004 | LA | RE | 300 |
| 69 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/31/2004 | LA | RE | 100 |
| 70 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 9/1/2004 | LA | RE | 300 |
| 71 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 9/1/2004 | LA | RE | 300 |
| 72 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/31/2004 | LA | RE | 300 |
| 73 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 8/31/2004 | LA | RE | 100 |
| 74 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200408 | 9/1/2004 | LA | RE | 300 |
| 75 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200410 | 10/18/2004 | LA | RE | 300 |
| 76 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200410 | 10/28/2004 | LA | RE | 300 |
| 77 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200410 | 10/6/2004 | LA | RE | 300 |
| 78 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/9/2005 | LA | RE | 300 |
| 79 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/14/2005 | LA | RE | 300 |
| 80 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/10/2005 | LA | RE | 100 |
| 81 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/14/2005 | LA | RE | 300 |
| 82 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/14/2005 | LA | RE | 100 |
| 83 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/14/2005 | LA | RE | 300 |
| 84 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200503 | 3/25/2005 | LA | RE | 100 |
| 85 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200504 | 5/2/2005 | LA | RE | 300 |
| 86 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200504 | 4/27/2005 | LA | RE | 300 |
| 87 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200504 | 5/2/2005 | LA | RE | 300 |
| 88 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200504 | 5/2/2005 | LA | RE | 300 |
| 89 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200507 | 7/27/2005 | LA | RE | 100 |
| 90 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200509 | 9/26/2005 | LA | RE | 300 |
| 91 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200509 | 9/26/2005 | LA | RE | 100 |
| 92 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200509 | 9/26/2005 | LA | RE | 300 |
| 93 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200509 | 9/29/2005 | LA | RE | 300 |
| 94 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200510 | 10/24/2005 | LA | RE | 300 |
| 95 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200510 | 10/24/2005 | LA | RE | 300 |
| 96 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200511 | 11/7/2005 | LA | RE | 300 |
| 97 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200511 | 11/7/2005 | LA | RE | 300 |
| 98 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200511 | 11/7/2005 | LA | RE | 300 |
| 99 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200511 | 11/14/2005 | LA | RE | 100 |

| | W | X | Y | Z |
|---|---|---|---|---|
| 67 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 68 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 69 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 70 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 71 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 72 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 73 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 74 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 75 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 76 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 77 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 78 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 79 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 80 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 81 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 82 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 83 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 84 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 85 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 86 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 87 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 88 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 89 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 90 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 91 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 92 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 93 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 94 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 95 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 96 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 97 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 98 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 99 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 100 | 12793364 | 11/10/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $267.50 |
| 101 | 12801433 | 11/16/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $133.75 |
| 102 | 13922614 | 11/30/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.25 | 1.25 | $668.75 |
| 103 | 13931435 | 12/9/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $401.25 |
| 104 | 13934931 | 12/12/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.5 | 1.5 | $802.50 |
| 105 | 13936939 | 12/13/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $133.75 |
| 106 | 13947000 | 12/20/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $401.25 |
| 107 | 13964169 | 12/23/2005 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $401.25 |
| 108 | 14189270 | 6/13/2006 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.25 | 1.25 | $706.25 |
| 109 | 15120547 | 6/16/2006 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.7 | 0.7 | $224.00 |
| 110 | 15121276 | 6/22/2006 | 12938 | FRIEDMAN, JOSEPH | 120105 | 1 | 0.4 | 0.4 | $128.00 |
| 111 | 14210159 | 6/26/2006 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $423.75 |
| 112 | 14208984 | 6/27/2006 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.5 | 1.5 | $720.00 |
| 113 | 15306380 | 11/17/2006 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $141.25 |
| 114 | 15314107 | 11/21/2006 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.25 | 0.25 | $141.25 |
| 115 | 15410485 | 2/5/2007 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.75 | 0.75 | $487.50 |
| 116 | 15411070 | 2/6/2007 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.25 | 1.25 | $812.50 |
| 117 | 16323120 | 2/15/2007 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $650.00 |
| 118 | 16323123 | 2/15/2007 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $325.00 |
| 119 | 16346008 | 2/20/2007 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.8 | 1.8 | $990.00 |
| 120 | 16346129 | 2/21/2007 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 3.5 | 3.5 | $1,925.00 |
| 121 | 16346737 | 2/22/2007 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.4 | 1.4 | $770.00 |
| 122 | 21132912 | 4/7/2009 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $347.50 |
| 123 | 21156292 | 4/7/2009 | 7019 | BURKE, P. JOHN | 120105 | 1 | 1.5 | 0 | $930.00 |
| 124 | 21156364 | 4/8/2009 | 7019 | BURKE, P. JOHN | 120105 | 1 | 0.5 | 0.5 | $310.00 |
| 125 | 21134943 | 4/9/2009 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1.5 | 1 | $1,042.50 |
| 126 | 21157017 | 4/14/2009 | 7019 | BURKE, P. JOHN | 120105 | 1 | 1 | 1 | $620.00 |
| 127 | 29336850 | 8/7/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.5 | 1.5 | $1,050.00 |
| 128 | 29336854 | 8/8/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.8 | 0.8 | $560.00 |
| 129 | 29336788 | 8/12/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.5 | 1.5 | $1,050.00 |
| 130 | 29336794 | 8/13/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.8 | 0.8 | $560.00 |
| 131 | 29337454 | 8/26/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.1 | 1.1 | $770.00 |
| 132 | 29481370 | 10/31/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.8 | 1.8 | $1,260.00 |

| | J | K | L |
|---|---|---|---|
| 100 | $287.50 | $287.50 | $0.00 |
| 101 | $143.75 | $143.75 | $0.00 |
| 102 | $718.75 | $718.75 | $0.00 |
| 103 | $431.25 | $431.25 | $0.00 |
| 104 | $862.50 | $862.50 | $0.00 |
| 105 | $143.75 | $143.75 | $0.00 |
| 106 | $431.25 | $431.25 | $0.00 |
| 107 | $431.25 | $431.25 | $0.00 |
| 108 | $743.75 | $743.75 | $0.00 |
| 109 | $241.50 | $241.50 | $0.00 |
| 110 | $138.00 | $138.00 | $0.00 |
| 111 | $446.25 | $446.25 | $0.00 |
| 112 | $742.50 | $742.50 | $0.00 |
| 113 | $148.75 | $148.75 | $0.00 |
| 114 | $148.75 | $148.75 | $0.00 |
| 115 | $487.50 | $487.50 | $0.00 |
| 116 | $812.50 | $812.50 | $0.00 |
| 117 | $650.00 | $650.00 | $0.00 |
| 118 | $325.00 | $325.00 | $0.00 |
| 119 | $990.00 | $990.00 | $0.00 |
| 120 | $1,925.00 | $1,925.00 | $0.00 |
| 121 | $770.00 | $770.00 | $0.00 |
| 122 | $347.50 | $347.50 | $0.00 |
| 123 | $930.00 | $0.00 | ($930.00) |
| 124 | $310.00 | $310.00 | $0.00 |
| 125 | $1,042.50 | $695.00 | ($347.50) |
| 126 | $620.00 | $620.00 | $0.00 |
| 127 | $1,050.00 | $1,050.00 | $0.00 |
| 128 | $560.00 | $560.00 | $0.00 |
| 129 | $1,050.00 | $1,050.00 | $0.00 |
| 130 | $560.00 | $560.00 | $0.00 |
| 131 | $770.00 | $770.00 | $0.00 |
| 132 | $1,260.00 | $1,260.00 | $0.00 |

082
AkinSubpoena_0000062

CONFIDENTIAL

| | M |
|---|---|
| 100 | Initial review of correspondence from attorney. |
| 101 | Review and follow up; analysis. |
| 102 | Review various Agreements on Studio City; telephone conference with RC re voting Agreement; review and analysis. |
| 103 | Follow up with RC re issues on buy/sell and Sport Center Operating. |
| 104 | Review and follow up with Bob Schenker; review and analysis re interaction of Buy/Sell; follow up. |
| 105 | Follow up with RC. |
| 106 | Review re Operating Agreements. |
| 107 | (Studio city) Follow up re issues on buy/sell. |
| 108 | Work on review and approval stockholders Agreement; review and follow up with Julie re issues; review re cover letter. |
| 109 | Review title issues; telephone call with Chicago Title Company to get report on the ISCO property; review trust documents and files. |
| 110 | Follow-up re ISCO title report; e-mail; review report received from Chicago Title. |
| 111 | Review and follow up re miscellaneous re RC assets; deal with old partnership for potential transfers to trust. |
| 112 | Review files re Costa Mesa deal and option transactions and holdings; numerous correspondence re same; conferences. |
| 113 | Follow up re Agreements on transfer of control of Four Square. |
| 114 | Telephone conference with RC re buy-out; follow up with fax. |
| 115 | Review and deal with Stockholders Agreement. |
| 116 | Review the Stockholders Agreement; review and follow up with Julie. |
| 117 | Review re Archstone term sheet; review and follow up with Tony. |
| 118 | Follow up re Four Square Buy/Sell. |
| 119 | [WILLOW TREE] Review articles on REIT issues and protections; analysis re deal structure; telephone calls. |
| 120 | [WILLOW TREE] Analyze tax and real estate issues; prepare issue list; correspondence and telephone calls re same. |
| 121 | [WILLOW TREE] Telephone calls; correspondence re securities issues; follow-up and review on tax and property structure and questions. |
| 122 | Telephone conference with Henry Winterstern. |
| 123 | (MARIE SHOW) Telephone call to F. Nigro; telephone call to H. Winterstern. |
| 124 | Telephone call to H. Sohaili re: "MARIE SHOW"; review materials. |
| 125 | Meet with RC and Henry Winterstern; follow up. |
| 126 | [MARIE] Meet with H Sohaili, Robert Cohen, H. Winterstern re: "MARIE SHOW" |
| 127 | Review correspondence; review documents; telephone call with client; review correspondence. |
| 128 | Telephone calls with Robert Shenkman on 4-Square deal. |
| 129 | Telephone call with client and attorneys; review documents re entities from attorneys; correspondence to client. |
| 130 | Telephone calls; review documents and correspondence. |
| 131 | Four Square correspondence and calls; review LLC documents for entities from Allen Matkins; telephone call with client. |
| 132 | Continue review and analysis of documents re Studio City; correspondence re same. |

| | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|
| 100 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200511 | 11/14/2005 | LA | RE | 100 |
| 101 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200511 | 11/18/2005 | LA | RE | 100 |
| 102 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200512 | 12/2/2005 | LA | RE | 100 |
| 103 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200512 | 12/12/2005 | LA | RE | 100 |
| 104 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200512 | 12/13/2005 | LA | RE | 100 |
| 105 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200512 | 12/15/2005 | LA | RE | 100 |
| 106 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200512 | 12/22/2005 | LA | RE | 100 |
| 107 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200512 | 1/3/2006 | LA | RE | 100 |
| 108 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200606 | 6/14/2006 | LA | RE | 100 |
| 109 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200606 | 7/3/2006 | LA | RE | 300 |
| 110 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200606 | 7/3/2006 | LA | RE | 300 |
| 111 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200606 | 6/30/2006 | LA | RE | 100 |
| 112 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200606 | 6/29/2006 | LA | RE | 110 |
| 113 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200611 | 11/20/2006 | LA | RE | 100 |
| 114 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200611 | 11/27/2006 | LA | RE | 100 |
| 115 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 2/6/2007 | LA | RE | 100 |
| 116 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 2/7/2007 | LA | RE | 100 |
| 117 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 2/20/2007 | LA | RE | 100 |
| 118 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 2/20/2007 | LA | RE | 100 |
| 119 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 3/1/2007 | LA | RE | 110 |
| 120 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 3/1/2007 | LA | RE | 110 |
| 121 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200702 | 3/1/2007 | LA | RE | 110 |
| 122 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200904 | 4/9/2009 | LA | RE | 100 |
| 123 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200904 | 5/1/2009 | LA | COR | 100 |
| 124 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200904 | 5/1/2009 | LA | COR | 100 |
| 125 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200904 | 4/13/2009 | LA | RE | 100 |
| 126 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 200904 | 5/1/2009 | LA | COR | 100 |
| 127 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201309 | 9/23/2013 | LA | RE | 110 |
| 128 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201309 | 9/23/2013 | LA | RE | 110 |
| 129 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201309 | 9/23/2013 | LA | RE | 110 |
| 130 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201309 | 9/23/2013 | LA | RE | 110 |
| 131 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201309 | 9/23/2013 | LA | RE | 110 |
| 132 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201310 | 11/1/2013 | LA | RE | 110 |

| | W | X | Y | Z |
|---|---|---|---|---|
| 100 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 101 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 102 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 103 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 104 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 105 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 106 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 107 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 108 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 109 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 110 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 111 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 112 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 113 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 114 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 115 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 116 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 117 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 118 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 119 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 120 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 121 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 122 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 123 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 124 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 125 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 126 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 127 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 128 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 129 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 130 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 131 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 132 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 133 | 29557273 | 11/1/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 2.6 | 2.6 | $1,820.00 |
| 134 | 29554805 | 11/13/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1 | 1 | $700.00 |
| 135 | 29684136 | 12/3/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.8 | 0.8 | $560.00 |
| 136 | 29683191 | 12/6/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.3 | 1.3 | $910.00 |
| 137 | 29684143 | 12/9/2013 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 2.3 | 2.3 | $1,610.00 |
| 138 | 29690467 | 12/9/2013 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.5 | 0.5 | $425.00 |
| 139 | 29632524 | 12/20/2013 | 10969 | QUIGLEY, DAVID H. | 120105 | 1 | 0.7 | 0.7 | $444.50 |
| 140 | 29635819 | 12/20/2013 | 17389 | SHLOMI, DANIEL | 120105 | 1 | 4.4 | 4.4 | $1,694.00 |
| 141 | 29688756 | 12/20/2013 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 0.8 | 0.8 | $680.00 |
| 142 | 29635820 | 12/21/2013 | 17389 | SHLOMI, DANIEL | 120105 | 1 | 1.6 | 1.6 | $616.00 |
| 143 | 29646359 | 12/21/2013 | 17063 | BURTON, DAVID K | 120105 | 1 | 0.8 | 0.8 | $628.00 |
| 144 | 29632527 | 12/22/2013 | 10969 | QUIGLEY, DAVID H. | 120105 | 1 | 0.7 | 0.7 | $444.50 |
| 145 | 29644043 | 12/22/2013 | 7217 | SOHAILI, HUSHMAND | 120105 | 1 | 1 | 1 | $850.00 |
| 146 | 29646121 | 12/22/2013 | 17063 | BURTON, DAVID K | 120105 | 1 | 0.9 | 0.9 | $706.50 |
| 147 | 29673923 | 12/22/2013 | 17584 | RENNA, CARMELA THERESA | 120105 | 1 | 1.6 | 1.6 | $400.00 |
| 148 | 29731110 | 1/21/2014 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.8 | 1.8 | $1,323.00 |
| 149 | 29731100 | 1/22/2014 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.3 | 1.3 | $955.50 |
| 150 | 29731078 | 1/24/2014 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.7 | 0.7 | $514.50 |
| 151 | 29951258 | 2/18/2014 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 1.8 | 1.8 | $1,323.00 |
| 152 | 29951926 | 2/27/2014 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.8 | 0.8 | $588.00 |
| 153 | 29952035 | 2/28/2014 | 10351 | SALANDRA, ANTHONY R. | 120105 | 1 | 0.7 | 0.7 | $514.50 |

| | J | K | L |
|---|---|---|---|
| 133 | $1,820.00 | $1,820.00 | $0.00 |
| 134 | $700.00 | $700.00 | $0.00 |
| 135 | $560.00 | $560.00 | $0.00 |
| 136 | $910.00 | $910.00 | $0.00 |
| 137 | $1,610.00 | $1,610.00 | $0.00 |
| 138 | $425.00 | $425.00 | $0.00 |
| 139 | $444.50 | $444.50 | $0.00 |
| 140 | $1,694.00 | $1,694.00 | $0.00 |
| 141 | $680.00 | $680.00 | $0.00 |
| 142 | $616.00 | $616.00 | $0.00 |
| 143 | $628.00 | $628.00 | $0.00 |
| 144 | $444.50 | $444.50 | $0.00 |
| 145 | $850.00 | $850.00 | $0.00 |
| 146 | $706.50 | $706.50 | $0.00 |
| 147 | $400.00 | $400.00 | $0.00 |
| 148 | $1,323.00 | $1,323.00 | $0.00 |
| 149 | $955.50 | $955.50 | $0.00 |
| 150 | $514.50 | $514.50 | $0.00 |
| 151 | $1,323.00 | $1,323.00 | $0.00 |
| 152 | $588.00 | $588.00 | $0.00 |
| 153 | $514.50 | $514.50 | $0.00 |



CONFIDENTIAL

| | M |
|---|---|
| 133 | Review documents; prepare revisions to shareholder agreement; review trust document; review documents-LLC; send mark-up. |
| 134 | Telephone call re Four-Square agreement with Matt Ertman; review and analysis of documents. |
| 135 | Review agreement; analysis re issues; telephone calls; correspondence re same. |
| 136 | Telephone call with client; analysis re issues; review documents; e-mail to Matt Ertman. |
| 137 | Review documents; review prior correspondence and drafts; prepare notes and changes; revise shareholder agreement. |
| 138 | Follow up re tax plan. |
| 139 | Review environmental assessment to provide comments. |
| 140 | Pacific Tax Dededuction diligence - Review all items on datasite; draft summary of diligence for T. Salandra. |
| 141 | Review and follow up; re tax shelter. |
| 142 | Pacific Tax Deduction - Conduct follow up research and email response to H. Sohaili and T. Salandra. |
| 143 | [Paciflca Land Tax Credit] Review and prepare detailed emails to Tony Salandra and Daniel Shlomi regarding conservation easement tax deduction ru |
| 144 | Complete review of summary of phase I assessment and related correspondence. |
| 145 | Follow up re tax credit deal; review and analysis. |
| 146 | [Pacifica Land Tax Credit] Legal research regarding subordination of mortgagee required for conservation easement tax deduction; prepare detailed e |
| 147 | Review Pacifica Phase I ESA; correspondence with D. Quigley, T. Salandra, and H. Sohaili regarding the same. |
| 148 | Review and revise documents; telephone call with Victor Christosomo; correspondence to client; correspondence to Matt Ertman. |
| 149 | Correspondence; document review; conference call re Four Square issues/LLC/S Corp/Shareholders documents/trusts. |
| 150 | Telephone call with Matt Ertman re S Corp/LLC/Trusts/Shareholder Agreement; prepare e-mail re same. |
| 151 | Prepare changes to shareholder document per client; send correspondence to Matt Ertman. |
| 152 | Telephone calls with Eleda Cohen and with Robert Shenkman; correspondence to Victor Crisostomo. |
| 153 | Telephone call with Victor Crisostomo; telephone call with Eleda Cohen. |

| | N | O | P | Q | R | S | T | U | V |
|---|---|---|---|---|---|---|---|---|---|
| 133 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201311 | 11/21/2013 | LA | RE | 110 |
| 134 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201311 | 11/21/2013 | LA | RE | 110 |
| 135 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 1/3/2014 | LC | RE | 110 |
| 136 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 1/3/2014 | LC | RE | 110 |
| 137 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 1/3/2014 | LC | RE | 110 |
| 138 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201401 | 1/6/2014 | LC | RE | 100 |
| 139 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/23/2013 | DC | EL | 110 |
| 140 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/24/2013 | LC | RE | 300 |
| 141 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 1/3/2014 | LC | RE | 100 |
| 142 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/24/2013 | LC | RE | 300 |
| 143 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/31/2013 | NY | TAX | 100 |
| 144 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/23/2013 | DC | EL | 110 |
| 145 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/30/2013 | LC | RE | 100 |
| 146 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 12/31/2013 | NY | TAX | 100 |
| 147 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201312 | 1/3/2014 | DC | EL | 320 |
| 148 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201401 | 1/24/2014 | LC | RE | 100 |
| 149 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201401 | 1/24/2014 | LC | RE | 100 |
| 150 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201401 | 1/24/2014 | LC | RE | 100 |
| 151 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201402 | 3/4/2014 | LC | RE | 100 |
| 152 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201402 | 3/4/2014 | LC | RE | 100 |
| 153 | COHEN, ROBERT | GENERAL | 120105 | COHEN, ROBERT | 201402 | 3/4/2014 | LC | RE | 100 |



CONFIDENTIAL

| | W | X | Y | Z |
|---|---|---|---|---|
| 133 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 134 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 135 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 136 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 137 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 138 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 139 | MD | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 140 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 141 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 142 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 143 | NY | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 144 | MD | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 145 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 146 | NY | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 147 | DC | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 148 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 149 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 150 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 151 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 152 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |
| 153 | LAS | SOHAILI, HUSHMAND | SOHAILI, HUSHMAND | LC |

# EXHIBIT "J"

Planet Depos
We Make It Happen™

# Transcript of Ezra Cohen

**Date:** September 30, 2024
**Case:** S&W Blue Jay Way, LLC, In Re:

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

In re
S&W BLUE JAY WAY, LLC,
Reorganized Debtor. : Case No. 9:23-bk-10672-RC

DEPOSITION OF EZRA COHEN
Los Angeles, California
Monday, September 30, 2024

Stenographically Reported by:
JUSTYNE N. JOHNSON
RPR, CSR. No. 14301
Job No. 553676
Pages 1-141

2

The Deposition of EZRA COHEN, was taken on behalf of Reorganized Debtor, at 10345 West Olympic Boulevard, Los Angeles, California, beginning at 10:05 a.m., Pacific time on September 30, 2024, before JUSTYNE JOHNSON, RPR, Certified Shorthand Reporter No. 14301.

3

APPEARANCES:

FOR S&W BLUE JAY WAY, LLC
ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
BY: ROYE ZUR, ESQ.
Attorney at Law
10345 West Olympic Boulevard
Los Angeles, California 90064

FOR BLUE JAY 180, LLC
GREENSPOON MARDER LLP
BY: DANIEL A. LEV, ESQ.
Attorney at Law
333 South Grand Avenue
Suite 3400
Los Angeles, California 990071-1406

LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, APC
BY: RONALD RICHARDS, ESQ.
Attorney at Law
P.O Box 11480
Beverly Hills, California 90213

Also Present:
Hushnand Sohaili
Baron Cohen

4

INDEX


| WITNESS | EXAMINATION |
| --- | --- |
| EZRA COHEN | |
| BY MR. ZUR | 8 |
| BY MR. RICHARDS | 127 |
| BY ZUR | 139 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Eddie Ezra Cohen's responses and objections to document requests in connection with subpoena to testify at a deposition in a bankruptcy case (7 pages) | 13 |
| EXHIBIT 2 | Declaration of Eddie Ezra Cohen in support of Plaintiffs' opposition to Defendant's motion for partial summary judgment" (4 pages) | 20 |
| EXHIBIT 3 | Document dated February 6, 2014, Bates-stamped SWBJ000369 through SWBJ000371 (3 pages) | 27 |
| EXHIBIT 4 | Document from Astro Escrow, Inc., dated December 29, 2015 (1 page) | 32 |
| EXHIBIT 5 | Email thread with subject "1633 Blue Jay Way, West Hollywood" (3 pages) | 46 |
| EXHIBIT 6 | Email with subject "Blue Jay Way Indemnity Agreement" (1 page) | 49 |
| EXHIBIT 7 | Email thread with subject "Blue Jay Way - Note, Indemnity and Conflict Waiver" (2 pages) | 57 |
| EXHIBIT 8 | Letter from Hushmand Sohaili to Robert Cohen, dated February 21, 2013 (5 pages) | 61 |
| EXHIBIT 9 | "Promissory Note Secured by Deed of Trust," dated February 26, 2013 (4 pages) | 61 |



EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 10 | Letter from Hushmand Sohaili to Ezra Cohen and Robert Cohen, dated April 17, 2018 (4 pages) | 67 |
| EXHIBIT 11 | Email from Hushmand Sohaili to Robert Cohen and Richard Weintraub, dated February 8, 2014 (1 page) | 87 |
| EXHIBIT 12 | Email from Daniel Shlomi with subject "Blue Jay Way Indemnity Agreement," dated February 22, 2013 (1 page) | 99 |
| EXHIBIT 13 | Email from Daniel Shlomi with subject "Blue Jay Way Conflict Waiver," dated February 22, 2013 (1 page) | 105 |
| EXHIBIT 14 | Email thread with subject "Blue Jay Way" (2 pages) | 108 |
| EXHIBIT 15 | Email from Daniel Shlomi with subject "Blue Jay Way," dated February 25, 2013 (1 page) | 109 |
| EXHIBIT 16 | Email thread with subject "Robert's Wire," dated February 25, 2013 (2 pages) | 114 |
| EXHIBIT 17 | Declaration of Hushmand Sohaili in support of Debtor's reply to Claim No. 2-1 of Blue Jay 190, LLC, a California limited liability company (7 pages) | 120 |



Los Angeles, California
September 30, 2024 | 10:05 a.m.

THE STENOGRAPHER: Good morning. We are going on the record at 10:05 a.m. on Monday, September 30, 2024, in the matter of re: S&W Blue Jay Way, LLC, Case Number 9:23-bk-10672-RC. Today's deposition is taking place at 10345 West Olympic Boulevard, Los Angeles, California.

My name is Justyne Johnson. I am a California certified shorthand reporter representing the firm Planet Depos, and my certification number is 14301. The deponent is Ezra Cohen.

Counsel, can you please introduce yourselves.

MR. ZUR: Good morning. This is Roye Zur of Elkins Kalt on behalf of S&W Blue Jay Way, LLC.

MR. JANNOL: Henry N. Jannol for the witness, Ezra Cohen.

MR. LEV: And Daniel Lev from Greenspoon Marder LLP on behalf of Blue Jay 180, LLC, and specially appearing for Ronald Richards, who's in trial today on behalf of the Cohen Trust.

THE STENOGRAPHER: Mr. Cohen, can you raise your right hand, please?

///

///



EZRA COHEN,

having first been sworn by the Certified Shorthand Reporter, was examined and testified as follows:

THE WITNESS: I do.

EXAMINATION

BY MR. ZUR:

Q Good morning, Mr. Cohen.
A Good morning.
Q As mentioned, my name is Roye Zur. I represent S&W Blue Jay Way.
A Can you speak up a bit, please?
Q Oh, I'm sorry.
A Thank you.
Q My name is Roye Zur. I represent S&W Blue Jay Way --
A Mm-hmm.
Q -- which is the debtor in the bankruptcy case pending in the Central District of California. Thank you for being here. We appreciate it.
Have you ever been deposed before?
A Yes.
Q And so you understand that since you're under oath, you're sworn to tell truth, and the effect of that oath is the same as if you were testifying in court?

**A Yes.**
Q Is there any reason you can't testify today?
**A No.**
Q You understand that we're going to need audible answers, no gestures, no shaking of the head or nodding; correct?
**A Correct.**
Q And if you need any clarification, if I'm not speaking loudly enough or speaking too quickly, just please interrupt me and let me know. Also, if you need a break, please let me know. Happy to do that.
Of course, your attorney may object on certain grounds. And he may instruct you not to answer. If he does, we can go off the record and discuss. But other than that, if he interposes any objections other than those in which he instructs you not to answer, you have to answer. You understand that?
**A I do.**
Q Thank you.
What's your current profession?
**A I'm in the real estate business, mostly management.**
Q And is that management of commercial properties, residential properties or both?
**A One residential property that I own but mostly**



**commercial properties.**
Q And the commercial properties are owned by?
**A A series of different trusts set up by my parents for the benefit of the children and grandchildren.**
Q And are you the only manager of those properties?
**A Yes.**
Q Are you a practicing attorney?
**A I am licensed, but I haven't taken a client in 30 years. Maybe even longer.**
Q When you say you haven't taken a client, do you mean you haven't taken on a new client in that long or you haven't practiced as an attorney?
**A I haven't practiced as an attorney for -- I've only practiced as an attorney with relationship to family matters I've handled.**
Q Okay. And when you say "family matters," is that in reference to the properties that you just mentioned or other things as well?
**A I think ex- -- I can only think of, right now, exclusively the property matters -- properties that I manage.**
Q Okay. Were you ever employed in the last 10 years by a law firm?
**A No.**
Q Okay. Did you sear- --



**A And that might not be -- just going back to my earlier answer, I have represented A.C.C. Company and Burton Way Hotels in connection with matters related to the hotel and the fee but never as their sole lawyer. It's always been another lawyer.**
Q Is it fair to say that you represented those entities as outside in-house counsel?
**A I don't know what that term refers to. I think of it more as in-house counsel. What do you mean by "outside in-house counsel"?**
Q We can move on. I --
**A Okay.**
Q When I said out- -- outside in-house counsel, I meant not formally employed by the entities such that you would be in-house counsel, but you would serve as an in-house counsel in the sense that you would provide general advice as an in-house counsel would before going to outside counsel.
**A I don't know if I would say as in-house counsel would because I think of an in-house counsel working solely in connection with the entity. So I would render advice, provide input to both my father and my uncle with regards to the business of the partnerships.**
Q And just to clarify, your father is Joseph Cohen?
**A Yes.**



Q And your uncle is Robert Cohen?
**A Yes.**
Q Okay.
MR. ZUR: I'm just going to mark --
MR. LEV: Can I just interject?
MR. ZUR: Yes.
MR. LEV: -- before you start going through documents? Maybe you're going to ask the question, but I just want to get a foundational statement first. Because to the extent you're going to ask if he was counsel of record for the Cohen trust or Robert Cohen as part of this transaction, then we may have to interpose objections on behalf of the trust because that would be invasive of the attorney-client privilege. So maybe you can ask it --
MR. JANNOL: Guys --
MR. LEV: -- at the outset --
MR. JANNOL: Let's --
MR. LEV: -- that question --
MR. JANNOL: Sure.
MR. LEV: -- so we can clarify whether or not he was acting as counsel. Because if he's not -- wasn't acting as counsel, then let's go. That's what I'm saying.
MR. ZUR: Let's -- why don't we get to that?
MR. LEV: Okay.
MR. ZUR: I have other things that I need to get to.

MR. LEV: That's fine.
MR. ZUR: We'll get to that.
MR. LEV: At this point --
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. ZUR: We'll get to that.
MR. LEV: Okay. That's fine. I just want to let you know at the outset that that is going to be, obviously, an issue.
MR. ZUR: Well --
MR. LEV: And if he answers "No, I wasn't counsel," then --
MR. JANNOL: That's going to be the answer.
MR. LEV: Okay.
MR. ZUR: We -- we --
MR. LEV: We'll get there, is what you're saying.
MR. ZUR: We'll get there.
MR. LEV: Okay. Thank you, Counsel.
MR. ZUR: Okay. We're going to mark as Exhibit 1.
(Exhibit 1 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q So, Mr. Cohen, I've handed you a document entitled "Eddie Ezra Cohen's responses and objections to



document requests in connection with subpoena to testify at a deposition in a bankruptcy case." For the record, this was received by my office. It was sent over by Mr. Jannol's office.
Have you seen this document before?
**A Yes.**
Q And can you tell me briefly what your understanding of what this document is?
**A My understanding is this is in response to a request for documents by you or your firm or somebody on behalf of Blue Jay Way, LLC. And this is the response.**
Q Okay. Did you review these responses before counsel served them on my office?
**A Yes.**
Q And these responses are -- and I'm not asking about the legal objections. But the responses are correct, as far as you know?
**A Yes. They're prepared by my attorney, and I think they're correct.**
Q Did you work with your counsel to review and identify responsive documents in response to these requests?
**A I was instructed by my attorney to produce all the documents that were related to the request. And that we did.**



Q Okay. And so did you withhold any documents for --
**A No.**
Q -- any reason? Okay.
And other than your counsel, did you speak to anyone else about this deposition or the requests?
**A No.**
Q Come back to that later.
We spoke briefly about Burton Way Hotels and A.C.C. Company. What is the relationship exactly between the two entities?
**A Burton Way Hotels is the tenant as a leasehold interest and a piece of property owned by A.C.C. Company.**
Q And what is that property?
**A It is currently known as the Four Seasons Hotel in Los Angeles. That is the property. 300 South Doheny.**
(Stenographer clarification.)
BY MR. ZUR:
Q Is there any ownership interest between the two entities? Is there common ownership between the two of them?
**A There was. Today I don't believe -- well, there -- the interest of A.C.C. Company are owned by two trusts. They're owned by two LLCs, and the ownership of the LLC that represented my father's interest is a series**



**of trusts created by my parents.**
Q Okay.
**A And I don't know exactly the ownership on the other side, which would be RC's side.**
Q When you say "the other side," do you mean the other part of A.C.C. Company --
**A Yes.**
Q -- or of Burton Way Hotels?
**A I would say both.**
Q Okay. So is it fair to say -- do you know generally what the percentages are -- ownership between the two entities of what side is your family versus the RC side?
**A Well, initially it was in the ratio 58/40 -- not initially, but for the long time, it was 58/42.**
Q In which favor --
**A And 58 percent being RC's side, 42 percent being my father's side.**
Q And did that change at some point?
**A It's changed a numbers of times. Yeah.**
Q Okay. And as of today, do you have any idea what it might be?
**A Which entity?**
Q Well, let's start with A.C.C.
**A I believe it's 58/40 -- I'm not positive. I**

think it's 58/42 between an LLC created by RC for the benefit of his family and 42 percent is owned by an LLC my parents created. But I'm not exactly sure on RC's -- he did estate planning many years ago, and so there's some other -- I'm not exactly sure of the ownership interest. But in my mind, it's 58/42.
Q And that's as to A.C.C.; is --
A That's correct.
Q Is it also true as to Burton Way Hotels?
A Well, RC's divided his interest in a number of different ways amongst various family members of his. So I don't know -- and also, many years ago, his son had a 5 percent interest, which was then diluted to 3.5 interest. But there's a whole ownership structure on RC's side.
But in my mind, it remains 58/42. But that's not exactly the breakdown when you look at the percentages. You'd have to look at the K-1s and see which entity owns what percentage.
Q Understood. Thank you.
Who managed the entities for the period of time that you served as in-house counsel for them?
A Okay. So I'm not sure exactly what you mean by "manage." My father and my uncle both retained a voice -- you needed to act -- each of them needed to act in concert



with the other, but the more active role was definitely RC.
Q And when you say "active role," did that pertain to big-picture matters or did it pertain also to sort of day-to-day matters?
A I wouldn't say big-picture matters. I would say day-to-day matters. My father was essentially deaf. RC had a different personality. So he engaged with a number of people related to the hotel much more than my father did.
Q Would you consider Burton Way Hotels and the trust -- let me back up for a second. Let's -- strike that, please.
When you refer to the RC side of the family owning either a part of A.C.C. Company or Burton Way Hotels, was that ownership through the family trust that Robert Cohen was the trustee of?
A If you'd repeat it, because you lost me.
Q Apologies.
A Why don't you get to what you're trying to find out and that would be easier than a lot of words.
Q Did Robert Cohen's family trust own on behalf of the RC side of the family the parts of A.C.C. and Burton Way Hotels that you discussed earlier?
MR. JANNOL: If you know.



