# EXHIBIT "K"

Planet Depos®
We Make It Happen™

# Transcript of Michelle Lerman

**Date:** February 28, 2025
**Case:** S&W Blue Jay Way, LLC, In Re:

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

In re
S&W BLUE JAY WAY, LLC,
Reorganized Debtor.
Case No. 9:23-bk-10672-RC

DEPOSITION OF MICHELLE LERMAN
Los Angeles, California
Friday, February 28, 2025

Stenographically Reported by:
JUSTYNE N. JOHNSON
RPR, CSR. No. 14301
Job No. 571602
Pages 1-138

2

The Deposition of MICHELLE LERMAN, was taken on behalf of Reorganized Debtor, at 10345 West Olympic Boulevard, Los Angeles, California, beginning at 9:01 a.m., Pacific time, on February 28, 2025, before JUSTYNE JOHNSON, RPR, Certified Shorthand Reporter No. 14301.

3

APPEARANCES:

FOR S&W BLUE JAY WAY, LLC:
ELKINS KALT WEINTRAUB REUBEN GARTSIDE, LLP
BY: ROYE ZUR, ESQ.
Attorney at Law
10345 West Olympic Boulevard
Los Angeles, California 90064
Rzur@elkinskalt.com

FOR DEPONENT:
FROST, LLP
BY: CHRISTOPHER FROST, ESQ.
Attorney at Law
10960 Wilshire Boulevard
Suite 2100
Los Angeles, California 90024
Chris@frostllp.com

4

APPEARANCES (Continued):

FOR BLUE JAY 180, LLC:
LAW OFFICES OF RONALD RICHARDS & ASSOCIATES, APC
BY: RONALD RICHARDS, ESQ.
Attorney at Law (appearing remotely)
P.O. Box 11480
Beverly Hills, California 90213
Ron@ronaldrichards.com

LAW OFFICES OF GEOFFREY LONG, A.P.C.
BY: GEOFFREY LONG, ESQ.
Attorney at Law (appearing remotely)
1601 North Sepulveda Boulevard
No. 729
Manhattan Beach, California 90266
Glong0607@gmail.com

Also Present:
Hushmand Sohaili
David Tiraturyan, Esq.

INDEX


| WITNESS | EXAMINATION |
|---|---|
| MICHELLE LERMAN | |
| BY MR. ZUR........................ | 9 |




EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Ernest Cohen's notice of subpoena to testify at a deposition in a bankruptcy case (or adversary proceeding) (14 pages) | 13 |
| EXHIBIT 2 | Amended joint objections and responses of Beverly Cohen, Eleda Cohen, Ernest Cohen, and Michelle Lerman to notice of subpoena to testify at a deposition in a bankruptcy case (or adversary proceeding) (49 pages) | 16 |
| EXHIBIT 3 | Document Bates-stamped Cohen Trust 000176 through Cohen Trust 000180 (5 pages) | 35 |
| EXHIBIT 4 | Letter from Hushmand Sohaili to Ezra Cohen and Robert Cohen, dated April 17, 2018 (4 pages) | 45 |
| EXHIBIT 5 | Printout of the webpage for Jeffrey Lerman from the website "www.realestateinvestorlaw.com /attorney/jeffrey-h-lerman" (15 pages) | 65 |
| EXHIBIT 6 | Email thread (5 pages) | 86 |
| EXHIBIT 7 | Declaration of Eddie Ezra Cohen in support of Plaintiffs' opposition to Defendant's motion for partial summary judgment (12 pages) | 90 |
| EXHIBIT 8 | Declaration of Daniel Shlomi (5 pages) | 95 |




EXHIBITS (Continued)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 9 | Declaration of Hushmand Sohaili in support of Debtor's motion for summary judgment on its objection to Claim No. 21 of Blue Jay 180, LLC (10 pages) | 99 |
| EXHIBIT 10 | Complaint for: 1) Legal malpractice; 2) Breach of fiduciary duty; 3) Elder abuse (California Welfare and Institution Code, Section 15610.30 (21 pages) | 108 |
| EXHIBIT 11 | Assignment of Deed of Trust with Assignment of Rents (Long Form), filed in Official Recorder's Office, Los Angeles County, California, on May 3, 2023, at 8:00 a.m., Bates-stamped 180 Blue Jay 0292 through 180 Blue Jay 0298 (7 pages) | 110 |
| EXHIBIT 12 | Letter from Matthew Cave to Ronald Richards, re: Beverly Cohen, et al. v. Hushmand Sohaili, dated December 13, 2024 (6 pages) | 117 |
| EXHIBIT 13 | Email thread with subject line "Blue Jay Way - Note, Indemnity and Conflict Waiver" (2 pages) | 126 |




Los Angeles, California
February 28, 2025 | 9:01 a.m.

THE STENOGRAPHER: Good morning. We are going on the record at 9:01 a.m., on Friday, February 28, 2025, in the matter of In re S&W Blue Jay Way, LLC, Case Number 9:23-bk-10672-RC. Today's deposition is taking place at 10345 West Olympic Boulevard, Los Angeles, California.

My name is Justyne Johnson. I am a California certified shorthand reporter representing the firm Planet Depos, and my certification number is 14301. The deponent is Michelle Lerman.

Counsel, can you please introduce yourselves?

MR. ZUR: Good morning. My name is Roye Zur. I represent S&W Blue Jay Way, LLC.

MR. FROST: Chris Frost, F-r-o-s-t, here with my colleague, David Tiraturyan, T-i-r-a-t-u-r-y-a-n, from Frost, LLP, here on behalf of the witness.

MR. LONG: Geoffrey Long on Zoom video, representing Claimant Blue Jay 180, LLC.

MR. RICHARDS: Ronald Richards on Zoom, representing Claimant 180 Blue Jay, LLC [sic].

THE STENOGRAPHER: Ms. Lerman, can you raise your right hand, please?

///

MICHELLE LERMAN,
having first been sworn by the Certified Shorthand Reporter, was examined and testified as follows:
THE WITNESS: Yes.

EXAMINATION
BY MR. ZUR:
Q Good morning, Ms. Lerman.
A Hi.
Q Again, I'm Roye Zur. I represent S&W Blue Jay Way, LLC, which is the debtor in this bankruptcy case. Thank you for coming all the way up here. I know you're not local here, so we'll try to get over with this as quickly as we can. So just a few general admonitions.
Have you been deposed before?
A Yes.
Q Approximately how many times?
A Once. No. Once.
Q And how long ago was that?
A Ages. Oh, my gosh. I don't remember. 20-plus, 30 years.
Q Okay. So given the passage of time, we'll refresh your deposition admonition recollection. So you remember you are under oath. So you've sworn to tell the truth, and the effect of that oath is the same as if you



were testifying in court.
You're aware of that; right?
**A Yes.**
Q Is there any reason why you can't testify today?
**A No.**
Q Okay. I'm going to need audible answers from you. No nodding or shaking of the head.
**A Okay.**
Q That means words, not gestures.
If you need a clarification or don't understand a question or if you need me to repeat, interrupt me or ask the court reporter to reread a question.
I won't ask you to guess. But there may be instances where I ask you a question and you may be required to give an estimate. An estimate is okay. A guess is not.
**A Okay.**
Q If you need a break, of course let me know. You have counsel here, Mr. Frost and Mr. Tiraturyan. One or both may object to a particular question. But you are still required to answer, unless it's -- unless there's an instruction not to answer based on privilege or something similar.
Okay. So with that, could you just restate your name, please, just for the record?



**A Michelle Lerman.**
Q And what's your current profession?
**A Attorney.**
Q And what kind of an attorney are you?
**A Estate planning, trust and probate.**
Q And how long have you been working as an estate planning, trust and probate attorney?
**A About 30 years.**
Q And has that been your profession since you graduated from law school?
**A I've been an attorney since graduating from law school.**
Q And in estate planning, probate and trusts?
**A No.**
Q What did you do before that?
**A Some litigation and real estate just for two years.**
Q Okay. And what kind of work do you do currently as an estate planning, probate and trust attorney?
**A I'm of counsel to Cunninghamlegal.**
Q And what kind of advice do you generally give? I'm not asking for specifics, obviously.
**A I do more practice building as opposed to giving any advice.**
Q So more business development?



**A Business development.**
Q Okay. Has that -- has that been your role for the last 30 years or was there a period of time where you've -- were focused more on the advice rendering?
**A More on the advice rendering prior to now.**
Q Okay. And was that before you joined Cunninghamlegal?
**A Exactly.**
Q Okay. So before you were at Cunninghamlegal, where were you? What firm?
**A Lerman Law Partners.**
Q And that -- was that a firm that you ran with your husband --
**A Yes.**
Q -- Jeffrey Lerman?
**A Yes.**
Q Okay. And so when you were at Lerman Law Partners, you did more of the advice rendering than the business development?
**A I did both.**
Q Okay.
**A Always have done both.**
Q And what kind of -- typically, what kind of estate planning advice did you give?
**A Setting up living trusts, handling trust**

**administration when someone dies, handling probate.**
Q Giving tax advice?
**A No.**
Q Okay. But general trust administration post-trust execution?
**A I'm not sure what you mean by "post-trust execution," but trust administration after someone dies and tax advice about estate tax issues, just to clarify that.**
Q Understood.
MR. ZUR: Okay. We'll go back to the type of work you've done a little bit later, but I just want to get a couple things out of the way. So the document, this will be marked as Exhibit 1.
(Exhibit 1 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. FROST: Thank you. And do we have the exhibits available for the people on Zoom?
MR. ZUR: No. I did not set that up. I apologize.
Can we go off the record momentarily?
THE STENOGRAPHER: Off the record at 9:09 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 9:10 a.m.
BY MR. ZUR:
Q So we marked as Exhibit 1, this is a document



called "Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding)." It's dated August 21, 2024.
Ms. Lerman, have you seen this document before?
**A I think so.**
Q Okay. And just for the record, this is a document that was addressed to Ernest Cohen. I believe that there was a document that was substantially identical directly to you.
When did you first see this document, approximately?
**A When I was served. I don't remember when that was.**
Q Could it have been around late August of last year?
**A I don't remember. Could have been.**
Q Okay. And after you received this document, did you review the requests one by one?
**A No.**
Q Okay. Have you -- have you ever reviewed the requests one by one?
**A Yes.**
Q And when did you do that?
**A Sometime after receiving it.**
Q Okay. And when you reviewed the requests, did



you have a general sense of whether you had documents and res- -- that are responsive to each of the requests?
**A I had no idea what this was about when I got it. I didn't recognize anything.**
Q Did you recognize the name "Blue Jay," for example?
**A No, I didn't.**
Q Okay. Did you eventually figure out what this was about?
(Mr. Sohaili joined the conference room.)
THE WITNESS: Just very general terms.
BY MR. ZUR:
Q Okay. And when was that, approximately?
**A Around the same time that I was served. Sometime after that.**
Q Okay. And when you realized what this was about, did you then look at the requests and try to figure out whether you had anything --
**A I did.**
Q -- in your capacity as a trustee?
**A I did.**
MR. ZUR: Okay. And so let's go to the next one. I'm going to mark this next document as Exhibit 2. For the record, this document is entitled "Amended joint objections and responses of Beverly Cohen, Eleda Cohen,



Ernest Cohen, and Michelle Lerman to notice to subpoena to testify at a deposition bankruptcy case (or adversary proceeding)."
(Exhibit 2 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Just take a moment to familiarize yourself with the document, Ms. Lerman.
**A Okay.**
Q Have you ever seen this document before?
**A I don't recall. I don't think so.**
Q Okay. So beginning on page 2 and continuing throughout the document, there are responses to requests for production. Did you assist in the responses -- in the creation of the responses to these requests?
**A No.**
Q Okay. Did you provide any documents to your counsel in response to any of these requests?
**A No.**
Q And I'm not asking for anything privileged. Is that because you didn't have anything or because of some other reason?
**A Both.**
Q Okay. Were you asked to --
MR. FROST: Hold -- hold on. Hold on.

You can answer whether you understood that you needed to look for documents. Do not answer the question of whether you were asked to look for documents.
Fair enough?
MR. ZUR: Fair.
MR. FROST: Okay. So answer the question --
THE WITNESS: Repeat the question.
MR. FROST: Assume the question is: Did you understand you needed to look for responsive documents?
THE WITNESS: Yes.
BY MR. ZUR:
Q Okay. And what kind of search did you conduct in trying to find documents that were responsive?
**A I didn't know anything about it, so I had no documents and no place to search.**
Q Okay. Other than your counsel who are here today, did you speak to anybody else about the document requests or this deposition?
**A No.**
Q Did you speak with your brother, Ernest Cohen, about it?
**A No.**
Q Did you speak with Eleda Cohen about it?
**A No.**
Q Did you speak with the other counsel on the Zoom?



**A No.**
Q Okay. So you're a trustee of the -- let me get the name exact -- the Cohen Family Trust, dated March 13, 1986, as restated December 31, 2005; is that correct?
**A Correct.**
Q And who are the other cotrustees?
**A My mom, Beverly Cohen; my sister, Eleda Cohen; and my brother, Ernest Cohen.**
Q And how long have you been a cotrustee?
**A Since my father died.**
Q And how long is that -- how long ago was that?
**A He died May 2nd -- May 3rd, 2020 -- let's see -- 2023.**
Q Okay. And was there a provision in the trust for automatic appointment of you and your siblings and your mother as cotrustees?
**A We were appointed as the successor cotrustees.**
Q Okay. Was there a meeting to decide that or did that happen --
**A No.**
Q -- automatically?
**A There was no meeting to decide it. The trust documents said that that's what would happen.**
Q Understood. And do you -- do you and -- well,



scratch that.
What does your mother do as cotrustee?
**A Attend meetings, talk to the financial advisor.**
Q And who's the financial advisor?
**A Wealthspire.**
Q Could you spell that, please?
**A W-e-a-l-t-h-s-p-i-r-e.**
Q Got it. And what is your brother's role as cotrustee?
**A I mean, the role of the trustee is just to follow the terms of the trust.**
Q Understood.
**A So whatever that could involve dealing with the trust attorney. That's about it.**
Q And who's the trust attorney?
**A Nancy Reimann.**
Q Could you --
**A R-e-i-m-a-n-n.**
Q And when you have conversations with the trust attorney, for example, do you all speak with her at the same time? Do you correspond by email? How is that done?
**A Usually at the same time.**
Q Okay. And do you have regular meetings?
**A No.**
Q Just as things come up?



**A Correct.**
Q Okay. Is the trust engaged in any active business?
**A I'm not sure I understand the question.**
Q Okay. Does the trust own anything?
**A Yes.**
Q What does it own?
MR. RICHARDS: I'm going to --
MR. FROST: Objection. Hold on.
MR. RICHARDS: Objection. Vague.
MR. FROST: Roye, help me understand how this relates to the issues in the litigation. Only -- for privacy concerns.
MR. ZUR: Well, one is the equities. Are -- it's -- can we go off the record?
MR. FROST: Yeah. Let's go off the record. You know what? Why don't we do --
THE STENOGRAPHER: Off the record at --
MR. FROST: Sorry. Go ahead. Off the record.
THE STENOGRAPHER: Off the record at 9:20 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 9:21 a.m.
MR. FROST: Can you repeat your question?
MR. RICHARDS: My other objection was out -- outside the scope of this case. Not proportioned to the needs of

discovery in this case.
MR. ZUR: Okay. I don't know if it was when we were off the record, Mr. Frost, or just before, but could you just repeat your objection and your instruction so we can deal with it?
MR. FROST: You know what, why don't we take a break? 'Cause I want to make sure we don't have a privilege issue. Let's talk about this, see if I can solve it real quick.
THE STENOGRAPHER: Shall I take it off the record?
MR. ZUR: Yes. Thank you.
THE STENOGRAPHER: Off the record at 9:22 a.m.
(Off the record.)
THE STENOGRAPHER: We're going back on the record at 9:28 a.m.
And real quick, before we went on our last break, when I took us off, I didn't ask all counsel if they wanted to go off, and Mr. Richards advised that I didn't ask. Going forward, I will ask if it is appropriate to go off the record.
Thank you, and I apologize once again.
MR. ZUR: No problem. Thank you.
MR. FROST: Mr. Zur, with respect to your last question, I'm going to instruct the witness not to answer on privacy grounds. And I understand you disagree and



that's fine. We can sort it out later. But for now, the instruction stands.
(Witness instructed not to answer.)
MR. ZUR: Okay. The debtor's position is that to the extent that that's the instruction and there's no protective order in place, we are going to have to repeat this deposition.
MR. FROST: Okay. Well, we can deal with that in due course. We disagree, but we'll take it up in due course.
MR. ZUR: Okay. So I'll just repeat the question and that way we can get your objection and your instruction again on the record.
BY MR. ZUR:
Q What does the trust own?
MR. FROST: Instruct her not to answer.
(Witness instructed not to answer.)
MR. FROST: And are you going to follow that instruction?
THE WITNESS: Yes.
BY MR. ZUR:
Q Do you know who signs tax returns for the trust?
**A No.**
Q It's not you?
**A I'm not sure.**
Q Do you recall ever signing a tax return for the



trust?
**A I'm not sure.**
Q Who prepares the tax returns for the trust?
**A I'm not sure.**
Q Okay. Would one of your cotrustees assist in the preparation of tax returns for the trust?
**A No.**
Q You have no idea whatsoever who prepares the tax returns?
**A Well, it's some sort of an accountant or tax attorney.**
Q Okay. And where would they get the information from to prepare the return?
**A Our office.**
Q When you say "our" --
**A Shingly at our office.**
Q Okay. And for the record, is that Shingly Lee?
**A Yes.**
Q And what is her position?
MR. FROST: And before you answer that question, I'm sorry, for the court reporter's sake, can you spell her name if you know --
You have it?
THE STENOGRAPHER: (Nodding head in the affirmative.)
THE WITNESS: Mm-hmm.



MR. FROST: Okay. Very good.
THE WITNESS: You have it? Okay.
BY MR. ZUR:
Q Could you tell me what her position is?
**A She's an assistant.**
Q Assistant for anyone in particular?
**A For everything that the family does.**
Q Understood. Does the family have any other businesses other than what's owned by the Cohen Trust, the family trust, the one we identified earlier?
MR. FROST: Can you repeat that question, please?
THE STENOGRAPHER: Question, "Does the family have any other businesses other than what's owned by the Cohen Trust, the family trust, the one we identified earlier?"
THE WITNESS: You asked if "the family." I mean, we have a huge family.
BY MR. ZUR:
Q Okay. So when you say "the family," who are you referring to exactly?
**A My mom.**
Q Okay. So just to take a couple steps back, earlier you said that Shingly assists, quote, "the family." Who is the family in that answer?
**A My mom. Maybe me. Whoever needs her help.**
Q Okay. And does the family, as a collective --

and when I say "the family," I'm referring to you and your siblings and your mother. Does the family have, collectively together, any ownership in businesses other than what is owned by the family trust?
MR. FROST: That's a yes-or-no answer.
THE WITNESS: Yes.
BY MR. ZUR:
Q Okay. And what are those businesses?
**A I don't -- well, I'm not even sure how to answer that. "What are those businesses?"**
MR. RICHARDS: And I would just make an objection on privacy grounds and relevance.
THE WITNESS: It's complicated, and I couldn't begin to answer specifically.
BY MR. ZUR:
Q How was it complicated?
**A Many different entities' structures, irrevocable trusts. What do you call a business?**
Q Are you the -- sorry. Were you -- I just want to make sure you were finished.
**A (Nodding head the affirmative.)**
Q Okay. Are you a trustee of any other trust?
**A Yes.**
Q And what is that?
MR. FROST: Objection. Privacy.



THE WITNESS: And I don't remember the name of it.
BY MR. ZUR:
Q Is it a trust also connected to your siblings and your mother?
**A It could -- it -- it could be.**
MR. FROST: Don't guess. If you know, you know. If you don't --
THE WITNESS: Right.
MR. FROST: -- you don't. There is no "could be."
THE WITNESS: Right.
MR. FROST: It either is or it isn't or you don't know.
THE WITNESS: Yes.
BY MR. ZUR:
Q So are there other trusts in which you and one or more of your siblings or your mother is also a cotrustee?
**A Yes.**
Q Okay. And those trusts are separate entities from the trust that we identified earlier?
**A Yes.**
Q Okay.
**A Not an entity but separate.**
Q Okay.
**A 'Cause...**
Q Just to clarify, use --



MR. RICHARDS: My -- I just have one objection. It miss -- it misstates the law. The trust is not an entity.
BY MR. ZUR:
Q You said that they were irrevocable; is that right? Are they all?
**A Some are, yes.**
Q And so do they have their own tax IDs?
**A Yes.**
Q And they file their own tax returns?
**A I don't know about the tax part of it.**
Q Okay. Does -- and when I refer to "the trust," I'm referring to the trust I identified earlier. Just to clarify, it's the -- again, I'll read the name. It's the Cohen Family Trust, dated March 13, 1986, as restated December 31, 2005.
MR. FROST: So do I understand correctly that, going forward, unless you clarify, when you refer to "the trust," that's what you're referencing?
MR. ZUR: Correct.
MR. FROST: Okay. Very good. Thank you.
BY MR. ZUR:
Q Does the trust make any loans to third parties?
**A I don't know.**
Q Has the trust made any loans to third parties?
**A I don't know.**



Q Are you familiar with the loan that the trust made to the debtor in this case?
**A No.**
Q Were you aware of that loan before I asked you this question?
**A Yes.**
Q And how did you become aware of it?
**A When I got the subpoena.**
Q And that was in or about August of last year?
**A In the fall of last year.**
Q Okay. So before the fall of last year, you did not know that the trust had made a loan to this entity, S&W Blue Jay Way --
**A Correct.**
Q -- LLC?
**A Correct.**
Q Has the trust made any loans since you became a cotrustee?
**A I don't know.**
Q Does the trust have any loans on its books?
**A I don't know.**
Q Is the trust a borrower on any loans?
**A I don't know. Probably.**
MR. FROST: Don't "probably."
THE WITNESS: Oh.

29

MR. FROST: You know or you don't.
THE WITNESS: I don't know.
BY MR. ZUR:
Q Have you ever seen a financial statement for the trust?
**A No.**
Q Have you seen a balance sheet for the trust?
**A No.**
Q Do you know if those exist?
**A No. I'm assuming they do.**
**My counsel's going to get mad at me.**
MR. FROST: It's okay. I forgive you this time.
THE WITNESS: Okay.
BY MR. ZUR:
Q Are you familiar with the Four Seasons Hotel in -- well, I guess, it's in Beverly Hills but not really in Beverly Hills. Are you familiar with that hotel?
**A Yes.**
Q And who owns that hotel?
**A It's a complicated structure.**
Q Okay. Does the trust have a beneficial ownership interest in it, indirect or otherwise?
**A Yes.**
Q Okay. And do you know the name of the entity that owns the hotel?

30

**A No.**
Q Have you heard of an entity called Burton Way Hotels?
**A Yes.**
Q Okay. And is that the entity that owns the hotel?
MR. FROST: If you know.
THE WITNESS: Yes --
MR. ZUR: Okay.
THE WITNESS: -- to the best of my knowledge.
BY MR. ZUR:
Q Okay. And does the trust own part of Burton Way Hotels?
**A To the best oy my knowledge, yes.**
Q Do you know approximately how much of Burton Way Hotels the trust owns?
**A I think it's about 51 percent. I think it's a little over 50 percent.**
Q Okay. And do you know how much the trust interest in the hotel is worth?
**A No.**
Q You can estimate.
**A No idea.**
Q Is it $1 million?
**A No idea. I'm sure it's more than one million, but I honestly have no idea.**

31

Q Is it -- I understand. But I will still ask --
**A Okay.**
Q -- because I'd like to understand if you have any idea as to a range. Because you're pretty sure it's not a million.
**A Yes.**
Q And I appreciate that.
**A Yes.**
Q Is it 10 million?
**A No.**
MR. RICHARDS: Objection. Foundation. Lack of personal knowledge.
BY MR. ZUR:
Q Okay. Is it -- is it a hundred million?
**A I don't know.**
MR. RICHARDS: Objection. Foundation. Lack of personal knowledge.
BY MR. ZUR:
Q Who has the trust books and records?
**A I don't know all the people who have those books and records.**
Q Is it potentially your brother, Ernest Cohen?
**A No.**
Q Could it be your sister, Eleda?

32

**A It could be. But I honestly don't know who has the books and records.**
Q When was the last time you saw any of them?
**A I don't think I've ever seen any of them.**
MR. RICHARDS: Objection. Assumes the facts.
BY MR. ZUR:
Q What do you see as your job as cotrustee of the trust?
**A To follow the terms of the trust, to administer them.**
Q And does that include reviewing or having knowledge of what's in the books and records of the trust?
**A It includes some of that.**
Q Okay. But despite that, you haven't seen the books and records of the trust or you don't recall?
MR. FROST: Objection. Asked and answered.
BY MR. ZUR:
Q You can answer.
**A I'm confused by the question. I haven't seen the books and records of the hotel. That's what you were asking me about. And I don't look at books and records at all –**
Q Okay.
**A – or financial statements or tax returns.**
Q Just to clarify. I was asking about the books

33

and records of the trust -- specifically the trust, not the hotel.
**A Mm-hmm.**
Q So I'll ask that question again just -- now that we got that out of the way. Have you seen the books and records of the trust?
**A I'm not sure what you're referring to "books and records." But I don't get into the nitty-gritty and reviewing. If you're talking about financial statements or tax returns, I just don't get involved in that.**
Q Okay. So you -- when I ask about reviewing, I don't mean reviewing in fine detail but seeing at all.
**A I don't know what you mean by --**
MR. RICHARDS: Asked and answered.
THE WITNESS: Yeah. I just -- I don't know what you mean by "books and records." So I don't know.
BY MR. ZUR:
Q Okay. Do you know if the hotel is managed by an outside hotel operator?
**A Yes.**
Q And which one is that?
**A Four Seasons.**
Q And has it been managed by the Four Seasons since the trust came to own the hotel indirectly?
**A Since the hotel opened, it's been managed by Four**

34

**Seasons.**
Q Okay. And does anyone interact with Four Seasons on behalf of the Cohen Trust?
**A Yes.**
Q And who is that?
**A Eleda, my sister.**
Q And is there anybody else?
**A In the family?**
Q Yes.
**A No. In our family, no. My sister does that.**
Q Okay. And has she always been the one to interact with Four Seasons?
**A My dad would interact with Four Seasons. Hush would interact with Four Seasons.**
Q Okay. And, just generally, what was the nature of the interaction with Four Seasons? What did that --
**A I don't know.**
Q -- entail?
**A I don't know. I'm not involved.**
Q Okay. But until your father's passing, he dealt with Four Seasons and your sister, Eleda, also did?
**A Correct.**
Q Okay.
MR. ZUR: I'm going to mark the next document Exhibit 3.

35

(Exhibit 3 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. FROST: We just need one copy over here. It's fine.
BY MR. ZUR:
Q Take a minute to familiarize yourself with the document, please.
MR. FROST: And if you could, Roye, if you wouldn't mind for the benefit of those on Zoom, just describe the document for the record.
MR. ZUR: Yes. I'll get to that.
So for the record, this is a document bearing Bates numbers Cohen Trust 000176 through 180.
MS. FROST: And Ron and Geoff --
MR. LONG: Does the document have a name or a title, something other than the Bates stamp?
MR. FROST: Yeah. Ron and Geoff, the document has -- it's four columns, "year of completion," "development type," "cost," and "project name/address."
MR. RICHARDS: Okay. Well, let's see if the witness recognizes it first so I don't have to waste any time on it.
MR. ZUR: Let's go off the record.
Is that okay, Counsel?
MR. RICHARDS: What do we need to go off the record

36

for what?
MR. ZUR: Yeah. I'm going to --
MR. FROST: Yeah. Let's --
MR. ZUR: To accommodate the witness.
MR. RICHARDS: Oh, you mean the witness needs to take a break?
THE WITNESS: I'm fine.
MR. ZUR: You sure?
THE WITNESS: (Nodding head in the affirmative.)
BY MR. ZUR:
Q Okay. Have you had an opportunity to take a look at this document, Ms. Lerman?
**A Yes.**
Q Are you familiar with it?
**A No.**
Q Have you seen it before?
**A No.**
Q Taking a look at it, can you tell me what it is?
MR. RICHARDS: I'm going to object. Lack of personal knowledge. She's not here just to speculate on documents she's never seen before.
BY MR. ZUR:
Q You can answer.
**A I'm assuming this is --**
MR. FROST: Don't. Don't.

THE WITNESS: Okay.
MR. FROST: Let's not assume.
THE WITNESS: Okay. But I'm --
MR. FROST: You either know or you don't.
THE WITNESS: Yeah. I mean -- okay. I guess I don't really 'cause I've never seen this --
MR. FROST: Then that's the answer.
THE WITNESS: -- before.
MR. FROST: Then that's the answer.
THE WITNESS: Yeah. I would just be guessing in looking at it. But I've never seen the document before. I don't know if it's accurate. I don't know anything about this document.
MR. RICHARDS: And just -- one more objection and caution. You're just to provide facts that you know, not any opinion of things, like, as a lawyer or any other opinion.
THE WITNESS: Hm.
BY MR. ZUR:
Q Okay. Ms. Lerman, if you take a look at the right-hand column entitled, "project name/address," do any of these names look familiar to you?
**A Yes.**
Q And could you tell me what they are?
**A You mean which ones look familiar?**



Q Sure.
**A So the name Copa de Oro, Copa Ladeene, Paseo Del Mar. On the next page, Willow Tree. Another Paseo Del Mar. On the third page...**
**Wow, let's see. Empire West. Bayco Financial Center. On the next page, Casa Montana. On the next page -- on the last page, Four Seasons Hotel, Villa Martinique, Taylor Ranch, Cottonwood Ranch, Aspen Ranch. That's all.**
Q And are these projects that your father was involved in?
**A The ones I mentioned.**
MR. FROST: When you say -- okay. You just clarified what I was going to ask.
Did you get both his question and her answer?
THE STENOGRAPHER: I did.
MR. FROST: Thank you.
MR. ZUR: Thank you.
BY MR. ZUR:
Q And your father was a real estate developer?
**A Yes.**
Q And these were developments that were some residential and some commercial?
**A The ones I mentioned.**
Q Yes. I'm only asking about the ones you



mentioned. I'm not asking about the other ones that you said you were not familiar with.
And are you aware of any developments that your father did after the last one that's mentioned in the final page of this document?
**A No.**
Q Do you know of any other developments that your father was involved in that's not on this list?
MR. RICHARDS: My only objection would be foundation. Lack of personal knowledge. Speculation.
THE WITNESS: I'm not sure if this list is complete or not. But I don't have any -- I can't recall any -- anything that's not listed.
BY MR. ZUR:
Q The one that's called "Four Seasons Hotel" in Beverly Hills, that's the hotel that we talked about earlier; right?
**A I assume so. I know I'm not supposed to assume. Let me just -- what page?**
Q It's the final page.
**A "Luxury hotel." Yes, correct.**
Q And the document says in the -- in the third column from the left, it says "cost." And the cost for this one, it says it's $85 million. Do you know anything about that?