BY MR. ZUR:
Q If you know.
A My recollection is that the interest was held by RC and his wife as to most of their interest with -- early on, I think he set up an irrevocable trust for a piece of it, only 'cause I remember seeing that on documents. But there was a point in time where he did additional estate planning where he transferred his interest, I believe, into the -- a trust that he had created. But it wasn't for the piece that he had originally transferred many years ago into an irrevocable trust.
Q And when you say "many years ago," could that have been done in the '80s?
A Yes.
Q Okay. So is it fair to say that the Cohen trust that Robert Cohen had set up was a distinct entity from Burton Way Hotels?
A I don't know that. I don't know the trust you're talking about. This would be total speculation. I know that there is an entity Burton Way Hotels. There's an LLC. There's a limited partnership. And I -- there're a variety of different entities which make up ownership of that.
Q I'll sort of get to my question. Given that Burton Way Hotels and A.C.C. Company were owned by two



parts of the families -- one being your side, your father's side, and the other being RC's side -- you wouldn't consider Burton Way Hotels or A.C.C. to be the same as Robert Cohen's; correct? Distinct; right?
A There are --
(Mr. Sohaili entered the conference room.)
THE WITNESS: So should we go on [sic] the record?
MR. ZUR: Let's go off the record a moment.
THE WITNESS: Okay.
THE STENOGRAPHER: One -- off the record at 10:22 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 10:24 a.m.
MR. ZUR: Thank you. I'm going to mark as Exhibit 2.
(Exhibit 2 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. JANNOL: Thank you.
MR. LEV: Thanks.
BY MR. ZUR:
Q Take a moment please just to familiarize yourself with the document. I'm not going to ask you specifics about it, so... and let me know when you're ready.
For the record, this is an excerpt of the document, so you'll notice that it is not the complete document, and that was done intentionally.
A Oh.

21

Q I wanted to save paper.
**A I didn't notice that. Thank you.**
**I haven't seen this document in a long time.**
Q Okay. So are you generally familiar with what the document is? And for the record, it's Exhibit 2. It is the -- it's a document entitled "Declaration of Eddie Ezra Cohen in support of Plaintiffs' opposition to Defendant's motion for partial summary judgment." It appears to have been filed in a case entitled "Burton Way Hotels Limited, et al., v. Four Seasons Hotel Limited, et al., in the U.S. District Court, Central District of California, and Case Number 2:11-CV-00303-PSG.
Are you generally familiar with this document, Mr. Cohen?
**A I recognize the document.**
Q Okay. And as mentioned earlier, this is an excerpt of the full document. And the final page of this document, which is marked page 11, that's your signature?
**A Yes.**
Q And so fair to say that if you take my representation as true that I left out the pages that were in this document originally, this was a declaration that you signed and that was filed in this case?
**A Yes.**
Q Okay. If you look at paragraphs 1 and 2 where

22

you stated in this declaration that you have "served as counsel to Plaintiffs Burton Way Hotels, LLC; Burton Way Hotels, Limited; and A.C.C. Company since 1985," this is the representation that you referred to earlier when you answered my questions about your work as an attorney?
**A Question's not exactly clear. But this -- I represented them. I don't believe Burton Way Hotels, LLC, existed in 1985. But when it came into existence, I think Burton Way Hotels, LTD, and A.C.C. Company were in existence then. So -- but I represent -- I worked on behalf of both of those and represented them.**
Q Okay. And what general subject matters did you advise those entities about?
**A Well, I was involved with certain capital events. This one has to do with a negotiation with Four Seasons regarding an amendment to the management contract.**
Q And when you say capital events, are you referring to loan transactions, equity infusions?
**A Dealing with lenders. I was involved working with Hush and his firms. They changed over years. And I was involved with working alongside my uncle and my father and working with them.**
Q In providing the legal services to those entities, who did you communicate with on the --
**A Mostly --**

23

Q -- A.C.C. --
**A Hush.**
Q Okay.
**A And also other members of his firm, Tony Salandra. I mean, there's a whole list of folks.**
Q And on the A.C.C. Burton Way Hotel side, other than your father and RC, who else did you communicate with?
**A From time to time, different members, but mostly my father and RC. Nobody else had as active as [sic] role as they did.**
Q And so when you needed direction, you communicated with one or both of them; correct?
**A Yes.**
Q When you needed legal direction. Apologies.
**A Well, yes. I communicated with both of them freely.**
Q Understood. Did you have any formal retainer agreements with A.C.C. or Burton Way Hotels?
**A I don't believe so.**
Q Did you have any retainer agreements with any other entities that either of them owned?
**A No.**
Q Did you send them periodic billing?
**A Not on a regular basis. I mean, not on a monthly**

24

**basis.**
Q So how did you get paid?
**A Usually at the conclusion of a capital event, I would send them a bill.**
Q And it was hourly work?
**A No. It was scope of work. It was -- depended -- the -- it depend on the -- how long I'd been working on something, depended on, you know, that kind of an effort.**
Q And did you keep track of the time you spent on any particular matters for them?
**A No.**
Q Okay. At this time, did you have any other clients other than --
**A No.**
Q Okay. What kinds of legal documents did you review in providing the legal service to Burton Way Hotels and A.C.C. Company generally?
**A The review of documents I mostly left to Hush. The comments to Hush's review was mostly where I was involved. I wasn't the person primarily reviewing documents. Maybe if there were term sheets, I would read them also. But principally relying on Hush's review and then discussing particulars as they came up from there.**
Q Did you ever have conversations either with your father or RC about matters that didn't necessarily have to

do with Burton Way Hotels or A.C.C. Company specifically over legal matters?
**A Well, my father for sure. Because I -- all the things that I could do in my mind, like a number of leases, I handled for my father. Purchased the house, I handled that. I don't think we used outside counsel. But I did a number of things for my father. But I wa- -- RC would not -- I did not do that for RC.**
**I mean, I was intimately involved with the day-to-day management or running and development of my father's business. And I also worked on behalf of the hotel.**
Q So if you had conversations with RC and RC had some kind of legal question, was it always pertaining to Burton Way Hotels and A.C.C. or did it sometimes pertain to other things not specifically related to those entities?
**A I think it related to Burton Way Hotels and A.C.C.**
Q Did they consider you a reliable attorney in the family with whom they could consult?
**A Who's "they"?**
Q Your father and RC.
**A I think they both trusted me. My father relied on me more than RC did. My father relied on me quite a**



**bit.**
Q Okay. Did RC rely on others in addition to you?
**A I believe so. Yeah. He had a...**
Q Anybody else that you can think of that he relied on for legal advice that were members of the family?
**A I know he relied on Hush. I don't know what other lawyers -- he would get input from a variety of different lawyers. There was a firm in Washington that gave him tax input at one point. There was -- I don't know. I would be speculating.**
Q Any other members of the family that he might have relied on in addition to you?
**A I don't know. I mean, I don't know to what extent he used his son-in-law or his daughter. I have no idea.**
Q And his daughter is Michelle Lerman?
**A One of his daughters is Michelle Lerman. Yeah. She's an attorney.**
Q And the son --
**A She did estate work, so I don't know if he would really rely on her. And, you know, Jeff was, I think, a litigator. I never worked with Jeff. I don't know if he'd rely on him or used him.**
Q And when you say "Jeff," you're referring to Jeff Lerman?



**A Yes. Michelle's husband.**
Q Okay. This document's going to be Exhibit 3.
(Exhibit 3 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment to familiarize yourself with the document and let me know when you're ready.
You ready?
**A Yes.**
Q So for the record, this is a document with a Bates number at the bottom-right corner bearing Bates number SWBJ000369 through 371. This is a document that was produced to my office by Mr. Cohen in response to the subpoena.
Mr. Cohen, can you tell me generally what this document is?
**A Looks like an escrow instruction.**
Q From whom to whom?
**A Well, to, I believe there's a person named Mary Brown, who's an escrow agent, and it's from all the parties who signed it.**
Q If you look at the third page -- that's 371, the bottom-right corner -- is that your signature at the top?
**A Yes. Where it says Ezra Cohen, yes, that's me.**
Q Okay. And this was an instruction given by



A.C.C. Company to this escrow agent that you identified earlier; is that correct?
**A That's the way it reads to me.**
Q And you --
**A I don't know if it's only by A.C.C. Company because it's signed by the borr- -- I'm not -- yeah. It's an escrow instruction. I think it's from everybody but...**
Q And it's signed by you on behalf of JC/SC Family LLC and it's signed by Eleda Cohen on behalf of RC/BC Family LLC?
**A That is correct.**
Q And are those the two entities that you were thinking of when you said that A.C.C. was owned by -- in part by your father's side of the family and another part by the RC side of the family?
**A Yes. But I believe there's also a piece owned by another entity originally relating from RC's interest. I don't know if that's the exclusive ownership of the partnership.**
Q Can you recall where you got this document from?
**A Came off my computer.**
Q Just for the record, this is a document that was produced by my office to Mr. Lev in response to document requests that were served on the debtor by Mr. Lev's client. Did you receive --

29

**A So you said I produced this document. I had my nephew go through my computer and take everything off the computer that was related to the request for production of documents. And I believe that where's this came from. I don't know if I produced one that doesn't have the number on the bottom – the Bates stamp. 'Cause I'm not sure how one with the Bates stamp would have it.**

MR. JANNOL: Let's make it quick. I think we produced a Mary Brown document. And now you're providing us with Mary Brown document ten years ago so...

MR. ZUR: Let's go off the record for a minute.

THE STENOGRAPHER: Off the record at 10:40 a.m.

(Off the record.)

THE STENOGRAPHER: Back on the record at 10:42 a.m.

BY MR. ZUR:

Q Mr. Cohen, can you tell me generally what these escrow instructions related to?

**A Very vaguely. I don't recall seeing it. When I first – when I saw it more recently and scratched – you know, thinking back, there was – okay. I was surprised that the loan came from A.C.C. I thought my dad had made a loan to Ar- – to Hush. And now I'm thinking, like, okay, maybe A.C.C. made the loan.**

**I thought my dad and my uncle made independent loans to Hush at some point, and they got paid back. Now**

30

**I'm seeing oh, no, the loan was made by A.C.C. to Hush, and that loan was paid back.**

**I wasn't involved with the making of the loan. I think I was helping to facilitate the repayment of the loan.**

Q Okay. And when you say loan to Hush, the borrower on this -- reflected on this document is 180 PCH, LLC, and it looks like there are two members who have signature pages. One of them is HS 270, LLC, with Mr. Sohaili as its sole member, and then there's another one called PCH 10,000 LLC with an individual named Richard Weintraub as a member. Does that sort of refresh your recollection as to who the borrower was?

**A No. I mean, in my mind, my father's mind, it was a loan to Hush.**

Q Okay.

**A So, you know, you could do – I wouldn't know the entities. We don't underwrite – we're not in the business of making loans. So we don't underwrite things, all that, but my dad fully trusted Hush and...**

Q Okay. Did you have anything to do with this loan in February of 2014 when this document was signed or did you just get this document and sign it?

**A I think I was more involved with facilitating the payback of the loan. I don't even fully understand how**

31

**the loan gets paid back, to be honest with you, whether it's going to be an instruction from Eleda, Hush, or myself. I mean, I'm not even sure the whole gyration. I get intimately involved with the things I handle for my dad principally, and I couldn't tell you the exact gymnastics of who -- I don't know who Mary Brown is. Haven't used First American Title. I didn't prepare the document, this escrow instruction.**

Q Do you know who negotiated this loan on behalf of A.C.C.?

**A It would be speculation. But I would think it was my uncle and Hush.**

Q Okay.

**A But that would be speculation. I don't know that for certain. Like I said, I thought my dad had made a loan to Hush that got paid back -- an initial loan to Hush that got paid back. And so I look at this, I see A.C.C. made the loan.**

Q Okay. Do you know if your father or RC asked for a guarantee of this loan by either Mr. Sohaili or Mr. Weintraub, the two members of 180 PCH?

**A Well, I don't know Richard Weintraub. I know Hush. And we would typically want to -- I just -- we would want -- like I said, we would make a loan to Hush, not to an entity. I don't want to get involved with the**

32

**gymnastics of an entity.**

Q Okay.

MR. ZUR: This next document is a single page. It's Exhibit 4.

(Exhibit 4 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZUR:

Q Let me know when you've had a chance to --

**A Just one page; right?**

Q Yes.

**A Yeah.**

Q This is a document -- for the record, it appears to be dated December 29, 2015. Can you tell me what this document is, Mr. Cohen?

Well, first, let me back up for a second. Is -- at the bottom, in blue ink next to the word "signature," it has a signature, and then it says "authorized officer." Is that your signature?

**A Yes.**

Q Okay. Can you tell me what this document is?

**A I believe it indicates the amount to get a loan paid off as of a certain date.**

Q And is it --

**A Known as a demand.**

Q And is it the same loan that we had just

discussed in Exhibit 4?
**A I think so.**
Q I'm sorry. Exhibit 3.
**A I think so.**
Q Okay. And does this refresh your recollection as to what the timing was as between the making of the loan and the repayment of the loan?
**A No.**
Q Okay. This document is dated December 29, 2015. The other document was dated sometime in February 2014. Do you remember generally now what the timing of the making of the loan was and the repayment of the loan?
**A No.**
Q Okay. Do you recall receiving -- you mentioned that this loan was made, in your mind, to Hush. It wasn't, but in your mind. Do you recall receiving any conflict waiver letters from Hush or his law firm?
MR. JANNOL: For this loan?
MR. ZUR: For this loan.
THE WITNESS: I don't recall. Not saying that there wasn't, but I don't recall.
MR. JANNOL: You've answered.
BY MR. ZUR:
Q If a conflict waiver letter had been provided to A.C.C., would you have reviewed it? In other words, would



you have been the person to review it?
**A I would have trusted Hush. So...**
Q But would you have been the person to review?
**A I would have done probably a cursory review of it. But it was -- I had full trust in Hush. So if he put something and asked me to sign it, I would sign it.**
Q Okay. But it wouldn't have been your father reviewing it carefully or --
**A No.**
Q -- RC?
**A I don't know about RC.**
Q Okay. But your father would have trusted you to be the one to look at it and tell him if anything was amiss; right?
**A I don't think my -- my father would have relied on either Hush or myself before he signed the document.**
Q Okay.
MR. ZUR: Can we take a five-minute break?
MR. JANNOL: Sure.
MR. ZUR: Off the record.
THE STENOGRAPHER: Off the record at 10:50 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 11:01 a.m.
BY MR. ZUR:
Q Mr. Cohen, when you provided legal advice to your



father or RC in connection with Burton Way Hotels and A.C.C. matters, did you do so in emails, texts, phone calls, all of the above?
**A My -- I don't believe we dealt much in texts. Maybe a little bit. Mostly maybe with RC and my dad. Well, mostly with my dad would probably be email, and RC mostly in phone -- by phone.**
Q So if you sent RC a document to look at, is it fair to say that he would call you and you guys would chat about it on the phone?
**A I don't recall sending RC documents. I wasn't -- I didn't operate in a formal capacity. I participated in conversations. Like, RC probably had more conversations with Hush than he did with me directly. And I know when RC would communicate with my dad, he would make a point to sit with him in person 'cause my dad couldn't hear on the phone.**
**So I didn't report to RC that way. It was more facilitating and working in connection with various conversations that were happening. So I don't know if that -- I mean, I think you're trying to describe something that was kind of, like, more formal, but it wasn't.**
Q I think I asked you earlier about --
**A Sorry.**



Q I'll ask it again. Do you recall receiving a conflict waiver letter from Hush or Hush's firm in connection with the A.C.C. loan back in 2014?
**A I don't recall.**
Q Okay. What would have been the purpose of such a conflict had it been sent, in your mind?
**A Hush needing something with respect to his firm saying that he could borrow money from a client.**
Q And why would it have been important for a conflict waiver letter to be sent at all given his role as a lawyer?
**A Well, we worked with Hush for years. So he was our lawyer. And then there was -- Hush was also a businessman doing deals -- or trying to do deals. So he wanted to borrow money from my dad and my uncle.**
Q And would it have been appropriate for him to -- to serve as a lawyer in a transaction that he was involved in personally or through an entity that he owned?
**A There's a relationship of trust there. So we trusted him.**
Q Right. But my question is different. Would it have been appropriate for him to act as a lawyer?
**A I can't comment on that. I mean, he did what he did. What can I tell you?**
Q And if he sent a conflict waiver letter, what

would the purpose of that letter be?
**A I suspect to have cover with his firm, to make sure that his firm knew, look, we have a conflict waiver.**
Q And would it make sense for him to tell your father or RC, who are the decision-makers, that his clients -- that they should not rely on him as counsel and they should speak to somebody else about that matter given that he has a personal stake in it?
MR. JANNOL: Do you want his state of mind today or at the time?
MR. ZUR: At any time.
MR. JANNOL: If it ever occurred to you.
BY MR. ZUR:
Q I ask you as a lawyer.
**A I'm going to answer based on my relationship with Hush and my father. And as I saw it, it was a relationship based on trust. And so my dad would -- my dad had a very good sense of when to do business with somebody. And he did it basically -- 'cause he couldn't hear very well. So he had to be able to trust somebody. So that was the most important, I think, that my dad went on. And it was innate, and he just had it. Took me a long time to realize that he had that skill. So he fully trusted Hush.**
Q And the documents I've shown you, which we've



marked as Exhibits 3 and 4, having to do with that loan back in 2014 from A.C.C. to 180 PCH, did you have anything to do with the documentation of that loan? Did you review any documents? Did you comment on them?
**A Not that I recall. I thought the loan was from my father to Hush. And now I see that it was from A.C.C. to an entity. So my recollection is -- I don't have a recollection of that.**
Q And you were counsel to A.C.C. at the time; right?
**A I did not -- well, Hush was counsel to A.C.C. at the time too, so was his entire firm. So everything I did for A.C.C. was through Hush. Like, I would rely on Hush in -- on legal matters related to A.C.C. And he knew that. We were very close.**
Q And this matter, the loan that we're referring to, was not a matter that related solely to A.C.C. -- right? -- because it was a loan to an entity that Hush had an interest in; right?
**A Well, you say --**
Q That's what the document reflects.
**A It was a loan from A.C.C. to another entity. But I can tell you, from my dad's point of view, from my point of view, it would have been a loan to Hush. Would haven't been made without that.**



Q I understand. And you, as a lawyer --
**A Mm-hmm.**
Q -- a very experienced one, would not --
**A Why do you say I'm so experienced?**
Q Well, you've practiced since I was a child.
**A You're doing something with these comments, and I don't appreciate it.**
Q I --
**A I didn't take any outside clients. I only worked for a family partnership. And I had the tutelage -- I learned everything I learned from Hush. I knew him from right out of law school. Worked for him in a law firm. I could go on, but I relied on him. So don't -- let's keep things straight with what they are.**
Q I'm only trying to keep things straight. My --
**A Okay.**
Q -- question was, I thought, straightforward.
If Hush's personally involved in a loan transaction --
**A Mm-hmm.**
Q -- from an entity that you represent, would you have the same type of blind trust in Hush or would you, as counsel for that entity, give independent advice?
**A Sir, we weren't in the business of making loans to people. We made a loan to Hush. So it's basic, it**



**wasn't underwritten. There wasn't -- look at financials. None of that stuff. You make a loan to Hush 'cause you trust him.**
**He's acted as family counsel for so many years. Everybody in the family trusted him with everything.**
Q What was the interest rate on that loan? Do you recall?
**A I don't recall.**
Q Okay. Let's take a take a look at Exhibit 4.
**A Yeah, I see that.**
Q Middle of the page in blue ink.
**A Mm-hmm.**
Q Does that refresh your recollection as to what the interest rate was?
**A No.**
Q Okay. Under the word "demand" --
**A Mm-hmm.**
Q -- could you read that paragraph to me?
**A "You are handed herewith a Note in the amount of $2,000,000 dated February 7, 2014, secured by a Deed of Trust recorded in the County of Los Angeles, executed by: 180 PCH, LLC, in favor of: A.C.C. Company, together with Deed of Trust and Request For Full" convey -- "Reconveyance thereof, which you are authorized to deliver to the parties in interest or their representative**

**provided on or before close of escrow you hold for our account the sum of $2,021,232.88 calculated as follows: $2,000,000 plus interest at the rate of 12.5 percent per annum from December 1, 2015, to December 31, 2015, to and including the close of escrow.**
**"Additional fees, if any, none.**
**"Disbursement to be made by check of your company or by title company designated by you. In the event that the conditions of your escrow have not been complied with, you are instructed to return" the enclosed -- "all enclosed documents upon our written demand to you. Mail check to the undersigned beneficiary at the address given."**
MR. JANNOL: Do you want him to read more?
MR. ZUR: No. Thank you.
MR. JANNOL: Okay.
BY MR. ZUR:
Q Do you have any reason to believe that the 12.5 percent reflected in this document is incorrect?
**A I don't remember the document, and so I'm not going to -- it looks corre- -- it looks like it's in my handwriting.**
Q Okay. And if it was wrong, would you have signed it, or would you have made sure that what's in here is correct before signing it?



**A I was getting the numbers from somewhere and the names of the entities from somewhere, and I wrote them in.**
Q Okay.
**A So I believe they were correct.**
Q Okay. Do you remember anything about who chose the 12.5 percent --
**A No.**
Q -- interest rate for that loan?
**A No.**
Q Do you recall speaking to anybody about the interest rate on that loan?
**A No.**
Q Did you raise any issues with respect to the interest rate on the loan?
**A No.**
Q Did you consider that maybe the interest rate was illegal under California law?
**A I wouldn't assume it to be illegal.**
Q Okay. And you didn't speak to anybody involved in the transaction about the interest rate, any issues with it?
**A There's something in my mind that says 1 percent a month, and that's 12 percent. So I don't know the 12.5 percent, and I didn't negotiate the interest rate. So I don't recall.**



Q Did you recall if your father or RC ever consulted with you about the interest rate, whether you provided advice or not on it?
**A No.**
Q Okay. Did Hush say anything to you about the interest rate?
**A Not that I recall. I -- the -- what I remember from Hush is 1 percent per month or -- and I think that's kind of -- as I remember, there was a business term that it was going to be 1 percent a month. But that came in initially after the fact.**
**Then there was a subsequent loan, and we weren't part of that subsequent loan. And I think that's where I remember that discussion. I didn't even realize this was a year. I didn't think it was even that long. I thought it was a shorter-term loan.**
Q Would your father or your uncle have consulted with anybody other than you on this loan, as far as -- as far as lawyers?
**A I don't know.**
Q Okay.
**A My father wouldn't have.**
Q You mentioned earlier that your family was not in the business of making loans. Are you --
**A I was speaking of my father's family. I don't**



**know what RC has done and his family's done.**
Q Are you aware of any loan transactions to third parties or family members that --
**A Well, to family members is a different matter. To third parties, I remember maybe two loans my dad made. One to a really long-time friend. She had a birthday with him. Known him for 60, 70 years, for $25,000 and probably his best friend's wife, who -- my dad's best friend passed away. Loans her $10,000.**
Q And --
**A But we weren't -- may dad didn't make loans.**
Q And did your father ever consult with you about anything having to do with those two loans that you mentioned?
**A I helped facilitate them. I don't think there was a promissory note for Jackie Hassen. I think there was a very rudimentary promissory note for Rose Benon. She was the one that had a $10,000 loan.**
Q And when you say you facilitated, does that mean that you --
**A I made sure the check got written, and we got it delivered and got them paid, you know.**
Q Would you have drafted the promissory note?
**A The -- I don't believe there was a promissory note for Jackie Hassen. I do believe there was a**

**promissory note for Rose Benon. And I took something off the computer. It was maybe one paragraph. Maybe it was two paragraphs, but it just memorialized that there was a $10,000 loan.**
Q Are you aware of any loan transactions to family members or otherwise by the RC side of the family?
**A No.**
**And on our family side, there's a lot of loans between -- my sisters had borrowed money from my parents and it goes on and on. So there's -- that is extensive. And there are some transactions we try and keep up with the -- the federal interest rate to make sure, you know, all that stuff. But that's on an immediate-family basis. I can't speak for RC's family in that regard.**
Q Would RC have made loans to anybody through an entity?
**A I don't know.**
Q Okay. You mentioned that the family -- both the RC side of the family and your father's -- consulted various lawyers over the years in addition to --
**A I did not say that, sir.**
Q -- Hush's firm --
**A I said RC's family and RC consulted a lot of lawyers. My dad didn't. My dad had very few -- he used Henry. There was a fellow named Al Howard he used before**



**Hush came in the picture, who died. And then there was Hush. I don't -- that was it.**
Q And when would RC have opted to consult with you as opposed to Hush on a particular matter involving Burton Way Hotels or any other entity?
**A I think RC would discuss things that he wanted me to communicate to my father. So that's really how he used me. He didn't use me as the entity lawyer so much. He used me more as a go-between between -- to facilitate a communication between my father and him.**
Q Okay.
MR. ZUR: I'm going to mark as Exhibit 5.
(Exhibit 5 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. JANNOL: Thank you.
MR. LEV: Thanks.
BY MR. ZUR:
Q Take moment to generally familiarize yourself this document and let me know when you're ready.
MR. JANNOL: You've read it?
THE WITNESS: I'm ready. Sorry.
BY MR. ZUR:
Q So just for the record, this is a -- appears to be an email chain with the latest email being Friday, February 1, 2013, at 3:53 p.m. Pacific time. That's an



email from Hush to -- I think that's RC with a CC to you; is that correct, Mr. Cohen?
**A Yes.**
Q Can you tell me what this email chain is?
**A I think it speaks for itself. I don't really remember it. Oh, I don't remember it. I don't know if -- I remember meeting with East West Bank in Pasadena on occasion probably around 2013 about generally engaging or using East West Bank to be our bankers or to take a position as our bankers because we'd been using City National Bank.**
**So if that's the meeting -- 'cause I do remember driving to Pasadena one time and meeting people at East West Bank maybe some time around -- a long time ago. I don't remember it as a meeting regarding a property.**
Q When you say -- you said our bank, is that a specific entity or the family generally?
**A Well, I think -- whether the hotel would do banking there, whether Burton Way Hotels would do banking there, whether A.C.C. Company would do banking from there, whether my father and his various entities and trusts would do banking there, and the same thing on RC's side on -- for RC. That's what I meant by "our."**
Q So this email chain, as you remember it, related to a meeting with East West Bank in connection --



**A Well, let me go back and say it again. 'Cause that's not -- I don't remember this email chain. I see that I'm copied on it. With respect to East West Bank, I remember one meeting that I attended that had to do with the subject matter that I described, not the subject matter of Hush's 1633 Blue Jay Way property.**
**So I don't recall ever going to East West Bank in regards to Hush's development. And I think Hush was with us when we went to East West Bank to talk about a general banking relationship. And I'm not sure how that introduction came. I don't know if it was through Hush or through somebody else. But that's, as I recall, what that meeting was about.**
Q Do you remember Hush having any sort of connection to East West Bank?
**A Not that I recall.**
Q Is it possible that somebody else would have connected you to East West Bank other than Hush?
**A Well, somebody did. I don't know who did. Somebody made an introduction for us.**
Q Is it possible that it was Mr. Weintraub?
**A I don't know that. I've never met Richard. I've met Richard one time at my uncle's house but I wouldn't recognize him if I saw him.**
Q And what was the meeting at which you might have

met him?
**A It was a holiday party in December at my uncle's house. I believe there was an introduction amongst a large group of people.**
Q Do you remember approximately what year that might have been?
**A No. It would have been a long time ago. I don't know. Ten years ago. Maybe longer. I only went to one or two of my uncle's holiday parties. Maybe three. I mean, not many.**
Q Okay. Do you know anything generally about Mr. Weintraub? I understand you don't know him personally. You might have met him once or twice, but...
**A Generally, I know --**
MR. JANNOL: What's the relevance, guys?
MR. ZUR: I'm just asking.
THE WITNESS: He does real estate development. He's been attached to some interesting projects.
MR. ZUR: Okay. This next document is going to Exhibit 6.
(Exhibit 6 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. JANNOL: Thank you.
BY MR. ZUR:
Q Take a moment to familiarize yourself with this



document and let me know when you're ready, Mr. Cohen.
**A I'm ready.**
Q So for the record, this is an email -- well, the underlying email, which was forwarded from you to jwoods@jcre-la.com on May 2, 2024. The original email was from Joseph Cohen to you on February 23, 2013, at 10:10 a.m. with the subject re: Blue Jay Way Indemnity Agreement."
Can you tell me what this email is?
**A It's a communication by my father to me regarding a loan to Hush and Weintraub in connection with Blue Jay Way.**
Q And what's -- and what's your father telling you in this email as you understood--
**A He's not interested in going forward.**
(Stenographer clarification.)
THE WITNESS: I think there -- you know, when the first loan was paid off, there was a request for another loan. I remember receiving from Hush a rendering, and then that was the first time we went to look at the property. We didn't like the property. We go on reasons about that.
And it was a complicated structure because Hush wanted the ability to get a construction loan. If I recall, there was something about a subordination. That's



all I recall.
BY MR. ZUR:
Q You mentioned a loan before this one --
**A Yeah.**
Q -- you said, was paid off. Which loan is that you're referring to?
**A I think that was the $2 million loan that got paid off.**
**Hush is shaking his head, so I'm not sure what I'm saying wrong.**
Q So let's -- just for the record, the email here is dated February 2013. And I believe the loan that you're referring to is the one that's referenced in Exhibit 3.
**A Mm-hmm.**
Q And that loan -- at least in Exhibit 3 and then in Exhibit 4, that postdates this email that's 2014 and 2015.
**A I'm going to tell you my recollection that there was one loan. That loan got paid off. I thought it was a loan from my father to Hush. And it turns out maybe it's a loan from A.C.C. to Hush. And it's not even to Hush. It's to an entity.**
**And then there's a subsequent – I remember there was a subsequent loan. Because Hush was telling me, you**



**know, about the project, and they wanted to get their invested rights. And I'm not sure. A lot of stuff like that. But most importantly we went to the site and – so as a real estate matter, it didn't seem to make sense to us. And everything was complicated.**
Q Who went to the site?
**A My father and I.**
Q Just the two of you?
**A Yes.**
Q And did you discuss the -- other than the site itself, did you discuss the terms of the potential loan with your father?
**A My dad would have looked at it and asked himself or – whether he thought that was a viable development – viable deal, if it made sense. Didn't make sense to my dad, so he wasn't interested.**
Q Would you have discussed the -- other than as a general real estate development, would you have discussed the terms of the loan with your dad specifically in helping him decide whether to invest?
**A Well, yeah. You would discuss it. I mean, I remember it being complicated.**
Q What part of it was complicated, in your mind?
**A Entities, subordination, things like that. So, you know.**

Q Did you have a full understanding of the terms other than the subordination and the entities involved?

**A Not that I can recount. I mean, I didn't -- we didn't pursue it. So...**

Q Would you have, in a conversation with your father, said this is -- these are the entities. This is the subordination. These are the terms of the repayment, the interest rate, et cetera. Would you have had that conversation with him?

**A No. That was probably more detailed than my father would want to hear. He would -- if it wasn't so straightforward that he could follow, that spoke for itself.**

Q At the time, did you know what the terms of the proposed loan transaction were?

**A I don't recall.**

Q In setting yourself up for a conversation with your father about it, would you have reviewed those documents to familiarize yourself with the terms so that you could?

**A I don't recall seeing documents. I do recall -- I don't even -- I just know that there was some -- I don't even recall the particular conversation. I know that there was some -- yeah. I'm -- Hush was excited about a project he was going to do with Richard and why it was so**



**great. And you can make a lot of money.**

**But we went and saw the ren- -- we saw the rendering that he had sent us, and we saw the site. I think there was already concrete in the ground. And so they had done some work. That's my recollection of what we saw. Saw very steep site, very high up Blue Jay Way. Wasn't interesting to my father.**

Q In the email from your father to you, it looks like there was an attachment called "Blue Jay Way Indemnity Agreement."

**A Mm-hmm.**

Q Do you recall that document at all?

**A No.**

Q Did you send it to your father?

**A I don't know.**

Q It looks like there's a part of the email that you had sent to him that might be cut off here. I can't see the content of the email. Is it possible that your email to him had that document attached to it?

**A I don't know.**

Q Could your father have gotten it from any other person?

**A Yes.**

Q Who?

**A Hush. Hush emailed my father.**



Q Would Hush have communicated with your father directly on this?

**A Quite possibly.**

Q Okay.

**A Could have been somebody from his firm.**

Q Did you ever speak to Hush about this loan?

**A I know we spoke about that -- how it was complicated. It wasn't clean.**

**I don't know if it got reduced down to my father would make a loan to you but wouldn't make a loan to your entity. I don't recall specifically.**

**But I know that there was a general -- there were two problems with it. One was that it was complicated, and the other my dad didn't believe in the project.**

Q And when your father -- it looks like he decided to pass on this --

**A Mm-hmm.**

Q -- opportunity, did he communicate that directly to Hush or did you?

**A I don't know. I know he did to me, but he may have very well communicated to Hush too. My dad had dialogue or communications with Hush. It wasn't all through me.**

Q And you mentioned a conversation or a series or -- I didn't really catch how many times, but at least



one time that you relayed to Hush your father's concerns with the project. Do you recall when that was?

**A I don't recall.**

Q Would it have been before this email or after this email from your father to you?

**A I don't recall. I suspect it would have been after. I don't know when this email was sent in context of our communication about it.**

Q Okay.

**A I don't have a timeline on all this.**

Q And when you spoke to Hush, was it in person or was it on the phone?

**A Probably on the phone. I don't -- you know, Hush and I generally didn't meet in person. I mean, I would come to his office, but mostly we would speak on the phone. So I suspect it was on the phone.**

Q And is it possible that upon receiving this email, you might have picked up the phone and called Hush and said, "My dad decided to pass on this"?

**A I don't know. I really don't know. I probably wouldn't have -- I didn't -- probably wouldn't have done it immediately. Maybe I did. I don't remember.**

MR. ZUR: This next document is going to be marked Exhibit 7.