**A No.**
Q Okay.
MR. FROST: If we're moving to a different document, let's take a short break, if you don't mind.
MR. ZUR: Okay.
MR. FROST: Just five minutes.
MR. ZUR: Sure.
THE STENOGRAPHER: Mr. Richards, is that okay?
MR. RICHARDS: Yeah. You can hear me okay; right?
THE STENOGRAPHER: Yes, sir.
MR. RICHARDS: There's a little bit of a latency in the microphone. I don't know why. But yeah, we can go off the record. Thank you.
THE STENOGRAPHER: Off the record at 9:54 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 10:04 a.m.
BY MR. ZUR:
Q Ms. Lerman, you're -- you testified earlier that you have specific expertise in trust administration as a lawyer?
**A Yeah. Yes.**
Q And have you used that expertise in connection with the trust --
**A No.**
Q -- that we've been discussing?

MR. FROST: Hold on one second. Just let him finish his question --
THE WITNESS: Sorry.
MR. FROST: -- before you answer.
BY MR. ZUR:
Q You've never advised the family about trust issues?
MR. FROST: Objection. I'm going to let her answer the question with the understanding that there's going to be no waiver of any attorney-client privilege. Okay?
MR. ZUR: Understand.
MR. FROST: Okay. You can answer that question "yes" or "no."
THE WITNESS: Our trust attorney does all the advising, not me. I don't advise the family at all.
BY MR. ZUR:
Q Have you ever advised the family at all on trust issues?
MR. FROST: With respect to this trust?
MR. ZUR: Yes.
MR. FROST: Okay. You can answer with respect to this trust --
THE WITNESS: I don't know.
MR. FROST: -- only "yes" or "no."
THE WITNESS: I don't recall. Maybe. I know I'm not



supposed to guess, but I don't think so. The answer's no. Because we've always had separate -- we've always had a trust attorney representing the family.
BY MR. ZUR:
Q Okay. And that trust attorney is -- is it Nancy Reimann?
**A It is now. Before, it was someone else.**
Q Do you recall who it was before?
**A I think it was Vicki Magasinn.**
Q Okay. Let's get the spelling, just for the record.
**A I don't know the spelling.**
Q Okay.
**A I'm amazed I remembered the name.**
Q Okay.
**A Oh. And there was some -- another attorney also. I don't remember his name.**
Q And these attorneys, they represented, to the best of your recollection, this trust and maybe another trust of the family?
**A Correct.**
Q Okay. Did these attorneys represent any other entities that --
**A I don't know.**
Q Okay.



**A Sorry. I was supposed to let you finish.**
MR. FROST: You're fine.
BY MR. ZUR:
Q How are decisions made on behalf of the trust?
**A That's very broad. Can you explain --**
MR. RICHARDS: I'm going to --
THE WITNESS: -- what you're asking?
MR. RICHARDS: Let me object. Overbroad. Impinges on, potentially, attorney-client and financial privacy.
MR. ZUR: I'll try to restate the question more clearly.
BY MR. ZUR:
Q Do you and the other cotrustees have voting power for the trust?
**A We do.**
Q Okay. Is it equal?
**A Yes.**
Q So just for the record, there's four of you. So that would mean that's 25 percent each?
**A Correct.**
Q Okay. And do you make decisions unanimously or do you sometimes hold votes and the decision is not necessarily unanimous?
**A We ju- -- we always reach an agreement. We don't** raise our hands (indicating) and vote. We talk it out.



Q And when you talk it out, do you do that in person?
**A Sometimes.**
Q Do you exchange emails?
**A Maybe.**
Q Do you exchange text messages?
**A Maybe.**
Q Okay. Do you recall the trust making any decisions in connection with the loan to my client, S&W --
**A No. I --**
Q Wait. Let me just finish talking.
**A Sorry.**
Q -- making any decisions with respect to the loan made to S&W Blue Jay Way, LLC?
**A No. I wasn't involved at all. I had no information.**
Q So if you weren't involved and the decision was made on behalf of the trust, it would have had to be either your brother or your sister?
**A I don't know because I wasn't involved.**
MR. RICHARDS: Objection. Speculation. Speculation. Lack of personal knowledge.
MR. LONG: I would also object it's overbroad. Vague and ambiguous.
///

BY MR. ZUR:
Q Does anybody else make decisions for the trust over than the four trustees?
**A No.**
Q Okay.
**A Well, clarify when.**
Q Understood. I -- since your father's passing.
**A Yes. Correct. Just us.**
Q Just you. Okay.
MR. ZUR: This next document is going to be marked 4 -- Exhibit 4?
THE STENOGRAPHER: Yes.
(Exhibit 4 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q For the record, this is a document dated April 17, 2018. It's on the letterhead of the law firm Akin Gump Strauss Hauer Feld, LLP. It's a four-page document. Take a look to familiarize yourself, please, and then let me know when you're done.
MR. FROST: Is that --
THE WITNESS: Mm.
MR. FROST: There's your spelling.
THE WITNESS: Okay.
///



BY MR. ZUR:
Q Can you tell me what this document is?
**A It appears to be a letter.**
Q Have you ever seen this document before?
**A Perhaps, but I don't recall. Oh. It says, "CC Michelle Lerman," but I -- so --**
MR. FROST: Don't --
THE WITNESS: -- I don't re- -- I -- I'm not sure.
BY MR. ZUR:
Q Okay. And I think after your name, it says "Esquire"; is that right? It's hard to read.
**A Yeah. Mine is blurry. I can't read it. It appears to say "Esquire," but it's blurry.**
MR. RICHARDS: Can we identify the document and the date?
MR. ZUR: I did, but here it is again. This is a document dated April 17, 2018. It's on the letterhead of Akin Gump Strauss Hauer and Feld, LLP.
BY MR. ZUR:
Q Ms. Lerman, can you tell me who this document is addressed to?
MR. FROST: Objection to any questions related to the document based on lack of foundation.
THE WITNESS: On the face --
MR. RICHARDS: My other objection -- Ms. Lerman, the



document speaks for itself. So it's -- that's my objection. If you don't remember reading it or receiving it or know why it's generated, then the document speaks for itself.
BY MR. ZUR:
Q You can answer.
**A It says, on the first page, that it's addressed to Ezra and R.C.**
Q Okay. Individually or?
**A I don't know.**
Q Was it addressed to an entity?
**A I don't know.**
Q Well, what does it say in the matters?
**A Well, it says, "Dear Ezra and R.C."**
Q Okay. And right above that, what does that say?
**A Right above it, it says, "Ezra Cohen, Robert Cohen, Burton Way Hotels, LLC" and then an address.**
Q Okay. And is that an address where that entity was located?
MR. FROST: Objection. Speculation. Foundation.
THE WITNESS: That's our family office --
BY MR. ZUR:
Q Okay. So --
**A -- LaPeer Drive. So my dad's personal office and -- plus any entities relating to my dad.**



Q And to be clear, in 2018, the entity, Burton Way Hotels, LLC, was an entity that you would call related to your dad?
**A Yes.**
Q Okay. And if you look at the second to last page under the words "agreed," could you tell me what it says below "agreed?
**A Second to the last page. Second to the last page says "Agreed: Burton Way Hotels, LLC, by Ezra Cohen" and the date.**
Q And for the record, Ezra Cohen is your cousin; is that right?
**A Yes.**
Q And do you know why he signed on behalf of Burton Way Hotels, LLC?
**A I don't.**
Q Did he have a position with Burton Way Hotels, LLC?
**A I'm not sure legally what his position was.**
Q He's -- well, at the time at least, was he a practicing attorney?
**A I don't know if he had a license. He was trained as a lawyer, but I don't know if he stayed active as a lawyer. I'm not sure.**
Q Was he employed by Burton Way Hotels, LLC?

**A I really wasn't involved at that level. I have no idea if he was actually employed by Burton Way Hotels.**
Q Do you know why this document was cc'd to you?
**A Yes. Well, I -- I mean, I didn't write the document, so I guess I have to say no. Because I don't know why Hush wrote this document. So it -- so he --**
MR. FROST: You've answered --
THE WITNESS: -- cc'd me.
MR. FROST: -- answered the question.
THE WITNESS: Yeah. I didn't write the document, so I don't know the intention.
MR. ZUR: Can we take a break?
MR. FROST: A short one.
MR. ZUR: Yeah.
MR. FROST: We -- we really need to --
MR. ZUR: Understood.
MR. FROST: -- move forward.
THE STENOGRAPHER: Mr. Richards, are you okay with going off the record?
MR. RICHARDS: Yes, I am.
But let's -- let's, Roye, try to get in the -- issues in this case, if we can.
MR. ZUR: Okay.
THE STENOGRAPHER: Off the record at 10:16 a.m.
(Off the record.)



THE STENOGRAPHER: Back on the record at 10:19 a.m.
BY MR. ZUR:
Q Okay. Ms. Lerman, back to this document -- and I know part of it is a little blurry. But you said earlier that you don't recall seeing it; is that right?
**A Now I recall seeing it.**
Q Okay. And what do you recall what this -- okay. What do you recall about this document?
**A That there was a dispute over fees is what I remember.**
Q And when -- who was that dispute between?
**A With Hush. There was a dispute over the fees.**
Q Between Hush and who?
**A And my dad. I don't know the details.**
Q So if you look at the first sentence on the document --
**A Mm-hmm.**
Q -- it says, "This agreement amends Akin Gump's February 14, 2012, engagement letter with Burton Way Hotels, LLC, a Delaware limited liability company" --
**A Mm-hmm.**
Q -- "and memorializes our agreement regarding the firm's past work, past fees due, and the financial terms of our ongoing representation of BWH in connection with the Four Seasons matter."



**A Mm-hmm.**
Q Does that refresh your recollection as to who the dispute was between?
MR. LONG: Objection. Lacks foundation. Calls for speculation.
THE WITNESS: I just remember that the dispute was between -- was with Hush. I don't remember any -- and his firm and the fees. I don't remember any specifics and more -- more than that.
BY MR. ZUR:
Q Okay. Did Akin Gump represent Burton Way Hotels?
**A Yes.**
Q Okay. And the fees, were fees charged to Burton Way Hotels?
MR. FROST: Objection. Assumes facts not in evidence. Foundation. Speculation.
MR. RICHARDS: Join.
THE WITNESS: Yeah. I don't know. I don't know how those fees work. I mean, ultimately, it comes from my dad and from Ezra's dad.
BY MR. ZUR:
Q And who --
**A That's how -- but I'm speculating. I really don't know this. I don't know the intricacies of that.**
Q Okay. And who is Ezra's father?



**A Joe Cohen.**
Q And Joe Cohen was your father's brother?
**A Correct.**
Q Okay. And did Joe Cohen have an ownership interest in Burton Way Hotels indirect?
**A Yes.**
Q Okay. And the other ownership interest was by the trust? And when I say "the trust," I'm referring to your family trust.
**A Yes. And maybe other entities were part of that. I don't remember -- or trusts were part of it.**
Q Okay.
**A As I said before, it's a convoluted ownership structure. It's not just straightforward.**
Q And did -- did Ezra Cohen advise his father?
**A I don't know. I mean, I assume.**
MR. FROST: Don't.
THE WITNESS: But I wasn't there.
MR. FROST: Yeah. Wait.
THE WITNESS: Yeah.
MR. FROST: (Indiscernible.)
THE WITNESS: Okay.
MR. FROST: Yes or no.
THE WITNESS: Yeah. Yeah.
THE STENOGRAPHER: And, please, one at a time.

THE WITNESS: I -- oh, okay.
MR. LONG: Well, hold on. I'd like to assert an objection here. It's vague. Ambiguous. Overbroad.
BY MR. ZUR:
Q Did you ever advise your father on any legal matters?
MR. FROST: Objection. Instruction you not to answer on the basis of attorney-client privilege.
(Witness instructed not to answer.)
MR. ZUR: It's just a "yes" or "no," though.
MR. FROST: Well -- but your question inherently assumes communications. You know what? If we can agree that there's no waiver of attorney-client privilege, I will let her answer the question "yes" or "no."
MR. ZUR: Yeah, we agree.
MR. FROST: Okay.
THE WITNESS: I wouldn't call it "advising" as an attorney -- legal advice as an attorney. 'Cause we deferred to -- Hush was the lawyer.
BY MR. ZUR:
Q So if you look at the -- if you look at the people to whom this letter at least reflects it was cc'd on, above your name, looks like it says, "Henry Jannol, Esquire," and below, it looks like it says, "Douglas Maynard." Do you know who Henry Jannol or Douglas Maynard are?



**A Yes. I know who Henry is.**
Q And who's Henry?
**A He was a lawyer that, I think, worked for Ezra.**
Q Okay. And do you know who Douglas Maynard was?
**A I don't.**
Q Okay. Do you know why this letter was cc'd on Henry Jannol?
**A No.**
Q Ezra signed this document; right? Or at least that's -- looks like his signature in the penultimate page?
MR. FROST: Objection. Speculation.
THE WITNESS: I don't know Ezra's signature. It has his name under the signature line typed, but I don't know Ezra's signature.
BY MR. ZUR:
Q But you have no reason to believe that his signature was forged; right?
MR. FROST: Objection. Speculation.
THE WITNESS: I have no idea. I didn't witness him signing, and I don't recognize his signature.
BY MR. ZUR:
Q Okay. Is it possible that this was copied on Henry Jannol because Ezra's the signatory to this?



MR. RICHARDS: Objection. Anything's possible in this world. It's an improper question.
BY MR. ZUR:
Q You can answer it.
MR. FROST: If you know.
THE WITNESS: I think you'd have to ask Hush why he copied Henry.
BY MR. ZUR:
Q Okay. And in the last page here, above the line that says, "Robert Cohen," is that your father's signature there?
**A Yes.**
Q Okay. And you're sure of that?
**A Yes.**
Q Okay. Did you advise your father in connection with this agreement?
**A No.**
Q Did he ask you about it?
**A We probably discussed it, but I don't remember the specifics.**
Q And why did you discuss it?
MR. RICHARDS: Objection. Attorney-client privilege.
MR. FROST: And --
MR. RICHARDS: Potential privacy.
MR. FROST: -- and speculation.



MR. ZUR: I had asked earlier if you provided legal advice to your father, and you said, "No." So I'm going to ask the question again and ask counsel to think about whether that's a valid objection if your testimony was that you were not advising him as a lawyer. So I'm going to ask the question again.
BY MR. ZUR:
Q Why did you discuss this letter with your father?
MR. FROST: So did -- let me just ask you this as a prefatory matter. Did you advise your father in connection with this engagement agreement?
THE WITNESS: I don't specifically remember if I advised him on it, but I do recall discussing it and discussing the issue of all of these fees that were adding up and adding up and adding up.
BY MR. ZUR:
Q And did your father discuss it with your brother, Ernest?
**A I have no idea.**
Q Did he discuss with Eleda?
**A I have no idea.**
Q Okay. Did he discuss it with your mother?
**A I have no idea.**
Q Okay. And did he discuss it with you because you're an attorney?

57

**A No.**
MR. RICHARDS: I'm just going to object. Here's my objection, Roye. If they're discussing a document and there's lawyers involved, it could impinge upon attorney-client privilege. You don't get to invade the internal discussions of the trustees and what advice they're getting with respect to this letter. And this is way beyond the scope of this case. It's nothing to do with this case.
And you're invading your internal discussion about a letter that was sent by their lawyer in connection with the dispute. So I would (audio interference) the witness will be able to parse out what was legal advice and what wasn't legal advice, if she even remembers the discussion. So that's my objection.
MR. ZUR: Okay. So I'm going to object to your objection because you do not represent this witness and you do not hold the privilege. And you cannot object on privilege grounds. That's why she has counsel.
MR. FROST: So let me try to --
MR. RICHARDS: I didn't object on privilege grounds.
MR. ZUR: Yes, you did.
MR. FROST: All right. I'm going to stop the argument now, and I'm just going to see if we can cut through this.
Do you remember any more of the specifics of your

58

conversation with your father relating to this letter other than what you've discussed?
THE WITNESS: No.
MR. FROST: Okay. And so -- and we'll agree that anything she's answered will not constitute a waiver of any privileges; correct?
MR. ZUR: Correct.
MR. FROST: Okay. I think we can move on.
BY MR. ZUR:
Q Okay. My last question about this is: Did your father discuss it with you because you're an attorney?
**A I have no idea what his frame of --**
MR. RICHARDS: Speculation.
THE WITNESS: -- mind was.
BY MR. ZUR:
Q So if he came to you with this letter, did you ask him, "Why are you bringing this to me?"
MR. RICHARDS: Objection. Improper hypothetical. Calls for speculation.
MR. ZUR: I'm asking if she asked.
THE WITNESS: I don't recall him coming to me with this letter. I recall that there was an issue because the fees just were -- it was a crazy amount of money and what to do about these fees. I think my dad probably looked up to me and admired me because of my background, but that's

59

the extent of it. My dad and I were very close.
BY MR. ZUR:
Q Understood. Is the family trust mentioned in this letter at all?
**A I have --**
MR. FROST: Objection.
THE WITNESS: -- no idea. It's blurry on the second page, and I don't know.
BY MR. ZUR:
Q Well, take a look and what you're actually able to see, let me know if you see any references to the Cohen Trust.
**A I don't know.**
MR. FROST: You know, we're not going to sit here and burn time with her just going through a document that's already in the record just to see if it includes information or not.
MR. ZUR: Right.
BY MR. ZUR:
Q Is Burton Way Hotels, LLC, the same as the Cohen Trust? Are they the same entity?
MR. FROST: Objection. Vague and ambiguous.
MR. RICHARDS: Calls for a legal opinion. Misstates the law. The trust is not an entity.
THE WITNESS: What was your question? Are they

60

different?
BY MR. ZUR:
Q My question is whether they are the same or different. Separate.
**A I don't know.**
Q Okay. Well, I'll ask it a different way. Are you a trustee of Burton Way Hotels, LLC?
**A No.**
Q Okay. Are you a trustee of the Cohen Family Trust?
**A Not at this time. But they're all interrelated.**
Q I apologize.
**A They'll all -- as I said at the beginning, the -- you have to look at the whole chart to understand where the trusts and the LLC and the corporation and how that fits together.**
Q I understand. So --
**A It's a design that Hush created, I believe.**
Q Okay. Do you -- are you a member of Burton Way Hotels, LLC?
**A I don't know. I'm not sure. I don't get into that kind of minute --**
Q Do you --
**A -- details.**
Q -- do you receive a K-1?

**A I don't know.**
Q You don't know if you receive a K-1 from Burton Way Hotels, LLC?
**A I don't.**
Q Okay. But you know you're a trustee of the -- today -- of the Cohen Family Trust?
**A Yes.**
Q Okay. But you don't know whether you hold any position with respect to Burton Way Hotels?
**A No.**
Q Okay. And you don't know if they're one and the same entity, the Cohen Family Trust and Burton Way Hotel, LLC?
MR. FROST: Misstates her testimony.
BY MR. ZUR:
Q Are they the same entity?
**A I don't know.**
Q Okay. But you are a lawyer; right?
**A I'm -- yes.**
MR. RICHARDS: That's argumentative and obnoxious. You don't need to answer that.
(Side discussion between Mr. Sohaili and Mr. Zur.)
BY MR. ZUR:
Q Is there another entity that has an ownership



interest in Burton Way Hotels, LLC, other than the Cohen Family Trust?
**A I don't know. I think so. As I keep saying, it's a complicated structure, and I would think Hush (indicating) could tell you that.**
Q Okay. Last question on this document and then I'll move on. If you look at paragraph 7, it's the penultimate paragraph on the second page. Do you see the last sentence of that paragraph that says, "BWH releases Akin Gump and its partners, employees, and representatives from any claims or demands known or unknown related to or arising from Akin Gump's representation of BWH and the Four Seasons matter through the date of the execution of this agreement."
Do you see that sentence?
**A I do.**
Q Okay. The sentence purports to be a release; is that right?
**A I don't know.**
MR. RICHARDS: Objection. The document speaks for itself. Calls for a legal conclusion.
BY MR. ZUR:
Q Well, but -- but you are an attorney. So there is some legal --
MR. RICHARDS: Objection. That's argumentative.



MR. ZUR: You need to let me finish my question.
MR. RICHARDS: You're not asking her about it.
MR. ZUR: You got to -- you can't interrupt me.
MR. RICHARDS: I'm going to suspend the deposition, Roye, if you don't get to some reasonable questions here.
MR. ZUR: Yeah. I don't think --
MR. RICHARDS: You're really wasting her time.
MR. ZUR: I don't think you get to do that, but okay.
BY MR. ZUR:
Q I'm asking you as a lawyer. Is that last sentence -- is that a release?
**A I think that would be a legal opinion, and I'm not qualified to answer that.**
Q Have you ever --
MR. RICHARDS: Objection. The document speaks for itself. Calls for a legal conclusion. She's not here as an expert witness.
BY MR. ZUR:
Q Have you ever drafted a release in your capacity as a lawyer?
**A Yes.**
Q Okay.
MR. RICHARDS: Objection. Relevance.
BY MR. ZUR:
Q Okay. And when you've drafted a release before,



would you have said that X releases Y?
MR. FROST: Objection. Calls for an --
MR. RICHARDS: Objection. Vague.
MR. FROST: Ron -- Ron, bear with me, please.
MR. RICHARDS: Sorry.
MR. FROST: Objection. Objection. Calls for a legal conclusion. Incomplete hypothetical. It's also vague and ambiguous.
MR. ZUR: I'll ask the question a different way. Perhaps --
THE WITNESS: My releases, if I drafted it, don't look like this.
BY MR. ZUR:
Q I understand. But would you use the word "release" in drafting a release?
MR. FROST: Objection. Incomplete hypothetical. Calls for a legal conclusion. We're -- let's move on. I mean, the document says what it says, and she's not going to give you some blanket admission that just because it includes the word "release," the legal effect of any of that. That's not what she's here to answer.
BY MR. ZUR:
Q Did this -- did the Cohen Trust release anybody in this document?
**A No.**

MR. FROST: Calls for a legal conclusion.
MR. ZUR: Okay.
MR. FROST: And did you get her answer?
THE STENOGRAPHER: I did.
MR. FROST: Thank you.
BY MR. ZUR:
Q Did you represent your father in connection with this document?
**A No.**
Q Okay. Did you represent the Cohen Trust in connection with this?
**A No.**
Q Did you represent Burton Way Hotels in connection with this?
**A No.**
MR. ZUR: We are we up to Exhibit 5 now?
THE STENOGRAPHER: Yes.
MR. ZUR: Okay. So this next document is going to be marked as Exhibit 5.
For the record, this is a document that was printed from the internet. It says it was done so yesterday at 2:16 p.m., and the webpage is www.realestateinvestorlaw.com/attorney/jeffrey-h-lerman/.
(Exhibit 5 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)



BY MR. ZUR:
Q Take a look, Ms. Lerman, and let me know when you've had a chance to review this.
MR. RICHARDS: My only objection is this document was not produced in discovery. Probably highly irrelevant.
THE WITNESS: Okay.
BY MR. ZUR:
Q Can you tell me what this document is?
**A Well, you just said that you printed this yesterday and that this was on the internet.**
Q Okay. Is -- do you have any reason to believe that that's not accurate?
**A Just that the addresses aren't current. So that's one --**
MR. FROST: I don't think he's trying to --
THE WITNESS: -- reason.
MR. FROST: -- figure out if any of the information is inaccurate.
THE WITNESS: Right.
MR. FROST: I think he's just trying to figure out if this is your webpage.
THE WITNESS: I haven't looked at our webpage in a long time. And so I'm just surprised -- I mean, if this is our webpage yesterday, it has our old address. So yeah.



BY MR. ZUR:
Q Understood.
**A Yeah.**
Q Do you have any reason to believe that this was not the webpage in existence yesterday?
**A I have no idea. But because you -- you did this. But I do recognize the logo, and I do recognize my husband's photo.**
Q And on --
**A So --**
Q Sorry. And on the third page, page 3 of 15 under the heading "Biography," that appears to include your husband's biography; is that correct?
**A Yes.**
Q And do you see in the second sentence, could you read that for me, please?
**A The second sentence reads, "Before cofounding Lerman Law Partners, Mr. Lerman practiced at prominent large firms, served as general counsel for two real estate companies with large portfolios of award-winning commercial, mixed use, retail, medical office, and residential properties nationwide, including Los Angeles' Four Seasons Hotel."**
Q Okay. And is the reference to the Los Angeles Four Seasons Hotel -- is that the hotel that's owned



indirectly by your family trust?
**A Yes.**
Q How long have you been a partner of your husband -- legal partner?
**A Oh, goodness. Maybe around 30 years.**
Q Okay. And is what it says in that second sentence -- is that an accurate description of his prior experience?
**A I'd have to look at it for a minute. Is it accurate? Let's see. "General Counsel...mixed-use."**
**I mean, he never served as general counsel of the Four Seasons Hotel. So if that's what you're asking about, I would say -- yeah. I would say he didn't -- he wasn't involved with the Four Seasons Hotel. But he did help my dad and do legal work way back when, before we started our law firm.**
MR. FROST: So let's be clear. Roye, are you asking her is that statement a -- is each part of that statement accurate or is that an accurate overall statement of his practice?
MR. ZUR: I guess both.
MR. FROST: Okay. So the answer to -- the latter part of that would be vague and overbroad. But I want you to pay attention to that statement. Because I don't think he's asking you, was your husband the general counsel of

Four Seasons Hotel. Because the statement is --
THE WITNESS: Right.
MR. FROST: -- was he the general counsel of two real estate companies --
THE WITNESS: Mm-hmm.
MR. FROST: -- that would have held the Four Seasons Hotel.
THE WITNESS: Yes. Yes.
MR. FROST: Is that accurate?
THE WITNESS: Yes, that's accurate.
BY MR. ZUR:
Q Okay. And do you know what those two real estate companies are?
**A He worked for my dad --**
MR. RICHARDS: Objection. Privilege.
THE WITNESS: -- he worked for my dad way back when for two years, and he worked for Sam Freshman, who's a real estate developer/investor.
BY MR. ZUR:
Q Okay. And do you know the names of the two real estate companies referenced here in the second sentence?
**A Well, my dad and --**
MR. RICHARDS: Objection. Privacy and privilege. Attorney-client secrets.
THE WITNESS: -- my dad and Sam Freshman.



BY MR. ZUR:
Q Was your dad a sole proprietor?
**A I don't know the legal -- his legal formation.**
Q Okay.
**A Yeah.**
Q So the reference here to real estate companies, is your testimony that it could have been a company that your dad owned?
MR. RICHARDS: I'm going to -- well, I have one more objection. I'm going to also object under marital privilege. You're asking her to talk about communications with her husband. Those are where she would get that information.
The State Bar Act is greater than attorney-client privilege. I'm just putting it out there that I'm not consenting or waiving marital privilege or waiving any privacy rights under the Business and Professions Code. Even though I'm not her counsel here, those things should all be considered.
MR. FROST: Yeah. Join.
MR. ZUR: Okay.
THE WITNESS: What were you asking?
BY MR. ZUR:
Q I was asking if the -- at least one of those two real estate companies referenced in the sentence is one



that your dad owned?
MR. FROST: Objection. Foundation.
MR. RICHARDS: I would object to any information that you've obtained from your husband.
MR. FROST: And you'll agree that there's no waival of -- waiver of any privilege if she answers this question?
MR. ZUR: Correct.
MR. FROST: Okay.
THE WITNESS: My dad was a partner in an entity and Jeff -- that Jeff was involved in also.
BY MR. ZUR:
Q Did your husband ever represent the trust?
**A I don't know.**
Q Approximately how many clients did you -- did you and your husband have when you were running your firm?
**A I don't know.**
MR. FROST: Hold on.
Read that question back, please.
THE STENOGRAPHER: Question, "Approximately how many clients did you and your husband have when you were running your firm?"
MR. FROST: Objection. Speculation. And we're getting to a very dicey area. So we're going to take it a question at a time.
THE WITNESS: I mean, maybe thousands. I really don't



know.
BY MR. ZUR:
Q Okay. If your husband were to do work for your father while you two were partners, would you know about it?
MR. FROST: Objection. Speculation.
MR. RICHARDS: Objection. Marital privilege.
MR. ZUR: They were law partners.
THE WITNESS: Maybe. Maybe not.
BY MR. ZUR:
Q Okay. What kind of client intake procedure did you have at your firm?
**A Well, we had the firm for 30 years. So --**
Q Was the intake procedure the same throughout?
**A Probably not. I'm sure it must have varied.**
Q Okay. So let's see if we can narrow it down by time period. When did you -- did you ever dissolve that firm, Lerman Law Partners?
**A No.**
Q Okay. When did you leave the firm?
**A May 2023.**
Q Okay. And --
**A Oh, but I didn't leave the firm. What do you mean when did I leave the firm?**
Q Apologies.

**A 'Cause we -- yeah.**
Q Do you and your husband still run Lerman Law Partners?
**A No.**
Q Okay. So is the firm -- does the firm not operate any more?
**A It does operate.**
Q Okay. And -- and do the two of you still work at the firm?
**A No.**
Q Okay. So is -- did somebody else --
MR. FROST: By "two of you," do you mean both of them or either one of them?
MR. ZUR: Okay. Let's take one by one.
BY MR. ZUR:
Q Does your husband still work for Lerman Law Partners?
**A No.**
Q Do you still work for --
**A Yes.**
Q Okay. When did your husband stop working for Lerman Law Partners?
**A May 2023.**
Q Got it. Okay. So for let's just say the period 2010 through May 2023, do you recall what type of intake



procedure you had at Lerman Law Partners?
**A It depended on the matter, the intake would be different.**
Q Okay. So let's just say for a prospective client on a real estate matter, what kind of intake procedure did you have?
**A I wasn't involved with that at all, so I don't know. I wasn't involved with intake for anything other than my probate clients and trust and estate clients.**
Q So what --
**A It was very separate.**
Q What was the intake procedure for your specific clients?
**A Depended whether it was pre-death or post-death. And -- but, basically, it would be an engagement agreement and sometimes a conflict waiver.**
Q Okay. And who would sign a conflict waiver?
**A Who?**
MR. RICHARDS: Objection. Outside the scope.
THE WITNESS: I mean, if there was a conflict, then the parties who would have a potential conflict would sign the conflict waiver.
BY MR. ZUR:
Q Okay. And did you prepare those conflict waivers?