///

57

(Exhibit 7 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment to read this, familiarize yourself and then let me know when you're ready.
**A I'm ready.**
Q Okay. For the record, this is an email chain that was forwarded to -- from you to yourself and jwoods@jcre-la.com on May 2, 2024. And --
**A So, like I said, my nephew went through my computer and pulled everything he could. And then he sent it to himself so he could sent it over to Henry's office.**
Q Understood. Thank you.
Are you familiar with this email chain?
**A I don't remember.**
Q Looks like the initial email -- at least the first one in the chain is an email from Daniel Shlomi, who has an Akin Gump email address, on February 21, 2013, at 8:33 p.m. to Hush. And it says, "Hush, please find clean and redlined versions of the following document. Note to Cohen trust, indemnity agreement, conflict waiver."
Then there's another email forwarding it from Hush to Shingly Lee with a CC to Robert Cohen. Can you tell me who Shingly Lee is?
**A She worked for RC, his family, various entities,**

58

**and she worked for A.C.C. Company and Burton hotels.**
Q And what was -- does she still work for those entities?
**A Yes.**
Q What's her position today?
**A I think the same as it's always been, kind of a go-to person. She's -- I mean, she probably best -- facilitates the paperwork, keep track of paperwork. I don't -- she doesn't have any -- of entities we're involved in, she doesn't have any power or authority to do things, but she would make sure things are set up, things like that.**
Q Is she sort of like an office manager?
**A I think so.**
Q Okay.
**A We don't have formal structure in how people -- you know, so I think she's kind of like the go-to person.**
Q Would RC perhaps use her as an assistant of sorts?
**A Yeah.**
Q Okay.
**A I think everybody in their family used her as an assistant.**
Q Okay.
**A Continues to.**

59

Q The next email looks like a forward of the first forward from Hush to Shingly Lee and RC, and it says, "Hi Ezra, RC wanted to ask if you could review these documents and call him to discuss. Hush needs the docs to be signed this morning. So if you could do this right away, we'd appreciate it. Thanks, Shingly."
And this was sent from Shingly to you on February 22nd at 9:28 a.m., and the subject is a forward "Blue Jay Way - Note, Indemnity, and Conflict Waiver." And it appears that there are a bunch of documents that are attached as well.
Do you recall receiving this email?
**A No.**
Q Well, did you receive this email?
**A Well, I believe so. It was on my computer.**
Q Okay.
**A I don't know if I opened it, but I believe I did.**
Q Okay.
**A I -- it didn't -- you know, you can see -- if it's highlighted or not. I have a bunch of emails I haven't opened. I don't know if this one -- I don't remember this document. But it came from my computer.**
Q If Shingly had sent you an email, is there any reason why you might ignore it?
**A Yeah.**

60

Q What reason would that be?
**A Busy doing other things. I'm kind of a one-man show. So...**
Q Well, would you eventually get to it or would you just --
**A Not necessarily.**
Q Okay.
**A Like I say, I still have unopened emails on my computer.**
Q From Shingly?
**A I bet you I -- soup to nuts I do.**
Q Okay. And if Shingly asked you -- well, let me take a step back. Strike that.
Did you speak to RC about these documents?
**A I don't recall.**
Q If you had opened that email, would you have done what RC asked and reviewed the documents and called him to discuss?
**A Not in great detail. I would have done a cursory review. You know, I don't do secured transactions on my own. So I don't -- I'm really not an expert in it, but I can give a cursory review. I mean, most of what I do is go through leases. And then after that, oftentimes I use outside attorneys to help me with leases, if they get more complicated or something like that.**

Q Well --
**A So I might have done a cursory review.**
Q Well, what would a cursory review include?
**A Not much. Looking at the document. I mean, the documents would have been prepared by Hush, and I would have trusted those documents.**
Q All right. Let's come back to this one.
**A Okay.**
MR. ZUR: We're going to go to Exhibits 8 and 9. The first one is Exhibit 8. And then the next one I'll just hand out now -- may as well -- is going to be Exhibit 9.
(Exhibits 8 and 9 were marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment just to familiarize yourself with the documents and let me know when you're ready.
**A I'm ready.**
Q Okay. So in Exhibit 7, at the second page there were various attachments to the email that Ms. Lee had sent you.
**A Mm-hmm.**
Q And one of them is promissory note secured by deed of trust -- well, excuse me. Sorry. The second document is redlined, and it has a document number "V1



Promissory Note Secured By Deed of Trust," et cetera, et cetera. And then at the bottom, there's a redline, again, with numbers "v1-RC Consent and Waiver," et cetera, et cetera.
Are these the documents that were attached to that email?
**A I don't know.**
Q Are the numbers at the -- that are reflected in the second page of Exhibit 7 the same as the numbers at the bottom-left corners of the two documents that we've marked as Exhibits 8 and 9?
**A Let's see here.**
**So I think one of the documents is listed here. And that's this 203390061-v2. This one says "-RC." On the -- number on the bottom doesn't say "-RC." So that one -- let's see if we can find this one. Is this it?**
**So then there's -- this one looks like it's the 1203383924-v2. It's a redline, looks like. So that one I think is listed.**
Q Okay. So when you do a cursory review of these two documents, what would you have looked for?
**A I don't remember looking at them.**
Q Okay. If you do a cursory review of a promissory note, what would you be looking for?
**A I don't remember doing cursory reviews of**



**promissory note [sic]. If I looked at it, it would -- but I don't remember, so I don't -- what I would look for, probably the names, maybe the dates, the amounts, the interest rate. I mean, I don't remember making a cursory review of these documents.**
Q And do you remember speaking with RC about this at all?
**A No.**
Q Did you relay to anybody other than --
**A I believe --**
Q -- Hush --
**A -- I told RC my dad wasn't interested in going forward with this. That, I think, would have been -- and I think RC said he wanted to do it. I'm just trying to kind of put this in my mind how this came about. There was a time they were both going to do it. Then we were -- my dad wasn't interested. And RC, I think -- I mean, I just left it to RC and Hush to work it out.**
Q And do you remember when you spoke to RC about your dad not wanting to be involved?
**A No.**
Q Would it have been immediately after getting that email from your dad or later on?
**A Would have been after.**
Q Immediately after or a week after?



**A I don't know.**
Q Okay.
**A But it might have been before too. I mean, the email seems like as of right now, but I think that there were misgivings before that. So I don't know.**
Q So is it possible that you might have communicated to RC that your dad wasn't interested in participating in this transaction before receiving that email?
**A Probably not. But my -- you know, my father would, you know, talk in terms "I got cold feet." He would say something like that. So I would know that there's some, you know -- but I don't know exactly when -- whether my father communicated to RC or whether I did. I can't recall. Very well could have been my father talking to RC.**
Q And did -- do you know why Shingly sent you this email?
**A No.**
Q Do you know why RC would have wanted you to look at the documents?
**A Probably 'cause Hush told him somebody's got to look at it for him.**
Q And why would Hush tell him that?
**A Because Hush is his lawyer and wants to borrow**

65

**money from him.**
Q Okay. So Hush couldn't give him advice on that?
**A I think so. I think that where's we're going with this.**
Q Okay. And so is this why Hush gave that conflict waiver letter that is attached as Exhibit 8?
**A I don't know. I would assume so, but I don't know. I think so.**
Q Would it have been important to you to speak to your uncle and talk to him about this given that he couldn't do it with Hush?
**A I think we all trusted her, and I think my uncle trusted Hush. So --**
Q Okay. But if RC wanted to talk to you about something --
**A He wouldn't have talked to me in confidentiali- -- should I do this? Should I not do this? Should I do it with Hush? That was completely between him and Hush.**
Q That's in terms of doing the transaction --
**A The whole negotiation --**
Q -- in general?
**A -- of it. RC would have negotiated this with Hush. He wouldn't have had me negotiate it with Hush. It would be something RC would do.**
Q Okay. And are there any parts of the transaction

66

that RC would not negotiate directly with Hush?
**A Not that I know of.**
Q Would RC, for example, know what interest rate to charge?
**A RC would, again, trust Hush in terms of what they were negotiating. I think RC would talk to him about the interest rate, talk to him about the amount of the loan. I think they would have done all of that. It was certainly not done through me.**
Q Okay. And would RC be sophisticated enough to dictate the terms of the loan?
**A I don't know what you mean by --**
MR. JANNOL: I'm sorry I'm laughing.
THE WITNESS: I mean, I don't know what you mean by "sophisticated." He did not have a lot of school education, but he was a very smart man. And he too trusted people. He once gave me a long story how he -- when -- the core to his success was his ability to trust people.
MR. JANNOL: Let's take a minute since you are new to the game.
MR. ZUR: Which game?
MR. JANNOL: Let's go off the record for a second.
THE STENOGRAPHER: Off the record at 11:50 a.m.
(Off the record.)

67

THE STENOGRAPHER: Back on the record at 1:09 p.m.
MR. ZUR: Good afternoon again, Mr. Cohen. We're going to mark this next document as Exhibit 10.
(Exhibit 10 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment and familiarize yourself with it and then let me know when you're ready.
**A I'm ready.**
Q Could you tell me what this document is?
**A I believe it's a document to some kind of a work out with past fees between Burton Way Hotels and Akin Gump with respect to the Four Seasons litigation.**
Q Okay. And if you look at the third -- the third of the four pages of this document where it says, "Agreed: Burton Way Hotels, LLC, By: Ezra Cohen," is that your signature?
**A Yes, it is.**
Q And it's dated April 20, 2018?
**A Yes, it is.**
Q Did you review this document before you signed it?
**A I believe so. I don't remember, but I believe so.**
Q Okay. And what does this agreement accomplish in

68

your mind?
**A Just looking at the face of it right now, I think it was a way to deal with past due fees and an arrangement regarding payment of past due fees and maybe an arrangement with respect to potentially future fees.**
Q And was there some sort of dispute that had arisen before this agreement was signed?
**A I don't recall it being a dispute. I do know that there was concern about the amount of fees and the high fees and high fees of going forward. So I don't -- that's -- and I think this is an attempt to solve that.**
Q Okay. And did you act as counsel for Burton Way Hotels in connection with this agreement?
**A I think I was more in a capacity of negotiating it with RC and Hush, not so much as the lawyer on it.**
Q So did you negotiate this directly with Hush?
**A I can't remember. I think maybe my uncle did. I see that there was a part here about a deferral of fees that had to do with an outcome, and I don't know if it was me that was driving that. I think it was -- I'm not sure.**
Q If there was a dispute between Burton Way Hotels and its own counsel, in this case being Akin Gump --
**A Mm-hmm.**
Q -- would Burton Way Hotels need another lawyer to advise it in connection with that dispute, given that

Akin Gump clearly can't be counsel in connection with that dispute?
**A Well, you're calling it a dispute. I'm thinking that we're negotiating past fees. And, to me, it was a negotiation of monies. So --**
Q When --
**A -- I don't know if there was -- I don't belie- -- we didn't have another lawyer. I mean, we brought in another lawyer to represent us on an appeal that was outside of the Akin Gump firm. But I don't think that he helped us with respect to this.**
Q And why -- and -- do you know who -- on the last page, it's got some individuals CC'd. One of them is Mr. Jannol. In what capacity did Mr. Jannol serve in connection with this agreement?
**A I'm not sure.**
Q Do you know why he was cc'd on this?
**A I do not.**
Q Okay. The last name here looks likes Douglas Maynard?
**A Mm-hmm.**
Q Do you know who that is?
**A I do not.**
Q And do you know why this person might have been CC'd?



**A I do not.**
Q Okay. And then the middle name, looks like, is Michelle Lerman, Esquire?
**A Yeah. That would be my cousin.**
Q Any idea why Michelle Lerman was copied on this?
**A I do not.**
Q She's a lawyer; right?
**A Yes, she is.**
Q Is it possible that she had advised somebody in connection with in agreement?
**A I suppose it's possible. I think her expertise -- or her field was in estates and trusts. But, you know, I think she was probably concerned about her father, father's health. So maybe she took a more active role in something.**
Q Okay. So if she was involved --
**A I don't know that she was.**
Q If --
**A Yeah.**
Q -- if she was involved, she would have been involved on behalf of her father?
**A I don't know.**
Q RC --
**A I mean, I --**
Q She wouldn't -- let me just finish.



**A I'm sorry.**
Q She would not have been involved on behalf of Burton Way Hotels; right?
**A I don't know if that would be the case. You'd -- I don't know. I don't -- I don't know that.**
Q If she had been involved on behalf of Burton Way Hotels --
**A Mm-hmm.**
Q -- since you're the person signing on behalf of Burton Way Hotels --
**A Mm-hmm.**
Q -- this agreement -- if she had been involved on behalf of Burton Way Hotels, she would've communicated with you; right?
**A I don't know that. I mean, this is a family relationship, so I don't know. I can't remember the circumstances, to be honest with you.**
Q Okay. Would she have spoken, for example, with your father about this agreement?
**A It's hard to speak to my father. Like I said, he couldn't hear. So that wouldn't have been -- RC would have spoken to Father. I doubt she would have spoken to Hush. They had a more acrimonious relationship. Probably -- I'm just guessing -- it was me talking to Hush or RC talking to Hush.**



Q Okay. And --
**A But it could have been Michelle too. She would have very well called Hush and -- I don't know. I don't pretend to control people and know what everybody says, so I don't know.**
Q And she likely would have spoken to her father about this?
**A I would imagine that for sure.**
Q Okay. Did your father and RC ever have disputes between the two of them?
**A Yes.**
Q And were you involved ever in resolving those disputes?
**A Yes.**
Q Was Hush ever involved in resolving those disputes?
**A Absolutely.**
Q Okay. And who else might have advised them in connection with those disputes?
**A Well, I think they looked at Hush as being somebody that would be impartial to both. So he had a lot of voice in the relationship. I'm sure R- -- if there was a dispute between my dad and RC, I had a lot of voice with my dad, maybe a lot less with RC, and RC would probably use me to communicate his point to my dad to try and**

**convince my dad.**
Q And you would meet in person with your dad to --
**A Yeah. We --**
Q -- have those conversations?
**A I would see him quite bit.**
Q Okay. You wouldn't speak to him on the phone; right?
**A Very rarely.**
Q Okay.
**A That was difficult.**
Q Would Hush ever speak to him on the phone?
**A Maybe. But difficult. Usually when you talk to my dad on the phone, it's a one-way conversation. He could speak, but he couldn't hear. So him speaking on the phone was very difficult.**
Q Okay. Going back to this document, which we marked as Exhibit 10, if you look at paragraph 7, which is on the second page --
**A Mm-hmm.**
Q -- can you tell me what paragraph 7 is, just generally?
**A Well, I'm not fully reading it but just looks like a release.**
Q Now, why would there -- is this a release both ways on -- one on behalf of Akin Gump and the other one on



behalf of Burton Way Hotels?
**A It looks like it's both ways.**
Q Okay. And why would there be a release in this document?
**A I would imagine that the parties are trying to start at ground zero moving forward.**
Q Okay. Well, if there's no dispute, why is there a need for a release?
**A I think that fees were very high and trying to set some -- I think just what I said, just trying to set some groundwork to go forward.**
Q And did Burton Way Hotels contend that the fees were too high and shouldn't be paid?
**A Frequently. I don't know about -- yeah. I would say we complained quite a bit about fees.**
Q Okay. And was the complaint relayed by you to Hush or by your uncle or your father to Hush?
**A I would guess it was mostly RC to Hush. RC was probably more heavy with Hush than I was. I had close personal relationship with Hush. I don't remember having those conversations with him, but I might have.**
Q Okay. And you mentioned earlier that another counsel was brought in at some point in connection with an appeal. Was there -- which counsel was that? Do you remember?



**A His name's Richard Schirtzer. Quinn Emanuel was the firm.**
Q Okay. And Quinn Emanuel represented Burton Way Hotels only in an appeal or was it in this underlying litigation as well?
**A Well, I think that's where we were in this litigation. So they took the appeal from this litigation.**
Q Okay. And what was Akin Gump's role once Quinn Emanuel came?
**A I think to cooperate and assist them in -- give you a chance to read that.**
Q Go ahead.
**A You sure?**
Q Yeah. Go ahead.
**A Okay.**
Q Finish your answer.
**A They were -- took on the appeal. Akin's role, I think, was to assist with the -- prosecuting the litigation.**
Q But Akin was no longer lead counsel once --
**A That's correct.**
Q -- once -- okay.
**A I don't think they even sat at the table when the** appeal was brought. I remember Martyr (phonetic), I forget his first name, was there. But I think he sat



behind the attorneys. So -- but I think Richard Schirtzer, my recollection, took the lead on it.
Q And when was this? What time?
**A I'm going to guess it's probably right around this time. I mean, I'm not exactly sure the years.**
Q Okay. So is it fair to say, just to sort of sum it up, that in or about April of 2018, there was -- there had been some dispute between Burton Way Hotels and Akin Gump about past fees and future fees and that the result of it was this agreement (indicating) and Quinn Emanuel eventually replacing Akin Gump as counsel?
**A That's going to be my speculation of what this is. That's my best guess right now sitting here.**
Q Okay. And this individual at Quinn Emanuel, Mr. Schirtzer --
**A Mm-hmm.**
Q -- did he handle the trial after the appeal?
**A Yes.**
Q Okay. Going back to the loan from A.C.C. to 180 PCH or -- yeah. I think it's 180 PCH. Do you recall raising the -- raising usury in connection with that loan back in 2014?
**A No. What I recall was a drive out to the property and look at the property and told Hush how much I liked the property. And he had plans. He was going to do**

77

three houses and all that. I said, "Well, okay. I'll take one." That just never came to pass.
So -- so I was trying to get myself in there. That was something I thought looked good, trying to find a way to -- find a piece for myself in that. That looked like an interesting deal. And there was some issues about access and the driveway and doing a split and all this stuff. But, to me, that seemed like an amazing piece of property.
Q When you were looking at this loan back in 2014, this opportunity in -- I guess, it was in Malibu -- did you understand that the property was owned by an entity and not by Hush personally?
A I assumed -- I didn't even know if they had title to it. I don't really know the ownership structure. I would imagine it was going to be a partnership. I don't know if they owned it at the time.
Q When you say "they," who are you referring to?
A I know he was working with Richard on it.
Q Richard who?
A Richard Weintraub.
Q Okay.
A Could have been something they just hadn't tied up. I mean, my recollection was an embryonic stage and -- but I don't really know. I never got very far with it.

78

Q And would you expect that if they're buying a piece of property together as a partnership that they would form some sort of entity for that purpose?
A I would.
Q And that the entity would essentially just own that piece of property?
A No. I think they had a -- they were going to develop it. They were going to do whatever they were going to do with it.
Q Correct.
A You know, it was the plan.
Q Okay. And did you discuss the terms of that loan and that investment potential with your father?
A I don't recall.
Q When you say your father decided to make the loan, did he just speak directly to Hush and decide to make the loan?
A I don't recall saying that my dad chose -- I think Hush worked it out with RC. Like, I thought my dad was -- when I looked at those documents for this, I was surprised to see that the loan was not to my dad -- from my dad to Hush. I thought my dad made a loan to Hush.
So -- but now I see it was, oh, A.C.C. made the loan to the entity that was buying the property or bought the property. So I'm not sure -- and I think that was

79

probably a discussion that Hush had with RC. And then I was involved on the -- when it was being repaid.
Q Would your --
A As --
Q -- would your dad make a loan personally on behalf of himself and RC?
A No. Not on behalf of RC. But he -- I -- in my mind, I thought that this was a loan between my dad to Hush that got repaid. So -- then realized, no, it wasn't. It was from the partnership to Hush. Okay. So then I think RC probably told my dad about -- you know, that we made that loan and it's getting repaid.
Q Okay. Would your dad make a loan to Hush or Hush's entity based on conversations that Hush had with RC?
A Yeah. They were both loaning the money separately to Hush, so Hush -- RC would go to my dad and say, "Okay. This is what" -- you know, they would do things together. So that's how I -- in my mind, that's how it was set up. So, like I said, I was surprised it was A.C.C. that got paid back. But I see that. That makes sense.
Q But if the two of them are making a loan --
A Mm-hmm.
Q -- then Hush has to have spoken to one or both of

80

them to get that loan going, right?
A Yeah. I think he would have spoken to RC, not so much with my dad. Hush didn't speak to my dad that much.
Q Got it.
A And then the entity that would have the money would be A.C.C. So that's where the money would be. So makes sense that the loan came from A.C.C.
(Side discussion between Mr. Zur and Mr. Sohaili.)
BY MR. ZUR:
Q Okay. And your dad wouldn't make a loan personally anyway because he only made those two loans that you referenced earlier to friends?
A Yeah. He was not in the lending business. I mean, you could think of it more like -- and he didn't invest in other people's deals so much, so I know that he has a history of, like -- he's borrowed money just on the basis of a relationship and a handshake with banks. So that kind of dealing wasn't foreign to him, so...
Q Okay. This was -- this was in 2014.
A Mm-hmm.
Q Going back to the 2013 loan in connection with that Blue Jay property, when your father sent you that --
A Just so you know, I'm not real clear on the difference. I know that there's one that got paid back.

**And then I think the second one my father did not participate in, is my recollection going forward.**
Q So the record is clear, the loan we had just talked about where your father participated through A.C.C., that occurred after the other loan. The other loan --
**A I don't remember.**
Q -- that we refer to as the Blue Jay loan, that took place in 2013. This one re- -- involving A.C.C. occurred in 2014.
**A So which one got paid back?**
Q The one in 2014.
**A Okay.**
Q Going back to Exhibit 6, which is the email from your father, February 23rd, at 10:10 a.m., where he tells you that he's inclined to pass.
**A Why don't I see it?**
Q Your counsel just gave it to you, but...
**A I got it.**
Q So in the email, he says, "As I understand the Hush Weintraub loan, the lender will be guaranteeing the construction loan, the land loan, and one other loan?"
It seems that he had some understanding of the terms. Do you know how he got an understanding of the terms of the transaction?



**A Through discussions --**
Q With?
**A -- with RC and myself.**
Q Okay.
**A I don't think he pro -- I doubt he would have talked to Hush about it.**
Q Okay. And so let's dissect that. If he had spoken to you --
**A Mm-hmm.**
Q -- what terms would he get from you? What information would you relay to him about the transaction?
**A Whatever I knew. And I don't remember these pieces to it. I knew there was a construction loan that Hush had to get, and there was a subordination issue. I don't know what the land loan is, and I don't know what the one other loan is. Maybe the land loan was the loan that they were going to make. I'm not sure. It would be speculation.**
Q And how would you know the terms of the loan -- or the transaction rather?
**A Mostly probably conversations with Hush. Maybe a little bit with RC, but probably more directly with Hush.**
Q Okay. And do you remember speaking to Hush about this loan?
**A Not specifically. I can't recall a conversation,**



**but I would have talked to Hush about this --**
Q Okay.
**A -- if this was something my dad was going to participate in.**
Q Okay. Let's go back to Exhibit 8, which was -- it looks like a redline of the conflict waiver letter.
**A I'm going the wrong way.**
(Stenographer clarification.)
THE WITNESS: I'm going wrong way. So let me just -- is it the letter dated February 21, 2013?
MR. ZUR: Yes. It's a redline.
THE WITNESS: Okay.
MR. ZUR: Yeah. It's a draft.
BY MR. ZUR:
Q Generally looking at this document, does it contain the terms of the transaction?
**A I don't know. Contains the terms of a transaction. I'm just looking at it, says "land loan for $3 million." It mentions East West Bank so maybe that's the lender. I'm not sure.**
Q In the email from your father where he says, "The lender will be guaranteeing the construction loan," who -- which lender is he talking about?
**A I'm not sure.**
Q Is it reasonable for him to think that



East West Bank would be the lender here?
**A Well, from the document, I'm going to guess it was East West Bank. But I don't know that from that, and I don't even know -- I can't remember.**
Q Would East West --
**A I mean, it's not based on my recollection of this.**
Q East West Bank wouldn't guarantee anything -- right? -- in a transaction like this. Is it possible that he's --
**A I don't know.**
Q -- is it possible that when he says "the lender," he's talking about the Cohen trust because the Cohen trust is lending money pursuant to this transaction that's described in this letter?
**A I don't know that. I don't know that.**
Q Okay. So if your father has some sort of understanding of the terms --
**A Mm-hmm.**
Q -- and he likely didn't get it from Hush, but he might have gotten it either from you or from his brother --
**A Mm-hmm.**
Q -- from RC, then if he got it from you, then you would know the terms pursuant to this letter; right?

**A If I remember. I don't remember. I don't really remember seeing this.**
Q Okay. But you did receive a copy of it; right?
**A It -- I believe we sent you this from my computer.**
Q Okay. So you would know the terms either from talking to Hush, talking to your uncle, or reading this document or another document like it. Is that fair to say? Those are the possibilities?
**A That would be the possibilities. I don't recall reading it. I don't recall engaging with it. There was -- if it was something my dad wasn't going to do, I was going to be less involved. Things that my dad was involved with, I became very involved with. So that's what I can tell you.**
**And I don't remember going through the nitty-gritty with this. I do remember that there was -- one of the reasons my dad passed was that the deal was complicated. And I can't remember exactly what all those complications were, but there was a lot.**
Q Okay. And if it -- if the deal was complicated, how would your dad know all of the ins and outs? It'd have to be relayed to him by you?
**A Yeah. It can't be communicated very directly. It's complicated.**



Q And you would have been knowledgeable enough about the terms of the deal to educate him about it; right?
**A I don't have a recollection of the deal at this point. But it probably would have been communicated through my dad -- through RC or myself. My dad and RC would have breakfast together frequently. They had conversations. That wasn't with me. So my dad got stuff. But...**
Q And RC knew enough about the real estate and the lending businesses to communicate these things effectively to your up -- to your father?
**A RC could make a deal. I think he was very -- he'd been involved in a number of deals. I don't see RC as a lender, more -- as much as I do as a deal person.**
Q Okay. So getting into details of who's going to guaranteeing what and things of that nature, that would have to be you communicating that to your father; right?
**A Possibly. I don't recall doing that here.**
THE WITNESS: You keep shaking your head, and I don't know why. You just, like, doing this (indicating), and it's bugging me.
MR. SOHAILI: Well, well --
THE WITNESS: It's bugging me.
MR. SOHAILI: Okay. Well, then I won't do it.



THE WITNESS: Thank you. I'm trying to be with him, and you're sitting here going like this (indicating). It's a little strange.
So he would get the details from me or maybe even RC. So -- my dad was a smart man too. So he could figure things out.
MR. ZUR: Okay.
THE WITNESS: But he wasn't as involved with the details, but he was a smart man.
MR. ZUR: Okay. We're going to mark this next exhibit as Exhibit 11.
THE STENOGRAPHER: Mm-hmm.
MR. JANNOL: 11.
MR. ZUR: 11. Yep.
(Exhibit 11 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a minute or two to familiarize yourself with this and just let me know when you're ready.
**A I'm ready.**
Q Okay. So for the record, this is a document -- this is an email dated February 8, 2013, at 2:14 p.m., and it's from Hush to Robert Cohen and Richard Weintraub. And it starts, "I just want to" summarize -- it's a typo -- "summarize [sic] bullet points since we are getting ready



to waive contingencies Monday and get a land loan from East West." And then it has a list of items. And the last item says "will also have to get a conflict waiver from RC due to the client relationship. Let me know if either of you have any issue with this or I have left something out. Thanks."
Have you ever seen this email before today?
**A No.**
Q Okay. In the last paragraph when Hush says he will also have to "get a conflict waiver from RC due to the client relationship," do you know why?
**A Well, I know RC was one of his clients, the partnership, Burton Way Hotels, A.C.C. RC might have also been a client of Hush.**
Q Okay.
**A I'm not sure.**
Q And what would the purpose of the conflict waiver be in this scenario?
**A Well, to clear RC to be able to do a deal and clear Akin Gump from any deal that Hush was doing with RC.**
Q And would Hush, as part of that conflict waiver, need to tell RC, "Hey, we're doing a deal together. I can't be your counsel on this"?
**A Well, I think -- I would suppose so. Yeah.**
Q Have you ever sent a conflict waiver letter to a

client?
A No.
Q Okay. So going back to Exhibit 8, which was the draft of the conflict waiver that was dated February 21st, in the final paragraph, at the bottom of page 2, where it says "The firm and I advise you that you may want to seek the advice of independent counsel of your choice in connection with the transaction and this consent and waiver."
Is that where Hush would tell somebody who he's got a client relationship with that he can't represent him on that deal and he should speak to other counsel?
**A I would think that's part of papering it for -- to make the -- ability to make the loan to Hush.**
Q I understand that. But Hush can't represent the client he's doing a deal with; right?
**A I believe that's true.**
Q Okay. And so he would have to tell the client, "I can't do it. You should speak to somebody else." And that's what that draft says; right?
**A Hush is -- I don't think he probably -- I think that says we need a conflict letter in order for this thing to go forward.**
Q Well, that's his email --
**A Mm-hmm.**



Q -- on February 8th.
**A And so conflict letter is going to say, in this case, "We've advised you to seek independent counsel." I see that in the words.**
Q Is that what the letter says? It says "We have advised you" or "I do advise you"?
**A Well, I think he's advising them to seek -- or advising RC to seek advice from independent counsel and/or saying that he may -- I think that's what it says.**
Q Okay. So on February 8th, Hush told RC, "Hey, we're going to have to get a conflict waiver due to the client relationship." And then sometime around February 21st, there's a draft of this conflict waiver letter where he says, "I advise you to seek independent counsel."
That's consistent with the email; right?
**A I believe so.**
Q Okay. And do you know if RC followed up --
**A I don't know --**
Q -- on that recommendation?
**A -- I don't know that.**
Q When Shingly Lee sent you that email saying RC wants you to look at these documents and discuss with him because these documents need to be signed, do you think that that's why she asked you to do that?



**A That would be consistent with this. I don't have any recollection of having a discussion with RC about this. I never went through the terms with RC about this.**
Q Okay.
**A I can see how -- I recall -- we were out -- my dad was out, so I wasn't that involved. And it was complicated. Now, Hush is trying to do what he needed to do to allow this to go forward, and I think RC wanted to go forward with it. So that's where it's at.**
Q The family trusted Hush at this time; right?
**A Definitely.**
Q Okay. And so if Hush sent a letter --
**A Mm-hmm.**
Q -- to RC telling him that he should speak to other counsel because he can't advise him on it, RC would have taken that advice seriously -- right? -- and sought other counsel?
**A No. I don't think that's the way I read the letter, to be honest with you. I read it as saying, hey, we got to get this done to make the deal happen. And when I say the family trusted Hush, trusted Hush with the advice he gave us in terms of our outside matters, trusted Hush to invest with him -- or to do something with him maybe. Maybe not. I don't know.**
**My dad always thought Hush was an honorable**



**person, would loan to him or whatever. I mean, he trusted him. I know that Hush helped my father quite a bit with respect to me, in terms of providing -- getting a sounding board to work through issues that I had with my father. And he just trusted Hush, had -- you know, was able to hear both side of things and play that role. So that's trust.**
Q As a lawyer --
**A Mm-hmm.**
Q -- you're generally familiar with lawyers' duties in entering into business deals with their clients; right?
**A I don't know "generally" means in this case. I mean, I think there are lawyers that invest with clients many times. So I don't know exactly the fine -- the slicing it thin.**
(Mr. Richards joined the videoconference.)
BY MR. ZUR:
Q Would a lawyer have a duty under the rules -- I'm not asking which rule specifically, obviously. But would a lawyer have a duty to advise a client that they are doing a deal with, "Hey, I cannot represent you in this matter. You should get your own counsel"?
**A Yeah. I think there's a conflict of interest, but a lawyer does business directly with a client. But I can think -- I got to believe there are situations where**

93

**lawyers invest with clients. It just doesn't -- I don't have an exact example of it, but it doesn't seem foreign to me, so...**
Q And in a situation like that, that communication would be made by way of a conflict waiver perhaps?
**A I would imagine that's the case.**
Q Okay. And in this particular transaction, do you think that that's the way it was communicated here with that conflict waiver letter that Hush sent?
**A I think the words say that. But I think that there was still a trust that went beyond what the words were, so...**
Q So when Shingly emails you --
**A Mm-hmm.**
Q -- and says, "RC wants" to -- wants "you to look at this and discuss with him," does RC want to discuss the terms of the business deal?
**A I have no idea. I wasn't part of it. And I have no idea -- I get -- I'm kind of a one-man show. So I get busy on a lot of things. And if my involvement isn't on that, I'm doing other things. So I don't recall.**
Q Would RC want to have consulted with you about whether he should do the deal at all?
**A No. He wouldn't have asked me that.**
Q Okay.

94

**A If anything, he would have asked me, "Would you come in and sign something for me" or "I just need you." But he never discu- -- I don't remember him discussing the merits of either of these transactions with me.**
Q And these transactions -- this particular one on Blue Jay had nothing to do with Burton Way Hotels; right?
**A I don't -- I think it had to do with A.C.C. Because that's where -- I'm just guessing that's where A.C.C.'s money -- the money was with A.C.C. So -- and I thought -- I mean, before I thought my dad had made part of the loan on one of the properties. But it's not clear to me.**
**But go ahead.**
Q Okay. So if RC wants to talk to you about this loan, it's likely not about the economic -- the economics of the deal and whether he should do it; right?
**A I don't have any recollection of RC talking to me about any deal that didn't deal with the hotel.**
Q Right. So if he wants you to look at the documents, it's in your role as a licensed member of the Bar. Is that fair?
**A I did not act like RC's lawyer in this transaction.**
Q I wasn't asking that. I understand --
**A Well, you're asking me if I did it as a licensed**

95

**member of the Bar, so.**
Q I'm not talking about what you did. I'm asking about what his expectation was. And my question is very specific. When he is asking you to look at the documents, which is what Shingly said to you in that email, is he asking you to look at the documents and tell him whether he should even do this deal economically business-wise or --
**A I have no idea, sir.**
Q Well, let me finish the question.
**A Okay.**
Q -- or is it more likely that he views you as a lawyer and simply wants you to look at it and make sure everything is --
MR. RICHARDS: I'm going to object as speculation.
By the way, this is Ronald Richards. I'm here as well appearing now.
THE WITNESS: I have no idea.
BY MR. ZUR:
Q Okay. But he -- did he ever seek your advice on whether to do an economic deal? Not the legalities. Not legal issues surrounding the deal, but whether --
**A I'm thinking --**
THE STENOGRAPHER: One at a time, please. I did not hear the full question.

96

MR. ZUR: I said not -- not the legalities or legal issues, but whether he should do the deal.
THE WITNESS: That didn't concern my father?
BY MR. ZUR:
Q Yes.
**A Not that I can think of.**
Q Can you recall multiple instances where RC, either directly or through Shingly, asked you to look at documents -- legal documents?
**A RC would send through Shingly, even probably himself too, a lot of emails. A lot of traffic. I didn't respond to all of them. So there was stuff about Martin** Deet (phonetic). There's all kinds of stuff that I just -- I wouldn't be able to keep up with all that. So that was beyond what I could do.
Q Would you eventually, next time you saw him or next time you were on the phone with him, go through these things?
**A No. Not necessarily.**
Q So there might have been scenarios where he asked you questions about particular documents and you just never told him?
**A Absolutely. Yes.**
Q And if you -- would this be true as well as to matters that he communicated to you were time sensitive?