**A My paralegal, with my guidance and oversight.**
Q Okay. And can you just tell me generally -- I'm not asking for anything specific, obviously -- generally what you would expect to see in a conflict waiver that your paralegal handed you and you had to then take and revise? What would you expect to see in that conflict waiver?
**A An explanation of why there would be a conflict.**
MR. LONG: Objection. Overbroad. Vague. Improper hypothetical and (indiscernible) --
MR. RICHARDS: Yeah.
MR. LONG: -- not reasonably calculated to lead to the discovery of admissible evidence.
MR. RICHARDS: Roye, you're not going to use her conflict procedures to have any relevance in this case. This is getting so far afield, it's almost preposterous.
MR. SOHAILI: You're getting close.
MR. FROST: Hush, your comments are going to be on the record if you keep saying them out loud. Can you also do me a favor? If you're going to continue to type, will you turn on your soft keys feature on your phone, please?
MR. SOHAILI: How do I do that?
MR. ZUR: Can we take a quick break?
MR. FROST: Yeah, that would be great.
THE STENOGRAPHER: Mr. Richards, can we take a break?



THE WITNESS: You know what? Let's do it at the next break because I actually need to get home, if you don't mind. Yeah. Just keep clicking, if you --
MR. RICHARDS: Yeah. I mean, you are really badgering this witness beyond belief. These questions about her internal conflict waivers have nothing to --
THE STENOGRAPHER: We're still on the record.
MR. RICHARDS: -- do with this case.
I know we are. I'm not agreeing to go off the record.
(Side discussion between Mr. Sohaili and Mr. Zur.)
MR. ZUR: Okay. So I asked my question. Could you, please, read it back?
THE STENOGRAPHER: One moment, please.
MR. ZUR: Thank you.
THE STENOGRAPHER: Question, "Okay. And can you just tell me, generally -- I'm not asking for anything specific, obviously -- generally, what you would expect to see in a conflict waiver that your paralegal handed you and you had to then take and revise? What would you expect to see in that conflict waiver?"
THE WITNESS: Examples of the potential conflict.
BY MR. ZUR:
Q Anything else?

**A The names.**
Q Anything else?
**A The date, signature lines.**
Q Would there be any instruction to the client to seek counsel from another lawyer?
MR. FROST: Yeah. If --
MR. RICHARDS: Objection. Speculation.
MR. FROST: Yeah. I'm going to let her answer this question and then we're going to shut it down. Because I do think this, at this point, is harassing and is seeking and improper legal opinion. The rules regarding conflict waivers are what they are, and I think her opinion of that doesn't shed any light on that.
So you can answer this question and let's move on.
THE WITNESS: I would imagine that it would have a statement that they should seek their own counsel.
MR. ZUR: Okay. Thank you.
BY MR. ZUR:
Q Did you have associates at your firm?
**A Yes.**
Q Approximately, how many?
**A It varied over the years. Yeah. I mean, it varied other the years.**
Q Okay. And did they -- did your associates



interact regularly with clients whether you were --
MR. RICHARDS: Vague. Overbroad.
MR. ZUR: You got to let me finish my question, please.
BY MR. ZUR:
Q -- where you were involved in the -- sorry. Not -- scratch that. Strike that, please.
Whether you were copied on an email or not, did your associates correspond or speak or communicate with clients regularly?
MR. FROST: Same objections.
THE WITNESS: I'm not sure I'm understanding. Of course associates would communicate with clients.
MR. ZUR: Okay.
MR. LONG: I'm sorry. I'm having a hard time hearing 'cause someone's phone is vibrating and I can -- it sounds close to the mic.
THE WITNESS: Can you stop typing?
MR. SOHAILI: No. But someone can show me what they need me to do.
THE WITNESS: Or can you put the phone outside --
MR. SOHAILI: Well, I'm going to --
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One --



MR. FROST: You know what? Stop. Just don't talk. Just stop.
MR. SOHAILI: Okay.
MR. FROST: Stop. Stop. Whatever you're doing, hold until the next break and then you can pick it back up. Or if you want to go to that side of the room so you're not picking up on a hot mic, that would be great. Okay.
MR. SOHAILI: Or you could just as easily --
MR. FROST: Don't. Just don't.
MR. ZUR: Got it.
MR. FROST: Just don't.
UNIDENTIFIED SPEAKER: I'm not going to argue this point. Okay?
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. FROST: Okay. Finish your question.
BY MR. ZUR:
Q Did associates --
MR. RICHARDS: I can't hear him.
MR. FROST: No. No. He's starting now. You're good.
BY MR. ZUR:
Q Did associates bring in new clients without your knowledge? And when I say "new clients," I'm referring to clients in the field that you were working with.



MR. FROST: Objection. Vague. Overbroad.
MR. RICHARDS: Objection. Join.
MR. LONG: Not relevant or reasonably calculated to lead to the discovery of admissible evidence.
MR. FROST: Roye, help me understand what we're doing.
MR. RICHARDS: He's wasting your time. That's what he's doing to appease his client.
MR. FROST: Okay. Beyond that, help me understand why this is relevant to the discussion of this --
MR. ZUR: We're getting there.
MR. FROST: -- agreement.
MR. ZUR: We're going to get there. If you guys just -- please just be patient. And you guys are making this go much longer than it needs to go, please.
MR. FROST: All right. I've been very polite to you. Do not do the "you guys" thing.
MR. ZUR: I'm referring more to Ron. I --
MR. FROST: Okay. Then don't make it --
THE STENOGRAPHER: One --
MR. FROST: -- "you guys."
MR. ZUR: Chris --
MR. FROST: Okay.
MR. ZUR: -- I'm not pointing any fingers at you. I'm just telling you that I would like to move forward, but I keep getting objections, and I would -- really just want

to finish this.
MR. FROST: Okay. I would love for you to finish this too. So I'm going to give you a couple of questions on this, but we are not going to do a full inquiry into her legal history in the way she ran her law firm because it's different from the way Hush ran his. And that's not -- it -- ultimately, it's not going to be relevant to anything.
So if you have a couple more questions to get to the point, that's fine. Otherwise, I'm going to shut it down.
BY MR. ZUR:
Q Okay. Were you aware when someone became a new client at your firm in --
**A Not always.**
Q If they became a new client in estate planning or probate or trust administration --
**A Yes.**
Q -- were you aware?
**A Yes.**
Q Yes. Could an associate just go out and bring in a new client without your knowledge?
**A Yes.**
Q Could an associate do that without an engagement agreement?



MR. RICHARDS: Speculation.
THE WITNESS: It wasn't our policy to do that without an engagement agreement.
BY MR. ZUR:
Q Okay.
Let's go back for a moment to the document we marked as Exhibit 2. It's this one (indicating). And for the record, Exhibit 2 was the amended joint objections and responses of Beverly Cohen, Eleda Cohen, Ernest Cohen, and Michelle Lerman, et cetera, et cetera. Could you turn to page 26 of the document, please?
Actually, if you don't mind, I apologize. If you look at page 25, that actually has the request. It's at line 9, Request for Production Number 31.
**A Mm-hmm.**
Q So for the record, this request states, "All engagement agreements and/or conflict waivers (drafts and final) between the Cohen Trust and attorneys or law firms representing the Cohen Trust from 2010 through 2024."
Do you have any documents that are responsive to that request?
**A No.**
Q Okay. Did you provide any documents that were responsive to that request to your counsel?
**A No.**



Q Did --
MR. RICHARDS: I'm just going to make one comment for the record. You're not the only one that responded to that subpoena on behalf of the trust.
MR. FROST: Right. I assume you were just asking her specifically?
MR. ZUR: Correct.
MR. FROST: Okay.
MR. RICHARDS: Okay.
BY MR. ZUR:
Q So I believe you answered the question. Do you know if any -- if there are any engagement agreements between Cohen Trust and the Akin Gump law firm?
**A I don't know.**
Q Okay. Have you seen any bills sent by the Akin Gump law firm to the Cohen Trust?
**A I think so.**
Q Do you know when those bills were sent?
**A No idea.**
Q Do you know how much they were for?
**A No.**
Q And do you know who might have those bills?
**A No.**
Q Would they have been sent to one of the other cotrustees?



**A I don't know.**
Q Okay. Did the Cohen Trust make any payments to the Akin Gump law firm?
**A I assume so. I don't know. Not something I'm involved with.**
Q Okay. Well I'm not asking for assumptions, so if you don't know, you don't know; right?
**A Right.**
Q Okay.
MR. RICHARDS: Let's not change your testimony.
BY MR. ZUR:
Q Do you have any documents that state that the Cohen Trust is a client of Akin Gump?
**A No.**
Q Okay.
MR. FROST: On that last question, you just meant her personally; correct?
MR. ZUR: Yes.
BY MR. ZUR:
Q So over the years, did your father ever ask you to draft a conflict waiver or -- well, I'll split the question. Did he ever ask you to draft a conflict waiver?
**A I don't remember.**
Q Did he ever ask you to ever look at a conflict waiver?

**A I don't remember.**
Q Did he ever ask your husband to look at a conflict waiver?
**A I don't know.**
MR. FROST: Objection. Okay. That's fine. You got the answer?
THE STENOGRAPHER: I did.
MR. FROST: Okay. Very good.
BY MR. ZUR:
Q Do you know what, generally, your husband's area of expertise is --
**A Yes.**
Q -- in the law?
What is that?
**A Real estate.**
Q Transactional?
**A Yes.**
Q Litigation?
**A Yes.**
Q Is there any -- okay. Scratch that.
Did your father consult with your husband after you started your firm, Lerman Law Partners, on real estate matters?
**A I don't know.**
MR. RICHARDS: I'm going to object. Marital



privilege.
MR. FROST: Hold on one second.
(Discussion off the record.)
MR. ZUR: Okay. So we're going to mark this next document as Exhibit 6. And I'll just describe it for Mr. Richards and Mr. Long. This looks like a printout of emails from Gmail. And the subject at least on the first page is "Re: Summons-RC." And it contains emails in or about October 18, 2019, through, looks like, November 1, 2019.
(Exhibit 6 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Ms. Lerman, have you had an opportunity to look at this briefly?
MR. FROST: Is she on these emails?
MR. ZUR: Well, we'll get to that.
MR. FROST: Okay.
THE WITNESS: Briefly.
MR. FROST: So I'm -- okay. We'll get there when we get there.
THE WITNESS: Briefly.
BY MR. ZUR:
Q Okay. Do you know who Michelle Klein is?
**A Yes.**



Q And who is Michelle Klein?
**A Assistant.**
Q Assistant?
**A To the family.**
Q Assistant for the family in?
**A Mm-hmm.**
Q Doing what?
**A Assisting.**
Q Can we be a little bit more specific? Assisting with anything?
**A Whatever the family asks.**
Q Like, would she pick up dry cleaning?
**A She might.**
Q Okay. It says -- on the first page, there's an email dated October 18, 2019, from Michelle Klein to Shingly -- and I'm assuming that's Shingly Lee -- and Eleda Cohen, and her signature block says, "accountant."
Does that -- is that an accurate recitation of at least part of her role for the family, Michelle Klein's?
**A I don't know.**
Q Okay. If you go to page 4 out of 5, there's an email from Jeff Lerman to multiple recipients, and it's Jeff@lermanlaw.com. Was that your law firm's email?
**A Yes.**
Q Okay. And you guys were partners at the time?



**A Yes.**
Q Okay. And the first paragraph of the email says, "Richard" -- and this is to someone named Rich Bunt. It says, "Please be advised that Lerman Law Partners, LLP, represents Robert Cohen in his capacity as trustee of the Cohen Family Trust and in his individual capacity and Eleda Cohen in connection with your proposed engagement agreement and conflict of interest letter."
The Cohen Family Trust that's referenced in that email, is that the family trust of which you're the cotrustee?
**A I have no idea. I've never seen this.**
Q Were you aware of your husband's representation of your father either in his personal capacity or as trustee of the Cohen Family Trust?
**A No.**
Q Does it surprise you that your husband, or at least according to this document, represented your father?
MR. FROST: Objection. Argumentative.
MR. RICHARDS: Objection.
MR. FROST: Objection. Argumentative.
MR. RICHARDS: Assumes the fact not in evidence.
MR. FROST: Did you get both those?
THE STENOGRAPHER: I did not get your full objection.
MR. FROST: Objection. Argumentative. Speculation.

Assumes facts not in evidence. Overly broad to the -- and incomplete hypothetical to the extent he's asking you "does it surprise you," which is an inherently open-ended question.
THE WITNESS: I don't know anything about this.
BY MR. ZUR:
Q Okay. But would it surprise you to know or to hear that your husband represented your father?
MR. FROST: You do not have to assume that.
MR. RICHARDS: Objection. Assumes the facts.
MR. FROST: Yeah. You do not have to assume that fact to be true.
THE WITNESS: I don't know anything about this email and what it says.
BY MR. ZUR:
Q Did your husband have -- or have today -- the experience to advise somebody, anybody, about an engagement agreement and conflict of interest letter?
MR. RICHARDS: Speculation. Improper hypothetical. Calls for expert opinion.
MR. FROST: It's also vague and overbroad.
MR. RICHARDS: And marital privilege.
THE WITNESS: He has knowledge of engagement agreements and conflict waivers. But I don't know the level of his expertise.



BY MR. ZUR:
Q Okay. Over the years, did your father call you or your husband with one-off legal questions?
MR. RICHARDS: Objection. Vague. Overbroad.
THE WITNESS: I don't know what he called my husband to ask. With me, no.
BY MR. ZUR:
Q Okay. Do you know if your father had ever consulted Ezra Cohen on legal matters?
MR. FROST: Objection. Speculation.
THE WITNESS: I don't know.
MR. ZUR: This next document is Exhibit 7. It's a document entitled -- for the record, it's a document entitled, "Declaration of Eddie Ezra Cohen in support of Plaintiffs' opposition to Defendant's motion for partial summary judgment." And it looks like a document that was filed in the United States District Court, Central District of California, Western Division. And at the top of the document, it has a case number and an ECF stamp showing that it was filed 9/26/11.
(Exhibit 7 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Take a moment, Ms. Lerman, and let me know when you've had a chance to look at this.



**A I'm --**
MR. FROST: Have you --
THE WITNESS: -- looking at the pages. It's long, and I've never seen it.
BY MR. ZUR:
Q Okay. Take a look at the -- at page 1. And I'm talking about the -- at the bottom where it says "1." Paragraph 1. Actually, paragraph 2 where it says, "Since 1985, I have provided legal counsel to Plaintiffs," and the plaintiffs are defined as Burton Way Hotels, LLC, Burton Way Hotels, Limited, and A.C.C. Company "regarding various real estate and financing matters, including without limitation the negotiations and execution of financing agreements, hotel management agreements, and ground leases. I served primarily in," quote, "'in-house capacity advising Plaintiffs directly on legal matters and working directly on their behalf with their outside counsel on various matters."
Does this refresh your recollection as to what Ezra Cohen might have done in connection with Burton Way Hotels or any of the other businesses related to your family?
MR. FROST: Objection. Speculation. Foundation. It's also vague and overbroad to the extent the question asks what he, quote, "might have done."



If you know, you know. If you don't, tell him you don't know.
THE WITNESS: No. I don't know.
BY MR. ZUR:
Q And over the last 15 years, have you had regular or semiregular interactions with your cousin, Ezra Cohen?
**A No.**
Q How often do you speak to him?
**A I haven't spoken with him in a really long time.**
Q Has it been years?
**A I don't remember when I saw him last. Maybe Thanksgiving.**
Q Do you guys regularly get together for Thanksgiving? When I say "you guys," members of your family.
**A Sometimes.**
Q Okay. Did you have Thanksgiving dinner last year together, 2024?
**A You mean together with Ezra? Is that what you're asking? Did I --**
Q Let me be more specific. With one of, or all of, Ezra, any of your siblings?
MR. FROST: Well, one of or all of?
MR. ZUR: Let's go with one of.
MR. FROST: Okay.

93

THE WITNESS: Yes.
BY MR. ZUR:
Q And who was that? Which of them?
**A I couldn't say everyone that was there. My mom, my siblings, my kids. Some of Eddie's -- Ezra's family. I don't remember if Ezra was there.**
Q Okay. How about the year prior, in 2023?
**A I don't remember.**
Q Do you remember the last Thanksgiving that you had before your father passed?
**A I don't remember.**
Q And he -- did he pass in 2023?
**A Yes.**
Q Okay. So would the last Thanksgiving before his passing, would that have been in 2022?
**A Are you asking me if the Thanksgiving before he died was --**
Q Yes.
**A Yeah -- I think that's the calendar.**
Q And do you not remember going to Thanksgiving dinner --
**A I don't remember.**
Q -- for the last time?
**A I don't.**
Q I'm sorry. Let me just finish the question.

94

Do you remember the last Thanksgiving you had with your father?
**A I don't remember.**
Q Okay. Do you remember having Thanksgiving dinner with your siblings in 2022?
**A I don't remember.**
Q Okay.
(Side discussion between Mr. Zur and Mr. Sohaili.)
BY MR. ZUR:
Q Do you remember having any conversations with any of your siblings about Hush, Mr. Sohaili, or about -- or about Blue Jay?
**A No.**
Q Do you remember having any conversations with them about Hush in -- on Thanksgiving or at a Thanksgiving dinner?
**A No.**
Q And just to clarify, I'm referring to 2022. And your answer was "no"; is that right?
**A Right. My answer was "No."**
**I don't remember.**
Q And it's still "no" now that you know that I'm referring to Thanksgiving of 2022?
**A No.**

95

Q Okay.
MR. ZUR: All right. This next document is going to be Exhibit 8. And for the record, it's a document entitled, "Declaration of Daniel Shlomi," which was filed in the bankruptcy case of S&W Blue Jay Way, LLC, on January 10, 2025, according to the ECF stamp at the top.
(Exhibit 8 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Ms. Lerman, please take a few minutes and just review the document.
MR. RICHARDS: Objection. I'm going to --
MR. FROST: Yeah.
MR. RICHARDS: -- I'm going to object to any line of questioning on the witness commenting on someone else's testimony and a summary judgment motion. Completely improper for her comment on that testimony.
MR. FROST: Have you -- have you seen this document before?
THE WITNESS: No. And --
MR. FROST: Okay.
THE WITNESS: -- I don't know anything about it.
MR. FROST: Okay.
MR. ZUR: I promise I've got questions, and you can object, if it's necessary.

96

MR. FROST: Well, if you want to ask her specific questions about the document, you can do that. But I'm not going to make her sit here and read the whole document on something she already said she doesn't know.
MR. ZUR: We'll get to it.
MR. FROST: Okay. And that's fine. I'm just saying we're not going to burn five or ten minutes making her read this document. If you have something you want her to look at, we'll deal with it one question at a time.
MR. ZUR: Okay.
BY MR. ZUR:
Q Ms. Lerman do you know who Daniel Shlomi is?
**A No.**
Q Okay. If you take a look at paragraph 5, do you have any -- any reason to believe that what's in paragraph 5 is inaccurate?
**A I don't know anything about this.**
MR. FROST: Objection. Improper --
MR. ZUR: I understand.
THE WITNESS: Okay.
MR. RICHARDS: Totally improper.
BY MR. ZUR:
Q I'm only asking if you have any reason to believe that anything is inaccurate.
**A I can't answer that --**

MR. FROST: You're not getting -- hold on.
THE WITNESS: -- 'cause I don't know anything about its.
MR. FROST: Yeah.
THE WITNESS: I wouldn't know if it's accurate, if it's inaccurate, I don't know who this is, never saw this before. Don't know anything about this.
MR. ZUR: I understand.
THE WITNESS: So --
MR. ZUR: I understand.
THE WITNESS: -- I have no idea.
MR. ZUR: And is --
MR. RICHARDS: Roye, I'm getting very close to suspending the depo and moving for a protective order. This is ridiculous testimony about you showing her your summary judgment declarant and asking her if there's anything inaccurate. This is ridiculous and improper.
I'm going to move -- if you keep going down this question [sic], I'm going to move to suspend this deposition and we'll litigate it in front of the judge.
BY MR. ZUR:
Q Okay. Same question as to paragraph 6. Any reason to believe that anything is inaccurate in this paragraph?
MR. FROST: Objection.



THE WITNESS: I can't answer.
MR. FROST: Speculation. Hold on one second. Objection. Foundation. Speculation.
You can answer.
THE WITNESS: I can't answer. I don't know anything about this.
MR. ZUR: Okay.
THE WITNESS: I can't comment.
MR. FROST: So to be clear, you do not know anything about whether it's accurate, inaccurate, anything about it; right?
THE WITNESS: Exactly.
MR. FROST: Okay. Very good.
(Side discussion between Mr. Sohaili and Mr. Zur.)
BY MR. ZUR:
Q Okay. And then the same question as to paragraph 7.
**A I don't know anything about this.**
Q Okay.
**A Anything to do with this.**
Q Okay.
MR. FROST: I'll move to -- objection. Foundation. Speculation. Improper hypothetical.
MR. ZUR: All right. This next document is Exhibit 9.



The document entitled, "Declaration of Hushmand Sohaili in support of debtor's motion for summary judgment and its objection to Claim 2-1 of Blue Jay 180, LLC." And it's a document also that was filed in the bankruptcy case on January 10, 2025, with an -- has an ECF stamp at them top.
(Exhibit 9 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q I'm not going to make you read this whole document. Have you ever seen it before?
**A No.**
Q Okay. Take a look at paragraph 5. Do you have any reason to believe that what's in paragraph is inaccurate?
**A I've never seen this.**
MR. FROST: Roye, let's --
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. FROST: Go ahead and answer the question.
THE WITNESS: I have no idea.
MR. FROST: Okay. So, Roye --
THE WITNESS: I don't know anything about this.
MR. FROST: Let's not keep doing this. I mean, you know, this is not going to be admissible anyway as she has



no idea about any of this information. So if you want to ask her whether she -- whether she knows of those facts, that's one thing. But to ask her the loaded, argumentative question of "do you have any reason to believe it's not true," ask her if she knows it one way or the other. And maybe you have a different issue. But if you just keep asking her, "Do you have a reason to believe that's not true," we just -- we really are just wasting time.
MR. ZUR: I understand. I do want to go through and establish that she doesn't know of a specific --
MR. FROST: Yeah. But --
MR. ZUR: -- paragraph.
MR. FROST: Yeah. But that's not what you're asking. You're asking the loaded question of does she have any reason to believe it's not true.
MR. ZUR: Okay. I can --
MR. FROST: And that's -- just ask her the question, "Do you have any knowledge one way or the other," and I'll let her answer that.
MR. ZUR: All right.
THE WITNESS: Hush was my dad's attorney.
MR. FROST: Okay. There no --
THE WITNESS: Sorry.
MR. FROST: -- there's no question pending.

101

BY MR. ZUR:
Q Okay. Do you have any knowledge as to paragraph 5, one way or the other?
**A I don't have any knowledge of anything in this. I've never seen this document before.**
MR. FROST: Okay.
THE WITNESS: Hush was my dad's attorney.
MR. ZUR: Okay.
THE WITNESS: So I'm not reading this word by word. But if it's saying that he wasn't, then that's just not true.
BY MR. ZUR:
Q Okay. My question was as to paragraph 5. And for the record, paragraph 5 reads, "Based on the results of a reasonable search by Akin Gump as part of discovery and my understanding of Akin Gump's policy, the Cohen Trust does not and never has been a client of Akin Gump."
My specific question as to this paragraph is: Do you have any knowledge as to what's in this paragraph?
MR. LONG: Well, objection. Asked and answered. Argumentative.
MR. RICHARDS: She answered it.
THE WITNESS: Hush was my dad's attorney.
BY MR. ZUR:
Q Well -- but that wasn't my question. I'm

102

asking --
**A Okay.**
Q I'm sorry. But I'm asking is about what it says in paragraph 5.
**A Yeah. Okay. So I don't know anything about this, so I can't.**
MR. LONG: Hold on. Hold on. I'm going to object 'cause that's misleading. Because paragraph 5 relates exactly to what she just testified about. So now you're trying to trick the witness. Counsel --
MR. RICHARDS: You're digging your own grave here. Why don't you just ask her the elephant in the room. What is your understanding what Hush's relationship was with respect to her dad? Why don't you ask her that question instead of dancing around it?
MR. ZUR: I don't need you to tell me what questions to ask. Thank you, though, for the advice.
MR. SOHAILI: He's not representing --
MR. RICHARDS: Well, you're totally wasting my time.
MR. ZUR: You're wasting my time by interjecting constantly.
MR. RICHARDS: I can't wait for you to argue to the judge or try to show the witness a declaration and summary judgment that she's never seen and ask her if she thinks it's accurate or not.

103

MR. ZUR: Okay.
MR. RICHARDS: That's not really relevant what she thinks.
MR. FROST: Can I cut through this for a second?
Do you have any information whatsoever concerning Akin Gump and its databases or search processes?
THE WITNESS: No.
MR. FROST: Okay. And the statement in that paragraph that says the Cohen Trust is not and has never been a client of Akin Gump, do you have an understanding, one way or the other, as to whether or not that's true?
THE WITNESS: That's false.
MR. FROST: Okay.
BY MR. ZUR:
Q Okay. And when you say "that's false," what does that --
MR. RICHARDS: Why is that false?
BY MR. ZUR:
Q Yeah. Why is that false?
**A 'Cause Hush was my dad's lawyer.**
Q Paragraph 5 talks about the Cohen Trust.
**A Yeah. But that's my dad.**
Q Your dad and the Cohen Trust are the same?
**A Yes. It's a revocable living trust.**
Q Okay.

104

**A Yes.**
Q And --
**A They're one and the same.**
Q Okay. Do you -- if we go back to Exhibit 6, which is the email correspondence from your husband in October of 2019, where it says, "Lerman Law Partners represents Robert Cohen in his capacity as trustee of the Cohen Family Trust and in his individual capacity," is that -- are those one and the same, Robert Cohen in his individual capacity and Robert Cohen in his capacity as trustee?
**A As I said, I don't know anything about my husband's email. Sorry.**
Q Okay.
MR. RICHARDS: Oh, my God. Pick up the mic.
THE STENOGRAPHER: I'm sorry?
MR. RICHARDS: No. There was a mic drop a minute ago. I had to pick it up. We're good now.
(Side discussion between Mr. Sohaili and Mr. Zur.)
BY MR. ZUR:
Q If you look at paragraph 13, do you have any knowledge of anything that's in paragraph 13?
MR. FROST: Objection. Vague and overbroad.
MR. LONG: And also objection. Compound.

MR. FROST: And speculation.
THE WITNESS: I don't know anything about paragraph 13.
MR. LONG: Other than what you've already testified --
MR. ZUR: She testified that --
MR. LONG: -- correct?
THE WITNESS: -- that -- I don't -- that doesn't conflict with anything that I already testified. My dad always thought of Hush and knew that he was his lawyer. But I don't know anything about informing Robert Cohen in writing. I don't know who Daniel Shlomi is.
MR. FROST: You --
THE WITNESS: I just --
MR. FROST: You've answered the question.
THE WITNESS: Yeah.
BY MR. ZUR:
Q If you look at paragraph 16 -- I know it's slightly longer -- do you have any knowledge of what's in paragraph 16 other than what you've already testified?
MR. FROST: Objection. Foundation. Speculation. Argumentative and compound. And do you want her to include the footnote as well?
MR. ZUR: Yes.
THE WITNESS: I don't have knowledge of the fall and what happened and who knew what. So I can't comment.



BY MR. ZUR:
Q Do you know who Andrew Kirsh is?
**A No.**
Q You haven't heard that name ever?
**A Not that I recall.**
Q Okay. Paragraph 17, same question. Do you have any knowledge of what's in paragraph 17?
**A I don't know anything about the loan.**
Q I understand.
**A So this --**
Q Just bear with me?
**A -- this considers -- I did not consider the legality of the interest rate and the loan, and I don't know anything about the loan. So I can't answer that.**
Q Okay.
MR. FROST: Objection. I'm going to object to this whole line of question as argumentative, compound, speculation. Although I know we normally don't need to reserve these objections in a deposition, you are also asking her to speak to statements that constitute hearsay or improper legal opinions.
BY MR. ZUR:
Q Do you have any knowledge of the contents of paragraph 18?
**A I don't know anything about the loan whatsoever.**



Q And just for the record, when you say "the loan," paragraph 18 refers to a different loan than the loan we've been talking about.
**A I didn't know that. I -- you're just asking about a document I've never seen, about conversations I know nothing about, so I can't comment.**
MR. RICHARDS: Objection. Counsel can't testify that it's a different loan. Don't assume anything he's telling you, you need to accept as true.
BY MR. ZUR:
Q Okay. Same question as to paragraph 19. Do you have any knowledge of any of the contents of paragraph 19?
MR. LONG: Objection. Compound.
THE WITNESS: I don't know.
MR. LONG: Lacks foundation.
THE WITNESS: I don't know anything about loan documents, interest rate, the conversation that it references. The usury issue. I know nothing about what's in paragraph 19.
MR. FROST: And I'll incorporate my prior objections.
MR. ZUR: Okay.
All right. I need a break because I need some water.
MR. FROST: Okay. Very good.
THE STENOGRAPHER: Mr. Richards, is that okay?



MR. RICHARDS: That's -- how long will the break be?
MR. ZUR: Five minutes. Thank you.
MR. RICHARDS: All right. Let's go off the record.
MR. FROST: Yeah. I need a break. Just saying.
THE STENOGRAPHER: Off the record at 11:33 a.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 11:55 a.m.
MR. ZUR: Okay.
THE STENOGRAPHER: Next one will be Exhibit 10.
MR. ZUR: Thank you. You read my mind.
(Exhibit 10 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Ms. Lerman, take a minute to familiarize yourself with this document. For the record, this is a document entitled, "Complaint for, one, legal malpractice, two, breach of fiduciary duty, three, elder abuse," and then it references a code section.
MR. RICHARDS: All right. That -- I'm not going to allow her to answer any questions about the complaint that we filed in the other case. I'm going to suspend the deposition. So if you want to go into that, we're not going to take discovery in a case where, especially yesterday, your client's other lawyer individually filed a motion for stay in that case.

So I'm going to suspend the deposition. You're going to go through our legal malpractice case. So we can take it up with the judge. So that -- if you want to go into that exhibit, that's what I'm going to do. And I'll move for a protective order. You're not going to take state court discovery in this case --
MR. ZUR: This is not state --
MR. RICHARDS: -- on a case that was remanded by the court. I don't care what you say. We're not going to argue it. I'm going to suspend the deposition. So if you want to go into this exhibit, the deposition's over. We're done.
MR. SOHAILI: Just get that on the record.
MR. ZUR: Yes.
MR. SOHAILI: And -- and, Ron, this case was in the other case, and the questions are whether she knows.
MR. FROST: No. Hold on. Hold on.
MR. ZUR: Hold on.
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. FROST: So here's what we're going to do. Given what Ron said, either -- why don't you just move on to the next exhibit that is not this one and let's finish up what we can. And then we'll have that fight if we have to.