97

**A I don't know.**
Q Did he ever differentiate between matters that were time sensitive and matters that were not?
**A I don't recall. I see in Shingly's letter, she's saying something needs to happen by today or tomorrow. So that would be an example. But I don't know.**
**Oftentimes Hush, like -- or RC would try and, you know, "This is a rush." But I didn't always respond to that.**
Q When did you find out from your father that he was not interested in participating in that loan?
**A I can't remember exactly when. I remember when we drove up there -- and I don't know exactly when that was. But I just know from that time on, he wasn't interested.**
Q If you look at Exhibit 6 again, which is the email from your father --
**A Mm-hmm.**
Q -- where he says to you -- it's the last sentence. He says --
**A I'm inclined to pass.**
Q That's the -- that's the penultimate sentence.
**A Oh.**
Q The one right after that says, "Let's take another ride out there and let's talk about the negatives

98

versus the positives."
**A Mm-hmm.**
Q Is it fair to say that you went there again after Saturday, February 23rd?
**A I don't know exactly when we went up there. But I do remember going up there with him and looking at the site and him not being interested in...**
Q Did you go just once to the site?
**A I only went there once with him. I believe I went there once on my own.**
Q Okay. So when he says, "Let's take another ride up there" --
**A Mm-hmm.**
Q -- that references the only time that you guys went together?
**A I only have one memory of being up there with my dad. And I'm pretty sure I went up there once just to go check it out for myself. I wanted to see what it was about.**
Q Okay. And sometime after you guys went there together, he confirmed it to you that he was officially out?
**A Yeah. He confirmed that he was not interested in that.**
Q Okay.

99

MR. ZUR: Are we up to 12?
THE STENOGRAPHER: Yes.
(Exhibit 12 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. ZUR: Let's go off the record for a moment.
THE STENOGRAPHER: Off the record at 1:56 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 1:58 p.m.
MR. ZUR: Thank you.
BY MR. ZUR:
Q So, Mr. Cohen, if your father passed on the deal sometime after sending this email to you on February 23rd, when -- at some point after you guys went to the site together, the email that you received from Shingly saying RC wants you to look this over, at that time your dad hadn't yet communicated to you that he is not interested in doing the deal; is that right?
**A I don't remember the dates.**
Q Okay.
**A So...**
Q Well, let's look at them. The email from your father was Saturday, February 23rd, at 10:10 a.m.
**A Mm-hmm.**
Q You guys went to the site a few days later?
**A I don't know.**

100

Q Would it have been --
**A I don't know.**
Q Okay. If you look at Exhibit 7, which is the email from Shingly to you, that email is dated February 22nd at 9:28 a.m. So about 24 hours earlier.
**A Mm-hmm. What is it? This is -- okay.**
Q So at that time when you received this email from Shingly --
**A Mm-hmm.**
Q -- you hadn't yet heard from your father that he's no longer interested in pursuing the deal; right?
**A I hadn't received this email, but I'm not sure my dad was interested prior to him even sending this email. 'Cause I remember there was some -- it's complicated. And I don't remember exactly when that happened. And then my suspicion is RC's talking to my dad, and then my dad's just reaching out to me.**
Q If you had gotten an email from RC on Burton Way Hotels or A.C.C. saying, "Hey, I need you to look at this document. It's getting signed today or tomorrow," would you ignore that email?
**A My --**
MR. RICHARDS: Objection. Calls for speculation. Improper hypothetical.
///

BY MR. ZUR:
Q Have you ever received emails from RC that said, "I need you to look that the document. It's going to be signed today or tomorrow," and ignored it?
**A Well, I don't remember seeing this one. So this would be one. And if you said "before" in your hypothetical about the hotel, if I did receive it, I probably would have sent it to Hush. But that's why I think it would have gone to Hush.**
**I relied on Hush. I can't think of anything I did for Burton Way Hotels without it being also through Hush.**
Q Okay. And if RC had told you that something was time sensitive, would you address it?
MR. RICHARDS: Objection. Calls for speculation. Improper hypothetical. Asked and answered.
THE WITNESS: I can't read that.
MR. ZUR: You're not supposed to read it.
THE WITNESS: Well, he's putting in front of me. I can't read backwards.
BY MR. ZUR:
Q You can -- you can answer the question.
**A Say it again, please.**
MR. ZUR: Could you read back the question, please?
THE STENOGRAPHER: Question, "Okay. And if RC had



told you that something was time sensitive, would you address it?"
THE WITNESS: Not --
MR. RICHARDS: Same objections. Speculation. Improper hypothetical. Asked and answered.
BY MR. ZUR:
Q You can answer.
**A I don't know. It was also a family relationship with RC and I. We got into our share of squabbles. And he was my uncle, so it wasn't purely attorney-client privilege that we – you seem to be describing. So he was also my dad's partner. So I carried – so there's a whole different type of relationship.**
Q Was Hush eventually fired as counsel for the family business?
**A I don't recall. I remember after we lost the case, I had a conversation with Hush where I – we went to dinner. He took me to dinner at Avra, and I expressed how disappointed I was in the outcome and disappointed in him that we got there.**
(Stenographer clarification.)
THE WITNESS: So I don't -- that was the last time I remember speaking with Hush.
BY MR. ZUR:
Q And the firing, if it occurred, was in connection



with Quinn Emanuel replacing Akin Gump in that litigation?
**A No. I think after the outcome of the litigation, as far as I know, we just stopped using Hush. It's not like we replaced him with anybody. We just flapped around without counsel. We still really don't have counsel.**
Q But as far as your litigation is concerned, in 2017, Akin Gump was replaced by Quinn Emanuel?
**A I believe so. But I'm not pos- – I don't know the – that chain – because I think they were still on the pleadings or something. And then when there was an appeal – so I remember the appeal, Hush had an appellate lawyer, and his firm – I forget his name, but he was there. I'm not exactly sure of the time. But I never saw a letter that says "You're fired."**
Q Okay.
**A My understanding we just stopped using him. The last exhibit that we marked –**
MR. ZUR: Was that 12?
THE STENOGRAPHER: Yes.
BY MR. ZUR:
Q -- that was a February 22, 2013, email from Daniel Shlomi to Robert Cohen with copies to Shingly, you, Hush, Richard Weintraub, and Rahsanna Allen. Do you have that in front of you?
**A I do.**



Q Have you ever seen this document?
**A I don't recall ever seeing it.**
Q But it was sent to you; right?
**A It's got the correct email address.**
Q Okay. You see it has attachments?
**A No.**
Q Just below the subject.
**A Okay.**
Q Do you recall opening up any of those attachments?
**A I do not.**
Q Okay. This email was sent on Friday, February 22nd, at 10:17 p.m. Had your father communicated to you by that time whether he was interested in continuing?
**A I don't recall.**
Q Okay. And if he had not yet communicated it to you, would you read this email?
**A I don't know. I don't -- on a Friday night, you're not likely to get me reading emails, I guess, unless there's something that's directly going on. I don't remember seeing this. And I -- you know, clearly people are up late at night working on things. I wasn't part of that.**
Q Was there a time sensitivity communicated by this

email?
**A I don't know. I don't see that.**
Q Could you read the final sentence?
**A "Hopefully this document is acceptable to all parties as we need to get Robert's signature tomorrow morning."**
Q Does that communicate a time sensitivity?
**A It suggests one, but it's not always the case. I mean, I don't know why you'd get a signature on Saturday morning. People frequently write things and time goes on.**
MR. ZUR: Okay. Let's go to the next one. It's going to be Exhibit 13.
(Exhibit 13 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Let me know when you're ready.
**A I'm ready.**
Q Okay. So this is an email from Daniel Shlomi to Robert Cohen with copies to Shingly, you, and Hush. And the subject is -- and the -- it was sent February 22nd at 10:18 p.m.
**A Mm-hmm.**
Q Subject "Blue Jay Way Conflict Waiver." And it says, "Robert, attached please find a revised draft of the conflict waiver and a redline against the draft, I



believe, Hush previously sent you. This revised draft mentions the deed of trust as security for your note, discusses the completion guarantee for your loan, and substitutes a new entity for Richard as discussed in my email regarding the indemnity agreement."
Did you read this email?
**A I don't believe so.**
Q Did you read any of the attachments?
**A No. I don't belie- -- I don't recall receiving this, and it is my email address.**
Q Do you know what he's referring to when he says "completion guarantee for your loan"?
**A I don't. I was confused earlier when I was trying to explain it. I think -- oh, I think that they -- he needed a completion guarantee from RC is what I recall.**
Q Okay. So if we go back to Exhibit 6, which is the email from your father to you, the following morning, when he says "As I understand the Hush Weintraub loan, the lender will be guaranteeing the construction loan."
Is that the completion guarantee referenced in Mr. Shlomi's email to you?
**A I don't know. It might be, but I don't know that.**
Q So when your father is mentioning the lender will be guaranteeing the construction loan, how would he know



that?
MR. RICHARDS: Objection. Calls for speculation. Lack of foundation. Lack of personal knowledge.
BY MR. ZUR:
Q You can answer.
**A I don't know. Either through me or RC. I'm not sure.**
Q Do you recall speaking to your father about a completion guarantee?
**A No. I recall that the deal was complicated. I don't remember the ins and outs exactly of it. I recall one of the hang-ups being subordination and not having a clear guarantee from Hush saying he's going to pay back this loan. That, to me, was easil- -- more easily defined. And we didn't believe in the project.**
Q The loan wasn't to Hush personally; right?
**A Hush's entity. So Hush could have signed a personal guarantee.**
Q Right. If the loan had been to Hush personally, there would be no need for a guarantee; right?
**A No. There probably wouldn't be because the guarantee wouldn't have been enforceable. If we made the loan to Hush, Hush's guarantee wouldn't have been effectively a guarantee, from what I've learned.**
Q Right. You only need a guarantee from an



individual if you make a loan to an entity; right?
**A That's my understanding. Correct.**
Q Okay.
MR. ZUR: This is going to be 14.
(Exhibit 14 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Let me know when you're ready.
**A I'm ready.**
Q Okay. So this is an email from Mr. Shlomi to Shingly and RC, and copies to you and Hush, and it's dated February 25, 2013, at 10:07 a.m. And it says, "Robert, as discussed, attached are the final Word versions of the indemnity agreement and conflict waiver. I only need PDFs of your signature on the two signature pages I sent in my previous email. I will then circulate final executed copies."
Do you recall receiving this email?
**A No.**
Q Did this -- did you receive this email before you went and visited the site with your father?
**A I don't recall receiving this email.**
Q Well, you know -- we know that you did receive the email. It was sent to you. So my question is a little bit different. Did this email come to you before

you went with your father to visit the site?
**A I don't know.**
Q Would you have gone to the site first thing in the morning on Monday?
MR. RICHARDS: Objection. Calls for speculation. Improper hypothetical.
BY MR. ZUR:
Q You can answer.
**A I don't know. I don't recall.**
MR. ZUR: It's 15?
THE STENOGRAPHER: (Nods head in the affirmative.)
(Exhibit 15 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Did you know who Daniel Shlomi was at the time?
**A Yeah.**
Q So you knew he was an associate at Akin Gump working for Hush?
**A You know, I was just thinking, I don't know if he was an associate or partner. But he worked at Akin Gump underneath Hush.**
Q Okay. And when you got emails from Akin Gump on Burton Way hotel matters, you would address them; right?
**A Sometimes. Not always.**
Q If they contained legal documents?



**A Not always.**
Q Did you wonder, at or about February 25, 2013, why you were getting all these emails from Daniel Shlomi that had nothing to do with Burton Way Hotels?
**A I don't know that I opened them. I see it had something to do with Burton Blue Jay Way. I don't remember receiving them. And if my dad -- if -- knew enough about Blue Jay Way for us to go up to the property or talked about going up to the property, doesn't surprise me that emails came my way. But I can't tell you I remember them.**
Q But at this time, you hadn't yet found out finally that your dad wasn't interested; right?
**A I can't tell you that.**
MR. RICHARDS: Objection. Asked and answered.
THE WITNESS: I don't have --
MR. RICHARDS: Speculation.
Are you getting my objections, Madam Court Reporter?
THE STENOGRAPHER: I am.
MR. RICHARDS: Okay. Mister -- Ezra, can you give me half a second for me to impose an objection?
And also, Roye, can we take a break in about five minutes so I can walk up there?
MR. ZUR: Sure.



MR. RICHARDS: Thanks.
MR. LEV: I told him not to come up.
THE WITNESS: Do we want to do a break now for him or what?
MR. LEV: I don't care.
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: I'm sorry. One at a time, please.
MR. ZUR: Let's go off the record briefly.
THE STENOGRAPHER: Off the record at 2:17 p.m.
(Mr. Richards entered the conference room.)
(Off the record.)
THE STENOGRAPHER: Back on record at 2:33 p.m.
BY MR. ZUR:
Q Okay. So I've passed out Exhibit 15. It's an email from Daniel Shlomi to Shingly, copying Robert Cohen, you, and Hush, subject "Blue Jay Way." I don't know if I stated the date already, but it's February 25th at 9:33 a.m.
The second paragraph -- so it's addressed to Shingly. And it says, "We should be receiving the East West loan documents this morning, and Robert will be cosigning the guarantee. Once you receive this document, please arrange for it to be signed as soon as possible since the bank will need everything signed quickly."



Have you ever seen this document before?
**A I've never seen it.**
Q But this was sent to you?
**A It has my name in the CC line. Doesn't have my email address. But it has my name.**
Q Okay. Is the guarantee that's referenced in the second paragraph, is that the guarantee that your father referred to in the email to you?
MR. RICHARDS: Objection. Speculation. Lack of personal knowledge. Foundation.
BY MR. ZUR:
Q You can answer.
**A I don't know.**
Q And if Shingly had communicated to you, as she did three days earlier, that RC wants you to look at documents, and then you receive documents for several days thereafter, you wouldn't bother opening this email or reading it?
MR. RICHARDS: Objection. Speculation. Improper hypothetical. Conjecture.
BY MR. ZUR:
Q You can answer.
**A It's very possible.**
Q That in spite of her telling you that --
**A Yes.**

Q -- he wants you to look at it?
THE WITNESS: Can I have a minute with my attorney?
MR. ZUR: Of course.
THE WITNESS: Just want to say one thing.
MR. JANNOL: Sure.
THE STENOGRAPHER: Off the record at 2:35 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 2:37 p.m.
THE WITNESS: Okay.
So I keep looking at the date, February 25th. I don't recall seeing these documents. But I could tell you for the last 33 years, I've had a spiritual teacher. And his birthday is February 26th. And it's always something we celebrate in a big way.
This is three years after he died. But we still continued to celebrate. So there could have been emails and all this stuff. I've got a lot of emails I don't open. I'm not directly involved with something, I don't necessarily open it. I don't believe -- I could very well have not seen this and not even been in the office while this was going down. I'm not telling you for sure.
But I'm just looking at that date, and if that's one day before we're going to commemorate his birth, I'm guessing that's even more reason why. But I don't -- this wasn't my thing. This wasn't my deal. So there's a lot



of chatter going back and forth. I can see, personality-wise, Hush likes to communicate a lot. RC likes to communicate a lot. I think they're doing the whole thing. It wasn't going through me.
MR. JANNOL: Got it. Okay.
Next question.
MR. ZUR: Okay. This next one is going to 16.
(Exhibit 16 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a minute to look, and let me know when you're ready.
You ready?
**A Yeah.**
Q Okay. Have you ever seen these emails?
**A I don't recall. No.**
Q Okay. So for the record, there's an email dated February 25th at 11:37 from Daniel Shlomi to Hush and copying Shingly. Then there's a response from Shingly to Daniel Shlomi this time with copies to Hush. The second email address is, I believe, RC's. And then it says -- and then you. And the subject is "Re: Robert's Wire," and it's dated February 25, 2013, at 1:42 p.m.
Do you see that email?
**A The 1:40- -- yeah.**



Q Okay. Were you and RC copied on the initial email from Daniel Shlomi to Hush copying Shingly?
**A I bel- --**
MR. RICHARDS: Objection. Lack of personal knowledge. Speculation.
MR. ZUR: He's looking at the document.
THE WITNESS: Well, from the document, I don't believe I've ever seen this.
BY MR. ZUR:
Q Okay. So is it fair to say that Shingly added you to the email?
MR. RICHARDS: Objection. Speculation.
THE WITNESS: I don't know.
BY MR. ZUR:
Q Well, Shingly is the one who responded; correct?
**A Could have been somebody on Shingly's account. I don't really fully know.**
Q Somebody using Shingly's email?
**A Yeah. I don't know.**
Q Either Shingly or somebody else?
**A Somebody. And I got -- I assume that's me. I mean, it's got my name on it, but it doesn't have my email address.**
Q Okay.
**A So...**



Q Did anybody else have access to Shingly's email?
**A I don't know. Never been to her office.**
Q Okay. So somebody -- either Shingly or somebody posing as Shingly -- responded to the emails from Daniel Shlomi and added RC. That is RC's email; correct?
**A I -- well, I assume so.**
Q Added RC and you. Any idea why she might have done that?
MR. RICHARDS: Objection. Calls for speculation. Assumes the fact not in evidence. Lack of personal knowledge. Lack of authentication that there's no other emails in between these emails.
BY MR. ZUR:
Q You can answer.
**A I don't know.**
Q Okay. Given that she sent you an email three days earlier saying RC wanted you to discuss these documents --
**A Mm-hmm.**
Q -- wanted you to review these documents and discuss with him, is it fair to say that she thought you were looking at these documents?
MR. RICHARDS: Objection.
THE WITNESS: I don't --
MR. RICHARDS: Speculation. Hold on. Let me just get

my objection. Speculation. No foundation. Improper hypothetical. Badgering.
THE WITNESS: You're not badgering me, but I don't know. But maybe you are.
He's really badgering me?
I don't know.
BY MR. ZUR:
Q She communicated to you three days earlier that she wanted you to look at documents; right? We've looked at that --
MR. RICHARDS: Objection.
MR. ZUR: You've got to let me finish.
MR. RICHARDS: I will.
MR. ZUR: Thank you.
BY MR. ZUR:
Q She communicated to you three days earlier that she wanted you to review the documents -- or that RC wanted you to review the documents; right?
MR. RICHARDS: Objection. Asked and answered.
MR. JANNOL: Would you --
THE WITNESS: So --
MR. JANNOL: Let him finish, please. Are you done with your question?
MR. ZUR: I'm done with my question.
MR. JANNOL: Objection. Asked and answered.



Argumentative. Ask him a question. Don't make accusations, please.
MR. ZUR: They're not accusations.
MR. JANNOL: They are.
MR. ZUR: They're not. They're really not.
MR. JANNOL: Okay.
MR. ZUR: They're really not.
MR. JANNOL: You can answer the question.
THE WITNESS: Can you repeat the question, please?
MR. JANNOL: Sure.
MR. RICHARDS: Are you going to read the objections too? 'Cause I just don't know if I want to keep objecting. Can you read my objection?
THE STENOGRAPHER: If you want me to, I will.
MR. RICHARDS: I do.
THE STENOGRAPHER: One moment.
Question, "She communicated to you three days earlier that she wanted you to review the documents -- or that RC wanted you to review the documents; right?"
Mr. Richards, "Objection. Asked and answered."
Mr. Jannol, "Would you" --
The witness, "So" --
Mr. Jannol, "Let him finish, please.
Are you done with your question?"
Mr. Zur, "I'm done with my question."



Mr. Jannol, "Objection. Asked and answered. Argumentative. Ask him a question. Don't make accusations, please."
Mr. Zur, "They're not accusations."
Mr. Jannol, "They are."
THE WITNESS: I didn't ask you to repeat the -- hear that. But you said the word "communicated." I don't remember Shingly communicating this to me verbally. I see that there's some emails back and forth. I don't remember receiving them. I don't remember engaging Shingly with this. I don't even remember engaging RC with this.
So I'm not saying -- I don't have a recollection of exactly how my involvement -- I was not in on all these back and forths while they're doing this and they're, like, minutes apart with these emails. That's not happening at all in real time with me.
BY MR. ZUR:
Q Is there a reason that you can think of that Akin Gump would be sending you these emails and Shingly would add you to emails if -- if neither RC nor Akin Gump wanted you to read them?
MR. LEV: Objection. Calls for speculation. Improper hypothetical. Lack of personal knowledge. Vague as to who Akin Gump is.
THE WITNESS: So I think it goes back to what we



discussed earlier. I think they wanted me involved for appearance. But I wasn't involved with this thing.
BY MR. ZUR:
Q Who's "they"?
**A I was --**
Q I'm sorry.
**A Hush and RC. I mean, to make this deal happen, this was between them and what they were doing.**
Q Understood.
**A Did not get negotiated with me.**
Q Okay. Did you ever communicate to Hush or to Mr. Shlomi or anybody that you're not reading these emails, that you're not involved in this, that you have...
**A Not that I recall.**
Q Okay. You never sent any emails in response to Mr. Shlomi or to Shingly?
**A Not that I recall.**
Q Okay.
**A I have produced everything I found.**
MR. ZUR: Okay. This is the last exhibit.
THE STENOGRAPHER: So Exhibit 17?
MR. ZUR: Yeah.
(Exhibit 17 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. JANNOL: Thank you.

121

MR. ZUR: You're welcome.
Oh, did I give you two?
BY MR. ZUR:
Q You don't have to read this whole document but just familiarize yourself generally, and then we're going to focus on paragraph 9.
**A Well, there's a lot here. I'm not a quick reader.**
Q I understand.
**A So I'll just go to 9. Is that okay? I can see that it has to do with litigation, Hush's declaration. It's in this Blue Jay Way matter. Is that enough familiarity?**
Q Sure.
**A Okay.**
Q So for the record, this is a document filed in the Blue Jay Way bankruptcy case. It was filed as docket number 109. It's entitled "Declaration of Hushmand Sohaili in support of Debtor's reply to Claim No. 2-1 of Blue Jay 180, LLC, [sic] a California limited liability company."
And wow. I'm now noticing a massive typo.
MR. JANNOL: Happens.
MR. ZUR: It happens. Yes.
///

122

BY MR. ZUR:
Q So for the record, this is a declaration that Mr. Sohaili submitted in the bankruptcy case. Could you read paragraph number 9, Mr. Cohen, please?
**A "I asked RC which attorney was reviewing it for him and to whom the promissory note should be sent. RC told me to send the documents to his nephew, Ezra Cohen, Esquire" -- never called me that -- "whom I knew well because he had worked on BWH and A.C.C. matters. As RC instructed, Mr. Sohaili sent the loan documents to Ezra Cohen."**
Q Is it true that Mr. Shlomi sent the loan documents to you as reflected in the emails that we've seen?
**A I only know what those documents -- what they present. So I don't remember ever seeing them.**
Q Okay. Is it true that you knew Hush well because you had worked on BWH and A.C.C. matters?
**A I would go further. I knew Hush before that. I mean, when I came out of law school, the first job I took, Hush was there. And I mildly worked underneath him, but we had a fast friendship, and he had represented other members of my family. So I felt close to him from the very beginning when I met him.**
Q Is it reasonable, given the existence of the

123

conflict waiver where Hush told RC to got his own counsel because he couldn't advise him on it and given that Shingly asked you to look at the documents on behalf of RC -- is it reasonable for Hush to have thought that RC had his own counsel?
MR. LEV: Objection. Speculation. Conjecture. Lack of personal knowledge.
THE WITNESS: I don't think so.
BY MR. ZUR:
Q Why?
**A Hush knew my capacity as a lawyer. He knew I didn't do secured transactions. I didn't -- wouldn't have been a -- I wouldn't have -- there, once or twice, I signed an opinion letter for A.C.C. Company in connection with financing for Burton Way Hotels. He prepared the whole thing. I just signed it 'cause he put it in front of me and said, "We need to have separate counsel do this."**
**So for him to think that RC was getting, you know, independent counsel to review all this stuff, it was -- he would have only gone to me because, "Hey, he's a lawyer. He's going to be friendly. He's going to help us get this thing done." So that would be my speculation.**
Q I see.
**A I don't know that. Nobody's ever said that to**

124

**me, but that would be my guess. So I don't think it's reasonable for -- I don't reasonably think he thought he was going to a third-party lawyer to go deal with this thing. He figured he was coming to me because he's going to help make this thing happen. I think that's why I was included in these emails. I was the easiest workplace to go.**
Q You thought that's why Shingly sent you that email?
**A I think --**
MR. LEV: Speculation.
THE WITNESS: -- Shingly -- you want to read that to me?
MR. JANNOL: You have a question pending.
MR. ZUR: Yeah.
THE WITNESS: I'm not sure. He asked if I thought it was reasonable, and I don't think it was reasonable.
BY MR. ZUR:
Q For Shingly to send you that email?
**A Oh. I think Shingly was doing just as directed.**
Q By?
**A RC.**
Q Okay.
**A That's what I think.**
Q And did you represent A.C.C. the following year

125

on a similar loan to another one of Hush's entities?
**A Not that I know of.**
Q The exhibits that we looked at before with the payoff requests and the letter to escrow --
**A Oh, getting paid back? I thought -- my recollection was that was a loan that was coming back to my dad. I don't remember it being a loan from A.C.C. So he went through the whole thing, and I helped -- facilitated the payoff of that loan. So...**
**But if you'd ask me before all this, I thought my dad had made the loan. I didn't realize the loan came from A.C.C. Company. And I looked at all the documents, okay, I can see it.**
Q But your dad had never made any loans personally in that amount?
**A To family members. I mean, I don't know. Not -- yeah. So...**
Q Okay.
MR. ZUR: Let's go off the record for a minute.
THE STENOGRAPHER: Off the record at 2:53 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 2:56 p.m.
MR. ZUR: So we're actually, we're ready to conclude.
MR. RICHARDS: I got a couple questions.
MR. ZUR: We'll conclude our part.

126

THE WITNESS: You're concluded?
MR. ZUR: We're concluding our part. Yeah.
THE WITNESS: Okay. Good. He's coming around so I can see him.
MR. RICHARDS: Are the exhibits in front of him?
MR. JANNOL: Scanned it --
THE WITNESS: Yes, they are, and they're in order.
THE STENOGRAPHER: One -- I'm sorry. One at a time, please.
MR. RICHARDS: We're not on the record. Oh yeah.
THE STENOGRAPHER: Yes, we are.
MR. RICHARDS: Where are the official exhibits? Are they over there (indicating)?
MR. LEV: She's got them.
MR. RICHARDS: Okay.
THE WITNESS: I have copies that they gave me, and they're still in order, I think.
MR. RICHARDS: All right.
MR. JANNOL: Take these. These are numbered.
THE WITNESS: Oh.
MR. JANNOL: Okay?
THE WITNESS: Easier.

127

EXAMINATION
BY MR. RICHARDS:
Q Okay. If you could just look at Exhibit 7, please. When you received the email on February 22, 2013, that's before the email that your dad sent that indicated he didn't want to do the project; isn't that correct?
**A I don't remember receiving this email dated February 22nd. The date of the February 22nd email to me is before the date of my father's email to me.**
Q That's correct. I just want to establish that you -- when Shingly sent you the documents to look at, it was the day before your father sent you the email; correct. It's dated before?
**A It's dated before. I don't remember seeing this.**
Q That's right. Sitting here today, can you rule out that she wasn't sending you the documents to look at them for your father's benefit?
**A I don't know. That would be speculation.**
Q Right. So you couldn't say, yes, she was sending them to look for the benefit of my father or, no, she wasn't. You have no opinion; correct?
**A I have no idea.**
Q Okay.
**A Well, it would be -- she probably would have said my dad's name in there, but I don't know. I don't know.**

128

Q 'Cause when you look at the emails in date order, it looks like your father's interested in the deal until we see the February 23rd email where he says he's not interested. Is that fair to say, just looking at the emails only?
**A Going by the dates.**
Q Right.
**A But I don't remember seeing this.**
Q I'm not saying you need to remember seeing this.
**A Okay.**
Q I'm saying, did you ever look at documents for your father ever with respect to deals?
**A Yes.**
Q Okay. And at any time, did you ever tell Hush in this transaction that's at issue in this case that you were representing RC?
**A No.**
Q Okay. And did --
**A I don't recall. I don't think I would have said that.**
Q Right. Well, you testified that you didn't represent him -- correct? -- in this transaction?
**A As far as I know, I did not.**
Q So I'm just -- for the record, I'm establishing you don't have any recollection of telling Hush that you

129

were representing him; correct?
MR. ZUR: Vague.
THE WITNESS: I don't have recollection of having that discussion with Hush.
BY MR. RICHARDS:
Q Well, if you're typically not representing someone in a transaction, would it be fair to say you wouldn't then tell people you were; right?
**A I don't typically represent people in a transaction.**
Q Right. And you --
**A That's not what I do.**
Q Right. And you testified earlier that you don't do secured debt -- you don't represent clients in secured debt transactions; is that fair to say?
**A That's definitely fair to say.**
Q Okay. And do you remember Hush ever having a conversation with you that --
**A I would say I've never represented something. In fact, I would use somebody to do it for me.**
Q Okay. So you don't feel you have the skill set to do -- represent paying clients in a secured debt transaction?
**A That's correct.**
Q All right. And you don't have any recollection

130

of Hush telling you with spoken words, "Hey, you're representing RC in this transaction"; correct?
**A I don't have a recollection of that.**
Q Okay. And do you have a recollection of Daniel Shlomi telling you, "Hey, I understand you're acting as an attorney for RC"? Do you have a recollection of that?
**A I don't have a recollection of that.**
Q Okay. And in other emails, you see people sending RC documents without you on the email. Did you see that in the exhibits?
**A I did not see that.**
Q You did not?
**A No.**
Q Okay. All right. Let's take a look at Exhibit 16. Just at the bottom of the first page, you'll see an email from Daniel Shlomi to Shingly, and he's writing Hush.
**A So it's Daniel Shlomi to Hush, and it's copied to Shingly. And that's it.**
Q Right. I'll represent I'm not going to keep you here to show you a bunch of other emails where you're not on the email. But, typically, when you're -- are you familiar with the anti-contact rule?
**A No.**

131

Q Okay. Are you aware, just generally, that if you actually were the lawyer in a transaction, people wouldn't be emailing your client or their assistant without you on the email, if you were the lawyer, or do you not know what the anti-contact rule is?
**A I don't know the anti-contact rule, but you usually go through somebody's attorney.**
Q Okay. And let's take a look at Exhibit 8, please, the conflict waiver -- or the draft of a conflict waiver, Exhibit 8 and 10. Mr. Zur, my colleague, showed you these documents.
**A So 8 or 10? Which one do you want me to look at?**
Q I'd like for you to just have 8 and 10 in front of you. (Indiscernible) copy.
(Stenographer clarification.)
MR. RICHARDS: These are really dark.
BY MR. RICHARDS:
Q Okay. Let's look at Exhibit 8 first. Did you have any participation in the preparation of this conflict waiver in Exhibit 8?
**A No.**
Q Okay. And as a lawyer, have you ever assist -- have you ever been paid to draft conflict waivers for clients?
**A No.**

132

Q Do you have any clients tip -- are you, like, a practicing attorney?
**A I have no clients, and I'm not a practicing -- well, I am a lawyer. I'm a licensed lawyer, but I don't hang a shingle. I don't take clients.**
Q And so when Mr. Zur was asking you about certain, what I would call, statutory language in a conflict waiver about you have the right to seek independent counsel, have you ever taken any courses to what that language means?
**A No.**
Q Okay. And have you ever given advice to any third party as a lawyer on what they should do if they get a conflict before they sign a conflict waiver?
**A No.**
Q Did you, in any way, advise RC on the ramifications of the conflict waiver that his trusted lawyer, Hush, had sent him?
**A No.**
Q At any time during the -- this -- during the time that you knew Hush, did he ever tell you that he put his clients in usurious loans?
**A No.**
Q At any time did Hush ever indicate to you that he would put your brother in a loan that was illegal?
**A My father's brother.**

133

Q Your father's brother. Sorry. I apologize.
**A Yeah. No.**
Q At any time during your review -- or at any time this matter was being considered by Joe Cohen, did Hush ever tell you, hey -- something to the effect of, "Hey, secretly, this is a usurious loan, but I'm not going to tell anybody"?
**A No.**
Q Would it have surprised you to find out if Hush played a trick on either Joe or Robert Cohen that he drafted -- his office drafted a usurious loan?
**A Yes.**
Q And why is that?
**A Because there was a relationship of trust there. And I think both speaking for my dad and RC, they would have loaned money to Hush based on their relationship with Hush, not based on even his financial statement, anything like that. It would have been -- and so even if it's going to an entity, the person -- you wouldn't have just done it with an entity without knowing who's involved with the entity and you trust the person.**
**I mean, I --**
Q You --
**A -- never drafted a loan like that (indicating). I mean...**

134

Q I think you're pointing to Exhibit 9; right?
**A That's correct.**
Q Okay. And if you look at the first paragraph of Exhibit 9, you see that the interest rate is 12 percent.
**A Yes.**
Q Are you aware that, in this case, over a decade later, Hush is now contending that the loan that his office drafted for your uncle is usurious? Are you aware of that?
**A Not directly. I've been -- I don't have much knowledge of the case. I've stayed away from it. But I've heard -- I -- I've heard --**
Q Okay.
**A -- that there's a usurious claim.**
Q In the course of you dealing with Hush, did he ever trick your father, to the best of your knowledge, with any documents he prepared?
**A Not that I know of. I --**
Q What about your uncle?
THE STENOGRAPHER: I'm sorry.
BY MR. RICHARDS:
Q I'm sorry. I cut you off. Go ahead. Finish the sentence.
**A Not that I know of. Trust him.**
**And you were asking about my uncle. Do I know of him ever tricking my uncle? Not that I know of.**

135

Q And your uncle's Robert Cohen?
**A That's correct.**
Q Okay. Would it surprise you to learn that Hush drafted a promissory note for his company to lend money to your uncle Robert, and then 11 years later he contended that the interest rate he put on the loan was usurious?
**A Yes.**
MR. ZUR: Objection. Compound. Impossible to understand. Assumes facts not in evidence. Calls for speculation.
MR. JANNOL: You can answer.
MR. ZUR: Mischaracterizes.
THE WITNESS: It would surprise me because I believe Hush -- if it was usurious and improper, he knew it at -- when the loan was signed. I mean, he wrote it, and he would have known it. I mean, he's done so many secured transactions. I mean, that was such a big part of his business. So he -- and opinion letters. Every time we did a loan, he had to -- you know, had the firm, that was multiple days to opine on a loan and to say it was correct.
And, I mean, I don't know all the things that go into an opinion letter, but all the stuff that a lender would traditionally want. So that would surprise me.

136

BY MR. RICHARDS:
Q As a brother lawyer of Hush, did you consider Hush to be an expert in secured transactions?
**A I don't know. Did you say "brother"?**
Q Brother, lawyer, fellow attorney, member of the Bar?
**A Yeah. I considered Hush to be an expert in secured transactions.**
Q And I've read this conflict waiver a couple times. Does it say anywhere that Hush was advising Robert Cohen that the loan that he -- the loan documents he drafted were usurious?
MR. ZUR: Objection.
THE WITNESS: I don't know. I'm sorry.
THE STENOGRAPHER: What was the objection?
MR. ZUR: Assumes facts not in evidence. Mischaracterizes prior testimony.
THE WITNESS: I don't know. I didn't read the conflict letter.
BY MR. RICHARDS:
Q You didn't read the conflict -- would you want to -- I can represent to you the word "usury" or "usurious" is not in the letter. Will you take my word for it?
**A Yeah.**

Q Okay. Would -- did -- at any -- do you know of any reason why -- knowing Hush so well as a trusted confidant of the family, why he wouldn't have disclosed in 2013 that the loan that his law firm -- or the loan documents that his law firm created was he -- was usurious, according to Hush?