MR. ZUR: I think that's a great --
MR. FROST: Okay.
MR. ZUR: -- idea. So we will move on from Exhibit 10 for now, and we will come back to it. Okay? And then Mr. Richards can say what he wants.
This next document is Exhibit 11.
MR. FROST: Should we mark this Exhibit 10 since we're not going to use the other one and it will just be the subject for later?
MR. ZUR: We've already marked it as Exhibit 10, so we'll just come back to Exhibit 10 and this is now Exhibit 11.
MR. FROST: Okay.
(Exhibit 11 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
MR. RICHARDS: What is it?
MR. ZUR: So for the record, Exhibit 11 is a document bearing Bates number 180 Blue Jay 0292 through 0298. And it is a -- looks like a recorded document recorded in the Recorder's office in Los Angeles County and has a recorder's number. The title of the document, which is on the second page, is "Assignment and Deed of Trust with assignment of rents (long form)." And it's -- on the third page, there's a longer subject -- longer title. And it's dated April 26, 2023.



BY MR. ZUR:
Q Ms. Lerman, have you had an opportunity to look at this document briefly, just to familiarize yourself with it?
**A Yeah.**
Q And can you tell --
MR. LONG: Counsel, can I -- this is Geoff Long. I'm just asking you to provide the -- document recorded documented number that would be -- that way to identify for us?
MR. ZUR: Yes. No problem. It's -- on the first page, it says 20230286457.
MR. LONG: Thank you.
MR. ZUR: You're welcome.
BY MR. ZUR:
Q Can you tell me what this document is, Ms. Lerman?
**A I've never seen it.**
Q Okay. And having had admittedly a limited opportunity to read through it, can you tell me what it is?
MR. FROST: Objection. It assumes facts not in evidence. Speculation. Foundation, given that she said she's never seen it.
THE WITNESS: It's not my area of the law.



MR. RICHARDS: My objection is the document speaks for itself.
THE STENOGRAPHER: And I didn't hear the full answer.
THE WITNESS: It's not my area of law, so I can't -- I can't comment as to this document.
BY MR. ZUR:
Q And what area of law would you say this document falls into when you say --
**A I don't know.**
Q Not --
**A I don't know. Lending, real estate, I don't know 'cause it's not my area.**
Q Understood. So in the Bates page 0295, it says under the heading "Recitals."
**A What do you mean by that?**
Q At the bottom right, there's a Bates number?
MR. FROST: Right here (indicating).
THE WITNESS: Oh, got it. Okay.
MR. FROST: Looking right here.
THE WITNESS: Okay.
BY MR. ZUR: Know
Q It says under "Recitals," "No all men by these presents, that in consideration of the sum of $10 lawful money of the United States and other good and valuable consideration, to it in hand paid at or before the

113

ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, Assignor does hereby grant, bargain, sell, assign, transfer and set over unto Assignee," et cetera, et cetera.
When it says, "other good and valuable considerations," do you have any idea what that refers to?
MR. FROST: Objection. Speculation. Foundation.
I'm going to instruct you not to answer any questions concerning the document you've never seen before.
(Witness instructed not to answer.)
MR. ZUR: Of course I'm only ask to ask -- I'm only asking if she has knowledge.
THE WITNESS: I don't know any --
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. FROST: All right. But you're asking what she understands a document to mean that she's never seen before.
MR. ZUR: So let me clarify.
MR. FROST: Please.
BY MR. ZUR:
Q I am not asking for your interpretation of the document. I'm asking you if you know -- and this is a

114

"yes" or "no" -- if you know what this refers to?
**A No.**
MR. FROST: Okay. But you --
Okay. Did you get her answer?
THE STENOGRAPHER: I did.
MR. FROST: For future reference, that's exactly what you're asking her to do is interpret the document. You're saying, "Do you know what is referred to within the document," that she said she's never seen before. That's my issue. But she's answered your question.
MR. ZUR: Okay.
BY MR. ZUR:
Q If you look at page bearing Bates number 0296, so that's the page with the signature, you see under assignor, it says "Robert Cohen, by Eleda Cohen as his attorney in fact." Is that Eleda Cohen's signature?
**A Yes.**
Q Now, you stated earlier that you don't know anything about the Blue Jay loan; is that a correct --
**A Correct.**
Q -- depiction of your testimony?
Okay. Do you know who of the other trustees does know about this loan? It's just a "yes" or "no." Do you know?
**A Yes.**

115

Q And who would that be?
**A Eleda, my sister.**
Q Okay. And I'm not asking you to speculate, but do you know what she would know --
**A No.**
Q -- about it?
Okay. Would your mother know anything about this loan?
**A I don't know.**
Q Okay. Have you ever heard of the entity referenced at the top of the page bearing the Bates stamp 0295? Just before the defined term "assignee," there's an entity -- or there's a name of something, and it says, "Blue Jay 180, LLC, a California limited liability company.
Have you ever heard of that?
**A Not until I got the subpoena.**
Q Okay. And you had never seen this document before?
**A Correct.**
Q You hadn't seen it before today?
**A Correct.**
Q Do you have any ownership interest in this entity, Blue Jay 180, LLC?
**A I have no idea.**

116

Q Have you ever received anything in the mail from this entity?
**A Not that I know of.**
Q Okay. Do you know if the Cohen Family Trust, the trust of which you are a cotrustee, whether that trust has any ownership interest in that entity?
**A I have no idea.**
Q Do you know if Eleda Cohen knows?
**A I don't know what she knows. I assume so. I'm guessing.**
Q Don't guess.
**A Okay.**
Q Would --
MR. RICHARDS: I'm going to move to strike the guessing.
MR. FROST: She -- it's fine, Ron. She didn't guess.
BY MR. ZUR:
Q Would -- does Ernest Cohen know?
**A I don't know.**
MR. RICHARDS: If she's never seen or heard of the entity, how would she know if anybody else knows? These are ridiculous questions. They're just harassing.
MR. ZUR: Okay. So we're going to mark the next document Exhibit 12. For the record, it's an e- -- it looks like a letter dated December 13, 2024. And it's

from the law firm Kibler, Fowler & Cave, LLP. And it's addressed to Mr. Richards.

(Exhibit 12 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)

BY MR. ZUR:

Q Ms. Lerman, have you ever seen this document before?

**A No.**

Q Have you ever heard of the firm Kibler Fowler & Cave before?

**A No.**

Q If you look at page 2, the second paragraph beginning with "You have made several factual representations to the Court" -- I'm only asking if you have knowledge -- do you have any knowledge of anything that's stated in that paragraph?

MR. FROST: Objection. Vague. Overbroad. Compound. Speculation.

THE WITNESS: I don't know anything about this.

MR. LONG: Lacks foundation. Calls for legal opinion, conclusion.

MR. RICHARDS: Irrelevant and not reasonably calculated -- calculated to lead to the discovery of admissible evidence.

///



(Simultaneous cross talk interrupted by the stenographer.)

MR. RICHARDS: Let the record reflect you're showing her a letter that Hush's individual lawyer wrote to me, and you're asking this witness to comment on that letter.

MR. ZUR: I am asking if she knows about it.

THE WITNESS: I don't.

BY MR. ZUR:

Q Okay. The paragraph on the same page, beginning with "You know that if the debtor prevails on its usury defense," this continues into the next page for two lines, have you -- do you have any knowledge of what's in that paragraph?

MR. FROST: Same objections. It also calls for a legal conclusion given the fact that the paragraph is referencing case law and -- or at least law and references to legal consequences.

THE WITNESS: I don't know anything about it.

BY MR. ZUR:

Q On page 3, the bullet point that starts with "You have taken entirely inconsistent positions" and continuing into page 4, do you have any knowledge of what's in that bullet point?

MR. FROST: Same objections.

THE WITNESS: I don't know what --



MR. LONG: Join. Same objections.

THE WITNESS: I don't have any information.

BY MR. ZUR:

Q Okay. Same question as to the next bullet point, the one that starts "You have taken the position in the adversary proceeding that the four-year statute of limitations does not apply."

MR. FROST: Same objections.

THE WITNESS: I don't know anything about it.

BY MR. ZUR:

Q Okay. Next page, page 5. The first full bullet point. Do you have any knowledge of the content of that bullet point?

MR. FROST: Same objections.

MR. LONG: Hold on.

MR. FROST: Other --

MR. LONG: Hold on.

MR. FROST: Geoff --

MR. LONG: Hold on.

MR. FROST: Geoff, give -- this is Chris. Give me a second.

MR. LONG: Sure.

MR. FROST: Same objections. Other than issues on which you have already testified.

MR. LONG: And so this is Geoffrey Long. Can I get



the date of this document again?

MR. ZUR: December 13, 2024.

MR. LONG: December 13.

MR. ZUR: Yes.

MR. LONG: You're cutting out a little bit.

MR. ZUR: Yes. December 13, 2024.

MR. LONG: Okay. Hold on. Okay. Now what -- what paragraph are you asking about? Which page, what paragraph?

MR. ZUR: Page 5, first -- first full bullet point.

MR. LONG: Okay. So here's the problem with this. This is what Mr. Richards was raising before. These -- all of these bullet points are premised with the statement, "The most egregious misrepresentations you have made to the Court in the adversary proceeding are summarized below."

The adversary -- adversary proceeding is the state court action that's been remanded in state court. We're not going to let you now do a roundabout on what you were trying to get by showing her the complaint by asking questions that are in Mr. Sohaili's attorney's letter. So we're not going to go here.

MR. ZUR: This bullet point references evidence in the bankruptcy proceeding. It references the bankruptcy proceeding and it's what we're talking about now.

MR. LONG: No. No.
MR. RICHARDS: It's been remanded.
MR. LONG: It says --
MR. ZUR: It talks about -- it --
(Simultaneous cross talk interrupted by the stenographer.)
THE STENOGRAPHER: One at a time, please.
MR. LONG: On the -- read the introductory sentence, all the bullet points on the top of page 3.
MR. ZUR: Okay. I'm on page 5.
MR. LONG: Right.
MR. FROST: Can -- can I --
MR. LONG: And those are still bullet points under that -- under that introductory statement. Adversary --
MR. FROST: Okay.
MR. LONG: -- proceeding was ruined by your client to the bankruptcy court. That's why there were citations to bankruptcy proceedings but then the state court action was removed and then remanded.
MR. FROST: Can I --
MR. LONG: So these are all, again, questions related to the state court action.
MR. FROST: Can I --
MR. LONG: Not going to take discovery on the state court action in this deposition.



MR. FROST: Objection. Can I make a suggestion on how to deal with this so, for the benefit of the witness, we can close today's deposition other than on that issue?
Other than your statement that you believed that Hush was your father's attorney, do you know anything either way about any of the content of this letter?
MR. LONG: Well, not --
MR. FROST: And if the answer --
MR. LONG: I'm not okay -- sorry. Mr. Long. I'm still not okay with that because the content of this letter involves a pending state court action with numerous causes of action and allegations, and you're asking her about four pages of argument by counsel in a letter regarding that the allegations and the claims in that state court action.
MR. FROST: Yeah.
MR. LONG: So I'm still not okay with that summary basis.
MR. FROST: Yeah. And I understand. My job is to protect the witness. And so my view of it is if the witness doesn't know anything about this letter other than the fact that she believed Hush was her dad's lawyer, then I'm willing to let her say that on the understanding so that we can close this academic issue and on the understanding that nobody will argue that that is a waiver



of any arguments that you maintain with respect to taking discovery in the state court action.
Is that fair? Can everybody live with that?
MR. ZUR: I can. Thank you.
MR. LONG: No. That's not fair. Because that's limiting the areas that she may have knowledge on in the state court action regarding the claims in that action that are summarized and argued by Mr. Sohaili's attorney in this letter.
MR. FROST: All right.
MR. LONG: (Indiscernible), for example, the allegations and merit of the elder abuse claim, the allegations and the merit of the legal malpractice claim. The allegations and the merit of the breach of the fiduciary duty claim.
MR. FROST: All right.
MR. LONG: So I'm not okay with that.
MR. FROST: Listen, Geoff, I understand your point. I'm not getting in the middle of that, if that's their position. Then set it aside. And we'll deal it with respect to Exhibit 10 as well. Okay?
That's the only thing I know to do with it. I'm not getting in the middle of a dispute over what's proper and not proper in the context of one litigation versus another. And we will let you guys fight that out, and we



will produce a witness again or not produce a witness again based on what the court says.
What exhibit is this?
THE STENOGRAPHER: 12.
MR. ZUR: 12.
MR. FROST: All right. So we're not going to answer any more questions about Exhibit 12. You can reserve that with Exhibit 10.
MR. ZUR: I have one question about Exhibit 10. Just one.
MR. FROST: About 10?
MR. ZUR: Yeah.
MR. FROST: All right. What's the question?
BY MR. ZUR:
Q Have you ever seen this document before?
**A No.**
Q Thank you.
MR. FROST: Is that your only question you had about that one?
MR. ZUR: Yeah.
MR. FROST: So we can set that issue aside?
MR. ZUR: We can set the issue aside and come back to it after the court orders.
MR. FROST: Okay.
MR. ZUR: And I just for the record, I have -- I did

earlier reserve the ability to respond to -- I didn't -- I don't know if you said it specifically or not, Chris, but if you're going to move for a protective order on the confidentiality privacy issues that you raised earlier, I reserve the right to respond to that as well.
MR. FROST: Of course. All rights and remedies reserved.
MR. ZUR: Can I have two minutes just to make sure that if there's anything else that we address it and if not that we put it aside until -- that's --
MR. FROST: Yeah. We can deal with it in motion practice if we need to.
MR. ZUR: Sure.
THE STENOGRAPHER: Can we go off the record?
MR. FROST: Yes.
THE STENOGRAPHER: Off the record at 12:17 p.m.
(Off the record.)
THE STENOGRAPHER: Back on the record at 12:27 p.m.
MR. ZUR: Are we up to 13 now, Exhibit 13?
THE STENOGRAPHER: I believe so.
MR. ZUR: Okay.
Okay. So for the record, Exhibit 13 -- excuse me. Exhibit 13 is -- appears to be a printout of email correspondence. There was -- there are underlying emails that appear to have been sent in February of 2013. And



they were forwarded from Ezra Cohen to an email address hnj@smbgroup.com in May of 2024.
(Exhibit 13 was marked for identification by the Certified Shorthand Reporter and is attached hereto.)
BY MR. ZUR:
Q Ms. Lerman, just if you can, please take a quick look at this exhibit and let me know when you've had a chance to do that.
**A Okay.**
MR. FROST: I'll object to the record any questions on this document that she's not a party to. Speculation and foundation.
BY MR. ZUR:
Q Ms. Lerman, have you ever seen these emails before?
**A No.**
Q Okay. The latest one before it was forwarded -- okay? -- so at least according to this document, the one -- the email that was sent on Friday, February 22, 2013, at 9:28 a.m., is that Shingly's email address --
**A Yes.**
Q -- in the "from"? It is?
**A Yes.**
Q Okay. And is that Ezra Cohen's email address in



the "to"?
**A I don't know.**
Q Okay. So the email says, "Hi Ezra. R.C. wanted to ask if you could review these documents and call him to discuss. Hush needs the docs to be signed this morning, so if you could do this right away, we'd appreciate it. Thanks Shingly."
Is the reference to R.C., is that your father?
MR. FROST: Objection.
MR. ZUR: Here. Let me rephrase.
MR. FROST: Please.
BY MR. ZUR:
Q Did people refer to your father as "R.C."?
**A Yes.**
Q Okay. Is it possible then --
MR. FROST: No.
MR. ZUR: Possible.
MR. FROST: Don't do it. Don't go there. Don't do it.
BY MR. ZUR:
Q Okay. What was Shingly's position again?
**A Assistant.**
Q Okay. She was an assistant to your father?
**A To -- yes. To my father, his entities.**
Q And --



**A I --**
Q Sorry. And what did she do for your father in her role as assistant, from what you remember?
**A Too many things to name. Anything. Arranging a driver, arranging housekeepers, anything that was needed.**
Q Okay. And so did she communicate with lawyers on your father's behalf?
**A I would think so.**
Q Okay.
MR. FROST: You know or you don't.
THE WITNESS: I'm just assuming.
MR. FROST: Yeah. Let's not assume.
THE WITNESS: But...
BY MR. ZUR:
Q Okay. Is that something that she -- is it within the range of her duties?
**A What, to --**
Q To communicate with lawyers?
MR. RICHARDS: Misstates her testimony.
MR. ZUR: I'm asking a question.
MR. RICHARDS: No foundation. Lack of personal knowledge. No foundation. Lack of personal knowledge.
MR. FROST: Did you finish your question?
MR. ZUR: I think I did.
MR. FROST: Did you get the full question?

129

THE STENOGRAPHER: Yes.
MR. FROST: Can you read the question back to me, please?
THE STENOGRAPHER: Question, "Is that something that she -- is it within the range of her duties?"
Answer, "What, to --"
Question, "To communicate with lawyers."
MR. FROST: Okay.
THE WITNESS: I don't think so.
MR. FROST: Okay.
THE WITNESS: No.
BY MR. ZUR:
Q It was not within the range of her duties to communicate with lawyers?
**A No.**
Q If your father wanted to set up a call with somebody, would he have asked Shingly to arrange a call?
MR. RICHARDS: Speculation.
THE WITNESS: I don't know. He might have asked my sister.
BY MR. ZUR:
Q Your sister, Eleda?
**A (Nodded head in the affirmative.)**
THE STENOGRAPHER: I'm sorry. I didn't get a verbal response.

130

BY MR. ZUR:
Q I had asked, "Your sister, Eleda?" And you said --
**A Yes.**
Q -- yes.
Okay. Reading this email, is she asking Ezra to do something?
MR. FROST: Objection. The document speaks for itself. I'm going to instruct you not to answer questions about a document you don't know anything about.
(Witness instructed not to answer.)
MR. ZUR: Okay.
MR. FROST: And maybe we can just cut through it.
Do you have any idea why Shingly is sending this email?
THE WITNESS: No.
MR. FROST: Or for under what authority?
THE WITNESS: And she would, generally, not give instructions to a lawyer.
MR. FROST: Okay. You've answered the questions.
BY MR. ZUR:
Q You stated earlier that you have -- or at least before this deposition, you did not have knowledge, much or if any, of the loan that we've been discussing; is that -- is that accurate?

131

**A Yes.**
Q Okay. Do you know which of the other cotrustees, if any, of the Cohen Family Trust knows about this loan?
**A My sister, Eleda.**
Q Okay. Anybody else?
**A I don't know.**
Q Okay. And what makes you think that she has knowledge of this loan?
**A 'Cause I saw her signature on that document you showed me.**
Q Okay. Is there any other reason that you have to believe that she has knowledge of this loan?
**A Because she's involved in this lawsuit and prosecuting this lawsuit.**
MR. FROST: So stop there. Yeah. I just want to make sure we're not stepping on attorney-client privilege and work product stuff. So if that's how you know, then let's just end your answer there.
BY MR. ZUR:
Q Can you tell me what you mean by "involved in prosecuting this lawsuit"?
MR. FROST: No, she cannot. 'Cause you're going to step on privilege if you do.
MR. RICHARDS: I would join in that. I will join in that. No way she can know unless it's privileged.

132

THE WITNESS: I actually don't know. I'm just --
MR. ZUR: Okay.
THE WITNESS: -- assuming. But -- because I wasn't involved. So I can't say what she knows or whether she was involved.
MR. FROST: And just so we're clear, I think that clears up the issue anyway. But you're just going to have to trust me, if you go any further down that line, you're going to step into what she knows because of attorney involvement by the time she even knew about the loan. That's the issue.
MR. ZUR: Okay.
MR. FROST: She -- any information along those lines she would have learned in meetings relating to counsel.
MR. ZUR: You're ta- -- when you say "she," are you referring to Ms. Lerman?
MR. FROST: Correct.
MR. ZUR: Okay.
BY MR. ZUR:
Q So have you ever spoken to your sister about this?
**A I asked her -- yes.**
Q Okay. When did you speak to her about this?
**A I asked her when I got the subpoena.**
Q Okay. And what did you guys talk about?

133

**A Just --**
MR. RICHARDS: I would object if there's a joint -- there's -- you're not entitled to talk -- get testimony or statements between the trustees in contemplation of legal advice in response to your subpoena by going to seek advice of counsel.
MR. FROST: Okay. So we're going to step out and discuss the privilege issue. We'll be back in 60 seconds.
MR. RICHARDS: We're not going off the record.
MR. FROST: Yeah, no need. We'll be right back.
(Mr. Frost, Mr. Tiraturyan, and Ms. Lehman left the conference room.)
(Mr. Frost, Mr. Tiraturyan, and Ms. Lehman entered the conference room.)
MR. FROST: All right. We're still on the record; right?
THE STENOGRAPHER: Yes.
MR. FROST: I'm going to allow the witness to answer this question on the understanding that it will not be considered a waiver of any privilege, approximate, otherwise, whatsoever, including joint defense. Okay?
MR. ZUR: Sure.
MR. FROST: All right.
All right. So re-ask your question.
///

134

BY MR. ZUR:
Q When you spoke with your sister after you received this subpoena --
**A Mm-hmm.**
Q -- right? -- you stated earlier that you had spoken to her after you received the subpoena. Did you speak with her before?
**A No.**
Q Okay. So my question is: What did you guys talk about after you received the subpoena?
**A She just said, "It's about Hush," that we're -- yeah. That "there's an action against Hush" and that's what it's about and "Shingly's handling it."**
Q She told you that --
**A That's it. Shingly.**
Q Sorry.
**A Because I didn't know anything about any documents or have any information. And she said Shingly --**
Q Did she --
**A -- is handling it.**
Q Sorry. I apologize for interrupting.
Did she explain to you what she meant by "Shingly is handling it"?
**A No. It was a very quick conversation.**

135

Q And what do you think that means that Shingly's handling --
MR. FROST: Objection. Spec- -- inherently speculative.
You're not going to guess --
MR. RICHARDS: Join.
MR. FROST: -- as to what she meant, unless she told you.
MR. RICHARDS: (Indiscernible) Shingly let me read it.
MR. FROST: Yeah. If she told you what she meant, you can answer that. If she didn't, I don't want you to guess as to what you think she might have. Okay?
So yeah. Why don't we do that? Did she tell you what she meant by that?
THE WITNESS: No.
MR. FROST: Okay.
THE WITNESS: That was a very short conversation, and that was the end of it.
MR. FROST: Okay. So I don't -- then I don't want you to guess as to what she meant.
BY MR. ZUR:
Q And you don't know what Shingly's done; is that right?
**A Right.**
MR. FROST: Outside of anything you would have learned

136

through counsel?
THE WITNESS: Right.
MR. FROST: Okay.
MR. ZUR: Okay. I have one last question.
BY MR. ZUR:
Q Do you recall a conversation in or about Thanksgiving of 2022 with your brother, Ernie Cohen, about a settlement regarding Blue Jay --
**A No.**
Q -- regarding this loan?
**A No.**
Q You do not recall that conversation?
**A No.**
Q Okay.
MR. ZUR: All right. So I think where we -- where the -- this leaves us is I have don't have any other questions other than the matters we are setting aside. The expectation is that -- will you be moving for a protective order?
MR. FROST: We'll get back to you on --
MR. ZUR: Okay.
MR. FROST: So if any motion practice is necessary, it will be coming from either my office -- a combination of Geoffrey Long, Ron Richards, and my office.
MR. ZUR: Okay. So just to be clear, the deposition

137

is not being concluded at this time. We are reserving all rights with respect to questions about this document, Exhibit 10, as well as the other matters on which your witness was instructed not to answer.

MR. FROST: And I think it is fair to say that all positions are reserved both with respect to whether any further questions should be asked and whether the deposition should remain open. And I think that's, you know, ever -- everybody reserves all their positions and we'll deal with in due course.

Fair enough?

MR. ZUR: Sure.

MR. FROST: Okay. Very good. Thank you.

THE STENOGRAPHER: Can I get orders on the record, please? Whatever anyone wants to order, just state your name first, please.

MR. FROST: Chris Frost. We're going to need a rough. Not -- I don't think we need an expedite, but a rough would be helpful.

MR. ZUR: This is Roye Zur. We'll take it at the same time.

MR. FROST: That's all we need.

THE STENOGRAPHER: Off the record at 12:40 p.m.

(Time noted 12:40 p.m.)

---o0o---

138

)
STATE OF CALIFORNIA )
)

CERTIFICATE OF REPORTER

I, JUSTYNE N. JOHNSON, do hereby certify that the witness in the foregoing deposition was by me duly affirmed to tell the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed under my direction and supervision; that the foregoing is a full, complete and true record of said testimony; that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of February, 2025.

Justyne Johnson
JUSTYNE N. JOHNSON, CSR NO. 14301

**A**

**ability**
125:1
**able**
57:13, 59:10
**above**
47:15, 47:16, 53:23, 55:9
**abuse**
7:13, 108:17, 123:12
**academic**
122:24
**accept**
107:9
**accommodate**
36:4
**according**
88:18, 95:6, 126:18
**accountant**
23:10, 87:17
**accurate**
37:12, 66:12, 68:7, 68:10, 68:19, 69:9, 69:10, 87:18, 97:5, 98:10, 102:25, 130:25
**acknowledged**
113:2
**act**
70:14
**action**
120:18, 121:18, 121:22, 121:25, 122:11, 122:12, 122:15, 123:2, 123:7, 134:12
**active**
20:2, 48:23
**actually**
49:2, 59:10, 76:2, 82:12, 82:13, 91:8, 132:1
**adding**
56:14, 56:15
**address**
35:19, 37:21, 47:17, 47:18, 66:24, 125:9, 126:1, 126:21, 126:25
**addressed**
14:7, 46:21, 47:7, 47:11, 117:2
**addresses**
66:13
**administer**
32:9
**administration**
13:1, 13:4, 13:7, 40:19, 81:17
**admired**
58:25
**admissible**
75:13, 80:4, 99:25, 117:24
**admission**
64:19
**admittedly**
111:19
**admonition**
9:23
**admonitions**
9:14
**adversary**
6:6, 6:14, 14:2, 16:2, 119:6, 120:15, 120:17, 121:14
**advice**
11:21, 11:24, 12:4, 12:5, 12:18, 12:24, 13:2, 13:8, 53:18, 56:2, 57:6, 57:13, 57:14, 102:17, 133:5, 133:6
**advise**
41:15, 52:15, 53:5, 55:15, 56:10, 89:17
**advised**
21:18, 41:6, 41:17, 56:13, 88:4
**advising**
41:15, 53:17, 56:5, 91:16
**advisor**
19:3, 19:4
**affirmative**
23:24, 25:21, 36:9, 129:23
**affirmed**
138:9
**afield**
75:16
**after**
13:7, 14:17, 14:24, 15:15, 39:4, 46:10, 85:21, 124:23, 134:2, 134:6, 134:10
**again**
9:10, 21:21, 22:12, 27:13, 33:4, 46:16, 56:3, 56:6, 120:1, 121:21, 124:1, 124:2, 127:21
**against**
134:12
**ages**
9:20
**ago**
9:19, 18:12, 104:17
**agree**
53:12, 53:15, 58:4, 71:5
**agreed**
48:6, 48:7, 48:9
**agreeing**
76:9
**agreement**
43:24, 50:18, 50:22, 55:16, 56:11, 62:14, 74:15, 80:11, 81:25, 82:3, 88:8, 89:18
**agreements**
82:17, 83:12, 89:24, 91:14
**ahead**
20:19, 99:20
**akin**
45:17, 46:18, 50:18, 51:11, 62:10, 62:12, 83:13, 83:15, 84:3, 84:13, 101:15, 101:16, 101:17, 103:6, 103:10
**al**
7:27
**all**
9:12, 19:20, 21:17, 27:5, 31:21, 32:22, 33:12, 38:9, 41:14, 41:15, 41:17, 44:15, 56:14, 57:23, 59:4, 60:11, 60:13, 70:19, 74:7, 80:15, 82:16, 92:21, 92:23, 95:2, 98:25, 100:21, 107:22, 108:3, 108:19, 112:22, 113:18, 120:13, 121:9, 121:21, 123:10, 123:16, 124:6, 124:13, 125:6, 133:15, 133:23, 133:24, 136:15, 137:1, 137:5, 137:9, 137:22
**allegations**
122:12, 122:14,

123:12, 123:13, 123:14
**allow**
108:20, 133:18
**almost**
75:16
**along**
132:13
**already**
59:16, 96:4, 105:4, 105:8, 105:19, 110:10, 119:24
**also**
4:19, 26:3, 26:16, 34:21, 42:16, 44:23, 64:7, 70:10, 71:10, 75:19, 89:21, 91:24, 99:4, 104:25, 106:19, 118:14
**although**
106:18
**always**
12:22, 34:11, 42:2, 43:24, 81:15, 105:9
**amazed**
42:14
**ambiguous**
44:24, 53:3, 59:22, 64:8
**amended**
6:8, 15:24, 82:8
**amends**
50:18
**amount**
58:23
**andrew**
106:2
**angeles**
1:22, 2:5, 3:8, 3:17, 7:19, 8:1, 8:8, 67:22, 67:24, 110:20
**another**
38:3, 42:16, 42:19, 61:25, 77:5, 123:25
**answer**
10:21, 10:22, 17:1, 17:2, 17:6, 21:24, 22:3, 22:15, 22:16, 23:20, 24:23, 25:5, 25:9, 25:14, 32:18, 36:23, 37:7, 37:9, 38:15, 41:4, 41:8, 41:12, 41:21, 47:6, 53:7, 53:9, 53:14, 55:4, 61:21, 63:13, 64:21, 65:3, 68:22, 77:8, 77:14, 85:6, 94:20, 94:21, 96:25, 98:1, 98:4, 98:5, 99:20, 100:20, 106:14, 108:20, 112:3, 113:8, 113:11, 114:4, 122:8, 124:6, 129:6, 130:9, 130:11, 131:18, 133:18, 135:11, 137:4
**answer's**
42:1
**answered**
32:16, 33:14, 49:7, 49:9, 58:5, 83:11, 101:20, 101:22, 105:14, 114:10, 130:20
**answers**
10:6, 71:6
**anybody**
17:17, 34:7, 45:2, 64:23, 89:17, 116:21, 131:5
**anyone**
24:6, 34:2, 137:15
**anything**
15:4, 15:18, 16:20, 16:21, 17:14, 20:5, 37:12, 39:13, 39:24, 58:5, 74:8, 75:3, 76:18, 76:25, 77:2, 81:8, 87:10, 89:5, 89:13, 95:22, 96:17, 96:24, 97:2, 97:7, 97:17, 97:23, 98:5, 98:9, 98:10, 98:19, 98:21, 99:23, 101:4, 102:5, 104:12, 104:23, 105:2, 105:8, 105:10, 106:8, 106:14, 106:25, 107:8, 107:16, 114:19, 115:7, 116:1, 117:15, 117:19, 118:18, 119:9, 122:5, 122:21, 125:9, 128:4, 128:5, 130:10, 134:17, 135:25
**anything's**
55:1
**anyway**
99:25, 132:7
**apc**
4:4
**apologies**
72:25
**apologize**
13:19, 21:21, 60:12, 82:12, 134:22
**appear**
125:25
**appearances**
3:1, 4:1
**appearing**
4:6, 4:13
**appears**
46:3, 46:13, 67:12, 125:23
**appease**
80:7
**apply**
119:7
**appointed**
18:18
**appointment**
18:16
**appreciate**
31:8, 127:6
**appropriate**
21:19
**approximate**
133:20
**approximately**
9:17, 14:11, 15:13, 30:15, 71:14, 71:19, 77:22
**april**
6:23, 45:16, 46:17, 110:25
**area**
71:23, 85:10, 111:25, 112:4, 112:7, 112:12
**areas**
123:6
**aren't**
66:13
**argue**
79:12, 102:22, 109:10, 122:25
**argued**
123:8
**argument**
57:23, 122:13
**argumentative**
61:20, 62:25, 88:19, 88:21, 88:25, 100:4,