MR. ZUR: Calls for speculation.

THE WITNESS: I can answer?

BY MR. RICHARDS:

Q Yeah.

**A I don't know of any reason why.**

Q Okay. In 2013, would it be fair --

**A And did you ask if it would surprise me?**

Q Yeah. You said --

**A Yeah, it would surprise me.**

Q -- that he wouldn't disclose that?

**A Yeah.**

Q Okay.

**A Or that he would create it.**

Q And back in 2013, would it be fair to say that you had -- your family had a close relationship with Hush?

**A Yes.**

Q And did you -- and you've testified that you trusted him implicitly; correct?

**A Yes.**



Q Did you consider -- did your family consider him a fiduciary?

**A Yes.**

Q And can you think of any reason why, as a fiduciary, that Hush would direct his law firm to draft a loan document that 11 years later he would contend was usurious?

MR. ZUR: Objection. Calls for speculation.

THE WITNESS: I don't know of any reason why.

BY MR. RICHARDS:

Q Did Hush -- did you ever get to observe Hush's relationship with RC?

**A Yes.**

Q And did RC trust Hush, to the best of your knowledge?

**A Yes. I think -- I'm just going to speculate, but I think Hush was -- had a fondness for my father, maybe more than RC, but absolutely he really liked RC and respected him. And yeah.**

Q And I'm assuming you never -- Counsel never showed you the operating agreement for S&W Blue Jay, but I'm assuming you never read that either; correct?

**A I never saw it.**

Q Okay.

MR. RICHARDS: All right. I don't have any further



questions.

THE STENOGRAPHER: Mr. Jannol, and Mr. Richards, are you ordering a copy?

MR. JANNOL: No.

MR. LEV: Yes. I did order one through the email.

MR. ZUR: I have just one --

MR. RICHARDS: Oh, we're going to go for round three.

(Simultaneous cross talk interrupted by the stenographer.)

THE STENOGRAPHER: One at a time, please.

MR. ZUR: I just have one question.

THE WITNESS: I can't read it when it's upside down.

MR. ZUR: Eyes on me, please.

EXAMINATION

BY MR. ZUR:

Q Would it surprise you to hear that in 2014, in connection with the loan made by A.C.C. to 180 PCH, you raised an issue as to usury in connection with that loan?

MR. RICHARDS: Objection as to form.

THE WITNESS: I don't --

MR. JANNOL: Would it surprise you, yes or no?

MR. RICHARDS: Assumes the fact not in evidence.

THE WITNESS: It would surprise me.

MR. ZUR: Okay.



THE STENOGRAPHER: Off the record at 3:12 p.m.

(Off the record.)

THE STENOGRAPHER: Back on the record at 3:13 p.m.

MR. RICHARDS: He's finishing -- Mr. Zur's finishing and I have no re-redirect.

THE STENOGRAPHER: Off the record at 3:13 p.m.

(Time noted 3:13 p.m.)

---o0o---

)
STATE OF CALIFORNIA )
)

CERTIFICATE OF REPORTER

I, JUSTYNE N. JOHNSON, do hereby certify that the witness in the foregoing deposition was by me duly affirmed to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed under my direction and supervision; that the foregoing is a full, complete and true record of said testimony; that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of September, 2024.

Justyne Johnson
JUSTYNE N. JOHNSON, CSR NO. 14301

A

**ability**
50:24, 66:18, 89:14
**able**
37:20, 88:19, 92:5, 96:14
**about**
14:16, 15:6, 15:9, 19:19, 20:21, 22:5, 22:13, 24:25, 34:11, 35:10, 35:24, 37:7, 42:5, 42:10, 42:20, 43:2, 43:5, 44:12, 47:8, 48:9, 48:13, 49:11, 50:22, 50:25, 52:1, 53:18, 53:24, 55:6, 55:7, 56:8, 60:14, 63:6, 63:15, 63:19, 65:10, 65:14, 66:6, 66:7, 68:9, 68:18, 70:13, 71:19, 72:7, 74:14, 74:15, 76:7, 76:9, 77:6, 79:11, 81:4, 82:6, 82:11, 82:23, 83:1, 83:23, 84:13, 86:2, 86:10, 91:2, 91:3, 93:22, 94:14, 94:15, 94:18, 95:2, 95:3, 96:12, 96:21, 97:25, 98:19, 100:5, 101:7, 107:8, 110:2, 110:8, 110:9, 110:23, 132:6, 132:8, 134:19, 134:25
**above**
35:3
**absolutely**
72:17, 96:23, 138:18
**acceptable**
105:4
**access**
77:7, 116:1
**accomplish**
67:25
**according**
137:6
**account**
41:2, 115:16
**accusations**
118:2, 118:3, 119:3, 119:4
**acrimonious**
71:23
**act**
17:25, 36:22, 68:12, 94:22
**acted**
40:4
**acting**
12:21, 130:6
**active**
18:1, 18:3, 23:10, 70:14
**actually**
125:23, 131:2
**add**
119:20
**added**
115:10, 116:5, 116:7
**addition**
26:2, 26:12, 45:20
**additional**
19:7, 41:6
**address**
41:12, 57:18, 101:14, 102:2, 104:4, 106:10, 109:23, 112:5, 114:21, 115:23
**addressed**
111:20
**advice**
11:17, 11:22, 26:5, 34:25, 39:23, 43:3, 65:2, 89:7, 90:8, 91:16, 91:22, 95:20, 132:11
**advise**
22:13, 68:25, 89:6, 90:6, 90:14, 91:15, 92:20, 123:2, 132:15
**advised**
70:9, 72:18, 90:3, 90:6
**advising**
90:7, 90:8, 136:10
**affirmative**
109:11
**affirmed**
141:9
**after**
43:11, 56:4, 56:7, 60:23, 63:22, 63:24, 63:25, 76:17, 81:5, 97:24, 98:3, 98:20, 99:12, 99:13, 102:16, 103:2, 113:15
**afternoon**
67:2
**again**
36:1, 48:1, 62:2, 66:5, 67:2, 97:16, 98:3, 101:23
**against**
105:25
**agent**
27:20, 28:1
**ago**
17:4, 17:12, 19:11, 19:12, 29:10, 47:14, 49:7, 49:8
**agreed**
67:15
**agreement**
5:26, 6:16, 50:8, 54:10, 57:21, 67:25, 68:7, 68:13, 69:15, 70:10, 71:12, 71:19, 76:10, 106:5, 108:14, 138:21
**agreements**
23:19, 23:21
**ahead**
75:12, 75:14, 94:13, 134:22
**akin**
57:18, 67:12, 68:22, 69:1, 69:10, 73:25, 75:8, 75:20, 76:8, 76:11, 88:20, 103:1, 103:7, 109:17, 109:20, 109:22, 119:18, 119:20, 119:24
**akin's**
75:17
**al**
21:10, 21:11, 45:25
**all**
14:23, 25:3, 27:20, 30:20, 35:3, 36:10, 41:10, 45:13, 51:1, 54:12, 55:22, 56:10, 61:7, 63:7, 65:12, 66:8, 77:1, 77:7, 85:19, 85:22,

93:23, 96:12, 96:13, 96:14, 105:4, 110:3, 113:17, 119:13, 119:16, 123:20, 125:10, 125:12, 126:18, 129:25, 130:15, 135:23, 135:24, 138:25
**allen**
103:23
**allow**
91:8
**alongside**
22:21
**already**
54:4, 111:18
**also**
3:23, 9:10, 17:9, 17:12, 18:4, 23:4, 24:22, 25:11, 28:16, 36:13, 88:3, 88:10, 88:13, 101:11, 102:8, 102:12, 110:23
**always**
11:5, 25:14, 58:6, 91:25, 97:8, 105:8, 109:24, 110:1, 113:13
**amazing**
77:8
**amendment**
22:16
**american**
31:7
**amiss**
34:14
**amongst**
17:11, 49:3
**amount**
32:21, 40:19, 66:7, 68:9, 125:15
**amounts**
63:3
**angeles**
1:22, 2:3, 3:8, 3:16, 7:1, 7:8, 15:16, 40:21
**annum**
41:4
**another**
11:5, 28:14, 28:17, 30:10, 38:22, 50:18, 57:22, 68:24, 69:8, 69:9, 74:22, 85:8, 97:25, 98:11, 125:1
**answer**
9:13, 9:16, 9:17, 11:2, 13:14, 37:15, 75:16, 101:22, 102:7, 107:5, 109:8, 112:12, 112:22, 116:14, 118:8, 135:12, 137:8
**answered**
22:5, 33:22, 101:16, 102:5, 110:15, 117:19, 117:25, 118:20, 119:1
**answers**
9:5, 13:12
**anti-contact**
130:24, 131:5, 131:6
**any**
9:2, 9:8, 9:15, 15:1, 15:4, 15:19, 16:21, 23:18, 23:21, 24:10, 24:12, 26:11, 33:16, 37:11, 38:4, 39:9, 41:6, 41:18, 42:13, 42:20, 44:2, 45:5, 46:5, 48:14, 54:21, 58:9, 58:10, 59:23, 65:25, 70:5, 88:5, 88:20, 91:2, 94:17, 94:18, 104:9, 106:8, 116:7, 120:15, 125:14, 128:14, 128:25, 129:25, 131:19, 132:1, 132:9, 132:11, 132:15, 132:19, 132:23, 133:3, 134:17, 137:1, 137:2, 137:11, 138:4, 138:9, 138:25, 141:19, 141:20
**anybody**
26:4, 42:10, 42:19, 43:18, 45:15, 63:9, 103:4, 116:1, 120:12, 133:7
**anyone**
15:6
**anything**
30:21, 34:13, 38:2, 42:5, 43:5, 44:13, 49:11, 84:8, 94:1, 101:10, 133:17
**anyway**
80:12
**anywhere**
136:10
**apart**
119:15
**apc**
3:18
**apologies**
18:19, 23:15
**apologize**
133:1
**appeal**
69:9, 74:24, 75:4, 75:7, 75:17, 75:24, 76:17, 103:11
**appearance**
120:2
**appearances**
3:1
**appearing**
7:19, 95:17
**appears**
21:9, 32:12, 46:23, 59:10
**appellate**
103:11
**appreciate**
8:20, 39:7, 59:6
**appropriate**
36:16, 36:22
**approximately**
49:5
**april**
6:7, 67:19, 76:7
**ar**
29:22
**argumentative**
118:1, 119:2
**arisen**
68:7
**around**
47:8, 47:14, 76:4, 90:12, 103:4, 126:3
**arrange**
111:24
**arrangement**
68:3, 68:5
**asked**
31:19, 34:6, 35:24, 52:13, 60:12, 60:17, 90:25, 93:24, 94:1, 96:8, 96:20, 101:16, 102:5, 110:15, 117:19, 117:25, 118:20, 119:1,

122:5, 123:3, 124:16
**asking**
14:15, 49:16, 92:19, 94:24, 94:25, 95:2, 95:4, 95:6, 132:6, 134:25
**assist**
75:10, 75:18, 131:22
**assistant**
58:18, 58:23, 131:3
**associate**
109:17, 109:20
**associates**
3:18
**assume**
42:18, 65:7, 115:21, 116:6
**assumed**
77:14
**assumes**
116:10, 135:10, 136:16, 139:23
**assuming**
138:20, 138:22
**astro**
5:19
**attached**
13:22, 20:15, 27:4, 32:6, 46:14, 49:18, 49:22, 54:19, 57:2, 59:11, 61:13, 62:5, 65:6, 67:5, 87:16, 99:4, 105:14, 105:24, 108:6, 108:13, 109:13, 114:9, 120:24
**attachment**
54:9
**attachments**
61:20, 104:5, 104:10, 106:8
**attempt**
68:11
**attended**
48:4
**attorney**
3:6, 3:13, 3:20, 9:12, 10:7, 10:12, 10:13, 10:14, 14:18, 14:23, 22:5, 25:20, 26:18, 113:2, 122:5, 130:6, 131:7, 132:2, 136:5, 141:19
**attorney-client**
12:14, 102:10
**attorneys**
60:24, 76:1
**audible**
9:4
**authentication**
116:11
**authority**
58:10
**authorized**
32:17, 40:24
**avenue**
3:14
**avra**
102:18
**aware**
44:2, 45:5, 131:1, 134:6, 134:8
**away**
44:9, 59:5, 134:11

**B**

**back**
11:1, 15:8, 18:12, 20:12, 29:14, 29:20, 29:25, 30:2, 31:1, 31:16, 31:17, 32:15, 34:23, 36:3, 38:2, 48:1, 60:13, 61:7, 67:1, 73:16, 76:19, 76:22, 77:10, 79:21, 80:22, 80:25, 81:11, 81:14, 83:5, 89:3, 99:8, 101:24, 106:16, 107:13, 111:13, 113:8, 114:1, 119:9, 119:14, 119:25, 125:5, 125:6, 125:22, 137:20, 140:3
**backwards**
101:20
**badgering**
117:2, 117:3, 117:5
**bank**
47:7, 47:9, 47:11, 47:14, 47:16, 47:25, 48:3, 48:7, 48:9, 48:15, 48:18, 83:19, 84:1, 84:3, 84:8, 111:25
**bankers**
47:9, 47:10
**banking**
47:19, 47:20, 47:22, 48:10
**bankruptcy**
1:1, 5:9, 8:18, 14:2, 121:17, 122:3
**banks**
80:18
**bar**
94:21, 95:1, 136:6
**baron**
3:25
**based**
37:15, 37:17, 79:14, 84:6, 133:16, 133:17
**basic**
39:25
**basically**
37:19
**basis**
23:25, 24:1, 45:13, 80:18
**bates**
27:11, 29:6, 29:7
**bates-stamped**
5:17
**bc**
28:9
**bearing**
27:11
**became**
85:14
**because**
11:20, 12:9, 12:13, 12:21, 18:18, 25:3, 28:6, 38:18, 47:10, 50:23, 51:25, 64:25, 80:12, 84:13, 90:24, 91:15, 94:8, 103:9, 107:21, 122:9, 122:17, 123:2, 123:21, 124:4, 133:14, 135:14
**been**
8:2, 8:21, 11:5, 19:13, 21:9, 24:7, 33:24, 34:1, 34:3, 34:7, 36:5, 36:6, 36:9, 36:16, 36:22, 38:24, 38:25, 41:9, 47:10, 49:6, 49:7, 49:18, 55:5, 56:4, 56:6, 58:6,

61:5, 63:13, 63:22, 63:24, 64:3, 64:15, 65:9, 69:24, 70:20, 71:2, 71:6, 71:12, 71:21, 72:2, 76:8, 77:23, 86:1, 86:5, 86:14, 88:14, 96:20, 100:1, 107:19, 107:22, 107:23, 113:16, 113:20, 115:16, 116:2, 123:13, 131:23, 133:18, 134:10
**before**
2:4, 8:21, 11:17, 12:7, 14:5, 14:12, 34:16, 41:1, 41:25, 45:25, 51:3, 56:4, 64:3, 64:5, 64:8, 67:21, 68:7, 88:7, 94:10, 101:6, 108:20, 108:25, 112:1, 113:23, 122:19, 125:3, 125:10, 127:5, 127:9, 127:12, 127:13, 127:14, 132:13
**beginning**
2:3, 122:24
**behalf**
2:1, 7:15, 7:19, 7:20, 12:13, 14:11, 18:22, 22:11, 25:11, 28:8, 28:9, 31:9, 70:21, 71:2, 71:6, 71:9, 71:13, 73:25, 74:1, 79:6, 79:7, 123:3
**behind**
76:1
**being**
8:20, 16:17, 20:1, 20:2, 46:24, 52:22, 68:8, 68:22, 72:20, 79:2, 98:7, 98:16, 101:11, 107:12, 125:7, 133:4
**bel**
115:3
**belie**
69:7, 106:9
**believe**
15:22, 16:25, 19:8, 22:7, 23:20, 26:3, 27:19, 28:16, 29:4, 32:21, 35:4, 41:18, 42:4, 44:24, 44:25, 49:3, 51:12, 55:14, 59:15, 59:17, 63:10, 67:11, 67:23, 85:4, 89:17, 90:17, 92:25, 98:9, 103:8, 106:1, 106:7, 107:15, 113:19, 114:21, 115:7, 135:14
**below**
104:7
**beneficiary**
41:12
**benefit**
10:4, 17:2, 127:17, 127:20
**benon**
44:17, 45:1
**best**
44:8, 58:7, 76:13, 134:16, 138:14
**bet**
60:11
**between**
15:10, 15:19, 15:20, 16:11, 17:1, 33:6, 45:9, 46:9, 46:10, 65:18, 67:12, 68:21, 72:10, 72:23, 76:8, 79:8, 80:8, 97:2, 116:12, 120:8
**beverly**
3:22
**beyond**
93:11, 96:15
**big**
113:14, 135:18
**big-picture**
18:4, 18:6
**bill**
24:4
**billing**
23:24
**birth**
113:23
**birthday**
44:6, 113:13
**bit**
8:12, 26:1, 35:5, 73:5, 74:15, 82:22, 92:2, 108:25
**blind**
39:22
**blue**
1:7, 3:3, 3:10, 5:23, 5:25, 5:29, 6:15, 6:19, 6:24, 6:26, 6:33, 7:6, 7:15, 7:19, 8:11, 8:15, 14:11, 32:16, 40:11, 48:6, 50:7, 50:11, 54:6, 54:9, 59:9, 80:23, 81:8, 94:6, 105:23, 110:6, 110:8, 111:17, 121:12, 121:17, 121:20, 138:21
**board**
92:4
**borr**
28:6
**borrow**
36:8, 36:15, 64:25
**borrowed**
45:9, 80:17
**borrower**
30:7, 30:13
**both**
9:24, 11:22, 16:9, 17:24, 22:11, 23:13, 23:16, 25:24, 45:18, 63:16, 72:21, 73:24, 74:2, 79:16, 79:25, 92:6, 133:15
**bother**
112:17
**bottom**
29:6, 32:16, 62:2, 62:15, 89:5, 130:16
**bottom-left**
62:10
**bottom-right**
27:11, 27:23
**bought**
78:24
**boulevard**
2:2, 3:7, 7:8
**box**
3:21
**break**
9:11, 34:18, 110:23, 111:3
**breakdown**
17:17

**breakfast**
86:7
**briefly**
14:7, 15:9, 111:9
**brother**
84:22, 132:24, 132:25, 133:1, 136:2, 136:4, 136:5
**brought**
69:8, 74:23, 75:24
**brown**
27:20, 29:9, 29:10, 31:6
**bugging**
86:22, 86:24
**bullet**
87:25
**bunch**
59:10, 59:20, 130:22
**burton**
11:3, 15:9, 15:12, 16:8, 17:9, 18:11, 18:15, 18:23, 19:17, 19:20, 19:25, 20:3, 21:9, 22:2, 22:7, 22:9, 23:6, 23:19, 24:16, 25:1, 25:15, 25:18, 35:1, 46:4, 47:19, 58:1, 67:12, 67:16, 68:12, 68:21, 68:24, 71:3, 71:6, 71:10, 71:13, 74:1, 74:12, 75:3, 76:8, 88:13, 94:6, 100:18, 101:11, 109:23, 110:4, 110:6, 123:15
**business**
9:21, 11:23, 25:11, 30:19, 37:18, 39:24, 43:9, 43:24, 80:14, 92:11, 92:24, 93:17, 102:15, 135:19
**business-wise**
95:7
**businesses**
86:11
**businessman**
36:14
**busy**
60:2, 93:20
**buying**
78:1, 78:24
**bwh**
122:9, 122:18

C

**calculated**
41:2
**california**
1:2, 1:22, 2:3, 3:8, 3:16, 3:22, 6:34, 7:1, 7:8, 7:9, 8:19, 21:12, 42:17, 121:20, 141:2
**call**
35:9, 59:4, 132:7
**called**
30:11, 54:9, 56:18, 60:17, 72:3, 122:8
**calling**
69:3
**calls**
35:3, 100:23, 101:15, 107:2, 109:5, 116:9, 119:22, 135:10, 137:7, 138:8
**came**
22:8, 24:23, 28:21, 29:4, 29:21, 43:10, 46:1, 48:11, 59:22, 63:15, 75:9, 77:2, 80:7, 110:10, 122:20, 125:11
**can't**
9:2, 36:23, 45:14, 54:17, 64:15, 68:17, 69:1, 71:16, 82:25, 84:4, 85:19, 85:24, 88:23, 89:11, 89:15, 89:19, 91:15, 97:12, 101:10, 101:17, 101:20, 110:10, 110:14, 139:12
**cannot**
92:21
**capacity**
35:12, 68:14, 69:14, 123:11
**capital**
22:14, 22:17, 24:3
**caption**
141:20, 141:21
**care**
111:5
**carefully**
34:8
**carried**
102:12
**case**
1:9, 5:10, 7:6, 8:18, 14:2, 21:9, 21:12, 21:23, 68:22, 71:4, 90:3, 92:12, 93:6, 102:17, 105:8, 121:17, 122:3, 128:15, 134:6, 134:11
**catch**
55:25
**cause**
19:6, 29:6, 35:16, 37:19, 40:2, 47:12, 48:1, 64:22, 100:14, 118:12, 123:16, 128:1, 141:10, 141:21
**cc**
47:1, 57:23, 112:4
**cc'd**
69:13, 69:17, 69:25
**celebrate**
113:14, 113:16
**central**
1:2, 8:19, 21:11
**certain**
9:12, 22:14, 31:15, 32:22, 132:6
**certainly**
66:9
**certificate**
141:5
**certification**
7:11
**certified**
2:5, 7:10, 8:2, 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:13, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 114:9, 120:24
**certify**
141:7, 141:18
**cetera**
53:8, 62:1, 62:2, 62:3, 62:4
**chain**
46:24, 47:4, 47:24, 48:2, 57:7, 57:14,

57:17, 103:9
**chance**
32:8, 75:11
**change**
16:19
**changed**
16:20, 22:20
**charge**
66:4
**chat**
35:9
**chatter**
114:1
**check**
41:7, 41:12, 44:21, 98:18
**child**
39:5
**children**
10:4
**choice**
89:7
**chose**
42:5, 78:18
**circulate**
108:16
**circumstances**
71:17
**city**
47:10
**claim**
6:33, 121:19, 134:14
**clarification**
9:8, 15:17, 50:16, 83:8, 102:21, 131:15
**clarify**
11:24, 12:20
**clean**
55:8, 57:19
**clear**
22:6, 80:24, 81:3, 88:19, 88:20, 94:11, 107:13
**clearly**
69:1, 104:22
**client**
10:8, 10:10, 10:11, 28:25, 36:8, 88:4, 88:11, 88:14, 89:1, 89:11, 89:16, 89:18, 90:12, 92:20, 92:24, 131:3
**clients**
24:13, 37:6, 39:9, 88:12, 92:11, 92:13, 93:1, 129:14, 129:22, 131:24, 132:1, 132:3, 132:5, 132:21
**close**
38:15, 41:1, 41:5, 74:19, 122:23, 137:21
**cohen**
1:20, 2:1, 3:25, 4:3, 5:12, 5:34, 6:6, 6:7, 6:10, 7:12, 7:17, 7:21, 7:22, 8:1, 8:8, 11:24, 12:1, 12:11, 13:24, 18:17, 19:15, 19:16, 21:7, 21:14, 27:13, 27:15, 27:24, 28:9, 29:16, 32:14, 34:25, 47:2, 50:1, 50:6, 57:21, 57:23, 67:2, 67:16, 84:13, 87:23, 99:11, 103:22, 105:19, 111:16, 122:4, 122:7, 122:11, 133:4, 133:10, 135:2, 136:11
**cohen's**
5:5, 13:25, 18:22, 20:4
**cold**
64:11
**colleague**
131:10
**com**
50:5, 57:9
**come**
15:8, 56:15, 61:7, 94:2, 108:25, 111:2
**coming**
124:4, 125:6, 126:3
**commemorate**
113:23
**comment**
36:23, 38:4
**comments**
24:19, 39:6
**commercial**
9:23, 10:1, 10:2
**common**
15:20
**communicate**
22:24, 23:7, 35:15, 46:7, 55:18, 72:25, 86:11, 105:7, 114:2, 114:3, 120:11
**communicated**
23:13, 23:16, 55:1, 55:21, 64:7, 64:14, 71:13, 85:24, 86:5, 93:8, 96:25, 99:16, 104:13, 104:17, 104:25, 112:14, 117:8, 117:16, 118:17, 119:7
**communicating**
86:18, 119:8
**communication**
46:10, 50:10, 56:8, 93:4
**communications**
55:22
**company**
6:35, 11:2, 15:10, 15:13, 15:23, 16:6, 18:15, 19:25, 22:3, 22:9, 24:17, 25:1, 28:1, 28:5, 40:22, 41:7, 41:8, 47:20, 58:1, 121:21, 123:14, 125:12, 135:5
**complained**
74:15
**complaint**
74:16
**complete**
20:23, 141:14
**completely**
65:18
**completion**
106:3, 106:12, 106:15, 106:20, 107:9
**complicated**
50:23, 52:5, 52:22, 52:23, 55:8, 55:13, 60:25, 85:19, 85:21, 85:25, 91:7, 100:14, 107:10
**complications**
85:20
**complied**
41:9
**compound**
135:9
**computer**
28:21, 29:2, 29:3, 45:2, 57:11, 59:15, 59:22, 60:9, 85:5
**concern**
68:9, 96:3

**concerned**
70:13, 103:6
**concerns**
56:1
**concert**
17:25
**conclude**
125:23, 125:25
**concluded**
126:1
**concluding**
126:2
**conclusion**
24:3
**concrete**
54:4
**conditions**
41:9
**conference**
20:6, 111:11
**confidant**
137:3
**confidentiali**
65:16
**confirmed**
98:21, 98:23
**conflict**
5:30, 6:19, 33:17, 33:24, 36:2, 36:6, 36:10, 36:25, 37:3, 57:21, 59:9, 65:5, 83:6, 88:3, 88:10, 88:17, 88:21, 88:25, 89:4, 89:22, 90:2, 90:11, 90:13, 92:23, 93:5, 93:9, 105:23, 105:25, 108:14, 123:1, 131:9, 131:19, 131:23, 132:7, 132:13, 132:16, 136:9, 136:19, 136:21
**confused**
106:13
**conjecture**
112:20, 123:6
**connected**
48:18
**connection**
5:7, 11:3, 11:21, 14:1, 35:1, 35:19, 36:3, 47:25, 48:15, 50:11, 68:13, 68:25, 69:1, 69:15, 70:10, 72:19, 74:23, 76:21, 80:22, 89:8, 102:25, 123:14, 139:18, 139:19
**consent**
62:3, 89:8
**consider**
18:11, 20:3, 25:20, 42:16, 136:2, 138:1
**considered**
133:4, 136:7
**consistent**
90:16, 91:1
**construction**
50:24, 81:22, 82:13, 83:22, 106:19, 106:25
**consult**
25:21, 44:12, 46:3
**consulted**
43:2, 43:17, 45:19, 45:23, 93:22
**contain**
83:16
**contained**
109:25
**contains**
83:17
**contend**
74:12, 138:6
**contended**
135:6
**contending**
134:7
**content**
54:18
**context**
56:7
**contingencies**
88:1
**continued**
6:1, 113:16
**continues**
58:25
**continuing**
104:15
**contract**
22:16
**control**
72:4
**conversation**
53:5, 53:9, 53:17, 53:23, 55:24, 73:13, 82:25, 102:17, 129:18
**conversations**
24:24, 25:13, 35:13, 35:20, 73:4, 74:21, 79:14, 82:21, 86:8
**convey**
40:23
**convince**
73:1
**cooperate**
75:10
**copied**
48:3, 70:5, 115:1, 130:19
**copies**
103:22, 105:19, 108:11, 108:17, 114:20, 126:16
**copy**
85:3, 131:14, 139:3
**copying**
111:16, 114:19, 115:2
**core**
66:18
**corner**
27:11, 27:23
**corners**
62:10
**corre**
41:21
**correct**
9:6, 9:7, 14:17, 14:19, 17:8, 20:4, 23:13, 28:2, 28:11, 41:25, 42:4, 47:2, 75:21, 78:10, 104:4, 108:2, 115:15, 116:5, 127:6, 127:10, 127:13, 127:21, 128:22, 129:1, 129:24, 130:2, 134:2, 135:3, 135:22, 137:24, 138:22, 141:16
**cosigning**
111:23
**could**
19:12, 25:4, 25:21, 30:17, 36:8, 39:13, 40:18, 53:12, 53:20, 54:21, 55:5, 57:11, 57:12, 59:3, 59:5, 64:15, 67:10, 72:2, 73:14, 77:23, 80:15, 86:13, 87:5, 96:15, 101:24, 105:3, 107:17, 113:11, 113:16, 113:19, 115:16, 122:3, 127:3
**couldn't**
31:5, 35:16,

37:19, 65:2, 65:11, 71:21, 73:14, 123:2, 127:19
**counsel**
7:13, 11:7, 11:9, 11:10, 11:13, 11:15, 11:16, 11:17, 11:18, 11:19, 11:20, 12:10, 12:21, 12:22, 13:12, 13:19, 14:13, 14:20, 15:5, 17:22, 22:2, 25:6, 37:6, 38:9, 38:11, 39:23, 40:4, 68:12, 68:22, 69:1, 74:23, 74:24, 75:20, 76:11, 81:18, 88:23, 89:7, 89:12, 90:3, 90:8, 90:15, 91:15, 91:17, 92:22, 102:14, 103:5, 123:1, 123:5, 123:17, 123:20, 132:8, 138:20, 141:18
**county**
40:21
**couple**
125:24, 136:9
**course**
9:12, 113:3, 134:15
**courses**
132:9
**court**
1:1, 8:25, 21:11, 110:18
**cousin**
70:4
**cover**
37:2
**create**
137:19
**created**
16:1, 17:1, 17:3, 19:9, 137:5
**cross**
13:4, 111:6, 139:8
**csr**
1:33, 141:26
**current**
9:20
**currently**
15:15
**cursory**
34:4, 60:19, 60:22, 61:2, 61:3, 62:20, 62:23, 62:25, 63:4
**cut**
54:17, 134:22

**D**

**dad**
29:21, 29:24, 30:20, 31:5, 31:15, 35:5, 35:6, 35:15, 35:16, 36:15, 37:17, 37:18, 37:21, 44:5, 44:11, 45:24, 52:13, 52:16, 52:19, 55:14, 55:21, 56:19, 63:12, 63:17, 63:20, 63:23, 64:7, 72:23, 72:24, 72:25, 73:1, 73:2, 73:13, 78:18, 78:19, 78:21, 78:22, 79:5, 79:8, 79:11, 79:13, 79:17, 80:3, 80:11, 83:3, 85:12, 85:13, 85:18, 85:22, 86:6, 86:8, 87:5, 91:6, 91:25, 94:10, 98:17, 99:15, 100:13, 100:16, 110:7, 110:13, 125:7, 125:11, 125:14, 127:5, 133:15
**dad's**
38:23, 44:8, 100:16, 102:12, 127:25
**daniel**
3:12, 6:14, 6:18, 6:25, 7:18, 57:17, 103:22, 105:18, 109:15, 110:3, 111:16, 114:18, 114:20, 115:2, 116:4, 130:5, 130:17, 130:19
**dark**
131:16
**date**
32:22, 111:18, 113:10, 113:22, 127:8, 127:9, 128:1
**dated**
5:16, 5:20, 5:34, 5:38, 6:7, 6:11, 6:16, 6:20, 6:26, 6:29, 32:13, 33:9, 33:10, 40:20, 51:12, 67:19, 83:10, 87:22, 89:4, 100:4, 108:11, 114:17, 114:23, 127:7, 127:13, 127:14
**dates**
63:3, 99:18, 128:6
**daughter**
26:14, 26:16
**daughters**
26:17
**day**
113:23, 127:12, 141:23
**day-to-day**
18:5, 18:7, 25:10
**days**
99:24, 112:15, 112:16, 116:17, 117:8, 117:16, 118:17, 135:21
**deaf**
18:7
**deal**
52:15, 68:3, 77:6, 85:18, 85:21, 86:2, 86:4, 86:13, 86:15, 88:19, 88:20, 88:22, 89:12, 89:16, 91:20, 92:21, 93:17, 93:23, 94:16, 94:18, 95:7, 95:21, 95:22, 96:2, 99:11, 99:17, 100:11, 107:10, 113:25, 120:7, 124:3, 128:2
**dealing**
22:19, 80:19, 134:15
**deals**
36:14, 80:16, 86:14, 92:11, 128:12
**dealt**
35:4
**debt**
129:14, 129:15, 129:22
**debtor**
1:9, 2:2, 8:18,

28:24
**debtor's**
6:32, 121:19
**decade**
134:6
**december**
5:20, 32:13, 33:9, 41:4, 49:2
**decide**
52:20, 78:16
**decided**
55:15, 56:19, 78:15
**decision-makers**
37:5
**declaration**
5:11, 6:31, 21:6, 21:22, 22:1, 121:11, 121:18, 122:2
**deed**
5:38, 40:20, 40:23, 61:24, 62:1, 106:2
**deet**
96:13
**defendant's**
5:14, 21:8
**deferral**
68:18
**defined**
107:15
**definitely**
18:1, 91:11, 129:16
**deliver**
40:24
**delivered**
44:22
**demand**
32:24, 40:16, 41:11
**depend**
24:7
**depended**
24:6, 24:8
**deponent**
7:11
**depos**
7:11
**deposed**
8:21
**deposition**
1:20, 2:1, 5:9, 7:7, 14:2, 15:6, 141:8, 141:11, 141:17, 141:20
**describe**
35:21
**described**
48:5, 84:15
**describing**
102:11
**description**
5:3, 6:3
**designated**
41:8
**detail**
60:19
**detailed**
53:10
**details**
86:16, 87:4, 87:9
**develop**
78:8
**development**
25:10, 48:8, 49:17, 52:14, 52:18
**dialogue**
55:22
**dictate**
66:11
**died**
46:1, 113:15
**difference**
80:25
**different**
10:3, 17:11, 18:8, 19:22, 23:9, 26:8, 36:21, 44:4, 102:13, 108:25
**differentiate**
97:2
**difficult**
73:10, 73:12, 73:15
**diluted**
17:13
**dinner**
102:18
**direct**
138:5
**directed**
124:20
**direction**
23:12, 23:15, 141:13
**directly**
35:14, 55:2, 55:18, 66:1, 68:16, 78:16, 82:22, 85:24, 92:24, 96:8, 104:21, 113:18, 134:10
**disappointed**
102:19
**disbursement**
41:7
**disclose**
137:16
**disclosed**
137:3
**discu**
94:3
**discuss**
9:14, 46:6, 52:10, 52:11, 52:21, 59:4, 60:18, 78:12, 90:23, 93:16, 116:17, 116:21
**discussed**
18:24, 33:1, 52:17, 52:18, 106:4, 108:13, 120:1
**discusses**
106:3
**discussing**
24:23, 94:3
**discussion**
43:14, 79:1, 80:8, 91:2, 129:4
**discussions**
82:1
**dispute**
68:6, 68:8, 68:21, 68:25, 69:2, 69:3, 72:23, 74:7, 76:8
**disputes**
72:9, 72:13, 72:16, 72:19
**dissect**
82:7
**distinct**
19:16, 20:4
**district**
1:2, 8:19, 21:11
**divided**
17:10
**division**
1:2
**docket**
121:17
**docs**
59:4
**document**
5:6, 5:16, 5:19, 13:24, 14:1, 14:5, 14:8, 20:20, 20:23, 20:24, 21:3, 21:5, 21:6, 21:13, 21:15, 21:17, 21:18, 21:22, 27:7, 27:10, 27:12, 27:16, 28:20, 28:22, 28:23, 29:1, 29:9, 29:10, 30:7, 30:22, 30:23, 31:8, 32:3, 32:12,