101:21, 105:21, 106:17
**arguments**
123:1
**arising**
62:12
**around**
14:14, 15:14, 68:5, 102:15
**arrange**
129:17
**arranging**
128:4, 128:5
**aside**
123:20, 124:21, 124:22, 125:10, 136:17
**asked**
16:24, 17:3, 24:15, 28:4, 32:16, 33:14, 56:1, 58:20, 76:13, 101:20, 129:17, 129:19, 130:2, 132:22, 132:24, 137:7
**asking**
11:22, 16:20, 32:21, 32:25, 38:25, 39:1, 43:7, 58:20, 63:2, 63:10, 68:12, 68:17, 68:25, 70:11, 70:22, 70:24, 75:3, 76:18, 83:5, 84:6, 89:2, 92:20, 93:16, 96:23, 97:16, 100:7, 100:14, 100:15, 102:1, 102:3, 106:20, 107:4, 111:8, 113:13, 113:18, 113:24, 113:25, 114:7, 115:3, 117:14, 118:5, 118:6,
120:8, 120:20, 122:12, 128:20, 130:6
**asks**
87:11, 91:25
**aspen**
38:8
**assert**
53:2
**assign**
113:3
**assignee**
113:4, 115:12
**assignment**
7:16, 7:17, 110:22, 110:23
**assignor**
113:2, 114:15
**assist**
16:14, 23:5
**assistant**
24:5, 24:6, 87:2, 87:3, 87:5, 127:22, 127:23, 128:3
**assisting**
87:8, 87:9
**assists**
24:22
**associate**
81:21, 81:24
**associates**
4:4, 77:20, 77:25, 78:9, 78:13, 79:19, 79:23
**assume**
17:8, 37:2, 39:18, 52:16, 83:5, 84:4, 89:9, 89:11, 107:8, 116:9, 128:12
**assumes**
32:5, 51:15, 53:12, 88:22, 89:1, 89:10, 111:22
**assuming**
29:10, 36:24, 87:16, 128:11, 132:3
**assumptions**
84:6
**attached**
13:16, 16:5, 35:2, 45:14, 65:25, 86:12, 90:22, 95:8, 99:7, 108:12, 110:15, 117:4, 126:4
**attend**
19:3
**attention**
68:24
**attorney**
3:6, 3:14, 4:6, 4:13, 6:29, 11:3, 11:4, 11:7, 11:11, 11:19, 19:14, 19:15, 19:20, 23:11, 41:14, 42:3, 42:5, 42:16, 48:21, 53:18, 56:25, 58:11, 62:23, 65:23, 100:22, 101:7, 101:23, 114:16, 122:5, 123:8, 132:9, 138:19
**attorney's**
120:21
**attorney-client**
41:10, 43:9, 53:8, 53:13, 55:22, 57:5, 69:24, 70:14, 131:16
**attorneys**
42:18, 42:22, 82:18
**audible**
10:6
**audio**
57:12
**august**
14:3, 14:14, 28:9
**authority**
130:17
**automatic**
18:16
**automatically**
18:22
**available**
13:18
**award-winning**
67:20
**aware**
10:2, 28:4, 28:7, 39:3, 81:13, 81:19, 88:13
**away**
127:6

**B**

**back**
13:11, 13:23, 20:22, 21:14, 24:21, 40:16, 50:1, 50:3, 68:15, 69:16, 71:18, 76:14, 79:5, 82:6, 104:4, 108:7, 110:4, 110:11, 124:22, 125:18, 129:2, 133:8, 133:10, 136:20
**background**
58:25
**badgering**
76:4
**balance**
29:7
**bankruptcy**
1:1, 6:5, 6:13, 9:11, 14:2, 16:2, 95:5, 99:4, 120:24,

121:17, 121:18
**bar**
70:14
**bargain**
113:3
**based**
10:22, 46:23, 101:14, 124:2
**basically**
74:15
**basis**
53:8, 122:18
**bates**
35:13, 35:16, 110:18, 112:13, 112:16, 114:13, 115:11
**bates-stamped**
6:17, 7:22
**bayco**
38:5
**beach**
4:16
**bear**
64:4, 106:11
**bearing**
35:12, 110:18, 114:13, 115:11
**became**
28:17, 81:13, 81:16
**because**
16:21, 31:4, 31:5, 42:2, 44:20, 49:5, 54:25, 56:24, 57:17, 58:11, 58:22, 58:25, 64:19, 67:6, 68:24, 69:1, 76:2, 77:9, 81:5, 102:8, 107:22, 122:10, 123:5, 131:13, 132:3, 132:9, 134:17
**become**
28:7
**been**
9:2, 9:15, 11:6, 11:9, 11:11, 12:2, 14:14, 14:16, 18:10, 33:23, 33:25, 34:11, 40:25, 68:3, 70:7, 80:15, 83:24, 92:10, 93:15, 101:17, 103:9, 107:3, 120:18, 121:2, 125:25, 130:24
**before**
2:6, 9:15, 11:15, 12:6, 12:9, 14:4, 16:10, 21:3, 21:16, 23:20, 28:4, 28:11, 36:16, 36:21, 37:8, 37:11, 41:4, 42:7, 42:8, 46:4, 52:13, 63:25, 67:17, 68:15, 93:10, 93:14, 93:16, 95:19, 97:7, 99:10, 101:5, 112:25, 113:10, 113:20, 114:9, 115:12, 115:19, 115:21, 117:7, 117:10, 120:12, 124:15, 126:15, 126:17, 130:23, 134:7
**begin**
25:13
**beginning**
2:5, 16:12, 60:13, 117:13, 118:9
**behalf**
2:3, 8:18, 34:3, 43:4, 44:18, 48:14, 83:4, 91:17, 128:7
**being**
137:1
**belief**
76:5
**believe**
14:7, 54:18, 60:18, 66:11, 67:4, 83:11, 96:15, 96:23, 97:23, 99:13, 100:5, 100:7, 100:16, 125:20, 131:12
**believed**
122:4, 122:22
**below**
48:7, 53:24, 120:16
**beneficial**
29:21
**benefit**
35:9, 122:2
**best**
30:10, 30:14, 42:19
**between**
50:11, 50:13, 51:3, 51:7, 61:22, 76:11, 82:18, 83:13, 94:8, 98:14, 104:19, 133:4
**beverly**
4:8, 6:9, 7:26, 15:25, 18:8, 29:16, 29:17, 39:16, 82:9
**beyond**
57:8, 76:5, 80:8
**bills**
83:15, 83:18, 83:22
**biography**
67:12, 67:13
**bit**
13:12, 40:11, 87:9, 120:5
**blanket**
64:19
**block**
87:17
**blue**
1:7, 3:3, 4:3, 7:7, 7:22, 7:23, 7:31, 8:6, 8:15, 8:20, 8:22, 9:10, 15:5, 28:13, 44:14, 94:13, 95:5, 99:3, 110:18, 114:19, 115:14, 115:24, 136:8
**blurry**
46:12, 46:13, 50:4, 59:7
**books**
28:20, 31:20, 31:21, 32:2, 32:12, 32:15, 32:20, 32:21, 32:25, 33:5, 33:7, 33:16
**borrower**
28:22
**both**
10:20, 12:20, 12:22, 16:23, 38:15, 68:21, 73:12, 88:23, 137:6
**bottom**
91:7, 112:16
**boulevard**
2:4, 3:7, 3:15, 4:14, 8:8
**box**
4:7
**breach**
7:12, 108:17, 123:14
**break**
10:18, 21:6, 21:16, 36:6, 40:4, 49:12,

75:23, 75:25, 76:2, 79:5, 107:22, 108:1, 108:4
**briefly** 86:15, 86:19, 86:22, 111:3
**bring** 79:23, 81:21
**bringing** 58:17
**broad** 43:5, 89:1
**brother** 17:20, 18:9, 31:23, 44:19, 52:2, 56:17, 136:7
**brother's** 19:8
**building** 11:23
**bullet** 118:20, 118:23, 119:4, 119:11, 119:13, 120:10, 120:13, 120:23, 121:9, 121:13
**bunt** 88:3
**burn** 59:15, 96:7
**burton** 30:2, 30:12, 30:15, 47:17, 48:1, 48:9, 48:14, 48:17, 48:25, 49:2, 50:19, 51:11, 51:13, 52:5, 59:20, 60:7, 60:19, 61:2, 61:9, 61:12, 62:1, 65:13, 91:10, 91:11, 91:20
**business** 11:25, 12:1, 12:19, 20:3, 25:18, 70:17
**businesses** 24:9, 24:13, 25:3, 25:8, 25:10, 91:21
**bwh** 50:24, 62:9, 62:12

C

**calculated** 75:12, 80:3, 117:23
**calendar** 93:19
**california** 1:2, 1:22, 2:5, 3:8, 3:17, 4:8, 4:16, 7:13, 7:20, 8:1, 8:8, 8:9, 90:18, 115:14, 138:2
**call** 25:18, 48:2, 53:17, 90:2, 127:4, 129:16, 129:17
**called** 14:1, 30:2, 39:15, 90:5
**calls** 51:4, 58:19, 59:23, 62:21, 63:16, 64:2, 64:6, 64:17, 65:1, 89:20, 117:20, 118:14
**came** 33:24, 58:16
**can't** 10:4, 39:12, 46:12, 63:3, 79:20, 96:25, 98:1, 98:5, 98:8, 102:6, 102:22, 105:25, 106:14, 107:6, 107:7, 112:4, 112:5, 132:4
**cannot** 57:18, 131:22
**capacity** 15:20, 63:19, 88:5, 88:6, 88:14, 91:16, 104:7, 104:8, 104:10
**caption** 138:20, 138:21
**care** 109:9
**casa** 38:6
**case** 1:9, 6:6, 6:14, 8:6, 9:11, 14:2, 16:2, 20:25, 21:1, 28:2, 49:22, 57:8, 57:9, 75:15, 76:8, 90:19, 95:5, 99:4, 108:21, 108:23, 108:25, 109:2, 109:6, 109:8, 109:15, 109:16, 118:16
**cause** 21:7, 26:24, 37:6, 53:18, 73:1, 78:16, 97:2, 102:8, 103:20, 112:12, 131:9, 131:22, 138:10, 138:21
**causes** 122:12
**caution** 37:15
**cave** 7:25, 117:1, 117:10
**cc** 46:5
**cc'd** 49:3, 49:8, 53:22, 54:7
**center** 38:6
**central** 1:2, 90:17
**certificate** 138:5
**certification** 8:11
**certified** 2:7, 8:10, 9:2, 13:16, 16:5, 35:2, 45:14, 65:25, 86:12, 90:22, 95:8, 99:7, 108:12, 110:15, 117:4, 126:4
**certify** 138:7, 138:18
**cetera** 82:10, 113:4
**chance** 66:3, 90:25, 126:8
**change** 84:10
**charged** 51:13
**chart** 60:14
**chris** 8:16, 80:21, 119:20, 125:2, 137:17
**chris@frostllp** 3:18
**christopher** 3:13
**citations** 121:17
**claim** 7:6, 99:3, 123:12, 123:13, 123:15
**claimant** 8:20, 8:22
**claims** 62:11, 122:14,

123:7
**clarification**
10:10
**clarified**
38:13
**clarify**
13:8, 26:25, 27:13, 27:17, 32:25, 45:6, 94:19, 113:21
**cleaning**
87:12
**clear**
48:1, 68:17, 98:9, 132:6, 136:25
**clearly**
43:11
**clears**
132:7
**clicking**
76:3
**client**
44:9, 72:11, 74:4, 77:4, 80:7, 81:14, 81:16, 81:22, 84:13, 101:17, 103:10, 121:16
**client's**
108:24
**clients**
71:14, 71:20, 74:9, 74:13, 78:1, 78:10, 78:13, 79:23, 79:24, 79:25
**close**
59:1, 75:17, 78:17, 97:13, 122:3, 122:24
**code**
7:14, 70:17, 108:18
**cofounding**
67:17
**cohen**
6:9, 6:10, 6:17, 6:18, 6:22, 6:23, 6:35, 7:27, 14:7, 15:25, 16:1, 17:20, 17:23, 18:3, 18:8, 18:9, 24:9, 24:13, 27:14, 31:23, 34:3, 35:13, 47:16, 47:17, 48:9, 48:11, 52:1, 52:2, 52:4, 52:15, 55:10, 59:11, 59:20, 60:9, 61:6, 61:12, 62:1, 64:23, 65:10, 82:9, 82:18, 82:19, 83:13, 83:16, 84:2, 84:13, 87:17, 88:5, 88:6, 88:7, 88:9, 88:15, 90:9, 90:14, 91:20, 92:6, 101:16, 103:9, 103:21, 103:23, 104:7, 104:8, 104:9, 104:10, 105:10, 114:15, 116:4, 116:8, 116:18, 126:1, 131:3, 136:7
**cohen's**
6:3, 114:16, 126:25
**colleague**
8:17
**collective**
24:25
**collectively**
25:3
**column**
37:21, 39:23
**columns**
35:18
**com**
3:9, 3:18, 4:9, 4:17, 6:28, 65:23, 87:23, 126:2
**combination**
136:23
**come**
19:25, 110:4, 110:11, 124:22
**comes**
51:19
**coming**
9:12, 58:21, 136:23
**comment**
83:2, 95:17, 98:8, 105:25, 107:6, 112:5, 118:5
**commenting**
95:15
**comments**
75:18
**commercial**
38:23, 67:21
**communicate**
78:9, 78:13, 128:6, 128:18, 129:7, 129:14
**communications**
53:12, 70:11
**companies**
67:20, 69:4, 69:13, 69:21, 70:6, 70:25
**company**
50:20, 70:7, 91:11, 115:15
**complaint**
7:10, 108:16, 108:20, 120:20
**complete**
39:11, 138:14
**completely**
95:16
**completion**
35:18
**complicated**
25:13, 25:16, 29:20, 62:4
**compound**
104:25, 105:21, 106:17, 107:13, 117:17
**concerning**
103:5, 113:9
**concerns**
20:13
**concluded**
137:1
**conclusion**
62:21, 63:16, 64:7, 64:17, 65:1, 117:21, 118:15
**conduct**
17:12
**conference**
15:10, 133:12, 133:14
**confidentiality**
125:4
**conflict**
7:32, 74:16, 74:17, 74:20, 74:21, 74:22, 74:24, 75:4, 75:6, 75:8, 75:15, 76:6, 76:20, 76:22, 76:23, 77:11, 82:17, 84:21, 84:22, 84:24, 85:3, 88:8, 89:18, 89:24, 105:8
**confused**
32:19
**connected**
26:3
**connection**
40:22, 44:9, 50:24, 55:15, 56:11, 57:11, 65:7, 65:11,

65:13, 88:7, 91:20
**consenting**
70:16
**consequences**
118:17
**consider**
106:12
**consideration**
112:23, 112:25
**considerations**
113:6
**considered**
70:19, 133:20
**considers**
106:12
**constantly**
102:21
**constitute**
58:5, 106:20
**consult**
85:21
**consulted**
90:9
**contains**
86:8
**contemplation**
133:4
**content**
119:12, 122:6, 122:10
**contents**
106:23, 107:12
**context**
123:24
**continue**
75:20
**continued**
4:1, 7:1
**continues**
118:11
**continuing**
16:12, 118:21
**conversation**
58:1, 107:17, 134:25, 135:17, 136:6, 136:12
**conversations**
19:19, 94:11, 94:15, 107:5
**convoluted**
52:13
**copa**
38:2
**copied**
54:24, 55:7, 78:8
**copy**
35:3
**corporation**
60:15
**correct**
18:5, 18:6, 20:1, 27:19, 28:14, 28:16, 34:22, 39:21, 42:21, 43:20, 45:8, 52:3, 58:6, 58:7, 67:13, 71:7, 83:7, 84:17, 105:6, 114:19, 114:20, 115:20, 115:22, 132:17, 138:16
**correctly**
27:16
**correspond**
19:21, 78:9
**correspondence**
104:5, 125:24
**cost**
35:19, 39:23
**cotrustee**
18:10, 19:2, 19:9, 26:16, 28:18, 32:7, 88:11, 116:5
**cotrustees**
18:7, 18:17, 18:18, 23:5, 43:13, 83:25, 131:2
**cottonwood**
38:8
**could**
10:24, 14:14, 14:16, 19:6, 19:13, 19:17, 21:3, 24:4, 26:5, 26:9, 31:25, 32:1, 35:8, 37:24, 48:6, 57:4, 62:5, 67:15, 70:7, 76:13, 79:8, 81:21, 81:24, 82:10, 127:4, 127:6
**couldn't**
25:13, 93:4
**counsel**
8:13, 10:19, 11:20, 16:18, 17:16, 17:25, 21:17, 35:24, 56:3, 57:19, 67:19, 68:10, 68:11, 68:25, 69:3, 70:18, 77:5, 77:17, 82:24, 91:9, 91:18, 102:10, 107:7, 111:7, 122:13, 132:14, 133:6, 136:1, 138:18
**counsel's**
29:11
**county**
7:20, 110:20
**couple**
13:13, 24:21, 81:3, 81:9
**course**
10:18, 22:9, 78:13, 113:12, 125:6, 137:10
**court**
1:1, 10:1, 10:12, 23:21, 90:17, 109:6, 109:9, 117:14, 120:15, 120:18, 121:17, 121:18, 121:22, 121:25, 122:11, 122:15, 123:2, 123:7, 124:2, 124:23
**cousin**
48:11, 92:6
**crazy**
58:23
**created**
60:18
**creation**
16:15
**cross**
78:23, 79:14, 99:17, 109:19, 113:15, 118:1, 121:5
**csr**
1:33, 138:26
**cunninghamlegal**
11:20, 12:7, 12:9
**current**
11:2, 66:13
**currently**
11:18
**cut**
57:24, 103:4, 130:13
**cutting**
120:5

D

**dad**
34:13, 47:25, 48:3, 50:14, 51:19, 51:20, 58:24, 59:1, 68:15, 69:14, 69:16, 69:22, 69:25, 70:2, 70:8, 71:1, 71:9, 102:14, 103:22, 103:23, 105:8
**dad's**
47:24, 100:22, 101:7, 101:23,

103:20, 122:22
**dancing**
102:15
**daniel**
6:40, 95:4, 96:12, 105:11
**databases**
103:6
**date**
46:15, 48:10, 62:13, 77:3, 120:1
**dated**
6:23, 7:28, 14:2, 18:3, 27:14, 45:16, 46:17, 87:15, 110:25, 116:25
**david**
4:21, 8:17
**day**
138:23
**de**
38:2
**deal**
21:5, 22:8, 96:9, 122:2, 123:20, 125:11, 137:10
**dealing**
19:13
**dealt**
34:20
**dear**
47:14
**debtor**
1:9, 2:4, 9:11, 28:2, 118:10
**debtor's**
7:4, 22:4, 99:2
**december**
7:29, 18:4, 27:15, 116:25, 120:2, 120:3, 120:6
**decide**
18:19, 18:23
**decision**
43:22, 44:17
**decisions**
43:4, 43:21, 44:9, 44:13, 45:2
**declarant**
97:16
**declaration**
6:34, 6:40, 7:3, 90:14, 95:4, 99:1, 102:23
**deed**
7:16, 110:22
**defendant's**
6:37, 90:15
**defense**
118:11, 133:21
**deferred**
53:19
**defined**
91:10, 115:12
**del**
38:2, 38:3
**delaware**
50:20
**delivery**
113:1
**demands**
62:11
**depended**
74:2, 74:14
**depiction**
114:21
**depo**
97:14
**deponent**
3:11, 8:11
**depos**
8:11
**deposed**
9:15
**deposition**
1:20, 2:3, 6:5, 6:13, 8:7, 9:23, 14:1, 16:2, 17:18, 22:7, 63:4, 97:20, 106:19, 108:22, 109:1, 109:10, 121:25, 122:3, 130:23, 136:25, 137:8, 138:8, 138:11, 138:17, 138:20
**deposition's**
109:11
**describe**
35:9, 86:5
**description**
6:2, 7:2, 68:7
**design**
60:18
**despite**
32:14
**detail**
33:12
**details**
50:14, 60:24
**developer**
38:20, 69:18
**development**
11:25, 12:1, 12:19, 35:18
**developments**
38:22, 39:3, 39:7
**dicey**
71:23
**died**
18:11, 18:13, 93:17
**dies**
13:1, 13:7
**different**
25:17, 40:3, 60:1, 60:4, 60:6, 64:9, 74:3, 81:6, 100:6, 107:2, 107:8
**digging**
102:11
**dinner**
92:17, 93:21, 94:4, 94:17
**direction**
138:13
**directly**
14:9, 91:16, 91:17
**disagree**
21:25, 22:9
**discovery**
21:1, 66:5, 75:13, 80:4, 101:15, 108:23, 109:6, 117:23, 121:24, 123:2
**discuss**
55:21, 56:8, 56:17, 56:20, 56:22, 56:24, 58:11, 127:5, 133:8
**discussed**
55:19, 58:2
**discussing**
40:25, 56:13, 56:14, 57:3, 130:24
**discussion**
57:10, 57:15, 61:22, 76:11, 80:9, 86:3, 94:8, 98:14, 104:19
**discussions**
57:6
**dispute**
50:9, 50:11, 50:12, 51:3, 51:6, 57:12, 123:23
**dissolve**
72:17
**district**
1:2, 90:17, 90:18
**division**
1:2, 90:18
**docs**
127:5
**documented**
111:9
**documents**
15:1, 16:17,

17:2, 17:3, 17:9, 17:13, 17:15, 18:24, 36:20, 82:20, 82:23, 84:12, 107:17, 127:4, 134:18
**doing**
79:4, 80:5, 80:7, 87:7, 99:24
**done**
12:22, 13:12, 19:21, 45:20, 65:21, 91:20, 91:25, 109:12, 135:22
**douglas**
53:24, 53:25, 54:5
**down**
72:16, 77:9, 81:11, 97:18, 132:8
**draft**
84:21, 84:22
**drafted**
63:19, 63:25, 64:11
**drafting**
64:15
**drafts**
82:17
**drive**
47:24
**driver**
128:5
**drop**
104:17
**dry**
87:12
**due**
22:8, 22:9, 50:23, 137:10
**duly**
138:8
**duties**
128:16, 129:5, 129:13
**duty**
7:12, 108:17, 123:15

**E**

**e**
116:24
**each**
15:2, 43:19, 68:18
**earlier**
24:10, 24:14, 24:22, 26:19, 27:12, 39:17, 40:18, 50:4, 56:1, 114:18, 125:1, 125:4, 130:22, 134:5
**easily**
79:8
**ecf**
90:19, 95:6, 99:5
**eddie**
6:34, 90:14
**eddie's**
93:5
**effect**
9:25, 64:20
**egregious**
120:14
**either**
26:11, 37:4, 44:19, 73:13, 88:14, 109:23, 122:6, 136:23
**elder**
7:13, 108:17, 123:12
**eleda**
6:10, 15:25, 17:23, 18:8, 31:25, 34:6, 34:21, 56:20, 82:9, 87:17, 88:7, 114:15, 114:16, 115:2, 116:8, 129:22, 130:2, 131:4
**elephant**
102:12
**elkins**
3:4
**else**
17:17, 34:7, 42:7, 45:2, 73:11, 76:25, 77:2, 116:21, 125:9, 131:5
**else's**
95:15
**email**
6:32, 7:30, 19:21, 78:8, 87:15, 87:22, 87:23, 88:2, 88:10, 89:13, 104:5, 104:13, 125:23, 126:1, 126:19, 126:20, 126:25, 127:3, 130:6, 130:15
**emails**
44:4, 86:7, 86:8, 86:16, 125:24, 126:14
**empire**
38:5
**employed**
48:25, 49:2
**employees**
62:10
**end**
131:18, 135:18
**engaged**
20:2
**engagement**
50:19, 56:11, 74:15, 81:24, 82:3, 82:17, 83:12, 88:7, 89:18, 89:23
**enough**
17:4, 137:11
**ensealing**
113:1
**entail**
34:18
**entered**
133:14
**entirely**
118:21
**entities**
25:17, 26:18, 42:23, 47:25, 52:10, 127:24
**entitled**
15:24, 37:21, 90:13, 90:14, 95:4, 99:1, 108:16, 133:3
**entity**
26:22, 27:2, 28:12, 29:24, 30:2, 30:5, 47:11, 47:18, 48:1, 48:2, 59:21, 59:24, 61:12, 61:16, 61:25, 71:9, 115:10, 115:13, 115:24, 116:2, 116:6, 116:21
**equal**
43:16
**equities**
20:14
**ernest**
6:3, 6:10, 14:7, 16:1, 17:20, 18:9, 31:23, 56:18, 82:9, 116:18
**ernie**
136:7
**especially**
108:23
**esq**
3:5, 3:13, 4:5, 4:12, 4:21
**esquire**
46:13, 53:24
**esquire"**
46:11

**establish**
100:11
**estate**
11:5, 11:6, 11:13, 11:16, 11:19, 12:24, 13:8, 38:20, 67:19, 69:4, 69:12, 69:18, 69:21, 70:6, 70:25, 74:5, 74:9, 81:16, 85:15, 85:22, 91:12, 112:11
**estimate**
10:15, 30:22
**et**
7:27, 82:10, 113:4
**even**
25:9, 57:14, 70:18, 132:10
**eventually**
15:8
**ever**
14:20, 16:10, 22:25, 29:4, 32:4, 41:17, 46:4, 53:5, 63:14, 63:19, 71:12, 72:17, 84:20, 84:22, 84:24, 85:2, 90:8, 99:10, 106:4, 115:10, 115:16, 116:1, 117:6, 117:9, 124:15, 126:14, 132:20, 137:9
**everybody**
123:3, 137:9
**everyone**
93:4
**everything**
24:7
**evidence**
51:15, 75:13, 80:4, 88:22, 89:1, 111:23, 117:24, 120:23
**exact**
18:3
**exactly**
12:8, 24:19, 98:12, 102:9, 114:6
**examination**
5:2, 9:6
**examined**
9:3
**example**
15:6, 19:20, 123:11
**examples**
76:23
**exchange**
44:4, 44:6
**excuse**
125:22
**execution**
13:5, 13:7, 62:13, 91:13
**exhibit**
6:2, 6:3, 6:8, 6:17, 6:21, 6:25, 6:32, 6:34, 6:40, 7:2, 7:3, 7:10, 7:16, 7:25, 7:30, 13:14, 13:15, 13:25, 15:23, 16:4, 34:25, 35:1, 45:11, 45:13, 65:16, 65:19, 65:24, 82:7, 82:8, 86:5, 86:11, 90:12, 90:21, 95:3, 95:7, 98:25, 99:6, 104:4, 108:9, 108:11, 109:4, 109:11, 109:24, 110:3, 110:6, 110:7, 110:10, 110:11, 110:12, 110:14, 110:17, 116:24, 117:3, 123:21, 124:3, 124:7, 124:8, 124:9, 125:19, 125:22, 125:23, 126:3, 126:7, 137:3
**exhibits**
6:1, 7:1, 13:17
**exist**
29:9
**existence**
67:5
**expect**
75:4, 75:6, 76:19, 76:22
**expectation**
136:18
**expedite**
137:18
**experience**
68:8, 89:17
**expert**
63:17, 89:20
**expertise**
40:19, 40:22, 85:11, 89:25
**explain**
43:5, 134:23
**explanation**
75:8
**extent**
22:5, 59:1, 89:2, 91:24
**ezra**
6:22, 6:34, 47:8, 47:14, 47:16, 48:9, 48:11, 52:15, 54:4, 54:10, 90:9, 90:14, 91:20, 92:6, 92:19, 92:22, 93:6, 126:1, 126:25, 127:3, 130:6
**ezra's**
51:20, 51:25, 54:14, 54:16, 54:25, 93:5

**F**

**f-r-o-s-t**
8:16
**face**
46:24
**fact**
88:22, 89:11, 114:16, 118:15, 122:22
**facts**
32:5, 37:15, 51:15, 89:1, 89:10, 100:2, 111:22
**factual**
117:13
**fair**
17:4, 17:5, 123:3, 123:5, 137:5, 137:11
**fall**
28:10, 28:11, 105:24
**falls**
112:8
**false**
103:12, 103:15, 103:17, 103:19
**familiar**
28:1, 29:15, 29:17, 36:14, 37:22, 37:25, 39:2
**familiarize**
16:7, 35:6, 45:19, 108:14, 111:3
**family**
18:3, 24:7, 24:8, 24:10, 24:12, 24:14, 24:15, 24:16, 24:18, 24:23, 24:25, 25:1, 25:2, 25:4,