32:14, 32:20, 33:9, 33:10, 34:16, 35:8, 38:21, 41:19, 41:20, 46:19, 49:19, 50:1, 54:12, 54:19, 56:23, 57:20, 59:22, 61:4, 61:25, 67:3, 67:10, 67:11, 67:15, 67:21, 73:16, 74:4, 83:15, 84:2, 85:8, 87:21, 100:20, 101:3, 104:1, 105:4, 111:23, 112:1, 115:6, 115:7, 121:4, 121:16, 138:6
**document's**
27:2
**documentation**
38:3
**documents**
12:7, 14:10, 14:21, 14:24, 15:1, 19:6, 24:15, 24:18, 24:21, 29:4, 35:11, 37:25, 38:4, 41:11, 53:19, 53:21, 59:3, 59:10, 60:14, 60:17, 61:5, 61:6, 61:17, 62:5, 62:10, 62:13, 62:21, 63:5, 64:21, 78:20, 90:23, 90:24, 94:20, 95:4, 95:6, 96:9, 96:21, 109:25, 111:22, 112:16, 113:11, 116:18, 116:20, 116:22, 117:9, 117:17, 117:18, 118:18, 118:19, 122:7, 122:10, 122:13, 122:15, 123:3, 125:12, 127:11, 127:16, 128:11, 130:10, 131:11, 134:17, 136:11, 137:5
**doheny**
15:16
**doing**
36:14, 39:6, 60:2, 62:25, 65:19, 77:7, 86:19, 86:21, 88:20, 88:22, 89:16, 92:21, 93:21, 99:17, 114:3, 119:14, 120:8, 124:20
**done**
19:13, 20:24, 34:4, 44:1, 54:5, 56:21, 60:16, 60:19, 61:2, 66:8, 66:9, 91:20, 116:8, 117:22, 117:24, 118:24, 118:25, 123:23, 133:20, 135:17
**doubt**
71:22, 82:5
**douglas**
69:19
**down**
55:9, 113:21, 139:12
**draft**
83:13, 89:4, 89:20, 90:13, 105:24, 105:25, 106:1, 131:9, 131:23, 138:5
**drafted**
44:23, 133:11, 133:24, 134:8, 135:5, 136:12
**drive**
76:23
**driveway**
77:7
**driving**
47:13, 68:20
**drove**
97:13
**due**
68:3, 68:4, 88:4, 88:10, 90:11
**duly**
141:8
**during**
132:19, 133:3
**duties**
92:10
**duty**
92:18, 92:20

**E**

**each**
17:25
**earlier**
11:2, 18:24, 21:16, 22:4, 28:2, 35:24, 43:23, 74:22, 80:13, 100:5, 106:13, 112:15, 116:17, 117:8, 117:16, 118:18, 120:1, 129:13
**early**
19:4
**easier**
18:21, 126:22
**easiest**
124:6
**easil**
107:14
**easily**
107:14
**east**
47:7, 47:9, 47:13, 47:25, 48:3, 48:7, 48:9, 48:15, 48:18, 83:19, 84:1, 84:3, 84:5, 84:8, 88:2, 111:21
**economic**
94:15, 95:21
**economically**
95:7
**economics**
94:15
**eddie**
5:5, 5:11, 13:25, 21:6
**educate**
86:2
**education**
66:16
**effect**
8:24, 133:5
**effectively**
86:11, 107:24
**effort**
24:8
**either**
18:15, 23:22, 24:24, 31:20, 34:16, 84:21, 85:6, 88:5, 94:4, 96:8, 107:6, 115:20, 116:3, 133:10, 138:22
**eleda**
28:9, 31:2
**elkins**
3:4, 7:14
**else**
15:6, 23:7, 23:10, 26:4, 37:7, 48:12, 48:17, 72:18, 89:19, 115:20, 116:1
**emailed**
54:25

**emailing**
131:3
**emails**
35:2, 59:20, 60:8, 93:13, 96:11, 101:2, 104:20, 109:22, 110:3, 110:10, 113:16, 113:17, 114:15, 116:4, 116:12, 119:9, 119:15, 119:19, 119:20, 120:13, 120:15, 122:13, 124:6, 128:1, 128:5, 130:9, 130:22
**emanuel**
75:1, 75:3, 75:9, 76:10, 76:14, 103:1, 103:7
**embryonic**
77:24
**employed**
10:22, 11:14
**enclosed**
41:10, 41:11
**enforceable**
107:22
**engaged**
18:8
**engaging**
47:8, 85:11, 119:10, 119:11
**enough**
9:9, 66:10, 86:1, 86:10, 110:8, 121:12
**entered**
20:6, 111:11
**entering**
92:11
**entire**
38:12
**entities**
11:7, 11:14, 15:11, 15:20, 16:12, 17:21, 19:22, 22:13, 22:24, 23:22, 25:17, 28:12, 30:18, 42:2, 47:21, 52:24, 53:2, 53:6, 57:25, 58:3, 58:9, 125:1
**entitled**
13:25, 21:6, 21:9, 121:18
**entity**
11:21, 16:23, 17:18, 19:16, 19:20, 28:17, 31:25, 32:1, 36:18, 38:7, 38:18, 38:22, 39:21, 39:23, 45:16, 46:5, 46:8, 47:17, 51:23, 55:11, 77:12, 78:3, 78:5, 78:24, 79:14, 80:5, 106:4, 107:17, 108:1, 133:19, 133:20, 133:21
**equity**
22:18
**escrow**
5:19, 27:17, 27:20, 28:1, 28:7, 29:17, 31:8, 41:1, 41:5, 41:9, 125:4
**esq**
3:5, 3:12, 3:19
**esquire**
70:3, 122:8
**essentially**
18:7, 78:5
**establish**
127:10
**establishing**
128:24
**estate**
9:21, 17:4, 19:7, 26:20, 49:17, 52:4, 52:18, 86:10
**estates**
70:12
**et**
21:10, 53:8, 62:1, 62:3
**even**
10:9, 30:25, 31:3, 43:14, 43:15, 51:22, 53:22, 53:23, 75:23, 77:14, 84:4, 87:4, 95:7, 96:10, 100:13, 113:20, 113:24, 119:11, 133:17, 133:18
**event**
24:3, 41:8
**events**
22:14, 22:17
**eventually**
60:4, 76:11, 96:16, 102:14
**ever**
8:21, 10:22, 24:24, 37:12, 43:1, 44:12, 48:7, 55:6, 72:9, 72:12, 72:15, 73:11, 88:7, 88:25, 95:20, 97:2, 101:2, 104:1, 104:2, 112:1, 114:15, 115:8, 120:11, 122:16, 123:25, 128:11, 128:12, 128:14, 129:17, 131:22, 131:23, 132:9, 132:11, 132:20, 132:23, 133:5, 134:16, 135:1, 138:11
**every**
135:19
**everybody**
28:7, 40:5, 58:22, 72:4
**everything**
29:2, 38:12, 39:11, 40:5, 52:5, 57:11, 95:14, 111:25, 120:19
**evidence**
116:10, 135:10, 136:16, 139:23
**ex**
10:19
**exact**
31:5, 93:2
**exactly**
15:10, 16:3, 17:3, 17:5, 17:17, 17:23, 22:6, 64:13, 76:5, 85:19, 92:14, 97:12, 97:13, 98:5, 100:15, 103:13, 107:11, 119:13
**examination**
4:2, 8:6, 127:1, 139:15
**examined**
8:3
**example**
66:3, 71:18, 93:2, 97:6
**excerpt**
20:22, 21:17
**excited**
53:24
**exclusive**
28:18
**exclusively**
10:20
**excuse**
61:24
**executed**
40:21, 108:16

**exhibit**
5:3, 5:5, 5:11, 5:16, 5:19, 5:22, 5:25, 5:28, 5:33, 5:37, 6:3, 6:5, 6:9, 6:14, 6:18, 6:23, 6:25, 6:28, 6:31, 13:20, 13:21, 20:13, 20:14, 21:5, 27:2, 27:3, 32:4, 32:5, 33:1, 33:3, 40:9, 46:12, 46:13, 49:20, 49:21, 51:14, 51:16, 51:17, 56:24, 57:1, 61:10, 61:11, 61:19, 62:9, 65:6, 67:3, 67:4, 73:17, 81:14, 83:5, 87:10, 87:11, 87:15, 89:3, 97:16, 99:3, 100:3, 103:17, 105:12, 105:13, 106:16, 108:5, 109:12, 111:15, 114:8, 120:20, 120:21, 120:23, 127:3, 130:16, 131:8, 131:10, 131:18, 131:20, 134:1, 134:4
**exhibits**
5:1, 6:1, 38:1, 61:9, 61:12, 62:11, 125:3, 126:5, 126:12, 130:11
**existed**
22:8
**existence**
22:8, 22:10, 122:25
**expect**
78:1
**expectation**
95:3
**experienced**
39:3, 39:4
**expert**
60:21, 136:3, 136:7
**expertise**
70:12
**explain**
106:14
**expressed**
102:18
**extensive**
45:10
**extent**
12:10, 26:14
**eyes**
139:13
**ezra**
1:20, 2:1, 4:3, 5:5, 5:11, 6:6, 7:12, 7:16, 8:1, 13:25, 21:7, 27:24, 59:3, 67:16, 110:21, 122:7, 122:10

**F**

**face**
68:2
**facilitate**
30:4, 44:15, 46:9
**facilitated**
44:19, 125:9
**facilitates**
58:8
**facilitating**
30:24, 35:19
**fact**
43:11, 116:10, 129:20, 139:23
**facts**
135:10, 136:16
**fair**
11:6, 16:10, 19:15, 21:20, 35:9, 76:6, 85:8, 94:21, 98:3, 115:10, 116:21, 128:4, 129:7, 129:15, 129:16, 137:12, 137:20
**familiar**
21:4, 21:13, 57:14, 92:10, 130:24
**familiarity**
121:13
**familiarize**
20:19, 27:6, 46:18, 49:25, 53:19, 57:4, 61:16, 67:7, 87:18, 121:5
**families**
20:1
**family**
10:14, 10:16, 16:12, 17:2, 17:11, 18:14, 18:16, 18:22, 18:23, 25:21, 26:5, 26:11, 28:8, 28:10, 28:14, 28:15, 39:10, 40:4, 40:5, 43:23, 43:25, 44:3, 44:4, 45:5, 45:6, 45:8, 45:14, 45:18, 45:19, 45:23, 47:17, 57:25, 58:22, 71:15, 91:10, 91:21, 102:8, 102:15, 122:23, 125:16, 137:3, 137:21, 138:1
**family's**
44:1
**far**
14:17, 43:18, 43:19, 77:25, 103:3, 103:6, 128:23
**fast**
122:22
**father**
11:22, 11:24, 17:24, 18:7, 18:9, 22:21, 23:7, 23:10, 24:25, 25:3, 25:5, 25:7, 25:23, 25:24, 25:25, 31:19, 34:7, 34:12, 34:15, 35:1, 37:5, 37:16, 38:6, 43:1, 43:17, 43:22, 44:12, 46:7, 46:10, 47:21, 50:10, 50:13, 51:21, 52:7, 52:12, 53:6, 53:11, 53:18, 54:7, 54:8, 54:14, 54:21, 54:25, 55:1, 55:9, 55:15, 56:5, 64:10, 64:14, 64:15, 70:14, 70:21, 71:19, 71:20, 71:22, 72:6, 72:9, 74:17, 78:13, 78:15, 80:23, 81:1, 81:4, 81:15, 83:21, 84:17, 86:12, 86:18, 92:2, 92:4, 96:3, 97:10, 97:17, 99:11, 99:22, 100:10, 104:13, 106:17, 106:24, 107:8,

108:21, 109:1, 112:7, 127:12, 127:20, 128:12, 134:16, 138:17
**father's**
15:25, 16:18, 20:2, 25:11, 28:14, 30:14, 43:25, 45:19, 56:1, 70:14, 127:9, 127:17, 128:2, 132:25, 133:1
**favor**
16:16, 40:22
**february**
5:16, 5:35, 5:39, 6:12, 6:17, 6:21, 6:27, 6:30, 30:22, 33:10, 40:20, 46:25, 50:6, 51:12, 57:18, 59:8, 81:15, 83:10, 87:22, 89:4, 90:1, 90:10, 90:13, 98:4, 99:12, 99:22, 100:5, 103:21, 104:13, 105:20, 108:12, 110:2, 111:18, 113:10, 113:13, 114:18, 114:23, 127:4, 127:8, 128:3
**federal**
45:12
**fee**
11:4
**feel**
129:21
**fees**
41:6, 67:12, 68:3, 68:4, 68:5, 68:9, 68:10, 68:18, 69:4, 74:9, 74:12, 74:15, 76:9
**feet**
64:11
**fellow**
45:25, 136:5
**felt**
122:23
**few**
45:24, 99:24
**fiduciary**
138:2, 138:5
**field**
70:12
**figure**
87:5
**figured**
124:4
**filed**
21:9, 21:23, 121:16, 121:17
**final**
21:17, 89:5, 105:3, 108:13, 108:16
**finally**
110:13
**financial**
133:17
**financials**
40:1
**financing**
123:15
**find**
18:20, 57:19, 62:16, 77:4, 77:5, 97:10, 105:24, 133:9
**fine**
13:1, 13:8, 92:14
**finish**
70:25, 75:16, 95:10, 117:12, 117:22, 118:23, 134:22
**finishing**
140:4
**fired**
102:14, 103:14
**firing**
102:25
**firm**
7:10, 10:23, 14:10, 23:4, 26:8, 33:17, 36:2, 36:7, 37:2, 37:3, 38:12, 39:12, 45:22, 55:5, 69:10, 75:2, 89:6, 103:12, 135:20, 137:4, 137:5, 138:5
**firms**
22:20
**first**
8:2, 12:9, 29:19, 31:7, 32:15, 50:18, 50:20, 57:17, 59:1, 61:10, 75:25, 109:3, 122:20, 130:16, 131:18, 134:3
**five**
110:23
**five-minute**
34:18
**flapped**
103:4
**focus**
121:6
**folks**
23:5
**follow**
53:12
**followed**
90:18
**following**
57:20, 106:17, 124:25
**follows**
8:3, 41:2
**fondness**
138:17
**foregoing**
141:8, 141:14, 141:19
**foreign**
80:19, 93:2
**forget**
75:25, 103:12
**form**
78:3, 139:20
**formal**
23:18, 35:12, 35:22, 58:16
**formally**
11:14
**forth**
114:1, 119:9
**forths**
119:14
**forward**
50:15, 59:1, 59:2, 59:8, 63:13, 68:10, 74:6, 74:11, 81:2, 89:23, 91:8, 91:9
**forwarded**
50:4, 57:8
**forwarding**
57:22
**found**
110:12, 120:19
**foundation**
107:3, 112:10, 117:1
**foundational**
12:9
**four**
15:15, 21:10, 22:15, 67:13, 67:15
**freely**
23:17
**frequently**
74:14, 86:7, 105:10
**friday**
46:24, 104:12, 104:19

**friend**
44:6, 44:8
**friend's**
44:8
**friendly**
123:22
**friends**
80:13
**friendship**
122:22
**front**
101:19, 103:24, 123:16, 126:5, 131:13
**full**
21:17, 34:5, 40:23, 53:1, 95:25, 141:14
**fully**
30:20, 30:25, 37:23, 73:22, 115:17
**further**
122:19, 138:25, 141:18
**future**
68:5, 76:9

G

**game**
66:21, 66:22
**gartside**
3:4
**gave**
26:9, 65:5, 66:17, 81:18, 91:22, 126:16
**general**
11:17, 22:12, 48:9, 52:18, 55:12, 65:21
**generally**
16:11, 21:4, 21:13, 24:17, 27:15, 29:16, 33:11, 46:18, 47:8, 47:17, 49:11, 49:14, 56:14, 73:21, 83:15, 92:10, 92:12, 121:5, 131:1
**gestures**
9:5
**getting**
42:1, 63:22, 79:12, 86:16, 87:25, 92:3, 100:20, 110:3, 110:18, 123:19, 125:5
**give**
39:23, 60:22, 65:2, 75:10, 110:21, 121:2
**given**
19:24, 27:25, 36:10, 37:7, 41:13, 65:10, 68:25, 116:16, 122:25, 123:2, 132:11, 141:15
**go**
9:14, 12:22, 20:7, 20:8, 29:2, 29:11, 39:13, 48:1, 50:21, 60:23, 61:9, 66:23, 74:11, 75:12, 75:14, 79:17, 83:5, 89:23, 91:8, 91:9, 94:13, 96:17, 98:8, 98:17, 99:5, 105:11, 106:16, 110:8, 111:9, 121:10, 122:19, 124:3, 124:7, 125:19, 131:7, 134:22, 135:23, 139:7
**go-between**
46:9
**go-to**
58:7, 58:17
**goes**
45:10, 105:10, 119:25
**going**
7:4, 9:4, 11:1, 11:17, 12:4, 12:7, 12:8, 12:10, 13:9, 13:14, 13:20, 20:13, 20:20, 27:2, 31:2, 37:15, 41:21, 43:10, 46:12, 48:7, 49:19, 50:15, 51:19, 53:25, 56:23, 61:9, 61:11, 63:12, 63:16, 65:3, 67:3, 68:10, 73:16, 76:4, 76:12, 76:19, 76:25, 77:16, 78:7, 78:8, 78:9, 80:1, 80:22, 81:2, 81:14, 82:17, 83:3, 83:7, 83:9, 84:2, 85:12, 85:13, 85:16, 86:16, 87:2, 87:10, 89:3, 90:2, 90:11, 95:15, 98:6, 101:3, 104:21, 105:11, 107:13, 108:4, 110:9, 113:21, 113:23, 114:1, 114:4, 114:7, 118:11, 121:5, 123:22, 124:3, 124:4, 128:6, 130:21, 133:6, 133:19, 138:16, 139:7
**gone**
101:9, 109:3, 123:21
**good**
7:4, 7:14, 8:8, 8:9, 37:18, 67:2, 77:4, 126:3
**gotten**
54:21, 84:21, 100:18
**grand**
3:14
**grandchildren**
10:4
**great**
54:1, 60:19
**greenspoon**
3:11, 7:18
**ground**
54:4, 74:6
**grounds**
9:13
**groundwork**
74:11
**group**
49:4
**guarantee**
31:20, 84:8, 106:3, 106:12, 106:15, 106:20, 107:9, 107:13, 107:18, 107:20, 107:22, 107:23, 107:24, 107:25, 111:23, 112:6, 112:7
**guaranteeing**
81:21, 83:22, 86:17, 106:19, 106:25
**guess**
74:18, 76:4, 76:13, 77:11, 84:2, 104:20, 124:1
**guessing**
71:24, 94:8, 113:24
**gump**
57:18, 67:12,

68:22, 69:1, 69:10, 73:25, 76:9, 76:11, 88:20, 103:1, 103:7, 109:17, 109:20, 109:22, 119:19, 119:20, 119:24
**gump's** 75:8
**guys** 12:15, 35:9, 49:15, 98:14, 98:20, 99:13, 99:24
**gymnastics** 31:6, 32:1
**gyration** 31:3

**H**

**half** 110:22
**hand** 7:23, 61:11, 141:22
**handed** 13:24, 40:19
**handle** 31:4, 76:17
**handled** 10:15, 25:5, 25:6
**handshake** 80:18
**handwriting** 41:22
**hang** 132:5
**hang-ups** 107:12
**happen** 91:20, 97:5, 120:7, 124:5
**happened** 100:15
**happening** 35:20, 119:16
**happens** 121:23, 121:24
**happy** 9:11
**hard** 71:20
**hassen** 44:16, 44:25
**head** 9:5, 51:9, 86:20, 109:11
**health** 70:14
**hear** 35:16, 37:20, 53:11, 71:21, 73:14, 92:6, 95:25, 119:6, 139:17
**heard** 100:10, 134:12
**heavy** 74:19
**held** 19:3
**help** 60:24, 123:22, 124:5
**helped** 44:15, 69:11, 92:2, 125:8
**helping** 30:4, 52:20
**henry** 7:16, 45:25
**henry's** 57:12
**here** 8:20, 41:24, 51:11, 54:17, 62:12, 62:13, 68:18, 69:19, 76:13, 84:1, 86:19, 87:2, 93:8, 95:16, 121:7, 127:15, 130:22
**hereby** 141:7
**hereto** 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:14, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 114:9, 120:24
**hereunto** 141:22
**herewith** 40:19
**hey** 88:22, 90:10, 91:19, 92:21, 100:19, 123:21, 130:1, 130:5, 133:5
**hi** 59:2
**high** 54:6, 68:10, 74:9, 74:13
**highlighted** 59:20
**hills** 3:22
**himself** 52:13, 57:12, 79:6, 96:11
**history** 80:17
**hold** 41:1, 116:25
**holiday** 49:2, 49:9
**hollywood** 5:24
**honest** 31:1, 71:17, 91:19
**honorable** 91:25
**hopefully** 105:4
**hotel** 11:4, 15:15, 18:9, 21:10, 23:6, 25:12, 47:18, 94:18, 101:7, 109:23
**hotels** 11:3, 15:9, 15:12, 16:8, 17:9, 18:11, 18:16, 18:24, 19:17, 19:20, 19:25, 20:3, 21:10, 22:2, 22:3, 22:7, 22:9, 23:19, 24:16, 25:1, 25:15, 25:18, 35:1, 46:5, 47:19, 58:1, 67:12, 67:16, 68:13, 68:21, 68:24, 71:3, 71:7, 71:10, 71:13, 74:1, 74:12, 75:4, 76:8, 88:13, 94:6, 100:19, 101:11, 110:4, 123:15
**hourly** 24:5
**hours** 100:5
**house** 25:5, 48:23, 49:3
**houses** 77:1
**howard** 45:25
**hs** 30:9
**husband** 27:1
**hush's** 24:19, 24:22, 36:2, 39:18, 45:22, 48:6, 48:8, 79:14,

107:17, 107:23, 121:11, 125:1, 138:11
**hushmand**
5:33, 6:5, 6:9, 6:31, 121:18
**hushnand**
3:24
**hypothetical**
100:24, 101:7, 101:16, 102:5, 109:6, 112:20, 117:2, 119:23

**I**

**idea**
16:21, 26:15, 70:5, 93:18, 93:19, 95:9, 95:18, 116:7, 127:22
**identification**
13:21, 20:14, 27:3, 32:5, 46:13, 49:21, 57:1, 61:12, 67:4, 87:15, 99:3, 105:13, 108:5, 109:12, 114:8, 120:23
**identified**
28:1
**identify**
14:21
**ignore**
59:24, 100:21
**ignored**
101:4
**illegal**
42:17, 42:18, 132:24
**imagine**
72:8, 74:5, 77:16, 93:6
**immediate-family**
45:13
**immediately**
56:22, 63:22, 63:25
**impartial**
72:21
**implicitly**
137:24
**important**
36:9, 37:21, 65:9
**importantly**
52:3
**impose**
110:22
**impossible**
135:9
**improper**
100:24, 101:16, 102:5, 109:6, 112:19, 117:1, 119:22, 135:15
**in-house**
11:7, 11:9, 11:10, 11:13, 11:15, 11:16, 11:17, 11:19, 11:20, 17:22
**inc**
5:20
**inclined**
81:16, 97:21
**include**
61:3
**included**
124:6
**including**
41:5
**incorrect**
41:19
**indemnity**
5:26, 5:30, 6:16, 50:7, 54:10, 57:21, 59:9, 106:5, 108:14
**independent**
29:24, 39:23, 89:7, 90:3, 90:8, 90:14, 123:20, 132:8
**index**
4:1
**indicate**
132:23
**indicated**
127:5
**indicates**
32:21
**indicating**
76:10, 86:21, 87:2, 126:13, 133:24
**individual**
30:11, 76:14, 108:1
**individuals**
69:13
**information**
82:11
**infusions**
22:18
**initial**
31:16, 57:16, 115:1
**initially**
16:14, 16:15, 43:11
**ink**
32:16, 40:11
**innate**
37:22
**input**
11:22, 26:7, 26:9
**ins**
85:22, 107:11
**instances**
96:7
**instruct**
9:13
**instructed**
14:23, 41:10, 122:10
**instruction**
27:17, 27:25, 28:7, 31:2, 31:8
**instructions**
29:17
**instructs**
9:16
**intentionally**
20:24
**interest**
15:13, 15:19, 15:23, 15:25, 17:5, 17:10, 17:13, 17:14, 19:3, 19:4, 19:8, 28:17, 38:19, 40:6, 40:14, 40:25, 41:3, 42:8, 42:11, 42:14, 42:16, 42:20, 42:24, 43:2, 43:6, 45:12, 53:8, 63:4, 66:3, 66:7, 92:23, 134:4, 135:7
**interested**
50:15, 52:16, 63:12, 63:17, 64:7, 97:11, 97:15, 98:7, 98:23, 99:16, 100:11, 100:13, 104:14, 110:13, 128:2, 128:4, 141:20
**interesting**
49:18, 54:7, 77:6
**interject**
12:5
**interpose**
12:12
**interposes**
9:15
**interrupt**
9:10
**interrupted**
13:4, 111:6, 139:8
**intimately**
25:9, 31:4

**introduce**
7:13
**introduction**
48:11, 48:20, 49:3
**invasive**
12:13
**invest**
52:20, 80:16, 91:23, 92:13, 93:1
**invested**
52:2
**investment**
78:13
**involved**
22:14, 22:19, 22:21, 24:20, 25:9, 30:3, 30:24, 31:4, 31:25, 36:17, 39:18, 42:19, 53:2, 58:10, 63:20, 70:16, 70:20, 70:21, 71:2, 71:6, 71:12, 72:12, 72:15, 79:2, 85:13, 85:14, 86:14, 87:8, 91:6, 113:18, 120:1, 120:2, 120:13, 133:20
**involvement**
93:20, 119:13
**involving**
46:4, 81:9
**irrevocable**
19:5, 19:11
**issue**
13:10, 82:14, 88:5, 128:15, 139:19
**issues**
42:13, 42:20, 77:6, 92:4, 95:22, 96:2
**it'd**
85:22
**item**
88:3
**items**
88:2
**itself**
47:5, 52:11, 53:13

J

**jackie**
44:16, 44:25
**jannol**
7:16, 12:15, 12:17, 12:19, 13:14, 18:25, 20:16, 29:8, 33:18, 33:22, 34:19, 37:9, 37:12, 41:14, 41:16, 46:15, 46:20, 49:15, 49:23, 66:13, 66:20, 66:23, 69:14, 87:13, 113:5, 114:5, 117:20, 117:22, 117:25, 118:4, 118:6, 118:8, 118:10, 118:21, 118:23, 119:1, 119:5, 120:25, 121:23, 124:14, 126:6, 126:19, 126:21, 135:12, 139:2, 139:4, 139:22
**jannol's**
14:4
**jay**
1:7, 3:3, 3:10, 5:23, 5:25, 5:29, 6:15, 6:19, 6:24, 6:26, 6:34, 7:6, 7:15, 7:19, 8:11, 8:15, 14:11, 48:6, 50:7, 50:11, 54:6, 54:9, 59:9, 80:23, 81:8, 94:6, 105:23, 110:6, 110:8, 111:17, 121:12, 121:17, 121:20, 138:21
**jc**
28:8
**jeff**
26:21, 26:22, 26:24
**job**
1:35, 122:20
**joe**
133:4, 133:10
**johnson**
1:32, 2:4, 7:9, 141:7, 141:26
**joined**
92:16
**joseph**
11:24, 50:6
**judgment**
5:15, 21:8
**justyne**
1:32, 2:4, 7:9, 141:7, 141:26
**jwoods@jcre-la**
50:5, 57:9

K

**k-1s**
17:18
**kalt**
3:4, 7:15
**keep**
24:9, 39:13, 39:15, 45:11, 58:8, 86:20, 96:14, 113:10, 118:12, 130:21
**kind**
24:8, 25:14, 35:22, 43:9, 58:6, 58:17, 60:2, 63:15, 67:11, 80:19, 93:19
**kinds**
24:15, 96:13
**knew**
37:3, 38:14, 39:11, 82:12, 82:13, 86:10, 109:17, 110:7, 122:8, 122:17, 122:19, 123:11, 132:20, 135:15
**knowing**
133:20, 137:2
**knowledge**
107:3, 112:10, 115:4, 116:11, 119:23, 123:7, 134:11, 134:16, 138:15
**knowledgeable**
86:1
**known**
15:15, 32:24, 44:7, 135:17

L

**lack**
107:3, 112:9, 115:4, 116:10, 116:11, 119:23, 123:6
**land**
81:22, 82:15, 82:16, 83:18, 88:1
**language**
132:7, 132:9
**large**
49:4
**last**
10:22, 69:12, 69:19, 88:3, 88:9, 97:19, 102:22, 103:17, 113:12, 120:20
**late**
104:23
**later**
15:8, 63:23,

99:24, 134:7, 135:6, 138:6
**latest**
46:24
**laughing**
66:13
**law**
3:6, 3:13, 3:18, 3:20, 10:23, 33:17, 39:12, 42:17, 122:20, 137:4, 137:5, 138:5
**lawyer**
11:4, 11:5, 36:11, 36:13, 36:17, 36:22, 37:14, 39:1, 46:8, 64:25, 68:15, 68:24, 69:8, 69:9, 70:7, 92:8, 92:18, 92:20, 92:24, 94:22, 95:13, 103:12, 123:11, 123:22, 124:3, 131:2, 131:4, 131:22, 132:4, 132:12, 132:17, 136:2, 136:5
**lawyers**
26:7, 26:8, 43:19, 45:20, 45:24, 92:10, 92:13, 93:1
**lead**
75:20, 76:2
**learn**
135:4
**learned**
39:11, 107:24
**leasehold**
15:12
**leases**
25:5, 60:23, 60:24
**least**
51:16, 55:25, 57:16
**lee**
57:23, 57:24, 59:2, 61:20, 90:22
**left**
21:21, 24:18, 63:18, 88:5
**legal**
14:16, 22:23, 23:15, 24:15, 24:16, 25:2, 25:14, 26:5, 34:25, 38:14, 95:22, 96:1, 96:9, 109:25
**legalities**
95:21, 96:1
**lend**
135:5
**lender**
81:21, 83:20, 83:22, 83:23, 84:1, 84:12, 86:15, 106:19, 106:24, 135:24
**lenders**
22:19
**lending**
80:14, 84:14, 86:11
**lerman**
26:16, 26:17, 26:25, 70:3, 70:5
**less**
72:24, 85:13
**let's**
12:17, 12:22, 12:23, 16:24, 18:12, 20:8, 29:8, 29:11, 39:13, 40:9, 51:11, 61:7, 62:12, 62:16, 66:20, 66:23, 82:7, 83:5, 97:24, 97:25, 98:11, 99:5, 99:21, 105:11, 111:9, 125:19, 130:15, 131:8, 131:18
**letter**
5:33, 6:5, 33:24, 36:2, 36:10, 36:25, 37:1, 65:6, 83:6, 83:10, 84:15, 84:25, 88:25, 89:22, 90:2, 90:5, 90:14, 91:12, 91:19, 93:9, 97:4, 103:14, 123:14, 125:4, 135:24, 136:19, 136:23
**letters**
33:17, 135:19
**lev**
3:12, 7:18, 12:5, 12:7, 12:16, 12:18, 12:20, 12:24, 13:1, 13:3, 13:8, 13:12, 13:15, 13:17, 13:19, 20:17, 28:23, 46:16, 111:2, 111:5, 119:22, 123:6, 124:11, 126:14, 139:5
**lev's**
28:24
**liability**
6:35, 121:20
**licensed**
10:8, 94:20, 94:25, 132:4
**liked**
76:25, 138:18
**likely**
72:6, 84:20, 94:15, 95:12, 104:20
**likes**
69:19, 114:2, 114:3
**limited**
6:35, 19:21, 21:10, 22:3, 121:20
**line**
112:4
**list**
23:5, 88:2
**listed**
62:13, 62:19
**litigation**
67:13, 75:5, 75:7, 75:19, 103:1, 103:2, 103:6, 121:11
**litigator**
26:22
**little**
35:5, 82:22, 87:3, 108:25
**llc**
1:7, 3:3, 3:10, 6:34, 7:6, 7:15, 7:19, 14:11, 15:25, 17:1, 17:2, 19:21, 22:2, 22:7, 28:9, 28:10, 30:8, 30:9, 30:11, 40:22, 67:16, 121:20
**llcs**
15:24
**llp**
3:4, 3:11, 7:18
**loaned**
133:16
**loaning**
79:16
**loans**
29:25, 30:19, 39:24, 43:24, 44:5, 44:9, 44:11, 44:13,

45:8, 45:15, 80:12, 125:14, 132:21
**long**
10:11, 16:15, 21:3, 24:7, 37:23, 43:15, 47:14, 49:7, 66:17
**long-time**
44:6
**longer**
10:9, 49:8, 75:20, 100:11
**look**
17:17, 17:18, 21:25, 27:22, 31:17, 34:13, 35:8, 37:3, 40:1, 40:9, 50:20, 63:2, 64:20, 64:23, 67:14, 73:17, 76:24, 90:23, 93:15, 94:19, 95:4, 95:6, 95:13, 96:8, 97:16, 99:15, 99:21, 100:3, 100:19, 101:3, 112:15, 113:1, 114:11, 117:9, 123:3, 127:3, 127:11, 127:16, 127:20, 128:1, 128:11, 130:15, 131:8, 131:12, 131:18, 134:3
**looked**
52:13, 62:21, 63:1, 72:20, 77:4, 77:5, 78:20, 117:9, 125:3, 125:12
**looking**
61:4, 62:22, 62:24, 68:2, 77:10, 83:15, 83:18, 98:6, 113:10, 113:22, 115:6, 116:22, 128:4
**looks**
27:17, 30:8, 41:21, 54:8, 54:16, 55:15, 57:16, 59:1, 62:17, 62:18, 69:19, 70:2, 73:22, 74:2, 83:6, 128:2
**los**
1:22, 2:2, 3:8, 3:16, 7:1, 7:8, 15:16, 40:21
**lost**
18:18, 102:16
**lot**
18:21, 45:8, 45:23, 52:2, 54:1, 66:15, 72:21, 72:23, 72:24, 85:20, 93:20, 96:11, 113:17, 113:25, 114:2, 114:3, 121:7
**loudly**
9:9