27:14, 34:8, 34:10, 41:6, 41:15, 41:17, 42:3, 42:20, 47:21, 52:9, 59:3, 60:9, 61:6, 61:12, 62:2, 68:1, 87:4, 87:5, 87:11, 87:19, 88:6, 88:9, 88:10, 88:15, 91:22, 92:15, 93:5, 104:8, 116:4, 131:3
**far**
75:16
**father**
18:11, 38:10, 38:20, 39:4, 39:8, 51:25, 52:15, 53:5, 55:15, 56:2, 56:8, 56:10, 56:17, 58:1, 58:11, 65:7, 72:4, 84:20, 85:21, 88:14, 88:18, 89:8, 90:2, 90:8, 93:10, 94:2, 127:8, 127:13, 127:23, 127:24, 128:2, 129:16
**father's**
34:20, 45:7, 52:2, 55:10, 122:5, 128:7
**favor**
75:20
**feature**
75:21
**february**
1:24, 2:6, 8:2, 8:5, 50:19, 125:25, 126:20, 138:23
**fees**
50:9, 50:12, 50:23, 51:8, 51:13, 51:19, 56:14, 58:23, 58:24
**feld**
45:18, 46:18
**few**
9:14, 95:10
**fiduciary**
7:12, 108:17, 123:15
**field**
79:25
**fight**
109:25, 123:25
**figure**
15:8, 15:17, 66:17, 66:20
**file**
27:9
**filed**
7:18, 90:17, 90:20, 95:4, 99:4, 108:21, 108:24
**final**
39:5, 39:20, 82:18
**financial**
19:3, 19:4, 29:4, 32:24, 33:9, 38:5, 43:9, 50:23
**financing**
91:12, 91:14
**find**
17:13
**fine**
22:1, 33:12, 35:4, 36:7, 43:2, 81:10, 85:5, 96:6, 116:16
**fingers**
80:23
**finish**
41:1, 43:1, 44:11, 63:1, 78:3, 79:17, 81:1, 81:2, 93:25, 109:24, 128:23
**finished**
25:20
**firm**
8:10, 12:10, 12:12, 45:17, 51:8, 68:16, 71:15, 71:21, 72:12, 72:13, 72:18, 72:20, 72:23, 72:24, 73:5, 73:9, 77:20, 81:5, 81:14, 83:13, 83:16, 84:3, 85:22, 117:1, 117:9
**firm's**
50:23, 87:23
**firms**
67:19, 82:18
**first**
9:2, 14:10, 35:21, 47:7, 50:15, 86:7, 87:14, 88:2, 111:11, 119:11, 120:10, 137:16
**fits**
60:16
**five**
40:6, 96:7, 108:2
**focused**
12:4
**follow**
19:10, 22:17, 32:9
**follows**
9:3
**footnote**
105:22
**foregoing**
138:8, 138:14, 138:19
**forged**
54:19
**forgive**
29:12
**form**
7:18, 110:23
**formation**
70:3
**forward**
21:19, 27:17, 49:17, 80:24
**forwarded**
126:1, 126:17
**foundation**
31:12, 31:17, 39:9, 46:23, 47:20, 51:4, 51:16, 71:2, 91:23, 98:3, 98:23, 105:20, 107:15, 111:23, 113:7, 117:20, 126:12, 128:21, 128:22
**four**
29:15, 33:22, 33:23, 33:25, 34:2, 34:12, 34:13, 34:14, 34:16, 34:21, 35:18, 38:7, 39:15, 43:18, 45:3, 50:25, 62:13, 67:23, 67:25, 68:12, 68:14, 69:1, 69:6, 122:13
**four-page**
45:18
**four-year**
119:6
**fowler**
117:1, 117:9
**frame**
58:12
**freshman**
69:17, 69:25
**friday**
1:24, 8:5,

126:19
**front**
97:20
**full**
81:4, 88:24, 112:3, 119:11, 120:10, 128:25, 138:14
**further**
132:8, 137:7, 138:18
**future**
114:6

**G**

**gartside**
3:4
**general**
9:14, 13:4, 15:1, 15:11, 67:19, 68:10, 68:11, 68:25, 69:3
**generally**
11:21, 34:15, 75:2, 75:3, 76:18, 76:19, 85:10, 130:18
**generated**
47:3
**geoff**
35:14, 35:17, 111:7, 119:18, 119:20, 123:18
**geoffrey**
4:11, 4:12, 8:19, 119:25, 136:24
**gestures**
10:9
**getting**
57:7, 71:23, 75:16, 75:17, 80:10, 80:25, 97:1, 97:13, 123:19, 123:23
**give**
10:15, 11:21, 12:24, 64:19, 81:3, 119:20, 130:18
**given**
9:22, 109:22, 111:23, 118:15, 138:15
**giving**
11:23, 13:2
**glong@gmail**
4:17
**gmail**
86:7
**go**
13:11, 13:20, 15:22, 20:15, 20:16, 20:19, 21:18, 21:19, 35:23, 35:25, 40:12, 76:9, 79:6, 80:14, 81:21, 82:6, 87:21, 92:24, 99:20, 100:10, 104:4, 108:3, 108:22, 109:2, 109:3, 109:11, 120:22, 125:14, 127:18, 132:8
**god**
104:15
**going**
8:4, 10:6, 15:23, 20:8, 21:14, 21:19, 21:24, 22:6, 22:17, 27:16, 29:11, 34:24, 36:2, 36:19, 38:14, 41:8, 41:9, 43:6, 45:10, 49:19, 56:2, 56:5, 57:2, 57:16, 57:23, 57:24, 59:14, 59:15, 63:4, 64:18, 65:18, 70:9, 70:10, 71:23, 75:14, 75:18, 75:20, 77:8, 77:9, 78:22, 79:12, 80:12, 81:3, 81:4, 81:7, 81:10, 83:2, 85:25, 86:4, 93:20, 95:2, 95:12, 95:14, 96:3, 96:7, 97:18, 97:19, 99:9, 99:25, 102:7, 106:16, 108:19, 108:21, 108:23, 109:1, 109:2, 109:4, 109:5, 109:9, 109:10, 109:22, 110:8, 113:8, 116:14, 116:23, 120:19, 120:22, 121:24, 124:6, 125:3, 130:9, 131:22, 132:7, 132:9, 133:5, 133:7, 133:9, 133:18, 135:5, 137:17
**good**
8:4, 8:14, 9:8, 24:1, 27:20, 79:21, 85:8, 98:13, 104:18, 107:24, 112:24, 113:5, 137:13
**goodness**
68:5
**gosh**
9:20
**graduated**
11:10
**graduating**
11:11
**grant**
113:3
**grave**
102:11
**great**
75:24, 79:7, 110:1
**greater**
70:14
**ground**
91:15
**grounds**
21:25, 25:12, 57:19, 57:21
**guess**
10:13, 10:16, 26:6, 29:16, 37:5, 42:1, 49:5, 68:21, 116:11, 116:16, 135:5, 135:11, 135:20
**guessing**
37:10, 116:10, 116:15
**guidance**
75:1
**gump**
45:18, 46:18, 51:11, 62:10, 83:13, 83:16, 84:3, 84:13, 101:15, 101:17, 103:6, 103:10
**gump's**
50:18, 62:12, 101:16
**guys**
80:12, 80:13, 80:16, 80:20, 87:25, 92:13, 92:14, 123:25, 132:25, 134:9

**H**

**hand**
8:24, 112:25, 138:22
**handed**
75:5, 76:20
**handling**
12:25, 13:1,

134:13, 134:21, 134:24, 135:2
**hands**
43:25
**happen**
18:20, 18:24
**happened**
105:25
**harassing**
77:10, 116:22
**hard**
46:11, 78:15
**hauer**
45:18, 46:18
**head**
10:7, 23:24, 25:21, 36:9, 129:23
**heading**
67:12, 112:14
**hear**
40:9, 79:20, 89:8, 112:3
**heard**
30:2, 106:4, 115:10, 115:16, 116:20, 117:9
**hearing**
78:15
**hearsay**
106:20
**held**
69:6
**help**
20:11, 24:24, 68:15, 80:5, 80:8
**helpful**
137:19
**henry**
53:23, 53:25, 54:2, 54:3, 54:8, 54:25, 55:7
**here**
8:16, 8:18, 9:12, 9:13, 10:19, 17:16, 35:3, 36:20, 46:16, 53:3, 55:9, 59:14, 63:5, 63:16, 64:21, 69:21, 70:6, 70:18, 96:3, 102:11, 112:17, 112:19, 120:22, 127:10
**here's**
57:2, 109:22, 120:11
**hereby**
113:2, 138:7
**hereto**
13:16, 16:5, 35:2, 45:14, 65:25, 86:12, 90:22, 95:8, 99:7, 108:12, 110:15, 117:4, 126:4
**hereunto**
138:22
**hi**
9:9, 127:3
**highly**
66:5
**hills**
4:8, 29:16, 29:17, 39:16
**history**
81:5
**hm**
37:18
**hnj@smbgroup**
126:2
**hold**
16:25, 20:9, 41:1, 43:22, 53:2, 57:18, 61:8, 71:17, 79:4, 86:2, 97:1, 98:2, 102:7, 109:17, 109:18, 119:15, 119:17, 119:19, 120:7
**home**
76:2
**honestly**
31:1, 32:1
**hot**
79:7
**hotel**
29:15, 29:17, 29:19, 29:25, 30:6, 30:20, 32:20, 33:2, 33:18, 33:19, 33:24, 33:25, 38:7, 39:15, 39:16, 39:21, 61:12, 67:23, 67:25, 68:12, 68:14, 69:1, 69:7, 91:14
**hotels**
30:3, 30:13, 30:16, 47:17, 48:2, 48:9, 48:15, 48:17, 48:25, 49:2, 50:20, 51:11, 51:14, 52:5, 59:20, 60:7, 60:20, 61:3, 61:9, 62:1, 65:13, 91:10, 91:11, 91:21
**housekeepers**
128:5
**huge**
24:16
**hundred**
31:15
**husband**
12:13, 68:4, 68:25, 70:12, 71:4, 71:12, 71:15, 71:20, 72:3, 73:2, 73:16, 73:21, 85:2, 85:21, 88:17, 89:8, 89:16, 90:3, 90:5, 104:5
**husband's**
67:8, 67:13, 85:10, 88:13, 104:13
**hush**
34:13, 49:6, 50:12, 50:13, 51:7, 53:19, 55:6, 60:18, 62:4, 75:18, 81:6, 94:12, 94:16, 100:22, 101:7, 101:23, 103:20, 105:9, 122:5, 122:22, 127:5, 134:11, 134:12
**hush's**
102:13, 118:4
**hushmand**
4:20, 6:21, 7:3, 7:27, 99:1
**hypothetical**
58:18, 64:7, 64:16, 75:10, 89:2, 89:19, 98:24

**I**

**idea**
15:3, 23:8, 30:23, 30:25, 31:1, 31:5, 49:2, 54:21, 56:19, 56:21, 56:23, 58:12, 59:7, 67:6, 83:19, 88:12, 97:11, 99:21, 100:1, 110:3, 113:6, 115:25, 116:7, 130:14
**identical**
14:8
**identification**
13:15, 16:4, 35:1, 45:13,

65:24, 86:11, 90:21, 95:7, 99:6, 108:11, 110:14, 117:3, 126:3
**identified** 24:10, 24:14, 26:19, 27:12
**identify** 46:14, 111:9
**ids** 27:7
**imagine** 77:16
**impinge** 57:4
**impinges** 43:8
**improper** 55:2, 58:18, 75:9, 77:11, 89:19, 95:17, 96:18, 96:21, 97:17, 98:24, 106:21
**in-house** 91:15
**inaccurate** 66:18, 96:16, 96:24, 97:6, 97:17, 97:23, 98:10, 99:14
**include** 32:11, 67:12, 105:22
**includes** 32:13, 59:16, 64:20
**including** 67:22, 91:12, 133:21
**incomplete** 64:7, 64:16, 89:2
**inconsistent** 118:21
**incorporate** 107:20
**indemnity** 7:32
**index** 5:1
**indicating** 43:25, 62:5, 82:7, 112:17
**indirect** 29:22, 52:5
**indirectly** 33:24, 68:1
**individual** 88:6, 104:8, 104:10, 118:4
**individually** 47:9, 108:24
**information** 23:12, 44:16, 59:17, 66:17, 70:13, 71:3, 100:1, 103:5, 119:2, 132:13, 134:18
**informing** 105:10
**inherently** 53:11, 89:3, 135:3
**inquiry** 81:4
**instances** 10:14
**instead** 102:15
**institution** 7:14
**instruct** 21:24, 22:15, 113:8, 130:9
**instructed** 22:3, 22:16, 53:9, 113:11, 130:11, 137:4
**instruction** 10:22, 21:4, 22:2, 22:5, 22:11, 22:18, 53:7, 77:4
**instructions** 130:19
**intake** 72:11, 72:14, 73:25, 74:2, 74:5, 74:8, 74:12
**intention** 49:11
**interact** 34:2, 34:12, 34:13, 34:14, 78:1
**interaction** 34:16
**interactions** 92:6
**interest** 29:22, 30:20, 52:5, 52:7, 62:1, 88:8, 89:18, 106:13, 107:17, 115:23, 116:6
**interested** 138:20
**interference** 57:12
**interjecting** 102:20
**internal** 57:6, 57:10, 76:6
**internet** 65:21, 66:10
**interpret** 114:7
**interpretation** 113:24
**interrelated** 60:11
**interrupt** 10:11, 63:3
**interrupted** 78:23, 79:14, 99:17, 109:19, 113:15, 118:1, 121:5
**interrupting** 134:22
**intricacies** 51:24
**introduce** 8:13
**introductory** 121:8, 121:14
**invade** 57:5
**invading** 57:10
**investor** 69:18
**involve** 19:13
**involved** 33:10, 34:19, 38:11, 39:8, 44:15, 44:17, 44:20, 49:1, 57:4, 68:14, 71:10, 74:7, 74:8, 78:6, 84:5, 131:13, 131:20, 132:4, 132:5
**involvement** 132:10
**involves** 122:11
**irrelevant** 66:5, 117:22
**irrevocable** 25:17, 27:4
**issue** 21:8, 56:14, 58:22, 100:6, 107:18, 114:10, 122:3, 122:24, 124:21, 124:22, 132:7, 132:11, 133:8
**issues** 13:8, 20:12, 41:7, 41:18, 49:22, 119:23, 125:4

**itself**
47:1, 47:4, 62:21, 63:16, 112:2, 130:9

**J**

**jannol**
53:23, 53:25, 54:8, 54:25
**january**
95:6, 99:5
**jay**
1:7, 3:3, 4:3, 7:7, 7:22, 7:23, 7:31, 8:6, 8:15, 8:20, 8:22, 9:10, 15:5, 28:13, 44:14, 94:13, 95:5, 99:3, 110:18, 114:19, 115:14, 115:24, 136:8
**jeff**
71:10, 87:22
**jeff@lermanlaw**
87:23
**jeffrey**
6:26, 12:15
**jeffrey-h-lerman**
6:29, 65:23
**job**
1:34, 32:7, 122:19
**joe**
52:1, 52:2, 52:4
**johnson**
1:32, 2:6, 8:9, 138:7, 138:26
**join**
51:17, 70:20, 80:2, 119:1, 131:24, 135:6
**joined**
12:6, 15:10
**joint**
6:8, 15:24, 82:8, 133:2, 133:21
**ju**
43:24
**judge**
97:20, 102:23, 109:3
**judgment**
6:38, 7:5, 90:16, 95:16, 97:16, 99:2, 102:24
**justyne**
1:32, 2:6, 8:9, 138:7, 138:26

**K**

**k-1**
60:25, 61:2
**kalt**
3:4
**keep**
62:3, 75:19, 76:3, 80:25, 97:18, 99:24, 100:7
**keys**
75:21
**kibler**
117:1, 117:9
**kids**
93:5
**kind**
11:4, 11:18, 11:21, 12:23, 17:12, 60:22, 72:11, 74:5
**kirsh**
106:2
**klein**
86:24, 87:1, 87:15
**klein's**
87:19
**knew**
105:9, 105:25, 132:10
**knowledge**
30:10, 30:14, 31:13, 31:18, 32:12, 36:20, 39:10, 44:22, 79:24, 81:22, 89:23, 100:19, 101:2, 101:4, 101:19, 104:23, 105:18, 105:24, 106:7, 106:23, 107:12, 113:13, 117:15, 118:12, 118:22, 119:12, 123:6, 128:22, 130:23, 131:8, 131:12
**known**
62:11
**knows**
100:2, 100:5, 109:16, 116:8, 116:9, 116:21, 118:6, 131:3, 132:4, 132:9

**L**

**lack**
31:12, 31:17, 36:19, 39:10, 44:22, 46:23, 128:21, 128:22
**lacks**
51:4, 107:15, 117:20
**ladeene**
38:2
**lapeer**
47:24
**large**
67:19, 67:20
**last**
12:3, 14:14, 21:16, 21:23, 28:9, 28:10, 28:11, 32:3, 38:7, 39:4, 48:5, 48:8, 55:9, 58:10, 62:6, 62:9, 63:10, 84:16, 92:5, 92:11, 92:17, 93:9, 93:14, 93:23, 94:1, 136:4
**late**
14:14
**latency**
40:11
**later**
13:12, 22:1, 110:9
**latest**
126:17
**latter**
68:22
**law**
3:6, 3:14, 4:4, 4:6, 4:11, 4:13, 11:10, 11:11, 12:11, 12:17, 27:2, 45:17, 59:24, 67:18, 68:16, 72:8, 72:18, 73:2, 73:16, 73:22, 74:1, 81:5, 82:18, 83:13, 83:16, 84:3, 85:13, 85:22, 87:23, 88:4, 104:6, 111:25, 112:4, 112:7, 117:1, 118:16
**lawful**
112:23
**lawsuit**
131:13, 131:14, 131:21
**lawyer**
37:16, 40:20, 48:23, 48:24, 53:19, 54:4, 56:5, 57:11, 61:18, 63:10, 63:20, 77:5, 103:20, 105:9, 108:24, 118:4,

122:22, 130:19
**lawyers**
57:4, 128:6, 128:18, 129:7, 129:14
**lead**
75:12, 80:4, 117:23
**learned**
132:14, 135:25
**leases**
91:15
**least**
48:20, 53:22, 54:10, 70:24, 86:7, 87:19, 88:18, 118:16, 126:18, 130:22
**leave**
72:20, 72:23, 72:24
**leaves**
136:16
**lee**
23:17, 87:16
**left**
39:23, 133:11
**legal**
7:11, 53:5, 53:18, 56:1, 57:13, 57:14, 59:23, 62:21, 62:24, 63:12, 63:16, 64:6, 64:17, 64:20, 65:1, 68:4, 68:15, 70:3, 77:11, 81:5, 90:3, 90:9, 91:9, 91:16, 106:21, 108:16, 109:2, 117:20, 118:15, 118:17, 123:13, 133:4
**legality**
106:13
**legally**
48:19
**lehman**
133:11, 133:13
**lending**
112:11
**lerman**
1:20, 2:3, 5:3, 6:11, 6:26, 8:12, 8:23, 9:1, 9:8, 11:1, 12:11, 12:15, 12:17, 14:4, 16:1, 16:8, 36:12, 37:20, 40:18, 46:6, 46:20, 46:25, 50:3, 66:2, 67:18, 72:18, 73:2, 73:16, 73:22, 74:1, 82:10, 85:22, 86:14, 87:22, 88:4, 90:24, 95:10, 96:12, 104:6, 108:14, 111:2, 111:17, 117:6, 126:6, 126:14, 132:16
**let's**
15:22, 18:13, 20:16, 21:8, 35:20, 35:23, 36:3, 37:2, 38:5, 40:4, 42:10, 49:21, 64:17, 68:10, 68:17, 72:16, 73:14, 73:24, 74:4, 76:1, 77:14, 82:6, 84:10, 92:24, 99:16, 99:24, 108:3, 109:24, 128:12, 131:17
**letter**
6:21, 7:25, 46:3, 50:19, 53:22, 54:7, 56:8, 57:7, 57:11, 58:1, 58:16, 58:22, 59:4, 88:8, 89:18, 116:25, 118:4, 118:5, 120:21, 122:6, 122:11, 122:13, 122:21, 123:9
**letterhead**
45:17, 46:17
**level**
49:1, 89:25
**liability**
50:20, 115:14
**license**
48:22
**light**
77:13
**limitation**
91:13
**limitations**
119:7
**limited**
50:20, 91:11, 111:19, 115:14
**limiting**
123:6
**line**
7:30, 54:15, 55:9, 82:14, 95:14, 106:17, 132:8
**lines**
77:3, 118:11, 132:13
**list**
39:8, 39:11
**listed**
39:13
**listen**
123:18
**litigate**
97:20
**litigation**
11:16, 20:12, 85:18, 123:24
**little**
13:12, 30:18, 40:11, 50:4, 87:9, 120:5
**live**
123:3
**living**
12:25, 103:24
**llc**
1:7, 3:3, 4:3, 7:7, 8:6, 8:15, 8:20, 8:22, 9:11, 28:15, 44:14, 47:17, 48:2, 48:9, 48:15, 48:18, 48:25, 50:20, 59:20, 60:7, 60:15, 60:20, 61:3, 61:13, 62:1, 91:10, 95:5, 99:3, 115:14, 115:24
**llp**
3:4, 3:12, 8:18, 45:18, 46:18, 88:4, 117:1
**loaded**
100:3, 100:15
**loan**
28:1, 28:4, 28:12, 44:9, 44:13, 106:8, 106:13, 106:14, 106:25, 107:1, 107:2, 107:8, 107:16, 114:19, 114:23, 115:8, 130:24, 131:3, 131:8, 131:12, 132:10, 136:10
**loans**
27:22, 27:24, 28:17, 28:20, 28:22
**local**
9:13
**located**
47:19

**logo**
67:7
**long**
4:11, 4:12, 7:17, 8:19, 9:19, 11:6, 18:10, 18:12, 35:15, 44:23, 51:4, 53:2, 66:23, 68:3, 75:9, 75:12, 78:15, 80:3, 86:6, 91:3, 92:9, 101:20, 102:7, 104:25, 105:4, 105:6, 107:13, 107:15, 108:1, 110:23, 111:7, 111:13, 117:20, 119:1, 119:15, 119:17, 119:19, 119:22, 119:25, 120:3, 120:5, 120:7, 120:11, 121:1, 121:3, 121:8, 121:11, 121:13, 121:16, 121:21, 121:24, 122:7, 122:9, 122:17, 123:5, 123:11, 123:17, 136:24
**longer**
80:14, 105:18, 110:24
**look**
15:17, 17:2, 17:3, 17:9, 32:21, 36:11, 36:18, 37:20, 37:22, 37:25, 45:19, 48:5, 50:15, 53:21, 59:10, 60:14, 62:7, 64:11, 66:2, 68:9, 82:13, 84:24, 85:2, 86:14, 90:25, 91:6, 96:9, 96:14, 99:12, 104:22, 105:17, 111:2, 114:13, 117:12, 126:7
**looked**
58:24, 66:22
**looking**
37:11, 91:3, 112:19
**looks**
53:23, 53:24, 54:11, 86:6, 86:9, 90:16, 110:19, 116:25
**los**
1:22, 2:5, 3:8, 3:17, 7:19, 8:1, 8:8, 67:22, 67:24, 110:20
**loud**
75:19
**love**
81:2
**luxury**
39:21

**M**

**mad**
29:11
**made**
27:24, 28:2, 28:12, 28:17, 43:4, 44:14, 44:18, 117:13, 120:15
**magasinn**
42:9
**mail**
116:1
**maintain**
123:1
**make**
21:7, 25:11, 25:20, 27:22, 43:21, 45:2, 80:18, 83:2, 84:2, 96:3, 99:9, 122:1, 125:8, 131:15
**makes**
131:7
**making**
44:8, 44:13, 80:13, 96:7
**malpractice**
7:11, 108:16, 109:2, 123:13
**managed**
33:18, 33:23, 33:25
**management**
91:14
**manhattan**
4:16
**many**
9:17, 25:17, 71:14, 71:19, 77:22, 128:4
**mar**
38:3, 38:4
**march**
18:4, 27:14
**marital**
70:10, 70:16, 72:7, 85:25, 89:22
**mark**
15:23, 34:24, 86:4, 110:7, 116:23
**marked**
13:14, 13:15, 13:25, 16:4, 35:1, 45:11, 45:13, 65:19, 65:24, 82:7, 86:11, 90:21, 95:7, 99:6, 108:11, 110:10, 110:14, 117:3, 126:3
**martinique**
38:8
**matter**
8:6, 50:25, 56:10, 62:13, 74:2, 74:5
**matters**
47:13, 53:6, 85:23, 90:9, 91:12, 91:16, 91:18, 136:17, 137:3
**matthew**
7:25
**maybe**
24:24, 41:25, 42:19, 44:5, 44:7, 52:10, 68:5, 71:25, 72:9, 92:11, 100:6, 130:13
**maynard**
53:25, 54:5
**mean**
13:6, 19:10, 24:15, 33:12, 33:13, 33:16, 36:5, 37:5, 37:25, 43:19, 49:4, 51:19, 52:16, 64:18, 66:23, 68:11, 71:25, 72:24, 73:12, 74:20, 76:4, 77:23, 92:19, 99:24, 112:15, 113:19, 131:20
**means**
10:9, 135:1
**meant**
84:16, 134:23, 135:7, 135:10, 135:14, 135:20
**medical**
67:21
**meeting**
18:19, 18:23
**meetings**
19:3, 19:23, 132:14
**member**
60:19

**members**
92:14
**memorializes**
50:22
**men**
112:22
**mentioned**
38:12, 38:24, 39:1, 39:4, 59:3
**merit**
123:12, 123:13, 123:14
**messages**
44:6
**mic**
78:17, 79:7, 104:15, 104:17
**michelle**
1:20, 2:3, 5:3, 6:11, 8:12, 9:1, 11:1, 16:1, 46:6, 82:10, 86:24, 87:1, 87:15, 87:19
**microphone**
40:12
**middle**
123:19, 123:23
**might**
83:22, 87:13, 91:20, 91:25, 129:19, 135:12
**million**
30:24, 30:25, 31:6, 31:10, 31:15, 39:24
**mind**
35:9, 40:4, 58:14, 76:3, 82:12, 108:10
**mine**
46:12
**minute**
35:6, 60:22, 68:9, 104:17, 108:14
**minutes**
40:6, 95:10, 96:7, 108:2, 125:8
**misleading**
102:8
**misrepresentations**
120:14
**miss**
27:2
**misstates**
27:2, 59:23, 61:14, 128:19
**mixed**
67:21
**mixed-use**
68:10
**mm**
45:22
**mm-hmm**
23:25, 33:3, 50:17, 50:21, 51:1, 69:5, 82:15, 87:6, 134:4
**mom**
18:8, 24:20, 24:24, 93:4
**moment**
16:7, 76:15, 82:6, 90:24
**momentarily**
13:20
**money**
58:23, 112:24
**montana**
38:6
**more**
11:23, 11:25, 12:4, 12:5, 12:18, 26:16, 30:25, 37:14, 43:10, 51:9, 57:25, 70:9, 73:6, 80:17, 81:9, 87:9, 92:21, 124:7
**morning**
8:4, 8:14, 9:8, 127:5
**most**
120:14
**mother**
18:17, 19:2, 25:2, 26:4, 26:16, 56:22, 115:7
**motion**
6:37, 7:5, 90:15, 95:16, 99:2, 108:25, 125:11, 136:22
**move**
49:17, 58:8, 62:7, 64:17, 77:14, 80:24, 97:18, 97:19, 98:23, 109:5, 109:23, 110:3, 116:14, 125:3
**moving**
40:3, 97:14, 136:18
**much**
30:15, 30:19, 80:14, 83:20, 130:23
**multiple**
87:22
**must**
72:15

**N**

**name**
8:9, 8:14, 10:25, 15:5, 18:3, 23:22, 26:1, 27:13, 29:24, 35:15, 35:19, 37:21, 38:2, 42:14, 42:17, 46:10, 53:23, 54:15, 106:4, 115:13, 128:4, 137:16
**named**
88:3, 138:20, 138:21
**names**
37:22, 69:20, 77:1
**nancy**
19:16, 42:5
**narrow**
72:16
**nationwide**
67:22
**nature**
34:15
**necessarily**
43:23
**necessary**
95:25, 136:22, 138:16
**need**
10:6, 10:10, 10:11, 10:18, 35:3, 35:25, 49:15, 61:21, 63:1, 76:2, 78:20, 102:16, 106:18, 107:9, 107:22, 108:4, 125:12, 133:10, 137:17, 137:18, 137:22
**needed**
17:2, 17:9, 128:5
**needs**
20:25, 24:24, 36:5, 80:14, 127:5
**negotiations**
91:13
**never**
36:21, 37:6, 37:11, 41:6, 68:11, 88:12, 91:4, 97:6, 99:15, 101:5, 101:17, 102:24, 103:9, 107:5, 111:18, 111:24, 113:9, 113:19,

114:9, 115:18, 116:20
**new**
79:23, 79:24, 81:13, 81:16, 81:22
**next**
15:22, 15:23, 34:24, 38:3, 38:6, 45:10, 65:18, 76:1, 79:5, 86:4, 90:12, 95:2, 98:25, 108:9, 109:24, 110:6, 116:23, 118:11, 119:4, 119:11
**nitty-gritty**
33:8
**no"**
94:20
**nobody**
122:25
**nodded**
129:23
**nodding**
10:7, 23:24, 25:21, 36:9
**normally**
106:18
**north**
4:14
**northern**
1:2
**note**
7:31
**noted**
137:24
**nothing**
57:8, 76:6, 107:6, 107:18, 138:9
**notice**
6:3, 6:11, 16:1
**november**
86:10
**number**
8:6, 8:11, 82:14, 90:19, 110:18, 110:21, 111:9, 112:16, 114:13
**numbers**
35:13
**numerous**
122:11