**M**

**madam**
110:18
**made**
29:21, 29:23, 29:24, 30:1, 31:15, 31:18, 33:15, 38:25, 39:25, 41:7, 41:24, 44:5, 44:21, 45:15, 48:20, 52:15, 78:22, 78:23, 79:12, 80:12, 93:5, 94:10, 107:22, 125:11, 125:14, 139:18
**mail**
41:11
**make**
19:22, 29:8, 31:24, 35:15, 37:2, 37:4, 40:2, 44:11, 45:12, 52:4, 52:15, 54:1, 55:10, 58:11, 78:15, 78:17, 79:5, 79:13, 80:11, 82:17, 86:13, 89:14, 91:20, 95:13, 108:1, 118:1, 119:2, 120:7, 124:5
**makes**
79:22, 80:7
**making**
30:3, 30:19, 33:6, 33:12, 39:24, 43:24, 63:4, 79:23
**malibu**
77:11
**man**
66:16, 87:5, 87:9
**manage**
10:21, 17:24
**managed**
17:21
**management**
9:22, 9:23, 22:16, 25:10
**manager**
10:5, 58:13
**many**
17:4, 17:12, 19:10, 19:12, 40:4, 49:10, 55:25, 92:14, 135:17
**marder**
3:11, 7:18
**mark**
12:4, 13:20, 20:13, 46:12, 67:3, 87:10
**marked**
13:21, 20:14, 21:18, 27:3, 32:5, 38:1, 46:13, 49:21, 56:23, 57:1, 61:12, 62:11, 67:4, 73:17, 87:15, 99:3, 103:17, 105:13, 108:5, 109:12, 114:8, 120:23
**martin**
96:12
**martyr**
75:24
**mary**
27:19, 29:9, 29:10, 31:6
**massive**
121:22
**matter**
7:6, 37:7, 38:16, 38:17, 44:4, 46:4, 48:5, 48:6, 52:4, 92:22, 121:12, 133:4
**matters**
10:15, 10:16, 10:20, 11:3, 18:4, 18:5, 18:6, 18:7, 22:12, 24:10, 24:25, 25:2, 35:2, 38:14, 91:22, 96:25, 97:2, 97:3, 109:23, 122:9, 122:18
**maybe**
10:9, 12:8, 12:14, 24:21, 29:23, 35:5,

42:16, 44:5, 45:2, 47:14, 49:8, 49:9, 51:21, 56:22, 63:3, 68:4, 68:17, 70:14, 72:24, 73:12, 82:16, 82:21, 83:19, 87:4, 91:24, 117:4, 138:17
**maynard**
69:20
**mean**
10:11, 11:9, 16:5, 17:23, 23:5, 23:25, 25:9, 26:13, 30:14, 31:3, 35:21, 36:23, 44:19, 49:10, 52:21, 53:3, 56:14, 58:7, 60:22, 61:4, 63:4, 63:17, 64:3, 66:12, 66:14, 69:8, 70:24, 71:15, 76:5, 77:24, 80:15, 84:6, 92:1, 92:13, 94:10, 105:9, 115:22, 120:7, 122:20, 125:16, 133:22, 133:25, 135:16, 135:17, 135:18, 135:23
**means**
92:12, 132:9
**meant**
11:14, 47:23
**meet**
56:14, 73:2
**meeting**
47:7, 47:12, 47:13, 47:15, 47:25, 48:4, 48:13, 48:25
**member**
30:10, 30:12, 94:20, 95:1, 136:5
**members**
17:11, 23:4, 23:9, 26:5, 26:11, 30:8, 31:21, 44:3, 44:4, 45:6, 122:23, 125:16
**memorialized**
45:3
**memory**
98:16
**mentioned**
8:10, 10:17, 21:16, 33:14, 43:23, 44:14, 45:18, 51:3, 55:24, 74:22
**mentioning**
106:24
**mentions**
83:19, 106:2
**merits**
94:4
**met**
48:22, 48:23, 49:1, 49:13, 122:24
**michelle**
26:16, 26:17, 70:3, 70:5, 72:2
**michelle's**
27:1
**middle**
40:11, 70:2
**might**
11:1, 16:22, 26:11, 48:25, 49:6, 49:13, 54:17, 56:18, 59:24, 61:2, 64:3, 64:6, 69:24, 72:18, 74:21, 84:21, 88:13, 96:20, 106:22, 116:7
**mildly**
122:21
**million**
51:7, 83:19
**mind**
17:6, 17:16, 25:4, 30:14, 33:15, 33:16, 36:6, 37:9, 42:22, 52:23, 63:15, 68:1, 79:8, 79:19
**minute**
29:11, 66:20, 87:18, 113:2, 114:11, 125:19
**minutes**
110:24, 119:15
**mischaracterizes**
135:13, 136:17
**misgivings**
64:5
**mister**
110:21
**mm-hmm**
8:17, 39:2, 39:20, 40:12, 40:17, 51:15, 54:11, 55:17, 61:22, 68:23, 69:21, 71:8, 71:11, 73:19, 76:16, 79:24, 80:21, 82:9, 84:19, 84:23, 87:12, 89:25, 91:13, 92:9, 93:14, 97:18, 98:2, 98:13, 99:23, 100:6, 100:9, 105:22, 116:19
**moment**
20:8, 20:19, 27:6, 46:18, 49:25, 57:4, 61:16, 67:7, 99:5, 118:16
**monday**
1:24, 7:5, 88:1, 109:4
**money**
36:8, 36:15, 45:9, 54:1, 65:1, 79:16, 80:5, 80:6, 80:17, 84:14, 94:9, 133:16, 135:5
**monies**
69:5
**month**
42:23, 43:8, 43:10
**monthly**
23:25
**more**
11:9, 18:1, 18:9, 25:25, 29:19, 30:24, 35:13, 35:18, 35:22, 41:14, 46:9, 53:10, 60:24, 68:14, 70:14, 71:23, 74:19, 80:15, 82:22, 86:15, 95:12, 107:14, 113:24, 138:18
**morning**
7:4, 7:14, 8:8, 8:9, 59:5, 105:6, 105:10, 106:17, 109:4, 111:22
**most**
19:4, 37:21, 52:3, 60:22
**mostly**
9:21, 9:25, 22:25, 23:9, 24:18, 24:19, 35:5, 35:6, 35:7, 56:15, 74:18, 82:21

**motion**
5:14, 21:8
**move**
11:11
**moving**
74:6
**much**
18:9, 35:4, 46:8, 61:4, 68:15, 76:24, 80:3, 80:16, 86:15, 134:10
**multiple**
96:7, 135:21
**myself**
31:3, 34:16, 77:3, 77:5, 82:3, 86:6, 98:18

**N**

**name**
7:9, 8:10, 8:15, 69:19, 70:2, 75:25, 103:12, 112:4, 112:5, 115:22, 127:25
**name's**
75:1
**named**
27:19, 30:11, 45:25, 141:20, 141:21
**names**
42:2, 63:3
**national**
47:11
**nature**
86:17
**nd**
59:8, 100:5, 104:13, 105:20, 127:8
**necessarily**
24:25, 60:6, 96:19, 113:19
**necessary**
141:16
**need**
9:4, 9:8, 9:10, 12:25, 68:24, 74:8, 88:22, 89:22, 90:24, 94:2, 100:19, 101:3, 105:5, 107:20, 107:25, 108:14, 111:25, 123:17, 128:9
**needed**
17:25, 23:12, 23:15, 91:7, 106:15
**needing**
36:7
**needs**
59:4, 97:5
**negatives**
97:25
**negotiate**
42:24, 65:23, 66:1, 68:16
**negotiated**
31:9, 65:22, 120:10
**negotiating**
66:6, 68:14, 69:4
**negotiation**
22:15, 65:20, 69:5
**neither**
119:20
**nephew**
29:2, 57:10, 122:7
**never**
11:4, 26:22, 48:22, 77:2, 77:25, 91:3, 94:3, 96:22, 103:13, 112:2, 116:2, 120:15, 122:8, 125:14, 129:19, 133:24, 138:20, 138:22, 138:23
**new**
10:11, 66:20, 106:4
**next**
32:3, 32:16, 49:19, 56:23, 59:1, 61:10, 67:3, 87:10, 96:16, 96:17, 105:11, 114:6, 114:7
**night**
104:19, 104:23
**nitty-gritty**
85:17
**nobody**
23:10
**nobody's**
123:25
**nodding**
9:5
**nods**
109:11
**none**
40:2, 41:6
**northern**
1:2
**note**
5:29, 5:37, 40:19, 44:16, 44:17, 44:23, 44:25, 45:1, 57:20, 59:9, 61:23, 62:1, 62:24, 63:1, 106:2, 122:6, 135:5
**noted**
140:7
**nothing**
94:6, 110:4, 141:9
**notice**
20:23, 21:2
**noticing**
121:22
**number**
7:6, 7:11, 17:10, 18:8, 21:12, 25:4, 25:7, 27:11, 27:12, 29:5, 61:25, 62:15, 86:14, 121:18, 122:4
**numbered**
126:19
**numbers**
16:20, 42:1, 62:3, 62:8, 62:9
**nuts**
60:11

**O**

**oath**
8:24, 8:25
**object**
9:12, 95:15
**objecting**
118:13
**objection**
100:23, 101:15, 107:2, 109:5, 110:15, 110:22, 112:9, 112:19, 115:4, 115:12, 116:9, 116:23, 117:1, 117:11, 117:19, 117:25, 118:13, 118:20, 119:1, 119:22, 123:6, 135:9, 136:13, 136:15, 138:8, 139:20
**objections**
5:6, 9:15, 12:12, 13:25, 14:16, 102:4, 110:18, 118:11
**observe**
138:11
**obviously**
13:9, 92:19
**occasion**
47:8
**occurred**
37:12, 81:5,

81:10, 102:25
**office**
14:3, 14:4, 14:13, 27:13, 28:23, 56:15, 57:12, 58:13, 113:20, 116:2, 133:11, 134:8
**officer**
32:17
**offices**
3:18
**official**
126:12
**officially**
98:21
**oftentimes**
60:23, 97:7
**oh**
8:13, 20:25, 30:1, 47:6, 78:23, 97:23, 106:14, 121:2, 124:20, 125:5, 126:10, 126:20, 139:7
**olympic**
2:2, 3:7, 7:8
**once**
49:13, 66:17, 75:8, 75:20, 75:22, 98:8, 98:9, 98:10, 98:17, 111:23, 123:13
**one**
9:25, 13:6, 20:1, 20:10, 22:15, 23:13, 26:9, 26:17, 29:5, 29:7, 30:9, 30:11, 32:9, 34:13, 39:3, 44:6, 44:18, 45:2, 47:13, 48:4, 48:23, 49:8, 51:3, 51:13, 51:20, 55:13, 56:1, 57:17, 59:21, 61:7, 61:10, 61:23, 62:13, 62:14, 62:16, 62:17, 62:18, 69:13, 73:25, 77:2, 79:25, 80:25, 81:1, 81:9, 81:11, 81:12, 81:22, 82:16, 85:18, 88:12, 94:5, 94:11, 95:24, 97:24, 98:16, 101:5, 101:6, 105:8, 105:11, 107:12, 111:8, 113:4, 113:23, 114:7, 115:15, 118:16, 125:1, 126:8, 131:12, 139:5, 139:6, 139:10, 139:11
**one-man**
60:2, 93:19
**one-way**
73:13
**only**
10:5, 10:14, 10:19, 19:6, 28:5, 39:9, 39:15, 49:8, 75:4, 80:12, 98:9, 98:14, 98:16, 107:25, 108:14, 122:15, 123:21, 128:5
**open**
113:18, 113:19
**opened**
59:17, 59:21, 60:16, 110:5
**opening**
104:9, 112:17
**operate**
35:12
**operating**
138:21
**opine**
135:21
**opinion**
123:14, 127:21, 135:19, 135:24
**opportunity**
55:18, 77:11, 141:16
**opposed**
46:4
**opposition**
5:13, 21:7
**opted**
46:3
**order**
89:22, 126:7, 126:17, 128:1, 139:5
**ordering**
139:3
**original**
50:5
**originally**
19:10, 21:22, 28:17
**other**
9:14, 9:15, 10:18, 12:25, 15:5, 16:4, 16:5, 16:6, 17:5, 18:1, 20:2, 23:4, 23:6, 23:22, 24:12, 24:13, 25:16, 26:7, 26:11, 33:10, 33:25, 43:18, 46:5, 48:18, 52:10, 52:17, 53:2, 54:21, 55:14, 60:2, 63:9, 73:25, 80:16, 81:5, 81:22, 82:16, 89:12, 91:15, 91:17, 93:21, 116:11, 122:22, 130:9, 130:22
**others**
26:2
**otherwise**
45:6
**out**
11:13, 18:21, 21:21, 39:12, 51:21, 61:11, 63:18, 67:12, 76:23, 78:19, 87:6, 88:6, 91:5, 91:6, 97:10, 97:25, 98:18, 98:22, 100:17, 110:12, 111:15, 122:20, 127:16, 133:9
**outcome**
68:19, 102:19, 103:2, 141:21
**outs**
85:22, 107:11
**outset**
12:16, 13:9
**outside**
11:7, 11:10, 11:13, 11:18, 25:6, 39:9, 60:24, 69:10, 91:22
**over**
14:3, 22:20, 25:2, 45:20, 57:12, 99:15, 126:13, 134:6
**own**
9:25, 18:22, 60:21, 68:22, 78:5, 92:22, 98:10, 123:1, 123:5
**owned**
10:2, 15:13, 15:23, 15:24, 17:2, 19:25, 23:22, 28:13,

28:16, 36:18, 77:12, 77:17
**ownership**
15:19, 15:20, 15:24, 16:3, 16:11, 17:5, 17:14, 18:16, 19:22, 28:18, 77:15
**owning**
18:15
**owns**
17:18

**P**

**pacific**
2:3, 46:25
**page**
5:3, 5:21, 5:27, 6:3, 6:12, 6:17, 6:21, 6:27, 21:17, 21:18, 27:22, 32:3, 32:9, 40:11, 61:19, 62:9, 69:13, 73:18, 89:5, 130:16
**pages**
1:37, 5:10, 5:15, 5:18, 5:24, 5:31, 5:35, 5:39, 6:8, 6:24, 6:30, 6:36, 21:21, 30:9, 67:15, 108:15
**paid**
24:2, 29:25, 30:2, 31:1, 31:16, 31:17, 32:22, 44:22, 50:18, 51:5, 51:8, 51:20, 74:13, 79:21, 80:25, 81:11, 125:5, 131:23
**paper**
21:1
**papering**
89:13
**paperwork**
58:8
**paragraph**
40:18, 45:2, 73:17, 73:20, 88:9, 89:5, 111:20, 112:7, 121:6, 122:4, 134:3
**paragraphs**
21:25, 45:3
**parents**
10:3, 16:1, 17:3, 45:9
**part**
12:11, 16:6, 18:15, 28:14, 43:13, 52:23, 54:16, 68:18, 88:21, 89:13, 93:18, 94:10, 104:24, 125:25, 126:2, 135:18
**partial**
5:14, 21:8
**participate**
81:2, 83:4
**participated**
35:12, 81:4
**participating**
64:8, 97:11
**participation**
131:19
**particular**
24:10, 46:4, 53:23, 93:7, 94:5, 96:21
**particulars**
24:23
**parties**
27:21, 40:25, 44:3, 44:5, 49:9, 74:5, 105:5, 141:19
**partner**
102:12, 109:20
**partnership**
19:21, 28:19, 39:10, 77:16, 78:2, 79:10, 88:13
**partnerships**
11:23
**parts**
18:23, 20:1, 65:25
**party**
49:2, 132:12
**pasadena**
47:7, 47:13
**pass**
55:16, 56:19, 77:2, 81:16, 97:21
**passed**
44:8, 85:18, 99:11, 111:15
**past**
67:12, 68:3, 68:4, 69:4, 76:9
**pay**
107:13
**payback**
30:25
**paying**
129:22
**payment**
68:4
**payoff**
125:4, 125:9
**pch**
30:7, 30:11, 31:21, 38:2, 40:22, 76:20, 139:18
**pdfs**
108:14
**pending**
8:19, 124:14
**penultimate**
97:22
**people**
18:9, 39:25, 47:13, 49:4, 58:16, 66:17, 66:19, 72:4, 104:23, 105:10, 129:8, 129:9, 130:9, 131:2
**people's**
80:16
**percent**
16:17, 17:2, 17:13, 41:3, 41:19, 42:6, 42:22, 42:23, 42:24, 43:8, 43:10, 134:4
**percentage**
17:19
**percentages**
16:11, 17:17
**perhaps**
58:18, 93:5
**period**
17:21
**periodic**
23:24
**person**
24:20, 27:19, 34:1, 34:3, 35:16, 54:22, 56:11, 56:14, 58:7, 58:17, 69:24, 71:9, 73:2, 86:15, 92:1, 133:19, 133:21
**personal**
37:8, 74:20, 107:3, 107:18, 112:10, 115:4, 116:10, 119:23, 123:7
**personality**
18:8
**personality-wise**
114:2
**personally**
36:18, 39:18, 49:13, 77:13, 79:5, 80:12,

107:16, 107:19, 125:14
**pertain** 18:3, 18:4, 25:15
**pertaining** 25:14
**phone** 35:2, 35:7, 35:10, 35:17, 56:12, 56:13, 56:16, 56:18, 73:6, 73:11, 73:13, 73:15, 96:17
**phonetic** 75:24, 96:13
**picked** 56:18
**picture** 46:1
**piece** 15:13, 19:5, 19:10, 28:16, 77:5, 77:8, 78:2, 78:6
**pieces** 82:13
**place** 7:7, 81:9, 141:11
**plaintiffs** 5:13, 21:7, 22:2
**plan** 78:11
**planet** 7:10
**planning** 17:4, 19:8
**plans** 76:25
**play** 92:6
**played** 133:10
**pleadings** 103:10
**please** 7:13, 7:23, 8:12, 9:10, 9:11, 13:6, 18:13, 20:19, 57:19, 95:24, 101:23, 101:24, 105:24, 111:8, 111:24, 117:22, 118:2, 118:9, 118:23, 119:3, 122:4, 126:9, 127:4, 131:9, 139:10, 139:13
**plus** 41:3
**point** 13:3, 16:19, 19:7, 26:9, 29:25, 35:15, 38:23, 72:25, 74:23, 86:5, 99:13
**pointing** 134:1
**points** 87:25
**pos** 103:8
**posing** 116:4
**position** 47:10, 58:5
**positive** 16:25
**positives** 98:1
**possibilities** 85:9, 85:10
**possible** 48:17, 48:21, 54:18, 56:17, 64:6, 70:9, 70:11, 84:9, 84:12, 111:24, 112:23
**possibly** 55:3, 86:19
**postdates** 51:17
**potential** 52:11, 78:13
**potentially** 68:5
**power** 58:10
**practiced** 10:12, 10:13, 10:14, 39:5
**practicing** 10:7, 132:2, 132:3
**preparation** 131:19
**prepare** 31:7
**prepared** 14:18, 61:5, 123:15, 134:17
**present** 3:23, 122:16
**pretend** 72:4
**pretty** 98:17
**previous** 108:16
**previously** 106:1
**primarily** 24:20
**principally** 24:22, 31:5
**prior** 100:13, 136:17
**privilege** 12:14, 102:11
**pro** 82:5
**probably** 34:4, 35:6, 35:13, 44:7, 47:8, 53:10, 56:13, 56:20, 56:21, 58:7, 63:3, 64:10, 64:22, 70:13, 71:24, 72:24, 74:19, 76:4, 79:1, 79:11, 82:21, 82:22, 86:5, 89:21, 96:10, 101:8, 107:21, 127:24
**problems** 55:13
**produce** 14:23
**produced** 27:13, 28:23, 29:1, 29:5, 29:8, 120:19
**production** 29:3
**profession** 9:20
**project** 52:1, 53:25, 55:14, 56:2, 107:15, 127:6
**projects** 49:18
**promissory** 5:37, 44:16, 44:17, 44:23, 44:24, 45:1, 61:23, 62:1, 62:23, 63:1, 122:6, 135:5
**properties** 9:23, 9:24, 10:1, 10:2, 10:5, 10:17, 10:20, 94:11
**property** 9:25, 10:20, 15:13, 15:14, 15:16, 47:15, 48:6, 50:21, 76:24, 76:25, 77:9, 77:12, 78:2, 78:6, 78:24, 78:25, 80:23, 110:8,

110:9
**proposed**
53:15
**prosecuting**
75:18
**provide**
11:16, 11:22
**provided**
33:24, 34:25, 41:1, 43:3
**providing**
22:23, 24:16, 29:9, 92:3
**pulled**
57:11
**purchased**
25:5
**purely**
102:10
**purpose**
36:5, 37:1, 78:3, 88:17
**pursuant**
84:14, 84:25
**pursue**
53:4
**pursuing**
100:11
**put**
34:5, 63:15, 123:16, 132:20, 132:24, 135:7
**putting**
101:19

**Q**

**question**
12:8, 12:18, 19:24, 25:14, 36:21, 39:17, 95:3, 95:10, 95:25, 101:22, 101:24, 101:25, 108:24, 114:6, 117:23, 117:24, 118:1, 118:8, 118:9, 118:17, 118:24, 118:25, 119:2, 124:14, 139:11
**question's**
22:6
**questions**
22:5, 96:21, 125:24, 139:1
**quick**
29:8, 121:7
**quickly**
9:9, 111:25
**quinn**
75:1, 75:3, 75:8, 76:10, 76:14, 103:1, 103:7
**quite**
25:25, 55:3, 73:5, 74:15, 92:2

**R**

**r**
72:22
**rahsanna**
103:23
**raise**
7:22, 42:13
**raised**
139:19
**raising**
76:21
**ramifications**
132:16
**rarely**
73:8
**rate**
40:6, 40:14, 41:3, 42:8, 42:11, 42:14, 42:16, 42:20, 42:24, 43:2, 43:6, 45:12, 53:8, 63:4, 66:3, 66:7, 134:4, 135:7
**rather**
82:20
**ratio**
16:14
**rc's**
16:4, 16:17, 17:3, 17:10, 17:15, 20:2, 28:17, 45:14, 45:23, 47:22, 94:22, 100:16, 114:21, 116:5
**rd**
81:15, 98:4, 99:12, 99:22, 128:3
**re-redirect**
140:5
**reaching**
100:17
**read**
24:21, 40:18, 41:14, 46:20, 57:4, 75:11, 91:18, 91:19, 101:17, 101:18, 101:20, 101:24, 104:18, 105:3, 106:6, 106:8, 118:11, 118:13, 119:21, 121:4, 122:4, 124:12, 136:9, 136:18, 136:21, 138:22, 139:12, 141:16
**reader**
121:8
**reading**
73:22, 85:7, 85:11, 104:20, 112:18, 120:12
**reads**
28:3
**ready**
20:21, 27:7, 27:8, 46:19, 46:21, 50:1, 50:2, 57:5, 57:6, 61:17, 61:18, 67:8, 67:9, 87:19, 87:20, 87:25, 105:16, 105:17, 108:8, 108:9, 114:12, 114:13, 125:23
**real**
9:21, 49:17, 52:4, 52:18, 80:24, 86:10, 119:16
**realize**
37:23, 43:14, 125:11
**realized**
79:9
**really**
26:21, 44:6, 46:7, 47:5, 55:25, 56:20, 60:21, 77:15, 77:25, 85:1, 103:5, 115:17, 117:5, 118:5, 118:7, 131:16, 138:18
**reason**
9:2, 15:4, 41:18, 59:24, 60:1, 113:24, 119:18, 137:2, 137:11, 138:4, 138:9
**reasonable**
83:25, 122:25, 123:4, 124:2, 124:17
**reasonably**
124:2
**reasons**
50:21, 85:18
**recall**
28:20, 29:18, 33:14, 33:16, 33:20, 33:21, 35:11, 36:1, 36:4, 38:5, 40:7, 40:8,

42:10, 42:25, 43:1, 43:7, 48:7, 48:12, 48:16, 50:25, 51:1, 53:16, 53:21, 53:23, 54:12, 55:11, 56:2, 56:3, 56:6, 59:12, 60:15, 64:15, 68:8, 76:20, 76:23, 78:14, 78:18, 82:25, 85:10, 85:11, 86:19, 91:5, 93:21, 96:7, 97:4, 102:16, 104:2, 104:9, 104:16, 106:9, 106:15, 107:8, 107:10, 107:11, 108:18, 108:22, 109:9, 113:11, 114:16, 120:14, 120:17, 128:19
**receive**
28:25, 59:14, 85:3, 101:7, 108:20, 108:23, 111:23, 112:16
**received**
14:3, 99:14, 100:7, 100:12, 101:2, 127:4
**receiving**
33:14, 33:16, 36:1, 50:19, 56:17, 59:12, 64:8, 106:9, 108:18, 108:22, 110:7, 111:21, 119:10, 127:7
**recently**
29:19
**recognize**
21:15, 48:24
**recollection**
19:3, 30:13, 33:5, 38:7, 38:8, 40:13, 51:19, 54:5, 76:2, 77:24, 81:2, 84:6, 86:4, 91:2, 94:17, 119:12, 125:6, 128:25, 129:3, 129:25, 130:3, 130:4, 130:6, 130:8
**recommendation**
90:20
**reconveyance**
40:24
**record**
7:5, 9:14, 12:11, 14:2, 20:7, 20:8, 20:10, 20:11, 20:12, 20:22, 21:5, 27:10, 28:22, 29:11, 29:12, 29:13, 29:14, 32:12, 34:20, 34:21, 34:22, 34:23, 46:23, 50:3, 51:11, 57:7, 66:23, 66:24, 66:25, 67:1, 81:3, 87:21, 99:5, 99:6, 99:7, 99:8, 111:9, 111:10, 111:12, 111:13, 113:6, 113:7, 113:8, 114:17, 121:16, 122:2, 125:19, 125:20, 125:21, 125:22, 126:10, 128:24, 140:1, 140:2, 140:3, 140:6, 141:15
**recorded**
40:21
**recount**
53:3
**redline**
62:2, 62:18, 83:6, 83:11, 105:25
**redlined**
57:20, 61:25
**reduced**
55:9
**refer**
18:14, 81:8
**reference**
10:17
**referenced**
51:13, 80:13, 106:20, 112:6
**references**
98:14
**referred**
22:4, 112:8
**referring**
22:18, 26:24, 38:16, 51:6, 51:13, 77:18, 106:11
**refers**
11:8
**reflected**
30:7, 41:19, 62:8, 122:13
**reflects**
38:21
**refresh**
30:12, 33:5, 40:13
**regard**
45:14
**regarding**
22:16, 47:15, 50:10, 68:4, 106:5
**regards**
11:23, 48:8
**regular**
23:25
**related**
11:3, 14:24, 18:9, 25:16, 25:18, 29:3, 29:17, 38:14, 38:17, 47:24
**relating**
28:17
**relationship**
10:14, 15:10, 36:19, 37:15, 37:17, 48:10, 71:16, 71:23, 72:22, 74:20, 80:18, 88:4, 88:11, 89:11, 90:12, 102:8, 102:13, 133:14, 133:16, 137:21, 138:12
**relay**
63:9, 82:11
**relayed**
56:1, 74:16, 85:23
**release**
73:23, 73:24, 74:3, 74:8
**relevance**
49:15
**reliable**
25:20
**relied**
25:24, 25:25, 26:4, 26:6, 26:12, 34:15, 39:13, 101:10
**rely**
26:2, 26:21, 26:23, 37:6, 38:13
**relying**
24:22
**remains**
17:16
**remember**
19:6, 33:11, 41:20, 42:5, 43:7, 43:9, 43:14, 44:5, 47:6, 47:7, 47:12, 47:15,

47:24, 48:2, 48:4, 48:14, 49:5, 50:19, 51:24, 52:22, 56:22, 57:15, 59:22, 62:22, 62:25, 63:2, 63:4, 63:6, 63:19, 67:23, 68:17, 71:16, 74:20, 74:25, 75:24, 81:7, 82:12, 82:23, 84:4, 85:1, 85:2, 85:16, 85:17, 85:19, 94:3, 97:12, 98:6, 99:18, 100:14, 100:15, 101:5, 102:16, 102:23, 103:11, 104:22, 107:11, 110:7, 110:11, 119:8, 119:9, 119:10, 119:11, 122:16, 125:7, 127:7, 127:14, 128:8, 128:9, 129:17

**ren**
54:2

**render**
11:21

**rendering**
50:19, 54:3

**reorganized**
1:9, 2:2

**repaid**
79:2, 79:9, 79:12

**repayment**
30:4, 33:7, 33:12, 53:8

**repeat**
18:18, 118:9, 119:6

**replaced**
103:4, 103:7

**replacing**
76:11, 103:1

**reply**
6:33, 121:19

**report**
35:18

**reported**
1:31, 141:12

**reporter**
2:5, 7:10, 8:3, 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:13, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 110:19, 114:9, 120:24, 141:5

**represent**
8:10, 8:15, 22:10, 39:21, 69:9, 89:11, 89:15, 92:21, 124:25, 128:22, 129:9, 129:14, 129:22, 130:21, 136:22

**representation**
21:21, 22:4

**representative**
40:25

**represented**
11:2, 11:6, 15:25, 22:7, 22:11, 75:3, 122:22, 129:19

**representing**
7:10, 128:16, 129:1, 129:6, 130:2

**request**
14:10, 14:24, 29:3, 40:23, 50:18

**requests**
5:7, 14:1, 14:22, 15:6, 28:24, 125:4

**residential**
9:24, 9:25

**resolving**
72:12, 72:15

**respect**
36:7, 42:13, 48:3, 67:13, 68:5, 69:11, 92:3, 128:12

**respected**
138:19

**respond**
96:12, 97:8

**responded**
115:15, 116:4

**response**
14:9, 14:11, 14:21, 27:13, 28:23, 114:19, 120:15

**responses**
5:5, 13:25, 14:12, 14:15, 14:16

**responsive**
14:21

**result**
76:9

**retained**
17:24

**retainer**
23:18, 23:21

**return**
41:10

**reuben**
3:4

**review**
14:12, 14:20, 24:16, 24:18, 24:19, 24:22, 34:1, 34:3, 34:4, 38:3, 59:3, 60:20, 60:22, 61:2, 61:3, 62:20, 62:23, 63:5, 67:21, 116:20, 117:17, 117:18, 118:18, 118:19, 123:20, 133:3

**reviewed**
33:25, 53:18, 60:17

**reviewing**
24:20, 34:8, 122:5

**reviews**
62:25

**revised**
105:24, 106:1

**richard**
6:10, 30:11, 31:22, 48:22, 48:23, 53:25, 75:1, 76:1, 77:19, 77:20, 77:21, 87:23, 103:23, 106:4

**richards**
3:18, 3:19, 4:5, 7:20, 92:16, 95:15, 95:16, 100:23, 101:15, 102:4, 107:2, 109:5, 110:15, 110:17, 110:21, 111:1, 111:11, 112:9, 112:19, 115:4, 115:12, 116:9, 116:23, 116:25, 117:11, 117:13, 117:19, 118:11, 118:15, 118:20, 125:24, 126:5, 126:10, 126:12, 126:15, 126:18, 127:2, 129:5, 131:16, 131:17, 134:21, 136:1, 136:20, 137:9, 138:10, 138:25, 139:2, 139:7, 139:20, 139:23, 140:4

**ride**
97:25, 98:11
**right**
7:22, 10:19, 20:4, 32:9, 34:14, 36:21, 38:10, 38:18, 38:19, 39:12, 59:5, 61:7, 64:4, 68:2, 70:7, 71:3, 71:14, 73:7, 76:4, 76:13, 80:1, 84:9, 84:25, 85:3, 86:3, 86:18, 89:16, 89:20, 90:16, 91:10, 91:16, 92:11, 94:6, 94:16, 94:19, 97:24, 99:17, 100:11, 104:3, 107:16, 107:19, 107:20, 107:25, 108:1, 109:23, 110:13, 117:9, 117:18, 118:19, 126:18, 127:15, 127:19, 128:7, 128:21, 129:8, 129:11, 129:13, 129:25, 130:15, 130:21, 132:8, 134:1, 138:25
**rights**
52:2
**robert**
5:34, 6:6, 6:10, 12:1, 12:11, 18:17, 18:22, 19:16, 20:4, 57:23, 87:23, 103:22, 105:19, 105:24, 108:12, 111:16, 111:22, 133:10, 135:2, 135:6, 136:10
**robert's**
6:29, 105:5, 114:22
**role**
18:1, 18:3, 23:10, 36:10, 70:15, 75:8, 75:17, 92:6, 94:20
**ronald**
3:18, 3:19, 7:20, 95:16
**room**
20:6, 111:11
**rose**
44:17, 45:1
**round**
139:7
**roye**
3:5, 7:14, 8:10, 8:15, 110:23
**rpr**
1:33, 2:4
**rudimentary**
44:17
**rule**
92:19, 127:15, 130:24, 131:5, 131:6
**rules**
92:18
**running**
25:10
**rush**
97:8

S

**s**
19:13, 94:9
**s&w**
1:7, 3:3, 7:6, 7:15, 8:11, 8:15, 138:21
**said**
11:13, 28:13, 29:1, 31:15, 31:24, 45:23, 47:16, 51:5, 53:6, 56:19, 57:10, 63:14, 71:20, 74:10, 77:1, 79:20, 95:5, 96:1, 101:2, 101:6, 119:7, 123:17, 123:25, 127:24, 128:19, 137:14, 141:10, 141:12, 141:15, 141:16, 141:21
**salandra**
23:5
**same**
8:25, 20:4, 32:25, 39:22, 47:22, 58:6, 62:9, 102:4, 141:17
**sat**
75:23, 75:25
**saturday**
98:4, 99:22, 105:9
**save**
21:1
**saw**
29:19, 37:16, 48:24, 54:2, 54:3, 54:6, 96:16, 103:13, 138:23
**say**
10:10, 10:16, 11:6, 11:19, 16:5, 16:9, 16:10, 18:3, 18:6, 19:12, 19:15, 21:20, 22:17, 26:24, 30:6, 35:9, 38:20, 39:4, 43:5, 44:19, 45:21, 47:16, 48:1, 60:8, 62:15, 64:12, 74:15, 76:6, 77:18, 78:15, 79:18, 85:9, 90:2, 91:21, 93:10, 98:3, 101:23, 113:4, 115:10, 116:21, 127:19, 128:4, 129:7, 129:15, 129:16, 129:19, 135:21, 136:4, 136:10, 137:20
**saying**
12:22, 13:17, 33:20, 36:8, 51:10, 78:18, 90:9, 90:22, 91:19, 97:5, 99:14, 100:19, 107:13, 116:17, 119:12, 128:9, 128:11
**says**
27:24, 32:17, 42:22, 57:19, 59:2, 62:14, 67:15, 72:4, 81:20, 83:18, 83:21, 84:12, 88:3, 88:9, 89:6, 89:20, 89:22, 90:5, 90:9, 90:14, 93:15, 97:19, 97:20, 97:24, 98:11, 103:14, 105:24, 106:11, 106:18, 108:12, 111:21, 114:21, 128:3
**sc**
28:8
**scanned**
126:6
**scenario**
88:18
**scenarios**
96:20