**O**

**oath**
9:24, 9:25
**object**
10:20, 36:19, 43:8, 44:23, 57:2, 57:16, 57:18, 57:21, 70:10, 71:3, 85:25, 95:14, 95:25, 102:7, 106:16, 126:10, 133:2
**objection**
7:6, 20:9, 20:10, 20:24, 21:4, 22:11, 25:11, 25:25, 27:1, 31:12, 31:17, 32:5, 32:16, 37:14, 39:9, 41:8, 44:21, 46:22, 46:25, 47:2, 47:20, 51:4, 51:15, 53:3, 53:7, 54:13, 54:20, 55:1, 55:22, 56:4, 57:3, 57:15, 57:17, 58:18, 59:6, 59:22, 62:20, 62:25, 63:15, 63:23, 64:2, 64:3, 64:6, 64:16, 66:4, 69:15, 69:23, 70:10, 71:2, 71:22, 72:6, 72:7, 74:19, 75:9, 77:7, 80:1, 80:2, 85:5, 88:19, 88:20, 88:21, 88:24, 88:25, 89:10, 90:4, 90:10, 91:23, 95:12, 96:18, 97:25, 98:3, 98:23, 99:3, 101:20, 104:24, 104:25, 105:20, 106:16, 107:7, 107:13, 111:22, 112:1, 113:7, 117:17, 122:1, 127:9, 130:8, 135:3
**objections**
6:8, 15:25, 78:11, 80:25, 82:8, 106:19, 107:20, 118:14, 118:24, 119:1, 119:8, 119:14, 119:23
**obnoxious**
61:20
**obtained**
71:4
**obviously**
11:22, 75:3, 76:19
**october**
86:9, 87:15, 104:6
**office**
7:19, 23:14, 23:16, 47:21, 47:24, 67:21, 110:20, 136:23, 136:24
**offices**
4:4, 4:11
**official**
7:18
**often**
92:8
**oh**
9:20, 28:25, 36:5, 42:16, 46:5, 53:1, 68:5, 72:23, 104:15, 112:18
**old**
66:24
**olympic**
2:4, 3:7, 8:8
**once**
9:18, 21:21
**one**
10:19, 14:18, 14:21, 15:22, 20:14, 23:5, 24:10, 24:14, 26:15, 27:1, 30:25, 33:21, 34:11, 35:3, 37:14, 39:4, 39:15, 39:24, 41:1, 49:13, 52:25, 61:11, 66:14, 70:9, 70:24, 70:25, 73:13, 73:14, 76:15, 78:25, 79:16, 80:19, 82:7, 83:2, 83:3, 83:24, 86:2, 92:21, 92:23, 92:24, 96:9, 98:2, 99:19, 100:3, 100:5, 100:19, 101:3, 103:10, 104:3, 104:9, 108:9, 108:16, 109:21, 109:24, 110:8, 113:17, 119:5, 121:7, 123:24, 124:9, 124:10, 124:19, 126:17, 126:19, 136:4
**one-off**
90:3

**ones**
37:25, 38:12, 38:24, 38:25, 39:1
**ongoing**
50:24
**only**
20:12, 38:25, 39:9, 41:24, 66:4, 83:3, 96:23, 113:12, 117:14, 123:22, 124:18
**open**
137:8
**open-ended**
89:3
**opened**
33:25
**operate**
73:6, 73:7
**operator**
33:19
**opinion**
37:16, 37:17, 59:23, 63:12, 77:11, 77:12, 89:20, 117:20
**opinions**
106:21
**opportunity**
36:11, 86:14, 111:2, 111:20, 138:16
**opposed**
11:23
**opposition**
6:36, 90:15
**order**
22:6, 97:14, 109:5, 125:3, 136:19, 137:15
**orders**
124:23, 137:14
**oro**
38:2
**other**
16:22, 17:16, 17:25, 18:7, 20:24, 24:8, 24:9, 24:13, 25:3, 25:22, 26:15, 35:16, 37:16, 39:1, 39:7, 42:22, 43:13, 46:25, 52:7, 52:10, 58:2, 62:1, 74:8, 77:24, 83:24, 91:21, 100:6, 100:19, 101:3, 103:11, 105:4, 105:19, 108:21, 108:24, 109:16, 110:8, 112:24, 113:5, 114:22, 119:16, 119:23, 122:3, 122:4, 122:21, 131:2, 131:11, 136:16, 136:17, 137:3
**otherwise**
29:22, 81:10, 133:21
**out**
13:13, 15:8, 15:17, 20:24, 22:1, 33:5, 43:25, 44:1, 57:13, 66:17, 66:20, 70:15, 75:19, 81:21, 87:21, 120:5, 123:25, 133:7
**outcome**
138:21
**outside**
20:24, 33:19, 74:19, 78:21, 91:17, 135:25
**over**
9:13, 30:18, 35:3, 45:3, 50:9, 50:12, 77:23, 84:20, 90:2, 92:5, 109:11, 113:3, 123:23
**overall**
68:19
**overbroad**
43:8, 44:23, 53:3, 68:23, 75:9, 78:2, 80:1, 89:21, 90:4, 91:24, 104:24, 117:17
**overly**
89:1
**oversight**
75:1
**own**
20:5, 20:7, 22:14, 27:7, 27:9, 30:12, 33:24, 77:17, 102:11
**owned**
24:9, 24:13, 25:4, 67:25, 70:8, 71:1
**ownership**
25:3, 29:21, 52:4, 52:7, 52:13, 61:25, 115:23, 116:6
**owns**
29:19, 29:25, 30:5, 30:16
**oy**
30:14

**P**

**pacific**
2:5
**page**
6:2, 7:2, 16:12, 38:3, 38:4, 38:6, 38:7, 39:5, 39:19, 39:20, 47:7, 48:5, 48:8, 54:12, 55:9, 59:8, 62:8, 67:11, 82:11, 82:13, 86:8, 87:14, 87:21, 91:6, 110:22, 110:24, 111:12, 112:13, 114:13, 114:14, 115:11, 117:12, 118:9, 118:11, 118:20, 118:22, 119:11, 120:8, 120:10, 121:9, 121:10
**pages**
1:35, 6:7, 6:15, 6:19, 6:24, 6:30, 6:32, 6:38, 6:41, 7:8, 7:15, 7:24, 7:29, 7:33, 91:3, 122:13
**paid**
112:25
**paragraph**
62:7, 62:8, 62:9, 88:2, 91:8, 96:14, 96:16, 97:22, 97:24, 98:18, 99:12, 99:13, 100:13, 101:3, 101:13, 101:14, 101:18, 101:19, 102:4, 102:8, 103:8, 103:21, 104:22, 104:23, 105:3, 105:17, 105:19, 106:6, 106:7, 106:24, 107:2, 107:11, 107:12, 107:19, 117:12, 117:16, 118:9, 118:13, 118:15, 120:8, 120:9
**paralegal**
75:1, 75:5,

76:20
**parse**
57:13
**part**
27:10, 30:12, 50:4, 52:10, 52:11, 68:18, 68:22, 87:19, 101:15
**partial**
6:37, 90:15
**particular**
10:20, 24:6
**parties**
27:22, 27:24, 74:21, 138:19
**partner**
68:3, 68:4, 71:9
**partners**
12:11, 12:18, 62:10, 67:18, 72:4, 72:8, 72:18, 73:3, 73:17, 73:22, 74:1, 85:22, 87:25, 88:4, 104:6
**party**
126:11
**paseo**
38:2, 38:3
**pass**
93:12
**passage**
9:22
**passed**
93:10
**passing**
34:20, 45:7, 93:15
**past**
50:23
**patient**
80:13
**pay**
68:24
**payments**
84:2
**pending**
100:25, 122:11
**penultimate**
54:11, 62:8
**people**
13:18, 31:21, 53:22, 127:13
**percent**
30:17, 30:18, 43:19
**perhaps**
46:5, 64:10
**period**
12:3, 72:17, 73:24
**person**
44:2
**personal**
31:13, 31:18, 36:19, 39:10, 44:22, 47:24, 88:14, 128:21, 128:22
**personally**
84:17
**phone**
75:21, 78:16, 78:21
**photo**
67:8
**pick**
79:5, 87:12, 104:15, 104:18
**picking**
79:7
**place**
8:7, 17:15, 22:6, 138:11
**plaintiffs**
6:36, 90:15, 91:9, 91:10, 91:16
**planet**
8:10
**planning**
11:5, 11:7, 11:13, 11:19, 12:24, 81:16
**please**
8:13, 8:24, 10:25, 19:6, 24:11, 35:7, 45:19, 52:25, 64:4, 67:16, 71:18, 75:21, 76:14, 76:15, 78:4, 78:7, 79:16, 80:13, 80:14, 82:11, 88:4, 95:10, 99:19, 109:21, 113:17, 113:22, 121:7, 126:6, 127:11, 129:3, 137:15, 137:16
**plus**
9:20, 47:25
**point**
77:10, 79:13, 81:10, 118:20, 118:23, 119:4, 119:12, 119:13, 120:10, 120:23, 123:18
**pointing**
80:23
**points**
120:13, 121:9, 121:13
**policy**
82:2, 101:16
**polite**
80:15
**portfolios**
67:20
**position**
22:4, 23:19, 24:4, 48:17, 48:19, 61:9, 119:5, 123:20, 127:21
**positions**
118:21, 137:6, 137:9
**possible**
54:24, 55:1, 127:15, 127:17
**post-death**
74:14
**post-trust**
13:5, 13:6
**potential**
55:24, 74:21, 76:23
**potentially**
31:23, 43:9
**power**
43:13
**practice**
11:23, 68:20, 125:12, 136:22
**practiced**
67:18
**practicing**
48:21
**pre-death**
74:14
**prefatory**
56:10
**premised**
120:13
**preparation**
23:6
**prepare**
23:13, 74:24
**prepares**
23:3, 23:8
**preposterous**
75:16
**present**
4:19
**presents**
112:23, 113:1
**pretty**
31:5
**prevails**
118:10
**primarily**
91:15
**printed**
65:21, 66:9
**printout**
6:25, 86:6, 125:23

**prior**
12:5, 68:7, 93:7, 107:20
**privacy**
20:12, 21:25, 25:12, 25:25, 43:9, 55:24, 69:23, 70:17, 125:4
**privilege**
10:22, 21:7, 41:10, 53:8, 53:13, 55:22, 57:5, 57:18, 57:19, 57:21, 69:15, 69:23, 70:11, 70:15, 70:16, 71:6, 72:7, 86:1, 89:22, 131:16, 131:23, 133:8, 133:20
**privileged**
16:20, 131:25
**privileges**
58:6
**probably**
28:23, 28:24, 55:19, 58:24, 66:5, 72:15
**probate**
11:5, 11:7, 11:13, 11:19, 13:1, 74:9, 81:17
**problem**
21:22, 111:11, 120:11
**procedure**
72:11, 72:14, 74:1, 74:5, 74:12
**procedures**
75:15
**proceeding**
6:6, 6:14, 14:2, 16:3, 119:6, 120:15, 120:17, 120:24, 120:25, 121:16
**proceedings**
121:18
**processes**
103:6
**produce**
124:1
**produced**
66:5
**product**
131:17
**production**
16:14, 82:14
**profession**
11:2, 11:9
**professions**
70:17
**project**
35:19, 37:21
**projects**
38:10
**prominent**
67:18
**promise**
95:24
**proper**
123:23, 123:24
**properties**
67:22
**proportioned**
20:25
**proposed**
88:7
**proprietor**
70:2
**prosecuting**
131:14, 131:21
**prospective**
74:4
**protect**
122:20
**protective**
22:6, 97:14, 109:5, 125:3, 136:19
**provide**
16:17, 37:15, 82:23, 111:8
**provided**
56:1, 91:9
**provision**
18:15
**purports**
62:17
**put**
78:21, 125:10
**putting**
70:15

**Q**

**qualified**
63:13
**question**
10:11, 10:12, 10:14, 10:20, 17:2, 17:6, 17:7, 17:8, 20:4, 20:23, 21:24, 22:10, 23:20, 24:11, 24:12, 28:5, 32:19, 33:4, 38:15, 41:2, 41:9, 41:12, 43:10, 49:9, 53:11, 53:14, 55:2, 56:3, 56:6, 58:10, 59:25, 60:3, 62:6, 63:1, 64:9, 71:6, 71:18, 71:19, 71:24, 76:13, 76:17, 77:9, 77:14, 78:3, 79:17, 83:11, 84:16, 84:22, 89:4, 91:24, 93:25, 96:9, 97:19, 97:22, 98:17, 99:20, 100:4, 100:15, 100:18, 100:25, 101:13, 101:18, 101:25, 102:14, 105:14, 106:6, 106:17, 107:11, 114:10, 119:4, 124:9, 124:13, 124:18, 128:20, 128:23, 128:25, 129:2, 129:4, 129:7, 133:19, 133:24, 134:9, 136:4
**questioning**
95:15
**questions**
46:22, 63:5, 76:5, 81:3, 81:9, 90:3, 95:24, 96:2, 102:16, 108:20, 109:16, 113:9, 116:22, 120:21, 121:21, 124:7, 126:10, 130:9, 130:20, 136:17, 137:2, 137:7
**quick**
21:9, 21:16, 75:23, 126:6, 134:25
**quickly**
9:14
**quote**
24:22, 91:15, 91:25

**R**

**r**
127:13
**r-e-i-m-a-n-n**
19:18
**raise**
8:23, 43:25
**raised**
125:4
**raising**
120:12
**ran**
12:12, 81:5, 81:6

**ranch**
38:8
**range**
31:5, 128:16, 129:5, 129:13
**rate**
106:13, 107:17
**re-ask**
133:24
**reach**
43:24
**read**
27:13, 46:11, 46:12, 67:16, 71:18, 76:14, 96:3, 96:8, 99:9, 108:10, 111:20, 121:8, 129:2, 135:9, 138:16
**reading**
47:2, 101:9, 130:6
**reads**
67:17, 101:14
**real**
11:16, 21:8, 21:16, 38:20, 67:19, 69:3, 69:12, 69:18, 69:20, 70:6, 70:25, 74:5, 85:15, 85:22, 91:12, 112:11
**realestateinvest-orlaw**
6:28, 65:23
**realized**
15:16
**really**
29:16, 37:6, 49:1, 49:15, 51:23, 63:7, 71:25, 76:4, 80:25, 92:9, 100:8, 103:2
**reason**
10:4, 16:22, 54:18, 66:11, 66:16, 67:4, 96:15, 96:23, 97:23, 99:13, 100:4, 100:7, 100:16, 131:11
**reasonable**
63:5, 101:15
**reasonably**
75:12, 80:3, 117:22
**recall**
16:11, 22:25, 32:15, 39:12, 41:25, 42:8, 44:8, 46:5, 50:5, 50:6, 50:7, 50:8, 56:13, 58:21, 58:22, 73:25, 106:5, 136:6, 136:12
**receipt**
113:1
**receive**
60:25, 61:2
**received**
14:17, 116:1, 134:3, 134:6, 134:10
**receiving**
14:24, 47:2
**recipients**
87:22
**recitals**
112:14, 112:22
**recitation**
87:18
**recognize**
15:4, 15:5, 54:22, 67:7
**recognizes**
35:21
**recollection**
9:23, 42:19, 51:2, 91:19
**record**
8:5, 10:25, 13:20, 13:21, 13:22, 13:23, 14:6, 15:24, 20:15, 20:16, 20:18, 20:19, 20:20, 20:21, 20:22, 21:3, 21:10, 21:12, 21:13, 21:14, 21:20, 22:12, 23:17, 35:10, 35:12, 35:23, 35:25, 40:13, 40:14, 40:15, 40:16, 42:11, 43:18, 45:16, 48:11, 49:19, 49:24, 49:25, 50:1, 59:16, 65:20, 75:19, 76:7, 76:10, 82:8, 82:16, 83:3, 86:3, 90:13, 95:3, 101:14, 107:1, 108:3, 108:5, 108:6, 108:7, 108:15, 109:13, 110:17, 116:24, 118:3, 124:25, 125:14, 125:16, 125:17, 125:18, 125:22, 126:10, 133:9, 133:15, 137:14, 137:23, 138:15
**recorded**
110:19, 111:8
**recorder's**
7:19, 110:20, 110:21
**records**
31:20, 31:22, 32:2, 32:12, 32:15, 32:20, 32:21, 33:1, 33:6, 33:8, 33:16
**refer**
27:11, 27:17, 127:13
**reference**
67:24, 70:6, 114:6, 127:8
**referenced**
69:21, 70:25, 88:9, 115:11
**references**
59:11, 107:18, 108:18, 118:16, 120:23, 120:24
**referencing**
27:18, 118:16
**referred**
114:8
**referring**
24:19, 25:1, 27:12, 33:7, 52:8, 79:24, 80:17, 94:19, 94:24, 132:16
**refers**
107:2, 113:6, 114:1
**reflect**
118:3
**reflects**
53:22
**refresh**
9:23, 51:2, 91:19
**regarding**
50:22, 77:11, 91:11, 122:14, 123:7, 136:8, 136:10
**regular**
19:23, 92:5
**regularly**
78:1, 78:10, 92:13
**reimann**
19:16, 42:6
**related**
46:22, 48:2, 62:11, 91:21,

121:21
**relates**
20:11, 102:8
**relating**
47:25, 58:1, 132:14
**relationship**
102:13
**release**
62:17, 63:11, 63:19, 63:25, 64:15, 64:20, 64:23
**releases**
62:9, 64:1, 64:11
**relevance**
25:12, 63:23, 75:15
**relevant**
80:3, 80:9, 81:7, 103:2
**remain**
137:8
**remanded**
109:8, 120:18, 121:2, 121:19
**remedies**
125:6
**remember**
9:20, 9:24, 14:12, 14:16, 26:1, 42:17, 47:2, 50:10, 51:6, 51:7, 51:8, 52:11, 55:19, 56:12, 57:25, 84:23, 85:1, 92:11, 93:6, 93:8, 93:9, 93:11, 93:20, 93:22, 94:1, 94:3, 94:4, 94:6, 94:11, 94:15, 94:22, 128:3
**remembered**
42:14
**remembers**
57:14
**remotely**
4:6, 4:13
**removed**
121:19
**rendering**
12:4, 12:5, 12:18
**rents**
7:17, 110:23
**reorganized**
1:9, 2:4
**repeat**
10:11, 17:7, 20:23, 21:4, 22:6, 22:10, 24:11
**rephrase**
127:10
**reported**
1:31, 138:12
**reporter**
2:7, 8:10, 9:3, 10:12, 13:16, 16:5, 35:2, 45:14, 65:25, 86:12, 90:22, 95:8, 99:7, 108:12, 110:15, 117:4, 126:4, 138:5
**reporter's**
23:21
**represent**
8:15, 9:10, 42:22, 51:11, 57:17, 65:7, 65:10, 65:13, 71:12
**representation**
50:24, 62:12, 88:13
**representations**
117:14
**representatives**
62:10
**represented**
42:18, 88:18, 89:8
**representing**
8:10, 8:19, 8:21, 42:3, 82:19, 102:18
**represents**
88:5, 104:7
**request**
82:13, 82:14, 82:16, 82:21, 82:24
**requests**
14:18, 14:21, 14:25, 15:2, 15:17, 16:13, 16:15, 16:18, 17:18
**required**
10:15, 10:21
**reread**
10:12
**res**
15:2
**reserve**
106:19, 124:7, 125:1, 125:5
**reserved**
125:7, 137:6
**reserves**
137:9
**reserving**
137:1
**residential**
38:23, 67:22
**respect**
21:23, 41:19, 41:21, 44:13, 57:7, 61:9, 102:14, 123:1, 123:21, 137:2, 137:6
**respond**
125:1, 125:5
**responded**
83:3
**response**
16:18, 129:25, 133:5
**responses**
6:9, 15:25, 16:13, 16:14, 16:15, 82:9
**responsive**
15:2, 17:9, 17:13, 82:20, 82:24
**restate**
10:24, 43:10
**restated**
18:4, 27:14
**results**
101:14
**retail**
67:21
**return**
22:25, 23:13
**returns**
22:21, 23:3, 23:6, 23:9, 27:9, 32:24, 33:10
**reuben**
3:4
**review**
14:18, 66:3, 95:11, 127:4
**reviewed**
14:20, 14:25
**reviewing**
32:11, 33:9, 33:11, 33:12
**revise**
75:6, 76:21
**revocable**
103:24
**rich**
88:3
**richard**
88:3
**ridiculous**
97:15, 97:17, 116:22
**right**
8:24, 10:2, 26:8, 26:10, 27:5, 39:17,

40:9, 46:11, 47:15, 47:16, 48:12, 50:5, 54:10, 54:19, 57:23, 59:18, 61:18, 62:18, 66:19, 69:2, 80:15, 83:5, 84:7, 84:8, 94:20, 94:21, 95:2, 98:11, 98:25, 100:21, 107:22, 108:3, 108:19, 112:16, 112:17, 112:19, 113:18, 121:11, 123:10, 123:16, 124:6, 124:13, 125:5, 127:6, 133:10, 133:15, 133:16, 133:23, 133:24, 134:5, 135:23, 135:24, 136:2, 136:15
**right-hand**
37:21
**rights**
70:17, 125:6, 137:2
**robert**
6:22, 47:16, 55:10, 88:5, 104:7, 104:9, 104:10, 105:10, 114:15
**role**
12:2, 19:8, 19:10, 87:19, 128:3
**ron**
35:14, 35:17, 64:4, 80:17, 109:15, 109:23, 116:16, 136:24
**ron@ronaldrichar-ds**
4:9
**ronald**
4:4, 4:5, 7:26, 8:21
**room**
15:10, 79:6, 102:12, 133:12, 133:14
**rough**
137:17, 137:18
**roundabout**
120:19
**roye**
3:5, 8:14, 9:10, 20:11, 35:8, 49:21, 57:3, 63:5, 68:17, 75:14, 80:5, 97:13, 99:16, 99:22, 137:20
**rpr**
1:33, 2:6
**ruined**
121:16
**rules**
77:11
**run**
73:2
**running**
71:15, 71:21
**rzur@elkinskalt**
3:9

**S**

**s&w**
1:7, 3:3, 8:6, 8:15, 9:10, 28:13, 44:9, 44:14, 95:5
**said**
18:24, 24:22, 27:4, 39:2, 50:4, 52:13, 56:2, 60:13, 64:1, 66:9, 96:4, 104:12, 109:23, 111:23, 114:9, 125:2, 130:3, 134:11, 134:18, 138:10, 138:12, 138:15, 138:16, 138:21
**sake**
23:21
**sam**
69:17, 69:25
**same**
9:25, 15:14, 19:21, 19:22, 59:20, 59:21, 60:3, 61:12, 61:16, 72:14, 78:11, 97:22, 98:17, 103:23, 104:3, 104:9, 106:6, 107:11, 118:9, 118:14, 118:24, 119:1, 119:4, 119:8, 119:14, 119:23, 137:20, 138:17
**saw**
32:3, 92:11, 97:6, 131:9
**say**
23:15, 24:18, 25:1, 38:13, 46:13, 47:13, 47:15, 49:5, 52:8, 68:13, 73:24, 74:4, 79:24, 92:14, 93:4, 103:15, 107:1, 109:9, 110:5, 112:7, 112:8, 122:23, 132:4, 132:15, 137:5
**saying**
62:3, 75:19, 96:6, 101:10, 108:4, 114:8
**says**
39:22, 39:23, 39:24, 46:5, 46:10, 47:7, 47:14, 47:16, 48:6, 48:9, 50:18, 53:23, 53:24, 55:10, 62:9, 64:18, 65:21, 68:6, 87:14, 87:17, 88:2, 88:4, 89:14, 91:7, 91:8, 102:3, 103:9, 104:6, 111:12, 112:13, 112:22, 113:5, 114:15, 115:13, 121:3, 124:2, 127:3
**school**
11:10, 11:12
**scope**
20:25, 57:8, 74:19
**scratch**
19:1, 78:7, 85:20
**search**
17:12, 17:15, 101:15, 103:6
**seasons**
29:15, 33:22, 33:23, 34:1, 34:2, 34:12, 34:13, 34:14, 34:16, 34:21, 38:7, 39:15, 50:25, 62:13, 67:23, 67:25, 68:12, 68:14, 69:1, 69:6
**second**
41:1, 48:5, 48:8, 59:7, 62:8, 67:15, 67:17, 68:6, 69:21, 86:2, 98:2, 103:4, 110:22, 117:12, 119:21
**seconds**
133:8
**secrets**
69:24

**section**
7:15, 108:18
**see**
14:10, 18:13, 21:8, 32:7, 35:20, 38:5, 57:24, 59:11, 59:16, 62:8, 62:15, 67:15, 68:10, 72:16, 75:4, 75:6, 76:20, 76:22, 114:14
**seeing**
33:12, 50:5, 50:6
**seek**
77:5, 77:17, 133:5
**seeking**
77:10
**seen**
14:4, 16:10, 29:4, 29:7, 32:4, 32:14, 32:19, 33:5, 36:16, 36:21, 37:6, 37:11, 46:4, 83:15, 88:12, 91:4, 95:18, 99:10, 99:15, 101:5, 102:24, 107:5, 111:18, 111:24, 113:9, 113:19, 114:9, 115:18, 115:21, 116:20, 117:6, 124:15, 126:14
**sell**
113:3
**semiregular**
92:6
**sending**
130:14
**sense**
15:1
**sent**
57:11, 83:15, 83:18, 83:24, 125:25, 126:19
**sentence**
50:15, 62:9, 62:15, 62:17, 63:11, 67:15, 67:17, 68:7, 69:21, 70:25, 121:8
**separate**
26:18, 26:22, 42:2, 60:4, 74:11
**sepulveda**
4:14
**served**
14:12, 15:14, 67:19, 68:11, 91:15
**set**
13:19, 113:3, 123:20, 124:21, 124:22, 129:16, 138:22
**setting**
12:25, 136:17
**settlement**
136:8
**several**
117:13
**shaking**
10:7
**shall**
21:10
**shed**
77:13
**sheet**
29:7
**shingly**
23:16, 23:17, 24:22, 87:16, 127:7, 129:17, 130:14, 134:15, 134:19, 134:23, 135:9
**shingly's**
126:20, 127:21, 134:13, 135:1, 135:22
**shlomi**
6:40, 95:4, 96:12, 105:11
**short**
40:4, 49:13, 135:17
**shorthand**
2:7, 8:10, 9:2, 13:16, 16:5, 35:2, 45:14, 65:25, 86:12, 90:22, 95:8, 99:7, 108:12, 110:15, 117:4, 126:4
**should**
70:18, 77:17, 110:7, 137:7, 137:8
**show**
78:19, 102:23
**showed**
131:10
**showing**
90:20, 97:15, 118:3, 120:20
**shut**
77:9, 81:10
**siblings**
18:16, 25:2, 26:3, 26:16, 92:22, 93:5, 94:5, 94:12
**sic**
8:22, 97:19
**side**
61:22, 76:11, 79:6, 94:8, 98:14, 104:19
**sign**
74:17, 74:21
**signatory**
54:25
**signature**
54:11, 54:14, 54:15, 54:16, 54:19, 54:22, 55:10, 77:3, 87:17, 114:14, 114:16, 131:9
**signature-bi6ds**
138:24
**signed**
48:14, 54:10, 127:5
**signing**
22:25, 54:22
**signs**
22:21
**similar**
10:23
**simultaneous**
78:23, 79:14, 99:17, 109:19, 113:15, 118:1, 121:5
**since**
11:9, 11:11, 18:11, 28:17, 33:23, 33:25, 45:7, 91:8, 110:7
**sir**
40:10
**sister**
18:8, 31:25, 34:6, 34:10, 34:21, 44:19, 115:2, 129:20, 129:22, 130:2, 131:4, 132:20, 134:2
**sit**
59:14, 96:3
**slightly**
105:18
**soft**
75:21
**sohaili**
4:20, 6:21, 7:4, 7:28, 15:10, 61:22, 75:17, 75:22, 76:11, 78:19, 78:22, 79:3,

79:8, 94:9, 94:12, 98:14, 99:1, 102:18, 104:19, 109:13, 109:15
**sohaili's**
120:21, 123:8
**sole**
70:2
**solve**
21:8
**some**
11:16, 16:21, 23:10, 27:6, 32:13, 38:22, 38:23, 42:16, 62:24, 63:5, 64:19, 93:5, 107:22
**somebody**
73:11, 89:17, 129:17
**someone**
13:1, 13:7, 42:7, 78:19, 81:13, 88:3, 95:15
**someone's**
78:16
**something**
10:22, 35:16, 84:4, 96:4, 96:8, 115:13, 128:15, 129:4, 130:7
**sometime**
14:24, 15:14
**sometimes**
43:22, 44:3, 74:16, 92:16
**sorry**
20:19, 23:21, 25:19, 41:3, 43:1, 44:12, 64:5, 67:11, 78:6, 78:15, 93:25, 100:24, 102:3, 104:13, 104:16, 122:9, 128:2, 129:24, 134:16, 134:22
**sort**
22:1, 23:10
**sounds**
78:16
**speak**
17:17, 17:20, 17:23, 17:25, 19:20, 78:9, 92:8, 106:20, 132:23, 134:7
**speaker**
79:12
**speaks**
47:1, 47:3, 62:20, 63:15, 112:1, 130:8
**spec**
135:3
**specific**
40:19, 74:12, 75:3, 76:19, 87:9, 92:21, 96:1, 100:11, 101:18
**specifically**
25:14, 33:1, 56:12, 83:6, 125:2
**specifics**
11:22, 51:8, 55:20, 57:25
**speculate**
36:20, 115:3
**speculating**
51:23
**speculation**
39:10, 44:21, 47:20, 51:5, 51:16, 54:13, 54:20, 55:25, 58:13, 58:19, 71:22, 72:6, 77:7, 82:1, 88:25, 89:19, 90:10, 91:23, 98:2, 98:3, 98:24, 105:1, 105:20, 106:18, 111:23, 113:7, 117:18, 126:11, 129:18
**speculative**
135:4
**spell**
19:6, 23:21
**spelling**
42:10, 42:12, 45:23
**split**
84:21
**spoke**
134:2
**spoken**
92:9, 132:20, 134:6
**stamp**
35:16, 90:19, 95:6, 99:5, 115:11
**stands**
22:2
**started**
68:16, 85:22
**starting**
79:21
**starts**
118:20, 119:5
**state**
70:14, 84:12, 109:6, 109:7, 120:18, 121:18, 121:22, 121:24, 122:11, 122:15, 123:2, 123:7, 137:15, 138:2
**stated**
114:18, 117:16, 130:22, 134:5, 138:11
**statement**
29:4, 68:18, 68:19, 68:24, 69:1, 77:17, 103:8, 120:14, 121:14, 122:4
**statements**
32:24, 33:9, 106:20, 133:4
**states**
1:1, 82:16, 90:17, 112:24
**statute**
119:6
**stay**
108:25
**stayed**
48:23
**stenographer**
8:4, 8:23, 13:21, 13:23, 20:18, 20:20, 20:22, 21:10, 21:12, 21:14, 23:24, 24:12, 38:16, 40:8, 40:10, 40:14, 40:16, 45:12, 49:18, 49:24, 50:1, 52:25, 65:4, 65:17, 71:19, 75:25, 76:7, 76:15, 76:17, 78:24, 78:25, 79:15, 79:16, 80:19, 85:7, 88:24, 99:18, 99:19, 104:16, 107:25, 108:5, 108:7, 108:9, 109:20, 109:21, 112:3, 113:16, 113:17, 114:5, 118:2, 121:6, 121:7, 124:4, 125:14, 125:16, 125:18, 125:20, 129:1, 129:4, 129:24, 133:17, 137:14, 137:23
**stenographically**
1:31