**schirtzer**
75:1, 76:2, 76:15
**school**
39:12, 66:15, 122:20
**scope**
24:6
**scratched**
29:19
**sear**
10:25
**seasons**
15:15, 21:10, 22:15, 67:13
**second**
18:12, 32:15, 61:19, 61:24, 62:9, 66:23, 73:18, 81:1, 110:22, 111:20, 112:7, 114:20
**secretly**
133:6
**secured**
5:37, 40:20, 60:20, 61:23, 62:1, 123:12, 129:14, 129:22, 135:17, 136:3, 136:8
**security**
106:2
**see**
17:18, 31:17, 38:6, 40:10, 48:2, 54:18, 59:19, 62:12, 62:16, 68:18, 73:5, 78:21, 78:23, 79:21, 81:17, 86:14, 90:4, 91:5, 97:4, 98:18, 104:5, 105:2, 110:5, 114:1, 114:24, 119:8, 121:10, 123:24, 125:13, 126:4, 128:3, 130:9, 130:11, 130:12, 130:17, 134:4
**seeing**
19:6, 29:18, 30:1, 53:21, 85:2, 101:5, 104:2, 104:22, 113:11, 122:16, 127:14, 128:8, 128:9
**seek**
89:6, 90:3, 90:7, 90:8, 90:14, 95:20, 132:8
**seem**
52:4, 93:2, 102:11
**seemed**
77:8
**seems**
64:4, 81:23
**seen**
14:5, 21:3, 88:7, 104:1, 112:1, 112:2, 113:20, 114:15, 115:8, 122:14
**send**
23:24, 24:4, 54:14, 96:10, 122:7, 124:19
**sending**
35:11, 99:12, 100:13, 119:19, 127:16, 127:19, 130:10
**sense**
11:16, 37:4, 37:18, 52:4, 52:15, 79:22, 80:7
**sensitive**
96:25, 97:3, 101:14, 102:1
**sensitivity**
104:25, 105:7
**sent**
14:3, 35:8, 36:6, 36:10, 36:25, 54:3, 54:17, 56:7, 57:11, 57:12, 59:7, 59:23, 61:21, 64:17, 80:23, 85:4, 88:25, 90:22, 91:12, 93:9, 101:8, 104:3, 104:12, 105:20, 106:1, 108:15, 108:24, 112:3, 116:16, 120:15, 122:6, 122:10, 122:12, 124:8, 127:5, 127:11, 127:12, 132:17
**sentence**
97:20, 97:22, 105:3, 134:23
**separate**
123:17
**separately**
79:17
**september**
1:24, 2:4, 7:2, 7:5, 141:23
**series**
10:3, 15:25, 55:24
**seriously**
91:16
**serve**
11:15, 36:17, 69:14
**served**
14:13, 17:22, 22:1, 28:24
**service**
24:16
**services**
22:23
**set**
10:3, 19:5, 19:16, 58:11, 74:10, 79:20, 129:21, 141:22
**setting**
53:17
**several**
112:16
**shaking**
9:5, 51:9, 86:20
**share**
102:9
**sheets**
24:21
**shingle**
132:5
**shingly**
57:23, 57:24, 59:2, 59:6, 59:7, 59:23, 60:10, 60:12, 64:17, 90:22, 93:13, 95:5, 96:8, 96:10, 99:14, 100:4, 100:8, 103:22, 105:19, 108:11, 111:16, 111:21, 112:14, 114:19, 115:2, 115:10, 115:15, 115:20, 116:3, 116:4, 119:8, 119:10, 119:19, 120:16, 123:3, 124:8, 124:12, 124:19, 124:20, 127:11, 130:17, 130:20
**shingly's**
97:4, 115:16, 115:18, 116:1
**shlomi**
6:14, 6:18, 6:25, 57:17, 103:22, 105:18, 108:10, 109:15, 110:3, 111:16, 114:18, 114:20, 115:2, 116:5,

120:12, 120:16, 122:12, 130:5, 130:17, 130:19
**shlomi's** 106:21
**shorter-term** 43:16
**shorthand** 2:5, 7:10, 8:2, 13:22, 20:15, 27:4, 32:6, 46:14, 49:22, 57:2, 61:13, 67:5, 87:16, 99:4, 105:14, 108:6, 109:13, 114:9, 120:24
**should** 20:7, 37:6, 37:7, 65:17, 89:12, 89:19, 91:14, 92:22, 93:23, 94:16, 95:7, 96:2, 111:21, 122:6, 132:12
**shouldn't** 74:13
**show** 60:3, 93:19, 130:22
**showed** 131:10, 138:21
**shown** 37:25
**sic** 20:7, 23:10, 63:1, 87:25, 121:20
**side** 16:4, 16:5, 16:12, 16:13, 16:17, 16:18, 17:15, 18:14, 18:23, 20:1, 20:2, 23:6, 28:14, 28:15, 45:6, 45:8, 45:19, 47:22, 80:8, 92:6
**sign** 30:23, 34:6, 94:2, 132:13
**signature** 21:18, 27:23, 30:9, 32:16, 32:17, 32:18, 67:17, 105:5, 105:9, 108:15
**signature-7dmpd** 141:24
**signed** 21:23, 27:21, 28:6, 28:8, 28:9, 30:22, 34:16, 41:23, 59:4, 67:21, 68:7, 90:24, 100:20, 101:4, 107:17, 111:24, 111:25, 123:14, 123:16, 135:16
**signing** 41:25, 71:9
**similar** 125:1
**simply** 95:13
**simultaneous** 13:4, 111:6, 139:8
**since** 8:23, 22:3, 39:5, 66:20, 71:9, 87:25, 111:25
**single** 32:3
**sir** 39:24, 45:21, 95:9
**sisters** 45:9
**sit** 35:16
**site** 52:3, 52:6, 52:10, 54:3, 54:6, 98:7, 98:8, 99:13, 99:24, 108:21, 109:1, 109:3
**sitting** 76:13, 87:2, 127:15
**situation** 93:4
**situations** 92:25
**skill** 37:23, 129:21
**slicing** 92:15
**smart** 66:16, 87:5, 87:9
**sohaili** 3:24, 5:33, 6:5, 6:9, 6:32, 20:6, 30:10, 31:20, 80:9, 86:23, 86:25, 121:19, 122:3, 122:10
**sole** 11:4, 30:10
**solely** 11:21, 38:17
**solve** 68:11
**some** 16:19, 17:4, 25:14, 29:25, 45:11, 47:14, 49:18, 53:22, 53:24, 54:5, 64:13, 67:11, 68:6, 69:13, 74:10, 74:11, 74:23, 76:8, 77:6, 78:3, 81:23, 84:17, 99:13, 100:14, 119:9
**somebody** 14:10, 37:7, 37:19, 37:20, 48:12, 48:17, 48:19, 48:20, 55:5, 70:9, 72:21, 89:10, 89:19, 115:16, 115:18, 115:20, 115:21, 116:3, 129:20
**somebody's** 64:22, 131:7
**someone** 129:7
**something** 24:8, 34:6, 35:22, 36:7, 39:6, 42:22, 45:1, 50:25, 60:25, 64:12, 65:15, 65:24, 70:15, 77:4, 77:23, 83:3, 85:12, 88:6, 91:23, 94:2, 97:5, 101:13, 102:1, 103:10, 104:21, 110:6, 113:13, 113:18, 129:19, 133:5
**sometime** 33:10, 90:12, 98:20, 99:12
**sometimes** 25:15, 109:24
**somewhere** 42:1, 42:2
**son** 17:12, 26:19
**son-in-law** 26:14
**soon** 111:24
**sophisticated** 66:10, 66:15
**sorry** 8:13, 33:3, 35:25, 46:21, 61:24, 66:13,

71:1, 111:8, 120:6, 126:8, 133:1, 134:20, 134:22, 136:14
**sort** 18:4, 19:24, 30:12, 48:14, 58:13, 68:6, 76:6, 78:3, 84:17
**sorts** 58:19
**sought** 91:16
**sounding** 92:3
**soup** 60:11
**south** 3:14, 15:16
**speak** 8:12, 15:5, 37:7, 42:19, 45:14, 55:6, 56:15, 60:14, 65:9, 71:20, 73:6, 73:11, 73:14, 78:16, 80:3, 89:12, 89:19, 91:14
**speaking** 9:9, 42:10, 43:25, 63:6, 73:14, 82:23, 102:23, 107:8, 133:15
**speaks** 47:5
**specially** 7:19
**specific** 47:17, 95:4
**specifically** 25:1, 25:16, 52:19, 55:11, 82:25, 92:19
**specifics** 20:20
**speculate** 138:16
**speculating** 26:10
**speculation** 19:19, 31:11, 31:14, 76:12, 82:18, 95:15, 100:23, 101:15, 102:4, 107:2, 109:5, 110:17, 112:9, 112:19, 115:5, 115:12, 116:9, 116:25, 117:1, 119:22, 123:6, 123:23, 124:11, 127:18, 135:11, 137:7, 138:8
**spent** 24:9
**spiritual** 113:12
**spite** 112:24
**split** 77:7
**spoke** 15:9, 53:12, 55:7, 56:11, 63:19
**spoken** 71:18, 71:22, 72:6, 79:25, 80:2, 82:8, 130:1
**squabbles** 102:9
**st** 89:4, 90:13
**stage** 77:24
**stake** 37:8
**stamp** 29:6, 29:7
**start** 12:7, 16:24, 74:6
**starts** 87:24
**state** 37:9, 141:2
**stated** 22:1, 111:18, 141:11
**statement** 12:9, 133:17
**states** 1:1
**statutory** 132:7
**stayed** 134:11
**steep** 54:6
**stenographer** 7:4, 7:22, 13:5, 13:6, 15:17, 20:10, 20:12, 29:12, 29:14, 34:21, 34:23, 50:16, 66:24, 67:1, 83:8, 87:12, 95:24, 99:2, 99:6, 99:8, 101:25, 102:21, 103:19, 109:11, 110:20, 111:7, 111:8, 111:10, 111:13, 113:6, 113:8, 118:14, 118:16, 120:21, 125:20, 125:22, 126:8, 126:11, 131:15, 134:20, 136:15, 139:2, 139:9, 139:10, 140:1, 140:3, 140:6
**stenographically** 1:31
**step** 60:13
**still** 58:2, 60:8, 93:11, 103:5, 103:9, 113:15, 126:17
**stopped** 103:3, 103:16
**story** 66:17
**straight** 39:14, 39:15
**straightforward** 39:17, 53:12
**strange** 87:3
**strike** 18:12, 60:13
**structure** 17:14, 50:23, 58:16, 77:15
**stuff** 40:2, 45:13, 52:2, 77:8, 86:8, 96:12, 96:13, 113:17, 123:20, 135:24
**subject** 5:22, 5:25, 5:28, 6:15, 6:19, 6:23, 6:26, 6:28, 22:12, 48:5, 50:7, 59:8, 104:7, 105:20, 105:23, 111:17, 114:22
**submitted** 122:3
**subordination** 50:25, 52:24, 53:2, 53:7, 82:14, 107:12
**subpoena** 5:8, 14:1, 27:14
**subscribe** 141:17
**subsequent** 43:12, 43:13, 51:24, 51:25

**substitutes**
106:4
**success**
66:18
**suggests**
105:8
**suite**
3:15
**sum**
41:2, 76:6
**summarize**
87:24, 87:25
**summary**
5:15, 21:8
**supervision**
141:14
**support**
5:12, 6:32, 21:7, 121:19
**suppose**
70:11, 88:24
**supposed**
101:18
**sure**
12:19, 17:3, 17:5, 17:23, 25:3, 29:6, 31:3, 34:19, 37:3, 41:24, 44:21, 45:12, 48:10, 51:9, 52:2, 58:11, 68:20, 69:16, 72:8, 72:22, 75:13, 76:5, 78:25, 82:17, 83:20, 83:24, 88:16, 95:13, 98:17, 100:12, 103:13, 107:7, 110:25, 113:5, 113:21, 118:10, 121:14, 124:16
**surprise**
110:9, 135:4, 135:14, 135:25, 137:13, 137:15, 139:17, 139:22, 139:24
**surprised**
29:20, 78:21, 79:20, 133:9
**surrounding**
95:22
**suspect**
37:2, 56:6, 56:16
**suspicion**
100:16
**swbj**
5:17, 5:18, 27:12
**sworn**
8:2, 8:24

**T**

**table**
75:23
**take**
20:19, 21:20, 27:6, 29:2, 34:18, 39:9, 40:9, 46:18, 47:9, 49:25, 57:4, 60:13, 61:16, 66:20, 67:7, 77:2, 87:18, 97:24, 98:11, 110:23, 114:11, 126:19, 130:15, 131:8, 132:5, 136:23
**taken**
2:1, 10:8, 10:10, 10:11, 91:16, 132:9, 141:11
**taking**
7:7
**talk**
13:4, 48:9, 64:11, 65:10, 65:14, 66:6, 66:7, 73:12, 94:14, 97:25, 111:6, 139:8
**talked**
65:16, 81:4, 82:6, 83:1, 110:9
**talking**
19:19, 64:15, 71:24, 71:25, 83:23, 84:13, 85:7, 94:17, 95:2, 100:16
**tax**
26:9
**teacher**
113:12
**tell**
8:24, 14:7, 27:15, 29:16, 31:5, 32:13, 32:20, 34:13, 36:24, 37:4, 38:23, 47:4, 50:9, 51:19, 57:24, 64:24, 67:10, 73:20, 85:15, 88:22, 89:10, 89:18, 95:6, 110:10, 110:14, 113:11, 128:14, 129:8, 132:20, 133:5, 133:7, 141:9
**telling**
50:13, 51:25, 91:14, 112:24, 113:21, 128:25, 130:1, 130:5
**tells**
81:15
**ten**
29:10, 49:8
**tenant**
15:12
**term**
11:8, 24:21, 43:9
**terms**
52:11, 52:19, 53:1, 53:7, 53:14, 53:19, 64:11, 65:19, 66:5, 66:11, 78:12, 81:24, 81:25, 82:10, 82:19, 83:16, 83:17, 84:18, 84:25, 85:6, 86:2, 91:3, 91:22, 92:3, 93:17
**testified**
8:3, 128:21, 129:13, 137:23
**testify**
5:8, 9:2, 14:1
**testifying**
8:25
**testimony**
136:17, 141:12, 141:15
**texts**
35:2, 35:4
**th**
111:18, 113:10, 113:13, 114:18, 141:23
**thank**
8:14, 8:19, 9:19, 13:19, 17:20, 20:13, 20:16, 21:2, 41:15, 46:15, 49:23, 57:13, 87:1, 99:9, 117:14, 120:25
**thanks**
20:17, 46:16, 59:6, 88:6, 111:1
**thereafter**
112:17, 141:13
**therein**
141:11
**thereof**
40:24
**thin**
92:15

**thing**
47:22, 89:23, 109:3, 113:4, 113:25, 114:4, 120:2, 123:16, 123:23, 124:4, 124:5, 125:8
**things**
10:18, 12:25, 25:4, 25:7, 25:16, 30:19, 31:4, 39:14, 39:15, 46:6, 52:24, 58:11, 60:2, 79:19, 85:13, 86:11, 86:17, 87:6, 92:6, 93:20, 93:21, 96:18, 104:23, 105:10, 135:23
**thinking**
28:13, 29:20, 29:22, 69:3, 95:23, 109:19
**third**
27:22, 44:2, 44:5, 67:14, 132:12
**third-party**
124:3
**thought**
29:21, 29:24, 31:15, 38:5, 39:17, 43:15, 51:20, 52:14, 77:4, 78:19, 78:22, 79:8, 91:25, 94:10, 116:21, 123:4, 124:2, 124:8, 124:16, 125:5, 125:10
**thread**
5:22, 5:28, 6:23, 6:28
**three**
49:9, 77:1, 112:15, 113:15, 116:16, 117:8, 117:16, 118:17, 139:7
**through**
5:18, 12:7, 18:16, 27:12, 29:2, 36:18, 38:13, 45:15, 48:11, 48:12, 55:23, 57:10, 60:23, 66:9, 81:4, 82:1, 85:16, 86:6, 91:3, 92:4, 96:8, 96:10, 96:17, 101:11, 107:6, 114:4, 125:8, 131:7, 139:5
**tied**
77:23
**time**
2:3, 13:6, 16:15, 17:21, 19:7, 21:3, 23:9, 24:9, 24:12, 37:10, 37:11, 37:23, 38:9, 38:12, 46:25, 47:13, 47:14, 48:23, 49:7, 50:20, 53:14, 56:1, 63:16, 76:3, 76:5, 77:17, 91:10, 95:24, 96:16, 96:17, 96:25, 97:3, 97:14, 98:14, 99:15, 100:7, 101:14, 102:1, 102:22, 103:13, 104:14, 104:25, 105:7, 105:10, 109:15, 110:12, 111:8, 114:20, 119:16, 126:8, 128:14, 132:19, 132:23, 133:3, 135:19, 139:10, 140:7, 141:11
**timeline**
56:10
**times**
16:20, 55:25, 92:14, 136:10
**timing**
33:6, 33:11
**tip**
132:1
**title**
31:7, 41:8, 77:14
**today**
7:20, 9:2, 15:22, 16:21, 37:9, 58:5, 88:7, 97:5, 100:20, 101:4, 127:15
**today's**
7:7
**together**
40:22, 78:2, 79:19, 86:7, 88:22, 98:15, 98:21, 99:14
**told**
63:12, 64:22, 76:24, 79:11, 90:10, 96:22, 101:13, 102:1, 111:2, 122:7, 123:1
**tomorrow**
97:5, 100:20, 101:4, 105:5
**tony**
23:4
**took**
37:22, 45:1, 70:14, 75:7, 75:17, 76:2, 81:9, 102:18, 122:20
**top**
27:23
**total**
19:19
**track**
24:9, 58:8
**traditionally**
135:25
**traffic**
96:11
**transaction**
12:12, 36:17, 39:19, 42:20, 53:15, 64:8, 65:19, 65:25, 81:25, 82:11, 82:20, 83:16, 83:18, 84:9, 84:14, 89:8, 93:7, 94:23, 128:15, 128:22, 129:7, 129:10, 129:23, 131:2
**transaction"**
130:2
**transactions**
22:18, 44:2, 45:5, 45:11, 60:20, 94:4, 94:5, 123:12, 129:15, 135:18, 136:3, 136:8
**transcribed**
141:13
**transferred**
19:8, 19:10
**trial**
7:20, 76:17
**trick**
133:10, 134:16
**tricking**
135:1
**true**
17:9, 21:21, 89:17, 96:24, 122:12, 122:17, 141:15
**trust**
5:38, 7:21,

12:11, 12:13, 18:12, 18:16, 18:22, 19:5, 19:9, 19:11, 19:15, 19:18, 34:5, 36:19, 37:17, 37:20, 39:22, 40:3, 40:21, 40:23, 57:21, 61:24, 62:1, 66:5, 66:18, 84:13, 92:7, 93:11, 106:2, 133:14, 133:21, 134:24, 138:14
**trusted**
25:24, 30:20, 34:2, 34:12, 36:20, 37:24, 40:5, 61:6, 65:12, 65:13, 66:17, 91:10, 91:21, 91:22, 92:1, 92:5, 132:16, 137:2, 137:24
**trustee**
18:17
**trusts**
10:3, 15:24, 16:1, 47:21, 70:12
**truth**
8:24, 141:9, 141:10
**try**
45:11, 72:25, 97:7
**trying**
18:20, 35:21, 36:14, 39:15, 63:14, 74:5, 74:9, 74:10, 77:3, 77:4, 87:1, 91:7, 106:14
**turns**
51:21
**tutelage**
39:10
**twice**
49:13, 123:13
**two**
15:11, 15:19, 15:20, 15:23, 15:24, 16:12, 19:25, 28:12, 30:8, 31:21, 44:5, 44:13, 45:3, 49:9, 52:8, 55:13, 62:10, 62:21, 72:10, 79:23, 80:12, 87:18, 108:15, 121:2
**type**
39:22, 102:13
**typically**
31:23, 129:6, 129:9, 130:23
**typo**
87:24, 121:22

**U**

**uncle**
11:22, 12:1, 17:24, 22:21, 29:24, 31:12, 36:15, 43:17, 65:10, 65:12, 68:17, 74:17, 85:7, 102:10, 134:8, 134:19, 134:25, 135:1, 135:6
**uncle's**
48:23, 49:2, 49:9, 135:2
**under**
8:23, 40:16, 42:17, 92:18, 141:13
**underlying**
50:4, 75:4
**underneath**
109:21, 122:21
**undersigned**
41:12
**understand**
8:23, 9:4, 9:17, 30:25, 39:1, 49:12, 77:12, 81:20, 89:15, 94:24, 106:18, 121:9, 130:5, 135:10
**understanding**
14:8, 14:9, 53:1, 81:23, 81:24, 84:18, 103:16, 108:2
**understood**
17:20, 23:18, 57:13, 120:9
**understood-**
50:14
**underwrite**
30:18, 30:19
**underwritten**
40:1
**united**
1:1
**unless**
104:21
**unopened**
60:8
**until**
128:2
**upside**
139:12
**use**
46:8, 58:18, 60:23, 72:25, 129:20
**using**
47:9, 47:10, 103:3, 103:16, 115:18
**usually**
24:3, 73:12, 131:7
**usurious**
132:21, 133:6, 133:11, 134:8, 134:14, 135:7, 135:15, 136:12, 136:23, 137:6, 138:7
**usury**
76:21, 136:22, 139:19

**V**

**v1**
61:25
**v1-rc**
62:3
**v2**
62:14, 62:18
**vague**
119:23, 129:2
**vaguely**
29:18
**variety**
19:22, 26:7
**various**
17:11, 35:19, 45:20, 47:21, 57:25, 61:20
**verbally**
119:8
**versions**
57:20, 108:13
**versus**
16:12, 98:1
**viable**
52:14, 52:15
**videoconference**
92:16
**view**
38:23, 38:24
**views**
95:12
**visit**
109:1
**visited**
108:21
**voice**
17:24, 72:22, 72:23

**W**

**wa**
25:7

**waive**
88:1
**waiver**
5:30, 6:20, 33:17, 33:24, 36:2, 36:10, 36:25, 37:3, 57:21, 59:9, 62:3, 65:6, 83:6, 88:3, 88:10, 88:17, 88:21, 88:25, 89:4, 89:9, 90:11, 90:13, 93:5, 93:9, 105:23, 105:25, 108:14, 123:1, 131:9, 131:10, 131:20, 132:7, 132:13, 132:16, 136:9
**waivers**
131:23
**walk**
110:24
**want**
12:9, 13:8, 31:23, 31:24, 31:25, 37:9, 41:14, 53:11, 87:24, 89:6, 93:16, 93:22, 111:3, 113:4, 118:12, 118:14, 124:12, 127:6, 127:10, 131:12, 135:25, 136:22
**wanted**
21:1, 36:15, 46:6, 50:24, 52:1, 59:3, 63:14, 64:20, 65:14, 91:8, 98:18, 116:17, 116:20, 117:9, 117:17, 117:18, 118:18, 118:19, 119:20, 120:1
**wanting**
63:20
**wants**
64:25, 90:23, 93:15, 94:14, 94:19, 95:13, 99:15, 112:15, 113:1
**washington**
26:8
**way**
1:7, 3:3, 5:23, 5:26, 5:29, 6:15, 6:19, 6:24, 6:26, 7:6, 7:15, 8:11, 8:16, 11:3, 14:11, 15:9, 15:12, 16:8, 17:9, 18:11, 18:15, 18:24, 19:17, 19:20, 19:25, 20:3, 21:9, 22:2, 22:7, 22:9, 23:6, 23:19, 24:16, 25:1, 25:15, 25:18, 28:3, 35:1, 35:18, 46:5, 47:19, 48:6, 50:7, 50:12, 54:6, 54:9, 59:9, 67:12, 67:16, 68:3, 68:12, 68:21, 68:24, 71:3, 71:6, 71:10, 71:13, 74:1, 74:12, 75:3, 76:8, 77:5, 83:7, 83:9, 88:13, 91:18, 93:5, 93:8, 94:6, 95:16, 100:18, 101:11, 105:23, 109:23, 110:4, 110:6, 110:8, 110:10, 111:17, 113:14, 121:12, 121:17, 123:15, 132:15, 141:20
**ways**
17:11, 73:25, 74:2
**we'll**
13:2, 13:7, 13:17, 13:18, 125:25
**we're**
9:4, 13:20, 30:18, 38:16, 58:9, 61:9, 65:3, 67:2, 69:4, 87:10, 88:22, 90:11, 113:23, 121:5, 125:23, 126:2, 126:10, 139:7
**we've**
37:25, 62:10, 90:3, 117:9, 122:13
**week**
63:25
**weintraub**
3:4, 6:11, 30:12, 31:21, 31:22, 48:21, 49:12, 50:11, 77:21, 81:21, 87:23, 103:23, 106:18
**welcome**
121:1
**went**
37:21, 48:9, 49:8, 50:20, 52:3, 52:6, 54:2, 57:10, 91:3, 93:11, 98:3, 98:5, 98:9, 98:10, 98:15, 98:17, 98:20, 99:13, 99:24, 102:17, 108:21, 109:1, 125:8
**weren't**
39:24, 43:12, 44:11
**west**
2:2, 3:7, 5:24, 7:8, 47:7, 47:9, 47:14, 47:25, 48:3, 48:7, 48:9, 48:15, 48:18, 83:19, 84:1, 84:3, 84:5, 84:8, 88:2, 111:22
**whatever**
78:8, 82:12, 92:1
**whereof**
141:22
**whether**
12:20, 31:1, 43:2, 47:18, 47:19, 47:20, 47:21, 52:14, 52:20, 64:14, 93:23, 94:16, 95:6, 95:21, 95:22, 96:2, 104:14
**whole**
17:14, 23:5, 31:3, 65:20, 102:12, 114:4, 121:4, 123:16, 125:8, 141:9
**wife**
19:4, 44:8
**wire**
6:29, 114:22
**withhold**
15:1
**within-entitled**
141:10
**without**
38:25, 101:11, 103:5, 130:10,

131:3, 133:20
**witness**
4:2, 7:16, 8:4, 20:7, 20:9, 33:20, 46:21, 49:17, 50:17, 66:14, 83:9, 83:12, 86:20, 86:24, 87:1, 87:8, 95:18, 96:3, 101:17, 101:19, 102:3, 102:22, 110:16, 111:3, 113:2, 113:4, 113:9, 115:7, 115:13, 116:24, 117:3, 117:21, 118:9, 118:22, 119:6, 119:25, 123:8, 124:12, 124:16, 126:1, 126:3, 126:7, 126:16, 126:20, 126:22, 129:3, 135:14, 136:14, 136:18, 137:8, 138:9, 139:12, 139:21, 139:24, 141:8, 141:12, 141:15, 141:22
**wonder**
110:2
**word**
32:16, 40:16, 108:13, 119:7, 136:22, 136:23
**words**
18:21, 33:25, 90:4, 93:10, 93:11, 130:1
**work**
14:20, 22:5, 24:5, 24:6, 26:20, 54:5, 58:2, 63:18, 67:11, 92:4
**worked**
22:10, 25:11, 26:22, 36:12, 39:9, 39:12, 57:25, 58:1, 78:19, 109:20, 122:9, 122:18, 122:21
**working**
11:20, 22:19, 22:21, 22:22, 24:7, 35:19, 77:19, 104:23, 109:18
**workplace**
124:6
**would've**
71:13
**wouldn't**
18:6, 20:3, 30:17, 34:7, 42:18, 43:22, 48:23, 55:10, 56:21, 65:16, 65:23, 70:25, 71:21, 73:6, 80:11, 84:8, 93:24, 96:14, 107:21, 107:22, 107:23, 112:17, 123:12, 123:13, 129:8, 131:2, 133:19, 137:3, 137:16
**wow**
121:22
**write**
105:10
**writing**
130:18
**written**
41:11, 44:21
**wrong**
41:23, 51:10, 83:7, 83:9
**wrote**
42:2, 135:16

**Y**

**yeah**
16:20, 26:3, 26:17, 28:6, 32:11, 40:10, 51:4, 52:21, 53:24, 58:20, 59:25, 70:4, 70:19, 73:3, 74:14, 75:14, 76:20, 79:16, 80:2, 80:14, 83:13, 85:24, 88:24, 92:23, 98:23, 109:16, 114:14, 114:25, 115:19, 120:22, 124:15, 125:17, 126:2, 126:10, 133:2, 136:7, 136:25, 137:10, 137:14, 137:15, 137:17, 138:19
**year**
43:15, 49:5, 124:25
**years**
10:9, 10:23, 17:4, 17:12, 19:11, 19:12, 22:20, 29:10, 36:12, 40:4, 44:7, 45:20, 49:8, 76:5, 113:12, 113:15, 135:6, 138:6
**yep**
87:14
**yourself**
20:19, 27:6, 46:18, 49:25, 53:17, 53:19, 57:4, 57:8, 61:16, 67:7, 87:18, 121:5
**yourselves**
7:13

**Z**

**zero**
74:6
**zur's**
140:4

**$**

**$10,000**
44:9, 44:18, 45:4
**$2**
51:7
**$2,000,000**
40:20, 41:3
**$2,021,232.88**
41:2
**$25,000**
44:7
**$3**
83:19

**.**

**.127**
4:5
**.139**
4:6
**.8**
4:4

**0**

**000369**
5:17, 27:12
**000371**
5:18
**00303**
21:12
**01**
34:23
**05**
2:3, 7:2, 7:5
**07**
108:12
**09**
67:1

**1**

**1**
1:37, 5:21, 5:27, 6:12, 6:17, 6:21, 6:27, 67:1,

99:6, 99:8, 114:23
**10**
2:3, 6:5, 7:2, 7:5, 10:22, 20:10, 20:12, 29:12, 29:14, 34:21, 50:7, 67:3, 67:4, 73:17, 81:15, 99:22, 104:13, 105:21, 108:12, 131:10, 131:12, 131:13
**10,000**
30:11
**10345**
2:2, 3:7, 7:8
**105**
6:18
**10672**
1:10, 7:7
**108**
6:23
**109**
6:25, 121:18
**11**
6:9, 21:12, 21:18, 34:23, 66:24, 87:11, 87:13, 87:14, 87:15, 114:18, 135:6, 138:6
**114**
6:28
**11480**
3:21
**12**
6:14, 42:23, 99:1, 99:3, 103:18, 134:4, 140:1
**12.5**
41:3, 41:19, 42:6, 42:23
**120**
6:31
**1203383924**
62:18
**13**
5:5, 6:18, 105:12, 105:13, 140:3, 140:6, 140:7
**14**
6:23, 87:22, 108:4, 108:5
**1406**
3:16
**141**
1:37
**14301**
1:33, 2:5, 7:11, 141:26
**15**
6:25, 109:10, 109:12, 111:15
**16**
6:28, 114:7, 114:8, 130:16
**1633**
5:23, 48:6
**17**
6:7, 6:31, 104:13, 111:10, 120:21, 120:23
**18**
67:19, 105:21
**180**
3:10, 7:19, 30:7, 31:21, 38:2, 40:22, 76:20, 121:20, 139:18
**190**
6:34
**1985**
22:3, 22:8
**1:**
114:25

**2**

**2**
5:31, 6:24, 6:30, 87:22, 111:10, 111:13, 113:6, 113:8, 125:20, 125:22
**2-1**
6:33, 121:19
**20**
5:11, 67:19
**2013**
5:35, 5:39, 6:17, 6:21, 6:27, 6:30, 46:25, 47:8, 50:6, 51:12, 57:18, 80:22, 81:9, 83:10, 87:22, 103:21, 108:12, 110:2, 114:23, 127:4, 137:4, 137:12, 137:20
**2014**
5:17, 6:12, 30:22, 33:10, 36:3, 38:2, 40:20, 51:17, 76:22, 77:10, 80:20, 81:10, 81:12, 139:17
**2015**
5:20, 32:13, 33:9, 41:4, 51:18
**2017**
103:7
**2018**
6:7, 67:19, 76:7
**2024**
1:24, 2:4, 7:2, 7:5, 50:5, 57:9, 141:23
**203390061**
62:14
**21**
5:35, 57:18, 83:10, 89:4, 90:13
**22**
6:17, 6:21, 20:10, 59:8, 100:5, 103:21, 104:13, 105:20, 127:4, 127:8
**23**
1:10, 7:7, 50:6, 81:15, 98:4, 99:12, 99:22, 128:3
**24**
20:12, 100:5
**25**
6:27, 6:30, 108:12, 110:2, 111:18, 113:10, 114:18, 114:23
**26**
5:39, 113:13
**27**
5:16
**270**
30:9
**28**
59:8, 100:5
**29**
5:20, 32:13, 33:9
**2:-cv--psg**
21:12

**3**

**3**
5:18, 5:24, 46:25, 140:1, 140:3, 140:6, 140:7
**3.5**
17:14
**30**
1:24, 2:4, 7:2, 7:5, 10:9, 141:23
**300**
15:16
**31**
41:4
**32**
5:19
**33**
57:19, 111:13,

111:19, 113:12
**333**
3:14
**3400**
3:15
**35**
113:6
**37**
113:8, 114:18
**371**
27:12, 27:22

**4**

**4**
5:15, 5:39, 6:8
**40**
16:14, 16:25, 29:12, 114:25
**42**
16:15, 16:17, 17:1, 17:2, 17:6, 17:16, 29:14, 114:23
**46**
5:22
**49**
5:25

**5**

**5**
5:35
**50**
34:21, 66:24
**53**
46:25, 125:20
**553676**
1:35
**56**
99:6, 125:22
**57**
5:28
**58**
16:14, 16:15, 16:17, 16:25, 17:1, 17:6, 17:16, 99:8

**6**

**60**
44:7
**61**
5:33, 5:37
**67**
6:5

**7**

**7**
5:10, 6:36
**70**
44:7

**8**

**8**
57:19
**80**
19:13
**87**
6:9
**8th**
90:1, 90:10

**9**

**9**
59:8, 100:5, 111:19, 134:1
**90064**
3:8
**90213**
3:22
**99**
6:14
**990071**
3:16
**9:-bk--rc**
1:10, 7:7