**step**
131:23, 132:9, 133:7
**stepping**
131:16
**steps**
24:21
**still**
10:21, 31:2, 73:2, 73:8, 73:16, 73:19, 76:7, 94:23, 121:13, 122:10, 122:17, 133:15
**stop**
57:23, 73:21, 78:18, 79:1, 79:2, 79:4, 131:15
**straightforward**
52:14
**strauss**
45:18, 46:18
**strike**
78:7, 116:14
**structure**
29:20, 52:14, 62:4
**structures**
25:17
**stuff**
131:17
**subject**
7:30, 86:7, 110:9, 110:24
**subpoena**
6:4, 6:12, 14:1, 16:1, 28:8, 83:4, 115:17, 132:24, 133:5, 134:3, 134:6, 134:10
**subscribe**
138:17
**substantially**
14:8
**successor**
18:18
**suggestion**
122:1
**suite**
3:16
**sum**
112:23
**summarized**
120:16, 123:8
**summary**
6:38, 7:5, 90:16, 95:16, 97:16, 99:2, 102:23, 122:17
**summons-rc**
86:8
**supervision**
138:14
**support**
6:35, 7:4, 90:14, 99:2
**supposed**
39:18, 42:1, 43:1
**sure**
13:6, 20:4, 21:7, 22:24, 23:2, 23:4, 25:9, 25:20, 30:25, 31:5, 33:7, 36:8, 38:1, 39:11, 40:7, 46:8, 48:19, 48:24, 55:13, 60:21, 72:15, 78:12, 119:22, 125:8, 125:13, 131:16, 133:22, 137:12
**surprise**
88:17, 89:3, 89:7
**surprised**
66:23
**suspend**
63:4, 97:19, 108:21, 109:1, 109:10
**suspending**
97:14
**sworn**
9:2, 9:24

**T**

**t-i-r-a-t-u-r-y--a-n**
8:17
**ta**
132:15
**take**
16:7, 21:6, 21:10, 22:9, 24:21, 35:6, 36:5, 36:11, 37:20, 40:4, 45:19, 49:12, 59:10, 66:2, 71:23, 73:14, 75:5, 75:23, 75:25, 76:21, 90:24, 91:6, 95:10, 96:14, 99:12, 108:14, 108:23, 109:3, 109:5, 121:24, 126:6, 137:20
**taken**
2:3, 118:21, 119:5, 138:11
**taking**
8:7, 36:18, 123:1
**talk**
19:3, 21:8, 43:25, 44:1, 70:11, 78:23, 79:1, 79:14, 99:17, 109:19, 113:15, 118:1, 121:5, 132:25, 133:3, 134:9
**talked**
39:16
**talking**
33:9, 44:11, 91:7, 107:3, 120:25
**talks**
103:21, 121:4
**tax**
13:2, 13:8, 22:21, 22:25, 23:3, 23:6, 23:8, 23:10, 27:7, 27:9, 27:10, 32:24, 33:10
**taylor**
38:8
**tell**
9:24, 24:4, 36:18, 37:24, 46:2, 46:20, 48:6, 62:5, 66:8, 75:2, 76:18, 92:1, 102:16, 111:6, 111:16, 111:20, 131:20, 135:13, 138:9
**telling**
80:24, 107:8
**ten**
96:7
**term**
115:12
**terms**
15:11, 19:11, 32:9, 50:23
**testified**
9:3, 40:18, 102:9, 105:4, 105:5, 105:8, 105:19, 119:24
**testify**
6:4, 6:12, 10:4, 14:1, 16:2, 107:7
**testifying**
10:1
**testimony**
56:4, 61:14, 70:7, 84:10, 95:16, 95:17, 97:15, 114:21, 128:19, 133:3, 138:12, 138:15

**text**
44:6
**th**
138:23
**thank**
9:12, 13:17, 21:11, 21:21, 21:22, 27:20, 38:17, 38:18, 40:13, 65:5, 76:16, 77:18, 102:17, 108:2, 108:10, 111:13, 123:4, 124:17, 137:13
**thanks**
127:7
**thanksgiving**
92:12, 92:14, 92:17, 93:9, 93:14, 93:16, 93:20, 94:1, 94:4, 94:16, 94:24, 136:7
**thereafter**
138:13
**therein**
138:11
**thing**
80:16, 100:3, 123:22
**things**
13:13, 19:25, 37:16, 70:18, 128:4
**think**
14:5, 16:11, 30:17, 32:4, 42:1, 42:9, 46:10, 54:4, 55:6, 56:3, 58:8, 58:24, 62:3, 62:4, 63:6, 63:8, 63:12, 66:15, 66:20, 68:24, 77:10, 77:12, 83:17, 93:19, 110:1, 128:8, 128:24, 129:9, 131:7, 132:6, 135:1, 135:12, 136:15, 137:5, 137:8, 137:18
**thinks**
102:24, 103:3
**third**
27:22, 27:24, 38:4, 39:22, 67:11, 110:24
**thought**
105:9
**thousands**
71:25
**thread**
6:32, 7:30
**three**
108:17
**through**
6:18, 7:23, 35:13, 57:24, 59:15, 62:13, 73:25, 82:19, 86:9, 100:10, 103:4, 109:2, 110:18, 111:20, 130:13, 136:1
**throughout**
16:13, 72:14
**time**
2:6, 9:22, 12:3, 15:14, 19:21, 19:22, 29:12, 32:3, 35:21, 48:20, 52:25, 59:15, 60:11, 63:7, 66:23, 71:24, 72:17, 78:15, 79:16, 80:6, 87:25, 92:9, 93:23, 96:9, 99:19, 100:9, 102:19, 102:20, 109:21, 113:17, 121:7, 132:10, 137:1, 137:21, 137:24, 138:11
**times**
9:17
**tiraturyan**
4:21, 8:17, 10:19, 133:11, 133:13
**title**
35:15, 110:21, 110:24
**today**
10:4, 17:17, 61:6, 89:16, 115:21
**today's**
8:7, 122:3
**together**
25:3, 60:16, 92:13, 92:18, 92:19
**told**
134:14, 135:7, 135:10
**took**
21:17
**top**
90:18, 95:6, 99:5, 115:11, 121:9
**totally**
96:21, 102:19
**trained**
48:22
**transactional**
85:16
**transcribed**
138:13
**transfer**
113:3
**tree**
38:3
**trick**
102:10
**true**
89:12, 100:5, 100:8, 100:16, 101:11, 103:11, 107:9, 138:15
**trustee**
15:20, 18:2, 19:10, 25:22, 60:7, 60:9, 61:5, 88:5, 88:15, 104:7, 104:11
**trustees**
45:3, 57:6, 114:22, 133:4
**trusts**
11:13, 12:25, 25:18, 26:15, 26:18, 52:11, 60:15
**truth**
9:25, 138:9, 138:10
**try**
9:13, 15:17, 43:10, 49:21, 57:20, 102:23
**trying**
17:13, 66:15, 66:20, 102:10, 120:20
**turn**
75:21, 82:10
**two**
11:16, 67:19, 69:3, 69:12, 69:17, 69:20, 70:24, 72:4, 73:8, 73:12, 108:16, 118:11, 125:8
**type**
13:11, 35:19, 73:25, 75:20
**typed**
54:15
**typically**
12:23
**typing**
78:18

**U**

**ultimately**
51:19, 81:7

**unanimous**
43:23
**unanimously**
43:21
**under**
9:24, 48:6, 54:15, 67:11, 70:10, 70:17, 112:14, 112:22, 114:14, 121:13, 121:14, 130:17, 138:13
**underlying**
125:24
**understand**
10:10, 17:9, 20:4, 20:11, 21:25, 27:16, 31:2, 31:4, 41:11, 60:14, 60:17, 64:14, 80:5, 80:8, 96:19, 97:8, 97:10, 100:10, 106:9, 122:19, 123:18
**understanding**
41:9, 78:12, 101:16, 102:13, 103:10, 122:23, 122:25, 133:19
**understands**
113:19
**understood**
13:10, 17:1, 18:25, 19:12, 24:8, 45:7, 49:16, 59:3, 67:2, 112:13
**unidentified**
79:12
**united**
1:1, 90:17, 112:24
**unknown**
62:11
**unless**
10:21, 27:17, 131:25, 135:7
**until**
34:20, 79:5, 115:17, 125:10
**use**
26:25, 64:14, 67:21, 75:14, 110:8
**usually**
19:22
**usury**
107:18, 118:10

**V**

**vague**
20:10, 44:23, 53:3, 59:22, 64:3, 64:7, 68:23, 75:9, 78:2, 80:1, 89:21, 90:4, 91:24, 104:24, 117:17
**valid**
56:4
**valuable**
112:24, 113:5
**varied**
72:15, 77:23, 77:24
**various**
91:12, 91:18
**verbal**
129:24
**versus**
123:24
**vibrating**
78:16
**vicki**
42:9
**video**
8:19
**view**
122:20
**villa**
38:7
**vote**
43:25
**votes**
43:22
**voting**
43:13

**W**

**w-e-a-l-t-h-s-p--i-r-e**
19:7
**wait**
44:11, 52:19, 102:22
**waival**
71:5
**waiver**
7:32, 41:10, 53:13, 58:5, 71:6, 74:16, 74:17, 74:22, 75:4, 75:7, 76:20, 76:22, 84:21, 84:22, 84:25, 85:3, 122:25, 133:20
**waivers**
74:25, 76:6, 77:12, 82:17, 89:24
**waiving**
70:16
**want**
13:12, 21:7, 25:19, 68:23, 79:6, 80:25, 96:1, 96:8, 100:1, 100:10, 105:21, 108:22, 109:3, 109:11, 131:15, 135:11, 135:19
**wanted**
21:18, 127:3, 129:16
**wants**
110:5, 137:15
**waste**
35:21
**wasting**
63:7, 80:6, 100:8, 102:19, 102:20
**water**
107:23
**way**
1:7, 3:3, 7:31, 8:6, 8:15, 9:11, 9:12, 13:13, 22:11, 28:13, 30:2, 30:12, 30:15, 33:5, 44:14, 47:17, 48:1, 48:9, 48:15, 48:17, 48:25, 49:2, 50:19, 51:11, 51:14, 52:5, 57:8, 59:20, 60:6, 60:7, 60:19, 61:3, 61:9, 61:12, 62:1, 64:9, 65:13, 68:15, 69:16, 81:5, 81:6, 91:10, 91:11, 91:20, 95:5, 100:5, 100:19, 101:3, 103:10, 111:9, 122:6, 131:25, 138:20
**we'll**
9:13, 9:22, 13:11, 22:9, 58:4, 86:17, 86:20, 96:5, 96:9, 97:20, 109:25, 110:11, 123:20, 133:8, 133:10, 136:20, 137:10, 137:20
**we're**
21:14, 40:3, 59:14, 64:17, 71:22, 71:23, 76:7, 77:9, 80:5, 80:10, 80:12, 86:4,

96:7, 104:18, 108:22, 109:9, 109:12, 109:22, 110:7, 116:23, 120:19, 120:22, 120:25, 124:6, 131:16, 132:6, 133:7, 133:9, 133:15, 134:11, 137:17
**we've**
40:25, 42:2, 107:3, 110:10, 130:24
**wealthspire**
19:5
**webpage**
6:25, 65:22, 66:21, 66:22, 66:24, 67:5
**website**
6:27
**weintraub**
3:4
**welcome**
111:14
**welfare**
7:14
**went**
21:16
**weren't**
44:17
**west**
2:4, 3:7, 8:8, 38:5
**western**
90:18
**whatever**
19:13, 79:4, 87:11, 137:15
**whatsoever**
23:8, 103:5, 106:25, 133:21
**whereof**
113:2, 138:22
**whether**
15:1, 15:18, 17:1, 17:3, 56:4, 60:3, 61:8, 74:14, 78:1, 78:8, 98:10, 100:2, 103:11, 109:16, 116:5, 132:4, 137:6, 137:7
**whoever**
24:24
**whole**
60:14, 96:3, 99:9, 106:17, 138:9
**willing**
122:23
**willow**
38:3
**wilshire**
3:15
**within**
114:8, 128:15, 129:5, 129:13
**within-entitled**
138:10
**without**
79:23, 81:22, 81:24, 82:2, 91:13
**word**
64:14, 64:20, 101:9
**words**
10:9, 48:6
**work**
11:18, 13:11, 50:23, 51:19, 68:15, 72:3, 73:8, 73:16, 73:19, 131:17
**worked**
54:4, 69:14, 69:16, 69:17
**working**
11:6, 73:21, 79:25, 91:17
**world**
55:2
**worth**
30:20
**wouldn't**
35:8, 53:17, 97:5
**wow**
38:5
**write**
49:4, 49:10
**writing**
105:11
**wrote**
49:6, 118:4
**www**
6:28, 65:23

**Y**

**yeah**
20:16, 33:15, 35:17, 36:2, 36:3, 37:5, 37:10, 40:9, 40:12, 40:21, 46:12, 49:10, 49:14, 51:18, 52:19, 52:20, 52:24, 53:15, 63:6, 66:25, 67:3, 68:13, 70:5, 70:20, 73:1, 75:11, 75:24, 76:3, 76:4, 77:6, 77:8, 77:23, 89:11, 93:19, 95:13, 97:4, 100:12, 100:14, 102:5, 103:19, 103:22, 105:15, 108:4, 111:5, 122:16, 122:19, 124:12, 124:20, 125:11, 128:12, 131:15, 133:10, 134:12, 135:10, 135:13
**year**
14:15, 28:9, 28:10, 28:11, 35:18, 92:17, 93:7
**years**
9:21, 11:8, 11:17, 12:3, 68:5, 69:17, 72:13, 77:23, 77:24, 84:20, 90:2, 92:5, 92:10
**yes-or-no**
25:5
**yesterday**
65:22, 66:10, 66:24, 67:5, 108:24
**yourself**
16:7, 35:6, 45:19, 108:14, 111:3
**yourselves**
8:13

**Z**

**zoom**
8:19, 8:21, 13:18, 17:25, 35:9

**$**

**$1**
30:24
**$10**
112:23
**$85**
39:24

**.**

**.9**
5:4

**0**

**00**
7:21
**000176**
6:18, 35:13
**000180**
6:19
**01**
2:5, 8:2, 8:5

**0292**
7:23, 110:18
**0295**
112:13, 115:12
**0296**
114:13
**0298**
7:23, 110:18
**04**
40:16
**0607**
4:17
**09**
13:21

**1**

**1**
1:35, 7:11, 91:7
**10**
7:8, 7:10, 13:23, 31:10, 40:16, 49:24, 50:1, 95:6, 99:5, 108:9, 108:11, 110:3, 110:7, 110:10, 110:11, 123:21, 124:8, 124:9, 124:11, 137:3
**10345**
2:4, 3:7, 8:8
**10672**
1:10, 8:7
**108**
7:10
**10960**
3:15
**11**
7:16, 90:20, 108:5, 108:7, 110:6, 110:12, 110:14, 110:17
**110**
7:16
**11480**
4:7
**117**
7:25
**12**
6:38, 7:25, 116:24, 117:3, 124:4, 124:5, 124:7, 125:16, 125:18, 137:23, 137:24
**126**
7:30
**13**
6:3, 7:29, 7:30, 18:4, 27:14, 104:22, 104:23, 105:3, 116:25, 120:2, 120:3, 120:6, 125:19, 125:22, 125:23, 126:3
**138**
1:35
**14**
6:7, 50:19
**14301**
1:33, 2:7, 8:11, 138:26
**15**
6:30, 67:11, 92:5
**15610.30**
7:15
**16**
6:8, 49:24, 65:22, 105:17, 105:19
**1601**
4:14
**17**
6:23, 45:17, 46:17, 106:6, 106:7, 125:16
**18**
86:9, 87:15, 106:24, 107:2
**180**
4:3, 7:7, 7:22, 7:23, 8:20, 8:22, 35:13, 99:3, 110:18, 115:14, 115:24
**19**
50:1, 107:11, 107:12, 107:19
**1985**
91:9
**1986**
18:4, 27:14

**2**

**2**
7:12, 7:33, 65:22
**2-1**
99:3
**20**
9:20, 20:20
**2005**
18:4, 27:15
**2010**
73:25, 82:19
**2012**
50:19
**2013**
125:25, 126:20
**2018**
6:23, 45:17, 46:17, 48:1
**2019**
86:9, 86:10, 87:15, 104:6
**2020**
18:13
**2022**
93:15, 94:5, 94:19, 94:24, 136:7
**2023**
7:21, 18:14, 72:21, 73:23, 73:25, 93:7, 93:12, 110:25
**20230286457**
111:12
**2024**
7:29, 14:3, 82:19, 92:18, 116:25, 120:2, 120:6, 126:2
**2025**
1:24, 2:6, 8:2, 8:5, 95:6, 99:5, 138:23
**21**
7:6, 7:15, 14:3, 20:22
**2100**
3:16
**22**
21:12, 126:20
**23**
1:10, 8:7
**25**
43:19, 82:13
**26**
82:11, 90:20, 110:25
**27**
125:18
**28**
1:24, 2:6, 8:2, 8:5, 21:15, 126:20, 138:23
**2nd**
18:13

**3**

**3**
7:13
**30**
9:21, 11:8, 12:3, 68:5, 72:13
**31**
18:4, 27:15, 82:14
**33**
108:5
**35**
6:17
**3rd**
18:13

**4**

**4**
6:24

**40**
137:23, 137:24
**45**
6:21
**49**
6:15

**5**

**5**
6:19, 6:32, 6:41
**50**
30:18
**51**
30:17
**54**
40:14
**55**
108:7
**571602**
1:34

**6**

**6**
7:29
**60**
133:8
**65**
6:25

**7**

**7**
7:24
**729**
4:15

**8**

**8**
7:21
**86**
6:32

**9**

**9**
2:5, 8:2, 8:5, 13:21, 13:23, 20:20, 20:22, 21:12, 21:15, 40:14, 126:20
**90**
6:34
**90024**
3:17
**90064**
3:8
**90213**
4:8
**90266**
4:16
**95**
6:40
**99**
7:3
**9:-bk--rc**
1:10, 8:7

# EXHIBIT “L”

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Central District of California

In re S&W Blue Jay Way, LLC
Debtor

(Complete if issued in an adversary proceeding)

Case No. 9:23-bk-10672-RC

Chapter 11

Plaintiff
v.

Defendant

Adv. Proc. No. ______________

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: AKIN GUMP STRAUSS HAUER & FELD LLP
*(Name of person to whom the subpoena is directed)*

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit 1. Electronic production only.

| PLACE | DATE AND TIME |
|---|---|
| Greenspoon Marder LLP<br>1875 Century Park East, Suite 1900, Los Angeles, California 90067<br>Attn: Daniel A. Lev, daniel.lev@gmlaw.com and ron@ronaldrichards.com | July 15, 2024<br>10:00 a.m. |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: June xx, 2024

CLERK OF COURT

OR

______________________ /s Ronald Richards
*Signature of Clerk or Deputy Clerk* *Attorney's signature*
Ronald Richards

The name, address, email address, and telephone number of the attorney representing *(name of party)* Blue Jay 180, LLC, who issues or requests this subpoena, are: Daniel A. Lev, 1875 Century Park East, Suite 1900, Los Angeles, California 90067; daniel.lev@gmlaw.com; 213.617.5231; Ronald Richards, P.O. Box 11480, Beverly Hills, California 90213; ron@ronaldrichards.com; 310.556.1001

DAL 57926334v1

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any):* ______________________________
on *(date)* __________.

☒ I served the subpoena by delivering a copy to the named person as follows: ______________________________
______________________________________________________________________
______________________________ on *(date)* __________________; or

☐ I returned the subpoena unexecuted because: ______________________________
______________________________________________________________________

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ ____________________.

My fees are $ __________for travel and $ ________for services, for a total of $__________.

I declare under penalty of perjury that this information is true and correct.

Date: ________________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2)For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B)Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

...

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

| |
|---|
| For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013) |

# EXHIBIT 1

## DOCUMENTS REQUESTED

### Definitions

A. "Documents" means any medium, including accounts, agreements, writings, drawings, graphs, charts, photographs, audio and video recordings, computerized records, such as e-mails, which are in Your or Your representatives' possession, custody or control, or to which You have or had access, or of which You have knowledge or which You have a right or privilege to examine upon request or demand.

B. "Communications" means any transmission of information from one person or entity to another by mail, facsimile, electronic mail, text message, instant messaging, or audio recordings, including any form of memorialization of personal meetings, conferences, telephone conversations, or electronic mail.

C. "Related To" means mentioning, summarizing, describing, referring to, connected with, evidencing, constituting, concerning, or involving an act, event, transaction, fact, thing, or course of dealing.

D. "Any" and "All" means "any and all".

E. "Cohen Loan" means that certain loan made in or about February 2013, by Robert Cohen as Trustee of the Cohen Family Trust Dated March 13, 1986 as Restated December 31, 2005 to the Debtor in the maximum principal amount of $2,500,000 for purposes of S&W Blue Jay, LLC, a California limited liability company's acquisition of the property located at 1627-1633 Blue Jay Way, Los Angeles, California 90069, evidenced by that certain "Promissory Note Secured By Deed of Trust" dated February 26, 2013.

F. "Cohen Trust" means the Cohen Family Trust Dated March 13, 1986 as Restated December 31, 2005.

G. "You" or "Yours" means Akin Gump Strauss Hauer & Feld LLP.

H. "Sohaili" means Hushmand Sohaili, a former partner and employee of Akin Gump Strauss Hauer & Feld LLP.

**Requested Documents**

1. All Documents sufficient to describe Your policies, if any, regarding transactions, including, but not limited to, real estate loans, between Your lawyers and Your clients.

2. All Documents sufficient to describe Sohaili's compliance or non-compliance, as the case may be, with Your polices, if any, regarding transactions, including, but, not limited to, real estate loans, between Your lawyers and Your clients.

3. All Documents sufficient to confirm the existence of attorney-client relationships between You, on the one hand, and the Cohen Trust and/or Robert Cohen, on the other hand.

4. All documents sufficient to identify whether Sohaili, or any attorney acting under his direction, researched California usury loan in connection with the Cohen Loan.

5. All documents sufficient to identify any of Your personnel who participated in the drafting of any conflict-waiver letter between You and the Cohen Trust and/or Robert Cohen.

6. All documents sufficient to identify any of Your personnel who were consulted regarding any conflict-waiver letter between You and the Cohen Trust and/or Robert Cohen.

7. All communications between Sohaili and the Cohen Trust, Robert Cohen, or anyone serving as counsel of record for the Cohen Trust or Robert Cohen, regarding the Cohen Loan.

8. All communications between Sohaili and Richard Weintraub regarding the Cohen Loan.

# EXHIBIT "M"

# AMENDMENT TO PROMISSORY NOTE SECURED BY DEED OF TRUST

This Amendment to Promissory Note Secured By Deed Of Trust (this "**Amendment**") is made as of May 1, 2017, by and between S&W Blue Jay Way, LLC ("**Borrower**") and Robert Cohen, as trustee of the Cohen Family Trust dated March 13, 1986 as restated December 31, 2005, as amended ("**Lender**").

WHEREAS, Lender made a loan to Borrower in the original principal amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the "**Loan**"), which Loan is evidenced by that certain Promissory Note Secured By Deed of Trust dated February 26, 2013, in the original principal amount of the Loan, executed by Borrower (the "**Note**"), and which Note is secured by that certain Deed of Trust with Assignment of Rents (Long Form) (the "**Blue Jay Junior Deed of Trust**") dated as of March 5, 2013, recorded on March 19, 2013, as Instrument No. 20130411255 in the official records of the Los Angeles County, California ("**Official Records**"), on real property commonly known as 1633 Blue Jay Way, Los Angeles, California (the "**Blue Jay Property**"), and more fully described in the Deed of Trust. All capitalized terms used herein without definition shall have the meanings ascribed to them in the Note.

WHEREAS, Borrower and Lender desire to extend the Maturity Date subject to the terms of this Amendment.

NOW, THEREFORE, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby, parties hereby agree as follows:

1. Incorporation of Recitals. Borrower and Lender each confirms the truth and accuracy of the recitals, each of which are made a part of this Amendment.

2. Agreement to Extend Maturity Date of the Loan. The Maturity Date shall be extended to and shall hereinafter mean: the earlier of (i) May 1, 2019 or (ii) upon the closing of the sale of the Blue Jay Property by Borrower.

3. Additional Security. In consideration of the extension of the Maturity Date and Lender's agreement to subordinate as provided herein, Borrower shall execute and cause to be recorded a deed of trust substantially in the form attached hereto as Exhibit "A" (the "**Malibu Junior Deed of Trust**") on that certain real property commonly known as 33386 and 33398 Pacific Coast Highway, Malibu, California. Lender acknowledges and agrees that the Malibu Junior Deed of Trust shall be junior and subordinate to that certain Long Form Deed of Trust and Assignment of Rents dated as of December 15, 2015, recorded on January 6, 2016 as Instrument No. 20160011910 in the Official Records securing a loan in the amount of $2,700,000.00.

4. Secured Liens on Blue Jay Property; Subordination. The second to last paragraph on page 2 of the Note, which begins with "Borrower agrees that the only secured lien…", is hereby deleted in its entirety and replaced with the following: "Notwithstanding anything to the contrary in the Note, Lender acknowledges and agrees that it will subordinate the lien of the Blue Jay Junior Deed of Trust to the lien securing that certain senior loan in the amount of

$3,725,000.00 (i.e., a $1,500,000.00 increase over the current balance of the existing first lien) obtained, or about to be obtained, from the lender described in the subordination agreement attached hereto as Exhibit "B" (the "**Subordination Agreement**"), which new senior loan is or shall be secured by a deed of trust on the Blue Jay Property (the "**Blue Jay Senior Deed of Trust**"). Lender agrees to execute, and permit Borrower to record, the Subordination Agreement pursuant to which the Blue Jay Junior Deed of Trust is subordinated to the Blue Jay Senior Deed of Trust as more fully set forth in the attached subordination agreement.

5. Miscellaneous. Except as modified hereby, the terms and conditions of the Note shall continue in full force and effect. This Amendment may be executed in multiple counterparts, each of which shall be an original and all of which together shall constitute one agreement. In order to expedite the execution of this Amendment, a facsimile or electronic mail signature shall be binding and have the same effect as an original signature.

[*End of text; Signatures appear on the following page*]

Exhibit A

Form of Malibu Junior Deed of Trust

[Attached]

Exhibit B

Form of Subordination Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the date set forth above.

Borrower:

S&W Blue Jay Way, LLC

HS Blue Jay Way

By: ~~RCHS~~, LLC, a California limited liability company

By: ____________________________

Hushmand Sohaili, Manager

By: 1966 BJW, LLC, a Delaware limited liability company

By: ____________________________

Richard Weintraub, Authorized Signatory

Lender:

____________________________

Robert Cohen, as trustee of the Cohen Family Trust dated March 13, 1986 as restated December 31, 2005, as amended

# EXHIBIT "N"

# Eleda Cohen

**Cell: (818) 388-3383 Fax: (310) 274-6663**
**Email: eledacohen@gmail.com**

**FAX:** Hush

To: Daniel Shlomi From: ______

Fax#: 310 229-1001 Pages: ______

Phone#: ______ Date: ______

Re: ______ cc: ______

URGENT FOR REVIEW PLEASE COMMENT PLEASE REPLY

COMMENTS:

**Akin Gump**
STRAUSS HAUER & FELD LLP

**HUSHMAND SOHAILI**
+1 310.229.1060/fax: +1 310.229.1001
hsohaili@akingump.com

February 5, 2014

A.C.C. Company, a California General Partnership
2029 Century Park East
Suite 2200
Los Angeles, CA 90067-3010

Re: 33400 Pacific Coast Highway - Conflict Waiver

Dear Ladies/Gentleman:

As you know, Akin Gump Strauss Hauer and Feld LLP (the "Firm") and I have had a long standing relationship with A.C.C. Company, a California General Partnership ("ACC") as ACC's legal counsel. Since the California Rules of Professional Conduct requires full disclosure and informed written consent in cases of a potential or actual conflict of interest, I have prepared this letter to meet our professional obligations in that regard.

By signing this conflict waiver, you hereby consent as the general partners of ACC to the following (the "Transaction"):

1. 180 PCH, LLC, a California limited liability company ("Borrower"), shall acquire certain real property located at 33400 Pacific Coast Highway, Malibu, California (the "Property").

2. Through subsidiary entities, Richard Weintraub ("RW") and I shall each at closing have a 50% membership interest in Borrower.

3. ACC shall lend to Borrower the principal sum of $2,000,000.00 (the "Loan"), which Loan shall be evidenced by a promissory note (the "Note") and shall be secured by a first priority lien on the Property. The Loan shall bear interest at the rate of 12.5%, and shall be paid as follows: (i) interest only on a monthly basis and (ii) all principal and unpaid interest will be due on February 28, 2016. The Note shall provide that Borrower will keep the Property free of any other monetary liens. The Loan shall be prepayable at any time. Any prepayment of the Loan made prior to the first anniversary of the Loan ("First Anniversary") shall be subject to a prepayment penalty equal to the remaining interest that would have accrued on the amount of the Loan being prepaid from the date of such prepayment through the date of the First Anniversary, discounted to present value as of the date of prepayment by the United States 3-month Treasury rate as of such date. No prepayment penalty shall be due for any prepayment made after the First Anniversary.

**Akin Gump**
STRAUSS HAUER & FELD LLP



4. RW and I shall each sign and provide limited guaranties in favor of ACC guarantying the obligations of Borrower under the Note (collectively, the "Guaranties"). The Guaranties shall terminate upon the earlier of the date that Borrower either (i) obtains the necessary permits to develop the Property or (ii) repays the outstanding principal balance of the Loan.

5. This is not a full recitation of all the aspects of the Transaction but is rather a summary of the key terms. The Transaction will be documented in the Note, Deed of Trust, and the Guaranties.

The Firm and I advise you that you may want to seek the advice of independent counsel of your choice in connection with the Transaction and this consent and waiver. Please execute the enclosed copy of this letter in the space provided for your respective signature indicating your acknowledgement of, consent to, and waiver of any potential or actual conflicts created by my involvement in the Transaction.

[Signatures on following page]

**Akin Gump**
STRAUSS HAUER & FELD LLP



Sincerely,

Hushmand Sohaili of
Akin Gump Strauss Hauer & Feld LLP

ACKNOWLEDGED AND AGREED:

**A.C.C. COMPANY, A GENERAL PARTNERSHIP**

By: **RC/BC FAMILY LLC**, a California limited liability company,
A general partner of the Partnership

By: ______________________
Eleda Cohen, its Administrative Manager

By: **JC/SC FAMILY LLC**, a California limited liability Company,
a general partner of the Partnership

By: ______________________
Ezra Cohen, its Manager

204406060 v2